No. 24-1963

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**OPEN ARTIFICIAL INTELLIGENCE, INC. and GUY RAVINE**

*Defendants and Appellants,*

*v.*

**OPENAI, INC.**

*Plaintiff and Appellee.*

Appeal from United States District Court
Northern District of California
Hon. Yvonne Gonzalez Rogers
U.S. District Court Case No. 4:23-cv-03918-YGR

**APPELLANTS' OPENING BRIEF**

**WAYMAKER LLP**
Ryan G. Baker
rbaker@waymakerlaw.com
Scott M. Malzahn
smalzahn@waymakerlaw.com
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800

*Attorneys for Defendants and Appellants Open Artificial Intelligence, Inc.
and Guy Ravine*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant/Appellant

Open Artificial Intelligence, Inc. by and through its undersigned counsel, hereby

files its corporate disclosure statement as follows:

Open Artificial Intelligence, Inc. certifies that it has no parent corporation,

and that no publicly held corporation owns ten (10) percent or more of its stock.


DATED: April 16, 2024             WAYMAKER LLP


By:   _____s/ *Ryan G. Baker*_____
      RYAN G. BAKER
      *Attorneys for Defendants and Appellants*
      *Open Artificial Intelligence, Inc.*
      *and Guy Ravine*

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT .......................................................4

STATEMENT OF ISSUES ...................................................................4

STATEMENT OF THE CASE ..............................................................6

I.  FACTUAL BACKGROUND...........................................................6

    A.  "Open AI" Originated with Guy Ravine and Ravine Parties...............6

    B.  OAI Launches Its Company Using the "Open AI" Mark Despite Knowing of Ravine's Use; Is Unable to Acquire Ravine's Trademark or to Register "Open AI" at the PTO.................................8

    C.  The Public Release of OAI's DALL·E 2 and ChatGPT Products Launched in September 2022 and November 2022 ...........................11

    D.  OAI's Expert Declaration Submitted on Reply .................................12

    E.  Ravine Parties' Rule 59/60 Evidence................................................13

II.  PROCEDURAL BACKGROUND .................................................16

    A.  Preliminary Injunction Briefing and Hearing ...................................16

    B.  The Preliminary Injunction Order.....................................................17

    C.  Ravine Parties Seek Relief Pursuant to Fed. R. Civ. P. 59(e) and 60(b) and Appeal ..........................................................................18

SUMMARY OF ARGUMENT ............................................................20

STANDARD OF REVIEW .................................................................22

ARGUMENT .....................................................................................23

I.  THE DISTRICT COURT ERRED IN FINDING LIKELIHOOD OF SUCCESS ................................................................................23

    A.  OAI Bears a Heavy Burden to Establish Secondary Meaning Because Its Mark Is Highly Descriptive .............................................23

    B.  OAI Bears the Burden of Proving that Its Mark Acquired Secondary Meaning Before Ravine Parties Indisputably Used Their Mark in Commerce on November 16, 2022...............................25

    C.  The Record Does Not Support a Finding "OpenAI" Likely Acquired Secondary Meaning by September 2022 or Otherwise.......28

i

1. There Is No Consumer Survey or Consumer Testimonials Showing that Consumers Associate the "OpenAI" Mark with the Company That Offers ChatGPT or DALL·E 2 .......... 30

2. The Release of ChatGPT and DALL·E 2 Does Not Prove "OpenAI" Acquired Secondary Meaning in September 2022 or At Any Other Relevant Time ...................................... 32

3. Media Coverage Does Not Support of Secondary Meaning ................................................................. 35

4. OAI's Advertising Does Not Establish Support Secondary Meaning, Let Alone for a Highly Descriptive Mark ................................................................. 37

5. The District Court Erred In its Discussion of The Trademark Prosecution History, Which Is Persuasive as to the Lack of Secondary Meaning ........................................... 38

6. The Record Does Not Support a Finding that OAI's Use of Its Highly Descriptive Mark Was Substantially Exclusive and Continuous ........................................... 40

D. The Order Should be Reversed Due to OAI's Delay in Seeking Relief that Disrupts the Status Quo ..................................... 43

1. The District Court Should have Conducted an Evidentiary Hearing to Address Disputed Facts Relevant to Laches, which Should Bar Injunctive Relief ...................... 43

2. The Injunction Alters the Status Quo and Requires a Stronger Showing than What OAI Made .................................. 45

E. Undisputed Facts Show OAI Had Priority Based on Analogous Trademark Use .................................................... 48

II. THE DISTRICT COURT ERRED FINDING IRREPARABLE HARM ......................................................................... 50

III. THE DISTRICT COURT ERRED IN DENYING RAVINE PARTIES' RULE 59/60 MOTION ................................................ 53

IV. THE PRELIMINARY INJUNCTION IS OVERBROAD ............................ 59

CONCLUSION ....................................................................... 61

ii

# TABLE OF AUTHORITIES

## Cases

*20th Century Wear, Inc. v. Sanmark-Stardust Inc.*,
  747 F.2d 81 (2d Cir. 1984)...................................................................33

*Abu-Lughod v. Calis*,
  No. CV 13-2792 DMG (RZX),
  2015 WL 12746198 (C.D. Cal. May 20, 2015)...................................57

*adidas America, Inc. v. Skechers, USA, Inc.*,
  890 F.3d 747 (9th Cir. 2018) ......................................................... 22, 51

*Allen v. Santa Clara County Correctional Peace Officers Association*,
  38 F.4th 68 (9th Cir. 2022) ............................................................ 45, 46

*Allstate Insurance Co. v. Herron*,
  634 F.3d 1101 (9th Cir. 2011) ....................................................... 23, 54

*American Passage Media Corp. v. Cass Communications, Inc.*,
  750 F.2d 1470 (9th Cir. 1985) ............................................................52

*Andrusiek v. Cosmic Crusaders LLC*,
  Cancellation No. 92064830,
  2022 WL 4103636 (T.T.A.B. Sept. 6, 2022).......................................49

*Anova Applied Electronics, Inc. v. Inkbird Tech. C.L.*,
  C23-0845JLR,
  2023 WL 5177491 (W.D. Wash., Aug. 11, 2023)...............................51

*Application of Thunderbird Products Corporation*,
  406 F.2d 1389 (C.C.P.A. 1969) ..........................................................39

*Arc of Cal. v. Douglas*,
  757 F.3d 975 (9th Cir. 2014) ........................................................ 22, 28

*Athleta, Inc. v. Pitbull Clothing Co., Inc.*,
  2013 WL 142877 (C.D. Cal. Jan. 7, 2013) ............................. 21, 46, 47

*Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.*,
   289 F.3d 589 (9th Cir. 2022) ..................................................41

*Bosley Medical Institute, Inc. v. Kremer*,
   403 F.3d 672 (9th Cir. 2005) ........................................... 59, 60

*Braun Inc. v. Dynamics Corp. of America*,
   975 F.2d 815 (Fed. Cir. 1992) ......................................... 27, 32

*Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*,
   824 F.2d 665 (8th Cir. 1987) ..................................................60

*Caribbean Marine Services, Co., Inc. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) ........................................... 21, 50

*CG Roxane LLC v. Fiji Water Co. LLC*,
   569 F. Supp. 2d 1019 (N.D. Cal. 2008) ..................................24

*Cicena Ltd. v. Columbia Telecommunications Group*,
   900 F.2d 1546 (Fed. Cir. 1990) .............................................33

*Cochran Firm, P.C. v. Cochran Firm Los Angeles, LLP*,
   572 Fed. App'x. 491 (9th Cir. 2014) ......................................60

*Cold Storage Construction v. Cold Systems, Inc.*,
   No. 2:19-cv-07617-SB-MAA,
   2021 WL 6536672 (C.D. Cal. Dec. 19, 2021) .......................57

*Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc.*,
   214 F.3d 432 (3d Cir. 2000) ..................................................26

*Converse, Inc. v. International Trade Commission Skechers U.S.A., Inc.*,
   909 F.3d 1110 (Fed. Cir. 2018) ........................... 20, 26, 40

*Co-Rect Products, Inc. v. Mavy! Advertising Photo., Inc.*,
   780 F.2d 1324 (8th Cir. 1985) ..............................................27

*Cosmic Crusaders, LLC v. Andrusiek*,
   No. 2023-1150,
   2023 WL 6889054 (Fed. Cir. Oct. 19, 2023) ................... 48, 49

iv

*CycleBar Franchising, LLC v. StarCycle Franchise, LLC*,
   No. CV 19-9911-DMG,
   2020 WL 3840442 (C.D. Cal. March 27, 2020) ........................................... 45, 46

*Duncan McIntosh Co. Inc.*,
   324 F. Supp. 2d 1078 (C.D. Cal. 2004) .............................................................30

*Entrepreneur Media, Inc. v. Smith*,
   279 F.3d 1135 (9th Cir. 2002) ...........................................................................24

*Erickson v. Nebraska Machinery Company*,
   No. 15-cv-1147-JD,
   2015 WL 4089849 (N.D. Cal. July 6, 2015)........................................................57

*Farmasino, Inc. v. Farmasino Pharmaceuticals (Jiangsu) Co., Ltd.*,
   No. 5:15-CV-01877-SVW-DTB,
   2016 WL 7655740 (C.D. Cal. June 20, 2016) ....................................................49

*Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*,
   198 F.3d 1143 (9th Cir. 1999) .............................................................. 24, 29, 32

*First Brands Corp. v. Fred Meyer, Inc.*,
   809 F.2d 1378 (9th Cir. 1987) ...........................................................................38

*G. Heileman Brewing Co., Inc. v. Anheuser-Busch Inc.*,
   676 F. Supp. 1436 (E.D. Wis. 1987)...................................................................32

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) ...................................................................... 21, 45

*Giggle, Inc. v. netFocal, Inc.*,
   856 F. Supp. 2d 625 (S.D.N.Y. 2012) ................................................................37

*Halo Management, LLC v. Interland, Inc.*,
   308 F. Supp. 2d 1019 (N.D. Cal. 2003)..............................................................50

*Herb Reed Enterprises LLC v. Florida Entertainment Management, Inc.*,
   736 F.3d 1239 (9th Cir. 2013) .................................................................... 50, 52

*Herbal Chef, LLC v. AFG Distribution, Inc.*,
   840 F. App'x 223 (9th Cir. 2021) ............................................................... 25, 41

*In re Bongrain International Corp.*,
    894 F.2d 1316 (Fed. Cir. 1990) ..............................................................24

*In re E.I. Kane, Inc.*,
    221 U.S.P.Q. 1203,
    1984 WL 63112 (T.T.A.B. 1984) ........................................................37

*In re Gilman*,
    887 F.3d 956 (9th Cir. 2018) ...............................................................54

*In re JC Hospitality LLC*,
    802 F. App'x. 579 (Fed. Cir. 2020) ....................................................30

*In re North Carolina Lottery*,
    866 F.3d 1363 (Fed. Cir. 2017) ..........................................................24

*In re Seaman & Associates, Inc.*,
    1 U.S.P.Q. 2d 1657,
    1986 WL 83329 (T.T.A.B. 1986) ................................................ 24, 38

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
    304 F.3d 829 (9th Cir. 2002) ...............................................................44

*Jeff D. v. Kempthorne*,
    365 F.3d 844 (9th Cir. 2004) ...............................................................23

*Kendall-Jackson Winery, Ltd. v. E.&J. Gallo Winery*,
    150 F.3d 1042 (9th Cir. 1998) .............................................................23

*Lahoti v. VeriCheck, Inc.*,
    586 F.3d 1190 (9th Cir. 2009) .............................................................25

*Lang v. Retirement Living Publishing Co., Inc.*,
    949 F.2d 576 (2d Cir. 1991)................................................................59

*Levi Strauss & Co. v. Blue Bell, Inc.*,
    632 F.2d 817 (9th Cir. 1980) ...............................................................24

*Levi Strauss & Co. v. Blue Bell, Inc.*,
    778 F.2d 1352 (9th Cir. 1985) .............................................. 27, 28, 30

*Lockheed Martin Corp. v. Network Solutions, Inc.*,
  985 F. Supp. 949 (C.D. Cal. 1997) ...................................................60

