No. 24-1963

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**OPEN ARTIFICIAL INTELLIGENCE, INC. and GUY RAVINE**

*Defendants and Appellants,*

*v.*

**OPENAI, INC.**

*Plaintiff and Appellee.*

Appeal from United States District Court
Northern District of California
Hon. Yvonne Gonzalez Rogers
U.S. District Court Case No. 4:23-cv-03918-YGR

**APPELLANTS' EXCERPTS OF RECORD
VOLUME 2 of 10**

**WAYMAKER LLP**
Ryan G. Baker
rbaker@waymakerlaw.com
Scott M. Malzahn
smalzahn@waymakerlaw.com
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800

*Attorneys for Defendants and Appellants Open Artificial Intelligence, Inc.
and Guy Ravine*

```
1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3       Before The Honorable Yvonne Gonzalez Rogers, District Judge

4

5   OPEN AI, INC.,                    )
                                      )
6            Plaintiff,               )
                                      )
7   vs.                               )   No. C 23-03918-YGR
                                      )
8   OPEN ARTIFICIAL INTELLIGENCE, )
    INC., et al.,                     )
9                                     )
             Defendants.              )
10  _____   )

11                                  Oakland, California
                                    Wednesday, April 3, 2024
12

13      TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
                 RECORDING 2:58 - 3:13 = 15 MINUTES
14

15  APPEARANCES:

16  For Plaintiff:
                                Quinn, Emanuel, Urquhart &
17                                 Sullivan, LLP
                                555 Twin Dolphin Drive
18                              Fifth Floor
                                Redwood Shores, California
19                                 94065
                            BY:  ROBERT P. FELDMAN, ESQ.
20  For Defendants:
                                Waymaker, LLP
21                              515 South Flower Street
                                Suite 3500
22                              Los Angeles, California 90071
                            BY:  RYAN G. BAKER, ESQ.
23                              SCOTT M. MALZAHN, ESQ.

24          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

25
```

*Echo Reporting, Inc.*

2

1  For Defendants:

2                              Waymaker, LLP
                               777 South Figueroa Street
                               Suite 2850
3                              Los Angeles, California 90017
                          BY:  JOSE R. NUNO, ESQ.
4

5  Transcribed by:             Echo Reporting, Inc.
                               Contracted Court Reporter/
6                              Transcriber
                               echoreporting@yahoo.com
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  <u>Wednesday, April 3, 2024</u>                                    <u>2:58 p.m.</u>

2                        P-R-O-C-E-E-D-I-N-G-S

3                              --oOo--

4           THE COURT:  This is OpenAI, Inc. versus Open

5  Artificial Intelligence, Inc, 23CV3918.

6           So, a couple of things.  One is that the motion

7  for -- it's a motion for reconsideration.  Mr. Baker, are

8  you primary on this?

9           MR. BAKER (via Zoom):  Mr. Malzahn and I are

10 sharing the responsibility, your Honor.

11          THE COURT:  Okay.  I have to tell you, I'm -- it

12 is so much of a motion for reconsideration, I wonder if you

13 remember your Rule 11 obligations?  I get your footnote, but

14 this is absolutely unacceptable.

15      You do not, and you should know -- you're seasoned

16 attorneys -- you do not put brand new evidence that was

17 readily available to your client in front of me, ask for a

18 redo and call it some -- an amendment to the judgment, or an

19 amendment to the order.  The fact that the attorneys chose

20 not to do it, or neglected not to do it, is not a reason for

21 you to get a redo.

22      So, I don't know what you were thinking, but this --

23 this is on the verge of absurd.  Do you want to respond?

24          MR. BAKER:  Yes, I do, your Honor.  I think that I

25 will take the Court's opinion and obviously respect that,

*Echo Reporting, Inc.*

4

1 but with the same respect, would simply add, there are three

2 grounds that we've cited in the motion, which is brought

3 under Rules 59 and Rule 60.

4      The first ground is, which I understand the Court went

5 to the third one, which is the neglect of counsel.  That's

6 that basis on which we submitted the evidence --

7           THE COURT:  Well, the first ground is whether

8 there were material error of fact.  There was one typo that

9 I will fix, and I will explain how it was immaterial.  So

10 that argument is addressed.

11      The next one are manifest errors of law, which all rely

12 on the fact that either arguments weren't made or evidence

13 wasn't presented.  And then, of course, there's a third.

14           MR. BAKER:  Correct, your Honor.  So the first

15 one --

16           THE COURT:  There is no way that you can make an

17 argument without all of the additional evidence and

18 arguments that all of which could have been made in the

19 first instance.

20           MR. BAKER:  Well, your Honor, I think with regard

21 to that third issue, which is the neglect of counsel, that

22 is obviously a basis under Rule 60.  That's what we've

23 cited.  I understand the Court's opinion that you've

24 expressed already, which is that that's not a sufficient

25 basis and you're talking about Rule 11.  So I understand

*Echo Reporting, Inc.*

5

1  we're very far afield from having this motion heard.

2      Look, I don't want to antagonize the Court with an

3  argument that I don't think your Honor -- I mean, we've made

4  it in our papers.  It sounds like you've -- you're not

5  impressed with it, your Honor, and we've obviously noticed

6  an appeal and it sounds like we need to proceed with the

7  appeal.  And --

8          THE COURT:  And I can tell you what you will do,

9  and I'll put this in here.  I have issued preliminary

10 injunctions where I didn't have a full record, not through

11 any fault to the Court, and issued an order that at trial

12 was reversed.

13     So, I don't understand why it is you need to wait as

14 long as you were waiting to ask me for a trial.  You want a

15 trial?  You can have one in September and I'll let the Court

16 of Appeal know that.  I am offering you a trial in

17 September, a full record, and you can be heard.  You just

18 don't get a redo on this ground.

19     So, do you want a trial in September or not?

20         MR. BAKER:  Well, your Honor, I think I need to

21 discuss that with my client.  I appreciate that -- that

22 offer.  I need to talk about that with my client before I

23 do.

24     And, again, I mean I guess I feel like I need to

25 explain a little bit what our thinking was here, because it

*Echo Reporting, Inc.*

6

1 certainly wasn't, let's go have a redo.

2     When we appeared in this case -- if I just may for a

3 minute, your Honor? When we appeared in this case, I

4 obviously -- we got the injunction, literally the day or the

5 day after we were engaged. We appeared the next day. We

6 looked at the record. We saw that there was things -- it is

7 neglectful of counsel not to object to a bunch of evidence

8 that comes in on a reply. I understand your Honor's

9 position on it. I'm not rearguing that. I'm simply

10 observing, that was a mistake.

11     We, as attorneys for our clients -- and by the way, the

12 injunction -- I know they're -- I'm not rearguing evidence,

13 I'm simply trying to explain, to hopefully indicate that --

14 you know, I don't want to start off on this foot with the

15 Court, your Honor. Unfortunately, it looks like I already

16 have.

17     We, when we looked at this thought, there is no way you

18 don't object to this evidence. Why not? Well, Counsel

19 didn't have an explanation. It was a mistake. And, so, for

20 our client, we wanted to try to see -- and obviously, the

21 Court indicated that there were disputes of fact in the

22 hearing, and that maybe an evidentiary hearing was needed.

23 Again, not going back in time. I understand where the Court

24 is here.

25     We wanted to present the Court with the option -- and

7

1 then, of course, we did find the mistake, and the mistake, I

2 think, is more than a typo, because there's more around

3 that.  I understand your Honor will correct that.  And, once

4 we got into looking at the effect of that date, there are

5 effects, with regard to secondary meaning.  And your Honor,

6 apparently, has already thought of those and will address

7 those in the correction to the order.

8      We are simply trying to do the best we can for our

9 client.  And the thing that was not in the record, that

10 we've put in our briefing here, because it does relate to

11 some of the evidence that wasn't presented, is this is not

12 -- you know, our client is not a troll who has been doing

13 nothing.  He had millions of users.  The injunction is

14 obviously a significant impact, if not a terminating impact

15 on his business.  We're simply trying to find, and thought

16 we would present to the Court, these things that the Court

17 may want to correct.  The Court sounds like it will correct

18 one of them and not the others.

19      Again, your Honor, it wasn't my attention to have a do

20 over, that's how Counsel for OpenAI has characterized it.

21 That's how the Court apparently views it.  All I can say is,

22 we're trying to be diligent counsel, your Honor, and if

23 you're -- if the intent is -- whether it's to sustain the

24 motion to strike or grant the motion to strike, or something

25 else, we will move forward and I will certainly talk to my

8

1 client and immediately respond to the Court by the end of, I

2 hope tomorrow is okay, on the possible September trial date.

3          THE COURT:  Do the Plaintiff wish to be heard?

4          MR. FELDMAN (via Zoom):  No, your Honor.

5          THE COURT:  Look, you are not the only lawyer who

6 tries to do a redo, and that's what this is.  It really is.

7 You're -- all you're doing is trying to bolster an

8 opposition with significantly more evidence.  And I

9 understand what you're doing, but a rose by any other name

10 is still a rose, as they say.

11     And I, you know -- perhaps -- you all are the experts.

12 I just look at what you give me and I look at the law and I

13 issue an order.  You're the experts.  You want to go settle

14 this case because you've got all of this new information, go

15 settle it.  It's the reason why I didn't issue an order

16 immediately, because my view is you all should be settling

17 this case.  But if you're not going to settle it, and now

18 you've got all of this extra evidence for the Plaintiffs to

19 see, you've got a billion-dollar company out there, you want

20 to roll the dice with a jury, roll the dice.  I'm going to -

21 - I've got a three-month criminal trial and then I can try

22 this.

23     So, you know, if it's that devastating to have it

24 resolved on a complete and full record, which frankly, by

25 the way, is how I usually do these things.  Especially on

9

1  trademarks.  There is an evidentiary hearing.  There is a

2  trial.  And it gets resolved.  And it gets resolved quickly,

3  not a year and a half later, like you came in asking for.

4       And, by the way, when I had a case management

5  conference with you, you knew you were doing this and you

6  failed to tell me about it.

7            MR. BAKER:  Your Honor, may --

8            THE COURT:  There's no way you could have done

9  this in a day and a half.

10           MR. BAKER:  Your Honor, at the case -- we didn't

11 -- I didn't raise it at the case management conference, your

12 Honor.  I (Zoom glitch), I hope, as apparent in our briefing

13 -- there are several ways to try to skin this cat, and we

14 were still debating internally how to proceed.

15      We've obviously noticed an appeal, we filed this

16 motion.  And we -- I said more than once -- I drafted our

17 portions of the case management statement, and I said more

18 than once in that statement that we intended to challenge

19 the preliminary injunction.

20      Now, I -- it sounds like the Court wanted me to raise

21 it.  We hadn't finalized our strategy.  We did not finish

22 all of the briefing, your Honor.  Your Honor is right.  We

23 started drafting, figuring out arguments, finding out what

24 we have said, if we have had an opportunity to respond to

25 all of this evidence that came in on the reply, if we had

10

1  objected if Counsel had done what they should have done,

2  frankly, and we went out and we're trying to figure that

3  out, in order to decide how to frame it.

4      So, to the extent I need apologize to the Court,

5  because I didn't raise it, I will do that, but things were

6  still influx at that moment, your Honor.  And I indicated in

7  the brief that was filed in two places, we were going to

8  challenge the preliminary injunction, but again --

9          THE COURT:  Well you did challenge it.  It's up on

10 appeal.

11         MR. BAKER:  That's right, your Honor.  That

12 happened after --

13         THE COURT:  So that's how I interpret a challenge,

14 which is fine.  It's your right, but it's going -- the Court

15 of Appeals is going to be hard pressed with -- you know, if

16 your arguments are like they are with me, which is, hey,

17 there's all this other evidence that our lawyers didn't

18 present in the first instance.  And the Ninth Circuit is not

19 going to be very accommodating with that argument either.

20         MR. BAKER:  I don't disagree, your Honor.  I

21 understand that.

22         THE COURT:  So, you'll get a written order, but

23 the reason I got you on a platform is because my view is, if

24 you can't resolve this, as a business deal between the two

25 sides, then you can have a trial.

11

1     So --

2             MR. BAKER:  Thank you, your Honor.

3             MR. FELDMAN:  Thank you, your Honor.

4             THE COURT:  The offer is open.  I have

5  (indiscernible) --

6             MR. BAKER:  Your Honor --

7             THE COURT:  -- open.

8             MR. BAKER:  May we have until the end of tomorrow

9  to -- to respond to the offer?  Is that acceptable?

10            THE COURT:  That's fine.

11            MR. BAKER:  Okay, thank -- and I -- I will

12 coordinate with Counsel for OpenAI, as well, to the extent

13 that we're able to do that.

14            MR. FELDMAN:  Excuse me.  This is Bob Feldman.

15 I'll be in town until Friday and then I'll be literally off

16 the grid --

17            THE COURT:  Mr. Feldman, I'm losing my hearing.  I

18 can't hear you.

19            MR. FELDMAN:  It's my voice that's losing itself.

20 I just said, I'm going to be in town until Friday afternoon

21 and then entirely off the grid for 10 days.  So hopefully,

22 we can do whatever we have to do in the next two days.

23            THE COURT:  All I would say is, if we're going to

24 have this case tried in September, I just need to know if

25 there are conflicts, including religious holidays.  There

12

1   are many religious holidays.  I don't know who observes and

2   who doesn't observe.  That's typically my issue with

3   September.

4              MR. FELDMAN:  Okay.  Great.  Thank you, your

5   Honor.

6              MR. BAKER:  Thank you, your Honor.

7              THE COURT:  A joint email, please.  One email.

8   Meet and confer, send me one note back.

9              MR. FELDMAN:  Sure.

10             THE COURT:  Get something in writing.

11             MR. BAKER:  Will do, your Honor.  Thank you.

12             MR. FELDMAN:  Thank you.

13             THE COURT:  Thank you.

14        (Proceedings adjourned at 3:13 p.m.)

15

16

17

18

19

20

21

22

23

24

25

13

1                    CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16

17            Echo Reporting, Inc., Transcriber

18                 Saturday, April 6, 2024

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

**ER41**

Ryan G. Baker (Bar No. 214036)
 rbaker@waymakerlaw.com
Scott M. Malzahn (Bar No. 229204)
 smalzahn@waymakerlaw.com
Patricia Rojas-Castro (Bar No. 339087)
 projas-castro@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone:     (424) 652-7800
Facsimile:     (424) 652-7850

*Attorneys for Defendants Guy Ravine & Open
Artificial Intelligence, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPENAI, INC., a Delaware corporation,<br><br>             Plaintiff,<br><br>        v.<br><br>OPEN ARTIFICIAL INTELLIGENCE, INC.,<br>a Delaware corporation; and GUY RAVINE,<br>an individual,<br><br>             Defendants. | Case No. 4:23-cv-3918-YGR<br><br>**DEFENDANTS OPEN ARTIFICIAL<br>INTELLIGENCE, INC. AND GUY<br>RAVINE'S NOTICE OF MOTION AND<br>MOTION TO ALTER OR AMEND A<br>JUDGMENT PURSUANT TO FED. R.<br>CIV. P. 59(e), OR IN THE<br>ALTERNATIVE, FOR RELIEF FROM A<br>JUDGMENT OR ORDER PURSUANT TO<br>FED. R. CIV. P. 60(b)**<br><br>Hearing: May 7, 2024<br>Time: 2:00 p.m. |

Case No. 4:23-cv-3918-YGR

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 7, 2024, at 2:00 p.m., or as soon thereafter as the matter may be heard before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, 4th Floor of the Oakland Courthouse, 1301 Clay Street, Oakland, CA 94612, Defendants Open Artificial Intelligence, Inc. and Guy Ravine (together, "Open Artificial Intelligence" or "Defendants") shall and hereby do move pursuant to Federal Rule of Civil Procedure 59(e) for this Court to Alter or Amend its Order Granting Plaintiff's Motion for a Preliminary Injunction (DE No. 63, the "Order"), and/or, in the alternative, for relief from the Order pursuant to Federal Rule of Civil Procedure 60(b).[1]

This motion is supported by the Memorandum of Points and Authorities in Support of the Motion, the Declaration of Guy Ravine, the Declaration of Thomas Gruber, the Declaration of

---

[1] "Because the Order grants an injunction it is an appealable order under 28 U.S.C. § 1292(a)(1)[.]" *Huawei Techs., Co., Ltd. v. Samsung Elecs. Co., Ltd.*, No. 3:16-cv-02787-WHO, 2018 WL 3037924, at *1, n. 1 (N.D. Cal. June 19, 2018). Thus, Defendants may seek to alter or be relieved from the Order under Rules 59(e) and 60(b), within 28 days of the Order without seeking leave to file a motion for reconsideration under L.R. 7-9. *See* Fed. R. App. P. 4(a)(4)(A); *Monterey Bay Military Hous., LLC v. Pinnacle Monterey, LLC*, No. 14-cv-03953-BLF, 2015 WL 1548833, at *5, n. 9 (N.D. Cal. April 7, 2015) (plaintiff did not need leave under L.R. 7-9 to file its timely Rule 59(e) motion to reconsider granting of preliminary injunction, because L.R. 7–9 "imposes no time limits on filing and applies only to interlocutory orders that can be reconsidered at any time before the entry of final judgment"); *Zhang v. Safeco Ins. Co. of Am., Inc.*, No. C12-1430-CW, 2013 WL 6058307, at *2 (N.D. Cal. Nov. 14, 2013) (party can seek "reconsideration under Federal Rules of Civil Procedure 59(e) and 60(b)" even if party "failed to obtain leave of the Court to file a motion for reconsideration under Civil Local Rule 7–9").

However, this District's practices concerning this situation are not entirely uniform. *Compare Huawei Techs.*, 2018 WL 3037924; *Zhang*, 2013 WL 6058307; *Monterey Bay Military Hous.*, 2015 WL 1548833; and *Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*, No. 13-cv-04513-PJH, 2019 WL 2059661, *1 (N.D. Cal. May 9, 2019) (L.R. 7-9 applies only to orders that may be revised before entry of a judgment and "is itself promulgated under Fed[.] Rule [] 54(b)", and L.R. 7-9 "reflects that limitation"); *with Thomas v. County of Sonoma*, No. 17-cv-00245-LB, 2017 WL 2500886, at *2 (N.D. Cal. June 9, 2017) (applying L.R. 7-9 to Rule 59(e) motion).

Accordingly, to preserve the right to appeal the Order while presenting certain issues to this Court, Open Artificial Intelligence respectfully moves for relief pursuant to Federal Rules of Civil Procedure 59(e) and 60(b), and, in the alternative, should the Court deem this necessary, seeks leave to move for reconsideration under L.R. 7-9(b). Open Artificial Intelligence and has been diligent in seeking this relief, bringing this motion within weeks of the Order in spite of having recently retained new counsel.

DEFENDANTS' NOTICE OF MOTION AND MOTION TO ALTER OR AMEND A JUDGMENT

Kaustuv DeBiswas, the Declaration of Luke Tenery, the Declaration of Jose R. Nuño, and related

exhibits filed concurrently, all matters of which this Court may take judicial notice, and any evidence

or argument that is presented to the Court before or at the hearing.

DATED: March 27, 2024                    WAYMAKER LLP


                                         By:  _____ *s/ Ryan G. Baker* _____
                                               RYAN G. BAKER
                                               Attorneys for Defendants Guy Ravine & Open
                                               Artificial Intelligence, Inc.

**STATEMENT OF ISSUES TO BE DECIDED**

Pursuant to Civil Local Rule 7-4(a)(3), defendants Open Artificial Intelligence, Inc. and Guy Ravine (together "Open Artificial Intelligence" or "Defendants") ask the Court to decide whether Open Artificial Intelligence is entitled to relief under FRCP 59(e) and 60(b) from the Court's February 28, 2024 Order Granting Plaintiff's Motion for a Preliminary Injunction (the "Order") based on the following specific issues:

1.    Whether material errors of fact require this Court to alter or amend the Order, or otherwise grant Open Artificial Intelligence relief from the Order.

2.    Whether manifest errors of law, including the Court's application of an incorrect evidentiary standard for secondary meaning and the Court's apparent failure to consider new legal authority regarding the applicability of the "use analogous to trademark use" doctrine, require that this Court alter or amend the Order, or otherwise grant Open Artificial Intelligence relief from the Order.

3.    Whether the Order is manifestly unjust entitling Open Artificial Intelligence for relief from the Order due to error, mistake, oversight, and omission by Open Artificial Intelligence's prior counsel, including counsel's failure to object to questionable and highly prejudicial evidence submitted by Plaintiff on reply – such as the declaration of a previously undisclosed expert – as well as the form of Plaintiff's Proposed Order, which resulted in an overbroad injunction that will irreparably harm Defendants.

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT
**ER45**

1

**TABLES OF CONTENTS**

2    I.    INTRODUCTION ................................................................................................. 1

3    II.   BACKGROUND .................................................................................................. 5

4          A.   Preliminary Injunction Briefing ............................................................. 5

5          B.   The Preliminary Injunction Hearing ....................................................... 6

6          C.   Supplemental Authority ........................................................................... 6

     D.   The Preliminary Injunction Order ........................................................... 6

7    III.  LEGAL STANDARD ......................................................................................... 7

8    IV.   ARGUMENT ....................................................................................................... 8

9          A.   The Court Made an Error of Fact, Finding Distinctiveness By September 2022 ............. 8

10              1.   The Order Misstates By A Full Year The Relevant Date When the USPTO
                     Determined that the OpenAI Mark Had Not Acquired Secondary Meaning ...... 9

11              2.   No Facts Support A Finding That Plaintiff's "OpenAI" Mark Acquired
12                   Secondary Meaning ....................................................................... 9

13         B.   Finding Plaintiff Likely to Prevail on Its Infringement Claim Was Error ..................... 13

14              1.   Absent Evidence of Secondary Meaning in September 2022, Plaintiff Cannot
                     Show Protectable Right Before Defendants' November 16, 2022 Launch of
15                   OAI's AI Image Generator .............................................................. 13

16              2.   The Court Failed to Consider Supplemental Legal Authority on Analogous Use,
                     Which Demonstrates Defendants Used the Mark in Commerce First .............. 15

17         C.   Counsel's Failure to Object to Plaintiff's Evidence, and, in Particular, the Declaration of
18              Plaintiff's Undisclosed Expert, Constitutes Excusable Neglect From Which Open
19              Artificial Intelligence Should be Relieved ............................................................ 17

20         D.   Defendants' Prior Counsel Neglected To Present Evidence Of Irreparable Harm; At A
                Minimum, A Bond Should Issue ......................................................................... 22

21         E.   This Court Should Order An Evidentiary Hearing to Address Disputed Facts ............. 23

22         F.   The Preliminary Injunction Is Overbroad .............................................................. 23

23              1.   The Court Should Not Enjoin Defendants from Displaying Content on open.ai
                     Absent Any Risk of Trademark Infringement ...................................... 24

24              2.   The Court Should Not Enjoin Third Parties On This Record ...................... 25

25   V.    CONCLUSION ................................................................................................... 25

26

27

28

i                                    Case No. 4:23-cv-3918-YGR

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abu-Lughod v. Calis*,
　No. CV 13-2792 DMG (RZX), 2015 WL 12746198 (C.D. Cal. May 20, 2015)................... 19

*Additive Controls & Measurement Systems, Inc. v. Flowdata, Inc.*,
　96 F.3d 1390 (Fed. Cir. 1996) ...................................................................................... 4, 25

*Allstate Insurance Co. v. Herron*,
　634 F.3d 1101 (9th Cir. 2011) ............................................................................................ 7

*Andrusiek v. Cosmic Crusaders LLC*,
　No. 92064830, 2022 WL 4103636 (T.T.A.B. Sept. 6, 2022)................................ 6, 15, 16, 17

*Art Attacks Ink, LLC v. MGA Enttertainment Inc.*,
　581 F.3d 1138 (9th Cir. 2009) .......................................................................................... 13

*Behring Regional Center LLC v. Wolf*,
　544 F. Supp. 3d 937 (N.D. Cal. 2021) ................................................................................ 1

*In re Bongrain International Corp.*,
　894 F.2d 1316 (Fed. Cir. 1990) ........................................................................................ 10

*Bosley Medical Institute, Inc. v. Kremer*,
　403 F.3d 672 (9th Cir. 2005)............................................................................................. 24

*Braun Inc. v. Dynamics Corp. of America*,
　975 F.2d 815 (Fed. Cir. 1992)..................................................................................... 14, 15

*Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*,
　824 F.2d 665 (8th Cir. 1987)............................................................................................. 24

*CG Roxane LLC v. Fiji Water Co. LLC*,
　569 F. Supp. 2d 1019 (N.D. Cal. 2008) ....................................................................... 10, 14

*Converse, Inc. v. International Trade Commission Skechers U.S.A., Inc.*,
　909 F.3d 1110 (Fed. Cir. 2018)................................................................................. *passim*

*Cosmic Crusaders, LLC v. Andrusiek*,
　No. 2023-11502023, 2023 WL 6889054 (Fed. Cir. Oct. 19, 2023)...................... 3, 7, 15, 16

*Duncan McIntosh Co. Inc. v. Newport Dunes Marina LLC*,
　324 F. Supp. 2d 1078 (C.D. Cal. 2004)............................................................................. 11

*In re E.I. Kane, Inc.*,
　221 USPQ 1203, 1984 WL 63112 (T.T.A.B. 1984) .......................................................... 10

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT
**ER47**

*Epic Games, Inc. v. Apple Inc.*,
      493 F. Supp. 3d 817 (N.D. Cal. 2020) ........................................................ 1

*Erickson v. Nebraska Machinery Co.*,
      No. 15-cv-1147-JD, 2015 WL 4089849 (N.D. Cal. July 6, 2015)........................... 19

*Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*,
      No. 13-cv-04513-PJH, 2019 WL 2059661 (N.D. Cal. May 9, 2019) ...................... 1

*Farmasino, Inc. v. Farmasino Pharmaceuticals (Jiangsu) Co., Ltd.*,
      No. 5:15-cv-01877-SVW-DTB, 2016 WL 7655740 (C.D. Cal. June 20, 2016).............. 14, 17

*Fidelity Federal Bank, FSB v. Durga Ma Corp.*,
      387 F.3d 1021 (9th Cir. 2004).......................................................... 9

*Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*,
      198 F.3d 1143 (9th Cir. 1999)................................................... 10, 11, 13

*In re Gilman*,
      887 F.3d 956 (9th Cir. 2018)........................................................ 8, 18

*Halo Management, LLC v. Interland, Inc.*,
      308 F. Supp. 2d 1019 (N.D. Cal. 2003) .............................................. 17

*Hansen Cold Storage Construction v. Cold Systems, Inc.*,
      No.: 2:19-cv-07617-SB-MAA, 2021 WL 6536672 (C.D. Cal. Dec. 19, 2021) ............. 19

*Henson v. Fidelity National Financial, Inc.*,
      943 F.3d 434 (9th Cir. 2019)......................................................... 8

*Herbal Chef, LLC v. AFG Distribution, Inc.*,
      No. 2:18-cv-8539-AB-MRW, 2020 WL 3064439 (C.D. Cal. Mar. 10, 2020)................ 13

*Huawei Technologies, Co., Ltd. v. Samsung Electronics Co., Ltd.*,
      No. 3:16-cv-02787-WHO, 2018 WL 3037924 (N.D. Cal. June 19, 2018) ............... 1, 7

*Hunter Killer Productions, Inc. v. Zarlish*,
      No. 19-00168 LEK-KJM, 2020 WL 3980117 (D. Haw. June 15, 2020) ................. 25

*International Molders' & Allied Workers' Local Union No. 164 v. Nelson*,
      799 F.2d 547 (9th Cir. 1986)........................................................ 1

*Juanita's Foods v. Dominguez Family Enterprises., Inc.*,
      No. CV 22-6049 PA (PLAx), 2022 WL 18278389 (C.D. Cal. Dec. 16, 2022) ............ 22

*Lang v. Retirement Living Publishing Co., Inc.*,
      949 F.2d 576 (2d Cir. 1991)......................................................... 24

*Language Line Services, Inc. v. Language Services Associates., Inc.*,
      500 F. App'x 678 (9th Cir. 2012)................................................... 22

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT
**ER48**

*Monterey Bay Military Housing, LLC v. Pinnacle Monterey, LLC*,
   No. 14-cv-03953-BLF, 2015 WL 1548833 (N.D. Cal. April 7, 2015) ................................ 1, 7

*Paramount Pictures Corp. v. Primewire*,
   No. 2:21-cv-09317-MCS-SK, 2022 WL 423408 (C.D. Cal. Jan. 7, 2022) ........................... 22

*Planetary Motion, Inc. v. Techsplosion, Inc.*,
   261 F.3d 1188 (11th Cir. 2001)........................................................................................... 16

*Premier Nutrition, Inc. v. Organic Food Bar, Inc.*,
   475 F. Supp. 2d 995 (C.D. Cal. 2007)................................................................................. 11

*Price v. City of Stockton*,
   390 F.3d 1105 (9th Cir. 2004)........................................................................................23, 24

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996)............................................................................................. 18

*In re Seaman & Associates, Inc.*,
   1 USPQ2d 1657, 1986 WL 83329 (T.T.A.B. 1986) ............................................................ 10

*Securities & Exchange Commission v. Bivona*,
   No. 16-cv-01386-EMC, 2017 WL 4022485 (N.D. Cal. Sept. 13, 2017) .............................. 23

*Silva v. Woodford*,
   279 F.3d 825 (9th Cir. 2002)............................................................................................... 23

*Sims v. Greene*,
   161 F.2d 87 (3d Cir.1947).................................................................................................... 23

*Social Technologies LLC v. Apple Inc.*,
   4 F.4th 811 (9th Cir. 2021).................................................................................................. 23

*Solorio v. ABC Phones of North Carolina, Inc.*,
   No.: 1:20-cv-01051, 2021 WL 363680 (E.D. Cal. Feb. 3, 2021)........................................... 18

*Spark Industries, LLC v. Kretek International, Inc.*,
   No. CV 14-5726-GW, 2014 WL 4365736 (C.D. Cal. Aug. 28, 2014) ................................. 13

*Thomas v. County of Sonoma*,
   No. 17-cv-00245-LB, 2017 WL 2500886 (N.D. Cal. June 9, 2017)........................................ 1

*True Names LTD v. GoDaddy Inc.*,
   No. CV-22-01494-PHX-JJT, 2022 WL 4121401 (D. Ariz. Sept. 9, 2022)............................. 22

*U.S. Bank. Nat'l Assoc. v. Thunder Prop., Inc.*,
   No. 3:17-cv-00106-MMD-WGC,  2019 WL 2110512 (D. Nev. May 13, 2019) ............ 7, 8, 15

*U.S. v. Martin*
   226 F.3d 1042 (9th Cir. 2000)................................................................................................ 7

iv                        Case No. 4:23-cv-3918-YGR

*Waldman Publishing Corp. v. Landoll, Inc.*,
   43 F.3d 775 (2d Cir. 1994) ................................................................... 24

*Whaleco Inc. v. Arroyo*,
   No. CV-24-00036-PHX-SPL, 2024 WL 659482 (D. Ariz. Jan. 23, 2024) ....................... 4, 25

*Zhang v. Safeco Ins. Co. of Am., Inc.*,
   No. C12-1430-CW, 2013 WL 6058307 (N.D. Cal. Nov. 14, 2013) ......................................... 1

*In re Zyprexa Injunction*,
   474 F. Supp. 2d 385 (E.D.N.Y. 2007) ................................................................... 25

**Federal Statutes**

28 U.S.C. § 1292(a)(1)[................................................................................................... 1

**Other Authorities**

Fed. R. App. P. 4(a)(4)(A) ................................................................................... 1

Fed. R. Civ. P. 60(b)(1), (6) ................................................................................. 8

Federal Rule of Civil Procedure 59(e) ......................................................... 1, 7

Federal Rule of Civil Procedure 60(b) .......................................................... 1, 8

Federal Rule of Civil Procedure 65(c) .............................................................. 22

Federal Rules of Civil Procedure 59(e) and 60(b) ................................. 1, 3, 7

WAYMAKER

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT
**ER50**

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This Court's February 28, 2024 Order Granting Plaintiff's Motion for a Preliminary Injunction (the "Order") appears to have accomplished what Plaintiff was unable to achieve over the past nine years through direct negotiations or at the Patent and Trademark Office: depriving Defendants Open Artificial Intelligence ("OAI") and Guy Ravine (together, "Open Artificial Intelligence") of the "Open AI" trademark they have used since 2015 and for which they hold a valid US trademark registration predating the formation of Plaintiff's company. Seeking to impart the popularity of its ChatGPT and Dall·E products to its much weaker "OpenAI" name, Plaintiff would convert the determination of trademark rights into a popularity contest that would overwrite Open Artificial Intelligence's historical use and registration of the mark. But the correct application of fact and law exposes numerous critical flaws in the Order that this Court should address.

Because preliminary injunctive relief is an "extraordinary and drastic remedy," that is "never awarded as of right," the Court should fully consider the entire factual record. *See, e.g., Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 831–32 (N.D. Cal. 2020) (*citing Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)); *Behring Reg'l Ctr. LLC v. Wolf*, 544 F. Supp. 3d 937, 950 (N.D. Cal. 2021). The Ninth Circuit has stated that the "right to be heard in opposition to a motion for a preliminary injunction . . . includes presenting oral testimony when the pleadings and affidavits are conflicting." *See Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 554–55 (9th Cir. 1986) (*citing Sims v. Greene*, 161 F.2d 87, 88–89 (3d Cir.1947) (setting aside preliminary injunction because evidentiary hearing necessary to resolve contested facts). Here, there are significant disputed material facts that go to the heart of the legal issues before the Court. In the absence of an evidentiary proceeding, the Court has adopted Plaintiff's characterizations and used them to discredit and disregard Defendants' evidence. As a result, the Order is predicated on manifest errors of fact and law. An accurate factual record and faithful application of the law do not support a conclusion that Plaintiff has the right to enjoin Defendants from using the Open AI trademark they have used for nine years. The Court should vacate the Order and, if it deems necessary, hold an evidentiary hearing to develop a complete and accurate record before imposing

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT

**ER51**

the drastic remedy of a preliminary injunction that effectively strips Defendants of the Open AI mark and open.ai domain they have used for a decade.

Mistakes of fact. The Order is fundamentally flawed due to manifest mistakes of material fact. These foundational factual errors require that the Court provide Open Artificial Intelligence relief from the Order. For example, the Order's conclusion that plaintiff established trademark rights in September 2022 is predicated on mistaken dates. The Court assumed plaintiff's mark was not protectible as of the date of the USPTO's latest rejection of the OpenAI mark for being "merely descriptive," a point Plaintiff did not dispute. (DE 63 ("Order") at 15:22-16:2.) The Court however said that this descriptiveness rejection happened "*[a]s recently as January 3, 2022.*" (*Id.* at 15:22 (emphasis added).) However, ***the cited USPTO rejection had in fact had occurred a full year later, on January 3, 2023***. Furthermore, plaintiff had received additional "highly descriptive" rejections in these same trademark cases "as recently as" ***February 23, 2023, and again on April 12, 2023***. These errors led to the incompatible conclusions that the Court both agreed with the USPTO's rejections of the mark for being "merely descriptive" (which happened in in January, February, and April of 2023), while at the same time concluding that the mark acquired secondary meaning in September 2022. Compounding these errors, the Court found that secondary meaning in the "OpenAI" mark was somehow achieved in September 2022, based on the renown of two other marks, DALL-E (launched September 28, 2022) and ChatGPT (launched November 30, 2022). The launch dates of DALL-E and ChatGPT are incompatible with a finding of secondary meaning in September 2022, particularly for a wholly different mark, OpenAI. These manifest factual errors require vacatur. At a minimum, the errors highlight the need for an evidentiary hearing to permit the Court to decide this extraordinary motion on a complete and accurate record. Plaintiff's long delay in seeking injunctive relief shows there is little prejudice associated with the time required to conduct this further proceeding.