*Lopez v. Gap, Inc.*,
  883 F. Supp. 2d 400 (S.D.N.Y. 2012) ...........................................37

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
  571 F.3d 873 (9th Cir. 2009) ...........................................................46

*Oakland Trib., Inc. v. Chron. Pub. Co.*,
  762 F.2d 1374 (9th Cir. 1985) .........................................................44

*Otto Roth & Co. v. Universal Foods Corp.*,
  640 F.2d 1317 (C.C.P.A. 1981) .......................................................42

*Parks LLC v. Tyson Foods, Inc.*,
  863 F.3d 220 (3d Cir. 2017)................................................. 26, 28, 31

*Planetary Motion, Inc. v. Techsplosion, Inc.*,
  261 F.3d 1188 (11th Cir. 2001) .......................................................59

*Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*,
  149 F.3d 722 (7th Cir. 1998) ...........................................................30

*Premier Nutrition, Inc. v. Organic Food Bar, Inc.*,
  475 F. Supp. 2d 995 (C.D. Cal. 2007) .............................................33

*Prestonettes, Inc. v. Coty*,
  264 U.S. 359 (1924)..........................................................................59

*Price v. City of Stockton*,
  390 F.3d 1105 (9th Cir. 2004) .........................................................59

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ................................................. 22, 55

*Roman v. Wolf*,
  977 F.3d 935 (9th Cir. 2020) ...........................................................22

*Royal Crown Company, Inc. v. The Coca-Cola Company*,
  892 F.3d 1358 (Fed. Cir. 2018) ............................................... 31, 35

*RSI Corp. v. Int'l Bus. Machines Corp.*,
    2012 WL 3277136 (N.D. Cal. Aug. 9, 2012) ........................................44

*Sid Berk, Inc. v. Uniroyal, Inc.*,
    425 F. Supp. 22 (C.D. Cal. 1977) ................................................. 46, 47

*Solorio v. ABC Phones of North Carolina, Inc.*,
    No. 1:12-cv-01051 NONE JLT,
    2021 WL 363680 (E.D. Cal. Feb. 3, 2021)..........................................55

*Spark Industries, LLC v. Kretek International, Inc.*,
    No. CV 14-5726-GWASX,
    2014 WL 4365736 (C.D. Cal. Aug. 28, 2014) ....................................41

*Stanley v. University of Southern California*,
    13 F.3d 1313 (9th Cir. 1994) .............................................................22

*Thompson v. Runnels*,
    705 F.3d 1089 (9th Cir. 2013) ...........................................................45

*Trowbridge Sidoti LLP v. Taylor*,
    No. 8:16-CV-00771-ODW-SK,
    2017 WL 3720643 (C.D. Cal. Aug. 28, 2017) ....................................40

*U.S. Bank National Association v. Thunder Properties, Inc.*,
    3:17-CV-00106-MMD-WGC,
    2019 WL 2110512 (D. Nev. May 13, 2019)................................. 54, 55

*U-Haul International v. Jartran*,
    793 F.2d 1034 (9th Cir. 1986) ...........................................................60

*UV RML NL Assets, LLC v. Coulter Ventures, LLC*,
    No. 2:21-cv-04913-VAp-ASx,
    2021 WL 5706870 (C.D. Cal. Oct. 22, 2021).....................................47

*Waldman Publishing Corp. v. Landoll, Inc.*,
    43 F.3d 775 (2d Cir. 1994).................................................................59

*Warner Brothers Pictures v. Gittone*,
    110 F.2d 292 (3rd Cir. 1940) .............................................................48

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) ................................................................ 50, 53

*Yamaha Int'l Corp. v. Hoshino Gakki Co.*,
   840 F.2d 1572 (Fed. Cir. 1988) ...........................................24

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*,
   419 F.3d 925 (9th Cir. 2005) ...............................................29

*Zepeda v. United States I.N.S.*,
   753 F.2d 719 (9th Cir.1983) ................................................59

**Statutes**

15 U.S.C. § 1052 ................................................................ 24, 42

15 U.S.C. §§ 1121(a) and 1125 ...........................................4, 42

28 U.S.C. § 1292(a)(1) .........................................................4

28 U.S.C. §§ 1331, 1338, and 1367 ....................................4

**Rules**

Fed. R. Civ. P. 59(e) ...................................................... 5, 55, 56

Fed. R. Civ. P. 60(b) ................................................... 4, 5, 55, 56

Fed. R. App. P. 4(a)(4)(B) ..................................................4

**Treatises**

*McCarthy on Trademarks and Unfair Competition*, § 16:34 .......................... 27, 35

## INTRODUCTION

Defendants and Appellants Guy Ravine ("Ravine") and Open Artificial Intelligence, Inc. (together, with Ravine, the "Ravine Parties") appeal the district court's preliminary injunction of their use of the "Open AI" mark and the open.ai domain at the request of Plaintiff and Appellee OpenAI, Inc. ("OAI"). The Ravine Parties were enjoined from using a mark for which they hold a still-valid federal registration that predates the formation of OAI, and from using a domain which they indisputably registered before OAI existed and have used consistently for over nine years. OAI knew that Ravine was using the mark and the domain since at least the first day OAI was in business, and OAI immediately tried to purchase these assets from Ravine. When OAI was rebuffed, it used the mark anyway, unsuccessfully applying to register its "OpenAI" mark at least four times based on the PTO's determinations that "Ravine's [then] pending application may present a bar," the "OpenAI" mark is "merely descriptive," and it lacks "acquired distinctiveness." Having failed to register its "OpenAI" mark, OAI—in 2022—again asked to buy the mark and the domain from Ravine. Rebuffed a second time, OAI sued the Ravine Parties and almost immediately moved for a preliminary injunction, which, based on errors of fact and law, was granted. For several reasons, this Court should reverse.

First, the district court abused its discretion in finding that OAI acquired secondary meaning in its "OpenAI mark at any time—much less before Ravine

1

Parties first began to use the disputed mark. As the PTO has repeatedly determined, the "OpenAI" mark is "highly descriptive," and thus OAI bears a heavy burden in proving that consumers recognize and associate this mark with goods from a particular source. OAI—which had argued in its briefing below that its mark was inherently distinctive—did not create a record designed to support a finding of secondary meaning. Among other things, there were no consumer surveys, consumer testimonials, or evidence of specific advertising expenditures aimed at establishing secondary meaning in OAI's "OpenAI" mark. At most, news articles in the record show artificial intelligence is a matter of public interest and that ChatGPT (a separate mark) has received extensive coverage, particularly in 2023. Neither the facts nor the law support a finding that "OpenAI" acquired secondary meaning.

Moreover, OAI certainly has not shown a likelihood of success on its trademark infringement claim against the Ravine Parties—which requires it to demonstrate that "OpenAI" acquired secondary meaning before the Ravine Parties first began to use their "Open AI" mark. At the absolute latest, even setting aside abundant evidence of prior use dating back as far as March 2015, the Ravine Parties indisputably used their "Open AI" mark on November 16, 2022, in connection with their artificial intelligence-based text-to-image generator (the "Image Generator") on open.ai. At that time, ChatGPT had not yet been publicly released; indeed, the vast majority of news articles in the record published in 2023 and focus on ChatGPT

or the topic of artificial intelligence, not on the "OpenAI" mark. Likewise, OAI's release of a text-to-image generator called DALL·E 2, on September 28, 2022, has garnered less interest. The district court erred finding a likelihood of success on the merits of OAI's trademark infringement claim. This also requires reversal.

The district court also applied the incorrect legal standard—which requires that a court determine that "the law and facts clearly favor" the moving party before a mandatory injunction may issue. The Ravine Parties acquired the open.ai domain, registered their "Open AI" mark, and have used the mark over the past decade. Not only should OAI's delay preclude a preliminary injunction, but the Order disrupts the status quo and should be reversed for this reason, as well.

Moreover, the district court's refusal to reconsider its Order to prevent manifest injustice and to address the excusable neglect of Defendants' former counsel to object to defamatory and false evidence submitted on reply was erroneous. The district court made errors of fact in its discussion of the prosecution history before the PTO, and, even after correcting a "mistake of fact," failed to adjust its reasoning to conform to this evidence which it had relied upon.

Finally, the injunction improperly prohibits non-infringing uses of the open.ai domain and thus is overbroad. For all these reasons, this Court should reverse.

## JURISDICTIONAL STATEMENT

The district court's jurisdiction arises under 15 U.S.C. §§ 1121(a) and 1125, and 28 U.S.C. §§ 1331, 1338, and 1367. On February 28, 2024, the district court issued a preliminary injunction (the "Order"). The Ravine Parties timely noticed their appeal on March 29, 2024. 10-ER-2263.

On March 27, 2024, Ravine Parties filed a Motion to Alter or Amend the Preliminary Injunction Order Pursuant to Federal Rule of Civil Procedure 59(e), and, in the Alternative, for Relief from the Order Pursuant to Federal Rule of Civil Procedure 60(b) (the "Rule 59/60 Motion"). 2-ER-42. On April 5, 2024, the district court denied the Rule 59/60 Motion. 1-ER-2. On April 8, 2024, Ravine Parties timely amended their notice to appeal to appeal of the denial of the Rule 59/60 Motion. 10-ER-2265. This Court has jurisdiction over these orders pursuant to 28 U.S.C. § 1292(a)(1) and Federal Rule of Appellate Procedure 4(a)(4)(B).

## STATEMENT OF ISSUES

The district court issued a preliminary injunction enjoining Ravine Parties from using their "Open AI" trademark and denied Ravine Parties' Rule 59/60 Motion for relief. The issues in this appeal are:

1.      Did the district court abuse its discretion in finding that OAI acquired secondary meaning in its "OpenAI" mark in September 2022 or at any other time

before Ravine Parties indisputably released their AI-based Image Generator on November 16, 2022?

2.     Did the district court abuse its discretion in finding that OAI's use was sufficiently exclusive to support a finding of secondary meaning?

3.     Did the district court err by failing to apply the analogous use doctrine in considering whether Ravine Parties' undisputed registration of the open.ai domain and other activities established the Ravine Parties as senior users?

4.     Did the district court err by applying a presumption of irreparable harm or abuse its discretion in finding irreparable harm based on speculative statements?

5.     Did the district court err by applying the incorrect legal standard because the injunction alters the status quo, based on Ravine Parties' uninterrupted use of "Open AI" and open.ai for approximately eight years, as argued in Ravine Parties' briefing below and at the November 20, 2023 hearing?

6.     Did the district court err in denying Ravine Parties' Motion to Alter or Amend a Judgment Pursuant to Fed. R. Civ. P. 59(e), or in the alternative, for Relief from a Judgment or Order Pursuant to Fed. R. Civ. P. 60(b), in spite of the district court's acknowledgement that one of the factual errors raised in that motion required correction of the February 28, 2024 order granting the preliminary injunction?

7.     Is the preliminary injunction overbroad to the extent that it prohibits non-infringing uses of Ravine Parties' open.ai domain?

# STATEMENT OF THE CASE

## I.      FACTUAL BACKGROUND

### A.      "Open AI" Originated with Guy Ravine and Ravine Parties

Ravine has been a lifelong technology innovator and inventor. 5-ER-834. Ravine has founded several technology companies: Entity Inc., iNeed Inc., Video Inc., and Open Artificial Intelligence, Inc. 5-ER-834. He built over a dozen technologies in fields that included artificial intelligence ("AI") and collaborative research, as well as internet video, electric vehicles and social media. He established his first AI company, Entity, in 2000, building an early AI chatbot and an AI web prediction system. 5-ER-834.

Ravine was an early and passionate proponent of the concept that AI technology should be built for the benefit of humanity: Collaboratively developed, non-profit, and freely accessible for anyone in the world to see, use, share, and repurpose. 5-ER-834. These views have been in sharp contrast to the proprietary software model, where code is developed in secret, and access is controlled by for-profit entities. 5-ER-834.

In 2012, Ravine developed "Wikineering," a website providing information and tools to promote collaborative engineering. 5-ER-834. Ravine's Wikineering provided a platform for researchers to contribute research and expertise, with the

goal of contributing to shared research projects. 5-ER-834. In 2014, Ravine launched an AI discussion section on Wikineering. 5-ER-834.