Mistakes of law. The Court erred as a matter law by finding Open Artificial Intelligence likely infringed Plaintiff's trademark absent a showing that Plaintiff has both (a) met the high evidentiary standards for establishing secondary meaning and (b) proved it has priority over Defendants' trademark rights. Plaintiff has done neither. A party cannot be held liable for

infringement of a descriptive mark which occurred before such a mark has acquired secondary meaning. *See Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc.*, 909 F.3d 1110, 1116-17 (Fed. Cir. 2018). Here, it is uncontested that Defendants had over 1.4 million annual users as of January 2023, when the USPTO found Plaintiff's mark "merely descriptive" – a finding the USPTO revised to "highly descriptive" in April 2023. The Court assumed as of the January 2023 USPTO finding, "[P]laintiff's mark was not distinct enough to guarantee plaintiff its exclusive use." Even if Plaintiff did acquire secondary meaning in the mark at some point, it cannot argue that its use was "exclusive" on these facts. Further, a finding of secondary meaning requires a significant evidentiary showing, particularly for a highly descriptive mark. Plaintiff has not carried this evidentiary burden.

Additionally, the Court did not consider – or at least did not acknowledge – new legal authority timely presented by Defendants regarding the applicability of the "use analogous to trademark use" doctrine. The Court should have allowed Open Artificial Intelligence to brief the *Cosmic Crusaders* case submitted on February 2, 2024, as this newly precedential matter directly speaks to the establishment of Defendants' priority of use of the Open AI mark in 2015. These manifest errors of law, which are intertwined with critical errors of fact, must be revisited.

Excusable neglect of counsel. The Order is manifestly unjust due to error, mistake, oversight, and omission by Open Artificial Intelligence's prior counsel, such as the unexplained failure to object to unfounded and highly prejudicial evidence submitted by Plaintiff, including the declaration of previously undisclosed expert, Dr. Seth James Nielson, submitted on reply. Open Artificial Intelligence does not have in-house litigation counsel and exclusively relied on its prior counsel for evidentiary matters, such as objections. But none were made. Objections and responses were critical to Open Artificial Intelligence because Plaintiff's "evidence," including numerous spurious citations to the Internet Archive's Wayback Machine, smeared Mr. Ravine's reputation in the public record and became a basis for the Court to doubt or wholly disregard his truthful statements. The Court noted the failure to object and credited many of Plaintiff's dubious assertions. But the declarations are objectionable, and there is significant contrary evidence this Court should consider. Open Artificial Intelligence should be permitted to correct its prior counsel's evidentiary mistakes.

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT

**ER53**

In the absence of objections, the Court relied heavily on Dr. Nielson, citing his declaration no less than eight times, more than any other single piece of "evidence." In fact, many of the Court's foundational conclusions in the Order – including that "defendants did not use their mark in commerce, if at all"; "plaintiff's use of the mark was likely substantially exclusive"; and "the record paints a troubling picture of defendant Ravine's representations" – are predicated on Dr. Nielson's misleading and objectionable conclusions.

Open Artificial Intelligence's prior counsel also neglected to object to Plaintiff's proposed order. This oversight also harmed Defendants. The Court's Order closely tracks Plaintiff's unchecked proposal, not only enjoining Open Artificial Intelligence from using the disputed "Open AI" mark, but also requiring Open Artificial Intelligence to suspend the open.ai domain and prohibiting Open Artificial Intelligence from displaying "anything" other than a notice of suspension, regardless of whether the content might be confused with Plaintiff's mark. Moreover, the Order improperly enjoins third parties – "domain name registrars, web hosting services, and social media platforms" – not before the Court and without any evidence of complicity. *See Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1397 (Fed. Cir. 1996) (A district court is prohibited from "entering an injunction against a non-party that regulates the non-party's conduct independent of any complicity with an enjoined party."); *see also Whaleco Inc. v. Arroyo*, No. CV-24-00036-PHX-SPL, 2024 WL 659482, at *3 (D. Ariz. Jan. 23, 2024). There has been no showing that any of the third parties referenced in the injunction had any complicity in the wrongs alleged by Plaintiff. Without this evidence, the Order should not extend to any of the "domain name registrars, web hosting services, and social media platforms."

Although the injunction is "preliminary," without an adequate sunset period, the ability to redirect the three million plus users of the open.ai website, or the right to redirect its email, the Order effectively and irreparably takes away the entire business that Open Artificial Intelligence built. That business includes the open.ai website, in operation for nine years, as well as its three million users. The significance of the remedy and numerous factual and legal issues all favor this Court's further consideration. The Court could vacate the Order and, if necessary, order an evidentiary hearing so the Court can accurately consider all the relevant evidence before essentially handing

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT

**ER54**

Open Artificial Intelligence a death sentence, while handing the intellectual property Open Artificial Intelligence has spent almost ten years developing to a competitor who has been trying and failing to take the Open AI name for itself for almost that entire period.

## II.    BACKGROUND

### A.    Preliminary Injunction Briefing

On September 29, 2023, Plaintiff filed its Motion for a Preliminary Injunction (the "Motion").(DE 21.) During the parties' briefing, Plaintiff never asserted that it had acquired secondary meaning in its "OpenAI" mark. (*See id.*) Instead, Plaintiff took the position that its mark is protectable on the ground that the mark is suggestive in nature and Plaintiff had priority over Defendants' mark based on use in commerce. (*See* DE 21 at 12-13.) The parties did not develop an evidentiary record on whether Plaintiff's mark acquired secondary meaning.

On October 16, 2023, Defendants filed their opposition. (*See* DE 38; *see also* DE 38-2.) In his declaration, Mr. Ravine attested he purchased the open.ai domain in March 2015 and displayed the "Open AI" mark on a variety of online projects associated with the Open AI project, located at open.ai domain and other affiliated domains and subdomains, at various times over eight years from 2015 to 2023. (DE 38-2 at ¶¶ 5-6.) Mr. Ravine acknowledged some historical data relating to his use of the Open AI mark had been lost over time. He submitted evidence that included snapshots and other materials about the Open AI project, as well as email communications he had with Plaintiff from December 2015, and from February 2022, both instances where Plaintiff attempted to purchase the open.ai domain and "Open AI" mark from him. (*Id.* at ¶ 34.)

On October 24, 2023, Plaintiff replied. Among Plaintiff's extensive evidence offered for the first time on reply was a 21-page declaration from a previously undisclosed cyber-forensics expert, Dr. Seth James Nielson. (DE 47.) Based on an examination of the "Internet Archive's Wayback Machine and advanced searches on Google," Dr. Nielson opined Defendants' Wikineering website and subdomains associated with the open.ai domain either did not exist, did not operate, and/or did not have real users. (*See, e.g.,* DE 47 at ¶¶ 47, 48, 50-52, 61, 63.) Dr. Neilson further accused Mr. Ravine of plagiarism and made a series of assumptions casting doubt upon his veracity and motives.

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT

**ER55**

Defendants' former counsel did not object to this new evidence on reply, did not seek leave to file a sur-reply, or request a continuance of the hearing to conduct expert discovery.

### B.    The Preliminary Injunction Hearing

On November 20, 2023, this Court held oral argument. (DE 55.) During the argument, the Court observed that "the PTO has said multiple times that this is a descriptive mark" and questioned why either of the parties have any "protectable" interest in the disputed mark. (DE 56 at 64:18-25.) The Court also noted the absence of Defendants' objections to evidence. (*Id.* at 29:9-12.) And the Court repeatedly contemplated an evidentiary hearing. (*Id.* at 4:22-23; 6:10-12; 45:12-16.)

### C.    Supplemental Authority

Following the hearing, on February 2, 2024, Defendants filed supplemental legal authority with the Court on the analogous use doctrine. (DE 61.) This filing consisted of a notice, attaching Trademark Trial and Appeal Board's decision *Andrusiek v. Cosmic Crusaders LLC*, designated precedential January 3, 2024. Defendants "request[ed] that the Court permit the parties to submit briefing regarding the impact" of the decision "on the disposition of Plaintiff's Preliminary Injunction Motion." (*Id.* at 2:20-22.) The Court did not authorize further briefing.

### D.    The Preliminary Injunction Order

On February 28, 2024, this Court granted Plaintiff's Motion, finding Plaintiff had shown irreparable harm and was likely to prevail on trademark infringement. (*See* Order.) Consistent with the prosecution history before the USPTO, the Court treated both parties' marks as "merely descriptive." (*Id.* at 15:23-24, 18:3-5.) The Court focused on which party first used the mark in commerce and when, if at all, either mark acquired secondary meaning. (*Id.* at 14-17.) It assumed that Plaintiff's mark had not acquired secondary meaning when the USPTO most recently rejected Plaintiff's application to register the "OpenAI" mark – which rejection the Court stated was on January 3, 2022 (*see id.* at 15:22) but, in fact the cited rejection took place one year later, on January 3, 2023 (*see* DE 38-24), with subsequent rejections on February 23 and April 12, 2023 (rejections based on review of over 800 pages of evidence Plaintiff submitted since January 3 to support that its mark had acquired secondary meaning). (DE 38-12; DE 38-18.) The Court then found Plaintiff's

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT

**ER56**

mark likely acquired secondary meaning by "September 2022." (Order at 16:17-19.) The Court did not cite evidence of secondary meaning, other than a passing reference to Plaintiff's DALL-E and ChatGPT products released in late September and November 2022, respectively.

Although no evidentiary hearing took place, the Court wrote that "the current record paints a troubling picture of defendant Ravine's representations to the USPTO and this Court about the true extent of his use of the disputed mark." (*Id*. at 17:10-11.) For several of its foundational conclusions, the Court relied on the Nielson declaration, citing it 8 times – <u>more than any other single piece of evidence in the record</u>. (*See, e.g., id*. at 16:24-27.) The Court found, "plaintiff is likely to prove that it was a *bona fide* user of the disputed mark since at least September of 2022, if not earlier, and that its mark by that point was at least suggestive." (*Id*. at 16:17-19.) Finally, the Court ruled Plaintiff is entitled to a rebuttable presumption of irreparable harm. (*Id*. at 18:13-14.) The Order does not mention *Cosmic Crusaders*. Having received no objections, with few minor modifications, the Court adopted Plaintiff's proposed order. (*Compare* DE 51 *with* DE 63.)

Defendants substituted counsel on February 29, 2024. (*See* DE 65-69.)

## III.    LEGAL STANDARD

The Order is an appealable judgment subject to review under Federal Rules of Civil Procedure 59(e) and 60(b). *See U.S. v. Martin* 226 F.3d 1042, 1048 n. 8 (9th Cir. 2000); *See also Huawei Tech.*, 2018 WL 3037924, at *1.

A Rule 59(e) motion permits a party to: (1) "correct manifest errors of law or fact upon which the judgment rests; (2) . . . present newly discovered or previously unavailable evidence; (3) . . . prevent manifest injustice; or (4) . . . [address] an intervening change in controlling law." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011); *see also Monterey Bay Military*, 2015 WL 1548833, at *7 (Rule 59(e) motion proper to address court's error "fundamentally misappl[ying] the controlling case.") To that end, on a Rule 59(e) motion, a court can consider any evidence when doing so would correct a manifest error of fact or prevent manifest injustice. *See U.S. Bank. Nat'l Assoc. v. Thunder Prop., Inc.*, 2019 WL 2110512, at *1-2 (D. Nev. May 13, 2019) (evidence that could have been presented earlier but was not permitted on Rule 59(e) because of "the overriding concern for preventing manifest injustice and correcting manifest errors of fact"). *Thunder* also

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT

**ER57**

1    granted relief under Rule 60(b)(1), "based on the negligent mistake of Thunder's counsel" in failing

2    to present evidence. 2019 WL 2110512, at *3.

3          Under Rule 60(b), "the court may relieve a party or its legal representative from a final

4    judgment, order, or proceeding" for "(1) mistake, inadvertence, surprise, or excusable neglect … [or

5    for] (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b)(1), (6). "Rule 60(b) allows for

6    relief in cases of 'excusable neglect'—including negligence.'" *In re Gilman*, 887 F.3d 956, 963 (9th

7    Cir. 2018) (citations omitted); *Thunder*, 2019 WL 2110512, at *3; *see also id.* at 964 (Excusable

8    neglect is flexible standard and "Rule 60(b) allows relief even when counsel makes an unreasonable

9    mistake [and], we prefer to resolve cases on the merits.") Finally, Rule 60(b)(6) "is a grand reservoir

10   of equitable power that allows courts to grant relief from a final judgment for 'any' reason that

11   'justifies relief.'" *Henson v. Fid. Nat'l Fin., Inc*., 943 F.3d 434, 439-40 (9th Cir. 2019).

12   **IV.    ARGUMENT**

13        **A.    The Court Made an Error of Fact, Finding Distinctiveness By September 2022**

14        Ruling that Plaintiff has priority over the disputed mark, this Court assumed that the mark is

15   descriptive but found that Plaintiff is likely to prove that as of September 2022 "its mark by that

16   point was at least suggestive" [*i.e.*, acquired secondary meaning].[2] (Order at 16:18-19.) That finding

17   is clear factual error for at least two reasons. First, the Order states that the USPTO most recently

18   determined that the mark had not acquired secondary meaning by January 3, 2022, when, in fact,

19   that occurred on January 3, <u>2023</u>, and later again in February and April 2023. Second, there is no

20

21   _____

22   [2] Although the Court erroneously uses the term "suggestive" in this portion of the Order, the
     context implies that the Court concluded that the mark had acquired secondary meaning through
23   exclusive use over time. During oral argument, the Court expressed the view that the parties'
     marks are descriptive. (DE 56 at 64:16-25.) That was consistent with multiple determinations by
24   the USPTO that the mark was "merely descriptive" and "highly descriptive." A descriptive mark
     cannot "become" suggestive through use. (*See Converse, Inc. v. Int'l Trade Comm'n*, 909 F.3d
25   1110, 1116 (Fed. Cir. 2018) (party can obtain rights to use a descriptive mark only when mark has
     acquired distinctiveness or "secondary meaning").) Defendants therefore assume the Court meant
26   secondary meaning. The Order reflects this reasoning. (*See, e.g.*, Order at 15:22-16:2 ("the Court
     assumes that as of January of 2022 plaintiff's mark was not distinct enough to guarantee plaintiff
27   its exclusive use," citing USPTO rejection of Plaintiff's trademark application because the mark
     was "'merely descriptive' and had not acquired distinctiveness, or secondary meaning"), *id.* at
28   16:3-16 (Ninth Circuit four-factor secondary meaning test).)

evidence in the record to support OpenAI's secondary meaning by September 2022. The evidence speaks to other marks, but not to "OpenAI."

1.    The Order Misstates By A Full Year The Relevant Date When the USPTO Determined that the OpenAI Mark Had Not Acquired Secondary Meaning

This Court's finding that Plaintiff's mark likely acquired secondary meaning by September 2022 is based on the clearly erroneous factual premise that the USPTO last determined the mark lacked secondary meaning months earlier on "January 3, 2022[.]" (Order at 15:22-16:3.) "[F]or the purposes of this motion . . . the Court assume[d] that as of January 2022 plaintiff's mark was not distinct enough to guarantee plaintiff its exclusive use." (*Id.*) The problem is the USPTO in fact rejected plaintiff's claim of acquired distinctiveness a year later, on January 3, <u>2023</u>, concluding that Plaintiff's "OpenAI" mark "is highly descriptive" and "applicant's evidence [of secondary meaning] is not sufficient to show acquired distinctiveness." (DE 38-24.) Since then, as recently as February 23 and April 12, 2023, the USPTO again determined Plaintiff's mark and logo were unregistrable for being "highly descriptive" despite having submitted hundreds of pages of evidence in support of its claim (DE 38-12; DE 38-18.)

The Court previously "assumed" that the USPTO's determination that Plaintiff's mark "had not acquired distinctiveness, or secondary meaning" was correct as of the date of that determination. (Order at 15:22-16:3.) Moreover, at oral argument, the Court suggested it shared the view that the disputed mark is descriptive and that it may be that none of the parties have a protectible interest in the disputed mark. (DE 56 at 64:16-66:11.) There is no reason for this Court to now disagree with the USPTO. The Court's assumption applied to the correct date entitles Defendants to relief. *See, e.g., Fidelity Fed. Bank, FSB v. Durga Ma. Corp.*, 387 F.3d 1021, 1024 (9th Cir. 2004) (Rule 60(b)(1) motion granted to correct "mistake" Court made applying an incorrect interest rate).

2.    No Facts Support A Finding That Plaintiff's "OpenAI" Mark Acquired Secondary Meaning

The evidence does not support any departure by this Court from the USPTO's determination that Plaintiff's "OpenAI" mark lacked secondary meaning as of April 12, 2023 (or January 2023), much less seven months earlier. Plaintiff did not argue its mark had acquired secondary meaning in the preliminary injunction briefing; nor did Plaintiff develop an evidentiary record to support such

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT
**ER59**

1  a finding. In the absence of such a record, the Court's finding that Plaintiff's "OpenAI" mark
2  acquired secondary meaning in September 2022 is clearly erroneous.

3  "A descriptive term can be protected as a valid trademark only with a showing of secondary
4  meaning." *Filipino Yellow Pages, Inc. v. Asian J. Publ'n, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999);
5  *see also CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019, 1033 (N.D. Cal. 2008)
6  ("Descriptive marks without secondary meaning cannot be trademarked"). Trademark protection is
7  triggered for the user of a descriptive mark as soon as the mark acquires a "secondary meaning."
8  *See Converse, Inc.*, 909 F.3d at 1117-18 (date secondary meaning acquired is "important").

9  "The greater the degree of descriptiveness the term has, the heavier the burden to prove it
10 has attained secondary meaning." *In re Bongrain Int'l Corp.*, 894 F.2d 1316, 1317 n.4 (Fed. Cir.
11 1990) (citing *Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 1581 (Fed. Cir. 1988)).
12 Plaintiff's mark has been found to not just be merely descriptive, but "highly descriptive," a slight
13 half-step above genericism. A highly descriptive mark faces a much higher burden to establish
14 distinctiveness – more evidence is required where a mark is so highly descriptive that purchasers
15 seeing the matter in relation to the named goods and/or services would be less likely to believe that
16 it indicates source in any one party. *See, e.g., In re Seaman & Assocs., Inc.*, 1 USPQ2d 1657, 1986
17 WL 83329, at *4 (T.T.A.B. 1986); *In re E.I. Kane, Inc*., 221 USPQ 1203, 1206, 1984 WL 63112, at
18 *4 (T.T.A.B. 1984) (refusal to register OFFICE MOVERS, INC., for moving services, because there
19 was evidence of substantial advertising expenditures but no evidence the advertising aimed "to
20 creat[e] secondary meaning in applicant's highly descriptive trade name.").

21 Courts in the Ninth Circuit consider four factors in determining whether a mark has acquired
22 secondary meaning: "'(1) whether actual purchasers of the product bearing the claimed trademark
23 associate the trademark with the producer, (2) the degree and manner of advertising under the
24 claimed trademark, (3) the length and manner of use of the claimed trademark, and (4) whether use
25 of the claimed trademark has been exclusive.'" (Order at 15:18-21 (quoting *Yellow Cab Co. of
26 Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 930 (9th Cir. 2005).) "Secondary
27 meaning can be established in many ways, including (but not limited to) direct consumer testimony;
28 survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of

10                                                    Case No. 4:23-cv-3918-YGR

1    advertising; sales and number of customers; established place in the market; and proof of intentional

2    copying by the defendant." *Filipino Yellow Pages, Inc.*, 198 F.3d at 1151; *see also Duncan McIntosh*

3    *Co. Inc. v. Newport Dunes Marina LLC*, 324 F. Supp. 2d 1078, 1084 (C.D. Cal. 2004) (survey

4    evidence often "most persuasive evidence of consumer recognition and association").

5         There is no survey evidence as to whether (and if so when) Plaintiff's mark acquired

6    secondary meaning. There is no direct consumer testimony either, or evidence that quantifies

7    Plaintiff's sales or advertising expenditures.[3] There is no proof of intentional copying; rather, Ravine

8    registered the disputed mark first and acquired the open.ai domain before Plaintiff even existed. (DE

9    38-2 at ¶ 6.) There are some news articles in the record, but those articles do not establish that the

10   "Open AI" mark acquired secondary meaning in September 2022 or at any other time. (*See* DE 22

11   at ¶¶ 15-16, DE 22-17; DE 22-18.) On this record, there simply is no evidentiary basis to support

12   the finding that Plaintiff's mark acquired secondary meaning in September 2022—which was before

13   ChatGPT was launched. *See Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F. Supp. 2d

14   995, 1003-04 (C.D. Cal. 2007) (denying preliminary injunction motion where evidence was

15   insufficient to demonstrate secondary meaning even though a report showed that the movant's

16   "Organic Food Bar" is the number one selling nutrition bar in the country).

17        The Order cites the launch of "ChatGPT and DALL E 2" and a couple publications from

18   2023 as support for the finding that Plaintiff's "Open AI" mark likely acquired secondary meaning

19   by **September 2022**. (Order at 15:7-8, 16:17-19.) But the cited evidence and the record provide no

20   support for this finding. At most, they show the following:

21        • ChatGPT was released on November 30, 2022 (DE 22 at ¶ 8), and thus could not possibly
22          have caused "OpenAI" to become a household name two months earlier in September.
            There is no expert declaration, news articles, or any other evidence showing that
23          consumers recognized the "OpenAI" mark and associated it with ChatGPT in September
            2022 or at any other time. Plaintiff submitted a "compilation" of about 60 articles by
24          news and media organizations that its witness describes as "about OpenAI." (DE 22 at ¶

---

[3] At best, Plaintiff claims that there were more than 1.5 million active users of DALL·E 2 as of
September 2022, and that "Reuters reported that OpenAI's ChatGPT reached an estimated 100
million monthly active users just two months after its launch [i.e., January 2023]." (DE 22 at ¶ 9.)
These statements lack foundation and rest on hearsay. Even assuming they were true, they would
be probative of the DALL-E and ChatGPT marks and would not show that the "OpenAI" mark
acquired secondary meaning in September 2022.

15; DE 22-17.) But these articles discuss ChatGPT; only 17 of them expressly mention OpenAI. Moreover, these articles all post-date September 2022, ranging from December 2022 to September 2023.

- DALL·E 2 was released on September 28, 2022. (DE 22 at ¶ 7.) According to an announcement on that date, Plaintiff claims that "more 1.5 million users are actively creating over 2 million images per day with DALL·E[.]" (DE 22 at ¶ 9; DE 22-5.) There is no expert declaration, news articles, or any other evidence showing that consumers recognized the "OpenAI" mark and associated it with DALL·E or DALL·E 2.

- The Order mentions a website ranking and two articles published in *Forbes* and the *Washington Post*, which purportedly show that "the widespread association of the OpenAI mark with Plaintiff[.]" (Order at 2:18-19.) But these articles and the website ranking are from 2023 and thus provide no support for the finding that the OpenAI mark had likely acquired distinctiveness in September 2022 prior to the release of ChatGPT. (*See* DE 22 at ¶ 13 ("according to web analytics firm Similarweb, OpenAI's website ranked as the 28th most visited site in the world in *September 2023*") (bolding and italics added); DE 22-17 at 197 and 231 (*Forbes* article stating, "*[i]n 2023*, everyone knows OpenAI's name") (bolding and italics added); DE 22-17 at 231 (*Washington Post* article from *March 14, 2023* stating, "the viral chatbot's creator is rocketing into the mainstream").)

Publicly available data indicates that Plaintiff's OpenAI mark has not acquired secondary meaning. Google Trends data shows "ChatGPT" is far better known than both "OpenAI" and "DALL·E," which register at a low level of interest in 2023. (Declaration of Luke Tenery ("Tenery Decl.") ¶ 41, Ex. D, Fig. 5.) Further, public interest in ChatGPT only began to register in 2023. (*Id*.) Google Trends data shows interest in the terms "ChatGPT," "OpenAI," and "DALL·E." Data shows ChatGPT did not begin to trend until 2023 and had about 10 times the amount of interest as "OpenAI" and "DALL·E" (consistently low):



DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT

**ER62**

(Tenery Decl. ¶ 41, Ex. D, Fig. 5.)

As recently as February 2024, Plaintiff's application to trademark "ChatGPT" was rejected by the USPTO. (*See* Request for Judicial Notice ("RJN") Ex. A; Declaration of Jose R. Nuño ("Nuño Decl.") ¶ 2, Ex. A ("ChatGPT" is a descriptive mark and has not acquired secondary meaning).) If "ChatGPT" has not acquired secondary meaning, it is hard to fathom how Plaintiff's far less popular "OpenAI" has done so.

Moreover, Plaintiff certainly has not established that it had *five years* of substantially exclusive and continuous to support a finding of secondary meaning. *See Herbal Chef, LLC v. AFG Distribution, Inc.*, No. 2:18-cv-8539-AB-MRW, 2020 WL 3064439, at *6 (C.D. Cal. Mar. 10, 2020) (five months of exclusive use did not demonstrate secondary meaning); *Spark Indus., LLC v. Kretek Int'l, Inc.*, No. CV 14-5726-GW, 2014 WL 4365736, at *12 (C.D. Cal. Aug. 28, 2014) ("[T]wo years of exclusive use is on the low end of the spectrum"); *Filipino Yellow Pages, Inc.*, 198 F.3d at 1152 (mark did not have secondary meaning even after six years of use); *Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009) (no exclusivity); *Converse, Inc.*, 909 F.3d at 1121 (courts "have found five years' substantially exclusive and continuous use to weigh in favor of a finding of secondary meaning") (collecting cases). Because the USPTO rejected Plaintiff's trademark application and there is no evidence in the record to meet the high legal bar to prove secondary meaning, this Court erred finding Plaintiff's mark protectable.

**B.      Finding Plaintiff Likely to Prevail on Its Infringement Claim Was Error**

1.      Absent Evidence of Secondary Meaning in September 2022, Plaintiff Cannot Show Protectable Right Before Defendants' November 16, 2022 Launch of OAI's AI Image Generator

To the extent Plaintiff's "OpenAI" mark ever acquired secondary meaning (disputed), it certainly was not before the USPTO last rejected Plaintiff's trademark application on April 12, 2023. By that time, Defendants had already launched an open-source AI image generator and by the end of the year, had over 2.5 million annual users. (Tenery Decl. ¶ 33, Ex. D, Fig. 3.) Thus, even if the Court were disinclined to believe Defendants had acquired trademark rights through the registration and use of the Open AI mark from 2015-2022, it is uncontested that Defendants were using the mark as of November 16, 2022. Without evidence that Plaintiff's "Open AI" mark acquired secondary

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT

**ER63**

1   meaning earlier, Plaintiff cannot establish exclusivity required to show it is likely to prevail on its

2   trademark infringement claim.

3       "In any infringement action, the party asserting trade-dress [or trademark] protection must

4   establish that its mark had acquired secondary meaning before the first infringing use by each

5   alleged infringer"—such protection does not retroactively prohibit prior lawful uses of the mark by

6   other entities. *See Converse, Inc.*, 909 F.3d at 1116-17; *CG Roxane LLC*, 569 F. Supp. 2d at 1032

7   ("must show that secondary meaning existed prior to the date on which the defendant commenced

8   using the same or similar mark.") (cleaned up); *Farmasino, Inc. v. Farmasino Pharmaceuticals*

9   *(Jiangsu) Co., Ltd.*, 2016 WL 7655740, *7-8 (C.D. Cal. June 20, 2016) (defendants' prior use an

10  absolute defense to plaintiff's trademark claims).

11      Plaintiff has not shown its mark acquired secondary meaning before the first purportedly

12  infringing use by Defendants—much less that Plaintiff's use was substantially exclusive for *five*

13  *years*. Mr. Ravine acquired the open.ai domain in March 2015, before Plaintiff formed, and he

14  attested to the online use of his "OpenAI" mark over nearly a decade. (DE 38-2 at ¶ 6.) But even

15  setting aside that prior use (which is disputed), it is incontrovertible that Defendants launched their

16  AI-generator on November 16, 2022. (*See* Order at 7:28-8:1; DE 38-2 at ¶ 12 (Ravine "updated

17  Open.ai" to add "a third-party plugin [actually, open-source technology] for a text-to-image

18  generator" on November 16, 2022).) By December 2022, Defendants' AI-generator had over

19  170,000 users and over 2.3 million users in October 2023. (DE 38-2 at ¶ 12.)

20      Even assuming Plaintiff's "OpenAI" mark acquired secondary meaning sometime after

21  January 2023 when the USPTO rejected its trademark application, that would be too late to prove a

22  claim for trademark infringement against Defendants. By that time, Defendants were using their

23  mark in connection with their own AI-generator on the open.ai domain. Plaintiff cannot show that

24  it had exclusive use of the disputed mark at that time. Even if Plaintiff's mark had acquired

25  secondary meaning at some point, Plaintiff provides no precedent stating that it can enjoin another

26  user that began its use prior to plaintiff's mark acquiring secondary meaning, especially a senior

27  user with a Supplemental trademark registration. The opposite is true.

28      *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815 (Fed. Cir. 1992) is illustrative. There,

14                                      Case No. 4:23-cv-3918-YGR

plaintiff sued defendant "Waring" for *inter alia*, infringement of its trade dress on the design and packaging of its blender. *Id.* at 818. After a jury verdict for plaintiff, the Federal Circuit reversed, stating that even though plaintiff began selling its blender first, to prevail it must "show that its blender design acquired secondary meaning during the [] 18 months preceding the introduction of Waring's blender." *Id.* at 826. The Court noted that "while not impossible, it is difficult for a product to acquire secondary meaning during an 18-month period," and held the claims failed because plaintiff did not prove secondary meaning "before the infringement began." *Id.* at 826-27. Here, as in *Braun*, there can be no infringement based on secondary meaning when plaintiff, in a much shorter time span, did not acquire secondary meaning before any alleged "infringement began."

> 2. The Court Failed to Consider Supplemental Legal Authority on Analogous Use, Which Demonstrates Defendants Used the Mark in Commerce First

Even if Plaintiff could establish secondary meaning, Defendants have priority based on the analogous use doctrine through advertising, presentations and industry discussions commencing in March 2015, followed by the launch of a website and AI products within a commercially reasonable time. In finding "defendants' mark was not in commercial use" (Order at 16:15-16), this Court failed to consider supplemental legal authority that demonstrates Defendants can establish trademark priority through other activities analogous to actual trademark use followed by use in commerce within a commercially reasonable time period. (*See* DE 61.) The failure to consider controlling case law is grounds to alter or amend the Order to correct manifest errors and to prevent manifest injustice. *See Thunder*, 2019 WL 2110512, at *2-3.

In a decision recently designated as precedential,[4] the Trademark Trial and Appeal Board ("the Board") held a party has priority over a mark sufficient to cancel another's registration, when the party demonstrates "prior use analogous to trademark or service mark use.'" *Andrusiek v. Cosmic Crusaders LLC*, 2022 WL 4103636, at *6 (T.T.A.B. Sept. 6, 2022) ("*Cosmic Crusaders*") (citing *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 (Fed. Cir. 2002).) "Analogous

---

[4] The Board's decision in *Cosmic Crusaders* was affirmed by the Federal Circuit on October 19, 2023. *See Cosmic Crusaders, LLC v. Andrusiek*, 2023 WL 6889054 (Fed. Cir. Oct. 19, 2023) ("*Andrusiek*"). It was redesignated as "Precedential" by the Board January 3, 2024, and filed as supplemental authority February 2, 2024. (*See* DE 61, 61-4.)

1 uses are those which create an association in the minds of the purchasing public between the mark

2 and the petitioner's goods, but which do not constitute 'technical' or 'actual' trademark uses" such

3 as where a mark is affixed to the actual product or service. *Andrusiek*, 2023 WL 6889054, at *3. To

4 establish priority, "[f]ollowing an analogous use, the party must then actually use the mark in

5 connection with goods within a commercially reasonable timeframe." *Id.*

6 In *Cosmic Crusaders*, petitioner sought to cancel respondent's mark, "CAPTAIN

7 CANNABIS," which was registered by respondent in 2014, and used by both parties to sell comic

8 books. 2022 WL 4103636, at *5, *7. Petitioner claimed that he had priority over the mark based on

9 the "direct sale of a 420/Captain Cannabis comic book to a customer in the state of Florida" and

10 activities "through his CAPTAINCANNABIS.COM web portal since April 22, 1999." *Id.* at *6.

11 Relying on the analogous use doctrine, the Board held that the petitioner had priority, citing *inter*

12 *alia* the registration and maintenance of captaincanabis.com; attendance at a trade show; the sale of

13 one comic book to a Florida customer; social media use of the mark; and the relative niche market

14 for the mark. *Id.* at *9-11. The Board further found that petitioner's actual use of the mark in 2017,

15 following the analogous use in 2013-14, was a commercially reasonable period such that he had

16 priority. *Id.* at *12. The Federal Circuit affirmed, finding the Board's decision supported by

17 substantial evidence and reliance on analogous use proper. *Andrusiek,* 2023 WL 6889054, at *3-5.

18 This authority and the analogous use doctrine, both which went unaddressed in the Order,

19 demonstrate Defendants have priority over the disputed mark, such that Plaintiff cannot prevail. As

20 in *Cosmic Crusaders,* there is evidence in the record that more than eight months before Plaintiff

21 was formed, Mr. Ravine purchased and registered the open.ai domain in March 2015, where the

22 Open AI mark was prominently posted. (DE 38-2 at ¶ 5; Order at 6.) Defendants' mark was on the

23 website, and thus visible to the entire community rather than simply a few select individuals, which

24 supports analogous use – in fact, Mr. Ravine attested the "Open AI" mark was displayed on multiple

25 websites from 2015 until 2023 consisting of AI discussion boards and tools. (DE 38-2 at ¶¶ 8-13.)

26 All these activities constitute analogous use if not actual trademark use. *See Andrusiek*, 2023 WL

27 6889054, at *4-5; *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1196 (11th Cir. 2001)

28 (actual prior use when a software product and "Coolmail" mark was "available not merely to a

16 Case No. 4:23-cv-3918-YGR

1  discrete or select group (such as friends and acquaintances, or at a trade show with limited

2  attendance), but to numerous end-users via the Internet.").

3        Irrefutable evidence shows that on December 11, 2015, Mr. Ravine applied to register the

4  "Open AI" mark with the USPTO, which published on the Supplemental Register on August 1,

5  2017. (Order at 8:26-27, 10:5-6; DE 38-2 at ¶ 22.) It is undisputed that Mr. Ravine "met and

6  communicated about the Open AI initiative with leading executives in the artificial intelligence

7  field," including Sam Altman and Greg Brockman in December 2015. (DE 38-2 at ¶¶ 7, 19; DE 46

8  at ¶¶ 3-10.) In addition, on March 19, 2015, Thomas Gruber of Apple, co-founder of Siri, attended

9  a presentation of a project called "Open AI" by Guy Ravine, given to Google Chief Executive

10 Officer Larry Page. (Declaration of Thomas Gruber ("Gruber Decl.") at ¶ 8.) And in November

11 2022, [Mr. Ravine] launched an AI-based image generator on the open.ai domain, which displayed

12 the "Open AI" mark, (DE 38-2 ¶ 12), and beginning on June 2023, Defendants released an AI voice

13 chat bot called "Ava" on websites that displayed the Open AI" mark. (*Id*. ¶ 13.) Such actual use of

14 the mark within a few years of the analogous use date "create[s] a 'continuing association of the

15 mark' with [Defendants'] [services]." *Cosmic Crusaders*, 2022 WL 1403636, at *12; *see also*

16 *Farmasino*, 2016 WL 7655740, at *5-7 (priority based on registration of mark, website that

17 displayed mark, defendant's attendance at trade shows and sales to U.S. customers); *Halo Mgmt.,*

18 *LLC v. Interland, Inc.*, 308 F. Supp. 2d 1019, 1033 (N.D. Cal. 2003) (priority even where the

19 plaintiff "rendered its services to a very limited number of consumers"). Thus, under the analogous

20 use doctrine, as soon as Defendants made actual use of the Open AI mark within a commercially

21 reasonable period of time following the analogous use, their priority in that mark relates back to the

22 date when the analogous use first started.