As this work continued, Ravine coined a term to encapsulate his vision for collaborative development of AI software that would be freely available and for the benefit of all humanity: "Open AI." On March 26, 2015, Ravine purchased the open.ai domain, to promote the vision of the Open AI project. 5-ER-835. Immediately thereafter, Ravine launched an open.ai homepage that prominently displayed the brand "Open AI" and promoted Open AI as an "Open Industry Wide & Academia Wide Deep Learning Initiative," and provided basic functionality to allow interested parties to get in touch. 5-ER-835, 5-ER-860. Ravine applied to register OPEN AI with the United States Patent and Trademark Office ("PTO"), and he received a U.S. trademark registration for OPEN AI on the PTO's Supplemental Register on August 1, 2017. 5-ER-839, 6-ER-1090-94.

Throughout 2015, Ravine met and communicated about his Open AI project with leading executives, and he advocated for project support with prominent tech industry leaders. 5-ER-835.

Between 2015 and 2023, Ravine used the "Open AI" mark on a variety of projects based on the open.ai website, including various subdomains and on other affiliated pages. 5-ER-835-37. Under the Open AI mark, various tools were developed and made publicly available to foster research and collaboration among

7

AI engineers and scholars. 5-ER-834–36. Although server data relating to these tools has been lost over the past decade, Ravine submitted snapshots and other evidence about his Open AI project to the district court. 5-ER-857; 6-ER-1089.

In late 2020 or early 2021, Ravine—like many in the AI field at that time—began to develop an AI text-to-image generator (the "Image Generator"), completing it in March 2022. 5-ER-837. Ravine made his "Open AI" branded Image Generator publicly available at open.ai on November 16, 2022, and it immediately grew to have 170,000 users in December 2022. 5-ER-837. Interest in the Image Generator continued, and by October 2023, it had 2.3 million annual users. 5-ER-837. The Image Generator was taken down in March 2024 pursuant to the Order.

## B.  OAI Launches Its Company Using the "Open AI" Mark Despite Knowing of Ravine's Use; Is Unable to Acquire Ravine's Trademark or to Register "Open AI" at the PTO

On December 11, 2015, OAI's CEO and co-founder Sam Altman publicly announced the founding of a company called OpenAI, Inc. to create collaborative, shared, artificial intelligence technology that would benefit humanity; essentially, adapting nearly the identical mark—OpenAI vs. Open AI—for a shockingly similar use. 6-ER-1161; 5-ER-870-79. From inception, Altman knew that Ravine owned the open.ai domain and was using the "Open AI" mark; if not through his own research

8

prior to launch, then certainly when he was notified by Ravine on the day Altman's company was launched. 5-ER-916-17.

Ravine emailed Altman on that same day and notified him that (1) Ravine was already working on a competing AI initiative, called "Open.AI," that "has the same goals as yours, which are [to] accelerate the arrival of general AI through an open effort"; (2) Ravine was in discussions about a potential collaboration with Google parent Alphabet; but (3) "[b]efore we go the Alphabet route . . . it would make sense for us to meet and see if we could team up because we are working towards the same goals." 5-ER-916-17.

On December 16, 2015, OAI's President and co-founder, Greg Brockman, met with Ravine in person. 5-ER-838; 5-ER-916-17. At this meeting, Ravine presented his Open AI project and the initiatives he had undertaken using the Open AI Mark to date. 5-ER-838. Ravine suggested that the parties collaborate on AI development. 5-ER-838. Brockman rejected Ravine's collaboration proposal out of hand. He asked Ravine to stop using the "Open AI" mark and offered to buy the open.ai domain. 5-ER-838. Ravine declined. 5-ER-838.

From 2016 through the present, OAI has repeatedly tried and failed to register the "OpenAI Mark" with the PTO, and has been unsuccessful, both because Ravine's registration has an earlier priority date, and because the PTO consistently finds the "OpenAI" mark to be descriptive. 5-ER-837-40. On January 5, 2017, the PTO denied

OAI's request to register the "OpenAI" mark, asserting among other things, that the mark was "merely descriptive" and inviting OAI to submit evidence and arguments in support of registration. 5-ER-919-924. The PTO notified OAI that Ravine's "prior-filed [then] pending application may present a bar to registration of [OAI]'s mark as the filing date of [Ravine's] pending U.S. Application Serial No. 86847151 precedes applicant's filing date." 5-ER-920.

Several years later, in January 2022, OAI again filed a trademark application. 5-ER-881-904. On November 14, 2022, the PTO refused registration because OAI's mark was "merely descriptive." 6-ER-1090. On November 21, 2022, OAI made an additional submission arguing its mark was subject to registration because of its purported "acquired distinctiveness." 6-ER-1091. On January 3, 2023, the PTO again denied the application, concluding: "as the previously attached evidence demonstrates, the allegation of five years' use is insufficient to show acquired distinctiveness because the applied-for-mark is highly descriptive of applicant's goods and/or services." 6-ER-1091. The PTO again rejected OAI's application on February 23, 2023, for being "highly descriptive." 5-ER-907. Even after OAI submitted many more pages of arguments and evidence on March 28, 2023, the PTO again, refused OAI's registration on April 12, 2023 for being highly descriptive, and due to the likelihood of confusion of OAI's mark with Ravine's. 5-ER-955-59.

On February 19, 2022, during OAI's unsuccessful campaign with the PTO, its CEO Altman personally reached out to Ravine seeking to acquire the "open.ai domain name and related IP rights." 5-ER-952-53. It had been over six years since OAI's initial attempt to acquire these rights from Ravine, during which time OAI had seen its value multiply dramatically. Rather than seek personal profit, Ravine offered to give the domain and trademark to OAI, if it would in turn donate the fair value of those assets to an academic AI research collaboration, into which OAI could have significant input. 5-ER-839, 5-ER-952-53. OAI declined. 5-ER-839.

### C.     The Public Release of OAI's DALL·E 2 and ChatGPT Products in September 2022 and November 2022

Contemporaneously with the Ravine Parties' release of its AI image generator on November 16, 2022—and a slew of similar releases by several AI companies at that time—OAI launched two products in late 2022. 6-ER-1162-63. On September 28, 2022, OAI released a text-to-image generator called DALL·E 2 (6-ER-1162), and on November 30, 2022, OAI publicly released ChatGPT, a chatbot capable of generating human-like text in response to user prompts. 6-ER-1163.

While these products have proven popular over time, the record does not reflect whether or when OAI's "OpenAI" name acquired secondary meaning. Indeed, a September 5, 2023 Wired.com news article noted that prior to ChatGPT's

release in late November 2022, "awareness of [OAI and its mark] was largely confined to people following technology and software development." 8-ER-1627.

### D. OAI's Expert Declaration Submitted on Reply

In the reply briefing on the motion for a preliminary injunction, OAI submitted a declaration from a previously undisclosed expert, Dr. Seth James Nielson, to challenge statements in Ravine's declaration regarding use of the Open AI mark over the past decade. 4-ER-613-621.

Dr. Nielson surmised that the Wikineering website and various open.ai subdomains either did not exist, did not operate, and/or did not have real users. 4-ER-605, 4-ER-613-15, 4-ER-622-23. He based his opinions on the absence of certain archived records from the Wayback Machine or Google search results for certain tools or subdomains described in Ravine's declaration.[1] 4-ER-614-15, 4-ER-617-21. Dr. Nielson also questioned Ravine's reconstruction of a 2015 Initial Collaboration Tool, stating "most of the content (and all of the content with any technical depth) in Mr. Ravine's reconstruction is virtually identical to content in a 2017 college textbook[.]" 4-ER-605, 4-ER-616-17.

---

[1] Dr. Nielson found various evidence of Wikineering and the open.ai domain, including a "Coming soon" page on the Wayback Machine for the Wikineering homepage; five Google search results for Wikineering; a landing page for the open.ai homepage as early as September 5, 2015, and on five subsequent dates; redirects to OAI's website on two dates in 2022; and a webpage for CryptoArt on one date in 2022. 4-ER-614-615, 4-ER-617-21.

### E. Ravine Parties' Rule 59/60 Evidence

The Ravine Parties submitted substantial evidence with their Rule 59/60 Motion to rebut the Nielson Declaration and demonstrate Ravine Parties' prior use of the Open AI mark. Specifically, Ravine Parties filed declarations from Thomas Gruber (co-founder of Siri), Kaustav Debiswas (a venture-backed CEO), Luke Tenery (forensics expert), and Ravine. 2-ER-174-255. That evidence showed *inter alia* the following:

Although data has been lost over the past decade,[2] a forensics analysis of existing server data demonstrates—contrary to the speculative assertions in the Nielson Declaration—that the Wikineering and Open AI websites were functional and had real users:

- There was significant user traffic to the Wikineering family of sites between April 18, 2014, and December 29, 2016. 2-ER-216 ("logs show 15,932 events and 1,289 unique, legitimate users").

- Likewise, there was significant user traffic to the open.ai domain. Between April 6, 2015, and December 10, 2015, Ravine Parties' open.ai domain (including the subdomains decentralized.open.ai, beta.open.ai, hub.open.ai)[3] had attracted "393 unique, legitimate users"; and about 133 users signed up with their email addresses

---

[2] Ravine first began developing Wikineering in 2012. Since that time, some servers containing data related to Wikineering and Open AI has been lost. 2-ER-181-82, 2-ER-185.

[3] Ravine explained he had prepared a snapshot of the then new Initial Collaboration Tool that appeared on hub.open.ai to submit to the PTO as a substitute specimen. 2-ER-183-85; 3-ER-538; 5-ER-835-36; 5-ER-862.

between May 22, 2015, and December 11, 2015. 2-ER-214, 2-ER-236, 2-ER-183-84.

- Over the next two-plus years, the open.ai family of websites had about "16,334 unique, legitimate users" from May 22, 2015, through July 18, 2017; and about 6,202 users signed up with their email addresses between May 22, 2015, and July 18, 2017. 2-ER-215, 2-ER-237, 2-ER-185, 2-ER-186.

- Users on decentralized.open.ai could click on the "Start a New Company" button to create a new collaborative AI project; several such "companies" were created titled "General Purpose Face ID," "Automated Store," and "AI Super Renderer." 2-ER-186, 5-ER-836-37, 5-ER-866. After removing traffic associated with developers and administrators, at least 13 users made more than 450 revisions to the coding for these projects. 2-ER-216.

As corroborated by Gruber and Debiswas, Ravine "spent enormous amounts of time, effort, money and opportunity cost on the development of Wikineering and Open AI[.]" 2-ER-181-82. In November 2014, Ravine purchased a company from Debiswas that had created a cloud-based collaboration tool related to "large-scale open-source engineering projects," which Ravine integrated into his existing Wikineering technology. 2-ER-181-82. At that time, as Debiswas attested, "Wikineering already had been in use, operational, and publicly available" at that time. 2-ER-178, 2-ER-181 ("The Wikineering website did operate and did have users.").) "The Wikineering technologies were used as the technical foundation of Open AI's various collaboration tools." 2-ER-182.

Moreover, Ravine actively promoted his Open AI initiative to leading executives in the technology industry—before OAI existed. 2-ER-176. For example,

on March 19, 2015, Ravine gave a presentation to Google CEO Larry Page, attended by Gruber. 2-ER-176. Ravine separately discussed the project with Gruber, seeking Apple's support. 2-ER-176.

Finally, though OAI claims that its "OpenAI" mark acquired secondary meaning in late 2022 through association with its "DALL·E 2" and "ChatGPT" products, the familiarity of these products has not necessarily transferred to the OpenAI mark. Google Trends data shows that while "ChatGPT" was widely sought after its launch, both "OpenAI" and "DALL·E" registered at low levels of interest throughout 2022-2023, as shown here:



2-ER-218, 2-ER-240. Even with ChatGPT mark's considerably escalated profile vis-à-vis the "OpenAI" mark, the PTO, as recently as February 2024, rejected OAI's application to register "ChatGPT" for being merely descriptive without secondary meaning. 2-ER-83, 2-ER-86. It is difficult to fathom how OAI could have acquired

secondary meaning in its "OpenAI" mark when it has not done so for its far more popular "ChatGPT" mark.