23       Because Defendants' priority in the disputed mark pre-dates Plaintiff's use and purported

24 acquisition of secondary meaning, the Court erred as a matter of law enjoining Defendants' use.

25    **C.    Counsel's Failure to Object to Plaintiff's Evidence, and, in Particular, the
            Declaration of Plaintiff's Undisclosed Expert, Constitutes Excusable Neglect
26          From Which Open Artificial Intelligence Should be Relieved**

27       During the proceedings prior to the Order, Defendants were represented by, and relied on,

28 counsel. Defendants' prior counsel handled procedural matters, such as evidentiary objections.

1   However, for some reason, Defendants' former counsel did not object to, or address, much of

2   Plaintiff's evidence, including evidence Plaintiff submitted on reply. This was excusable neglect

3   from which Open Artificial Intelligence should be relieved. *See In re Gilman*, 887 F.3d at 963 (Rule

4   60(b)(1) allows for relief based on "mistake, inadvertence, or excusable neglect," including neglect

5   of counsel related to evidentiary matters).

6          The Court relied heavily on Plaintiff's unrefuted evidence – in particular the Declaration of

7   Plaintiff's previously undisclosed expert Dr. Nielson. Based on this unrefuted evidence, the Court

8   questioned Mr. Ravine's integrity and ultimately discredited may of his statements on the way to

9   issuing extraordinary relief in the form of a preliminary injunction. Defendants should be permitted

10  to respond to this evidence. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (district court

11  generally "should not consider the new evidence without giving the non-movant an opportunity to

12  respond"); *Solorio v. ABC Phones of N.C., Inc.*, 2021 WL 363680, at *5 (E.D. Cal. Feb. 3, 2021).

13  A complete evidentiary record would establish the following:

14          • ***Wikineering Existed:*** The Order concludes "defendants' Wikineering page was

15  either inoperative or lacking in users[.]" (Order at 16:25.) However, recent forensics of existing

16  server data confirms there was significant user traffic to the Wikineering family of sites between

17  April 18, 2014, and December 29, 2016. (Tenery Decl. at ¶ 35 ("logs show 15,932 events and 1,289

18  unique, legitimate users").) Other evidence shows Mr. Ravine invested significant time and

19  resources developing Wikineering, which existed in the public domain. (Declaration of Kaustuv

20  Debiswas ("Debiswas Decl.") at ¶¶ 3-7.)

21          • ***Ravine did not Commit Plagiarism:*** Plaintiff and its hired-gun expert accuse Mr.

22  Ravine of "fabricating" "sham" evidence before the USPTO, submitting "inauthentic evidence" to

23  this Court, and being a "copycat[.]" (*See, e.g.*, DE 21 at 12:7, 21:14; DE 45 at 7:11.) While Dr.

24  Nielson made every effort to impugn Mr. Ravine's honesty and integrity, these conclusions were

25  misleading and wrong – the facts tell a different story. For example, Mr. Ravine did ***not*** plagiarize

26  a 2017 college textbook in his reconstruction of what the Initial Collaboration Tool looked like in

27  2015. The text came from a 2015 post on Github about "Convolutional Neural Networks" which

28  Mr. Ravine had (quite openly) reposted in 2015 on the Open AI Initial Collaboration Tool, where

18                                           Case No. 4:23-cv-3918-YGR

such things were discussed. This can be proved unequivocally because an image of this actual page appeared in a time-verified screenshot of an Open AI brochure Mr. Ravine created in 2015. *Compare* DE 38-4 (reconstruction) *with* Declaration of Guy Ravine In Support of Defendants' Motion to Alter or Amend a Judgment ("Ravine Decl.") ¶ 8, Ex. B (brochure); *see also* Tenery Decl. at ¶ 39. It was the 2017 textbook author that copied, either from Mr. Ravine or from the same Github forum. It would not have been possible for Mr. Ravine in 2015 to have copied a 2017 textbook. Despite the falsity of Dr. Nielson's claims, the character assassination of Mr. Ravine clearly impacted the Court's view of his testimony.

- **The Wayback Machine Does Not Prove a Website Did Not Exist:** Attempting to prove a negative, Dr. Nielson points to the absence of archived records on the Wayback Machine to conclude that Wikineering did not exist, did not display the "Open AI" mark, and did not have actual users. (*See, e.g.,* DE 47 at ¶¶ 48, 50, 51, 52, 61). Although "[c]ourts have taken judicial notice of the contents of web pages available through the Wayback Machine," the absence of material on the Wayback Machine is not reliable proof that a web page did ***not*** exist. *Erickson v. Nebraska Mach. Co.*, No. 15-cv-1147-JD, 2015 WL 4089849, at *1 (N.D. Cal. July 6, 2015). As Mr. Tenery explains, screen captures from the Wayback Machine are only a snapshot in time; for a variety of reasons, the Wayback Machine does not capture certain websites, subpages, changes over time, or certain kinds of files. (Tenery Decl. at ¶¶ 30 and 36.) The web pages captured by the Wayback Machine "are not a complete archive of a website." *Abu-Lughod v. Calis*, No. CV 13-2792 DMG (RZX), 2015 WL 12746198, at *3 (C.D. Cal. May 20, 2015) (Wayback Machine may only be used to show website on the day of capture); *see also Hansen Cold Storage Constr. v. Cold Sys., Inc.*, 2021 WL 6536672, at *4 (C.D. Cal. Dec. 19, 2021). Asserting a website does not exist because it was not found on the Wayback Machine is akin to this Court saying that Houston, Texas, does not exist because one cannot see it from the Dellums Federal Building.

- **The open.ai Domain Existed With Users:** The Court's statement that Defendants' "Open.ai domain was nothing but a landing page until November 16, 2022" is incomplete and misleading. (Order at 16:25-26.) It is undisputed that in March 2015 – eight months before Plaintiff formed – Mr. Ravine purchased and registered the open.ai domain. (DE 38-2 at ¶ 5; Order at 6:1-

19          Case No. 4:23-cv-3918-YGR

13). The "Open AI" mark was posted in connection with an "Open Industry Wide & Academia Wide Deep Learning Initiative," and visitors were prompted to enter their email addresses to obtain information. (*Id.*) At the time, the initiative targeted a very small niche AI research community interested in deep learning. (Ravine Decl. at ¶ 3.) Between April 6, 2015, and December 10, 2015, just before Sam Altman and Greg Brockman announced the founding of Plaintiff, Defendants' open.ai domain (including the subdomains decentralized.open.ai, beta.open.ai, hub.open.ai) already had attracted "393 unique, legitimate users"; and about 133 users signed up with their email addresses between May 22, 2015, and December 11, 2015. (Tenery Decl. at ¶ 29, Ex. D, Fig. 1; Ravine Decl. at ¶ 12.) These numbers are significant given the small AI research community at that time and that the open.ai domain had only been operating for 6 to 8 months. Over the next two-plus years, this open.ai family of websites had about "16,334 unique, legitimate users" from May 22, 2015, through July 18, 2017; and about 6,202 users signed up with their email addresses between May 22, 2015, and July 18, 2017. (Tenery Decl. at ¶ 31, Ex. D, Fig. 2; Ravine Decl. at ¶ 19, 21.) This evidence demonstrates that the "Open AI" mark had attracted substantial attention and was used in commerce.

Moreover, Mr. Ravine launched an improved Initial Collaboration tool on hub.open.ai in September 2016, replacing the original. Mr. Ravine submitted a snapshot of the new tool on hub.open.ai to the USPTO as a substitute specimen supporting of his December 11, 2015 "Open AI" registration application. (Ravine Decl. at ¶¶ 12-18.) He prepared this substitute specimen without the guidance of counsel and believed it was proper. (*Id.*; DE 38-2 at ¶ 9 and Ex. 4; DE 56 at 70:23-25.) Mr. Ravine also launched other tools on beta.open.ai and decentralized.open.ai subdomains in 2017. (DE 38-2 at ¶¶ 10-11.) For example, users on decentralized.open.ai could click on the "Start a New Company" button to create a new collaborative AI project; several such "companies" were created titled "General Purpose Face ID," "Automated Store," and "AI Super Renderer." (Ravine Decl. at ¶ 21; *see also* DE 38-2 at ¶ 11, DE 38-8.) After removing traffic associated with developers and administrators, an expert analysis shows that at least 13 users made more than 450 revisions to the coding for these projects. (Tenery Decl. at ¶ 34.) The Order states that screenshots of this tool show that "the site was only set up with nonsensical references like 'this

20

Case No. 4:23-cv-3918-YGR

1    is a test,' 'lll,' and 'testing'" (Order at 7:12-13), but that is incorrect. Those references were created

2    in 2023 by unknown users, which prompted Defendants to restrict public access to the subdomain.

3    (Tenery Decl. at ¶ 34, Ex. E; Ravine Decl. at ¶ 23, Ex. C; DE 38-2 at ¶ 11.)

4          Although Plaintiff paints Mr. Ravine as a copycat, Mr. Ravine, like many others in the

5    AI industry, began development of his open source-based image generator before the launch of

6    Plaintiff's DALL-E. on November 16, 2022, Mr. Ravine launched his first AI-based image generator

7    at open.ai, at a time when multiple companies were leveraging industry-wide advances in AI

8    technology to launch similar products. (Ravine Decl. at ¶ 19; DE 38-2 at ¶ 12.)

9          • ***The open.ai Website Was Not "Remarkably Like" Plaintiff's Website*** : Plaintiff's

10   counsel suggested, and this Court held (Order at 8:12-23), that Defendants' 2023 website design

11   "looks remarkably like plaintiff's," in a clear attempt to imply that Defendants were seeking to profit

12   from Plaintiff's growing commercial success. This conclusion is clearly erroneous. Defendants'

13   website featured a constantly rotating display of 15 brightly colored images created with open-

14   source AI tools. Images ranged from Albert Einstein on the Golden Gate Bridge, to Barbie wearing

15   a VR headset, to a Zen garden. (*See* Ravine Decl. at ¶ 24, Ex. E.) One of those pictures was a

16   landscape of a desert under a full moon, and this picture alone among the 15 had a dark color palette.

17   This image – but not the other 14 bright, colorful images – was held out as what Defendants' website

18   looked like, and was compared to the dark palette of a screenshot from Plaintiff's web site. (*Id.*) The

19   two pages cannot subjectively or objectively be said to look similar; however, even if one were

20   inclined to believe that the images somehow looked confusingly similar, this conclusion would be

21   based on Defendant's website looked like less than 7% of the time. This misleading evidence was

22   not objected to by prior counsel and clearly was persuasive to this Court.

23         Contrary to this Court's earlier finding that Plaintiff is likely to prove its use was exclusive,

24   the foregoing evidence shows Defendants used the "Open AI" mark in commerce before Plaintiff.

25   Notably, Plaintiff claimed a first use date of December 15, 2015, for "research and development

26   services in the field of artificial intelligence." (DE 23-1 at 8.) Yet, as of December 15, 2015, the

27   only thing on Plaintiff's website was a blog post discussing what plaintiff intended to do. (*Id.*) This

28   is not evidence of actual use, and the Plaintiff has not established it offered services as early as that

WAYMAKER

date. Defendant should be permitted to address and/or clarify these issues for the Court. The absence

of any objections to Plaintiff's evidence allowed Plaintiff to unfairly discredit Mr. Ravine, which,

in turn, caused the Court to question his integrity, marginalize Defendants' evidence and present a

distorted picture to the Court. Defendants must be permitted to address and correct the issues on the

record created by the failure to object or otherwise respond primarily to evidence submitted on reply.

### D.   Defendants' Prior Counsel Neglected To Present Evidence Of Irreparable Harm; At A Minimum, A Bond Should Issue

Federal Rule of Civil Procedure 65(c) provides that "[a] court may issue a preliminary

injunction . . . only if the movant gives security in an amount that the court considers proper to pay

the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

The Ninth Circuit has held "district court's orders granting injunctive relief should include

explanations for its exercise of discretion under Rule 65(c)." *Language Line Servs., Inc. v. Language*

*Servs. Assocs., Inc.*, 500 F. App'x 678, 682 (9th Cir. 2012). Courts have ordered bonds even when

not requested in an opposition to a preliminary injunction motion. *See e.g.*, *True Names LTD v.*

*GoDaddy Inc.*, 2022 WL 4121401, at *2 (D. Ariz. Sept. 9, 2022) (requiring bond even though the

Defendants provided no briefing in the case); *see also Juanita's Foods v. Dominguez Family Enters.,*

*Inc.*, 2022 WL 18278389, at *2 (C.D. Cal. Dec. 16, 2022). And it is not uncommon for parties to

brief bond issues although not addressed in preliminary injunction filings. *See e.g.*, *Paramount*

*Pictures Corp. v. Primewire*, 2022 WL 423408, at *3 (C.D. Cal. Jan. 7, 2022).

Here, no evidence was presented of the devastating effects that a preliminary injunction

would have on Defendants. The Court heard evidence purporting to show harm to Plaintiff, a

company enjoying tremendous financial success notwithstanding alleged harm from Defendants'

use of a mark Plaintiff was aware of for over seven years. However, no counterbalancing

information was provided to inform the Court of the dire, existential challenges an injunction would

create for Defendants. By enjoining Defendants' use of its open.ai domain and Open AI mark, the

Court not only removed many millions of dollars of value from Defendants' IP portfolio overnight,

but the overbroad injunction ultimately issued deprived Defendant of any way to communicate with

over three million users that it had acquired through over twelve years, including over $2,000,000

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT

**ER72**

in capital expenditures, and 25-30 human-years of developer time. (Ravine Decl. at ¶ 25; DeBiswas Decl. at ¶¶ 3-7.) The difference in the balance of harm could not be starker: with no injunction in place, Plaintiff will not register harm that would rise to a rounding error on its multi-billion-dollar balance sheet. With the injunction, and the pace of change in the artificial intelligence field, Defendants' entire investment plummets to zero, permanently.

If the injunction remains, the Court should order a bond of $500,000 in the event Defendants are wrongfully enjoined. Mr. Ravine and his company stand to lose their entire financial investment and damages could easily exceed Defendants' financial investment by multiples. (*Id.*)

**E.      This Court Should Order An Evidentiary Hearing to Address Disputed Facts**

Due to the numerous and significant disputed facts, absent vacatur of the Order, an evidentiary hearing should be held. *See Silva v. Woodford*, 279 F.3d 825, 833 (9th Cir. 2002) (evidentiary hearing required where a defendant's "allegations, if proved, would establish the right to relief."); *Sims v. Greene*, 161 F.2d 87, 88–89 (3d Cir. 1947) (setting aside preliminary injunction where an evidentiary hearing to resolve contested issues of material fact). Because secondary meaning is "intensely factual," resolution of the parties' factual disputes is central to the proper disposition of this case. *See Soc. Techs. LLC v. Apple Inc.*, 4 F.4th 811, 816 (9th Cir. 2021).

In contrast to careful consideration of the evidence, this Court discredited Mr. Ravine's testimony regarding the existence, content and operation of various websites based on a one-sided and spurious expert presentation submitted on reply. There is significant evidence contradicting Dr. Nielson's conclusions. Moreover, there was no proper forensics investigation into Defendants' websites, which span a period of a decade, many on servers that no longer operate or exist. To the extent the Court rejected Mr. Ravine's testimony, Defendants should be permitted to provide additional evidence. *See Sec. & Exch. Comm'n v. Bivona*, 2017 WL 4022485, at *12–16 (N.D. Cal. Sept. 13, 2017).

**F.      The Preliminary Injunction Is Overbroad**

In adopting Plaintiff's amended proposed order, this Court issued an overbroad order. "[A]n injunction must be narrowly tailored 'to affect only those persons over which [the Court] has power' . . . to remedy only the specific harms shown by the plaintiffs[.]" *Price v. City of Stockton*, 390 F.3d

1105, 1117 (9th Cir. 2004) (quoting *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir.1983)). As currently

framed, the Order violates both principles.

      1.    <u>The Court Should Not Enjoin Defendants from Displaying Content on</u>
               <u>open.ai Absent Any Risk of Trademark Infringement</u>

      The Order goes beyond enjoining Defendants from using the disputed "Open AI" mark in a

manner that is likely to cause consumer confusion as to source or origin. Instead, the Order prohibits

non-infringing activity, by requiring suspension of the open.ai website and a prohibition on

"anything" being displayed on the website "other than a notice of suspension." (Order at 21:3-4,

21:10-20, 21:3-4 (prohibiting Defendants from "[u]sing any 'Open AI' mark . . . as a domain

name").) Plaintiff cited no authority in its briefing to support this relief.

      A preliminary injunction must be "narrowly tailored . . . to remedy only the specific harms

shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *Price*, 390 F.3d at

1117. "The Supreme Court has made it clear that trademark infringement law prevents only

unauthorized uses of a trademark in connection with a commercial transaction in which the

trademark is being used to confuse potential consumers." *Bosley Med. Inst., Inc. v. Kremer*, 403

F.3d 672, 676 (9th Cir. 2005) (citing *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924); *see also*

*Lang v. Ret. Living Publ'g Co., Inc.,* 949 F.2d 576, 582–83 (2d Cir. 1991) (trademark infringement

addresses mistaken purchasing decisions and not general confusion). Courts routinely fashion

trademark preliminary injunction orders to restrain only infringing conduct likely to cause confusion

as to the origin or source of a good or service. *See, e.g., Waldman Publ'g Corp. v. Landoll, Inc.*, 43

F.3d 775, 785 (2d Cir. 1994) (preliminary injunction beyond false designation overbroad); *Calvin*

*Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 667, 669 (8th Cir. 1987) (overbroad

injunction covering array of material).

      The Order's requirement that Defendants suspend open.ai and not display "anything" on the

website other than a notice of suspension goes too far because the Order already adequately protects

Plaintiff's claimed trademark rights. For example, paragraph 1(a) preliminarily enjoins Defendants

from "[u]sing [their] 'Open AI' mark, or any other logo, design, or word mark that is a colorable

imitation of, or similar to, it, including without limitation 'Open AI' and 'open.ai," in connection

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT

**ER74**

with the display, advertising, development [sic] marketing, production, promotion, sale, and/or distribution of any artificial intelligence products or services, including the results generated by such products or services[.]" (Order at 20:25-21:2.) Paragraph 1(c) prohibits Defendants from representing "goods, services, or other products branded with the 'Open AI' mark are approved, or authorized by, or originate from, [Plaintiff's] OpenAI." (Order at 21:5-9.) Defendants' compliance with these provisions is sufficient. Defendants should be permitted to post other content on open.ai.

### 2. The Court Should Not Enjoin Third Parties On This Record

It is unnecessary and improper for the Order to enjoin "domain name registrars, web hosting services, and social media platforms" (Order at 21) because there is no evidence of complicity on the part of any these third parties. Accordingly, they should not be enjoined. *See Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1397 (Fed. Cir. 1996) (A district court is prohibited from "entering an injunction against a non-party that regulates the non-party's conduct independent of any complicity with an enjoined party."); *see also Whaleco*, 2024 WL 659482, at *3 (domain registrars do not "necessarily act in concert or participation with a client who uses a domain to commit intellectual property violations."); *Hunter Killer Prods., Inc. v. Zarlish*, 2020 WL 3980117, at *6 (D. Haw. June 15, 2020). A court must conduct "[a] fact-sensitive inquiry . . . to determine whether persons not named in an injunction can be bound by its terms because they are acting in concert with an enjoined party." *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 419 (E.D.N.Y. 2007) (citing 11A Wright & Miller at § 2956). No such inquiry has taken place.

## V. CONCLUSION

For all the foregoing reasons, Defendants respectfully request that the Court vacate the Order. Alternatively, the Court should vacate the Order and schedule an evidentiary hearing to address the significant disputes of material fact.

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT

**ER75**

1 | DATED: March 27, 2024                    WAYMAKER LLP

2

3                                            By:    _____s/ Ryan G. Baker_____

4                                                   RYAN G. BAKER
                                                    Attorneys for Defendants Guy Ravine & Open
5                                                   Artificial Intelligence, Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT
**ER76**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPENAI, INC., a Delaware corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>OPEN ARTIFICIAL INTELLIGENCE, INC.,<br>a Delaware corporation; and GUY RAVINE,<br>an individual,<br><br>    Defendants. | Case No. 3:23-cv-3918-YGR<br><br>**[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e), OR IN THE ALTERNATIVE, FOR RELIEF FROM A JUDGMENT OR ORDER PURSUANT TO FED. R. CIV. P. 60(b)**<br><br>Hearing Date: May 7, 2024<br>Time: 2:00 p.m.<br>Location: Courtroom 1 |

Case No. 3:23-cv-3918-YGR

# [PROPOSED] ORDER

The Court has considered Defendants Guy Ravine's and Open Artificial Intelligence, Inc.'s ("Defendants'") Motion to Alter or Amend the Judgment Pursuant to Fed. R. Civ. P. 59(e), or in the Alternative, For Relief From a Judgment or Order Pursuant to Fed. R. Civ. P. 60(b) ("Motion"), all supporting papers, and the parties' oral argument, if any. Pursuant to Federal Rules of Civil Procedure 59(e) and/or 60(b), the Court vacates its order granting Plaintiff OpenAI, Inc.'s ("Plaintiff") Motion for a Preliminary Injunction ("Order") (Dkt. 63).

The Order is an appealable judgment subject to reconsideration under Federal Rules of Civil Procedure 59(e) and 60(b). *See U.S. v. Martin* 226 F.3d 1042, 1048 n. 8 (9th Cir. 2000); *See also Huawei Tech.*, 2018 WL 3037924, at *1. A Rule 59(e) motion permits a party to: (1) "correct manifest errors of law or fact upon which the judgment rests; (2) . . . present newly discovered or previously unavailable evidence; (3) . . . prevent manifest injustice; or (4) . . . [address] an intervening change in controlling law." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011); *see also Monterey Bay Military*, 2015 WL 1548833, at *7 (Rule 59(e) motion proper to address court's error "fundamentally misappl[ying] the controlling case.") To that end, on a Rule 59(e) motion, a court can consider any evidence when doing so would correct a manifest error of fact or prevent manifest injustice. *See U.S. Bank. Nat'l Assoc. v. Thunder Prop., Inc.*, 2019 WL 2110512, at *1-2 (D. Nev. May 13, 2019) (evidence that could have been presented earlier but was not permitted on Rule 59(e) because of "the overriding concern for preventing manifest injustice and correcting manifest errors of fact"). *Thunder* also granted relief under Rule 60(b)(1), "based on the negligent mistake of Thunder's counsel" in failing to present evidence. 2019 WL 2110512, at *3. Likewise, under Rule 60(b), "the court may relieve a party or its legal representative from a final judgment, order, or proceeding" for "(1) mistake, inadvertence, surprise, or excusable neglect … [or for] (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b)(1), (6); *see also In re Gilman*, 887 F.3d 956, 963 (9th Cir. 2018) ("Rule 60(b) allows for relief in cases of 'excusable neglect'— including negligence.'") (citations omitted)).

Here, consistent with the history of trademark prosecution before the USPTO, this Court previously found that Plaintiff's "OpenAI" mark is likely descriptive in nature. As such it can "be

1  protected as a valid trademark only with a showing of secondary meaning." *Filipino Yellow*

2  *Pages, Inc. v. Asian J. Publ'n, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999). Moreover, "[i]n any

3  infringement action, the party asserting trade-dress [or trademark] protection must establish that its

4  mark had acquired secondary meaning before the first infringing use by each alleged infringer[.]"

5  *See Converse, Inc. v. Int'l Trade Comm'n Skechers U.S.A., Inc.*, 909 F.3d 1110, 1116-17 (Fed.

6  Cir. 2018); *see also CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp. 2d 1019, 1032 (N.D.

7  Cal. 2008). Thus, Plaintiff cannot show a likelihood of success on its claim for trademark

8  infringement in the absence of sufficient evidence to support a finding that Plaintiff's mark has

9  acquired secondary meaning before the first alleged infringing use by Defendants.

10     Here, the Court previously stated that Plaintiff was likely to prove that its "OpenAI" mark

11  acquired secondary meaning by September 2022. However, the Court made a factual error. The

12  Court had started with the factual premise that the USPTO last determined the mark lacked

13  secondary meaning on "January 3, 2022," but that date was incorrect. (Order at 15:22-16:3.) In

14  fact, the USPTO determined the mark lacked secondary meaning a full year later on January 3,

15  2023, when it concluded that the mark "is highly descriptive" and "applicant's evidence [of

16  secondary meaning] is not sufficient to show acquired distinctiveness." (DE 38-24.) Since then, as

17  recently as February 23 and April 12, 2023, the USPTO again determined Plaintiff's mark and

18  logo were unregistrable for being "highly descriptive" despite having submitted hundreds of pages

19  of evidence in support of its claim. (DE 38-12; DE 38-18.) In light of the material factual error

20  contained in the Order, it is appropriate to reconsider and vacate the Order. The preliminary

21  injunction is immediately lifted.

22     Moreover, the evidentiary record does not support any departure from the USPTO's

23  determination that Plaintiff's "OpenAI" mark lacked secondary meaning. Courts in the Ninth Circuit

24  consider four factors in determining whether a mark has acquired secondary meaning: "'(1) whether

25  actual purchasers of the product bearing the claimed trademark associate the trademark with the

26  producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and

27  manner of use of the claimed trademark, and (4) whether use of the claimed trademark has been

28  exclusive.'" *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 930

1   (9th Cir. 2005). "Secondary meaning can be established in many ways, including (but not limited

2   to) direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark;

3   amount and manner of advertising; sales and number of customers; established place in the market;

4   and proof of intentional copying by the defendant." *Filipino Yellow Pages, Inc.*, 198 F.3d at 1151;

5   *see also Duncan McIntosh Co. Inc. v. Newport Dunes Marina LLC*, 324 F. Supp. 2d 1078, 1084

6   (C.D. Cal. 2004) (survey evidence often "most persuasive evidence of consumer recognition and

7   association"). In this case, there is no survey evidence as to whether (and if so when) Plaintiff's

8   mark acquired secondary meaning. There is no direct consumer testimony either, or evidence that

9   quantifies Plaintiff's sales or advertising expenditures.[1] There are some news articles in the record,

10   but those articles do not establish that the "Open AI" mark acquired secondary meaning in

11   September 2022 or at any other time. (*See* DE 22 at ¶¶ 15-16, DE 22-17; DE 22-18.). Moreover,

12   Plaintiff has not shown that its use of the disputed mark has been substantially exclusive and

13   continuous. *See Spark Indus., LLC v. Kretek Int'l, Inc.*, No. CV 14-5726-GW, 2014 WL 4365736,

14   at *12 (C.D. Cal. Aug. 28, 2014) ("[T]wo years of exclusive use is on the low end of the spectrum");

15       Plaintiff has not demonstrated that it acquired secondary meaning before Defendants

16   engaged in any allegedly infringing conduct. It is undisputed that defendant Guy Ravine acquired

17   the open.ai domain before Plaintiff even existed. (DE 38-2 at ¶ 6.) It also is undisputed that

18   Defendants launched their AI-generator on November 16, 2022. (DE 38-2 at ¶ 12.) By December

19   2022, Defendants' AI-generator had over 170,000 users and over 2.3 million users in October 2023.

20   (DE 38-2 at ¶ 12.) Even assuming Plaintiff's "OpenAI" mark acquired secondary meaning sometime

21   after January 2023 when the USPTO rejected its trademark application, that would be too late to

22   prove a claim for trademark infringement against Defendants. *See, e.g., Braun Inc. v. Dynamics*

23   *Corp. of Am.*, 975 F.2d 815, 826-27 (Fed. Cir. 1992).

24

25

26

27

28

---

[1] At best, Plaintiff claims that there were more than 1.5 million active users of DALL·E 2 as of September 2022, and that "Reuters reported that OpenAI's ChatGPT reached an estimated 100 million monthly active users just two months after its launch [i.e., January 2023]." (DE 22 at ¶ 9.) These statements lack foundation and rest on hearsay. Even assuming they were true, they would be probative of the DALL-E and ChatGPT marks and would not show that the "OpenAI" mark acquired secondary meaning in September 2022.

Even if Plaintiff could establish secondary meaning, this Court did not previously consider the decision in *Andrusiek v. Cosmic Crusaders LLC*, 2022 WL 4103636, at *6 (T.T.A.B. Sept. 6, 2022) ("*Cosmic Crusaders*"). (See DE 61.) In this newly precedential decision, the Trademark Trial and Appeal Board ("the Board") held a party may establish priority over a mark based on "prior use analogous to trademark or service mark use.'" *Cosmic Crusaders LLC*, 2022 WL 4103636, at *6. Here, there is evidence in the record that Defendants engaged in advertising, presentations and industry discussions commencing in March 2015 (before Plaintiff was founded), followed by the launch of a website and AI products within a commercially reasonable time. (DE 38-2 at ¶ 5; DE 38-2 at ¶¶ 8-13.) In light of this evidence, the Court cannot find that Plaintiff is likely to show that it has priority over Defendants' mark.

Finally, the Court finds that it is appropriate to reconsider its Order to prevent manifest injustice under Federal Rule 59(e) and to a relieve a party from excusable neglect under Federal Rule 60(b). Defendants' prior counsel failed to object to evidence submitted by Plaintiff, including the declaration of previously undisclosed expert, Dr. Seth James Nielson, which was submitted on reply; and failed to rebut it with its own evidence. Defendants have submitted credible evidence that casts significant doubt on the accuracy of certain tentative findings contained in the Order that lacked the benefit of a full record.

For the foregoing reasons, the Court vacates its February 28, 2024 Order.

IT IS SO ORDERED.

Dated:

HON. YVONNE GONZALEZ ROGERS
United States District Judge

1    Ryan G. Baker (Bar No. 214036)
     rbaker@waymakerlaw.com
2    Scott M. Malzahn (Bar No. 229204)
     smalzahn@waymakerlaw.com
3    WAYMAKER LLP
515 S. Flower Street, Suite 3500
4    Los Angeles, California 90071
Telephone:    (424) 652-7800
5    Facsimile:     (424) 652-7850

6

7    *Attorneys for Guy Ravine & Open Artificial Intelligence, Inc.*

8

9            **UNITED STATES DISTRICT COURT**

10         **NORTHERN DISTRICT OF CALIFORNIA**

11

| | |
|---|---|
| 12   OPENAI, INC., a Delaware corporation, | Case No. 3:23-cv-3918-YGR |
| 13        Plaintiff, | **DECLARATION OF JOSE R. NUÑO IN** |
| 14      v. | **SUPPORT OF DEFENDANTS OPEN ARTIFICIAL INTELLIGENCE, INC.** |
| 15   OPEN ARTIFICIAL INTELLIGENCE, INC., | **GUY RAVINE'S MOTION TO ALTER OR AMEND A JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e), OR IN THE** |
| 16   a Delaware corporation; and GUY RAVINE, an individual, | **ALTERNATIVE, FOR RELIEF FROM A JUDGMENT OR ORDER PURSUANT TO** |
| 17        Defendants. | **FED. R. CIV. P. 60(b)** |
| 18 | |
| 19 | Hearing Date: May 7, 2024 |
| 20 | Time: 2:00 p.m. Location: Courtroom 1 |

21

22

23

24

25

26

27

28

DECLARATION OF JOSE R. NUÑO
**ER82**

## DECLARATION OF JOSE R. NUÑO

I, Jose R. Nuño, declare as follows:

1.     I am an attorney licensed to practice in the State of California.  I am counsel at Waymaker LLP, attorneys of record to Defendants Open Artificial Intelligence, Inc. and Guy Ravine in this action ("Defendants").  I make this Declaration in support of Defendants' Motion to Alter or Amend the Judgment Pursuant to Fed. R. Civ. P. 59(e), or in the Alternative, For Relief From a Judgment or Order Pursuant to Fed. R. Civ. P. 60(b), in the above-captioned matter ("Motion").  I have personal knowledge of the facts set forth herein and if called as a witness I could and would testify competently thereto.

2.     On March 27, 2024, I visited the United States Patent and Trademark Office ("USPTO") website and located the case docket for OpenAI L.P.'s CHATGPT trademark application, Serial Number: 97733261, Filing Date: December 27, 2022 (the "CHATGPT Application"). I downloaded the February 9, 2024 "Final Office Action" refusing registration for the CHATGPT Application on the grounds that the mark is "merely descriptive." A true and correct copy of this February 9, 2024 Final Office Action that I downloaded is attached as **Exhibit A**. The document is also attached as Exhibit A to Defendants' concurrently filed Request for Judicial Notice, and can be located at the following URL:

https://tsdr.uspto.gov/documentviewer_caseId_sn97733261&docId_FREF20240209093901&linkId_1_docIndex_0&page_1.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 27th day of March, 2024, at Los Angeles, California.

_____
Jose R. Nuño

# EXHIBIT A

| To: | Steven M. Espenshade(tmcentral@pirkeybarber.com) |
|---|---|
| **Subject:** | U.S. Trademark Application Serial No. 97733261 - CHATGPT - OPAI015US |
| **Sent:** | February 09, 2024 09:38:28 AM EST |
| **Sent As:** | tmng.notices@uspto.gov |

**Attachments**

screencapture-cognitiv-ai-contextgpt-17043776437431
screencapture-www-digitalinnov-com-blog-search-engine-vs-artificial-intelligence-gpt-17043777223791
screencapture-appyhigh-com-products-mageai-gpt-17043779265521
screencapture-www-pcmag-com-encyclopedia-term-chat-17055926387691
screencapture-www-techopedia-com-definition-387-chat-17055926817031
screencapture-h2o-ai-wiki-gpt-17043767469591
screencapture-www-newsweek-com-harnessing-power-gpt-ai-transforming-future-business-1805363-17043768419051
screencapture-nostalab-com-gpt-17043774458931
screencapture-gptdefinity-com-17043775608971
screencapture-aws-amazon-com-what-is-gpt-17055925690701
screencapture-www-computerweekly-com-news-366548152-Nutanix-GPT-in-a-Box-aims-hyper-converged-at-AI-ML-use-cases-17055929541301
screencapture-hoongpt-com-chatbot-17055929798411
screencapture-www-newsfilecorp-com-release-156849-Nexalogy-Launches-Analytics-GPT-Beta-Program-for-SMEs-17055930012071
screencapture-devm-io-live-events-personalize-gpt-with-your-data-17074865712051
screencapture-www-connectionmodel-com-blog-what-chatbot-marketing-is-and-how-to-use-it-in-digital-marketing-17074868104481
screencapture-www-goldeneye-app-docs-software-development-gpt-development-17074877917681

### United States Patent and Trademark Office (USPTO)
#### Office Action (Official Letter) About Applicant's Trademark Application

**U.S. Application Serial No.** 97733261

**Mark:** CHATGPT

**Correspondence Address:**
Steven M. Espenshade
PIRKEY BARBER PLLC
1801 EAST 6TH STREET
SUITE 300
AUSTIN TX 78702
UNITED STATES

**Applicant:** OPENAI OPCO, LLC

**Reference/Docket No.** OPAI015US

**Correspondence Email Address:** tmcentral@pirkeybarber.com

**ER85**

# FINAL OFFICE ACTION

**Response deadline.** File a request for reconsideration of this final Office action and/or a timely appeal to the Trademark Trial and Appeal Board (TTAB) within three months of the "Issue date" below to avoid abandonment of the application. Review the Office action and respond using one of the links below to the appropriate electronic forms in the "How to respond" section below.

**Request an extension.** For a fee, applicant may request one three-month extension of the response deadline prior to filing a response and/or an appeal. The request must be filed within three months of the "Issue date" below. If the extension request is granted, the USPTO must receive applicant's response and/or appeal within six months of the "Issue date" to avoid abandonment of the application.

**Issue date:** February 9, 2024

## INTRODUCTION

This Office action is in response to applicant's communication filed on 1/06/2024.

In a previous Office action dated 05/25/2023, the trademark examining attorney refused registration of the applied-for mark based on the following: Trademark Act Section 2(e)(1)—Merely Descriptive.