## II.    PROCEDURAL BACKGROUND

### A.    Preliminary Injunction Briefing and Hearing

On September 29, 2023, OAI filed its Motion for a Preliminary Injunction (the "Motion"). 6-ER-1127. OAI argued its "OpenAI" mark is suggestive and thus inherently distinctive. 6-ER-1147-49. OAI did not argue that its mark had acquired secondary meaning and did not develop an evidentiary record on that issue. 3-ER-469-547, 4-ER-568-790, 6-ER-1127-56. OAI submitted news articles that it vaguely describes as being "about OpenAI" to show the mark was commercially strong. 6-ER-1165, 7-ER-1283, 8-ER-1637.

On October 16, 2023, Ravine Parties opposed the Motion. 5-ER-792, 5-ER-833-841. Ravine Parties did not address the issue of secondary meaning since OAI had not argued that position. 3-ER-469-547, 4-ER-568-790, 6-ER-1127-56. Instead, Ravine Parties argued they were the senior user, presenting evidence of Ravine's use of the Open AI mark since 2015. 5-ER-792-1087, 6-ER-1089-1126.

On October 24, 2023, OAI filed its reply. 4-ER-568-87. OAI submitted substantial new evidence challenging Ravine Parties' contention that they had actually used their mark in commerce. 4-ER-568-790. Again, OAI did not argue that its mark had acquired secondary meaning. 4-ER-568-790. Ravine Parties' former

16

counsel did not object to OAI's new evidence on reply, did not seek leave to file a sur-reply, or request a continuance of the hearing to conduct discovery.

On November 20, 2023, the district court held oral argument. 3-ER-469-547. The court observed that "the PTO has said multiple times that this is a descriptive mark" and that "there hasn't been secondary meaning." 3-ER-532. The court questioned why either of the parties have any "protectable" interest in the disputed mark. 3-ER-532. When OAI's counsel pointed to press "from before 2022" to support secondary meaning, the district court said: "[t]hen you're living in a bubble." 3-ER-533. OAI's counsel asserted: "[w]e believe secondary meaning was acquired certainly by the time ChatGPT was released." 3-ER-534. The district court noted the absence of objections to OAI's reply evidence. 1-ER-10.

On February 2, 2024, Ravine Parties filed supplemental legal authority on the analogous use doctrine. 3-ER-379-468.

## B.     The Preliminary Injunction Order

On February 28, 2024, the district court issued the Order granting a preliminary injunction. 1-ER-7-27. The district court agreed with the position of the PTO, writing: "As recently as January 3, 2022,[4] the USPTO rejected plaintiff's application to register its OpenAI mark on the Principal Register because it was

---

[4] In fact, the PTO issued this rejection a year later on January 3, 2023—not 2022. 6-ER-1090.

17

'merely descriptive' and had not acquired distinctiveness, or secondary meaning." 1-ER-21. The district court then went on to say: "the Court assumes that as of January of 2022 plaintiff's mark was not distinct enough to guarantee plaintiff its exclusive use." 1-ER-21. Based on the release of DALL·E 2 and ChatGPT products in late September and November 2022, respectively, the district court found OAI's mark likely acquired secondary meaning by "September 2022." 1-ER-22.

The district court rejected Ravine Parties' evidence of use pre-dating November 2022. 1-ER-22. Although no evidentiary hearing took place, the district court found "the current record paints a troubling picture of defendant Ravine's representations to the USPTO and this Court about the true extent of his use of the disputed mark." 1-ER-23. To support its findings, the district court cited the Nielson declaration 8 times – more than any other piece of evidence cited in the Order. 1-ER-22. Finally, the court ruled OAI is entitled to a presumption of irreparable harm. 1-ER-24. The district court's Order reflects OAI's proposed order with only minor changes. *Compare* 3-ER-548-552 *with* 1-ER-26-27.

## C.    Ravine Parties Seek Relief Pursuant to Fed. R. Civ. P. 59(e) and 60(b) and Appeal

On March 27, 2024, Ravine Parties sought relief in the district court by filing their Rule 59/60 Motion. 2-ER-42. Ravine Parties requested the district court vacate the Order and/or hold an evidentiary hearing over the significant disputed material

facts due to errors in law, fact, and mistake of counsel. 2-ER-42-75. On March 29, 2024, Ravine Parties noticed this appeal. 10-ER-2265-66.

On April 3, 2024, the district court held a hearing on the Rule 59/60 Motion. 2-ER-29-41.

On April 5, 2024, the district court issued a Notice of Errata correcting certain errors in the Order. 1-ER-2-5. The errata changed a sentence to read that the PTO recently rejected Plaintiff's application on "January 3, 202[2]**3** . . . ." 1-ER-2. Additionally, the errata changed the court's conclusion to state that Plaintiff's mark "by September of 2022" "[~~was at least suggestive~~] had acquired secondary meaning." 1-ER-2-5.

The district court otherwise denied the Rule 59/60 Motion. 1-ER-5. It reasoned that its "mistake of fact" with respect to the year when the PTO recently rejected Plaintiff's application "is not material[.]" 1-ER-5. It noted the application at issue in this rejection was filed in January 2022, and it reasoned that "[w]hat matters is that, as of September and November of 2022, when plaintiff released DALL·E and ChatGPT to the public with the OpenAI mark, plaintiff had made a strong evidentiary showing that it is likely to prove at trial that its mark had acquired secondary meaning." 1-ER-4-5. Alternatively, it found "whether plaintiff acquired secondary meaning by the end of 2022 or the beginning of 2023, the Court found that plaintiff is likely to prove that it has a protectible interest in its mark." 1-ER-5.

The district court declined to consider the prior use evidence presented with the Rule 59/60 motion, stating that it could have been presented earlier. 1-ER-4.

## SUMMARY OF ARGUMENT

The preliminary injunction should be reversed for multiple reasons.

First, the district court abused its discretion in finding that OAI is likely to succeed in showing that it acquired secondary meaning in its "OpenAI" by September 2022 *See Converse, Inc. v. International Trade Commission Skechers U.S.A., Inc.*, 909 F.3d 1110, 1116-17 (Fed. Cir. 2018) ("[i]n any infringement action, the party asserting [trademark] protection must establish that its mark had acquired secondary meaning before the first infringing use by each alleged infringer[.]") The court specifically points to the public release of DALLE 2 and ChatGPT in September and November of 2022, respectively, noting that these products made OAI a "household name." 1-ER-21-22. But the conclusion that OAI's mark acquired secondary meaning within days of launch of the lesser popular DALL·E website, and before the public launch of ChatGPT is simply not supported by the record or reason.

Second, the district court issued a mandatory injunction and thus erred in granting the injunction based on a "likelihood of success" standard rather than the more exacting mandatory injunction standard where a movant must establish "the law and facts *clearly favor* her position, not simply that she is likely to succeed."

20

*Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis in original). Mandatory injunctions as those that go beyond maintaining the preexisting *status quo* and here, "the uncontested status quo that preceded the present controversy consisted of both parties operating their respective websites" utilizing their respective Open AI marks. *Athleta, Inc. v. Pitbull Clothing Co., Inc.*, No. CV 12-10499-CAS, 2013 WL 142877, at *1-2 (C.D. Cal. Jan. 7, 2013).

Third, the district court erred by failing to apply the analogous use doctrine in considering whether Ravine Parties' undisputed registration of the open.ai domain and other activities established Ravine Parties as the senior user. Even crediting the findings below, there is undisputed evidence of analogous use.

Fourth, the district court erred by applying a presumption of irreparable harm given the fact that there was no likelihood of success on the merits, and in any case, abused its discretion in finding irreparable harm based on speculative statements. "Speculative injury does not constitute irreparable injury… [A] plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Services, Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original).

Fifth, the district court abused its discretion in finding OAI likely was the senior user and that Ravine Parties' use likely was not "bona fide." The district court should have considered the supplemental evidence submitted in support of the Rule

21

59/60 Motion and ordered an evidentiary hearing to resolve any factual conflicts. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (parties should be given an opportunity to respond to new evidence).

Finally, the preliminary injunction is overbroad to the extent that it prohibits non-infringing uses of Ravine Parties' open.ai domain. That is not necessary to protect against consumer confusion and it improperly prohibits legal uses of the open.ai domain that do not use the disputed mark.

## STANDARD OF REVIEW

A "district court's decision to grant or deny a preliminary injunction [is reviewed] for abuse of discretion." *Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020). The legal issues underlying a grant are reviewed de novo "because a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of law." *Adidas America, Inc. v. Skechers, USA, Inc.*, 890 F.3d 747, 753 (9th Cir. 2018); *see also Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014). A factual finding is clearly erroneous "if it is illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Id*. at 983–84 (citations and quotation marks omitted). Additionally, mandatory injunctions are "particularly disfavored," and "court[s] should deny such relief unless the facts and law clearly favor the moving party." *Stanley v. University of Southern California*, 13 F.3d 1313, 1320 (9th Cir. 1994) (internal citations and quotation marks omitted).

22

Similarly, rulings on Rule 59/60 motions are reviewed for abuse of discretion. *See Allstate Insurance Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011). This Court reviews de novo "any questions of law underlying the district court's decision[.]" *See Jeff D. v. Kempthorne*, 365 F.3d 844, 850-51 (9th Cir. 2004).

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN FINDING LIKELIHOOD OF SUCCESS

Consistent with the PTO's well-reasoned determinations, the district court correctly found OAI's "OpenAI" mark "merely descriptive[.]" 1-ER-21-22 (citing 6-ER-1090). In fact, it is a highly descriptive mark. Thus, OAI bears a heavy burden in proving that its mark acquired secondary meaning. It has not met its burden of showing a likelihood of success.

### A. OAI Bears a Heavy Burden to Establish Secondary Meaning Because Its Mark Is Highly Descriptive

To be protectable under the Lanham Act, "a mark must be capable of distinguishing the applicant's goods from the goods of others. In other words, the mark must be distinctive." *Kendall-Jackson Winery, Ltd. v. E.&J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998) (citing 15 U.S.C. § 1052). Marks are classified "in one of five categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *Id.*; *see also In re North Carolina Lottery*,

866 F.3d 1363, 1367 (Fed. Cir. 2017) ("A mark is merely descriptive if it immediately conveys information concerning a feature, quality, or characteristic of the goods or services for which registration is sought.").

"A descriptive mark is entitled to trademark protection only if 'it has acquired secondary meaning, *i.e.*, it has become distinctive of the applicant's goods in commerce.'" 1-ER-21 (quoting *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1142 n.3 (9th Cir. 2002))); *see also Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999); *CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019, 1033 (N.D. Cal. 2008) ("Descriptive marks without secondary meaning cannot be trademarked"). "The basic element of secondary meaning is a mental recognition in buyers' and potential buyers' minds that products connected with the symbol or device emanate from or are associated with the same source." *Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 820 (9th Cir. 1980).

"The greater the degree of descriptiveness the term has, the heavier the burden to prove it has attained secondary meaning." *In re Bongrain International Corp.*, 894 F.2d 1316, 1317 n.4 (Fed. Cir. 1990) (citing *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1581 (Fed. Cir. 1988)); *see also In re Seaman & Associates, Inc.*, 1 U.S.P.Q. 2d 1657, 1986 WL 83329, at *4 (T.T.A.B. 1986).

In this case, OAI's mark has been found to not just be merely descriptive, but "highly descriptive," a slight half-step above genericism. On multiple occasions, the PTO has rejected OAI's registration applications on these grounds. On November 14, 2022, the PTO found the mark "merely descriptive." 6-ER-1091. After OAI claimed acquired distinctiveness, on January 3, 2023, the PTO rejected the claim, finding the mark is "highly descriptive" and applicant's evidence is "not sufficient to show acquired distinctiveness." 6-ER-1089-94. It reaffirmed both findings again on April 12, 2023. 5-ER-954-963. The consistent, well-reasoned decisions of the PTO are persuasive and are entitled to deference. *See Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1199 (9th Cir. 2009), *aff'd*, 636 F.3d 501 (9th Cir. 2011) ("Deference to the PTO's classification decision is sensible because the PTO has special expertise that we lack on this fact-intensive issue"); *Herbal Chef, LLC v. AFG Distribution, Inc.*, 840 F. App'x 223, 224 (9th Cir. 2021).