The trademark examining attorney maintains and now makes FINAL the refusal in the summary of issues below. *See* 37 C.F.R. §2.63(b); TMEP §714.04.

## SUMMARY OF ISSUES MADE FINAL:

- Section 2(e)(1) Refusal—Merely Descriptive
- Advisory: Section 2(f) Claim of Acquired Distinctiveness

## SECTION 2(e)(1) REFUSAL—MERELY DESCRIPTIVE

The refusal under Trademark Act Section 2(e)(1) is now made FINAL for the reasons set forth below. *See* 15 U.S.C. §1052(e)(1); 37 C.F.R. §2.63(b).

Registration is refused because the applied-for mark merely describes a feature, function, or characteristic of applicant's goods and services. Trademark Act Section 2(e)(1), 15 U.S.C. §1052(e)(1); *see* TMEP §§1209.01(b), 1209.03 *et seq.*

A mark is merely descriptive if "it immediately conveys information concerning a feature, quality, or characteristic of [an applicant's] goods or services." *In re N.C. Lottery*, 866 F.3d 1363, 1367, 123 USPQ2d 1707, 1709 (Fed. Cir. 2017) (citing *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 963, 82 USPQ2d 1828, 1831 (Fed. Cir. 2007)); TMEP §1209.01(b); *see DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*, 695 F.3d 1247, 1251, 103 USPQ2d 1753, 1755 (Fed. Cir. 2012) (quoting *In re*

*Abcor Dev. Corp.*, 588 F.2d 811, 814, 200 USPQ 215, 218 (C.C.P.A. 1978)).

Determining the descriptiveness of a mark is done in relation to an applicant's goods and/or services, the context in which the mark is being used, and the possible significance the mark would have to the average purchaser because of the manner of its use or intended use. *See In re The Chamber of Commerce of the U.S.*, 675 F.3d 1297, 1300, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012) (citing *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 963-64, 82 USPQ2d 1828, 1831 (Fed. Cir. 2007)); TMEP §1209.01(b). Descriptiveness of a mark is not considered in the abstract. *In re Bayer Aktiengesellschaft*, 488 F.3d at 963-64, 82 USPQ2d at 1831.

A mark does not need to be merely descriptive of all the goods or services specified in an application. *In re Chamber of Commerce of the U.S.*, 675 F.3d 1297, 1300, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012); *In re Zuma Array Ltd.*, 2022 USPQ2d 736, at *5-6 (TTAB 2022). "A descriptiveness refusal is proper 'if the mark is descriptive of any of the [goods or] services for which registration is sought.'" *In re Chamber of Commerce of the U.S.*, 675 F.3d at 1300, 102 USPQ2d at 1219 (quoting *In re Stereotaxis Inc.*, 429 F.3d 1039, 1040, 77 USPQ2d 1087, 1089 (Fed. Cir. 2005)).

Generally, if the individual components of a mark retain their descriptive meaning in relation to the goods and/or services, the combination results in a composite mark that is itself descriptive and not registrable. *In re Zuma Array Ltd.*, 2022 USPQ2d 736, at *7 (TTAB 2022); *In re Fat Boys Water Sports LLC*, 118 USPQ2d 1511, 1516 (TTAB 2016); TMEP §1209.03(d); *In re Petroglyph Games, Inc.*, 91 USPQ2d 1332, 1341 (TTAB 2009) (holding BATTLECAM merely descriptive of computer game software with a feature that involve battles and provides the player with the option to utilize various views of the battlefield); *In re Cox Enters.*, 82 USPQ2d 1040, 1043 (TTAB 2007) (holding THEATL merely descriptive of publications featuring news and information about Atlanta where THEATL was the equivalent of the nickname THE ATL for the city of Atlanta); *In re Tower Tech, Inc.*, 64 USPQ2d 1314, 1317-18 (TTAB 2002) (holding SMARTTOWER merely descriptive of highly automated cooling towers); *In re Sun Microsystems, Inc.*, 59 USPQ2d 1084, 1085 (TTAB 2001) (holding AGENTBEANS merely descriptive of computer software for use in developing and deploying application programs on a global computer network).

Only where the combination of descriptive terms creates a unitary mark with a unique, incongruous, or otherwise nondescriptive meaning in relation to the goods and/or services is the combined mark registrable. *See In re Omniome, Inc.*, 2020 USPQ2d 3222, at *4 (TTAB 2019) (citing *In re Colonial Stores, Inc.*, 394 F.2d 549, 551, 157 USPQ 382, 384 (C.C.P.A. 1968); *In re Shutts*, 217 USPQ 363, 364-65 (TTAB 1983)); *In re Positec Grp. Ltd.*, 108 USPQ2d 1161, 1162-63 (TTAB 2013).

In this case, both the individual components and the composite result are descriptive of applicant's goods and/or services and do not create a unique, incongruous, or nondescriptive meaning in relation to the goods and/or services. The applied-for mark is CHATGPT, used in connection with "downloadable computer programs and downloadable computer software for the artificial production of human speech and text; downloadable computer programs and downloadable computer software for natural language processing, generation, understanding and analysis; downloadable computer programs and downloadable computer software for machine-learning based language and speech processing software; downloadable computer chatbot software for simulating conversations; downloadable computer programs and downloadable computer software for creating and generating text" in International Class 09 and "providing online non-downloadable software for the artificial production of human speech and text; providing online non-downloadable software for natural language processing, generation, understanding and analysis; providing online non-downloadable software for machine-learning based

language and speech processing software; providing online non-downloadable chatbot software for simulating conversations; providing online non-downloadable software for creating and generating text; research and development services in the field of artificial intelligence; research, design and development of computer programs and software" in International Class 42.

The previously attached Internet evidence shows that "CHAT" means "a synchronous exchange of remarks over a computer network." Further, the evidence of record also establishes that "GPT" is a widely used acronym that means "generative pre-trained transformers," which are neural network models that "give applications the ability to create human-like text and content (images, music, and more), and answer questions in a conversational manner." See the previously and presently attached definition and industry definitions from Acronymfinder.com, Aws.amazon.com, H2O.AI, Newsweek, and NostaLab.

Additionally, the evidence of record shows that both the wording "CHAT" and "GPT" are used descriptively in applicant's software industry to refer to a particular type of software where users may ask questions and an AI model then answers those questions based on data that has been inputted into the model. Some excerpts showing both use and description of "CHAT" and "GPT" in applicant's industry are below:

- "The advent of **GPT** models has revolutionized the concept of "**chat** using your own data", making it a popular use case. The premise is simple: link this potent language model to your data, thereby crafting a unique, personalized version of **GPT**." https://devm.io/live-events/personalize-gpt-with-your-data/

- "**Chat** ai **gpt** is a digital marketing strategy that helps to automate customer communication and will answer customer questions, up to a certain point, before the customer or user is directed to a real person for assistance." https://www.connectionmodel.com/blog/what-chatbot-marketing-is-and-how-to-use-it-in-digital-marketing

- "Integrating **GPT**-powered **chat**bots into businesses can automate repetitive tasks, improve efficiency, and streamline workflows. We develop intelligent **chat**bots that can handle a wide range of customer inquiries, automate lead generation and qualification, and provide personalized recommendations. These **chat**bots are trained on domain-specific data to ensure accurate and relevant responses. Our **chat**bots leverage machine learning and natural language processing techniques to understand user intents, extract key information, and provide contextually appropriate responses. They can handle complex conversations, ask clarifying questions, and guide users through various processes." https://www.goldeneye.app/docs/software-development/gpt-development

- "Generative Pre-trained Transformers, commonly known as **GPT**, are a family of neural network models that uses the transformer architecture and is a key advancement in artificial intelligence (AI) powering generative AI applications such as ChatGPT. **GPT** models give applications the ability to create human-like text and content (images, music, and more), and answer questions in a conversational manner. Organizations across industries are using **GPT** models and generative AI for Q&A bots, text summarization, content generation, and search." https://aws.amazon.com/what-is/gpt/

- "**GPT**, short for Generative Pre-Trained Transformers, is an advanced open-source language model that utilizes transformer architectures to generate human-like text. It is trained on vast

amounts of unlabeled text data from the internet, enabling it to understand and generate coherent and contextually relevant text." https://h2o.ai/wiki/gpt/#:~:text=GPT%2C%20short%20for%20Generative%20Pre,coherent%20and%20co

- "**GPT** is a machine learning model pre-trained on vast amounts of data. It can understand the context and generate natural-sounding language, making it an ideal tool for tasks such as **chat**bots, virtual assistants, and content generation. The model is trained on massive amounts of data, allowing it to understand the nuances of human language and produce contextually appropriate responses. Additionally, **GPT** models can be fine-tuned on specific datasets, allowing customization and adaptation to different domains." https://www.newsweek.com/harnessing-power-gpt-ai-transforming-future-business-1805363

- "As AI technology advances, the development of **GPT** (Generative Pretrained Transformer) models has become increasingly popular. In this article, we will take you through the process of building your own **GPT** project, from planning to deployment." https://www.ideamotive.co/gpt-software

- "We have been using a **GPT** model to explain our insights to operators as a part of BMC HelixGPT, and we have now started to decorate our root-cause insights with ticket resolution-based prescriptions. We constrain our **GPT** with a domain and tenant-specific model that continuously learns resolutions from subject matter experts (SMEs) in the organization—hence the phrase "expert of (your) systems"—and prompt our **GPT** with root-cause analysis we conduct using observational data in prior steps in our AI architecture." https://www.bmc.com/blogs/bmc-helixgpt-expert-of-your-systems/

The applicant's identification shows that it is using the mark in connection with software goods and services using artificial intelligence, machine learning, and natural language processing and generation which feature a synchronous exchange of remarks over a computer network. Accordingly, consumer encountering the mark "CHATGPT" would immediately understand this to communicate a feature of the applicant's software goods and services which feature neural network models that "give applications the ability to create human-like text and content (images, music, and more), and answer questions in a conversational manner" in a synchronous exchange of remarks over a computer network.

_Applicant's Arguments_

Applicant's sole argument against the refusal is that the mark is not merely descriptive without any additional support or evidence. However, in the present case, the evidence of record leaves no doubt that the mark is merely descriptive.

Additionally, two major reasons for not protecting descriptive marks are (1) to prevent the owner of a descriptive mark from inhibiting competition in the marketplace and (2) to avoid the possibility of costly infringement suits brought by the trademark or service mark owner. _In re Abcor Dev. Corp._, 588 F.2d 811, 813, 200 USPQ 215, 217 (C.C.P.A. 1978); TMEP §1209. Businesses and competitors should be free to use descriptive language when describing their own goods and/or services to the public in advertising and marketing materials. _See In re Styleclick.com Inc._, 58 USPQ2d 1523, 1527 (TTAB 2001).

Considering the above, the refusal to register the applied-for mark under Trademark Act Section 2(e)(1)

is hereby made FINAL.

Applicant should note the advisory below.

## ADVISORY: SECTION 2(f) CLAIM OF ACQUIRED DISTINCTIVENESS

In response to the refusal, applicant may assert a claim that the applied-for mark has acquired distinctiveness under Trademark Act Section 2(f). Applicant may respond by (1) requesting to amend the application to assert a claim of acquired distinctiveness under Section 2(f) and (2) providing sufficient evidence to support this claim (such as verified statements of long term use, advertising and sales expenditures, examples of typical advertisements, affidavits and declarations of consumers, customer surveys). *See* 15 U.S.C. §1052(f); 37 C.F.R. §2.41; TMEP §§1212.06 *et seq*. This evidence must demonstrate that the relevant public understands the primary significance of the mark as identifying the *source* of applicant's product or service rather than identifying the product or service itself. *In re Steelbuilding.com*, 415 F.3d 1293, 1297, 75 USPQ2d 1420, 1422 (Fed. Cir. 2005).

When determining whether the evidence shows the mark has acquired distinctiveness, the trademark examining attorney will consider the following six factors: (1) association of the mark with a particular source by actual purchasers (typically measured by customer surveys linking the name to the source); (2) length, degree, and exclusivity of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage. *See Converse, Inc. v. ITC*, 909 F.3d 1110, 1120, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018) ("the *Converse* factors"). "[N]o single factor is determinative." *In re Steelbuilding.com*, 415 F.3d at 1300, 75 USPQ2d at 1424; *see* TMEP §§1212.06 *et seq*. Rather, all factors are weighed together in light of all the circumstances to determine whether the mark has acquired distinctiveness. *In re Steelbuilding.com*, 415 F.3d at 1300, 75 USPQ2d at 1424.

## RESPONSE GUIDELINES

**How to respond.** File a **request form for reconsideration of this final Office action** that fully resolves all outstanding requirements and/or refusals and/or file a timely **appeal form to the Trademark Trial and Appeal Board** with the required fee(s). Alternatively, applicant may file a **request form for an extension of time to file a response** for a fee.

/Kelly Burke/
Kelly Burke
Examining Attorney
LO128--LAW OFFICE 128
(571) 272-6205
Kelly.Burke@uspto.gov

## RESPONSE GUIDANCE

- **Missing the deadline for responding to this letter will cause the application to abandon.** A response, appeal, or extension request must be received by the USPTO on or before 11:59 p.m. **Eastern Time** of the last day of the response deadline. Trademark Electronic Application System (TEAS) and Electronic System for Trademark Trials and Appeals (ESTTA) system availability could affect an applicant's ability to timely respond. For help resolving technical issues with TEAS, email TEAS@uspto.gov.

- **Responses signed by an unauthorized party** are not accepted and can **cause the application to abandon.** If applicant does not have an attorney, the response must be signed by the individual applicant, all joint applicants, or someone with legal authority to bind a juristic applicant. If applicant has an attorney, the response must be signed by the attorney.

- If needed, **find contact information for the supervisor** of the office or unit listed in the signature block.

**ER91**

https://cognitiv.ai/contextgpt/                                                                    at 09:14:10, 01/04/2024



COGNITIV.                    Solutions    Products    Resources    Company    Contact    Newsletter    🔍

AI FOR THE MOMENT

# GPT

**LEARN MORE →**



Our <mark>GPT</mark>-powered contextual platform allows users to build custom prompts unique to their brand, adjust relevancy and scale of results to improve outcomes, and activate as a PMP in the DSP of their choice.

ADVANCED PRODUCT FEATURES

## Custom Prompts, Inclusivity & Diversity

New and innovative solutions for

### BRAND ALIGNMENT
Ensure your messaging appears on content that aligns with your brand values.

### SCALABILITY & SAFETY
Avoid limitations or inaccuracies of segments



© 2024 Cognilix. All rights reserved.          Privacy Policy

https://www.digitalinnov.com/blog/search-engine-vs-artificial-intelligence-gpt                                                        at 09:15:30, 01/04/2024

Home > Blogs > Search Engine VS Artificial Intelligence (GPT)

## Search Engine VS Artificial Intelligence (GPT)

Jun 6 · 3 min read                                                                 Share:



Search Engine VS Artificial Intelligence (GPT), what are the advantages and drawbacks of each other?

## Search Engine VS Artificial Intelligence

Purpose and functionality is the main difference between GPT and search engines. While search engines are primarily focused on finding and presenting information to users, GPT is focused on generating text based on a given prompt. Search engines use a range of algorithms and signals to analyze web pages, while GPT uses deep learning techniques to generate text that mimics human language.

## Definitions

### Search Engine

Search engines are designed to help users find relevant information on the internet. Search engines are like your trusty GPS that guides you through the winding roads of the internet. They use algorithms and ranking systems to crawl and index web pages, analyze their content, and then present the most relevant results to the user's query. Just like how your GPS uses maps and satellite signals to find your way, search engines use algorithms and ranking systems to navigate the web and present you with the most relevant results. Search engines are particularly good at understanding the intent behind a user's query and delivering results that match that intent.They're like the Sherlock Holmes of the internet, sniffing out clues and understanding the intent behind your search queries.

Let's just call search engine the relevant clues factory using world wide web pages as raw materials.

### Artificial Intelligence : GPT (Generative Pre-trained Transformer)

GPT, on the other hand, is a type of AI language model that can generate text in response to a given prompt. It is trained on a large corpus of text and can generate coherent and natural-sounding sentences. GPT can be compared to a book writer who has reviewed a lot of books before writing his or her own. With the contents of the books the writer read, he or she gives an interpretation of those producing new ideas and insights. GPT can be used for various applications such as chatbots, language translation, and content generation.

Let's just call GPT the genius chef that has a vast pantry of ingredients. This chef selects and combines ingredients in clever ways for the users to use. The problem is this chef depends a lot on what's on his pantry unless otherwise restocked with new items.

1. **Understanding User Intent**

   - **Search engines** are designed to understand the intent behind a user's search query and deliver the most relevant results. For example, if a user searches for "best restaurants in New York," a search engine will deliver results that match the user's intent.

   - **Artificial Intelligence (GPT)**, on the other hand, may generate content related to restaurants in New York, but it may not understand the user's specific intent.

2. **Identifying Spam**

- **Search engines** are equipped with algorithms that can identify and filter out spammy websites, ensuring that users are presented with trustworthy and relevant results.
- **Artificial Intelligence (GPT)**, on the other hand, may generate content from any source, including spammy or low-quality sites.

3. **Interpreting Images and Videos**

- **Search engines** can analyze and interpret images and videos to determine their relevance to a search query. For example, if a user searches for "cute puppies," a search engine can deliver images and videos of puppies that match the user's intent.
- **Artificial Intelligence (GPT)**, on the other hand, may not have the capability to interpret images and videos.

4. **Providing Structured Data**

- **Search engines** use structured data to provide rich snippets, knowledge graphs, and other features that enhance the user experience. Structured data helps search engines understand the content on a website and present it in a more meaningful way.

- **Artificial Intelligence (GPT)** may generate high-quality content, but it may not have the capability to provide structured data.

5. **Crawling and Indexing Websites**

- **Search engines** crawl and index websites to build their database of information. This allows them to deliver relevant results

quickly and efficiently.

- **Artificial Intelligence (<mark>GPT</mark>)**, on the other hand, may not have the capability to crawl and index websites.

## Conclusion

In conclusion, while AI, specifically <mark>GPT</mark>, has advanced capabilities, search engines still have a unique set of skills that make them valuable tools for users and businesses alike. Search engines can interpret user intent, identify spam, interpret images and videos, provide structured data, and crawl and index websites, all of which are critical to providing relevant and trustworthy search results. Combining search engines and artificial intelligence in the future will be a big thing so let's watch out for these updates! Here at DigitalInnov we always check the newest tech trends to stay relevant. Check out our services to learn more!

Share:  

## Let's dig

Here's what we've been doing to transform our digital crew.







Unleash AI SEO Mastery—Seize Top Ranks Now!

Professional Web Development: Ignite Your Online Presence

Search Engine VS Artificial Intelligence (<mark>GPT</mark>)

DIGITALINNOV

Services    About    Blog    FAQS    Contact

© 2022 DigitalInnov. All rights reserved. | Privacy Policy

https://appyhigh.com/products/mageai-gpt?sku_id=38696648                                                    at 09:19:02, 01/04/2024









## Save Big with AppyHigh Prime



## How app works

① Sign up for Appyhigh Prime.

② Get exclusive coupons in your email for each app to activate PRO membership

③ Download MageAI **GPT** from Play Store or App Store

④ Go to the PRO tab in the app and select the yearly plan

⑤ Use the exclusive coupon on the Payment screen to activate PRO.

⑥ Enjoy unrestricted access

Get AppyHigh Prime

Enjoy a premium digital experience with Appyhigh Prime



## One pack, Sorted for App

One membership, multiple advantages!





## Activate

Activate PRO on the apps of your choice.

## Enjoy

Enjoy unrestricted access to Generative AI Apps, Social media tools, productivity & utility apps & many more.

Social Media Tools
**Create Faster, Get Popular**

Lifestyle
**Enhance Daily Life**

# FAQs

How do I use MageAI GPT?

How accurate are the responses MageAI GPT generates?

Can MageAI GPT understand and respond to any type of question or prompt?

Are there any limitations to the length of the input or response?

Can MageAI GPT provide medical, legal, or professional advice?

How does MageAI GPT handle sensitive or personal information provided in the input?

Is MageAI GPT capable of providing real-time or live chat responses?

How does Talk GPT work?



https://www.pcmag.com/encyclopedia/term/chat

at 10:44:06, 01/18/2024

# chat

Search PCMag Encyclopedia

## BROWSE ENCYCLOPEDIA

A  B  C  D  E  F  G  H  I  J  K  L  M  N  O  P  Q  R  S  T  U  V  W  X  Y  Z  0-9

A text communication via keyboard in real time between two or more users on a local network (LAN) or over the Internet. Although the original use of the term was only for text, "chat" became popular for every two-way communication. Audio and voice evolved into "audio chat" and "voice chat." Videoconferencing and video calling became "video chat."

### Live Chat for Support

Live text chat is a common website support system, allowing someone to be assisted by a company representative, who typically handles more than one site visitor at a time. Live chat is also called "live help" and "live support."

### Chat, Texting and Instant Messaging

All three terms are used synonymously. Texting (SMS) is built into every cellphone and usage only requires the recipient's phone number. All other chat services use a computer or phone app. Some require establishing an account and creating a contact list (see text messaging and instant messaging).

### Chatting Was Always Verbal

Before text chat became popular, "chatting on any phone" meant talking. See chat room, video chat and IRC.

ADVERTISEMENT



Chat and IRC.



**A Website Live Chat**

A live chat on a website is very helpful for potential customers such as this example on Cisco.com. Although the young woman's headset might imply a voice call, this "Chat Live" session is text only.

ADVERTISEMENT







then look no further than Lenovo. Get discounts on laptops, PCs,
accessories, and more! Earn 3% back with My Lenovo Rewards. Plus, free
shipping.

Shop Now at Lenovo.com →

**TRENDING**



**eBay Fined $3M After Ex-
Employees Harassed Couple
With Disturbing Tactics**

BY MICHAEL KAN

**Steam Deck OLED Beats Legion
Go on Repairability—Just Barely**

BY EMILY PRICE

**Get a Refurbished HP Desktop
With 512GB of Storage for
$189.97**

BY STACKCOMMERCE TEAM

**YouTube Slowdowns Traced to
Adblock Plus Bug**

BY EMILY PRICE

THIS DEFINITION IS FOR PERSONAL USE ONLY. All other reproduction requires permission.
Copyright © 1981- 2024. The Computer Language Co Inc. All rights reserved.

**PCMag Newsletters**

Our Best Stories in Your Inbox →

**Follow PCMag**

**HONEST, OBJECTIVE, LAB-TESTED REVIEWS**

PCMag.com is a leading authority on technology, delivering lab-based, independent reviews of the latest products and services. Our expert industry analysis and practical solutions help you make





## Chat

Margaret Rouse
Technology Expert

Last updated: 30 June, 2020

Disclosure    Why Trust Us

### What Does Chat Mean?

Chat refers to the process of communicating, interacting and/or exchanging messages over the Internet. It involves two or more individuals that communicate through a chat-enabled service or software.

Chat is also known as chatting, online chat or Internet chat.

### Techopedia Explains Chat

Chat may be delivered through text, verbal, audio, visual or audio-visual (A/V) communication via the Internet. If conducted through a desktop, chat requires software that supports Internet Relay Chat (IRC) or an instant messenger application, where a central server manages chat communication between different end user clients.

There are also online chat services that require users to sign up with a valid email address. After signing up, a user may join a group chat room or send a private message to another individual. Online chat services have

Most Popular Term

INTERNET

**Google E-E-A-T**

What is Google E-E-A-T? E-E-A-T is a set of principles that Google Quality Raters use to evaluate the quality of...

Full Explanation

MARGARET ROUSE · Technology Expert

TECH 101

**TikTok**

What is TikTok? TikTok is a social

purpose-built chat interfaces that manage the *entire* communication processes.

## What Does Chat Mean?

Chat refers to the process of communicating, interacting and/or exchanging messages over the Internet. It involves two or more individuals that communicate through a chat-enabled service or software.

Advertisements



Chat is also known as chatting, online chat or Internet chat.

## Techopedia Explains Chat

Chat may be delivered through text, verbal, audio, visual or audio-visual (A/V) communication via the Internet. If conducted through a desktop, chat requires software that supports Internet Relay Chat (IRC) or an instant messenger application, where a central server manages chat communication between different end user clients.

There are also online chat services that require users to sign up with a valid email address. After signing up, a user may join a group chat room or send a private message to another individual. Online chat services have purpose-built chat interfaces that manage the entire communication processes.

Advertisements



### Related Terms

Internet Relay Chat                     Chat Room

Chat Slang                              Internet Relay Chat Bot

Most Popular Term ⚡

**INTERNET**

**Google E-E-A-T**

What is Google E-E-A-T? E-E-A-T is a set of principles that Google Quality Raters use to evaluate the quality of...

[ Full Explanation ]

  MARGARET ROUSE · Technology Expert

Advertisements



**TECH 101**

**TikTok**

What is TikTok? TikTok is a social media platform that allows users to create and share short-form videos. It has...

[ Full Explanation ]

  MARIA WEBB · Technology journalist

**TECH 101**

**Chrome Browser Extension**

What is a Chrome Browser Extension? A Chrome browser extension, designed for the Google Chrome web browser, is an add-on...

[ Full Explanation ]

TIM KEARY · Technology Specialist

| Telepresence | Video Conferencing |
|---|---|
| Instant Message | FaceTime |
| ChatOps | |

## Related Reading

Web Roundup: Awesome Angles on IoT

Cloud Evolution: How We See and Use the Cloud Has Changed

Virtual Private Network: The Branch Office Solution

Remember IRC? It's Still Around — And It's Still Worth Using

Social Chatter: Should Your Company Be Listening?

TechDictionary

🔍 Search a tech term...

| # | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| R | S | T | U | V | W | X | Y | Z | | | | | | | | |

## About Techopedia's Editorial Process

Techopedia's editorial policy is centered on delivering thoroughly researched, accurate, and unbiased content. We uphold strict sourcing standards, and each page undergoes diligent review by our team of top technology experts and seasoned editors. This process ensures the integrity, relevance, and value of our content to our readers.

TAGS

INTERNET



**Margaret Rouse**

Margaret Rouse is an award-winning technical writer and teacher known for her ability to explain complex technical subjects to a non-technical, business audience. Over the past twenty years her explanations have appeared on TechTarget websites and she's been



Advertisement

REALIZE
YOUR VISION



cited as an authority in articles by the New York Times, Time Magazine, USA Today, ZDNet, PC Magazine and Discovery Magazine.Margaret's idea of a fun day is helping IT and business professionals learn to speak each other's highly specialized languages. If you have a suggestion for a new definition or how to improve a technical explanation, please email Margaret or contact her....

**All Posts by Margaret Rouse** ⟶

## Related News



FEATURED CONTENT

**The Gold Price has Been Declining Since January 1st – Where Does the Dip Stop?**

ALAN DRAPER · 4 years



CAREER PATHS

**How Much Do Software Engineers Make in 2024? Salaries Revealed**

NEIL C. HUGHES · 4 years

ARTIFICIAL INTELLIGENCE

**The Cloud Goes Wild on AI as User Adoption Soars Past 70%**

TIM KEARY · 4 years · Technology Specialist

FEATURED CONTENT

**This Crypto Casino Is Set To Become The Biggest Craze of 2024, Learn Why SCORP is Receiving Massive Investment**

VIRAJ RANDEV · 4 years · Editor



ARTIFICIAL INTELLIGENCE

**Are There 'Sleeper Agents' Hidden Within the Core of AI Systems?**

FRANKLIN OKEKE · 4 years · Technology Journalist



CAREER PATHS

**How to Get a Job in Tech With a Non-Technical Major in 2024**

NEIL C. HUGHES · 4 years · Senior Tech Writer

## Popular Categories

Show All ⟶

      

ER118



Antivirus   Artificial   Audio   CRM   Cryptocurrency   Gambling   Gaming   HR
             Intelligence

Investing   Laptops   Network   Password   Project   Spy   VoIP   VPN
                                 Managers   Management

**Get Techopedia's Daily Newsletter in your inbox every Weekday.**

Add your email                                    Subscribe

☐ Trending News   ☐ Latest Guides   ☐ Reviews   ☐ Term of the Day

By signing up, you agree to our Terms of Use and acknowledge the data practices in our Privacy Policy. You may unsubscribe at any time.



https://h2o.ai/wiki/gpt/# ~ text=GPT%2C%20short%20for%20Generative%20Pre_coherent%20and%20contextually%20relevant%20text.

at 08:59:20, 01/04/2024

H2O.ai   Platform   Solutions   Customers   Partners   Resources   Events   Company   🔍   Request Live Demo   On-Demand Demos   Sign In ⌄

WIKI



Topics   Alphabetic

H2O Wiki

Algorithms                              ⌄

Artificial Intelligence                 ⌄

BERT                                    ⌃

  Attention Mechanism

  BERT

  Binary Classification

  Classify Token ([CLS])

  Conversational Response
  Generation

  GLUE (General Language
  Understanding Evaluation)

  GPT (Generative Pre-Trained
  Transformers)

  Language Modeling

  Layer Normalization

  Mask Token ([MASK])

  Probability Distribution

  Probing Classifiers

  SQuAD (Stanford Question
  Answering Dataset)

  Self-attention

  Separate token ([SEP])

BERT                                    ⌃

# GPT (Generative Pre-Trained Transformers)

## What is GPT (Generative Pre-Trained Transformers)?

GPT, short for Generative Pre-Trained Transformers, is an advanced open-source language model that utilizes transformer architectures to generate human-like text. It is trained on vast amounts of unlabeled text data from the internet, enabling it to understand and generate coherent and contextually relevant text. Unlike rule-based systems, GPT learns patterns and structures in text data to generate human-like responses.

## How GPT (Generative Pre-Trained Transformers) Works

GPT uses a transformer architecture, which is composed of a stack of self-attention layers. These layers allow the model to consider the context of each word in relation to other words in the input text, capturing dependencies and long-range dependencies effectively. During training, GPT learns to predict the next word in a sentence given the preceding words, resulting in a model that can generate text by predicting the most likely subsequent words based on the provided input.

## Why GPT (Generative Pre-Trained Transformers) is Important

GPT has significant implications for businesses in the fields of machine learning and artificial intelligence. Some key reasons why GPT is important are:

- Language Generation: GPT enables businesses to generate high-quality human-like text, such as articles, product descriptions, chatbot responses, and more.

- Content Creation and Summarization: GPT can assist in generating content for various

Attention Mechanism

BERT

Binary Classification

Classify Token ([CLS])

Conversational Response
Generation

GLUE (General Language
Understanding Evaluation)

GPT (Generative Pre-Trained
Transformers)

Language Modeling

Layer Normalization

Mask Token ([MASK])

Probability Distribution

Probing Classifiers

SQuAD (Stanford Question
Answering Dataset)

Self-attention

Separate token ([SEP])

Sequence-to-sequence Language
Generation

Sequential Text Spans

Text Classification

Text Generation

Transformer Architecture

WordPiece

**Data**                        ⌄

**Deep Learning**               ⌄

**General**                     ⌄

**Machine Learning**            ⌄

**Modeling**                    ⌄

**Predictions**                 ⌄

**Tools**                       ⌄

applications, including writing articles, summarizing documents, and generating
personalized emails.

- Language Translation and Understanding: GPT can aid in language translation tasks, helping
  businesses communicate effectively with a global audience. It also enhances language
  understanding capabilities for sentiment analysis, customer feedback analysis, and more.

- Chatbots and Virtual Assistants: GPT's natural language processing capabilities are valuable
  for building advanced chatbots and virtual assistants that can interact with users in a more
  conversational and human-like manner.

## The Most Important GPT (Generative Pre-Trained Transformers) Use Cases

GPT has found extensive use across various industries. Some prominent use cases include:

- Content Generation: GPT can automatically generate content for websites, blogs, social
  media, and other platforms, reducing the time and effort required for manual content
  creation.

- Customer Support: GPT-powered chatbots and virtual assistants can provide instant and
  accurate responses to customer queries, improving customer support efficiency and
  satisfaction.

- Personalization: GPT can analyze user preferences and generate personalized
  recommendations for products, services, and content, enhancing customer experiences.

- Data Augmentation: GPT can generate synthetic data to augment training datasets,
  enabling businesses to train ML models on larger and more diverse datasets, leading to
  improved model performance.

## Related Technologies or Terms

While GPT is a powerful language model in the field of natural language processing, it is closely
related to other technologies and terms such as:

- BERT (Bidirectional Encoder Representations from Transformers): BERT is another popular
  language model that focuses on bidirectional contextual understanding. It complements
  GPT in various NLP tasks and applications.

- H2O.ai: H2O.ai is a leading open-source machine learning platform that provides scalable
  and efficient solutions for data science and AI. Users of H2O.ai can benefit from
  incorporating GPT into their workflows to enhance natural language processing capabilities.

- Transformer Models: GPT is based on transformer models, a class of neural networks that
  excel in sequence tasks by capturing long-range dependencies. Transformers have
  revolutionized many fields within AI and have become the backbone of various models,
  including GPT.

- Language Understanding and Generation: GPT's primary focus is on language understanding

and generation, making it an essential tool for tasks such as text summarization, language translation, sentiment analysis, and more.



https://www.newsweek.com/harnessing-power-gpt-ai-transforming-future-business-1695363

at 09:07:15, 01/04/2024

Newsweek   U.S.   World   Science   Health   Life   Rankings   Opinion   Culture   Fact Check   My Turn   Education   •••       SUBSCRIBE FOR $1   Login





DR_MICROBE/STOCK.ADOBE.COM

☐ 0     ⌁ share     🎧

By **Baruch Labunski**, Founder, Rank Secure

In today's rapidly evolving business landscape, companies are increasingly harnessing the power of GPT (Generative Pre-trained Transformer) and AI (Artificial Intelligence) technologies to revolutionize their operations and drive transformation. GPT, exemplified by models like GPT-3, is a cutting-edge language model that has taken the field of natural language processing to new heights. It can understand context, generate human-like text responses, and perform language-related tasks with astounding accuracy. AI encompasses a broader set of technologies and techniques that enable machines to simulate human intelligence, learn from data, and make intelligent decisions. Together, GPT and AI offer unprecedented opportunities for businesses to unlock new horizons and reimagine their approaches across various domains.

This article will explore the specific applications of GPT and AI in customer service, data analysis and insights, personalization and recommendation systems, and automation and process optimization. It will also delve into each area's benefits, challenges, and future prospects, shedding light on how GPT and AI are transforming the future of business across industries.

**Understanding GPT and AI**

GPT and AI are different but closely related technologies transforming the business's future. GPT is a machine learning model pre-trained on vast amounts of data. It can understand the context and generate



Trending



01   Has Jeffrey Epstein List Release Been Delayed? What We Know

187 comments

02   Gypsy Rose Blanchard Defends Husband From Online 'Haters'

5 comments

03   Ford Recalled 6 Million Cars in 2023

2 comments

04   Capitol Rioter Wants Supreme Court to Save Her From Mouse-Infested Jail

168 comments

05   Lululemon Founder Blasts Company's Push Towards Diversity

7 comments

To Homepage

THE DEBATE

Claudine Gay Betrayed the Values of My Black Elders to Exploit White Guilt

By Eli Steele



natural-sounding language, making it an ideal tool for tasks such as chatbots, virtual assistants, any content generation. The model is trained on massive amounts of data, allowing it to understand the nuances of human language and produce contextually appropriate responses. Additionally, GPT models can be fine-tuned on specific datasets, allowing customization and adaptation to different domains.

ADVERTISING

Try Semrush
for free

⦿ SEMRUSH

On the other hand, AI involves broader technologies, including machine learning, deep learning, and neural networks. AI systems can be trained on vast amounts of data to learn patterns and make predictions, enabling businesses to automate repetitive tasks and gain insights into customer behavior. AI-powered chatbots and virtual assistants can handle customer inquiries and provide personalized recommendations, freeing human resources for more complex tasks.