**B.     OAI Bears the Burden of Proving that Its Mark Acquired Secondary Meaning *Before* Ravine Parties Indisputably Used Their Mark in Commerce on November 16, 2022**

In addition to proving its "OpenAI" mark has acquired secondary meaning, OAI must show that it is likely to prove it acquired secondary meaning before Ravine Parties used their "Open AI" mark in connection with their Image Generator on

November 16, 2022. It is not enough to show that OAI acquired secondary meaning "by the end of 2022 or the beginning of 2023" or at another later date. 1-ER-5.

"In any infringement action, the party asserting trade-dress [or trademark] protection must establish that its mark had acquired secondary meaning before the first infringing use by each alleged infringer[.]" *See Converse*, 909 F.3d at 1116-17 (the acquisition of secondary meaning does not retroactively prohibit pre-existing uses of an otherwise descriptive mark by other persons); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 16:34 (5th ed. 2017 & March 2024 Update) (the purported "senior user must prove the existence of secondary meaning in its designation at the time and place that the junior user first began use of the accused mark.") (Collecting cases); *Commerce National Insurance Services, Inc. v. Commerce Insurance Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000) ("A plaintiff must establish secondary meaning in a mark at the time and place that the defendant began use of the mark.").

For example, in *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 223-24 (3d Cir. 2017), plaintiff sued defendant claiming defendant's use of the "PARK'S FINEST" name violated plaintiff's "PARKS" trademark. The Third Circuit affirmed a no infringement finding, holding that to prevail, plaintiff was "required to demonstrate the mark had secondary meaning at the time that [defendant] began to use the name PARK'S FINEST." *Id.* at 231. Similarly, in *Levi Strauss & Co. v. Blue*

26

*Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985), plaintiff *Levi* sued competitor defendant for trademark infringement over a pocket tab it placed on garments, asserting the tab had acquired secondary meaning and defendant's use of a similar pocket tab on shirts "are likely to cause customer confusion[.]" The plaintiff had used the pocket tab on pants since 1936, and on shirts since 1969. *Id*. Despite that lengthy history of prior use, the Ninth Circuit held that plaintiff "was required to prove that the tab as used on shirts had acquired secondary meaning by 1976, when Blue Bell began using a protruding label on shirts." *Id.* at 1358. Because the plaintiff had not proven that it acquired secondary meaning by that date, it affirmed the finding of no trademark infringement. *Id*.; *See also Braun Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 826-27 (Fed. Cir. 1992) (reversing finding of infringement, reasoning that even though plaintiff was first, it was required to show that its trade dress "acquired secondary meaning during the [] 18 months preceding the introduction of [defendant's] blender," and that it failed to do so during this shortened time frame.); *Co-Rect Products, Inc. v. Mavy! Advertising Photo., Inc.*, 780 F.2d 1324, 1330 (8th Cir. 1985) (trademark "user must also show that secondary meaning existed before the date on which the defendant commenced using the same or similar mark.").

The timeline in this case is even shorter than in *Levi* and *Braun*. Ravine acquired the open.ai domain in March 2015—before OAI was formed. Even setting

27

aside the disputed evidence of Ravine Parties' subsequent use of that mark (which the district court did not credit), it is uncontested that Ravine Parties launched their Image Generator at open.ai on November 16, 2022—two months after the release of DALL·E 2 and fourteen days before the release of ChatGPT. 5-ER-837; 4-ER-573 (Ravine Parties launched competing services in November 2022).

Thus, the Order must be vacated if OAI's "OpenAI" mark acquired secondary meaning at some later time after Ravine Parties indisputably released their Image Generator. No liability for trademark infringement can attach if Ravine Parties were using the disputed mark in commerce before OAI's mark acquired secondary meaning. *See Levi Strauss*, 778 F.2d at 1358; *Parks*, 863 F.3d at 223-24.

**C.     The Record Does Not Support a Finding "OpenAI" Likely Acquired Secondary Meaning by September 2022 or Otherwise**

The district court's finding that OAI's mark "had acquired secondary meaning" "since at least September 2022" is "without support in inferences that may be drawn from the facts in the record." *See Arc of Cal.*, 757 F.3d at 983. OAI did not argue its mark had acquired secondary meaning, nor did it develop an evidentiary record to support that finding. In the absence of such a record, the Court's finding that OAI's "OpenAI" mark acquired secondary meaning in September 2022 or at any other time is clearly erroneous.

28

Courts in the Ninth Circuit consider four factors in determining whether a mark has acquired secondary meaning: "'(1) whether actual purchasers of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been exclusive.'" 1-ER-21 (quoting *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 930 (9th Cir. 2005). "Secondary meaning can be established in many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *Filipino Yellow Pages,* 198 F.3d at 1151.

That test is not satisfied here. As the district court observed at the hearing, OAI's mark was not a household name and "certainly didn't have [common law trademark rights] before November of 2022." 3-ER-533 (OAI's counsel "living in a bubble" to the extent she claimed otherwise.). The Order did not explain the district court's shift on this issue. 1-ER-7-27. The evidentiary record does not support it.

1. <u>There Is No Consumer Survey or Consumer Testimonials</u>
   <u>Showing that Consumers Associate the "OpenAI" Mark with</u>
   <u>the Company That Offers ChatGPT or DALL·E 2</u>

Contrary to the purported finding that OAI's "users associate its [OpenAI] trademark with its products," (1-ER-22) there is no evidence of any such association. Despite OAI's assertion that ChatGPT and DALL·E 2 are popular, the record lacks any consumer survey or testimonial evidence to show that consumers associate the "OpenAI" mark with DALL·E 2, ChatGPT, any of OAI's other products, or OAI itself.

The "association of the [mark] with a particular source by actual purchasers [is] typically measured by customer surveys[.]" *In re JC Hospitality LLC*, 802 F. App'x. 579, 582 (Fed. Cir. 2020); *see also Levi Strauss*, 778 F.2d at 1358 ("expert survey of purchasers . . . most persuasive evidence on secondary meaning."); *Duncan McIntosh Co. Inc.*, 324 F. Supp. 2d 1078, 1084 (C.D. Cal. 2004), *aff'd*, 120 Fed. App'x. 199 (9th Cir. 2005) ("survey evidence . . . most persuasive evidence of consumer recognition and association"); *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722 (7th Cir. 1998) (absence of survey evidence as to secondary meaning weighs against plaintiff's request for a preliminary injunction).

30

OAI expert Scott Swain's survey does not fill this void. Swain's survey was "designed to provide a valid and reliable measure of the likelihood of consumer confusion" by having participants compare the parties' marks. 8-ER-1811-13. It was not designed to examine public perception of the "OpenAI" mark; it does not demonstrate the "association" required for secondary meaning, "nor does it address what meaning consumers attach to the term [OpenAI]." *See Royal Crown Company, Inc. v. The Coca-Cola Company*, 892 F.3d 1358, 1371 (Fed. Cir. 2018); *Parks*, 863 F.3d at 234-35 ("Two marks can be confusingly similar even if neither has secondary meaning . . . . Establishing that two marks are similar does not necessarily lead to any valid conclusion about whether either of the two has secondary meaning."). Moreover, "a survey is only probative if it deals with conditions at the appropriate time." *See Royal Crown*, 892 F.3d at 1371. Swain's 2023 consumer confusion survey provides no support for a finding that Plaintiff's mark acquired secondary meaning a year earlier in September 2022. 8-ER-1816.

The absence of a secondary meaning survey or testimonials showing consumers associate the "OpenAI" mark with the company that offers DALL·E 2 or ChatGPT should be dispositive. At a minimum, it weighs heavily against the decision below.

2.    The Release of ChatGPT and DALL·E 2 Does Not Prove

"OpenAI" Acquired Secondary Meaning in September 2022 or

At Any Other Relevant Time

In concluding that OAI's "OpenAI" mark acquired secondary meaning since "September of 2022," the district court relied on the public release of DALL·E 2 and ChatGPT in September and November of 2022, respectively. 1-ER-21-22 (asserting "the landscape has changed" since the release of these products, and "Plaintiff's trademark is one of the most recognized in the artificial intelligence industry, if not the world"). This conclusion is neither supported by fact or law. *See G. Heileman Brewing Co., Inc. v. Anheuser-Busch Inc*., 676 F. Supp. 1436, 1493 (E.D. Wis. 1987), *aff'd* 873 F.2d 985 (7th Cir. 1989) ("evidence cannot overcome the fact that there had not been adequate time for the 'LA' mark to acquire secondary meaning. . . The court has found no other case in which there has been a finding that secondary meaning had developed in a matter of weeks."); *Braun*, 975 F.2d at 826-27 ("while not impossible, it is difficult for a product to acquire secondary meaning during an 18–month period."); *Filipino Yellow Pages,* 198 F.3d at 1152 (mark did not have secondary meaning even after six years of use).

Recognizing ChatGPT is a popular product does not establish secondary meaning of "OpenAI" because there is no evidence that consumers associate the separate "OpenAI" mark with the company that offers ChatGPT. "Proof of a

32

product's popularity should not be equated with proof of secondary meaning." *20th Century Wear, Inc. v. Sanmark-Stardust Inc.,* 747 F.2d 81, 90 n.9 (2d Cir. 1984), *aff'd,* 815 F.2d 8 (2d Cir. 1987).

In *Cicena Ltd. v. Columbia Telecommunications Group*, 900 F.2d 1546, 1574, 1551 (Fed. Cir. 1990), the Federal Circuit ruled there was insufficient evidence to support a preliminary injunction based on secondary meaning despite the popularity of plaintiff's product. The product's commercial success was "not necessarily indicative of secondary meaning" and was attributable to other factors. *See also id.* (consumers' desire for phone was based on aesthetic appeal, and did not support a finding of secondary meaning—"They don't give a damn who made it."); *see also Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F. Supp. 2d 995, 1003-04 (C.D. Cal. 2007) (evidence insufficient to demonstrate secondary meaning even though a report showed the movant's "Organic Food Bar" is the number one selling nutrition bar in the country); 2 McCarthy on Trademarks and Unfair Competition § 15:47 (5th ed.) ("causation between the trademark and the popularity must be proved . . . . Large sales of the product may be due to dozens of factors, only one of which may be the drawing power of the trademark.").

Here, the record does not proffer causation evidence between the OAI's mark and the popularity of its products. Rather, it shows OAI "launched ChatGPT, with zero fanfare, in late November 2022" and "few expectations," and the launch "was

viewed in-house as a 'research preview.'" 7-ER-1494. There is no evidence consumers use ChatGPT or DALL·E 2 because the source of those products is OAI.

In any event, the November 30, 2022 public release of ChatGPT cannot logically support the finding that OAI's "OpenAI" mark acquired secondary meaning "by September 2022." 1-ER-21. It is undisputed that ChatGPT was not publicly released until November 30, 2022. 6-ER-1163. The district court relied on a *Wired.com* news article to find that ChatGPT "was the fastest growing consumer software in history," but that very same article makes clear that OAI's "OpenAI" mark was not well known to consumers before the release of ChatGPT. 1-ER-21 (citing 8-ER-1629). This September 2023 article states unequivocally:

> [u]ntil November of last year [i.e., November 2022], awareness of OpenAI was largely confined to people following technology and software development. But as the whole world now knows, OpenAI took the dramatic step of releasing a consumer product late that month.

8-ER-1627. OAI's evidence undermines the finding that its OpenAI mark acquired distinctiveness by September 2022.

There is no evidence DALL·E 2 was revolutionary or has achieved the popularity of ChatGPT. To the contrary, a September 28, 2022 "Verge" news article cited by the district court (1-ER-21 (citing 7-ER-1327), explains DALL·E 2 was publicly released in September 2022 to keep up with competition due to "a number of other text-to-image systems . . . that rival the speed and quality of DALL·E." 7-ER-1326-27 (stating "[o]ther systems . . . are much easier for anyone to access,

drawing attention away from OpenAI's own offering"). OAI provided no expert declaration, news articles, or any other evidence showing consumers recognize and associate the "OpenAI" mark with DALL·E or DALL·E 2.