ADVERTISING

## Applications of GPT and AI in Business

NEWSLETTER
The Bulletin    Your daily briefing of everything you need to know    Email address    SIGN UP

vs



**Hypocritical Right Wing Cancel Culture Warriors Claim Their Next Victim**

By Jason Nichols

ExoIris™
A new age of answers.
DISCOVER

⦿ EXO

OPINION

The integration of GPT and AI technologies has ushered in a new era of business possibilities. From enhancing customer service to revolutionizing data analysis, enabling personalized experiences, and streamlining business processes, GPT and AI are reshaping the future of business operations.

Below are some of the applications in detail:

ADVERTISEMENT



ADVERTISEMENT

SCROLL TO CONTINUE READING

### • Customer Service and UX

GPT and AI technologies have revolutionized customer service, enabling businesses to provide efficient and personalized customer support. Chatbots, virtual assistants, and automated response systems provide personalized and interactive experiences with 24/7 support as well as provide effective customized marketing campaigns driven by AI algorithms. This allows for more cross-selling and upselling by analyzing behaviors, preferences, and demographic information.

### • Data Analysis and Insights



N  Sign up for Newsweek's daily headlines

GPT and AI technologies are revolutionizing data analysis and insights, empowering businesses to extract valuable information from vast data. AI algorithms, trained on extensive datasets, excel in data processing, pattern recognition, and predictive analytics. This gives businesses using this technology a competitive edge. Data-driven insights and predictive analytics help in decision-making and strategic planning. It allows companies to better exploit competitors' weaknesses in marketing and stay on top of trends.

### • Automation and Process Optimization

Efficiently managing business processes is essential for productivity and cost-effectiveness. GPT and AI



Why Normalizing Venezuela's Maduro Is Dangerous
By Kristina Foltz

What's the End Game for Gaza? Netanyahu Must Spell It Out
By Tsafrir Kolb

How Taylor Swift Became the Loudest Woman We've Ever Seen
By Veronica Ruwckert

Hamas Tortured Me for Dissent. Here's What They Truly Think of Palestinians
By Hamza

Higher E...
By Roch...

Colleg...
By Angel...

What Is...
Larges...
By Pete P...

Efficiently managing business processes is essential for productivity and cost-effectiveness. GPT and AI technologies can streamline operations and improve efficiency through automation and intelligent decision-making. Automated workflows powered by GPT and AI can eliminate manual interventions and automate repetitive tasks, potentially reducing errors and improving accuracy. The result is enhanced productivity and cost savings.

ADVERTISEMENT




Intelligent decision-making systems can optimize resource allocation, leading to more effective use of budgets and minimizing unnecessary expenses. Businesses can allocate their financial resources strategically and achieve better cost management.

### The Future of GPT and AI in Business

The long-term future of this technology and how it will affect business is hard to imagine because of its infinite possibilities, both good and bad. What we should expect over the next few years is for GPT to unleash a new wave of creativity both in innovation and in marketing that innovation. It will likely create a competition divide between businesses that use it and those that don't. It could also create higher expectations for consumers as they begin to get improved customer experiences. That would force many who are reluctant to use this technology to jump on board to stay in the game.

As AI becomes more humanized, it will likely move into more personalized services such as the legal and medical fields. These are fields that are somewhat skeptical of AI because of the personal responsibility involved in dealing with clients this way, but some are testing it now. AI could feasibly speed up some legal cases, create new winnable courtroom arguments, and make the legal field much more competitive while eliminating some positions such as paralegals or administrative assistants. That could, in theory, cut some costs for clients and make legal advice more accessible to the public.

ADVERTISEMENT










The medical field is more intriguing because it could do online consultations and evaluations that typically are required before you see a doctor. There are currently things that a registered nurse would handle. As it advances, in theory, an AI or GPT program could do an entire physical remotely. That would change home health care and rural medicine dramatically.

*The Newsweek Expert Forum is an invitation-only network of influential leaders, experts, executives, and entrepreneurs who share their insights with our audience. What's this?*

Request Reprint & Licensing | Submit Correction | View Editorial Guidelines

**About the writer**

Baruch Labunski

To read how Newsweek uses AI as a newsroom tool, click here.

SPONSORED CONTENT











## The Transformative Power of AI

As technological advancements continue to disrupt various industries, the field of artificial intelligence (AI) has become a vital tool in revolutionizing how we approach and solve complex problems. One such example is the emergence of the Generative Pre-trained Transformer (GPT), a powerful deep learning algorithm that has shown remarkable success in various fields. GPT is a type of neural network that can generate human-like language, allowing it to understand context and meaning in text-based inputs.

## Everyday Life

GPT can make our lives easier in many ways. It can help us translate languages, write better emails or reports, summarize lengthy texts, and even create engaging content like poetry or stories. Virtual assistants and chatbots also use GPT for speech recognition and generating responses. Additionally, it can analyze vast amounts of text data to provide insights for decision-making. In summary, GPT is a versatile tool that can make our everyday tasks more efficient and effective.



© 2023 NOSTALAB. All Rights Reserved.



## BTC Definity Pro bot – powered by GPT Ai technologies

Disclaimer: BTC Definity bot is a crypto trading tool that provides traders with AI-based trade predictions. It is important to recognize that all investments come with inherent risks, and we strongly advise against risking any funds that you cannot afford to lose. Conduct thorough research, gain a comprehensive understanding of the associated risks, and carefully plan your investment budget to ensure responsible trading practices.



### Speed and Efficiency

AI-based trading bots such as Bitcoin GPT Definity Bot 2.0 can analyze vast amounts of data in real-time to make fast and efficient trading decisions.



### Accuracy

The AI-based trading algorithms can be programmed to make trading decisions better than humans ever could, by eliminating human error and emotions from the trading process.



### Customization

The GPT Definity AI-based trading platform can be customized to suit the requirements and preferences of crypto traders including trading strategies and risk parameters.



### 24/7 Trading

GPT Definity Bot 2.0 can operate 24/7 for traders to take advantage of opportunities in the market at any time and any place, so you never have to miss another trading opportunity.



## What is GPT Definity Ai?

GPT Definity Pro is a state-of-the-art generative AI based crypto auto-trading platform that uses the power of the latest AI technologies to help you make faster, more accurate, and more profitable trading decisions. Using AI technology in trading removes the possibilities of human error which in Crypto often occure due to heightened emotions. The BTC GPT Definity 2.0 platform works 24-7 and is powered by advanced algorithms that can analyze vast amounts of market data in real-time and identify patterns and trends that would be close to impossible for a human trader to spot.

The GPT Definity platform offers an edge in the market by staying ahead of the curve. Set custom trading strategies, risk parameters, and other preferences to suit your trading goals and preferences in order to tailor your trading approach to your specific needs and optimize your performance in the market. So whether you're a seasoned trader or just getting started, the BTC GPT Definity 2.0 AI-powered auto-trading platform is the perfect tool to take your trading to the next level.

AI tools incorporate the power of algorithmic trading and GPT technology based live data analysis tools enabling artificial intelligence to enter and exit trade the way that you generate the profit with minimum risk.





The BTC **GPT** Definity 2.0 platform also provides a variety of data analytics tools to help you make informed decisions about your trades. It provides real-time market analysis and insights, allowing you to quickly identify opportunities in the markets and take advantage of them. Additionally, you can backtest strategies and refine them based on the data provided, optimizing your strategies over time. Finally, the platform also offers a range of risk-management tools to help you manage your exposure to the markets.

Learn More

## Unveiling a New Dimension in Day Trading
## with <u>Immediate Intal Ai</u>

<u>Immediate Intal Ai</u> unveils a new dimension in day trading, featuring high-tech capabilities, live market updates, and AI-informed forecasts. Its user-centric design is a highlight, fitting for traders of all levels. Immediate Intal and Immediate Intal Ai cater to both crypto trading beginners and experts, setting the stage for an enthralling trading experience.

## <u>Immediate Avapro 360:</u> A Trailblazer
## in Crypto Trading Innovation

<u>Immediate Avapro 360</u> stands out as a trailblazer in crypto trading, offering advanced features, real-time market insights, and AI-led predictions. Its ease of use is a standout feature, accommodating traders from novice to professional. Both Immediate Avapro and Immediate Avapro Ai versions are tailored for varied trading experiences. Embark on a groundbreaking crypto trading journey.

#  Definity Ai & its latest BTC Definity Pro 2.0 versions

BTC Definity Ai is an innovative Crypto auto-trading bot powered by advanced **GPT** AI technologies. It identifies market opportunities by analyzing optimal buy and sell times for popular Cryptocurrencies like Bitcoin, Ethereum, Solana, Dogecoin, and many more. With state-of-the-art Ai-based technologies, BTC Definity Ai delivers optimal trading signals.

As a leading Crypto pro app, BTC **GPT** Definity 2.0 caters to both novice and experienced traders. Whether you're new to Crypto or seeking a tool which will help you trade cryptocurrencies BTC **GPT** Definity Bot is the ideal platform. Designed with user-friendliness and simplicity in mind, BTC **GPT** Ai provides all the necessary tools for successful trades. Even if you're a trading beginner, the Bitcoin Definity Bot handles the heavy lifting. Experience the unmatched accuracy and innovation of this industry-leading trading bot.

OPEN GPT BOT

## Ready to take your cryptocurrency trading to the next level?

Register now with the BTC Definity Ai Bot 2.0 crypto auto-trading platform that utilizes AI technology to optimize your trading strategy and stay ahead of the curve at all times.

Register



**01** Sign up for an account
Fill out the registration form and sign up for a BTC Definity AI Bot 2.0 account.

**02** Deposit funds
Once your account is verified, you can fund your account by depositing the minimum requirement.

**03** Start trading
After you've funded your account your ready to start trading with the AI auto-trading bot

ER141

## Bitcoin GPT Definity – crypto trading 2.0



Cryptocurrencies have been a popular topic of discussion in recent years, and their future certainly looks bright. While there are always risks and uncertainties associated with any investment, there are several factors that suggest that the value of cryptocurrencies is likely to continue to rise. Major companies like Tesla and PayPal have already begun accepting Bitcoin as a form of payment, and other businesses are likely to follow suit. This increased demand for cryptocurrencies as a means of payment and investment is likely to lead to a surge in their value.

Additionally, cryptocurrency transactions are becoming increasingly secure and efficient, due to the use of blockchain technology. This technology allows for more secure and efficient transactions, leading to more confidence in the cryptocurrency market. Furthermore, the decentralization of cryptocurrencies makes them more resilient to market manipulation, which can be a major benefit for investors. As more people become comfortable with the idea of investing in cryptocurrencies, the market will likely continue to grow, making cryptocurrencies an increasingly attractive investment.

The use of AI and machine learning has also made the GPT Definity Pro the most efficient trading bot. By using a 175 billion parameter, fine-tuned AI system and a generative pre-trained transformer, trading algorithms are able to make more informed decisions, leading to more successful trades. This has helped to further increase the confidence that investors have in the cryptocurrency market, and has encouraged more people to invest in cryptocurrencies. As more people become comfortable with the idea of investing in cryptocurrencies, the market will likely continue to grow, making cryptocurrencies an increasingly attractive investment.



## GPT Definity Bot - BTC Ai Trading Technologies

AI technology has the ability to analyze vast amounts of market data and make real-time trading decisions. This has enabled traders to make more informed and profitable trades, while reducing the potential for human error.

One of the key advantages of AI technology in trading is its ability to process and analyze large amounts of data quickly and accurately. This allows AI auto trading apps like GPT definity to identify patterns and trends in the market that could easily be missed by most human traders. AI technology can also learn from past market behavior and adjust their trading strategies accordingly.

## Frequently asked questions

What is BTC GPT Definity?                                                             —

BTC GPT Definity is an AI-based crypto trading tool that allows traders to take wised decision on when to buy or sell cryptocurrencies. GPT Definity AI uses sophisticated algorithms to analyze market trends and suggest on optimal trade opportunities without human intervention.






| How does GPT Definity Pro work? | + |
| Can I use GPT Definity Bot on my mobile device? | + |
| What cryptocurrencies does BTC Definity Ai covers? | + |
| Can I customize my trading strategy with GPT Definity Pro? | + |

## GPT Definity Ai & BTC Definity Bot 2.0 highlights

| 🦇 Trading Platform | Crypto Auto-Trading App |
| 💻 Platform Fee | No Fee |
| 🏅 Withdrawal Fee | Free |
| 💳 Deposit Option | Visa, Mastercard, Comodo, Gpay, Apple Pay, PayPal, Skrill, Neteller, UnionPay, Webmoney, Yandex |
| 📊 Minimum Deposit | $250 |
| 🌐 Countries | All countries are available except for USA |





We collaborate with a variety of third parties, including affiliates engaged in cryptocurrency trading who are not linked with the company listed on the website, and we may share your personal information with them. These third parties might use your information to get in touch with you or for their own commercial gain. Please be aware that trading carries a risk of losing some or all of the money invested, and that roughly 70% of investors eventually experience a loss. Before investing, thoroughly review our terms & conditions and disclaimer page.

Cryptobots LTD

Moxon St, Marylebone, London, W1U 4EW

About Us        Contact        Login        Privacy Policy        Terms And Conditions

© 2023 All Rights Reserved

contact@gptdefinity.com




**Explore Free Machine Learning Offers**
Build, deploy, and run machine learning
applications in the cloud for free


**Check out Machine Learning Services**
Innovate faster with the most
comprehensive set of AI and ML services


**Browse Machine Learning Trainings**
Get started on machine learning training
with content built by AWS experts


**Read Machine Learning Blogs**
Read about the latest AWS Machine
Learning product news and best practices

What is GPT?

Why is GPT important?

What are the use cases of
GPT?

How does GPT work?

How was GPT-3 trained?

What are examples of some
applications that use GPT?

How can AWS help you run
large language models like
How was GPT-3 trained?

What are examples of some
applications that use GPT?

How can AWS help you run

## What is GPT?

Generative Pre-trained Transformers, commonly known as GPT, are a family of neural network models that uses the transformer architecture and is a key advancement in artificial intelligence (AI) powering generative AI applications such as ChatGPT. GPT models give applications the ability to create human-like text and content (images, music, and more), and answer questions in a conversational manner. Organizations across industries are using GPT models and generative AI for Q&A bots, text summarization, content generation, and search.

## Why is GPT important?

The GPT models, and in particular, the transformer architecture that they use, represent a significant AI research breakthrough. The rise of GPT models is an inflection point in the widespread adoption of ML because the technology can be used now to automate and improve a wide set of tasks ranging from language translation and document summarization to writing blog posts, building websites, designing visuals, making animations, writing code, )researching complex topics, and even composing poems. The value of these models lies in their speed and the scale at which they can operate. For example, where you might need several hours to research, write, and edit an article on nuclear physics, a GPT model can produce one in seconds. GPT models have sparked the

large language models like GPT-3?

research in AI towards achieving artificial general intelligence, which means machines can help organizations reach new levels of productivity and reinvent their applications and customer experiences.

## What are the use cases of GPT?

The GPT models are general-purpose language models that can perform a broad range of tasks from creating original content to write code, summarizing text, and extracting data from documents.

Here are some ways you can use the GPT models:

### Create social media content

Digital marketers, assisted by artificial intelligence (AI), can create content for their social media campaigns. For example, marketers can prompt a GPT model to produce an explainer video script. GPT-powered image processing software can create memes, videos, marketing copy, and other content from text instructions.

### Convert text to different styles

GPT models generate text in casual, humorous, professional, and other styles. The models allow business professionals to rewrite a particular text in a different form. For example, lawyers can use a GPT model to turn legal copies into simple explanatory notes.

### Write and learn code

As language models, the GPT models can understand and write computer code in different programming languages. The models can help learners by explaining computer programs to them in everyday language. Also, experienced developers can use GPT tools to autosuggest relevant code snippets.

### Analyze data

The GPT model can help business analysts efficiently compile large volumes of data. The language models search for the required data and calculate and display the results in a data table or spreadsheet. Some applications can plot the results on a chart or create comprehensive reports.

### Produce learning materials

Educators can use GPT-based software to generate learning materials such as quizzes and tutorials. Similarly, they can use GPT models to evaluate the answers.

### Build interactive voice assistants

The GPT models allow you to build intelligent interactive voice assistants. While many chatbots only respond to basic verbal prompts, the GPT models can produce chatbots with conversational AI capabilities. In addition, these chatbots can converse verbally like humans when paired with other AI technologies.

## How does GPT work?

Though it's accurate to describe the GPT models as artificial intelligence (AI), this is a broad description. More specifically, the GPT models are neural network-based language prediction models built on the Transformer architecture. They analyze natural language queries, known as prompts, and predict the best possible response based on their understanding of language.

To do that, the GPT models rely on the knowledge they gain after they're trained with hundreds of billions of parameters on massive language datasets. They can take input context into account and dynamically attend to different parts of the input, making

What are the use cases of GPT?

How does GPT work?

How was GPT-3 trained?

What are examples of some applications that use GPT?

How can AWS help you run large language models like GPT-3?

them capable of generating long responses, not just the next word in a sequence. For example, when asked to generate a piece of Shakespeare-inspired content, a GPT model does so by remembering and reconstructing new phrases and entire sentences with a similar literary style.

There are different types of neural networks, like recurrent and convolutional. The GPT models are transformer neural networks. The transformer neural network architecture uses self-attention mechanisms to focus on different parts of the input text during each processing step. A transformer model captures more context and improves performance on natural language processing (NLP) tasks. It has two modules, which we explain next.

Read about neural networks »

Read about natural language processing (NLP) »

**What are the use cases of GPT?**

**How does GPT work?**

**How was GPT-3 trained?**

**What are examples of some applications that use GPT?**

**How can AWS help you run large language models like GPT-3?**

### Encoder

Transformers pre-process text inputs as embeddings, which are mathematical representations of a word. When encoded in vector space, words that are closer together are expected to be closer in meaning. These embeddings are processed through an encoder component that captures contextual information  from an input sequence. When it receives input, the transformer network's encoder block separates words into embeddings and assigns weight to each. Weights are parameters to indicate the relevance of words in a sentence.

Additionally, position encoders allow GPT models to prevent ambiguous meanings when a word is used in other parts of a sentence. For example, position encoding allows the transformer model to differentiate the semantic differences between these sentences:

- A dog chases a cat
- A cat chases a dog

So, the encoder processes the input sentence and generates a fixed-length vector representation, known as an embedding. This representation is used by the decoder module.

### Decoder

The decoder uses the vector representation to predict the requested output. It has built-in self-attention mechanisms to focus on different parts of the input and guess the matching output. Complex mathematical techniques help the decoder to estimate several different outputs and predict the most accurate one.

Compared to its predecessors, like recurrent neural nets, transformers are more parallelizable because they do not process words sequentially one at a time, but instead, process the entire input all at once during the learning cycle. Due to this and the thousands of hours engineers spent fine-tuning and training the GPT models, they're able to give fluent answers to almost any input you provide.

## How was GPT-3 trained?

In a published paper, researchers described generative pretraining as the ability to train language models with unlabeled data and achieve accurate prediction. The first GPT model, GPT-1, was developed in 2018. GPT-4 was introduced in March 2023 as a successor to GPT-3.

GPT-3 was trained with over 175 billion parameters or weights. Engineers trained it on over 45 terabytes of data from sources like web texts, Common Crawl, books, and Wikipedia. Prior to training, the average quality of the datasets was improved as the model matured from version 1 to version 3.

**What are the use cases of GPT?**

**How does GPT work?**

GPT-3 trained in a semi-supervised mode. First, machine learning engineers fed the deep learning model with the unlabeled training data. GPT-3 would understand the sentences, break them down, and reconstruct them into new sentences. In unsupervised training, GPT-3 attempted to produce accurate and realistic results by itself. Then, machine learning engineers would fine-tune the results in

GPT-3 attempted to produce accurate and realistic results by itself. Then, machine learning engineers would fine-tune the results in supervised training, a process known as reinforcement learning with human feedback (RLHF).

You can use the GPT models without any further training, or you can customize them with a few examples for a particular task.

**How was GPT-3 trained?**

**What are examples of some applications that use GPT?**

**How can AWS help you run large language models like GPT-3?**

## What are examples of some applications that use GPT?

Since its launch, the GPT models have brought artificial intelligence (AI) to numerous applications in various industries. Here are some examples:

- GPT models can be used to analyze customer feedback and summarize it in easily understandable text. First, you can collect customer sentiment data from sources like surveys, reviews, and live chats, then you can ask a GPT model to summarize the data.

- GPT models can be used to enable virtual characters to converse naturally with human players in virtual reality.

- GPT models can be used to provide a better search experience for help desk personnel. They can query the product knowledge base with conversational language to retrieve relevant product information.

## How can AWS help you run large language models like GPT-3?

Amazon Bedrock is the easiest way to build and scale generative AI applications with large language models, also known as foundation models (FMs), similar to GPT-3. Amazon Bedrock gives you access via an API to foundation models from leading AI startups, including AI21 Labs, Anthropic, and Stability AI—along with Amazon's newest foundation model family, Amazon Titan FMs. With Bedrock's serverless experience, you can get started quickly, privately customize FMs with your own data, and easily integrate and deploy them into your applications using the AWS tools and capabilities you are familiar with (including integrations with Amazon SageMaker ML features like Experiments to test different models and Pipelines to manage your FMs at scale) without having to manage any infrastructure. Learn more about building with foundation models on Amazon Bedrock.

## Machine learning next steps



**Get Started with AWS**
Learn how to start using AWS in minutes

**AWS Free Tier**
Gain free, hands-on experience with AWS for 12 months

**re:Invent recap: Best of generative AI | January 31, 2024**
Explore how generative AI can drive value for your organization. Register now »

re:Cap

| Learn About AWS | Resources for AWS | Developers on AWS | Help | |
|---|---|---|---|---|
| | | | | Create an AWS Account |

| What is AWS? | Getting Started | Developer Center | Contact Us |
| What Is Cloud Computing? | Training and Certification | SDKs & Tools | Get Expert Help |
| AWS Inclusion, Diversity & Equity | AWS Solutions Library | .NET on AWS | File a Support Ticket |
| What Is DevOps? | Architecture Center | Python on AWS | AWS re:Post |
| What Is a Container? | Product and Technical FAQs | Java on AWS | Knowledge Center |
| What Is a Data Lake? | Analyst Reports | PHP on AWS | AWS Support Overview |
| What Is Generative AI? | AWS Partners | JavaScript on AWS | Legal |
| AWS Cloud Security | | | AWS Careers |
| What's New | | | |
| Blogs | | | |
| Press Releases | | | |

Amazon is an Equal Opportunity Employer: *Minority / Women / Disability / Veteran / Gender Identity / Sexual Orientation / Age.*

**Language** عربي | Bahasa Indonesia | Deutsch | English | Español | Français | Italiano | Português | Tiếng Việt | Türkçe | Русский | ไทย | 日本語 | 한국어 | 中文 (简体) | 中文 (繁體)

Privacy | Site Terms | Cookie Preferences | © 2023, Amazon Web Services, Inc. or its affiliates. All rights reserved.



Nutanix will aim the initial launch squarely at customer on-premise use cases, but including edge workloads, with expansion to the cloud coming later.

Essentially, Nutanix believes customers need help to specify an infrastructure for AI because it can involve a complex mix of software elements plus hardware add-ons, and that concerns are commonplace over privacy and governance in AI applications.

"It's activity that consumes, creates and generates a lot of data," said Nutanix senior vice-president for product management Thomas Cornely. "And discussion about what you can do on-premise often resolves around privacy and governance."

Nutanix will offer what it calls a "full-stack AI-ready platform", in which it expects customers to deploy hardware and software to train and retrain models and be able to expose results to application developers.

GPT-in-a-Box bundles will comprise Nutanix HCI, Nvidia GPU hardware or recommendations, the Nutanix AHV hypervisor, a Kubernetes container layer, AI foundation models, open-source AI frameworks that could include KubeFlow, Jupiter and PyTorch, and a curated set of large language models including Llama2, Falcon GPT and MosaicML, all of which will provide outputs exposed for application development.

### Read more on storage for AI

- Podcast: Sizing data storage for AI/ML workloads. Artificial intelligence and machine learning workloads come with I/O profiles of different shapes and sizes. We talk to Curtis Anderson of Panasas about how best to procure and size storage for them.

- Storage requirements for AI, ML and analytics. We look at what is needed for artificial intelligence and machine learning, and the pros and cons of block, file and object storage to store and access very large amounts of often unstructured data.

Nutanix's offering is the latest effort from storage array makers to target AI/ML use cases, and clearly aims to hook on the surge in interest in chat-format AI. All of the big storage makers have addressed the rise in prominence of unstructured data as a source of analytics processing, but not all have been so explicit in targeting product bundles. An exception is Vast Data, which wants to build its recently launched Vast Data Platform as a global brain-like network of AI learning



free Data Storage

The easiest to setup, run, and upgrade.

Simplify Enterprise Storage

**Latest News**

Gartner: The big IT outsourcing contract returns

Anger sparked by TV drama forces Fujitsu to put public sector contract bidding on hold

PSTN switch-off threatens access to adult social care services

View All News

**Download Computer Weekly**

IN THE CURRENT ISSUE:
- Hundreds of subpostmasters to have their convictions quashed in blanket exoneration
- How Fujitsu became a central part of the decades-long Post Office scandal

Download Current Issue

**Latest Blog Posts**

The Last Word in Analysing SASE Offerings: Evaluation Advice
– Networks Generation

Tape is back on the main menu
– Write side up – by Freeform Dynamics

View All Blogs

**Related Content**

Nutanix Kubernetes 'ecosystem' aims to underpin ...
– ComputerWeekly.com

Nutanix aims for SMB growth with channel Cloud Bundles
– MicroScope

Out of this world? Nutanix delivers 'universal' cloud...
– ComputerWeekly.com

nodes.

Meanwhile, Nutanix GPT-in-a-Box is not just a self-service deploy-and-run offer. "It's a bundled offer and it can scale down and out," said Cornely. "But there's a consulting phase, on GPUs, for example, and the software elements needed to support customer requirements."

It's an offer primarily launched at greenfield deployments in core datacentre or edge locations. Existing Nutanix customers can, in theory, build AI-ready infrastructures but would still need to consult over, for example, GPU sizing. "They do need different components," said Cornely.

"They could upgrade their own infrastructure, but many customers lack the time to get started," he said. "And there are different components for different parts of the [machine learning] process. There's quite a lot of consulting up-front, but Nutanix has people that are chairs and vice-chairs of organisations that are putting this stuff out so they can say, 'This is what's needed for this deployment'."

According to Cornely, many customers lack policies for the data that's going into models and where it goes after it comes out, so for the time being, this offer is aimed at deployments on-premise to simplify matters of privacy, copyright and governance.

"It's clearly targeted at on-premise and edge, and allowing customers to be fully in control of what they're paying for and what data is going into it," he said. "The cloud element is limited to getting foundation models, registering for LLMs, etc."

## ↘ Next Steps

Why IT leaders should deploy generative AI infrastructure now

## ↘ Read more on Converged infrastructure



LLM series - Nutanix: Boxed for builders, how to forge & create developer AI tools

By: Adrian Bridgwater



Why IT leaders should deploy generative AI infrastructure now

By: Scott Sinclair



Out of this world? Nutanix delivers 'universal' cloud operating model

By: Adrian Bridgwater



Nutanix refreshes referral programme to cover all aspects of buying cycle

By: Simon Quicke

-ADS BY GOOGLE-

CustomerAI

CustomerAI allows you to generate tailored customer experiences at scale.

Twilio

Learn More

Latest TechTarget resources

CIO

SECURITY

NETWORKING

DATA CENTER

### CIO

**Top 7 CIO challenges in 2024 and how to handle them**

CIOs face multiple tests this year as they scrutinize innovation investment amid budget tightening, chart a course...

**Top 8 Web 3.0 trends and predictions for 2024 and beyond**

Despite blockchain hacks and cryptocurrency's legal troubles, development and adoption of the next...

**16 top ERM software vendors to consider in 2024**

Various software tools can help automate risk management and GRC processes. Here's a look at 16...

DATA MANAGEMENT

...mid-budget tightening, chart a course
for AI and ...

...development and adoption of the next
major iteration of the World ...

...processes. Here's a look at 10
enterprise risk management ...

**TechTarget**

About Us
Editorial Ethics Policy
Meet The Editors
Contact Us
Our Use of Cookies
Advertisers
Business Partners
Media Kit

Corporate Site
Contributors
Reprints
Answers
E-Products
Events
In Depth
Guides

Opinions
Quizzes
Photo Stories
Tips
Tutorials
Videos
Computer Weekly Topics

All Rights Reserved, Copyright
2000 - 2024, TechTarget

Privacy Policy
Do Not Sell or Share My Personal
Information

https://hoongpt.com/chatbot/                                                                                           at 10.49.42, 01/18/2024



FEATURES ⌄      PRICING      PROMOTIONS ⌄                                                LOGIN

# Have Human Conversations With A.I

This software can answer questions and assist you with tasks, such as composing emails, essays, and code.

Hoon GPT software is an A.I chatbot with extra automotive specific training, just like the one used in the Skoda Superb build featured on our social profiles.

You have your own personal A.I chatbot to interact with in a conversational way. The software can respond to questions you ask it. It can compose written content based on your prompt.

Save time in your work, speed up content creation and create customised plans for the projects that interest you.



Login      Privacy Policy      Development Roadmap

Copyright © 2024 Coscorp Pty Ltd trading as Hoon GPT

https://www.newsfilecorp.com/release/156849/Nexalogy-Launches-Analytics-GPT-Beta-Program-for-SMEs

at 10:50:04, 01/18/2024



f  |  ✕  |  in  |  ✉

🔒 Login   🔍 Search

About ▾    Services ▾    Newsroom ▾    Blog    Contact

f  ✕  in  🖨

## Nexalogy Launches Analytics GPT Beta Program for SMEs

March 02, 2023 8:00 AM EST | Source: **Datametrex AI Limited**

Toronto, Ontario--(Newsfile Corp. - March 2, 2023) - **Datametrex AI Limited (TSXV: DM) (FSE: D4G) (OTCQB: DTMXF)** (the **"Company"** or **"Datametrex"**) is pleased to announce that the Company's wholly-owned Artificial Intelligence ("AI") subsidiary, Nexalogy Environics Inc. ("**Nexalogy**"), is launching a beta program for its new Analytics GPT software. The program offers small to medium enterprises (SMEs) the opportunity to sign up for exclusive access to Nexalogy's revolutionary Analytics GPT software. The beta program will begin on March 6, 2023.

By participating in the beta program, users will be able to gain early access to the Analytics GPT software, allowing users to test the product and acquire valuable insights into its capabilities before its official launch. Participants will also have the opportunity to learn more about how the A.I. behind the software works, and receive an in-depth white paper that outlines key elements and use case examples that demonstrate how the tool can gather and analyze large sets of data and provide actionable insights.

The Analytics GPT beta program is an excellent opportunity for individuals and businesses seeking to leverage the power of artificial intelligence and data analytics to enhance their business and achieve a competitive advantage in their respective markets.

Don't miss the opportunity to be at the forefront of the next generation of data analytics and artificial intelligence technology.

To sign up for the Analytics GPT beta program and receive additional information, such as the white paper, sample reports, and more, visit https://www.datametrex.com/analyticsgpt.

"We're excited to give users a first-hand look at the software and have users experience the tool in real-time to see how it can provide insights and value for businesses of all sizes. We encourage business owners to sign up for our beta program and take advantage of this exclusive opportunity," said Marshall Gunter, CEO of the Company.

**About Nexalogy**

Nexalogy's technology, AnalyticsGPT reduces the time needed to interpret and integrate large sets of data by offering powerful automated analyses. He/she sets the parameters of the data collection via keywords and other media information (e.g., usernames and links). AnalyticsGPT extracts the relevant data and produces automated reports, thus allowing clients to work with a more manageable information set. AnalyticsGPT allows almost anyone to deal with hundreds of thousands of data points, producing actionable insights in minutes (possible in most, but not all cases). By harnessing the power of GPT technology and fusing it with our state-of-the-art A.I. algorithms, Analytics GPT has removed the barrier to entry to predictive analytics. Now, almost anyone can use Nexalogy's A.I. without the assistance of a trained data analyst to produce critical insights and get results.

Data can be easily filtered to get automatic reports on subsets of the data focusing on specific times, entities, social media users, or topics. With a click of a button, Analytics GPT allows you to receive full reports, complete with written summaries, recommendations, visualizers, and a compilation of media hits at your fingertips in seconds to simplify business operations and maximize potential. Analytics GPT provides critical insights, faster than ever before, provides predictive analysis, is a proven success, and gives you the power of A.I right at your fingertips! The resulting reports are delivered either as PDFs, DOCs, or via API for further processing.

Lastly, AnalyticsGPT helps the user to easily access the required information and helps to detect patterns that currently go unrecognized. This is needed in both the context of the 'short game' of crisis reporting and the 'long game' of identifying



datametrex
Datametrex AI Limited

### Sign up for Alerts

Sign up to receive news releases by email for Datametrex AI Limited or all companies belonging to the Banking/Financial Services, Technology industries.

SIGN UP

### Recent News

**Datametrex Generates over $1 Million Revenue in December for IT Services**
2024-01-11 7:30 AM EST

**Datametrex Expands IT Services Footprint to Energy Sector**
2024-01-05 7:30 AM EST

**Datametrex Secures Approximately $730K Purchase Order from Lotto**
2024-01-04 7:30 AM EST

COMPANY PROFILE

### Articles from Newsfile

NOV 14, 2023

narratives, as discussed within the BEAD (Build Engage Resolute District) framework.

For more information please visit https://www.datametrex.com/analyticsgpt.

**About Datametrex**

Datametrex AI Limited is a technology-focused company with exposure to artificial intelligence, machine learning, and telehealth and has recently entered the electric vehicle (EV) market. Datametrex's mission is to provide tools and solutions that support companies in fulfilling their operational goals, including health and safety, with predictive and preventive technologies. By working with companies to set a new standard of protocols through artificial intelligence and health diagnostics, the Company provides progressive solutions to support the supply chain.

For additional information on Datametrex and other corporate information, please visit the Company's website at www.datametrex.com.

To learn more about how our AI is used in Cyber Security, Telehealth, and EV, visit https://www.youtube.com/watch?v=ApFk3oWAltg.

**For further information:**

**Investor Relations & Communications**
Priya Monique Atwal, Director of Communications
Email: investors@datametrex.com
Tel: 416-901-5611 x 204

Marshall Gunter, CEO
Email: mgunter@datametrex.com
Tel: 514-295-2300

**Neither TSX Venture Exchange nor its Regulation Services Provider (as that term is defined in the policies of the TSX Venture Exchange) accept responsibility for the adequacy or accuracy of this release.**

**Forward-Looking Statements**

All statements included in this press release that address activities, events, or developments that the Company expects, believes, or anticipates will or may occur in the future are forward-looking statements. These forward-looking statements involve numerous assumptions made by the Company based on its experience, perception of historical trends, current conditions, expected future developments, and other factors it believes are appropriate in the circumstances. In addition, these statements involve substantial known and unknown risks and uncertainties that contribute to the possibility that the predictions, forecasts, projections, and other forward-looking statements will prove inaccurate, certain of which are beyond the Company's control. Except as required by law, the Company does not undertake to revise or update these forward-looking statements after the date hereof or revise them to reflect the occurrence of future unanticipated events.

###

SOURCE: Datametrex AI Limited

---

**PR Pros' Holiday Toolkit: 5 Press Release Examples from Amazon to Starbucks (+ more)**

Dive into the world of holiday PR with our essential toolkit, showcasing top press release examples from Amazon to Starbucks. In addition, explore how our Top 5 Holiday Press Release....

**Hashtags**

Banking    FinancialServices

Technology    OTC    OTCMarkets

OTCStocks    SmallCaps    TSXV

Investing

**Subjects**

Economy, Business and Finance
Financial and Business Service
Science and Technology

**Similar Stories**

Banking/Financial Services

Technology

---

Tell Us Your Story                                   LEARN MORE

**About Us**

Newsfile is a customer-first newswire focused on the distribution of press releases and regulatory disclosures to audiences worldwide.