Finally, Google Trends data confirms that the "OpenAI" mark has not acquired secondary meaning. ChatGPT did not begin to trend until 2023 and had about 10 times the amount of interest as "OpenAI" and "DALL·E." 2-ER-218, 2-ER-240. That objective data shows "ChatGPT" is far better known than both "OpenAI" and "DALL·E," which register a low level of interest even in 2023. 2-ER-218, 240.

### 3. Media Coverage Does Not Support of Secondary Meaning

The district court relies on a website ranking and two articles published in the *Washington Post* and *Forbes*, which it cites to show "Plaintiff's products and services have received extensive coverage" and "the widespread association of the OpenAI mark with Plaintiff[.]" 1-ER-8. Critically, however, these materials were published in 2023 and do not show that the "OpenAI" mark acquired secondary meaning—certainly not in the relevant period before the release of either ChatGPT or Ravine Parties' Image Generator. *See Royal Crown*, 892 F.3d at 1371 ("[S]econdary meaning is a time-related concept: it exists at a specific time, in a specific place, among a specific group of people who recognize that specified matter

indicates commercial origin of a specified type of product or service from one unique commercial source.") (citations omitted)).

At most, the articles indicate that OAI's products were in the process of becoming known to the public in 2023; they do not speak to the strength of OAI's mark, and certainly not in 2022. The district court cited a *Washington Post* article from March 14, 2023, stating, "the viral chatbot's creator is rocketing into the mainstream." 1-ER-8 (citing 7-ER-1513). It also cited a *Forbes* article stating: "[i]n 2023, everyone knows OpenAI's name[.]") 1-ER-8 (citing 7-ER-1479). And based on a website ranking by an analytics firm, it noted the popularity of OAI's website. 1-ER-22 (relying on 6-ER-1165 ("OpenAI's website ranked as the 28th most visited site in the world in September 2023."). Indeed, the vast majority of articles in the record were published in 2023. *See* 7-ER-1283 – 8-ER-1637.

OAI submitted a collection of news articles from December 22, 2015 covering its launch. 6-ER-1176-1217. These articles, written before OAI launched a product, do not support secondary meaning. The record then contains a handful of articles between 2016 and the end of 2022 when OAI claims that its mark acquired distinctiveness. *See* 7-ER-1283 – 8-ER-11345; 6-ER-1176-1217. Only 1 of those 14 articles was published in 2022 prior to September, during the period when the lower court felt "the landscape [] changed" and OAI's mark purportedly acquired secondary meaning. 7-ER-1317. Almost half of these 14 articles were published

36

between September and December 31, 2022; those articles covered various topics, including Altman's backstory, the release of a product called Whisper, the release of DALL·E 2, and the "quiet[] release" GPT3-5. 7-ER-1319-1345. Although these articles demonstrate media interest in AI, they do not establish secondary meaning. *See Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 427 (S.D.N.Y. 2012) (unsolicited media coverage does not establish that the mark "had taken root."); *Giggle, Inc. v. netFocal, Inc.*, 856 F. Supp. 2d 625, 632 (S.D.N.Y. 2012) (news articles do not establish market recognition).

### 4. OAI's Advertising Does Not Establish Support Secondary Meaning, Let Alone for a Highly Descriptive Mark

The district court relied on OAI's "extensive use of the trademark in advertising its products," but the supporting evidence is legally insufficient to establish secondary meaning. At most, the record shows OAI uses its "OpenAI" mark on its website, social media accounts, and products. 6-ER-1164-66. That is no different than most companies with an online presence. Critically, the record is devoid of evidence as to the *amount* of advertising expenditures—much less large expenditures aimed at creating secondary meaning in the "OpenAI" mark. *See In re E.I. Kane, Inc*., 221 U.S.P.Q. 1203, 1984 WL 63112, at *4 (T.T.A.B. 1984) (refusal to register "Office Movers, Inc." for moving services despite evidence of substantial

advertising expenditures because there was no evidence of advertising aimed "to creat[e] secondary meaning in applicant's highly descriptive trade name.").

There is no evidence to support secondary meaning based on "advertising" or product popularity, let alone sufficient to support such a finding as to OAI's highly descriptive mark in September 2022. *See, e.g., In re Seaman & Assocs., Inc.*, 1986 WL 83329, at *4; *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1383 (9th Cir. 1987) (Even "a 'large expenditure of money does not in itself create legally protectable rights.'") (citations omitted)).

5.    The District Court Erred In its Discussion of The Trademark Prosecution History, Which Is Persuasive as to the Lack of Secondary Meaning

Although the district court, in response to Ravine Parties' Rule 59/60 Motion, corrected a "mistake of fact" in its Order by substituting one date for another, its correction exposes a critical error.

In the original Order, the district court erroneously stated: "As recently as January 3, 2022, the USTPO rejected plaintiff's application to register its OpenAI mark on the Principal Register because it was 'merely descriptive' and had not acquired distinctiveness, or secondary meaning." 1-ER-21. In fact, this rejection took place a year later, on January 3, 2023. 6-ER-1090-91. After the issue was identified by Ravine Parties, the district court acknowledged a "mistake of fact" and

38

corrected the date. 1-ER-5. However, the court did not adjust its reasoning in that paragraph to conform to this evidence. As a result, the corrected opinion is nonsensical.

Even though the district court "assumes" that the PTO's determination was correct, it continued to treat the PTO's determination as if it were made in January 2022. 1-ER-22. Although OAI's application was filed in January 2022, it did not claim acquired distinctiveness to the PTO until November 2022. 6-ER-1090-91. Moreover, the PTO determined as of January 3, 2023 that OAI's mark lacked secondary meaning. *Id.* Indeed, the "registrability of a mark must be determined on the basis of facts as they exist at the time when the issue of registrability is under consideration[.]" *Application of Thunderbird Products Corporation*, 406 F.2d 1389, 1392 (C.C.P.A. 1969).

The district court overlooked two other, more recent rejections by the PTO on February 23, 2023, and April 12, 2023. 5-ER-905-14, 5-ER-954-63. Although the district court assumed the PTO did not have evidence before it regarding the release of "Dall-E 2 and ChatGPT to the public with the OpenAI mark" (1-ER-4-5), the record before the PTO was not so limited. In March 2023, OAI submitted many pages of additional evidence to the PTO on the issue of acquired distinctiveness. 3-ER-532. In March 2023, Dall·E 2 and ChatGPT had been publicly released for months. Despite newly submitted evidence, on April 12, 2023, the PTO again

rejected OAI's application on the grounds that its mark was highly descriptive and had not acquired secondary meaning. 5-ER-955-59.

The Order remains fatally infected by mistakes of fact. Accordingly, this Court should give deference to the well-reasoned determinations made by the PTO. *See Trowbridge Sidoti LLP v. Taylor*, No. 8:16-CV-00771-ODW-SK, 2017 WL 3720643, at *5 (C.D. Cal. Aug. 28, 2017) (ruling that OAI "would have to submit overwhelming evidence of secondary meaning to combat the recent PTO finding that the subject mark lacks distinctiveness, and it has failed to do so."). The Order should be vacated.

> 6. **The Record Does Not Support a Finding that OAI's Use of Its Highly Descriptive Mark Was Substantially Exclusive and Continuous**

OAI has not demonstrated its use of the highly descriptive mark has been substantially exclusive and continuous for a period sufficient to establish secondary meaning.

Under the Lanham Act, "[t]he Director may accept as *prima facie* evidence that the mark has become distinctive . . . proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made." 15 U.S.C. § 1052(f); *see also*, *Converse*, 909 F.3d at 1121 ("the Supreme Court has noted 'that the general

40

principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable' in other trademark proceedings, such as suits seeking to enforce unregistered marks under 15 U.S.C. § 1125(a)."); *Herbal Chef, LLC v. AFG Distribution, Inc.*, 2:18-CV-8539-AB-MRW, 2020 WL 3064439, at *6 (C.D. Cal. Mar. 10, 2020) (five months of exclusive use did not demonstrate secondary meaning); *Spark Industries, LLC v. Kretek International, Inc.*, No. CV 14-5726-GWASX, 2014 WL 4365736, at *12 (C.D. Cal. Aug. 28, 2014) ("[T]wo years of exclusive use is on the low end of the spectrum"). Moreover, even if OAI could establish a prima facie case of continuous and exclusive use over a period of five years, that is not enough to establish secondary meaning for its highly descriptive mark. In rejecting OAI's application, the PTO found, "as the previously attached evidence demonstrates, the allegations of five years' use is insufficient to show acquired distinctiveness because the applied for mark is highly descriptive of applicant's good and/or services." 6-ER-1090-91.

Here, the district court relied on oral representations made by OAI's counsel to find OAI first used its mark "on an actual artificial intelligence tool or service" on December 5, 2016, in connection with a "software platform called "Universe[.]" 1-ER-21. 1-ER-11. But "arguments and statements of counsel 'are not evidence.'" *Barcamerica Intern. USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2022) (quotation omitted). There is no evidence as to the nature of OAI's

purported use of its mark in connection with Universe or whether that use was continuous or exclusive. This reed is far too thin to support a finding of secondary meaning.

Additionally, Ravine Parties were using "Open AI" and open.ai prior to the earliest time OAI contends it established secondary meaning. Ravine purchased the open.ai domain and created the open.ai homepage, where he prominently displayed the "Open AI" mark in March 2015. 5-ER-835, 5-ER-860. OAI chose to use a highly descriptive mark and knew at least as soon as the day their company was announced that Ravine had registered the open.ai domain and was using the nearly identical "Open AI" mark.[5] 5-ER-916-17. Ravine Parties also used this mark on their open.ai domain in connection with their own Image Generator beginning in mid-November 2022—during the period when OAI purportedly acquired distinctiveness. OAI has not shown its use of the disputed mark was exclusive. *See, e.g., Otto Roth & Co. v. Universal Foods Corp.*, 640 F.2d 1317, 1320 (C.C.P.A. 1981) ("Any use by opposer, whether begun prior or subsequent to applicant's, and whether in a descriptive context or in a manner of mark, may be sufficient to defeat the applicant's claim that the term is distinctive of its goods or has become distinctive").

---

[5] Ravine informed Altman that Ravine Parties owned open.ai and were using the "Open AI" name on December 11, 2015, the day OAI's company was announced. 5-ER-916-17.

42

It was an abuse of discretion for the district court to find OAI is likely to succeed in showing it acquired secondary meaning before Ravine Parties used "Open AI." The preliminary injunction should be reversed on this ground alone.

### D. The Order Should be Reversed Due to OAI's Delay in Seeking Relief that Disrupts the Status Quo

#### 1. The District Court Should have Conducted an Evidentiary Hearing to Address Disputed Facts Relevant to Laches, which Should Bar Injunctive Relief

Significant evidence in the record shows OAI was aware of the Ravine Parties' use of "Open AI" and open.ai for approximately 8 years prior to filing this action and seeking preliminary injunctive relief. 5-ER-838-38; 5-ER-916-17; 5-ER-952-53. Indeed, as early as December 2015, just as OAI was announced, OAI unsuccessfully attempted to negotiate the acquisition of open.ai along with an agreement that the Ravine Parties would stop using "Open AI." 5-ER-916-17. After this, OAI received notices from the PTO regarding the Ravine Parties' senior mark. OAI attempted again in 2022 to acquire open.ai and "Open AI" from the Ravine Parties. 5-ER-952-53.

During this time, the Ravine Parties continued to develop their business, eventually obtaining several million users on their open.ai website, which also mitigates against the preliminary injunction. *See Jarrow Formulas, Inc. v. Nutrition*

43

*Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002) (essential elements of laches are "delay in filing suit" and "prejudice caused by the delay.") "Such prejudice may arise where a defendant 'invested money to expand its business or entered into business transactions based on his presumed rights.'" *See RSI Corp. v. Int'l Bus. Machines Corp.*, 2012 WL 3277136, at *15 (N.D. Cal. Aug. 9, 2012). The Ravine Parties' open and continuous use of "Open AI" and open.ai since 2015 was predicated on their status as senior users of the mark; they would not have continued to engage in allegedly infringing activity had OAI acted promptly to obtain a judicial determination that it had rights to the mark. 5-ER-841.