Copyright 2024 Newsfile Corp. All rights reserved.

**Legal**

Terms of Use
Anti-Spam Policy
Privacy Policy
Bill C-18



## Personalize GPT With Your Data

Using GPT for Retrieval Augmented Generation

Recording available until 21. February 2024

**Watch Recording**

---

This Fullstack Live Event Has Ended

---

### Chat Using Your Own Data

The advent of GPT models has revolutionized the concept of "chat using your own data", making it a popular use case. The premise is simple: link this potent language model to your data, thereby crafting a unique, personalized version of GPT.



While the initial setup is easy, real-world applications require careful consideration. In this Fullstack Live Event, we will explore the mechanisms utilized by Kern AI's software, providing a comprehensive understanding of the steps necessary to excel in this domain. We will dive into important aspects such as

- maintaining high data quality
- managing multilingualism
- handling sensitive private information within your data

While having intermediate knowledge and a basic understanding of machine learning is advantageous, newcomers to these concepts are equally welcome to join and learn with us!

[Watch Recording]



## Get To Know Our Expert

### Leonard Püttman - Kern AI

Leonard Püttmann is a data scientist and developer advocate at Kern AI.

He studied economics at the Hochschule Düsseldorf but quickly found his way into the world of machine learning . His domain of expertise is natural language processing (NLP), but he's also interested in classical machine learning topics, as well as cloud computing.

At the moment, Leonard is most interested in getting language models efficiently into production. He's also an avid tea drinker and always happy to talk about all things data and ML over a hot cup of tea.

## Register Now and Join Our Fullstack Live Event

### Already have Fullstack?

You're all set! Grab a pen and paper and simply check back in at the time of the event to participate. Want to see more Fullstack Live Events? Browse through the complete list of events here.

### No Fullstack yet?

Fullstack Experience members have free access to all Live Events – past, present and future. In addition, Fullstack members also have access to the recording of all live events for three months.

Register your Fullstack Experience now and benefit from this and

Register your Fullstack Experience now and benefit from this and future groundbreaking Fullstack Live Events.

**Watch Recording**

**Get Your Fullstack Experience**



### Fullstack Experience

Individual Membership

$120 p/a

**Start Now**

### Fullstack Team

For Teams between 3 – 15

From $267 p/a

**Start Now**

### Fullstack Company

For Teams above 16

On Request

**Book a Meeting**

## Is Your Team Larger Than 16 Employees?

We can help you master digitalization by giving your team unlimited and groundbreaking software know-how including interactive online workshops, thousands of articles, infographics, topic deep dives and much more!

Get In Touch and we can guide you through the best fit for your team!



**Inquire Now**

## Fullstack at a Glance

| | Basic | Fullstack | Fullstack Teams |
|---|:---:|:---:|:---:|
| Fullstack Read | ✔ | ✔ | ✔ |
| Fullstack Live-Events | ✖ | ✔ | ✔ |
| Fullstack Tutorials | ✖ | ✔ | ✔ |
| Add-Ons: up to 25 % Sale on Conferences & Training Events* | ✖ | ✔ | ✔ |
| Add-Ons: up to 25 % Sale on Akademy & FLEX Camps* | ✖ | ✔ | ✔ |

## Features

| | Basic | Fullstack | Fullstack Teams |
|---|:---:|:---:|:---:|
| Notes | ✔ | ✔ | ✔ |
| Collections | ✔ | ✔ | ✔ |
| AI-Search AskFrank | ✔ | ✔ | ✔ |
| Curated Theme Highlights | ✔ | ✔ | ✔ |
| Live Chat | ✖ | ✔ | ✔ |
| Direct Chat | ✖ | ✔ | ✔ |
| Discounts on Conferences, Training & Akademy Events* | ✖ | ✔ | ✔ |
| 6 Month Access to Video Recordings of Your Conferences | ✖ | ✔ | ✔ |
| Certificates of Participation in Conferences, Training & Academy Events* Events* | ✔ | ✔ | ✔ |
| Access to Slides & Presentations of Conferences Attended | ✔ | ✔ | ✔ |





| Conferences Attended | · | · | · |
| No Administrative Overhead | ✕ | ✕ | ✓ |
| Account Manager | ✕ | ✕ | ✓ |

*Training events & Academy will be available soon

Start Now Start Now

## Social

Follow us on social media for more news, content, and background stories from our authors, editors, and events. Share your personal experience with us.

Learn more

## App

Access your digital knowledge base everywhere with our mobile apps.

Download on the App Store

GET IT ON Google Play

## Expand your knowledge

As a subscriber to our newsletter, you will be the first to know about new content.

Email* SUBMIT

## Start your trial month now

Not convinced yet? Check out our training portfolio for free!

Test now

Privacy   Terms and Conditions   Contact   FAQ   Imprint

iOS   Android

https://www.connectionmodel.com/blog/what-chatbot-marketing-is-and-how-to-use-it-in-digital-marketing

at 08:53:44, 02/09/2024



Contact  |  Support  |  Demo LeadBot

About     Search Marketing     Design     Blog     Website Audit

Subscribe

## What Chatbot Marketing Is and How to Use It In Digital Marketing



With so much in the world leaning toward automation, it's no surprise that bots and chatbot technology are everywhere, especially in the world of digital marketing strategies. While it's still necessary to be hands-on with any marketing strategy, bots and automation certainly don't hurt when it comes to aiding in customer satisfaction, managing processes, and generating leads and customers.

One great automation strategy is chatbot marketing. Chatbot marketing is used with many platforms like Google and Bing AI chatbot.

What is chatbot? Chat ai gpt is a digital marketing strategy that helps to automate customer communication and will answer customer questions, up to a certain point, before the customer or user is directed to a real person for assistance. Digital marketing professionals are utilizing aichat more and more to develop digital marketing strategies for their clients.

But there's more to it than that.

### What Are Chatbots?

A chatbot is a computer program or software that automates conversation with a user. It is much like using virtual agents to assist your users. They can be programmed with different responses based on what a user chooses or requests. Chat GBT is the most commonly used chatbot program to provide seamless customer support. For example, a chatbot can ask a user which of a business's services they want to learn more about and provide a response or lead the user to better information based on the user's choice.

Advanced bots are powered by AI (artificial intelligence), but most chatbots are programmed with specific responses and built-out conversation trees to encourage customer engagement. There are many third-party services, like an ai bot writer, that make it easy for marketers and business owners to build out their own chatbot conversation trees with large language models without needing special coding or development skills. One such third-party service to help with creating your language model is bard ai chat GBT. A bard ai chatbot is



### Interested in a free website audit?

**GET YOUR FREE WEBSITE REPORT**

Company Name *

Website URL *

Primary Target Keyword *

Email *

Get Your Free Instant Website Report.

#### Subscribe Here!

Email*

Subscribe

### Get our latest ebook

ER164

another **conversational based chatbot** that is designed to determine customer expectations and provide useful information about your website.

A conversation tree covers every possible customer response and tells the chatbot what to say based on that response. This can be personalized to great lengths by the details you provide within your conversation tree and can be used for many fast digital marketing seo strategies. Some examples of ways you can use a conversation tree are with romantic chatbot platforms, **digital advertising**, and for automation paid search advertising as well depending on your **businesses needs**. Here's an example of a basic conversation tree:





*(Source)*

Yours would, of course, pertain to your specific business and the questions you want your bot to ask your customers just like as if they were speaking directly to your customer support team.

## What Is Chatbot Marketing?

Even if you are not looking for a digital marketing career understanding some basic principles is an asset for any company and you don't even have to go through a digital marketing boot camp to grasp the concepts! We've highlighted the main key points for you below:

Chatbot marketing is a strategy that utilizes a chatbot to market the business. This **strategy** really came into popularity when Facebook opened up the ability to integrate chatbots with its Messenger feature. Previously, many **Facebook Page Messengers** were going completely unused. Occasionally, customers would submit questions or concerns, and even less often would a business actually respond.

A **chatbot marketing strategy** makes sure that your customer service requests aren't going unanswered, and many can even help with lead generation and sales.



### How Can You Use Chatbots in Marketing?

There are many different ways to take advantage of a **chatbot marketing strategy** in your digital marketing. Bots can be incredibly useful for automating basic processes, answering common customer questions, and even making sales.



Let's learn a bit more

### Chatbots for Customer Service

If your business receives a lot of customer service requests through Messenger (or if you want to start utilizing Facebook Messenger as a customer service channel), a bot can be a huge help. You can create a chatbot that helps customers narrow down their customer service issues to a specific category before directing them to the right person to talk to the correct answer.

### Chatbots for Sales

A chatbot can help to lead people into your sales pipeline. Whether you use it set appointments for consultations or to collect emails for your newsletter, it can be a great start to a customer journey. Many customers don't want to pick up the phone and call, so adding an easy way for them to start communication online can be helpful.

### Chatbots for FAQ

Let customers or potential customers ask common questions of your chatbot. Programming a bot with a list of potential question options and their corresponding answers is a great way to offer up information to your audience in a more interactive setting. It can be fun for customers to engage with your chatbots, making them more likely to choose your company over a competitor.

### Chatbots for Shopping

Facebook Messenger chatbots will even allow your business to provide an in-app shopping experience. You can customize it to allow customers to browse through products and even make purchases directly within the chatbot.



### Chatbots for Marketing

Of course, there are so many different marketing tactics using a chatbot. You can use it as a lead nurturing device. Once someone willingly messages your chatbot, you're able to continue sending them helpful and informational messages in an effort to nurture them into making a purchase or signing up for services. This can be a powerful tool in your digital marketing arsenal (even more powerful than email marketing) because it's an even more direct form of one-on-one communication.

### What Not to Do in Chatbot Marketing

It's important to remember that there are still several don'ts when it comes to chatbot marketing. While it's a powerful and effective strategy, it still requires some work from your marketing team or agency.

First of all, don't let your bots take over your marketing completely. For a strategy to be successful, there has to be some kind of human touch. So while automation can be extremely helpful, it cannot be the only way to communicate. Whether you have your chatbots start the conversation that leads to a human or you have your





**ER166**



communicate. Whether you have your chatbots start the conversation that leads to a human or you have your team regularly checking in to ensure the bots are doing their job properly, it's important to remember that chatbot marketing is a "set it and forget it" kind of strategy.

Second, you don't want to overdo it when you're using your chatbot as a marketing or nurturing tool. Remember that it is a truly amazing tool to have, and it's useful to be able to directly message customers. So you don't want to abuse that power. If you send too many messages out to your audience, everyone is going to opt out. They're not going to want to see your business's spam in their Facebook Messenger inbox.

Chatbot marketing is a popular and high-converting digital marketing strategy. It definitely takes a bit of setup, especially when creating conversation trees and using a third-party software to program your chatbot, but the initial time and cost investment will be well worth it if you use this strategy correctly. You can now even invest in Chat GBT through their chat gbt stock options! This new phenomenon came about not only by the chatbot popularity but also from Chatbot Plus; a subscription-based service where you will have a unique chat gbt login and account to personalize your chatbot marketing strategies. You can also try chatgbt free to give it a try!

At Connection Model, we have worked with many clients to launch their chatbot efforts and have developed a Conversational Marketing e-book to highlight the benefits of AI and chatbots. Consider it your complimentary advertising bootcamp!

To learn more about how you can use chatbot marketing in your specific business, contact us today.

Written By: David Carpenter

Published on November 13, 2020

Last modified on August 7, 2023

Topics: Marketing, Conversational Marketing, Chatbot, artificial intelligence

CONNECT ON SOCIAL

CONNECTION MODEL

FROM THE BLOG

Search The Site

Connection Model
+1 206-400-7724
13555 SE 36th St
Bellevue, WA 98006
Hours: 8:00am-5:00pm PT weekdays
Contact
©2009-2023 Connection Model Privacy Policy

What is a Digital Marketing Agency
What is Inbound Marketing?
What is Organic Partner Agency
What is Organic SEO?
HubSpot Certified Partner Agency
How does Fast PageSpeed improve SEO?
Social Media Marketing

Connection Model has 10 reviews with an average rating of 5.0 stars on a 5.0 scale.

Third-Party Source: UpCity

Domains Vs Links

In digital marketing, SEO (search engine optimization) is essential for enhancing online visibility and driving organic...

Read more

HubSpot
PLATINUM
CERTIFIED AGENCY PARTNER



Web App Development
AI Software Development
Mobile App Development
Software Production

### 3. Personalized User Experiences

GPT development opens up opportunities for delivering highly personalized user experiences. We build AI-powered apps and services that leverage GPT to understand user preferences, recommend relevant products or content, and tailor the user experience based on individual needs.

Our personalized user experience solutions leverage GPT's natural language understanding capabilities to analyze user interactions, interpret user preferences, and provide personalized recommendations. By understanding user intent and historical data, our systems can anticipate user needs, present relevant options, and guide users through their customer journey.

By delivering personalized user experiences, businesses can increase customer engagement, improve customer satisfaction, and drive conversions. Personalization also enables businesses to gather valuable user insights and behavior data, which can be used for targeted marketing campaigns and product/service optimization.

5. Data Analytics and Insights
6. Integration with Existing Systems

### 4. Voice-Enabled AI Assistants

Integrating GPT into voice-enabled AI assistants can transform how businesses engage with their customers. We develop voice-enabled AI assistants that can understand and respond to voice commands, answer questions, perform tasks, and provide personalized recommendations.

Our voice-enabled AI assistants leverage GPT's capabilities to process natural language voice inputs, extract user intent, and generate spoken responses. These assistants can be integrated into smart speakers, mobile apps, and other voice-enabled devices, enabling customers to interact with businesses using voice commands.

By providing voice-enabled AI assistants, businesses can offer hands-free and convenient experiences to their customers, enhancing accessibility and improving customer satisfaction. Voice assistants also enable businesses to provide personalized recommendations and offers, enhancing customer engagement and driving sales.

### 5. Data Analytics and Insights

GPT-powered apps and services can provide valuable data analytics and insights to businesses. We develop AI systems that analyze chat logs, customer interactions, and user behavior to extract meaningful insights, identify patterns, and inform business decisions.

By analyzing chat data, businesses can gain a deep understanding of customer preferences, pain points, and common queries. This information can be used to optimize products and services, improve customer support processes, and develop targeted marketing strategies.

Our data analytics and insights solutions leverage machine learning algorithms and statistical techniques to identify trends, perform sentiment analysis, and uncover hidden patterns in the chat data. By providing actionable insights, we empower businesses to make data-driven decisions and continuously improve their customer experiences.

### 6. Integration with Existing Systems

5. Data Analytics and Insights
6. Integration with Existing Systems



We understand the importance of seamless integration with existing business systems and processes. Our GPT development services include expertise in integrating GPT-powered apps and services with our clients' existing software platforms, CRMs, and databases.

We collaborate closely with your team to understand your existing systems and infrastructure. Our experts develop robust APIs and integration modules that allow for seamless data exchange and communication between the GPT-powered apps and your existing systems. This ensures that customer data is synchronized, and relevant information is readily available to deliver personalized and context-aware experiences.

By integrating GPT-powered apps and services with your existing systems, businesses can leverage the power of conversational AI while maintaining data integrity, security, and compatibility with established infrastructure.

Partner with Goldeneye Industrial Intelligence for comprehensive GPT development services that help you harness the power of conversational AI to transform customer interactions, automate processes, and drive business growth.

Previous
« Software Development

Next
Web App Development »

**About**

Company

Our Products

**Services**

Consulting

Software Development

**Media**

Research

Twitter

Instagram

**Contact**

Email

Book A Consultation ⧉

**Legal & Compliance**

Terms Of Service

Privacy Policy ⧉

© 2024 Goldeneye Industrial Intelligence Inc.

ER171

**United States Patent and Trademark Office (USPTO)**

# USPTO OFFICIAL NOTICE

Office Action (Official Letter) has issued
on February 9, 2024 for
**U.S. Trademark Application Serial No. 97733261**

A USPTO examining attorney has reviewed your trademark application and issued an Office action.  You must respond to this Office action to avoid your application abandoning.  Follow the steps below.

**(1)  Read the Office action**.  This email is NOT the Office action.

**(2)  Respond to the Office action by the deadline** using the Trademark Electronic Application System (TEAS) or the Electronic System for Trademark Trials and Appeals (ESTTA), as appropriate.  Your response and/or appeal must be received by the USPTO on or before 11:59 p.m. **Eastern Time** of the last day of the response deadline.  Otherwise, your application will be abandoned.  See the Office action itself regarding how to respond.

**(3)  Direct general questions** about using USPTO electronic forms, the USPTO website, the application process, the status of your application, and whether there are outstanding deadlines to the Trademark Assistance Center (TAC).

After reading the Office action, address any question(s) regarding the specific content to the USPTO examining attorney identified in the Office action.

# GENERAL GUIDANCE

- **Check the status of your application periodically** in the Trademark Status & Document Retrieval (TSDR) database to avoid missing critical deadlines.

- **Update your correspondence email address** to ensure you receive important USPTO notices about your application.

- **Beware of trademark-related scams**.  Protect yourself from people and companies that may try to take financial advantage of you.  Private companies may call you and pretend to be the USPTO or may send you communications that resemble official USPTO documents to trick you.  We will never request your credit card number or social security number over the phone.  Verify the correspondence originated from us by using your serial number in our database, TSDR, to confirm that it appears under the "Documents" tab, or contact the Trademark Assistance Center.

- **<u>Hiring a U.S.-licensed attorney</u>.**  If you do not have an attorney and are not required to have one under the trademark rules, we encourage you to hire a U.S.-licensed attorney specializing in trademark law to help guide you through the registration process.  The USPTO examining attorney is not your attorney and cannot give you legal advice, but rather works for and represents the USPTO in trademark matters.

1  Ryan G. Baker (Bar No. 214036)
      rbaker@waymakerlaw.com
2  Scott M. Malzahn (Bar No. 229204)
      smalzahn@waymakerlaw.com
3  WAYMAKER LLP
   515 S. Flower Street, Suite 3500
4  Los Angeles, California 90071
   Telephone:   (424) 652-7800
5  Facsimile:    (424) 652-7850

6  *Attorneys for Guy Ravine & Open Artificial*
   *Intelligence, Inc.*

7

8              **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10

11  OPENAI, INC., a Delaware corporation,          Case No. 4:23-CV-03918-YGR

12              Plaintiff,                          **DECLARATION OF THOMAS GRUBER**

13         v.

14  OPEN ARTIFICIAL INTELLIGENCE, INC.,
    a Delaware corporation; and GUY RAVINE,
15  an individual,

16              Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF THOMAS GRUBER

I, Thomas Robert Gruber, declare as follows:

1.      I am over the age of 18. I have personal knowledge of the facts set forth herein. If called upon to testify as a witness to these matters, I could and would testify competently thereto.

2.      I am a computer scientist, inventor, and entrepreneur, with a focus on systems for knowledge sharing and collective intelligence. My work artificial intelligence, particularly in knowledge representation and knowledge acquisition, has been considered foundational for the Semantic Web. I am perhaps best known for co-founding Siri, Inc., which created the Siri functionality in Apple Computer's iOS.

3.      In 1982, I graduated *cum laude* from the Loyola University in New Orleans, Louisiana, with a B.S. in psychology and computer science.  In 1984, I received a M.S. in Computer and Information Science at the University of Massachusetts Amherst, focusing in part on natural language processing by computers. In 1988, UMass awarded me a Ph.D. in Computer and Information Science with a dissertation on knowledge acquisition in artificial intelligence systems.

4.      From 1988 to 1994, I was a research associate at the Knowledge Systems Laboratory of the Computer Science Department at Stanford University. In 1994, I became Senior Project Leader, Enterprise Integration Technologies, focusing on projects using the Internet to create shared environments for collaborative learning and work.

5.      During the period 1994-2007 I worked in industry, including co-founding companies that focused on collaborative knowledge management and networked software to support human collaboration and learning from collective knowledge on the Internet.

6.      In 2007 I co-founded Siri Inc., which created the Siri intelligent personal assistant. Siri, Inc. was acquired by Apple in 2010, and Siri is now an integral part of the Apple iPhone, iPad, and Mac.

7.      I worked at Apple from 2010-2018, leading the Advanced Development Group, which was focused on, among other things, advanced applications of artificial intelligence. I also served as Apple's representative at the industry consortium, Partnership on AI. This consortium

1    included AI leaders such as Yann LeCun from Facebook and AI leaders from Google, DeepMind,

2    and Microsoft.

3          8.      On March 19, 2015 I saw Guy Ravine proposing Open AI to Google CEO Larry

4    Page and requesting the backing of Open AI, presenting it as an initiative that Google should

5    support.

6          9.      Around that time, in March 2015, Guy Ravine and I also held discussions about the

7    Open AI initiative.

8          10.     In April 2015, Guy Ravine asked me if Apple would be interested in supporting

9    Open AI.

10         11.     It is indisputable that Guy Ravine was actively promoting Open AI from at least as

11    early as mid-March 2015, including to leading executives in the technology industry.

12

13        I declare under penalty of perjury under the laws of the United States of America that the

14    foregoing is true and correct.

15        Executed on this 26th day of March 2024, at Kihei, Hawaii.

16

17

18        Thomas Gruber

19

20

21

22

23

24

25

26

27

28

Ryan G. Baker (Bar No. 214036)
  rbaker@waymakerlaw.com
Scott M. Malzahn (Bar No. 229204)
  smalzahn@waymakerlaw.com
Patricia Rojas-Castro (Bar No. 339087)
  projas-castro@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone: (424) 652-7800
Facsimile:  (424) 652-7850

Attorneys for Defendants Guy Ravine &
Open Artificial Intelligence, Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPENAI, INC., a Delaware corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual,<br><br>    Defendant. | Case No. 3:23-cv-3918<br><br>**DECLARATION OF KAUSTUV DEBISWAS IN SUPPORT OF DEFENDANT OPEN ARTIFICIAL INTELLIGENCE, INC.'S NOTICE OF MOTION AND MOTION TO ALTER OR AMEND A JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e), OR IN THE ALTERNATIVE, FOR RELIEF FROM A JUDGMENT OR ORDER PURSUANT TO FED. R. CIV. P. 60(b)** |

1    **<u>DECLARATION OF KAUSTUV DEBISWAS</u>**

2        I, Kaustuv DeBiswas, declare as follows:

3        1.       I am the former Co-Founder and CEO of Design Play Technologies Inc. (DBA

4    Sunglass.io), a San Francisco-based venture-backed technology company focused on building

5    innovative Cloud-based Collaboration tools. I have personal knowledge of the facts set forth

6    herein and if called as a witness I could and would testify competently thereto.

7        2.       I hold a Masters from MIT in Design Computation and Artificial Intelligence in

8    Design. I was also a TED Fellow and presented at TED, founded an additional venture backed

9    company, and served as VP of innovation at Rakuten Intelligence.

10       3.       I can confirm the following: I developed Sunglass.io over a period of three years

11   with investments totaling nearly two million dollars and a dedicated team of more than ten skilled

12   professionals specializing in various aspects of technology development, including software

13   engineering, product design, and project management. In total, on the order of 15 man-years or

14   more were invested in the development of the technology and it was made available to users as a

15   collaboration tool.

16       4.       In 2012, Sunglass.io launched a publicly available Cloud-based 3D collaboration

17   and CAD management tool.

18       5.       On November 13, 2014, pursuant to the Agreement of Purchase and Sale, my

19   company, Design Play Technologies Inc. sold the underlying assets of Sunglass.io to Mr. Guy

20   Ravine who acquired them. The sale included all assets related to the Cloud-based Collaboration,

21   including intellectual property, software, and specifications.

22       6.       Pursuant to the terms of the agreement, I assisted in rebranding the 3D CAD tool to

23   Wikineering.  By December 2014, the 3D CAD tool was rebranded to Wikineering on sunglass.io.

24       7.       In addition, the 3D CAD tool was integrated into other versions of Wikineering,

25   which leveraged the foundation built by Sunglass.io for the advancement of large-scale open-

26   source engineering projects. As agreed, I assisted in the integration, transition, and smooth handoff

27   to Wikineering post-sale.  Wikineering already had been in use, operational, and publicly available

28   when we integrated Sunglass into Wikineering in November 2014.

1       I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct.

3       Executed on this ___th day of March, 2024, at _____Saligao_____, ___Goa, India___.

     3/26/2024

4

5       Kaustuv DeBiswas

6       Kaustuv DeBiswas

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DocuSign Envelope ID: 1B4D96EA-D3E5-4578-92B8-580D3DB36B47

1   Ryan G. Baker (Bar No. 214036)
      rbaker@waymakerlaw.com
2   Scott M. Malzahn (Bar No. 229204)
      smalzahn@waymakerlaw.com
3   Patricia Rojas-Castro (Bar No. 339087)
      projas-castro@waymakerlaw.com
4   WAYMAKER LLP
    515 S. Flower Street, Suite 3500
5   Los Angeles, California 90071
    Telephone:      (424) 652-7800
6   Facsimile:      (424) 652-7850

7   Attorneys for Defendants
    Guy Ravine & Open Artificial Intelligence, Inc.

8

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11

12  OPENAI, INC., a Delaware corporation,        Case No. 3:23-cv-3918

13               Plaintiff,                       **DECLARATION OF DEFENDANT GUY
                                                 RAVINE IN SUPPORT OF
14        v.                                     DEFENDANTS' MOTION
                                                 TO ALTER OR AMEND A JUDGMENT
15  OPEN ARTIFICIAL INTELLIGENCE, INC.,          PURSUANT TO FED. R. CIV. P. 59(e), OR
    a Delaware corporation; and GUY RAVINE,      IN THE ALTERNATIVE, FOR RELIEF
16  an individual,                               FROM A JUDGMENT OR ORDER
                                                 PURSUANT TO FED. R. CIV. P. 60(b)**
17               Defendant.
                                                 Hearing Date: May 7, 2024
18                                               Time: 2:00 p.m.
                                                 Location: Courtroom 1
19

20

21

22

23

24

25

26

27

28

                                                            Case No. 3:23-cv-3918

**DECLARATION OF GUY RAVINE**

I, Guy Ravine, declare as follows:

1.     I am a party in the above-entitled action. I make this Declaration in support of Defendants' Motion to Alter or Amend a Judgment in the above-captioned matter. I have personal knowledge of the facts set forth herein and if called as a witness I could and would testify competently thereto.

2.     My background is in technology and artificial intelligence.  I have interacted with individuals in the AI field for many years.  I started my first AI company, Entity Inc., in 2000. I started using the brand Open AI in early 2015 and founded defendant Open Artificial Intelligence, Inc. (formerly named Computronium Compute Corporation) in 2017.

3.     Beginning in the early 2010's, I was part of a small niche community of AI developers interested in deep learning.  Over the years, I have attended different AI conferences including the annual Conference on Neural Information Processing Systems ("NIPS"), which is the main conference for AI researchers.  In my experience, only a subset of NIPS conference attendees are part of the deep learning AI community.

4.     The community for AI researchers was very small at the time I started the Open AI project.  As a point of reference, it is my understanding from online research that about 2,400 individuals attended the NIPS conference in December 2014.

**Wikineering**

5.     The Court stated in its Order that Plaintiff "demonstrated that defendants' Wikineering page was either inoperative or lacking in users[.]"  (Order at 16:24-25.)  This is untrue. The Wikineering website did operate and did have users.  In the 12 years since I first developed Wikineering in 2012, some data has been lost since the four original servers were rendered partially or wholly inoperable, corrupted or inaccessible in May 2018.  I have located two old server backups that contain user access logs that cover certain periods of time.

6.     I spent enormous amounts of time, effort, money and opportunity cost on the development of Wikineering and Open AI over the last 12 years.  For example, in November 2014, I acquired a San Francisco based venture-backed company, Design Play Technologies, Inc.

1   ("Sunglass"), which had developed a cloud-based collaboration platform. At the time in late 2014,

2   the platform that I acquired was accessible, operative and had users at <u>sunglass.io</u>.  Attached as

3   **Exhibit A** is a true and correct copy of the purchase agreement for this Cloud-based tool.  I

4   executed the acquisition agreement on November 18, 2014. Pursuant to the acquisition agreement,

5   sunglass.io was rebranded as Wikineering and continued to reside on sunglass.io.[1]  I also hosted

6   versions of Wikineering on other domains in the following years.  The Wikineering technologies

7   were used as the technical foundation of Open AI's various collaboration tools.

8        7.    I also wish to address the reconstruction of the Initial Collaboration Tool attached

9   as Exhibit 2 to my prior declaration.  The original code for the Initial Collaboration Tool was on a

10  co-located server that around May 3, 2018, was rendered inoperable, and ultimately discarded

11  without my knowledge. However, in order to demonstrate what the Initial Collaboration Tool

12  looked like as an exemplar for the present litigation, I was able to locate the original MediaWiki

13  code I used for the Wikineering technology that underlay the first Open AI initial collaboration

14  tool. To the best of my recollection, I performed the same actions for this litigation as I had 9

15  years ago when I originally created the Open AI Initial Collaboration tool: First, I took the original

16  MediaWiki code I used for Wikineering. You can see the Wikineering site that ran the code is

17  shown in the Wikineering trademark application specimen of Dec 2012.  (*See* Ex. D.)[2]  Second, I

18  rebranded the mark to Open AI and launched a new instance of the code.

19       8.    Attached as **Exhibit B** is a true and correct copy of excerpts of an online brochure

20  date-stamped and verified as of October 2015.  The brochure states that Open AI, *in present tense,*

21  *as of September and October 2015:*  "Provides a platform and cloud for experimentation with new

22  models" with "materials for every step from high school to PhD in AI" "collectively refined by the

23

24  ---

    [1] In my previously filed declaration, I did not mention that a version of Wikineering existed on

25  sunglass.io for a period of time.

    [2] The USPTO specimen of the Wikineering trademark also shows the original MediaWiki based

26  version of Wikineering in use as of December 7, 2012 on www.ineed.com/wikineering.  Attached

    as **Exhibit D** is a true and correct copy of a specimen submitted to the USPTO.  The specimen is

27  publicly available at:

28  <u>https://tsdr.uspto.gov/documentviewer?caseId=sn85463987&docId=SPE20121208185825&linkId</u>
    <u>=7#docIndex=6&page=1</u>.

WAYMAKER

1  community." The brochure shows a screenshot of the Initial Collaboration Tool, which is similar

2  to the reconstruction that I made of this tool in October 2023 for the purpose of this litigation. The

3  document is dated October 2015, which is consistent with my prior testimony that the Open AI

4  Initial Collaboration Tool was in existence at that time as I stated in my prior declaration.

5       9.      The Initial Collaboration Tool was an open forum where users could share and

6  comment on public research and consolidate educational materials on deep learning in one place.

7  To reconstruct the content I had on the Initial Collaboration Tool as in the screenshot, I located the

8  March 2015 Wikipedia entry on "Convolutional Neural Networks"[3] which was a major topic on

9  Open AI at the time, and which you can see parts of in the presentation. According to this

10 screenshot from September 2015, such a page existed on the Initial Collaboration Tool as of

11 September 2015.

12      10.     The Initial Collaboration tool was similar to Wikipedia but for AI and was branded

13 Open AI. It was based on the same MediaWiki foundation, that I adapted for Wikineering. It was a

14 place for people to post, edit, and comment on AI topics collaboratively, to, as the brochure stated,

15 serve as a platform for educational AI materials to be "collectively refined by the community".

16 Much of the content was taken from Wikipedia, a source that permits reattribution of content, and

17 consolidated into one place devoted to AI.

18                          **Trademark Registration Application**

19      11.     The Court in its Order states that "the current record paints a troubling picture of

20 defendant Ravine's representations to the USPTO and this Court about the true extent of his use of

21 the disputed mark." (Order at 17:10-11.) To address the Court's concerns, I would like to provide

22 some additional context.

23      12.     I used the mark Open AI to describe my collaborative, publicly-available artificial

24 intelligence development project since March, 2015, and had been pitching the project to

25 academics and senior Silicon Valley officials under that name. On December 11, 2015, I saw a

26

27 [3] The 2015 page I used is publicly accessible here:

28 https://en.wikipedia.org/w/index.php?title=Convolutional_neural_network&oldid=650474279.

---

3                                              Case No. 3:23-cv-3918

DECLARATION OF DEFENDANT GUY RAVINE IN SUPPORT OF MOTION FOR RELIEF

**ER183**

1   blog post by Greg Brockman, and Ilya Sutskever announcing a similar project called OpenAI (the

2   same name, without a space).  Their infringement of the name I had already been using for nine

3   months surprised and worried me since I had started using the mark before them, so I hastily filed

4   a trademark application on the evening of December 11, 2015.  Given my concern, I did not feel

5   that I had time to retain or consult a lawyer before filing the application.

6        13.    To support the application, I believed that I merely had to show the Open AI logo

7   on a website.  I included a screenshot of the splash page on open.ai with the sign up box because I

8   thought that my contractors or I would revise the Initial Collaboration Tool, and by the time the

9   examiner would see it, we might have something else there, since we were actively thinking about

10  replacing it with newer technology (which we did some months later), so I decided to point the

11  examiner at the home page. Simultaneously, the logo looked more professional on that page than it

12  did on the Open AI Initial Collaboration Tool, which was developed without the aid of a designer.

13       14.    In February 2016, the server that hosted the Initial Collaboration Tool stopped

14  working.

15       15.    At the time, my team and I were already working on developing updated versions

16  of the Wikineering tools for Open AI, which we intended to replace the original Initial

17  Collaboration Tool and discussion board with.  Instead of trying to revive the original site, I

18  decided to focus on continuing to develop the other versions.

19       16.    In September 2016, my team and I had just barely finished development of the

20  Open AI "Hub" tool, an update of our earlier discussion board.  I deployed the new Hub tool at

21  hub.open.ai.  As explained above, posts on our collaboration tools started as commentary on

22  content that was publicly available elsewhere, and as such, there would have been nothing unusual

23  about content on an Open AI tool having been cross-posted from a similar discussion forum on

24  GitHub.

25       17.    I took a screenshot as a specimen. I believed this screenshot to be the best example

26  available to show the USPTO how I had been using the Open AI mark since 2015, given that the

27  2015 version of the website was no longer available. Acting without legal counsel – as is allowed

28

DocuSign Envelope ID: 1B4D96EA-025B-4E72-9A6F-02D0B6888412

by the USPTO[4] – I submitted this specimen believing that I was honestly providing a fair representation of what the mark had looked like since the start of my use.

18.    The USPTO accepted the specimen that I submitted in 2016, and I never gave the matter another thought.

19.    After launching Hub in September 2016, I continued to develop and launch the Open AI evolved collaboration tool, which was an update of the Initial Collaboration Tool that incorporated real time editing, on January 2017; and this followed by Decentralized, in October 2017, which provided collaboration tools for open AI projects to users. By 2021, I began investigating generative AI image generation using open (source) AI models. As the field was just emerging, many companies in the AI space, including Plaintiff, began to converge on AI image generation, which had just become feasible. By early 2022, AI image generation gripped the AI industry with excitement, and I had a design for an AI image generation site. By August 2022, I had a live image generation private beta. Plaintiff released their AI image generator on September 28, 2022. We released ours, based on open (source) AI models, on November 16, 2022. We followed this with the release of another version of the collaboration tool in early 2023, our Ava voice chatbot in June 2023, and continued with the development of mobile apps.

20.    I do not have a complete historical record of the content that appeared on open.ai or domains that hosted Wikineering from 2012 through the present.  As mentioned above, over this time period, we used different servers to host content for the various domain names that were under my control.  Initially, these servers were housed in off-site datacenter facilities subject to colocation agreements with vendors.  In May 2018, four such servers became inoperable and I lost data on these servers. Moreover, when I made changes or updates to source code or the content that appeared on these websites, it was not my practice to preserve historical copies or records of old source code or old content.  I did not anticipate that my use of certain domains or the Open AI mark later would become a disputed issue in the context of litigation some 9 years later.