OAI's inexcusable delay in seeking to enforce its purported rights rebutted the presumption of irreparable harm necessary for injunctive relief. *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). OAI's delay is wholly inconsistent with preliminary injunctive relief, and the district court disregarded a significant portion of the factual record to find OAI entitled to the drastic remedy of a preliminary injunction. This Court should credit the entire evidentiary record. To the extent issues of fact must be resolved prior to a final determination, the district court should be ordered to conduct an evidentiary hearing prior to enjoining the Ravine Parties.

2. The Injunction Alters the Status Quo and Requires a Stronger Showing than What OAI Made

In granting the preliminary injunction, the district court disrupted "the status quo," precluding the Ravine Parties from using a mark they registered and have been using since before OAI was founded; indeed, even now, the Ravine Parties are "the sole registered holders of the Open AI Mark." 5-ER-805. "The Ninth Circuit has plainly defined mandatory injunctions as those that go beyond maintaining the preexisting *status quo*." *CycleBar Franchising, LLC v. StarCycle Franchise, LLC*, No. CV 19-9911-DMG, 2020 WL 3840442, at *3 (C.D. Cal. March 27, 2020) (emphasis in original). A party seeking a mandatory injunction must establish "the law and facts *clearly favor* her position, not simply that she is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis in original); *id.* (mandatory injunctions are "particularly disfavored," and "should not issue in doubtful cases."). Here, the district court erroneously applied a "likelihood of success" standard instead of the higher standard required for a mandatory injunction.[6]

---

[6] This issue is properly before this Court. "The Supreme Court has made clear that in adjudicating a claim or issue pending before us, we have the authority to identify and apply the correct legal standard, whether argued by the parties or not." *Thompson v. Runnels*, 705 F.3d 1089, 1098 (9th Cir. 2013). Moreover, specific arguments need not be raised so long as claims are preserved. *See Allen v. Santa Clara County Correctional Peace Officers Association*, 38 F.4th 68, 71 (9th Cir. 2022) ("As the Supreme Court has made clear, it is claims that are deemed waived

The status quo is "the last uncontested status that preceded the parties' controversy." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citations omitted). "In the trademark context, [status quo] means the status that existed 'before [the alleged infringer] began using its allegedly infringing [mark].'" *Cyclebar*, 2020 WL 3840442 at *3 (citations omitted). In *Athleta, Inc.*, 2013 WL 142877, at *1-2, plaintiff clothing company had a trademark over the "Athleta" mark, and defendant used "Athletica" as a service mark for its retail website. After defendants began selling products with the "Athletica" brand name, plaintiff sought a preliminary injunction enjoining defendant company "from operating their website in any form." *Id.* at *12. The court refused to enjoin operation of the entire website, noting that "the uncontested status quo that preceded the present controversy consisted of both parties operating their respective websites that sold women's athletic apparel." *Id.* Similarly, in *Sid Berk, Inc. v. Uniroyal, Inc.*, 425 F. Supp. 22, 29 (C.D. Cal. 1977), the court declined to enjoin conduct that "would fundamentally alter the status of the parties" and "would enjoin status quo practices which have been peacefully pursued for more than three years[.]" *See also UV RML*

---

or forfeited, not arguments."); *see also id.* ("Appellants can make any argument in support of their claim on appeal—they are 'not limited to the precise arguments they made below.'") (Citations omitted).) Here, as described above and below, Ravine Parties maintained in the trial court that the requested injunction would disrupt the parties' status quo. This "is not a new claim but is, instead, a new argument in support of their consistent claim." *See Allen*, 38 F.4th 68.

*NL Assets, LLC v. Coulter Ventures, LLC*, No. 2:21-cv-04913-VAp-ASx, 2021 WL 5706870, at *5 (C.D. Cal. Oct. 22, 2021) (distinguishing case where "parties 'peacefully' coexisted for several years while the alleged trademark infringement occurred" reasoning that the peaceful coexistence in present case "only lasted *until* Plaintiff became aware of the alleged trademark infringement.").

Here, OAI requested, and the district court issued, a mandatory preliminary injunction that went beyond preserving the status quo. Specifically, the Order requires that Ravine Parties stop using their "Open AI' mark in connection with any website, app, or social media account, including as a domain name or social media handle." 1-ER-5; 1-ER-27. There is no dispute that OAI was aware that Ravine Parties had this domain name and were using it since at least 2015. 5-ER-838-39; 5-ER-916-17; 5-ER-952-53. Thus, as in *Athleta* and *Sid Berk*, "the last uncontested status that preceded the parties' controversy" was the *eight years* that OAI was aware that Ravine Parties owned and were using the open.ai domain and disputed mark. That coexistence is the status quo. OAI's counsel admitted at oral argument that OAI was aware and simply chose not to pursue protecting any supposed rights it had because of "the issue of resource use." 3-ER-520.

Moreover, OAI has not established any cognizable legal interest to date, but now, in one fell swoop, the district court has completely shut down Ravine Parties' domain name, email accounts, and website with millions of users under an erroneous

likelihood of success standard. 1-ER-26-27. This reaches far beyond the maintenance of the "status quo" and grants OAI rights not previously enjoyed. *See Warner Brothers Pictures v. Gittone*, 110 F.2d 292, 293 (3rd Cir. 1940) ("Irreparable loss resulting from refusal to accord the plaintiff a new status, as distinguished from interference with rights previously enjoyed . . . does not furnish the basis for interlocutory relief."). Accordingly, the Order should be reversed.

### E. Undisputed Facts Show OAI Had Priority Based on Analogous Trademark Use

"Analogous uses are those which create an association in the minds of the purchasing public between the mark and the petitioner's goods, but which do not constitute 'technical' or 'actual' trademark uses" such as where a mark is affixed to the actual product or service. *See Cosmic Crusaders, LLC v. Andrusiek*, No. 2023-1150, 2023 WL 6889054, at *3 (Fed. Cir. Oct. 19, 2023). To establish priority, "[f]ollowing an analogous use, the party must then actually use the mark in connection with goods within a commercially reasonable timeframe." *Id.*

More than eight months before OAI was formed, Ravine purchased and registered the open.ai domain, where the "Open AI" mark was prominently posted. 5-ER-834-35. Ravine applied to register the "Open AI" mark with the PTO, which mark published in the Supplemental Register on August 1, 2017. 5-ER-839; 5-ER-948-50. Ravine "met and communicated about the Open AI initiative with leading

executives in the artificial intelligence field," including Sam Altman and Greg Brockman in December 2015. 5-ER-835, 5-ER-838, 4-ER-589-51. All these activities constitute analogous use if not actual trademark use. *See Andrusiek v. Cosmic Crusaders LLC*, Cancellation No. 92064830, 2022 WL 4103636, at *9-11 (T.T.A.B. Sept. 6, 2022) (finding analogous use of the "Captain Cannabis" mark based on *inter alia* the registration and maintenance of captaincanabis.com; attendance at a trade show; the sale of one comic book to a Florida customer; social media use of the mark; and the fact that the mark was known in a relatively small, niche market).

Further, it is undisputed that, in November 2022, Ravine Parties launched an AI-based Image Generator on open.ai, which site continued to display the "Open AI" mark. 5-ER-837. In June 2023, Ravine Parties released an AI voice chat bot called "Ava" on websites that displayed the Open AI" mark. 5-ER-837. Such actual use of the mark within a few years of the analogous use date "create[s] a 'continuing association of the mark' with [Ravine Parties'] [services]." *See Cosmic Crusaders*, 2022 WL 1403636, at *12; *see also Farmasino, Inc. v. Farmasino Pharmaceuticals (Jiangsu) Co., Ltd.,* No. 5:15-CV-01877-SVW-DTB, 2016 WL 7655740, at *5-7 (C.D. Cal. June 20, 2016) (priority based on registration of mark, website that displayed mark, defendant's attendance at trade shows and sales to U.S. customers); *Halo Management, LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019, 1033 (N.D. Cal.

2003) (priority even where the OAI "rendered its services to a very limited number of consumers"). Thus, based on analogous use, as soon as Ravine Parties made actual use of the "Open AI" mark within a commercially reasonable period following Ravine Parties' analogous use, their priority in that mark relates back to the date when their analogous use started. Because Ravine Parties' priority in the disputed mark pre-dates OAI's use and purported acquisition of secondary meaning, the district court erred as a matter of law when it enjoined Ravine Parties' use.

## II.     THE DISTRICT COURT ERRED FINDING IRREPARABLE HARM

To find OAI "has been irreparably harmed" 1-ER-26, the district court erroneously relied on a presumption of irreparable harm. Because OAI did not establish that it is likely to succeed on the merits, it is not entitled to such a presumption. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 21-22 (2008).

"Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction . . . . [Instead, a] plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Services, Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original). OAI has not done this here.

In *Herb Reed Enterprises LLC v. Florida Entertainment Management, Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013), the court reversed the preliminary injunction

on the grounds that there was an insufficient record to support a finding of likely irreparable harm. Specifically, the Ninth Circuit noted that district court's "analysis of irreparable harm is cursory and conclusory, rather than being grounded in any evidence or showing offered by HRE." *Id*. (although "loss of control over business reputation and damage to goodwill could constitute irreparable harm," findings not grounded in evidence, nor related to whether irreparable injury is likely or whether legal remedies are adequate, do not support a finding of irreparable harm); *see also adidas Am., Inc.,* 890 F.3d at 759-760 (Ninth Circuit reversal of preliminary injunction based on no evidence of irreparable harm, discrediting self-serving evidence of employees); *Anova Applied Electronics, Inc. v. Inkbird Tech. C.L.*, C23-0845JLR, 2023 WL 5177491, at *3 (W.D. Wash., Aug. 11, 2023) ("the Ninth Circuit has made clear that a finding of irreparable harm cannot be based 'solely on a strong case of trademark infringement;' rather, the movant must establish irreparable harm with evidence.").

Here, OAI attempts to establish irreparable harm based exclusively on declarations from its own employees. 6-ER-1160-69. Specifically, OAI relies primarily on the declaration of James Dyett, OAI's Head of Strategic Accounts, who states only that OAI will suffer harm "if consumers are misled into believing OpenAI's products and services generate harmful content." 6-ER-1167. But this self-serving, conditional, and speculative testimony about what third parties may or

may not do, and about what "loss of control" may occur in the future is not sufficient evidence to establish irreparable harm. *American Passage Media Corp. v. Cass Communications, Inc.,* 750 F.2d 1470, 1473 (9th Cir. 1985) (conclusory affidavits offered by party executives are insufficient to demonstrate irreparable harm); s*ee Herb Reed*, 736 F.3d at 1250–51 (plaintiff seeking a preliminary injunction in a trademark infringement case must establish a likelihood of irreparable harm that is grounded in evidence, not in conclusory or speculative allegations of harm). To the contrary, the evidence in the record shows that OAI is not being harmed at all, but instead has "rocket[ed] into the mainstream" following the public release of ChatGPT, released two weeks after Ravine Parties' Image Generator. 5-ER-837.

Similarly, although OAI repeatedly refers to what it characterizes as "harmful content" allegedly created by Ravine Parties' products, it does not identify a single consumer who saw the alleged "harmful content." 6-ER-1141. Instead, OAI's *counsel* relies on a "compilation of screenshots and images" he allegedly saw displayed on the Feed Page and elsewhere on Defendants' Main Website." 10-ER-2057, 10-ER-2165.

Additionally, the district court erred when it did "not separately consider" the balance of equities. 1-ER-18. OAI's harms are speculative at best, as they did not and cannot demonstrate any actual concrete injury. In contrast, the Order absolutely forces Ravine Parties to cease any and all use of the open.ai domain Ravine acquired

in March 2015 without so much as a forwarding message to its users. In so doing, it completely shuts down Ravine Parties' business, causing the loss of all its goodwill and three million users gained after the investment of a many human-years of work and substantial capital investment. The failure to balance the equities is an abuse of discretion. *See Winter*, 555 U.S. at 26-27, 33 (courts "must balance the competing claims of injury"; it is not enough to address such considerations "in only a cursory fashion").