---

[4] "Do I need an attorney? … If you're domiciled in the United States, you're not required to have an attorney," Do I need an attorney, https://www.uspto.gov/trademarks/basics/do-i-need-attorney (last visited March 27, 2024).

**Decentralized.Open.AI**

21.     The Court states in its order that certain screenshots demonstrate that the decentralized.open.ai site "was only set up with nonsensical references like 'this is a test,' 'lll,' and 'testing[.]"  (Order at 7:11-13.)  This statement is incorrect. In October 2017, my team and I launched decentralized.open.ai as a subdomain of open.ai.  In October 2017, several freely accessible collaborative AI projects were created with this tool as reflected by the titles "General Purpose Face ID," "Automated Store," and "AI Super Renderer."

22.     After around 2020, I changed my focus to other products and stopped supporting development of Decentralized.

23.     At the end of 2023, I noticed that unknown users were editing the page in 2022 and 2023.  Attached as **Exhibit C** is a true and correct copy of a screenshot of edits to decentralized.open.ai.  These edits show that "lll", "test", "<aaa>", "PandaServer", and "TEST" did not occur until after we stopped supporting development of this page in 2023.  To stop further undesired edits, we added a password to protect the page.  The test projects did not exist until after 2020 when the decentralized.open.ai site was no longer supported by me or my team. Users apparently created test projects in 2022 and 2023 that we did not edit out since the site was openly available to everyone to edit and we no longer maintained it, as we had moved on to open (source) AI models based generative AI tools, and new collaboration tools. To prevent further vandalism we then placed a password to protect the site and preserve it for litigation.

**Appearance of Open AI in 2024**

24.     The Court states in its order that certain screenshots demonstrate that the open.ai site was redesigned to look[] remarkably like plaintiffs" and includes only one image from the open.ai website. (Order at 8.)  However, in 2023, the home page of open.ai was redesigned to feature 15 rotating images.  Attached as **Exhibit E** is a true and correct copy of all 15 images that appeared on open.ai.  Because the images rotated, a user would see a variety of the fifteen different images.  The images varied from realistic to fantastical, and included an image of Einstein running across a bridge, a waterfall with a rainbow, cacti in the dessert, and an otherworldly landscape with dozens of planets in the background.

**Irreparable Harm**

25.      Over the last decade, I have worked with a team to develop Open AI.  I have invested an enormous amount of time – 12 years in total from the beginnings as Wikineering – and at a minimum hundreds of thousands of dollars of my own personal funds in developing the Open AI and open.ai projects and foundations and growing their user bases. On top of our work, an additional $2 million was invested in developing the foundations for Wikineering, with the intent that these foundations would be devoted to further open artificial intelligence projects.  These foundations are now exclusively used for Open AI. By today we collectively spent well into the millions of dollars on business activities associated with Open AI. Collectively, I estimate that over 25 man-years were spent to develop Open AI and its foundations. We developed open collaboration tools, educational collaboration tools, generative AI tools, voice chat bots, mobile apps, and more, primarily using open (source) AI models to support the open (source) AI movement. This was done based in part on our reliance on our registered Open AI trademark, which went unopposed and unchallenged for over 7 years, as well as the use of the open.ai domain.

26.      As a result of these efforts, until recently due to the preliminary injunction, the open.ai domain had over 3 million users to which we offered open (source) AI generative tools and open (source) AI collaboration tools.  The goodwill associated with this business is tied together with the open.ai domain and open.ai subdomains,[5] where our users use our tools. The use of this domain has been enjoined without even the allowance of a forwarding address, practically eradicating our business and causing us to lose contact with our 3 million users that we had built over 12 years of gradual and increasing development, culminating with the recent explosion of generative AI which resulted in the success of many AI companies simultaneously including both ours and Plaintiff's.  In the artificial intelligence field, the pace of technological change is so fast that our existing product offerings or servings will be outdated before the conclusion of a trial and outside funding resources are unlikely to be available with an injunction in place. Without access

---

[5] I also will lose my ability to use email accounts tied to the open.ai domain that have been in my possession and control for nearly a decade.

1   to the user base we built over 12 years and with many iterations of development, this amounts to a

2   death sentence to our company.  The general public and AI researchers also will lose the benefit of

3   a truly *open* forum to collaboratively develop artificial intelligence, at a time when serious

4   concerns and objections have been raised about the increasingly proprietary AI software market,

5   with massive power and wealth being accumulated by Plaintiff and a few others.

6       27.     My company and I stand to lose years of work, my entire financial investment for

7   which I worked many years to finance, and the value that we had built with our products to users.

8       I declare under penalty of perjury under the laws of the United States of America that the

9   foregoing is true and correct.

10      Executed on this 27th day of March 2024, at Sunnyvale, California.



DocuSigned by:

Guy Ravine

1AA6A27162A4452

Guy Ravine

DECLARATION OF DEFENDANT GUY RAVINE IN SUPPORT OF MOTION FOR RELIEF

**ER188**

# EXHIBIT A

This Agreement of Purchase and Sale (the "Agreement") is made effective November 13, 2014.

**BETWEEN:**  **Design Play Technologies, Inc.** (the "Seller"), a company organized and existing under the laws of the State of Delaware, with its head office located at:

224 Guerrero St, Suite 3 San Francisco, CA 94103

**AND:**  **Guy Ravine** (the "Purchaser"), an individual with the address at 454 Lombard St #3, San Francisco, CA 94133

_____

## 1. SUBJECT MATTER

1.1. The Purchaser agrees to buy and the Seller agrees to sell to the Purchaser, all the undertaking and assets owned by the Seller in connection with the Cloud-based 3D Collaboration and CAD Data Management business carried on publicly as Sunglass at 224 Guerrero St, Suite 3 San Francisco, CA 94103, with a web address of www.sunglass.io (the "business") including, without limiting the generality of the foregoing:

1.2. The intellectual property including technical information, software, and specifications as described in Schedule A;

1.3. The current patent application(s) in prosecution and patents in connection with Cloud Based 3D Collaboration by the Seller or its agents, including application number PCT/US2012/049345 by DE BISWAS Kaustuv Kanti will be assigned to the Purchaser or to a new entity on behalf of the Purchaser

1.4. On behalf of the Seller, Kaustuv De Biswas agrees to:

1.4.1. Restore the service to a fully functional state through the installation of the necessary converter and other action items needed to allow fully operational service as was previously.

1.4.2. Re-brand the project with the assets provided by the Purchaser. Re-branding involves the change of logos and removal of any Design Play Technologies material on the website.

1.4.3. Create an introduction video showcasing and describing all the features and aspects of the collaboration system in operation.

1.4.4. Maintain servers for the project for 30 days after the execution of the agreement or until a successful handoff is made to the Purchaser's servers, whichever is earlier. The Purchaser agrees to take actions to complete the handoff in a timely manner.

1.4.5. Provide support as needed to accomplish these actions, and serve as an advisor once the transfer is complete

1.4.6. Assist in the prosecution of the patent application to acceptance by providing the input requested to the attorneys or agents pursuing the patent application

1.5. The Purchaser may further reassign the assets and the obligations by the Seller to a different entity

**2. PURCHASE PRICE AND TERMS OF PAYMENT**

2.1. The purchase price payable for the undertaking and assets agreed to be bought and sold is fifty three thousand dollars ($53,000).

**3. CONDITIONS, REPRESENTATIONS AND WARRANTIES BY SELLER**

3.1. In addition to anything else in this agreement, the following are conditions of completing this agreement in favor of the Purchaser:

3.1.1.   That the Seller supply or deliver on closing all of the closing documents;

3.1.2.   That Seller's board of directors has duly authorized the execution of this agreement;

3.1.3.   Seller warrants that, to the best of Seller's knowledge, Seller has complete title to the Intellectual Property and that there are no other claims or liens of any kind impacting the Intellectual Property.

3.2. The following representations and warranties are made and given by the Seller to the Purchaser and expressly survive the closing of this agreement. The representations are true as of the date of this agreement and will be true as of the date of closing when they shall continue as warranties according to their terms. At the option of the Purchaser, the representations and warranties may be treated as conditions of the closing of this agreement in favor of the Purchaser. However, the closing of this agreement shall not operate as a waiver or otherwise result in a merger to deprive the Purchaser of the right to sue the Seller for breach of warranty in respect of any matter warranted, whether or not ascertained by the Purchaser prior to closing:

3.2.1.   The Seller is a resident of The United States within the meaning of the Income Tax Act of the United States.

3.2.2.   The Seller owns all rights or has valid rights to use the Purchased Assets consisting of Intellectual Property without any conflict or infringement of the rights of others. And to the best knowledge of Seller, there has not been and there is not now any unauthorized use, infringement, or misappropriation of any of the Purchased Assets consisting of Intellectual Property by any third party.

3.2.3.   The assets agreed to be bought and sold are sold free and clear of all liens, encumbrances and charges, and with respect to purchased contracts, Seller is not in nor alleged to be in, material default or breach of any purchased contract.

3.2.4.   To the best of Seller's knowledge, Seller has been in compliance, and is currently in compliance with all Laws applicable to the Purchased Assets.  To the knowledge of Seller, no investigation, inquiry, audit or review by any Person or governmental body with respect to the Purchased Assets is pending or threatened.

3.2.5.   The Seller has made full and fair disclosure in all material respects of any matter that could reasonably be expected to affect the Purchaser's decision to purchase the undertaking and assets agreed to be bought and sold on the terms set out this agreement.

3.2.6.   The Seller will execute such assignments, consents, clearances or assurances after closing, prepared at the Purchaser's expense, as the Purchaser considers necessary or desirable to assure the Purchaser of the proper and effective completion of this agreement.

3.2.7.   No consent, waiver approval or authorization of or by, filing or registration with, any governmental or regulatory authority is required to be made or obtained by Purchaser in connection with the execution, delivery and performance of this Agreement.

3.2.8.   Seller has not committed to any undisclosed ongoing operational expense or obligation that has resulted in, or could result in any expenses in excess of $1000.00.

## 4.  TAXES

4.1. The Purchaser shall pay any and all sales taxes payable in respect of the purchase and sale of assets pursuant to this agreement.

4.2. The Seller shall pay all sales taxes payable or collectible in connection with carrying on the business up to closing.

4.3. Purchaser and Seller are responsible for their respective taxes and transfer fees, if any, that become due as a result of this settlement transaction.

## 5.  INDEPENDENT ADVICE

5.1. Purchaser and Seller have received independent tax and legal advice from attorneys of their choice with respect to the execution of this Agreement.

## 6.  JOINT PARTICIPATION

6.1. Each and every Party to this Agreement has participated in the drafting and negotiation of this Agreement, and for all purposes this Agreement shall be deemed to be drafted jointly by each of the Parties.

## 7.  GOVERNING LAW AND DISPUTE RESOLUTION

7.1. Any dispute or controversy arising out of, relating to, or concerning any interpretation, construction, performance, or breach of this Agreement (including disputes with respect to fees) shall be settled in San Francisco with California state laws applied. The non-prevailing Party shall be responsible for all court costs and all reasonable attorney costs (including collection agencies if applicable) of both Parties with respect to such matters.

## 8.  MISCELLANEOUS

8.1. In this agreement, the singular includes the plural and the masculine includes the feminine and neuter and vice versa unless the context otherwise requires.

8.2. The capitalized headings in this agreement are only for convenience of reference and do not form part of or affect the interpretation of this agreement.

8.3. If any provision or part of any provision in this agreement is void for any reason, it shall be severed without affecting the validity of the balance of the agreement.

8.4. Time is of the essence of this agreement.

8.5. There are no representations, warranties, conditions, terms or collateral contracts affecting the transaction contemplated in this agreement except as set out in this agreement.

8.6. This agreement binds and benefits the parties and their respective heirs, executors, administrators, personal representatives, successors and assigns.

8.7. This agreement is governed by the laws of the State of California.

## 9. ACCEPTANCE

9.1. This agreement executed on behalf of the Purchaser constitutes an offer to purchase which can only be accepted by the Seller by return of at least one originally accepted copy of agreement to the Purchaser.

**SELLER**                                          **PURCHASER**

Kaustuv De Biswas (Nov 12, 2014)                    Guy Ravine (Nov 18, 2014)

**ER193**

**SCHEDULE A**

**PURCHASED ASSETS**

1. **INTELLECTUAL PROPERTY:**

   1.1. Sunglass.io source code in its entirety, to include access to Seller's GitHub account, and any legacy code source, wherever hosted or otherwise stored and managed.

   1.2. The current patent application(s) in prosecution and patents in connection with Cloud Based 3D Collaboration by the Seller or its agents, including application number PCT/US2012/049345 by Kaustuv Kanti De Biswas will be assigned to the Purchaser or to a new entity on behalf of the Purchaser

   1.3. Sunglass hosted servers. Transition of access to all active servers and license agreements for hosting of Sunglass technology.



# wikineering

EchoSign Document History                              November 17, 2014

| | |
|---|---|
| Created: | November 12, 2014 |
| By: | Kaustuv De Biswas (kaustique@gmail.com) |
| Status: | SIGNED |
| Transaction ID: | XGD47NY4M83XU33 |

# "wikineering" History

📄 Document created by Kaustuv De Biswas (kaustique@gmail.com)
November 12, 2014 - 10:52 PM PST - IP address: 50.174.3.143

🖋 Document e-signed by Kaustuv De Biswas (kaustique@gmail.com)
Signature Date: November 12, 2014 - 10:54 PM PST - Time Source: server - IP address: 50.174.3.143

📧 Document emailed to Guy Ravine (guyravine@gmail.com) for signature
November 12, 2014 - 10:54 PM PST

📄 Document viewed by Guy Ravine (guyravine@gmail.com)
November 13, 2014 - 6:03 AM PST - IP address: 70.192.96.133

🖋 Document e-signed by Guy Ravine (guyravine@gmail.com)
Signature Date: November 17, 2014 - 5:42 PM PST - Time Source: server - IP address: 146.199.101.96

✅ Signed document emailed to Kaustuv De Biswas (kaustique@gmail.com) and Guy Ravine
(guyravine@gmail.com)
November 17, 2014 - 5:42 PM PST

# EXHIBIT B



ARTIFICIAL INTELLIGENCE SCHOOL



# 4. …And collectively refined by the community

## Details  [ edit ]

### Backpropagation  [ edit ]

When doing propagation, the momentum and weight decay values are cho...
gradient descent. See Backpropagation for more.

### Different types of layers  [ edit ]

### Convolutional layer  [ edit ]

Unlike a hand-coded convolution kernel (Sobel, Prewitt, Roberts), in a con...
convolution kernel are trained by the backpropagation algorithm. There ar...
each kernel is replicated over the entire image with the same parameters. ...
extract different features of the input. The capacity of a neural net varies, ...
convolution layers will obtain the low-level features, like edges, lines and ...
higher-level features it will get.

### ReLU layer  [ edit ]

ReLU is the abbreviation of Rectified Linear Units. This is a layer of neurons that use the non-saturating activation function $f(x) = max(0, x)$. It increases the nonlinear properties of the decision function and of the overall network without affecting the receptive fields of the convolution layer.

Other functions are used to increase nonlinearity. For example the saturating hyperbolic tangent $f(x) = tanh(x)$, $f(x) = |tanh(x)|$, and the sigmoid function $f(x) = (1 + e^{-x})^{-1}$. Compared to tanh units, the advantage of

**OPEN AI**

OPEN INDUSTRY WIDE & ACADEMIA
WIDE DEEP LEARNING INITIATIVE

Materials for every step from high school to PhD in AI

# 10. Provides platform and cloud for experimentation with new models





Collectively created open learning materials for every step of the way from high school to PhD level, and collectively created platform for experimentation with cloud provided by companies Create more people to improve the base algorithms together more easily and experiment at a higher rate and collectively improve them constructively

# EXHIBIT C

```
postgres=# SELECT id, title, created_at FROM companies;
      id       |          title          |          created_at
---------------+-------------------------+-------------------------------
 cYdY5ONqSlf7  | General Purpose Face ID | 2017-10-25 14:12:20.907+00
 calxr83uNFiO  | Automated Store         | 2017-10-25 14:12:36.683+00
 coTrNvKMmdGe  | AI Super Renderer       | 2017-10-25 14:12:46.062+00
 cYhF7j7Wj8FE  | Task: Masks             | 2020-03-12 01:53:08.852+00
 cU9tNqYJWOdi  | The Network             | 2020-03-17 03:48:59.084+00
 cShakwb4RTaS  | Rachel est              | 2020-08-23 03:53:39.527+00
 ceq3DOfTVgOD  | lll                     | 2022-06-28 21:33:45.173+00
 cyRW6ZglouKg  | test                    | 2023-04-14 14:59:35.931+00
 cOO65UO7kOws  | <aaa>                   | 2023-04-14 15:06:25.337+00
 cHXyPLUXSKOw  | PandaServer             | 2023-05-03 08:37:55.767+00
 cEAcFXCVucUf  | TEST                    | 2023-10-06 21:59:25.443+00
(11 rows)
```

Case: 24-1963, 05/08/2024, DktEntry: 15.3, Page 176 of 228
Case 4:23-cv-03918-YGR   Document 80-4   Filed 03/27/24   Page 1 of 2

(176 of 228)

# EXHIBIT D



ineed.com/wikineering/index.php/Main_Page

Gizmag VRGBlog VRNews News Popular Next Big Future PhysOrg Popular Science Ars Technica Cambridge Nights Walter Lewin Tuva MIT World Other Bookmarks

67.180.11.202 talk for this ip log in / create account

page discussion edit history

WIKINEERING COLLECTIVE ENGINEERING

# Main Page

A platform for collective engineering.

To get started, create a topic and start editing!

navigation
- Main Page
- Community portal
- Current events
- Recent changes
- Random page
- Help
- Donations

search

Go Search

toolbox
- What links here
- Related changes
- Special pages
- Printable version
- Permanent link

This page was last modified 23:12, 7 December 2012. This page has been accessed 5 times. Privacy policy About Wikineering Disclaimers

Powered By MediaWiki

# EXHIBIT E



DocuSign Envelope ID: 7451901E-D023-45F3-77A1-5543F20E53B3

1   Ryan G. Baker (Bar No. 214036)
      rbaker@waymakerlaw.com
2   Scott M. Malzahn (Bar No. 229204)
      smalzahn@waymakerlaw.com
3   Patricia Rojas-Castro (Bar No. 339087)
      projas-castro@waymakerlaw.com
4   WAYMAKER LLP
    515 S. Flower Street, Suite 3500
5   Los Angeles, California 90071
    Telephone:    (424) 652-7800
6   Facsimile:    (424) 652-7850

7   Attorneys for Defendants Guy Ravine & Open
    Artificial Intelligence, Inc.

8

9                 **UNITED STATES DISTRICT COURT**

10              **NORTHERN DISTRICT OF CALIFORNIA**

11

12  OPENAI, INC., a Delaware corporation,    Case No. 3:23-cv-3918

13              Plaintiff,                    **DECLARATION OF J. LUKE TENERY
                                             IN SUPPORT OF DEFENDANTS OPEN**
14      v.                                   **ARTIFICIAL INTELLIGENCE, INC.
                                             AND GUY RAVINE'S NOTICE OF**
15  OPEN ARTIFICIAL INTELLIGENCE, INC.,      **MOTION AND MOTION TO ALTER OR**
    a Delaware corporation; and GUY RAVINE,  **AMEND A JUDGMENT PURSUANT TO**
16  an individual,                           **FED. R. CIV. P. 59(e), OR IN THE
                                             ALTERNATIVE, FOR RELIEF FROM A**
17              Defendants.                   **JUDGMENT OR ORDER PURSUANT TO
                                             FED. R. CIV. P. 60(b)**
18
                                             Hearing Date: May 7, 2024
19                                           Time: 2:00 p.m.
                                             Location: Courtroom 1
20

21

22

23

24

25

26

27

28

                                                          Case No. 3:23-cv-3918
─────────────────────────────────────────────────
     DECLARATION OF J. LUKE TENERY IN SUPPORT OF MOTION FOR RELIEF
                              **ER207**

DocuSign Envelope ID: 7451901E-DCD2-3E1B-734F-3FB33A9EE8E9

## DECLARATION OF J. LUKE TENERY

I, J. Luke Tenery, declare as follows:

1.     I am J. Luke Tenery. I make this Declaration in support of Defendants Open Artificial Intelligence, Inc. ("Open AI") and Guy Ravine's Notice of Motion and Motion to Alter or Amend a Judgment in the above-captioned matter. I have personal knowledge of the facts set forth herein and if called as a witness I could and would testify competently thereto.

2.     I am a Partner and the global practice leader for cybersecurity at StoneTurn Group, LLP ("StoneTurn"), a global professional services firm founded in 2004, with operations and physical presence across five continents. My CV is attached hereto as **Exhibit A**.

3.     StoneTurn's cybersecurity practice consists of a multidisciplinary team of security leaders, cyber technology and risk management professionals who leverage decades of hands-on experience to support legal actions and related matters. As such, StoneTurn employs experts in corporate information security risk management, incident response, digital media forensics, cyber threat pursuit, system security, and data analysis.

4.     I have been employed by StoneTurn since November 2020. I live in Oak Brook, Illinois, and I graduated from Lipscomb University in Nashville, Tennessee, with a Bachelor of Science degree in Information Systems Management. I also earned a graduate degree from Northwestern University's Kellogg School of Management with a Master of Business Administration ("MBA") degree.

5.     I currently have, and have held, professional certifications in the fields of information security, cybersecurity, and digital forensics including the Certified Chief Information Security Officer (C/CISO) executive certification from the Carnegie Mellon Heinz School of Technology, Certified Information Systems Security Professional (CISSP), Certified Information Security Manager (CISM), and GIAC Penetration Tester (GPEN), Encase Certified Examiner (EnCE), among others.

6.     Prior to being employed by StoneTurn, I was employed by Ankura Consulting Group (ACG) as a Senior Managing Director where I founded and led their global cybersecurity practice. Prior to ACG, I worked for Kroll, Inc. for approximately fifteen years where I started my

DocuSign Envelope ID: 7451901E-D023-4F4B-BF77-66BF30EF5082

1   professional career, directly following completion of my undergraduate degree. I rose to the title

2   of Associate Managing Director serving as the Deputy Practice Leader of Kroll Cyber Risk. Prior

3   to the deputy practice leader role, I served as the Incident Response Practice Leader with Kroll's

4   Cyber Risk practice.

5          7.      In my current role at StoneTurn, I am responsible for leading the firm's

6   cybersecurity client service operations which includes cybersecurity case management, product

7   development and management, operations, and client development work. I am also responsible for

8   integrated cybersecurity services with other StoneTurn practice areas including business

9   intelligence, forensic accounting, physical security, construction advisory, data analytics, among

10  others. I am responsible for StoneTurn's cybersecurity practice which delivers service capabilities

11  including incident response, cyber investigations, national security, auditing, electronic discovery,

12  data analytics, threat intelligence, cybersecurity assessments, interim cybersecurity support,

13  managed services, digital forensics, expert services, risk management, compliance, and

14  governance, among others.

15         8.      Throughout my professional career, my consulting services have spanned a

16  multitude of technological dimensions. Some of the primary technological skillsets that have

17  supported my professional services include cloud security, endpoint security, malware analysis,

18  digital forensics, threat hunting, log analysis, digital asset and block chain analysis, cybersecurity

19  architecture, network security device management, system administration, web application

20  security, penetration testing, vulnerability management, disaster recovery and business continuity,

21  and security operations.

22         9.      I have worked on matters spanning a multitude of industries and global

23  geographies. Case matter types have included, but are not limited to, cybersecurity incident and

24  data breach response, digital investigations, mergers and acquisitions, enterprise risk assessments,

25  incident remediation, compliance mitigation, national security and Committee for Foreign

26  Investment in the US (CFIUS), threat modeling and mitigation, cyber intelligence investigation,

27  public key infrastructure (PKI) assurance, intellectual property theft, insider threats, data theft,

28  extortion, and digital asset security, among other corporate risk situations.

10.     Pertinent to this matter, I have investigated numerous cyber matters that involved forensically analyzing web page artifacts including logs, access telemetry, version history, and both authorized and unauthorized use. Through the course of these investigations and my training in the fields above, I learned how to retrieve, preserve, and assess evidence related to web servers and use of the resources used by entities accessing and interacting with websites.

I.      **ASSIGNMENT AND SUMMARY OF OBSERVATIONS**

11.     StoneTurn was retained on March 22, 2024, by Counsel as an independent advisor to investigate, test, assess and confirm the history and use of internet facing properties related to Open.ai and associated principals. Specifically, StoneTurn, under my direction conducted analysis activities to include identifying unique users and individual interactions on websites in scope.

12.     StoneTurn's investigation included log review and other internet artifacts and my team, and I found evidence and concluded that: (i) the Open.AI website existed since at least April of 2015. (ii) Furthermore, internet users interacted with the Open.AI website before the Plaintiff ("OpenAI") was officially founded. (iii) The Wiki tool at Decentralized.open.ai existed for several years between 2017 and 2022 and had users and interactions. (iv) Prior, but related to, Open.AI, evidence indicates the Wikineering.org ("Wikineering") web site was regularly used from April 18, 2014, to December 29, 2016. (iv) Additionally, log evidence showed that an iteration of the "Initial Collaboration Tool" was on the internet since at least September 13, 2014.

13.     These facts show the existence, accessibility, functionality, and usage of Wikineering website and related domain names, the "Initial Collaboration Tool," and the "Open.AI" website, the "Open AI" wiki collaboration site on Decentralized.open.ai and related subdomain name sites.

II.     **DESCRIPTION OF INFORMATION COLLECTED AND MEANS OF PRESERVATION**

14.     StoneTurn collected various artifacts through the course of our investigation. Web server and web proxy logs (referred to as "the logs") from three servers were provided to us, (identified as "Server 1", "Server 2", and "Server 3"). It is important to note that we did not archive or otherwise preserve these servers in their entirety. Individual files were downloaded as

1  needed using WinSCP with settings to maintain time stamps and preserved in a logical evidence

2  container. A list containing the name and location of each log file analyzed is attached as

3  **Exhibit B**.

4       15.    Recreations of the "Initial Collaboration Tool" displayed in Exhibit 2 of Mr.

5  Ravine's declaration identified a page titled "Convolutional Neural Network". This page was

6  hosted at the Path "/index.php/Main Page".

7       16.    The Wayback Machine hosted by the Internet Archive contained an archive of the

8  website "Sunglass.io" dated December 21, 2014, which contained the Wikineering logo and

9  branding. (https://web.archive.org/web/20141221225633/https://sunglass.io/)

10       17.    Google Analytics data was gathered from the Open AI property (ID: 253637511).

11  We preserved this information by exporting a report for the period of November 2022 to March

12  2024. We were provided access through two of our Gmail accounts to this property for both

13  analysis and data collection.

14       18.    Open AI hosted at decentralized.open.ai, a wiki service.  Revision, user interaction,

15  and Company (i.e. project) information for the wiki service hosted on decentralized.open.ai was

16  collected from an export of the PostgreSQL database hosted on Server 2.

17       19.    Between May 23, 2015, and July 18, 2017, open.ai hosted, among other services, a

18  form with the ability for users to enter their email address to be "informed of developments or join

19  the initiative."

20       20.    An archive of Ravine's Google Drive account contained two PDF brochures titled

21  "AI School Keynote Presentation 006c.pdf" and "AI School Keynote Presentation 006d.pdf" that

22  are dated October 15, 2015, and October 16, 2015, respectively. The brochures contain 27 and 26

23  slides, respectively. These brochures are similar, and both include the Open AI logo and branding

24  as well as an excerpt of the article hosted on the "Initial Collaboration Tool" as recreated in

25  Exhibit 2 of Mr. Ravine's declaration dated October 16, 2023.

26  **III.**    **DESCRIPTION OF ANALYSIS METHODOLOGY**

27       21.    The access logs were parsed and analyzed using a custom-built script. This script

28  enabled our analysis of the large volume of logs we were provided and excluded bots and

WAYMAKER

1   administrator traffic from our dataset. This ensured that our counts, to the best of our ability,

2   included only unique and "legitimate" (users who were not obviously bots) users. To filter the

3   data, we examined the fields "User Agent" and "Path" in the logs. User Agents are strings of text

4   that identify the web browser, operating system, and other details about a user's application and

5   system. (https://developer.mozilla.org/en-US/docs/Web/HTTP/Headers/User-Agent) Typically,

6   automated bots use specific, known User Agent strings associated with their programming

7   language, scanning application, or organization. We employed the use of a well-known

8   programming library named "is-bot" to do this bot checking. (https://github.com/omrilotan/isbot

9   and https://pypi.org/project/is-bot/) Additionally, we wrote our own custom application to be sure

10  the bots identified in the logs were properly filtered. To filter out administrator traffic (those who

11  developed the server), we examined the Path field in the logs. This field identified what webpages

12  the user attempted to access. A list of known webpages that only administrators had access to was

13  compiled and used to filter out log entries that included traffic from those users. While these

14  administrators did legitimately use the service, we did not include them in our results to ensure we

15  only identified the external users of the platform. For both filters, we exclude the user's IP address

16  from all log events if they were identified as either a bot or administrator. Unique users were

17  determined based on the number of unique IP addresses. While this was determined to be adequate

18  for our analysis, the number of actual unique users is likely greater than our analysis identifies as

19  there are instances where multiple users may interact with the service from the same IP address,

20  such as a business with multiple employees accessing the service. The number of interactions was

21  derived from the unique number of log entries present for a given time period and keyword of

22  interest (e.g. the string "open.ai" in the Referer field between April 6, 2015, and December 10,

23  2015). All keyword searches were done case-insensitive and did not include the use of pattern

24  matching.

25          22.     The web proxy logs did not specify the domain the request was being routed to. To

26  identify the service associated with an interaction, we analyzed the "Referer" field from the HTTP

27  request header. The Referer field contains either the complete or partial address from which a

28  website resource has been requested by the user. For instance, when a user clicks a link, the

1    Referer field would contain the address of the page the user originated from.

2    (https://developer.mozilla.org/en-US/docs/Web/HTTP/Headers/Referer) While we could not

3    definitively determine what service the user was accessing, we can assume that if the Referer field

4    present in the log included the domain of interest, the user had visited the web page populated in

5    the field.

6        23.    While the domain could not be found using the logs, by inspecting the Paths the

7    services used, we identified the individual service the user accessed. This technique was used to

8    find early usage of the "Initial Collaboration Tool" using the search term "Main_Page".

9        24.    Our team investigated publicly available archives to discover additional references

10   to Open AI and Wikineering, as well as their respective domains.

11       25.    The Google Analytics data was analyzed using the web dashboard.

12       26.    Revisions, user interactions, and Company information from decentralized.open.ai

13   was analyzed in the PostgreSQL tool pgAdmin4. (https://www.pgadmin.org/) A list of queries

14   used to format and export the relevant data points is attached hereto as **Exhibit C**. Administrator

15   and employee traffic was identified and disregarded. Active editors were classified as any user that

16   had created or revised a page.

17       27.    The identified text file containing the users' email addresses was analyzed to

18   determine the number of unique users who signed up to receive more information. The service

19   stored users' email addresses in a text file without timestamps. This required our team to

20   determine when the sign-up page was live to understand when these users were submitting their

21   email addresses. To do this, we utilized the Linux file timestamps found in the Open.ai source

22   code directory on Server 1. The timestamps showed the most recent modification to the web

23   application source code as May 23, 2015, and the most recent modification to the emails.txt file as

24   July 18, 2017. While Linux file timestamps can be modified, these dates aligned with our

25   expectations. The number of emails contained in the emails.txt file totaled 8,439. The email file

26   contained duplicate and likely fictitious email addresses from users potentially entering their email

27   address multiple times or by intentionally abusing the web form. We filtered out 2,237 email

28   addresses leaving our total count of users who signed up with email addresses at 6,202. Due to the

file not containing timestamps, we created a formula to calculate the ratio of the number of unique users visiting the platform while the sign-up page was live to the total number of sign-ups. This ratio was then used for each time period we analyzed for Open.AI to estimate the number of users who signed up during that time period. Based on a total unique user count of 16,334 (collected from logs containing open.ai in the Referer field between May 23, 2015, and July 19, 2017) and the total number of users who signed up with their email addresses at 6,202, our formula calculated a user to email sign-up ratio of approximately 2.634.

28.     The selective archive of Mr. Ravine's Google Drive was done using the industry-recognized forensics tool Axiom by Magnet Forensics.

## IV.   **OBSERVATIONS**

### A.     **The Open.AI Website**

29.     The logs provide evidence that Open.AI existed and had users before OpenAI was created. Between April 6, 2015, and December 10, 2015, the logs show 2,575 interactions and 393 unique, legitimate users from logs with open.ai in the Referer field. Based on the logs, open.ai averaged 286 interactions per month, and the estimated email sign-ups for this time period are 149. The number of interactions over time can be seen in the chart in **Exhibit D Figure 1**.

30.     Our team searched for publicly available archives as well as mentions or references to the Open.AI website dating back to the first timestamp of the logs on April 6, 2015. The earliest artifact we found was the previously identified "Wayback Machine" archive dated September 5, 2015. (https://web.archive.org/web/20150905165533/http://open.ai/). It is important to note that current searches for evidence of a website that was active in 2015 returns a limited and incomplete view. Search engines such as Google and webpage archives such as the Wayback Machine do not collect or store a 1:1 copy of the internet and the absence of information in either service does not mean the Open.AI website was not active before September 5, 2015 (https://www.forbes.com/sites/kalevleetaru/2015/11/16/how-much-of-the-internet-does-the-wayback-machine-really-archive/). It could mean search engines like Google either did not index or maintain information from the site and that the Wayback Machine did not create a capture

WAYMAKER

DocuSign Envelope ID: 7451901E-DFD3-3E1E-7A58-98EBE59E5898

before that date. Both scenarios are common issues and known challenges with investigations looking for historical website information.

31.     The logs suggest Open.AI and its family of subdomain sites that include decentralized.open.ai and beta.open.ai had substantial users for a period of over two years for which we have logs. Between May 22, 2015, and July 18, 2017, the logs show 119,717 events and 16,334 unique, legitimate users from logs with "open.ai" in the Referer field. Based on the logs, open.ai averaged 4,434 interactions per month, the estimated email sign-ups for this time period are 6,202. The number of interactions over time can be seen in the chart in **Exhibit D Figure 2**.

32.     Logs between 2017 and 2022 were unavailable for our analysis. We are aware of user activity during this time period as evidenced by data from both the Google Analytics and PostgreSQL data but cannot accurately quantify the totality of activity.

33.     The Google Analytics dashboard was configured to stream data from the Open.ai domain starting approximately on November 18, 2022.

- Between November 18, 2022, and November 30, 2022, the open.ai domain had approximately 7.2 thousand unique users, approximately 22 thousand page views, and approximately 61 thousand events.

- From the start of logging through the end of calendar year 2022, the open.ai domain had approximately 171 thousand unique users, approximately 501 thousand page views, and approximately 1.5 million events.

- Between November 18, 2022, and January 3, 2023, the open.ai domain had approximately 185 thousand unique users, approximately 544 thousand page views, and approximately 1.6 million events.

- Between November 18, 2022, and April 12, 2023, the open.ai domain had approximately 1.1 million unique users, approximately 2.9 million page views, and approximately 9.3 million events. For the 2023 calendar year the open.ai domain had approximately 2.5 million unique users, approximately 6.5 million page views, and approximately 21 million events.

The number of users, views, and events for these time periods can be seen in **Exhibit D Figure 3**.

DECLARATION OF J. LUKE TENERY IN SUPPORT OF MOTION FOR RELIEF

DocuSign Envelope ID: 74519016-D023-4545-A731-B3339FE288BB

34.     The PostgreSQL database containing the user and edit history for "decentralized.open.ai" was analyzed to determine the level of user interaction. After removing traffic associated with developers and administrators, we identified 453 revisions across the active companies made by 13 active editors. Revisions were made between October 25, 2017, and November 16, 2022. We specifically analyzed traffic through December 31, 2022. Traffic after this time frame was identified by Open AI as being "defaced". Examples of "defaced" companies can be seen in the database by viewing the active "Companies" table. The majority of Companies were created pre-2023. The companies created post 2022 are generally blank or filled with nonsensical information. One notable example created on October 6, 2023, is titled "TEST" with the description "dumpster company". The "Companies" table is attached hereto as **Exhibit E**.