## III. THE DISTRICT COURT ERRED IN DENYING RAVINE PARTIES' RULE 59/60 MOTION

In finding that OAI likely was the senior user and that Ravine Parties' use likely was not "bona fide", the district court gave great weight to a declaration from a previously undisclosed expert, Dr. Nielson, submitted on reply. The district court credited the Nielson declaration, and, based on the dubious statements in that declaration, rejected sworn testimony from Ravine as to his prior use of the mark. 1-ER-10-11. Counsel for Ravine Parties at the time did not object or otherwise respond to the Nielson Declaration. 3-ER-379-547. Accordingly, to prevent manifest injustice and to afford relief from excusable neglect, the district court should have considered the supplemental evidence submitted in support of the Rule 59/60 Motion and ordered an evidentiary hearing to resolve any factual conflicts.

A Rule 59(e) motion permits a party to, inter alia, "correct manifest errors of law or fact upon which the judgment rests [or to] . . . prevent manifest injustice[.]" *Allstate Ins*, 634 F.3d at 1111. To that end, on a Rule 59(e) motion, a court can consider any evidence when doing so would correct a manifest error of fact or prevent manifest injustice. *See U.S. Bank National Association v. Thunder Properties, Inc.*, 3:17-CV-00106-MMD-WGC, 2019 WL 2110512, at *1-2 (D. Nev. May 13, 2019).

Moreover, the Court has discretion to correct a judgment for mistake, inadvertence, or excusable neglect, and "Rule 60(b) allows for relief in cases of 'excusable neglect'—including negligence.'" *In re Gilman*, 887 F.3d 956, 963 (9th Cir. 2018) (citations omitted); *Thunder,* 2019 WL 2110512, at *3. "Excusable neglect under the federal rules 'is a somewhat elastic concept and is not limited strictly to omissions caused by circumstances beyond the control of the movant' . . . Therefore, Rule 60(b) allows relief even when counsel makes an unreasonable mistake. Moreover, we prefer to resolve cases on the merits." *In re Gilman*, 887 F.3d at 964.

In *Thunder*, the defendant sought reconsideration of the court's summary judgment order when defendant discovered a second notice of delinquent assessment that would have created an issue of genuine material fact if presented. The court granted defendant's 59(e) motion, holding that even though defendant "seeks to

present new evidence [that could have been raised earlier in the litigation], the overriding concern for preventing manifest injustice and correcting manifest errors of fact justifies granting relief under Rule 59(e)." *Thunder* also granted relief under Rule 60(b)(1), reasoning that "[r]elief is available under Rule 60(b)(1) based on the negligent mistake of Thunder's counsel. Plus, relief under Rule 60(b) is necessary 'to correct a clear error or prevent manifest injustice.'" *Thunder*, 2019 WL 2110512, at *3.

Here, the failure of Ravine Parties' former counsel to object to the Nielson declaration on reply was not a "strategic" decision, it was excusable neglect.[7] An objection to this untimely declaration was clearly warranted, as the district court itself recognized. 1-ER-10; *see also Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (court generally "should not consider the new evidence without giving the movant an opportunity to respond"); *Solorio v. ABC Phones of North Carolina, Inc.*, No. 1:12-cv-01051 NONE JLT, 2021 WL 363680, at *5 (E.D. Cal. Feb. 3, 2021). Moreover, it was this reply evidence that led to the district court's conclusions about the "serious, troubling allegations against Defendant Ravine (1-ER-3) and that

---

[7] In denying the Motion to Alter, the District Court cited its inquiry at the injunction hearing asking why Defendants did not respond to Plaintiff's allegations as to use of commerce in Defendants' *opposition*—not reply—papers. *See* 1-ER-3; 3-ER-489-500.

"defendants are not and have never been *bona fide* users of the disputed trademark" (1-ER-3) — all of which is manifestly wrong.

A complete evidentiary record would establish that, regardless of whether OAI acquired secondary meaning, Ravine used the "Open AI" mark in commerce well before 2022 and was the senior user:

***Wikineering Existed:*** Contrary to the finding that "defendants' Wikineering page was either inoperative or lacking in users" (1-ER-22), recent forensics of existing server data confirms there was significant user traffic to the Wikineering family of sites between April 18, 2014, and December 29, 2016. 2-ER-16 ("logs show 15,932 events and 1,289 unique, legitimate users"). Other evidence shows Mr. Ravine invested significant time and resources developing Wikineering, which existed in the public domain. 2-ER-178.

***Ravine did not Commit Plagiarism:*** Ravine did ***not*** plagiarize a 2017 college textbook in his reconstruction of what the Initial Collaboration Tool looked like in 2015. The text came from a 2015 post on Github about "Convolutional Neural Networks" which Ravine had (quite openly) reposted in 2015 on the Open AI Initial Collaboration Tool, where such things were discussed. This can be proved unequivocally because an image of this actual page appeared in a time-verified screenshot of an Open AI brochure Ravine created in 2015. *Compare* 5-ER-858 *with* 2-ER-182-83, 2-ER-197-200, *see also* 2-ER-217-18. It would not have been possible

56

for Ravine in 2015 to have copied a 2017 textbook. Despite the falsity of Dr. Nielson's claims, the character assassination of Ravine clearly impacted the court's view of his testimony.

*The Wayback Machine Does Not Prove a Website Did Not Exist:* Attempting to prove a negative, Dr. Nielson points to the absence of archived records on the Wayback Machine to conclude that Wikineering did not exist, did not display the "Open AI" mark, and did not have actual users. *See, e.g.,* 4-ER-613-15, 4-ER-622-23. Although "[c]ourts have taken judicial notice of the contents of web pages available through the Wayback Machine," the absence of material on the Wayback Machine is not reliable proof that a web page did ***not*** exist. *Erickson v. Nebraska Machinery Company*, No. 15-cv-1147-JD, 2015 WL 4089849, at *1 (N.D. Cal. July 6, 2015). As Tenery explains, screen captures from the Wayback Machine are only a snapshot in time; for a variety of reasons, the Wayback Machine does not capture certain websites, subpages, changes over time, or certain kinds of files. 2-ER-214-16. The web pages captured by the Wayback Machine "are not a complete archive of a website." *Abu-Lughod v. Calis*, No. CV 13-2792 DMG (RZX), 2015 WL 12746198, at *3 (C.D. Cal. May 20, 2015) (Wayback Machine may only be used to show website on the day of capture); *see also Hansen Cold Storage Construction v. Cold Systems, Inc.*, No. 2:19-cv-07617-SB-MAA, 2021 WL 6536672, at *4 (C.D. Cal. Dec. 19, 2021).

***The open.ai Domain Existed With Users:*** The district court's statement that Ravine Parties' "Open.ai domain was nothing but a landing page until November 16, 2022" is incomplete and misleading. 1-ER-22. Between April 6, 2015, and December 10, 2015, just before Altman and Brockman announced the founding of OAI, Ravine Parties' open.ai domain (including the subdomains decentralized.open.ai, beta.open.ai, hub.open.ai) already had attracted "393 unique, legitimate users"; and about 133 users signed up with their email addresses between May 22, 2015, and December 11, 2015. 2-ER-214, 2-ER-236, 2-ER-183-84. These numbers are significant given the small AI research community at that time and that the open.ai domain had only been operating for 6 to 8 months. Over the next two-plus years, this open.ai family of websites had about "16,334 unique, legitimate users" from May 22, 2015, through July 18, 2017; and about 6,202 users signed up with their email addresses between May 22, 2015, and July 18, 2017. 2-ER-215, 2-ER-237, 2-ER-185, 2-ER-186. This evidence demonstrates that the "Open AI" mark had attracted substantial attention and was used in commerce.

To prevent manifest injustice, this Court should consider the complete record and reverse the preliminary injunction. There is ample evidence showing that Ravine Parties are the senior user of the disputed mark. Thus, regardless of whether OAI acquired secondary meaning, Ravine Parties have priority and cannot be liable for trademark infringement. *See Planetary Motion, Inc. v. Techsplosion, Inc.,* 261 F.3d

1188, 1193 (11th Cir. 2001) (to prevail on infringement claim, plaintiff must show "it had prior rights to the mark at issue.").

## IV. THE PRELIMINARY INJUNCTION IS OVERBROAD

In adopting OAI's amended proposed order, the district court issued an overbroad order. "[A]n injunction must be narrowly tailored 'to affect only those persons over which [the Court] has power' . . . to remedy only the specific harms shown by the plaintiffs[.]" *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004) (quoting *Zepeda v. United States I.N.S.,* 753 F.2d 719, 727 (9th Cir.1983)). As currently framed, the Order violates both principles.

"The Supreme Court has made it clear that trademark infringement law prevents only unauthorized uses of a trademark in connection with a commercial transaction in which the trademark is being used to confuse potential consumers." *Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005) (citing *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924); *see also Lang v. Retirement Living Publishing Co., Inc.,* 949 F.2d 576, 582–83 (2d Cir. 1991) (trademark infringement addresses mistaken purchasing decisions and not general confusion). Courts routinely fashion trademark preliminary injunction orders to restrain only infringing conduct likely to cause confusion as to the origin or source of a good or service. *See, e.g., Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994) (preliminary injunction beyond false designation overbroad); *Calvin*

59

*Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 667, 669 (8th Cir. 1987) (overbroad injunction covering array of material).

Moreover, injunctions must be narrowly crafted to comply with First Amendment concerns. *See U-Haul International v. Jartran*, 793 F.2d 1034, 1042 (9th Cir. 1986); *Cochran Firm, P.C. v. Cochran Firm Los Angeles, LLP*, 572 Fed. App'x. 491, 494 (9th Cir. 2014) (reversing preliminary injunction as overbroad and directing court on remand to "tailor the injunction so as to burden no more protected speech than necessary"); *Lockheed Martin Corp. v. Network Solutions, Inc.,* 985 F. Supp. 949, 964 n.9 (C.D. Cal. 1997), *aff'd,* 194 F.3d 980 (9th Cir. 1999) ("Internet users may also have a free speech interest in non-infringing uses of domain names that are similar or identical to trademarks"); *Bosley Med. Inst.,* 403 F.3d at 675, 679-680 (use of a mark as a domain name for a website that expressed critical views of the plaintiff did not violate plaintiff's trademark rights).

Here, the Order is overbroad and infringes upon Ravine Parties' free speech rights because it requires the complete suspension of the open.ai domain and prohibits "anything" being displayed on the website "other than a notice of suspension[.]" 1-ER-27. That is not necessary to protect against consumer confusion and it prohibits other legal uses of the open.ai domain that do not use the disputed mark. Other aspects of the Order adequately protect OAI's claimed trademark rights. For example, paragraph 1(a) preliminarily enjoins Ravine Parties from "[u]sing

60

[their] 'Open AI' mark, or any other logo, design, or word mark that is a colorable imitation of, or similar to, it, including without limitation 'Open AI' and 'open.ai,'" in connection with the display, advertising, development [sic] marketing, production, promotion, sale, and/or distribution of any artificial intelligence products or services, including the results generated by such products or services[.]" 1-ER-26-27. Paragraph 1(c) prohibits Ravine Parties from representing "goods, services, or other products branded with the 'Open AI' mark are approved, or authorized by, or originate from, [OAI's] OpenAI." 1-ER-26. Ravine Parties' compliance with these provisions is sufficient. Ravine Parties should be permitted to post other content on open.ai.

## CONCLUSION

For the foregoing reasons, this Court should reverse and vacate the Injunction in its entirety. At a minimum, it should modify and narrow the scope of the Order to permit Ravine Parties to use the open.ai domain for non-infringing purposes.

DATED: May 8, 2024             WAYMAKER LLP


By:    _/s/ Ryan G. Baker_____
          RYAN G. BAKER
          *Attorneys for Defendants and Appellants*
          *Open Artificial Intelligence, Inc.*
          *and Guy Ravine*

61

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-1963

I am the attorney or self-represented party.

**This brief contains** 13,966 **words,** including 32 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated _____.

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Ryan G. Baker **Date** May 8, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*