   **B.     Wikineering**

35.     Wikineering existed and was regularly used for over two years. Between April 18, 2014, and December 29, 2016, the logs show 15,932 events and 1,289 unique, legitimate users from logs with "wikineering" in the Referer field. Based on the logs, Wikineering averaged 483 interactions per month. The number of interactions over time can be seen in the chart in **Exhibit D Figure 4**.

36.     Our team searched for publicly available archives to the Wikineering.org website dating back to the first timestamp of the logs on April 18, 2014. The earliest artifact we found was the previously identified "Wayback Machine" archive dated November 16, 2015. (https://web.archive.org/web/20151116131324/http://wikineering.org/). It is important to note that current searches for evidence of a website that was active in 2014 return a limited and incomplete view. Search engines such as Google and webpage archives such as the Wayback Machine do not collect or store a 1:1 copy of the internet and the absence of information in either service does not mean the Wikineering.org website was not active before November 16, 2015. (https://www.forbes.com/sites/kalevleetaru/2015/11/16/how-much-of-the-internet-does-the-wayback-machine-really-archive/) It could mean search engines like Google didn't either index or maintain information from the site and that the Wayback Machine doesn't have a capture before

DECLARATION OF J. LUKE TENERY IN SUPPORT OF MOTION FOR RELIEF
**ER216**

1  that date. Both scenarios are common issues and known challenges with investigations looking for

2  historical information.

3       37.     Our team identified an archive of the website "Sunglass.io" dated December 21,

4  2014, which contains the Wikineering logo in the top left corner of the page and "Copyright 2014

5  – Wikineering" in the footer. A screenshot of this webpage is included in **Exhibit F**.

6       **C.**     **Initial Collaboration Tool**

7       38.     The "Initial Collaboration Tool" existed on the internet since at least September 13,

8  2014. The logs show 4 interactions from 2 legitimate, unique users on September 13, 2014, and

9  December 17, 2014. Two out of the three interactions on September 13 successfully returned the

10  webpage the user requested. The request on December 17 contains the URL

11  "https://duckduckgo.com/" in the Referer field, indicating that the user originated from the search

12  engine DuckDuckGo. While the request was not successful, the request does indicate that this

13  webpage was indexed by DuckDuckGo (i.e. the webpage's URL was stored and served to users),

14  and a user clicked on a link from the search engine's website. The 4 interactions are presented in

15  spreadsheet format as **Exhibit G**. It is important to note that the Path presented as Exhibit 2 in Mr.

16  Ravine's declaration includes "/index.php/" before the Path "/Main_Page". We believe this is

17  likely due to the webpage presented in the declaration merely being a recreation of the legitimate

18  "Initial Collaboration Tool."

19       39.     The archive of Mr. Ravine's Google Drive uncovered two brochures titled "AI

20  School Keynote Presentation 006c.pdf" and "AI School Keynote Presentation 006d.pdf" which

21  advertise the Open AI and AI School projects. Three slides contain the Open AI logo and

22  branding. The three slides with Open AI branding can be seen in **Exhibit H Figures 5, 7, & 8**.

23  The earlier of the two, "AI School Keynote Presentation 006c.pdf", on Slide 14 contains an

24  excerpt of the article hosted on the "Initial Collaboration Tool" as recreated in Exhibit 2 of Mr.

25  Ravine's declaration. The archive preserved the creation date of October 15, 2015. A screenshot of

26  the artifact containing the creation date for both brochures can be seen in **Exhibit H Figures 1 &**

27  **3**. Unlike the file creation and modification dates on most operating systems, Google Drive's dates

28  are extremely unlikely to be tampered with. The brochures were also shared with the public

DocuSign Envelope ID: 74519016-DA2231EB-44E3-B829-4B52088

1  through Google Drive's link sharing permissions on the same date. The artifact containing the

2  permission change date for both brochures can be seen in **Exhibit H Figures 2 & 4**.

3       **D.**     **Other Analysis**

4       40.     Between January 23, 2014, and December 23, 2014, the logs show 137 events and

5  23 unique, legitimate users interacting with a web server using the same technology that was later

6  used to create the collaboration tools. Based on the logs, the Hyperloop page by itself averaged 12

7  interactions per month. The number of interactions over time can be seen in the chart in **Exhibit D**

8  **Figure 5**. These interactions are solely to the Hyperloop page, the total number of interactions and

9  users of this web server is likely greater than what this analysis shows. The Referer field for some

10  of these interactions indicates that this page was hosted on the domains "qa.ineed.com" and

11  "wikineering.org".

12       41.     Upon request, our team conducted analysis on the Google Trends for the search

13  terms "OpenAI", "ChatGPT", and "Dall-E" between August 2022, and March 2024. In Google

14  Trends, the numbers represent search interest relative to the highest point on the chart for the

15  given region and time. A value of 100 is the peak popularity for the term. A value of 50 means

16  that the term is half as popular. A score of 0 means there was not enough data for this term.

17  Throughout the period identified, OpenAI and Dall-E consistently had low search interest ratings,

18  with averages below 1 and 5.9, respectively. ChatGPT, on the other hand, had an average of 60,

19  which includes the four months preceding its public release with less than 1 search interest per

20  month. Between April 16 and April 22, 2023, the Google Trends popularity of the search term

21  ChatGPT peaked. The search interest for these three terms over time can be seen in the chart and

22  legend in **Exhibit D Figure 5**.

23  **V.**   **CONCLUSIONS**

24       42.     StoneTurn's investigation included log review and other internet artifacts and my

25  team, and I found evidence and concluded that: (i) the Open.AI website existed since at least April

26  of 2015. (ii) Furthermore, internet users interacted with the Open.AI website before the Plaintiff

27  ("OpenAI") was officially founded. (iii) Prior, but related to, Open.AI, evidence indicates the

28  Wikineering.org ("Wikineering") web site was regularly used from April 18, 2014, to December

1   29, 2016. (iv) Additionally, log evidence showed that "The Initial Collaboration Tool" on the

2   internet since at least September 13, 2014. (v) Decentralized.open.ai had usage and interactions

3   between 2017 and 2022.

4          These facts show the existence, accessibility, and functionality of Wikineering website and

5   related domain names, the "Initial Collaboration Tool," and the "Open.AI" website and related

6   subdomain sites including decentralized.open.ai.  The logs suggest Open.AI and its family of

7   subdomain sites that include decentralized.open.ai and beta.open.ai, which hosted wiki

8   collaboration tools had substantial users for a period of over two years for which we have logs.

9          I declare under penalty of perjury under the laws of the United States of America that the

10  foregoing is true and correct.

11         Executed on this 27th day of March 2024, at Oak Brook, in Illinois.

12

13

14

15  J. Luke Tenery

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**J. Luke Tenery**

**MBA, C/CISO, CISSP, CISM, GPEN**

227 W. Monroe Street

Chicago, Illinois 60606

312-775-1210

ltenery@stoneturn.com

---

| | | |
|---|---|---|
| **Experience** | **Partner** | November 2020 – Present |

**Cybersecurity Practice Lead**
**StoneTurn Group, LLP**

Practice head, and responsible for, of StoneTurn's cybersecurity client service areas covering organizational, strategic, and operational programs. Assigned practice leader responsibilities including go-to-market strategy, business development, and execution. Practice focus areas cover cybersecurity investigations, digital forensics, incident response, and management consulting. Provides cybersecurity risk management guidance concerning: threat and incident management, cybersecurity operations, security policy development, and IT project management and implementation.

**Senior Managing Director**                                   Oct 2016 – October 2020
**Cybersecurity Global Practice Leader**
**Ankura Consulting Group, LLC**

Co-leader, and was responsible for Ankura's global cybersecurity client services covering organizational, strategic, and operational programs. Assigned Global Response, Investigations, and Intelligence practice group to lead strategy, execution, and practice development. Investigates complex computer intrusion and breach matters and devises strategies to contain and eradicate threats in client networks and systems. Provides cybersecurity risk management guidance concerning threat and incident management, cybersecurity operations, security policy development, and IT project management and implementation.

**Associate Managing Director**                               Jan 2015 – Sep 2016
**Deputy Cyber Practice Leader**
**Kroll Cyber Security**

Oversaw aspects of the cyber practice's strategic and management operations, Led domestic and global cybersecurity engagements covering incident response and information risk management. Managed and directed strategic partner relationships, business development, and new practice offerings and capabilities.

**Senior Director**                                           Jan 2014 – Dec 2014
**Kroll Advisory Solutions**

Practice leader for Kroll's Cyber Investigations Incident Response Unit. Responded to and managed global cyber-related investigations covering corporate espionage, intellectual property theft, data breaches, and cyber-security incidents.

**Director**                                                  May 2011 – Dec 2013
**Kroll Advisory Solutions**

Delivered integrated functions to organizations encompassing information security, e-discovery, cyber investigations, computer forensics, business continuity, disaster recovery, incident response, IT audit, records management, penetration tests, vulnerability assessments, web application security and privacy.

Investigated client issues relating to large-scale information security review, data breach incident response, investigations of computer security events, Internet fraud, identity theft and intellectual property misappropriation, as well as privacy and information technology related matters.

**Consultant**                                                                      Apr 2010 – Apr 2011
**Secure Information Services and Computer Forensics**
**Kroll Ontrack, Chicago, Illinois**

- Deliver integrated functions to organizations encompassing information security, e-discovery, cyber investigations, computer forensics, business continuity, disaster recovery, incident response, IT audit, records management and privacy.
- Investigate client issues relating to large-scale information security reviews, data breach incident response, investigations of computer security events, Internet fraud, identity theft and intellectual property misappropriation, as well as privacy and information technology related matters.

**Senior Analyst and Senior Technology Specialist**                                  Jul 2006 – Mar 2010
**Computer Forensics Consulting**
**Kroll Ontrack Inc., Chicago, Illinois**

- Direct computer forensic and technology investigations within the Kroll Chicago office.
- Provide computer forensic, incident response and technology consulting services.
- Responsible for conducting sound computer forensic analysis and maintaining strict media chain of custody using protocols and procedures in line with generally accepted computer forensics techniques and best practices.
- Acquire and preserve computer media in either a lab setting or through onsite data capture or seizure. This involves creating sector-by-sector forensic copies of original media to be analyzed during the course of a computer forensic examination.
- Perform data recovery, including both file and e-mail recovery, on electronic media to be analyzed during the course of a computer forensic examination.
- Interact with project managers, case managers, legal consultants, clients and their attorneys.
- Conduct analysis of electronic media. Example analysis activities include but are not limited to:
    - Searches for evidence of fraud, theft of trade secrets, etc. on computer media from desktops, laptops and server platforms.
    - Searches for evidence of reformatting, dates of reformatting and utilities used to wipe or copy data from electronic media.
    - Locating evidence of improper removal, duplication, destruction or transmission of e-mail messages or files.
- Providing expert testimony and investigative/analytical support as needed on various projects.

**Senior Associate**                                                                 2001 – July 2006
**Kroll Associates, Inc. Chicago Illinois**
**Directed Chicago Kroll computer forensic and technology investigations**

- Responsibilities included developing and implementing internal and external network penetration tests, risk assessments, information security audits, policy and controls development, high technology investigations, incident response, litigation support and document management.
- Experience assisting clients with issues relating to network security and engineering, business continuity, disaster recovery and information technology operations.

- Conducted onsite computer evidence acquisitions.

**Testimony/Court Experience**

| | |
|---|---|
| • Trial Testimony – MMMG LLC and Mobile Mike Promotions, Inc. v. Seminole Tribe of FL, Inc. d/b/a Tribe, Inc., Tony Sanchez Jr, Larry Howard, Sally Tommie, Andrew Bowers, Mike Ulizio, Steven Osceola and Chris Osceola, Broward County, FL | 2019 |
| • Deposition – InDyne, Inc. v. Abacus Technology Corporation et al., McLean, VA (State) | 2014 |
| • Deposition – InDyne, Inc. v. Abacus Technology Corporation et al., McLean, VA (Federal) | 2012 |

**Education**

| | |
|---|---|
| MBA , Kellogg School of Management at Northwestern University | 2022 |
| Certified Chief Information Security Officer (C/CISO) Certificate Carnegie Mellon University, Heinz College, Pittsburgh, PA | 2019 |
| B.S., Computer Information Systems: Management Concentration – Cum Laude, David Lipscomb University, Nashville, TN | 2001 |

**Professional Certifications**

| | |
|---|---|
| Certified Information System Manager (CISM) | 2014 |
| GIAC Certified Penetration Tester (GPEN) | 2010 |
| EnCase Certified Examiner (EnCE) – inactive | 2006 |
| Certified Information Systems Auditor (CISA) – inactive | 2005 |
| Certified Information System Security Professional (CISSP) - inactive | 2004 |
| Network Plus Engineer (N+) | 2002 |

**Professional Training**

| | |
|---|---|
| Web Application Penetration Testing and Ethical Hacking, SEC 542, SANS CDI, Washington D.C. | Dec 2011 |
| Network Penetration Testing and Ethical Hacking, SEC 560, SANS Training, Orlando, Florida | Mar 2010 |
| Advanced File System Recovery and Memory Forensics, SANS Training, Orlando, Florida | Mar 2010 |
| Hacker Techniques, Exploits, and Incident Handling, SEC 504, SANS Training, Las Vegas, Nevada | Jun 2008 |
| Tactical Exploitation, SANS Training, Las Vegas, Nevada | Jun 2008 |
| Penetration Testing Summit:  What works in Penetration Testing, SANS Training, Las Vegas, Nevada | Jun 2008 |
| SEAK 16th Annual National Expert Witness Conference, SEAK Inc., Hyannis, Massachusetts | Jun 2007 |

| | |
|---|---|
| EnCase Network Intrusion Investigations and Incident Response Forensics, Guidance Software, Sterling, Virginia | Mar 2006 |
| Sarbanes Oxley Symposium (SOX), Information Systems Audit and Controls Association, Dallas, Texas | Aug 2005 |
| North American Computer Audit, Control and Security Conf. (CACACS), Information Systems Audit and Control Association, Las Vegas, Nevada | May 2005 |
| EnCase Intermediate Analysis and Reporting, Guidance Software, Sterling, Virginia | Mar 2005 |
| Auditing Networks, Perimeters & Systems, SANS Training, Monterrey, California | Jun 2003 |

**Professional Affiliations**

| | |
|---|---|
| Member, International Information System Security Certification Consortium (ISC2) | 2004 – Present |
| Member, Information Systems Audit and Control Association (ISACA) | 2005 – Present |

**Publications**

**Luke Tenery**, Daron Hartvigsen. "Plan to Protect: Cybersecurity for Employees Before Day One" https://www.lawjournalnewsletters.com/2023/06/01/plan-to-protect-cybersecurity-for-employees-before-day-one/ (June 2023)

**Luke Tenery**, Daron Hartvigsen. "Insider Risk: Unconventional Thoughts and Lessons Learned" https://www.cybersecurity-insiders.com/insider-risk-unconventional-thoughts-and-lessons-learned/ (May 5, 2023)

**Luke Tenery**, Nathan Fisher. "On Notice: Proactively Mitigating Cyber Vulnerabilities" https://securitytoday.com/Articles/2023/03/20/On-Notice-Proactively-Mitigating-Cyber-Vulnerabilities.aspx? (March 20, 2023)

**Luke Tenery**. "Cyber Threat Actors 2022 – Understanding the Drivers of Crisis" https://stoneturn.com/insight/cyber-threat-actors-2022-understanding-the-drivers-of-crisis/ (September 23, 2022)

**Luke Tenery**, Thomas McEwan. "Shifting Cyber Landscape – Crisis Awareness as a Means to Prevent and Prepare" https://stoneturn.com/insight/shifting-cyber-landscape-crisis-awareness-as-a-means-to-prevent-and-prepare/ (September 12, 2022)

**Luke Tenery**, Ross Rustici. "Reduce Risk With Better Cyber Due Diligence" https://www.darkreading.com/risk/reduce-risk-with-better-cyber-due-diligence (March 2, 2022)

**Luke Tenery**, Thomas McEwan, Ross Rustici. "Beyond Insurance:  Mitigating Cyber Risk In 2022" https://www.law360.com/insurance-authority/articles/1452656/beyond-insurance-mitigating-cyber-risk-in-2022 (January 7, 2022)

**Luke Tenery**, Nathan Fisher, Daron Hartvigsen. "A Step Ahead – Cybersecurity Insights Business Leaders Need Now" https://stoneturn.com/insight/a-step-ahead-cybersecurity-insights-business-leaders-need-now/ (October 29, 2021)

**Luke Tenery.** "Aligning Cybersecurity Risk with Business Imperatives" https://stoneturn.com/insight/aligning-cybersecurity-risk-with-business-imperatives/ (October 29, 2021)

**Luke Tenery**, Ross Rustici. "Expecting the Unexpected: Tips for Effectively Mitigating Ransomware Attacks in 2021" https://www.darkreading.com/vulnerabilities---threats/expecting-the-unexpected-tips-for-effectively-mitigating-ransomware-attacks-in-2021/a/d-id/1341288 (June 23, 2021)

**Luke Tenery**, Ross Rustici. "Cyber Risk Monitor: May 2021" https://stoneturn.com/insight/cyber-risk-monitor-may-2021/ (May 2021)

**Luke Tenery**, Shannon Murphy, Mark Clews, and John Stark.  "10 Questions Companies Should Address for a Remote Work Environment" https://www.law.com/corpcounsel/2020/06/26/10-questions-companies-should-address-for-a-remote-work-environment/ (June 26, 2020)

**Luke Tenery**, Robert A. Musiala, Jr., Esq., CFCS, Teresa M. Goody, Esq., CFE, Veronica Reynolds, Mark McGrath, Chris Rowland, and Sunil Sekhri. "Cryptocurrencies: Forensic techniques to meet the challenge of new fraud and corruption risks" https://future.aicpa.org/resources/download/cryptocurrencies-forensic-techniques-to-face-new-fraud-and-corruption-risks (Winter 2020)

**Luke Tenery**, Ted Thiesen, Bill Bray, and Pascale C. Siegel. "From Plausible to Probable: Cyberattack Targets Ukrainian financial Sector Using Stolen NSA Tools" https://ankura.com/insights/plausible-probable-cyberattack-targets-ukrainian-financial-sector-using-stolen-nsa-tools/ (August 24, 2017)

**Luke Tenery**, Ted Thiesen, Bill Bray. "From Possible to Plausible: Petya As Portent, WannaCry As Warning, NotPetya As Gathering Storm" https://ankura.com/insights/from-possible-to-plausible-probable-petya-as-portent- wannacry-as-warning-notpetya-as-gathering-storm/ (July 28, 2017)

**Luke Tenery**, Bill Bray, and Scott Corzine. "Geopolitics, Infrastructure, and Cyber: A Perfect Storm of Risk" https://ankura.com/insights/geopolitics-infrastructure-cyber-perfect-storm-risk/  (January 9, 2017)

# EXHIBIT B

# Exhibit B

| Server 1 | /mnt/disks/st1/opt/nginx_upload/logs/access_1.log |
|----------|---------------------------------------------------|
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.1 |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.2.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.3.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.4.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.5.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.6.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.7.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.8.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.9.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.10.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.11.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.12.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.13.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.14.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.15.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.16.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.17.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.18.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.19.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.20.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.21.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.22.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.23.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.24.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.25.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.26.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.27.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.28.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.29.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.30.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.31.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.32.gz |

| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.33.gz |
|---|---|
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.34.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.35.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.36.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.37.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.38.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.39.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.40.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.41.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.42.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.43.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.44.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.45.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.46.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.47.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.48.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.49.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.50.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.51.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.52.gz |
| Server 1 | /mnt/disks/st1/var/log/nginx/access.log.53.gz |
| Server 1 | /mnt/disks/st2/opt/nginx_upload/logs/access.log |
| Server 1 | /mnt/disks/st2/opt/nginx_upload/logs/access2.log |
| Server 1 | /mnt/disks/st2/opt/nginx-2014-03-21/logs/access.log |
| Server 1 | /mnt/disks/st2/opt/nginx/logs/access.log |
| Server 1 | /mnt/disks/st2/var/log/nginx/access.log |
| Server 1 | /mnt/disks/st2/var/log/nginx/access-1-4-7.log |
| Server 1 | /root/var/log/nginx/access.log.1 |
| Server 1 | /root/var/log/nginx/access.log.2.gz |
| Server 1 | /root/var/log/nginx/access.log.3.gz |
| Server 1 | /root/var/log/nginx/access.log.4.gz |
| Server 1 | /root/var/log/nginx/access.log.5.gz |
| Server 1 | /root/var/log/nginx/access.log.6.gz |
| Server 1 | /root/var/log/nginx/access.log.7.gz |
| Server 1 | /root/var/log/nginx/access.log.8.gz |
| Server 1 | /root/var/log/nginx/access.log.9.gz |
| Server 1 | /root/var/log/nginx/access.log.10.gz |
| Server 1 | /root/var/log/nginx/access.log.11.gz |

| Server 1 | /root/var/log/nginx/access.log.12.gz |
|----------|--------------------------------------|
| Server 1 | /root/var/log/nginx/access.log.13.gz |
| Server 1 | /root/var/log/nginx/access.log.14.gz |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log.1 |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log.2.gz |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log.3.gz |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log.4.gz |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log.5.gz |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log.6.gz |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log.7.gz |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log.8.gz |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log.9.gz |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log.10.gz |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log.11.gz |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log.12.gz |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log.13.gz |
| Server 2 | /var/discourse/shared/web_ai/log/var-log/nginx/access.log.14.gz |
| Server 2 | /var/log/nginx/access.log |
| Server 2 | /var/log/nginx/access.log.1 |
| Server 2 | /var/log/nginx/access.log.2.gz |
| Server 2 | /var/log/nginx/access.log.3.gz |
| Server 2 | /var/log/nginx/access.log.4.gz |
| Server 2 | /var/log/nginx/access.log.5.gz |
| Server 2 | /var/log/nginx/access.log.6.gz |
| Server 2 | /var/log/nginx/access.log.7.gz |
| Server 2 | /var/log/nginx/access.log.8.gz |
| Server 2 | /var/log/nginx/access.log.9.gz |
| Server 2 | /var/log/nginx/access.log.10.gz |
| Server 2 | /var/log/nginx/access.log.11.gz |
| Server 2 | /var/log/nginx/access.log.12.gz |
| Server 2 | /var/log/nginx/access.log.13.gz |
| Server 2 | /var/log/nginx/access.log.14.gz |
| Server 2 | /var/log/nginx/access.log.15.gz |
| Server 2 | /var/log/nginx/access.log.16.gz |
| Server 2 | /var/log/nginx/access.log.17.gz |
| Server 2 | /var/log/nginx/access.log.18.gz |
| Server 2 | /var/log/nginx/access.log.19.gz |

**ER229**

| Server 2 | /var/log/nginx/access.log.20.gz |
| Server 2 | /var/log/nginx/access.log.21.gz |
| Server 2 | /var/log/nginx/access.log.22.gz |
| Server 2 | /var/log/nginx/access.log.23.gz |
| Server 2 | /var/log/nginx/access.log.24.gz |
| Server 2 | /var/log/nginx/access.log.25.gz |
| Server 2 | /var/log/nginx/access.log.26.gz |
| Server 2 | /var/log/nginx/access.log.27.gz |
| Server 2 | /var/log/nginx/access.log.28.gz |
| Server 2 | /var/log/nginx/access.log.29.gz |
| Server 2 | /var/log/nginx/access.log.30.gz |
| Server 2 | /var/log/nginx/access.log.31.gz |
| Server 2 | /var/log/nginx/access.log.32.gz |
| Server 2 | /var/log/nginx/access.log.33.gz |
| Server 2 | /var/log/nginx/access.log.34.gz |
| Server 2 | /var/log/nginx/access.log.35.gz |
| Server 2 | /var/log/nginx/access.log.36.gz |
| Server 2 | /var/log/nginx/access.log.37.gz |
| Server 2 | /var/log/nginx/access.log.38.gz |
| Server 2 | /var/log/nginx/access.log.39.gz |
| Server 2 | /var/log/nginx/access.log.40.gz |
| Server 2 | /var/log/nginx/access.log.41.gz |
| Server 2 | /var/log/nginx/access.log.42.gz |
| Server 2 | /var/log/nginx/access.log.43.gz |
| Server 2 | /var/log/nginx/access.log.44.gz |
| Server 2 | /var/log/nginx/access.log.45.gz |
| Server 2 | /var/log/nginx/access.log.46.gz |
| Server 2 | /var/log/nginx/access.log.47.gz |
| Server 2 | /var/log/nginx/access.log.48.gz |
| Server 2 | /var/log/nginx/access.log.49.gz |
| Server 2 | /var/log/nginx/access.log.50.gz |
| Server 2 | /var/log/nginx/access.log.51.gz |
| Server 2 | /var/log/nginx/access.log.52.gz |
| Server 2 | /var/log/nginx/access.log.52 |
| Server 3 | /var/log/nginx/access.log |
| Server 3 | /var/log/nginx/access.log.1 |
| Server 3 | /var/log/nginx/access.log.2.gz |
| Server 3 | /var/log/nginx/access.log.3.gz |

**ER230**

| Server 3 | /var/log/nginx/access.log.4.gz |
|---|---|
| Server 3 | /var/log/nginx/access.log.5.gz |
| Server 3 | /var/log/nginx/access.log.6.gz |
| Server 3 | /var/log/nginx/access.log.7.gz |
| Server 3 | /var/log/nginx/access.log.8.gz |
| Server 3 | /var/log/nginx/access.log.9.gz |
| Server 3 | /var/log/nginx/access.log.10.gz |
| Server 3 | /var/log/nginx/access.log.11.gz |
| Server 3 | /var/log/nginx/access.log.12.gz |
| Server 3 | /var/log/nginx/access.log.13.gz |
| Server 3 | /var/log/nginx/access.log.14.gz |

# EXHIBIT C

# Exhibit C

## User Interaction Information

```sql
select u.id as ""UserID"", u.name as ""Username"", u.ip as ""userIP""
,*
from public.users u
left join (select owner_id , count(1) as ""comment_counts"", min(created_at) as
""first_comment"", max(created_at) as ""last_comment""
from public.comments group by owner_id ) coms
on coms.owner_id = u.id
left join (select owner_id , count(1) as ""discussion_comment_counts"",
min(created_at) as ""first_discussion_comment"", max(created_at) as
""last_discussion_comment""
from public.discussion_comments group by owner_id ) discussion_coms
on discussion_coms.owner_id = u.id
left join (select owner_id, count(1) as ""discussions_counts"", min(created_at) as
""first_discussions"", max(created_at) as ""last_discussions""
from public.discussions group by owner_id ) discussions
on discussions.owner_id = u.id
left join (select owner_id , count(1) as ""notebooks_counts"", min(created_at) as
""first_notebooks"", max(created_at) as ""last_notebooks""
from public.notebooks group by owner_id ) notebooks
on notebooks.owner_id = u.id
left join (select owner_id , count(1) as ""pages_counts"", min(created_at) as
""first_pages"", max(created_at) as ""last_pages""
from public.pages group by owner_id ) pages
on pages.owner_id = u.id
left join (select author_id , count(1) as ""revisions_counts"", min(created_at) as
""first_revisions"", max(created_at) as ""last_revisions""
from public.revisions group by author_id ) revisions
on revisions.author_id = u.id
left join (select author_id , count(1) as ""tasks_counts"", min(created_at) as
""first_tasks"", max(created_at) as ""last_tasks""
from public.tasks group by author_id ) tasks
on tasks.author_id = u.id
left join (select author_id , count(1) as ""task_actions_counts"", min(created_at) as
""first_task_actions"", max(created_at) as ""last_task_actions""
from public.task_actions group by author_id ) task_actions
on task_actions.author_id = u.id
left join (select user_id, count(1) as ""tokens_counts"", min(created_at) as
""first_tokens"", max(created_at) as ""last_tokens""
from public.tokens group by user_id ) tokens
on tokens.user_id = u.id
```

## Revisions Information

```sql
select users.name as   ""username"", users.ip  ""userIp"", author_id as ""UserID"",
    pag.title as ""PageTitle"", page_id as ""PageId"",  r.created_at as ""Revision
Date"",  left(changeset,100)::varchar(100) as ""Change Description""
    ,date_part('year',r.created_at) as ""Revision Year""
    ,companies.id as ""Company ID"", companies.title as ""Company Title""
    from public.revisions r
left join public.pages pag
on r.page_id = pag.id
left join public.users
on r.author_id = users.id
left join public.companies
on pag.company_id = companies.id
```

# EXHIBIT D

# Exhibit D

Figure 1



Figure 2



# Figure 3

November 18, 2022 – November 30, 2022



November 18, 2022 – December 31, 2022



November 18, 2022 – January 3, 2023



November 18, 2022 – April 12, 2023



January 1, 2023 – December 31, 2023



Figure 4



Figure 5



# EXHIBIT E

# Exhibit E

| id | title | description | owner_id | created_at | updated_at | logo |
|---|---|---|---|---|---|---|
| cYdY5ONqSlf7 | General Purpose Face ID | | 0f557d59-74fc-4ebf-bd6a-4108e946caab | 10/25/2017 | 10/25/2017 | |
| calxr83uNFiO | Automated Store | | 0f557d59-74fc-4ebf-bd6a-4108e946caab | 10/25/2017 | 10/25/2017 | |
| coTrNvKMmdGe | AI Super Renderer | | 0f557d59-74fc-4ebf-bd6a-4108e946caab | 10/25/2017 | 10/25/2017 | |
| cYhF7j7Wj8FE | Task: Masks | This is a test | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/11/2020 | 3/16/2020 | |
| cU9tNqYJWOdi | The Network | Defining the Network | 2c9862f4-9d58-4321-a728-c7b7bb86e5c5 | 3/16/2020 | 3/16/2020 | |
| cShakwb4RTaS | Rachel est | Testing | 69de7abc-51ae-4779-9bf7-d1603a582b31 | 8/22/2020 | 9/2/2020 | |
| ceq3DOfTVgOD | lll | lll | b67b245f-65e7-47e0-92c2-7083eddad062 | 6/28/2022 | 6/28/2022 | |
| cyRW6ZglouKg | test | Data analytics for publishers | 0952238c-5fbd-4df0-9ffe-7cf65fc95ad6 | 4/14/2023 | 4/14/2023 | |
| cO065UO7kOws | <aaa> | <b>hello</b>world | 44b7552b-54ea-441e-8b87-fa8a0dc4d7a9 | 4/14/2023 | 4/14/2023 | |
| cHXyPLUXSKOw | PandaServer | Reliable | 4fd3a5a1-05a5-46bf-bc1e-07101b8f94ef | 5/3/2023 | 5/3/2023 | |
| cEAcFXCVucUf | TEST | dumpster company | 3e2fb4c8-6b5e-4ff2-b7b1-1b2ca452e765 | 10/6/2023 | 10/6/2023 | |

**ER242**

# EXHIBIT F



# EXHIBIT G

| Remote IP | Timestamp | HTTP Method | Path | Protocol | HTTP Response | Content Length | Referer | User Agent | From Log Source |
|---|---|---|---|---|---|---|---|---|---|
| 91.236.74.170 | 2014-09-13 23:40:50+00:00 | GET | /Main_Page | HTTP/1.1 | 302 | 160 | http://wikineering.org/ | Mozilla/5.0 (Windows NT 5.1) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/27.0.1453.116 Safari/537.36 | server1-st2-opt-nginx_upload-logs-access2.log |
| 70.72.68.22 | 2014-12-17 07:16:17+00:00 | GET | /Main_Page | HTTP/1.1 | 500 | 192 | https://duckduckgo.com/ | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_10_1) AppleWebKit/600.2.5 (KHTML, like Gecko) Version/8.0.2 Safari/600.2.5 | server1-st2-opt-nginx_upload-logs-access2.log |
| 91.236.74.170 | 2014-09-13 23:40:51+00:00 | GET | /Main_Page | HTTP/1.1 | 200 | 6048 | http://wikineering.org/ | Mozilla/5.0 (Windows NT 5.1) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/27.0.1453.116 Safari/537.36 | server1-st2-var-log-nginx-access-1-4-7.log |
| 91.236.74.170 | 2014-09-13 23:40:51+00:00 | GET | /Main_Page | HTTP/1.1 | 200 | 6048 | http://wikineering.org/.6888/ | Mozilla/5.0 (Windows NT 5.1) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/27.0.1453.116 Safari/537.36 | server1-st2-var-log-nginx-access-1-4-7.log |

# EXHIBIT H

# Exhibit G

Figure 1

**ARTIFACT INFORMATION**

| | |
|---:|:---|
| User | **Guy Ravine** |
| Email | **guyravine@gmail.com** |
| User ID | **103718470693632700875** |
| Actor Type | **User** |
| Date/Time | **10/15/2015 9:22:34.644 AM** |
| Action | **Create** |
| Action Type | **Upload** |
| File Name | **AI School** Keynote Presentation 006c.pdf |
| File ID | **0B6W5QbS1k882bXJENjBxLWVIUU0** |
| MIME Type | **application/pdf** |
| Artifact type | Cloud Google Drive Activity |
| Item ID | **14238** |

Figure 2



Figure 3



**ARTIFACT INFORMATION**

| | |
|---|---|
| User | **Guy Ravine** |
| Email | **guyravine@gmail.com** |
| User ID | **103718470693632700875** |
| Actor Type | **User** |
| Date/Time | **10/16/2015 8:30:55.162 AM** |
| Action | **Create** |
| Action Type | **Upload** |
| File Name | **AI School Keynote Presentation 006d.pdf** |
| File ID | **0B6W5QbS1k882UTFEenB2QIRKU0U** |
| MIME Type | **application/pdf** |
| Artifact type | Cloud Google Drive Activity |
| Item ID | 14228 |

Figure 4

**ARTIFACT INFORMATION**

| | |
|---|---|
| User | **Guy Ravine** |
| Email | **guyravine@gmail.com** |
| User ID | **103718470693632700875** |
| Actor Type | **User** |
| Date/Time | **10/16/2015 8:31:03.470 AM** |
| Action | **Permission Change** |
| File Name | **AI School Keynote Presentation 006d.pdf** |
| File ID | **0B6W5QbS1k882UTFEenB2QIRKU0U** |
| Added Permissions | **Anyone as Viewer** |
| MIME Type | **application/pdf** |
| Artifact type | Cloud Google Drive Activity |
| Item ID | 14226 |

Figure 5



Figure 6

## Details  [ edit ]

### Backpropagation  [ edit ]

When doing propagation, the momentum and weight decay values are chosen to reduce oscillation during stochastic gradient descent. See Backpropagation for more.

### Different types of layers  [ edit ]

#### Convolutional layer  [ edit ]

Unlike a hand-coded convolution kernel (Sobel, Prewitt, Roberts), in a convolutional neural net, the parameters of each convolution kernel are trained by the backpropagation algorithm. There are many convolution kernels in each layer, and each kernel is replicated over the entire image with the same parameters. The function of the convolution operators is to extract different features of the input. The capacity of a neural net varies, depending on the number of layers. The first convolution layers will obtain the low-level features, like edges, lines and corners. The more layers the network has, the higher-level features it will get.

#### ReLU layer  [ edit ]

ReLU is the abbreviation of Rectified Linear Units. This is a layer of neurons that use the non-saturating activation function $f(x) = max(0, x)$. It increases the nonlinear properties of the decision function and of the overall network without affecting the receptive fields of the convolution layer.

Other functions are used to increase nonlinearity. For example the saturating hyperbolic tangent $f(x) = tanh(x)$, $f(x) = |tanh(x)|$, and the sigmoid function $f(x) = (1 + e^{-x})^{-1}$. Compared to tanh units, the advantage of

**ER253**

Figure 7



Figure 8

