No. 24-1963

---

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

---

**OPEN ARTIFICIAL INTELLIGENCE, INC. and GUY RAVINE**

*Defendants and Appellants,*

*v.*

**OPENAI, INC.**

*Plaintiff and Appellee.*

---

Appeal from United States District Court
Northern District of California
Hon. Yvonne Gonzalez Rogers
U.S. District Court Case No. 4:23-cv-03918-YGR

---

**APPELLANTS' EXCERPTS OF RECORD
VOLUME 3 of 10**

---

**WAYMAKER LLP**
Ryan G. Baker
rbaker@waymakerlaw.com
Scott M. Malzahn
smalzahn@waymakerlaw.com
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800

*Attorneys for Defendants and Appellants Open Artificial Intelligence, Inc.
and Guy Ravine*

Ryan G. Baker (Bar No. 214036)
  rbaker@waymakerlaw.com
Scott M. Malzahn (Bar No. 229204)
  smalzahn@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone:    (424) 652-7800
Facsimile:    (424) 652-7850

*Attorneys for Defendants Guy Ravine & Open
Artificial Intelligence, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPENAI, INC., a Delaware corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>OPEN ARTIFICIAL INTELLIGENCE, INC.,<br>a Delaware corporation; and GUY RAVINE,<br>an individual,<br><br>                    Defendants. | Case No. 3:23-cv-3918-YGR<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' MOTION TO ALTER OR AMEND A JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e), OR IN THE ALTERNATIVE, FOR RELIEF FROM A JUDGMENT OR ORDER PURSUANT TO FED. R. CIV. P. 60(b)**<br><br>Hearing Date: May 7, 2024<br>Time: 2:00 p.m.<br>Location: Courtroom 1 |

TO THE COURT, ALL PARTIES AND TO THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that pursuant to Federal Rules of Evidence 201, on May 7, 2024 at 2:00 p.m., or as soon thereafter as may be heard in Courtroom 1, 4th Floor of the Oakland Courthouse, 1301 Clay Street, Oakland, CA 94612, Defendants Open Artificial Intelligence, Inc. and Guy Ravine (together, "Open Artificial Intelligence" or "Defendants") respectfully request that the Court take judicial notice ("RJN") of the document identified below in support of Defendants' concurrently filed Motion to Alter or Amend the Judgment Pursuant to Fed. R. Civ. P. 59(e), or in the Alternative, For Relief From a Judgment or Order Pursuant to Fed. R. Civ. P. 60(b) ("Motion").

## I.    INTRODUCTION

Pursuant to Federal Rules of Evidence 201, Defendants request that this Court take judicial notice of the February 9, 2024 "Final Office Action" issued by the United States Patent and Trademark Office ("USPTO") and ruling on OpenAI L.P.'s CHATGPT trademark application, Serial Number: 97733261, Filing Date: December 27, 2022 (the "CHATGPT Application"). The USPTO refused registration for the CHATGPT Application on the grounds that the mark is "merely descriptive." A true and correct copy of February 9, 2024 "Final Office Action" retrieved from the USPTO's website is attached as Exhibit A to the March 27, 2024 Declaration of Jose R. Nuño ("Nuño Decl."), and also attached hereto as **Exhibit A**.

## II.    THE USPTO'S "FINAL OFFICE ACTION" IS JUDICIALLY NOTICEABLE

Pursuant to Federal Rule of Evidence 201(b), the court may take judicial notice of facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. *Johnson v. Tilton*, 2010 WL 3782446, *3 (C.D. Cal. July 22, 2010). Courts are required to take judicial notice "'if a party requests it and the court is supplied with the necessary information.'" *Threshold Enterprises Ltd. v. Pressed Juicery, Inc.,* 445 F. Supp. 3d 139, 145 (N.D. Cal. 2020) (citing Fed. R. Evid. 201(c)(2).) Moreover, "[m]aterials in the online files of the USPTO and other matters of public record are proper subjects of judicial notice." *Id.*; *see also, Wag Hotels, Inc. v. Wag Labs, Inc.*, 2023 WL 3605977 at *4 (N.D. Cal. May 22, 2023) (taking judicial notice of *inter alia*, "a copy of a Final Office Action" on a USPTO trademark application).

1   Further, it is well established that the Court may take judicial notice of government documents and

2   information "available from reliable sources on the Internet, such as websites run by governmental

3   agencies." *U.S., ex rel. Modglin v. DJO Glob. Inc.*, 114 F. Supp. 3d 993, 1008 (C.D. Cal. 2015).

4          Here, Defendants request that the Court take judicial notice of the USPTO's February 9,

5   2024 "Final Office Action" that was retrieved directly from the USPTO website. (*See* Nuño Decl.

6   ¶ 2.) Not only is this a document a matter of public record available to the public, it was retrieved

7   from the USPTO, a government agency, such that the document and the facts therein "can be

8   accurately and readily determined sources from whose accuracy cannot reasonably be questioned."

9   *See* Fed R. Evid. 201(b)(2). Moreover, courts have explicitly held such documents are judicially

10  noticeable. *See Threshold Enterprises ,*445 F. Supp. 3d at 145; *Wag Hotels, Inc*., 2023 WL

11  3605977 at *4.  Exhibit A is therefore a proper subject of judicial notice.

**III.    CONCLUSION**

13         For the foregoing reasons, Defendants respectfully requests that, in ruling on its Motion,

14  the Court take judicial notice and consider the document attached hereto as Exhibit A.

15

16  DATED:  March 27, 2024                    WAYMAKER LLP

17

18                                           By:       s/ *Ryan G. Baker*
                                                  _____
19                                                RYAN G. BAKER
                                                  *Attorneys for Defendants Guy Ravine & Open*
20                                                *Artificial Intelligence, Inc.*

21

22

23

24

25

26

27

28

# EXHIBIT A

| To: | Steven M. Espenshade(tmcentral@pirkeybarber.com) |
|---|---|
| Subject: | U.S. Trademark Application Serial No. 97733261 - CHATGPT - OPAI015US |
| Sent: | February 09, 2024 09:38:28 AM EST |
| Sent As: | tmng.notices@uspto.gov |

**Attachments**

screencapture-cognitiv-ai-contextgpt-17043776437431
screencapture-www-digitalinnov-com-blog-search-engine-vs-artificial-intelligence-gpt-17043777223791
screencapture-appyhigh-com-products-mageai-gpt-17043779265521
screencapture-www-pcmag-com-encyclopedia-term-chat-17055926387691
screencapture-www-techopedia-com-definition-387-chat-17055926817031
screencapture-h2o-ai-wiki-gpt-17043767469591
screencapture-www-newsweek-com-harnessing-power-gpt-ai-transforming-future-business-1805363-17043768419051
screencapture-nostalab-com-gpt-17043774458931
screencapture-gptdefinity-com-17043775608971
screencapture-aws-amazon-com-what-is-gpt-17055925690701
screencapture-www-computerweekly-com-news-366548152-Nutanix-GPT-in-a-Box-aims-hyper-converged-at-AI-ML-use-cases-17055929541301
screencapture-hoongpt-com-chatbot-17055929798411
screencapture-www-newsfilecorp-com-release-156849-Nexalogy-Launches-Analytics-GPT-Beta-Program-for-SMEs-17055930012071
screencapture-devm-io-live-events-personalize-gpt-with-your-data-17074865712051
screencapture-www-connectionmodel-com-blog-what-chatbot-marketing-is-and-how-to-use-it-in-digital-marketing-17074868104481
screencapture-www-goldeneye-app-docs-software-development-gpt-development-17074877917681

### United States Patent and Trademark Office (USPTO)
#### Office Action (Official Letter) About Applicant's Trademark Application

**U.S. Application Serial No.** 97733261

**Mark:** CHATGPT

**Correspondence Address:**
Steven M. Espenshade
PIRKEY BARBER PLLC
1801 EAST 6TH STREET
SUITE 300
AUSTIN TX 78702
UNITED STATES

**Applicant:** OPENAI OPCO, LLC

**Reference/Docket No.** OPAI015US

**Correspondence Email Address:** tmcentral@pirkeybarber.com

# FINAL OFFICE ACTION

**Response deadline.** File a request for reconsideration of this final Office action and/or a timely appeal to the Trademark Trial and Appeal Board (TTAB) within three months of the "Issue date" below to avoid abandonment of the application. Review the Office action and respond using one of the links below to the appropriate electronic forms in the "How to respond" section below.

**Request an extension.** For a fee, applicant may request one three-month extension of the response deadline prior to filing a response and/or an appeal. The request must be filed within three months of the "Issue date" below. If the extension request is granted, the USPTO must receive applicant's response and/or appeal within six months of the "Issue date" to avoid abandonment of the application.

**Issue date:** February 9, 2024

## INTRODUCTION

This Office action is in response to applicant's communication filed on 1/06/2024.

In a previous Office action dated 05/25/2023, the trademark examining attorney refused registration of the applied-for mark based on the following: Trademark Act Section 2(e)(1)—Merely Descriptive.

The trademark examining attorney maintains and now makes FINAL the refusal in the summary of issues below. *See* 37 C.F.R. §2.63(b); TMEP §714.04.

## SUMMARY OF ISSUES MADE FINAL:

- Section 2(e)(1) Refusal—Merely Descriptive
- Advisory: Section 2(f) Claim of Acquired Distinctiveness

## SECTION 2(e)(1) REFUSAL—MERELY DESCRIPTIVE

The refusal under Trademark Act Section 2(e)(1) is now made FINAL for the reasons set forth below. *See* 15 U.S.C. §1052(e)(1); 37 C.F.R. §2.63(b).

Registration is refused because the applied-for mark merely describes a feature, function, or characteristic of applicant's goods and services. Trademark Act Section 2(e)(1), 15 U.S.C. §1052(e)(1); *see* TMEP §§1209.01(b), 1209.03 *et seq.*

A mark is merely descriptive if "it immediately conveys information concerning a feature, quality, or characteristic of [an applicant's] goods or services." *In re N.C. Lottery*, 866 F.3d 1363, 1367, 123 USPQ2d 1707, 1709 (Fed. Cir. 2017) (citing *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 963, 82 USPQ2d 1828, 1831 (Fed. Cir. 2007)); TMEP §1209.01(b); *see DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*, 695 F.3d 1247, 1251, 103 USPQ2d 1753, 1755 (Fed. Cir. 2012) (quoting *In re*

*Abcor Dev. Corp.*, 588 F.2d 811, 814, 200 USPQ 215, 218 (C.C.P.A. 1978)).

Determining the descriptiveness of a mark is done in relation to an applicant's goods and/or services, the context in which the mark is being used, and the possible significance the mark would have to the average purchaser because of the manner of its use or intended use. *See In re The Chamber of Commerce of the U.S.*, 675 F.3d 1297, 1300, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012) (citing *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 963-64, 82 USPQ2d 1828, 1831 (Fed. Cir. 2007)); TMEP §1209.01(b). Descriptiveness of a mark is not considered in the abstract. *In re Bayer Aktiengesellschaft*, 488 F.3d at 963-64, 82 USPQ2d at 1831.

A mark does not need to be merely descriptive of all the goods or services specified in an application. *In re Chamber of Commerce of the U.S.*, 675 F.3d 1297, 1300, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012); *In re Zuma Array Ltd.*, 2022 USPQ2d 736, at *5-6 (TTAB 2022). "A descriptiveness refusal is proper 'if the mark is descriptive of any of the [goods or] services for which registration is sought.'" *In re Chamber of Commerce of the U.S.*, 675 F.3d at 1300, 102 USPQ2d at 1219 (quoting *In re Stereotaxis Inc.*, 429 F.3d 1039, 1040, 77 USPQ2d 1087, 1089 (Fed. Cir. 2005)).

Generally, if the individual components of a mark retain their descriptive meaning in relation to the goods and/or services, the combination results in a composite mark that is itself descriptive and not registrable. *In re Zuma Array Ltd.*, 2022 USPQ2d 736, at *7 (TTAB 2022); *In re Fat Boys Water Sports LLC*, 118 USPQ2d 1511, 1516 (TTAB 2016); TMEP §1209.03(d); *In re Petroglyph Games, Inc.*, 91 USPQ2d 1332, 1341 (TTAB 2009) (holding BATTLECAM merely descriptive of computer game software with a feature that involve battles and provides the player with the option to utilize various views of the battlefield); *In re Cox Enters.*, 82 USPQ2d 1040, 1043 (TTAB 2007) (holding THEATL merely descriptive of publications featuring news and information about Atlanta where THEATL was the equivalent of the nickname THE ATL for the city of Atlanta); *In re Tower Tech, Inc.*, 64 USPQ2d 1314, 1317-18 (TTAB 2002) (holding SMARTTOWER merely descriptive of highly automated cooling towers); *In re Sun Microsystems, Inc.*, 59 USPQ2d 1084, 1085 (TTAB 2001) (holding AGENTBEANS merely descriptive of computer software for use in developing and deploying application programs on a global computer network).

Only where the combination of descriptive terms creates a unitary mark with a unique, incongruous, or otherwise nondescriptive meaning in relation to the goods and/or services is the combined mark registrable. *See In re Omniome, Inc.*, 2020 USPQ2d 3222, at *4 (TTAB 2019) (citing *In re Colonial Stores, Inc.*, 394 F.2d 549, 551, 157 USPQ 382, 384 (C.C.P.A. 1968); *In re Shutts*, 217 USPQ 363, 364-65 (TTAB 1983)); *In re Positec Grp. Ltd.*, 108 USPQ2d 1161, 1162-63 (TTAB 2013).

In this case, both the individual components and the composite result are descriptive of applicant's goods and/or services and do not create a unique, incongruous, or nondescriptive meaning in relation to the goods and/or services. The applied-for mark is CHATGPT, used in connection with "downloadable computer programs and downloadable computer software for the artificial production of human speech and text; downloadable computer programs and downloadable computer software for natural language processing, generation, understanding and analysis; downloadable computer programs and downloadable computer software for machine-learning based language and speech processing software; downloadable computer chatbot software for simulating conversations; downloadable computer programs and downloadable computer software for creating and generating text" in International Class 09 and "providing online non-downloadable software for the artificial production of human speech and text; providing online non-downloadable software for natural language processing, generation, understanding and analysis; providing online non-downloadable software for machine-learning based

language and speech processing software; providing online non-downloadable chatbot software for simulating conversations; providing online non-downloadable software for creating and generating text; research and development services in the field of artificial intelligence; research, design and development of computer programs and software" in International Class 42.

The previously attached Internet evidence shows that "CHAT" means "a synchronous exchange of remarks over a computer network." Further, the evidence of record also establishes that "GPT" is a widely used acronym that means "generative pre-trained transformers," which are neural network models that "give applications the ability to create human-like text and content (images, music, and more), and answer questions in a conversational manner." See the previously and presently attached definition and industry definitions from Acronymfinder.com, Aws.amazon.com, H2O.AI, Newsweek, and NostaLab.

Additionally, the evidence of record shows that both the wording "CHAT" and "GPT" are used descriptively in applicant's software industry to refer to a particular type of software where users may ask questions and an AI model then answers those questions based on data that has been inputted into the model. Some excerpts showing both use and description of "CHAT" and "GPT" in applicant's industry are below:

- "The advent of **GPT** models has revolutionized the concept of "**chat** using your own data", making it a popular use case. The premise is simple: link this potent language model to your data, thereby crafting a unique, personalized version of **GPT**." https://devm.io/live-events/personalize-gpt-with-your-data/

- "**Chat** ai **gpt** is a digital marketing strategy that helps to automate customer communication and will answer customer questions, up to a certain point, before the customer or user is directed to a real person for assistance." https://www.connectionmodel.com/blog/what-chatbot-marketing-is-and-how-to-use-it-in-digital-marketing

- "Integrating **GPT**-powered **chat**bots into businesses can automate repetitive tasks, improve efficiency, and streamline workflows. We develop intelligent **chat**bots that can handle a wide range of customer inquiries, automate lead generation and qualification, and provide personalized recommendations. These **chat**bots are trained on domain-specific data to ensure accurate and relevant responses. Our **chat**bots leverage machine learning and natural language processing techniques to understand user intents, extract key information, and provide contextually appropriate responses. They can handle complex conversations, ask clarifying questions, and guide users through various processes." https://www.goldeneye.app/docs/software-development/gpt-development

- "Generative Pre-trained Transformers, commonly known as **GPT**, are a family of neural network models that uses the transformer architecture and is a key advancement in artificial intelligence (AI) powering generative AI applications such as ChatGPT. **GPT** models give applications the ability to create human-like text and content (images, music, and more), and answer questions in a conversational manner. Organizations across industries are using **GPT** models and generative AI for Q&A bots, text summarization, content generation, and search." https://aws.amazon.com/what-is/gpt/

- "**GPT**, short for Generative Pre-Trained Transformers, is an advanced open-source language model that utilizes transformer architectures to generate human-like text. It is trained on vast

amounts of unlabeled text data from the internet, enabling it to understand and generate coherent and contextually relevant text." https://h2o.ai/wiki/gpt/#:~:text=GPT%2C%20short%20for%20Generative%20Pre,coherent%20and%20co

- "**GPT** is a machine learning model pre-trained on vast amounts of data. It can understand the context and generate natural-sounding language, making it an ideal tool for tasks such as **chat**bots, virtual assistants, and content generation. The model is trained on massive amounts of data, allowing it to understand the nuances of human language and produce contextually appropriate responses. Additionally, **GPT** models can be fine-tuned on specific datasets, allowing customization and adaptation to different domains." https://www.newsweek.com/harnessing-power-gpt-ai-transforming-future-business-1805363

- "As AI technology advances, the development of **GPT** (Generative Pretrained Transformer) models has become increasingly popular. In this article, we will take you through the process of building your own **GPT** project, from planning to deployment." https://www.ideamotive.co/gpt-software

- "We have been using a **GPT** model to explain our insights to operators as a part of BMC HelixGPT, and we have now started to decorate our root-cause insights with ticket resolution-based prescriptions. We constrain our **GPT** with a domain and tenant-specific model that continuously learns resolutions from subject matter experts (SMEs) in the organization—hence the phrase "expert of (your) systems"—and prompt our **GPT** with root-cause analysis we conduct using observational data in prior steps in our AI architecture." https://www.bmc.com/blogs/bmc-helixgpt-expert-of-your-systems/

The applicant's identification shows that it is using the mark in connection with software goods and services using artificial intelligence, machine learning, and natural language processing and generation which feature a synchronous exchange of remarks over a computer network. Accordingly, consumer encountering the mark "CHATGPT" would immediately understand this to communicate a feature of the applicant's software goods and services which feature neural network models that "give applications the ability to create human-like text and content (images, music, and more), and answer questions in a conversational manner" in a synchronous exchange of remarks over a computer network.

_Applicant's Arguments_

Applicant's sole argument against the refusal is that the mark is not merely descriptive without any additional support or evidence. However, in the present case, the evidence of record leaves no doubt that the mark is merely descriptive.

Additionally, two major reasons for not protecting descriptive marks are (1) to prevent the owner of a descriptive mark from inhibiting competition in the marketplace and (2) to avoid the possibility of costly infringement suits brought by the trademark or service mark owner. _In re Abcor Dev. Corp._, 588 F.2d 811, 813, 200 USPQ 215, 217 (C.C.P.A. 1978); TMEP §1209. Businesses and competitors should be free to use descriptive language when describing their own goods and/or services to the public in advertising and marketing materials. _See In re Styleclick.com Inc._, 58 USPQ2d 1523, 1527 (TTAB 2001).

Considering the above, the refusal to register the applied-for mark under Trademark Act Section 2(e)(1)

is hereby made FINAL.

Applicant should note the advisory below.

## ADVISORY: SECTION 2(f) CLAIM OF ACQUIRED DISTINCTIVENESS

In response to the refusal, applicant may assert a claim that the applied-for mark has acquired distinctiveness under Trademark Act Section 2(f). Applicant may respond by (1) requesting to amend the application to assert a claim of acquired distinctiveness under Section 2(f) and (2) providing sufficient evidence to support this claim (such as verified statements of long term use, advertising and sales expenditures, examples of typical advertisements, affidavits and declarations of consumers, customer surveys). *See* 15 U.S.C. §1052(f); 37 C.F.R. §2.41; TMEP §§1212.06 *et seq*. This evidence must demonstrate that the relevant public understands the primary significance of the mark as identifying the *source* of applicant's product or service rather than identifying the product or service itself. *In re Steelbuilding.com*, 415 F.3d 1293, 1297, 75 USPQ2d 1420, 1422 (Fed. Cir. 2005).

When determining whether the evidence shows the mark has acquired distinctiveness, the trademark examining attorney will consider the following six factors: (1) association of the mark with a particular source by actual purchasers (typically measured by customer surveys linking the name to the source); (2) length, degree, and exclusivity of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage. *See Converse, Inc. v. ITC*, 909 F.3d 1110, 1120, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018) ("the *Converse* factors"). "[N]o single factor is determinative." *In re Steelbuilding.com*, 415 F.3d at 1300, 75 USPQ2d at 1424; *see* TMEP §§1212.06 *et seq*. Rather, all factors are weighed together in light of all the circumstances to determine whether the mark has acquired distinctiveness. *In re Steelbuilding.com*, 415 F.3d at 1300, 75 USPQ2d at 1424.

## RESPONSE GUIDELINES

**How to respond.** File a **request form for reconsideration of this final Office action** that fully resolves all outstanding requirements and/or refusals and/or file a timely **appeal form to the Trademark Trial and Appeal Board** with the required fee(s). Alternatively, applicant may file a **request form for an extension of time to file a response** for a fee.

> /Kelly Burke/
> Kelly Burke
> Examining Attorney
> LO128--LAW OFFICE 128
> (571) 272-6205
> Kelly.Burke@uspto.gov

## RESPONSE GUIDANCE

- **Missing the deadline for responding to this letter will cause the application to abandon.** A response, appeal, or extension request must be received by the USPTO on or before 11:59 p.m. **Eastern Time** of the last day of the response deadline. Trademark Electronic Application System (TEAS) and Electronic System for Trademark Trials and Appeals (ESTTA) system availability could affect an applicant's ability to timely respond. For help resolving technical issues with TEAS, email TEAS@uspto.gov.

- **Responses signed by an unauthorized party** are not accepted and can **cause the application to abandon.** If applicant does not have an attorney, the response must be signed by the individual applicant, all joint applicants, or someone with legal authority to bind a juristic applicant. If applicant has an attorney, the response must be signed by the attorney.

- If needed, **find contact information for the supervisor** of the office or unit listed in the signature block.

https://cognitiv.ai/contextgpt/                                                                                          at 09:14:10, 01/04/2024



CΦGNITIV.

Solutions    Products    Resources    Company    Contact    Newsletter

AI FOR THE MOMENT

## GPT

LEARN MORE →



Our **GPT**-powered contextual platform allows users to build custom prompts unique to their brand, adjust relevancy and scale of results to improve outcomes, and activate as a PMP in the DSP of their choice.

ADVANCED PRODUCT FEATURES

## Custom Prompts, Inclusivity & Diversity

New and innovative solutions for

✓ **BRAND ALIGNMENT**
Ensure your messaging appears on content that aligns with your brand values.

✓ **SCALABILITY & SAFETY**
Avoid limitations or inaccuracies of segments



© 2024 Cognilix. All rights reserved.          Privacy Policy

Home > Blogs > Search Engine VS Artificial Intelligence (GPT)

## Search Engine VS Artificial Intelligence (GPT)

Jun 6 · 3 min read                                         Share:



Search Engine VS Artificial Intelligence (GPT), what are the advantages and drawbacks of each other?

## Search Engine VS Artificial Intelligence

Purpose and functionality is the main difference between GPT and search engines. While search engines are primarily focused on finding and presenting information to users, GPT is focused on generating text based on a given prompt. Search engines use a range of algorithms and signals to analyze web pages, while GPT uses deep learning techniques to generate text that mimics human language.

## Definitions

### Search Engine

Search engines are designed to help users find relevant information on the internet. Search engines are like your trusty GPS that guides you through the winding roads of the internet. They use algorithms and ranking systems to crawl and index web pages, analyze their content, and then present the most relevant results to the user's query. Just like how your GPS uses maps and satellite signals to find your way, search engines use algorithms and ranking systems to navigate the web and present you with the most relevant results. Search engines are particularly good at understanding the intent behind a user's query and delivering results that match that intent.They're like the Sherlock Holmes of the internet, sniffing out clues and understanding the intent behind your search queries.

Let's just call search engine the relevant clues factory using world wide web pages as raw materials.

### Artificial Intelligence : GPT (Generative Pre-trained Transformer)

GPT, on the other hand, is a type of AI language model that can generate text in response to a given prompt. It is trained on a large corpus of text and can generate coherent and natural-sounding sentences. GPT can be compared to a book writer who has reviewed a lot of books before writing his or her own. With the contents of the books the writer read, he or she gives an interpretation of those producing new ideas and insights. GPT can be used for various applications such as chatbots, language translation, and content generation.

Let's just call GPT the genius chef that has a vast pantry of ingredients. This chef selects and combines ingredients in clever ways for the users to use. The problem is this chef depends a lot on what's on his pantry unless otherwise restocked with new items.

1. **Understanding User Intent**

- **Search engines** are designed to understand the intent behind a user's search query and deliver the most relevant results. For example, if a user searches for "best restaurants in New York," a search engine will deliver results that match the user's intent.
- **Artificial Intelligence (GPT)**, on the other hand, may generate content related to restaurants in New York, but it may not understand the user's specific intent.

2. **Identifying Spam**

- **Search engines** are equipped with algorithms that can identify and filter out spammy websites, ensuring that users are presented with trustworthy and relevant results.
- **Artificial Intelligence (GPT)**, on the other hand, may generate content from any source, including spammy or low-quality sites.

3. **Interpreting Images and Videos**

- **Search engines** can analyze and interpret images and videos to determine their relevance to a search query. For example, if a user searches for "cute puppies," a search engine can deliver images and videos of puppies that match the user's intent.
- **Artificial Intelligence (GPT)**, on the other hand, may not have the capability to interpret images and videos.

4. **Providing Structured Data**

- **Search engines** use structured data to provide rich snippets, knowledge graphs, and other features that enhance the user experience. Structured data helps search engines understand the content on a website and present it in a more meaningful way.

- **Artificial Intelligence (GPT)** may generate high-quality content, but it may not have the capability to provide structured data.

5. **Crawling and Indexing Websites**

- **Search engines** crawl and index websites to build their database of information. This allows them to deliver relevant results

quickly and efficiently.

- **Artificial Intelligence** (GPT), on the other hand, may not have the capability to crawl and index websites.

## Conclusion

In conclusion, while AI, specifically GPT, has advanced capabilities, search engines still have a unique set of skills that make them valuable tools for users and businesses alike. Search engines can interpret user intent, identify spam, interpret images and videos, provide structured data, and crawl and index websites, all of which are critical to providing relevant and trustworthy search results. Combining search engines and artificial intelligence in the future will be a big thing so let's watch out for these updates! Here at DigitalInnov we always check the newest tech trends to stay relevant. Check out our services to learn more!

Share:  

## Let's dig

Here's what we've been doing to transform our digital crew.









Unleash AI SEO Mastery—Seize Top Ranks Now!

Professional Web Development: Ignite Your Online Presence

Search Engine VS Artificial Intelligence (GPT)

DIGITALINNOV

Services    About    Blog    FAQS    Contact

© 2022 DigitalInnov. All rights reserved. | Privacy Policy

https://appyhigh.com/products/mageai-gpt?sku_id=38696648                                                                          at 09:19:02, 01/04/2024









## Save Big with AppyHigh Prime

| | AppyHigh Prime | Individual Buy |
|---|---|---|
| Yearly price | $299  $400 (Cost of 13 apps in Bundle) | $50 |
| Savings | 25% | 0% |
| | Get AppyHigh Prime @ $299/year | Buy this App |



## Ratings & Reviews

★★★★★

MageAI GPT is an amazing writing tool! Its advanced NLP algorithms helped me generate new ideas and improve my writing skills. It's a must-have for professionals.

**Maria**

★★★★★

I love MageAI GPT! It's a great tool for students who need quick answers to their homework questions. It saved me so much time and effort!

**Ethan**

★★★★★

MageAI GPT is a lifesaver! As a non-native English speaker, it has helped me improve my language skills and write better emails for my job. Highly recommend it!

**Samantha**

## How app works

1. **Sign up for Appyhigh Prime.**

2. **Get exclusive coupons in your email for each app to activate PRO membership**

3. **Download MageAI GPT from Play Store or App Store**

4. **Go to the PRO tab in the app and select the yearly plan**

5. **Use the exclusive coupon on the Payment screen to activate PRO.**

6. **Enjoy unrestricted access**

**Get AppyHigh Prime**

---

**Enjoy a premium digital experience with Appyhigh Prime**







# FAQs

| How do I use MageAI GPT? | ⌄ |
|---|---|

| How accurate are the responses MageAI GPT generates? | ⌄ |
|---|---|

| Can MageAI GPT understand and respond to any type of question or prompt? | ⌄ |
|---|---|

| Are there any limitations to the length of the input or response? | ⌄ |
|---|---|

| Can MageAI GPT provide medical, legal, or professional advice? | ⌄ |
|---|---|

| How does MageAI GPT handle sensitive or personal information provided in the input? | ⌄ |
|---|---|

| Is MageAI GPT capable of providing real-time or live chat responses? | ⌄ |
|---|---|

How does Talk GPT work?



**PC**

#BestBrandsoftheYear   #GetOrganizedin2024   Best Products   Reviews   How-To   News   Deals   Newsletters

Search

Home › Encyclopedia › C

# chat

Search PCMag Encyclopedia

BROWSE ENCYCLOPEDIA

A   B   C   D   E   F   G   H   I   J   K   L   M   N   O   P   Q   R   S   T   U   V   W   X   Y   Z   0-9

A text communication via keyboard in real time between two or more users on a local network (LAN) or over the Internet. Although the original use of the term was only for text, "chat" became popular for every two-way communication. Audio and voice evolved into "audio chat" and "voice chat." Videoconferencing and video calling became "video chat."

### Live Chat for Support

Live text chat is a common website support system, allowing someone to be assisted by a company representative, who typically handles more than one site visitor at a time. Live chat is also called "live help" and "live support."

### Chat, Texting and Instant Messaging

All three terms are used synonymously. Texting (SMS) is built into every cellphone and usage only requires the recipient's phone number. All other chat services use a computer or phone app. Some require establishing an account and creating a contact list (see text messaging and instant messaging).

### Chatting Was Always Verbal

Before text chat became popular, "chatting on any phone" meant talking. See chat room, video chat and IRC.

ADVERTISEMENT



Chat and IRC.



**A Website Live Chat**

A live chat on a website is very helpful for potential customers such as this example on Cisco.com. Although the young woman's headset might imply a voice call, this "Chat Live" session is text only.

ADVERTISEMENT





then look no further than Lenovo. Get extra discounts on laptops, PCs, accessories, and more! Earn 3% back with My Lenovo Rewards. Plus, free shipping.

Shop Now at Lenovo.com →

Windows 11  Make the everyday easier with Windows 11.

### TRENDING



**eBay Fined $3M After Ex-Employees Harassed Couple With Disturbing Tactics**

BY MICHAEL KAN

**Steam Deck OLED Beats Legion Go on Repairability—Just Barely**

BY EMILY PRICE

**Get a Refurbished HP Desktop With 512GB of Storage for $189.97**

BY STACKCOMMERCE TEAM

**YouTube Slowdowns Traced to Adblock Plus Bug**

BY EMILY PRICE

Ci
Bo
Re
BY

THIS DEFINITION IS FOR PERSONAL USE ONLY. All other reproduction requires permission.
Copyright © 1981- 2024. The Computer Language Co Inc. All rights reserved.

### PCMag Newsletters

Our Best Stories in Your Inbox →

### Follow PCMag

### HONEST, OBJECTIVE, LAB-TESTED REVIEWS

PCMag.com is a leading authority on technology, delivering lab-based, independent reviews of the latest products and services. Our expert industry analysis and practical solutions help you make





https://www.techopedia.com/definition/387/chat                                                                                    at 10:44:50, 01/18/2024

## Chat

Margaret Rouse
Technology Expert
Last updated: 30 June, 2020

### What Does Chat Mean?

Chat refers to the process of communicating, interacting and/or exchanging messages over the Internet. It involves two or more individuals that communicate through a chat-enabled service or software.

Chat is also known as chatting, online chat or Internet chat.

### Techopedia Explains Chat

Chat may be delivered through text, verbal, audio, visual or audio-visual (A/V) communication via the Internet. If conducted through a desktop, chat requires software that supports Internet Relay Chat (IRC) or an instant messenger application, where a central server manages chat communication between different end user clients.

There are also online chat services that require users to sign up with a valid email address. After signing up, a user may join a group chat room or send a private message to another individual. Online chat services have

Most Popular Term

INTERNET
**Google E-E-A-T**
What is Google E-E-A-T? E-E-A-T is a set of principles that Google Quality Raters use to evaluate the quality of...

Full Explanation

MARGARET ROUSE · Technology Expert

TECH 101
**TikTok**
What is TikTok? TikTok is a social

purpose-built chat interfaces that manage the entire communication processes.

## What Does Chat Mean?

Chat refers to the process of communicating, interacting and/or exchanging messages over the Internet. It involves two or more individuals that communicate through a chat-enabled service or software.

Advertisements



Chat is also known as chatting, online chat or Internet chat.

## Techopedia Explains Chat

Chat may be delivered through text, verbal, audio, visual or audio-visual (A/V) communication via the Internet. If conducted through a desktop, chat requires software that supports Internet Relay Chat (IRC) or an instant messenger application, where a central server manages chat communication between different end user clients.

There are also online chat services that require users to sign up with a valid email address. After signing up, a user may join a group chat room or send a private message to another individual. Online chat services have purpose-built chat interfaces that manage the entire communication processes.

Advertisements



## Related Terms

| | |
|---|---|
| Internet Relay Chat | Chat Room |
| Chat Slang | Internet Relay Chat Bot |

Most Popular Term

**INTERNET**
**Google E-E-A-T**

What is Google E-E-A-T? E-E-A-T is a set of principles that Google Quality Raters use to evaluate the quality of...

Full Explanation

MARGARET ROUSE - Technology Expert

Advertisements



**TECH 101**
**TikTok**

What is TikTok? TikTok is a social media platform that allows users to create and share short-form videos. It has...

Full Explanation

MARIA WEBB - Technology journalist

**TECH 101**
**Chrome Browser Extension**

What is a Chrome Browser Extension? A Chrome browser extension, designed for the Google Chrome web browser, is an add-on...

Full Explanation

TIM KEARY - Technology Specialist



| Telepresence | Video Conferencing |
| Instant Message | FaceTime |
| ChatOps | |

## Related Reading

Web Roundup: Awesome Angles on IoT

Cloud Evolution: How We See and Use the Cloud Has Changed

Virtual Private Network: The Branch Office Solution

Remember IRC? It's Still Around – And It's Still Worth Using

Social Chatter: Should Your Company Be Listening?

---

**TechDictionary**

🔍 Search a tech term...

# A B C D E F G H I J K L M N O P Q
R S T U V W X Y Z

## About Techopedia's Editorial Process

Techopedia's editorial policy is centered on delivering thoroughly researched, accurate, and unbiased content. We uphold strict sourcing standards, and each page undergoes diligent review by our team of top technology experts and seasoned editors. This process ensures the integrity, relevance, and value of our content for our readers.

TAGS

INTERNET



**Margaret Rouse**

Margaret Rouse is an award-winning technical writer and teacher known for her ability to explain complex technical subjects to a non-technical, business audience. Over the past twenty years her explanations have appeared on TechTarget websites and she's been



Advertisement

REALIZE YOUR VISION



cited as an authority in articles by the New York Times, Time Magazine, USA Today, ZDNet, PC Magazine and Discovery Magazine.Margaret's idea of a fun day is helping IT and business professionals learn to speak each other's highly specialized languages. If you have a suggestion for a new definition or how to improve a technical explanation, please email Margaret or contact her....

All Posts by Margaret Rouse →

## Related News



FEATURED CONTENT

**The Gold Price has Been Declining Since January 1st – Where Does the Dip Stop?**

ALAN DRAPER · 4 years



CAREER PATHS

**How Much Do Software Engineers Make in 2024? Salaries Revealed**

NEIL C. HUGHES · 4 years



ARTIFICIAL INTELLIGENCE

**The Cloud Goes Wild on AI as User Adoption Soars Past 70%**

TIM KEARY · 4 years · Technology Specialist



FEATURED CONTENT

**This Crypto Casino Is Set To Become The Biggest Craze of 2024, Learn Why $CORP is Receiving Massive Investment**

VIRAJ RANDEV · 4 years · Editor



ARTIFICIAL INTELLIGENCE

**Are There 'Sleeper Agents' Hidden Within the Core of AI Systems?**

FRANKLIN OKEKE · 4 years · Technology Journalist



CAREER PATHS

**How to Get a Job in Tech With a Non-Technical Major in 2024**

NEIL C. HUGHES · 4 years · Senior Tech Writer

## Popular Categories

Show All →

     

ER294



Antivirus     Artificial     Audio     CRM     Cryptocurrency     Gambling     Gaming     HR
              Intelligence

Investing     Laptops     Network     Password     Project     Spy     VoIP     VPN
                                      Managers    Management



**Get Techopedia's Daily Newsletter in your inbox every Weekday.**

Add your email                    Subscribe

☐ Trending News    ☐ Latest Guides    ☐ Reviews    ☐ Term of the Day

By signing up, you agree to our Terms of Use and acknowledge the data practices in our Privacy Policy. You may unsubscribe at any time.

**ER295**



https://h2o.ai/wiki/gpt/# ~ text=GPT%2C%20short%20for%20Generative%20Pre_coherent%20and%20contextually%20relevant%20text.
at 08.59.20, 01/04/2024



# GPT (Generative Pre-Trained Transformers)

## What is GPT (Generative Pre-Trained Transformers)?

GPT, short for Generative Pre-Trained Transformers, is an advanced open-source language model that utilizes transformer architectures to generate human-like text. It is trained on vast amounts of unlabeled text data from the internet, enabling it to understand and generate coherent and contextually relevant text. Unlike rule-based systems, GPT learns patterns and structures in text data to generate human-like responses.

## How GPT (Generative Pre-Trained Transformers) Works

GPT uses a transformer architecture, which is composed of a stack of self-attention layers. These layers allow the model to consider the context of each word in relation to other words in the input text, capturing dependencies and long-range relationships effectively. During training, GPT learns to predict the next word in a sentence given the preceding words, resulting in a model that can generate text by predicting the most likely subsequent words based on the provided input.

## Why GPT (Generative Pre-Trained Transformers) is Important

GPT has significant implications for businesses in the fields of machine learning and artificial intelligence. Some key reasons why GPT is important are:

- Language Generation: GPT enables businesses to generate high-quality human-like text, such as articles, product descriptions, chatbot responses, and more.
- Content Creation and Summarization: GPT can assist in generating content for various

Attention Mechanism

BERT

Binary Classification

Classify Token ([CLS])

Conversational Response
Generation

GLUE (General Language
Understanding Evaluation)

GPT (Generative Pre-Trained
Transformers)

Language Modeling

Layer Normalization

Mask Token ([MASK])

Probability Distribution

Probing Classifiers

SQuAD (Stanford Question
Answering Dataset)

Self-attention

Separate token ([SEP])

Sequence-to-sequence Language
Generation

Sequential Text Spans

Text Classification

Text Generation

Transformer Architecture

WordPiece

**Data**                                  ⌄

**Deep Learning**                         ⌄

**General**                               ⌄

**Machine Learning**                      ⌄

**Modeling**                              ⌄

**Predictions**                           ⌄

**Tools**                                 ⌄

applications, including writing articles, summarizing documents, and generating personalized emails.

- Language Translation and Understanding: GPT can aid in language translation tasks, helping businesses communicate effectively with a global audience. It also enhances language understanding capabilities for sentiment analysis, customer feedback analysis, and more.

- Chatbots and Virtual Assistants: GPT's natural language processing capabilities are valuable for building advanced chatbots and virtual assistants that can interact with users in a more conversational and human-like manner.

## The Most Important GPT (Generative Pre-Trained Transformers) Use Cases

GPT has found extensive use across various industries. Some prominent use cases include:

- Content Generation: GPT can automatically generate content for websites, blogs, social media, and other platforms, reducing the time and effort required for manual content creation.

- Customer Support: GPT-powered chatbots and virtual assistants can provide instant and accurate responses to customer queries, improving customer support efficiency and satisfaction.

- Personalization: GPT can analyze user preferences and generate personalized recommendations for products, services, and content, enhancing customer experiences.

- Data Augmentation: GPT can generate synthetic data to augment training datasets, enabling businesses to train ML models on larger and more diverse datasets, leading to improved model performance.

## Related Technologies or Terms

While GPT is a powerful language model in the field of natural language processing, it is closely related to other technologies and terms such as:

- BERT (Bidirectional Encoder Representations from Transformers): BERT is another popular language model that focuses on bidirectional contextual understanding. It complements GPT in various NLP tasks and applications.

- H2O.ai: H2O.ai is a leading open-source machine learning platform that provides scalable and efficient solutions for data science and AI. Users of H2O.ai can benefit from incorporating GPT into their workflows to enhance natural language processing capabilities.

- Transformer Models: GPT is based on transformer models, a class of neural networks that excel in sequence tasks by capturing long-range dependencies. Transformers have revolutionized many fields within AI and have become the backbone of various models, including GPT.

- Language Understanding and Generation: GPT's primary focus is on language understanding



https://www.newsweek.com/harnessing-power-gpt-ai-transforming-future-business-1695363

at 09:57:15, 01/04/2024

**Newsweek**   U.S.  World  Science  Health  Life  Rankings  Opinion  Culture  Fact Check  My Turn  Education  •••

SUBSCRIBE FOR $1   Login





DR_MICROBE/STOCK.ADOBE.COM

By Baruch Labunski, Founder, Rank Secure

💬 0        🔗        🎧

In today's rapidly evolving business landscape, companies are increasingly harnessing the power of GPT (Generative Pre-trained Transformer) and AI (Artificial Intelligence) technologies to revolutionize their operations and drive transformation. GPT, exemplified by models like GPT-3, is a cutting-edge language model that has taken the field of natural language processing to new heights. It can understand context, generate human-like text responses, and perform language-related tasks with astounding accuracy. AI encompasses a broader set of technologies and techniques that enable machines to simulate human intelligence, learn from data, and make intelligent decisions. Together, GPT and AI offer unprecedented opportunities for businesses to unlock new horizons and reimagine their approaches across various domains.

This article will explore the specific applications of GPT and AI in customer service, data analysis and insights, personalization and recommendation systems, and automation and process optimization. It will also delve into each area's benefits, challenges, and future prospects, shedding light on how GPT and AI are transforming the future of business across industries.

**Understanding GPT and AI**

GPT and AI are different but closely related technologies transforming the business's future. GPT is a machine learning model pre-trained on vast amounts of data. It can understand the context and generate


A new age of answers.

Trending



01  Has Jeffrey Epstein List Release Been Delayed? What We Know
187 comments

02  Gypsy Rose Blanchard Defends Husband From Online 'Haters'
8 comments

03  Ford Recalled 6 Million Cars in 2023
2 comments

04  Capitol Rioter Wants Supreme Court to Save Her From Mouse-Infested Jail
168 comments

05  Lululemon Founder Blasts Company's Push Towards Diversity
7 comments

To Homepage

THE DEBATE
Claudine Gay Betrayed the Values of My Black Elders to Exploit White Guilt
By Eli Steele 

content generation. The model is trained on massive amounts of data, allowing it to understand the nuances of human language and produce contextually appropriate responses. Additionally, GPT models can be fine-tuned on specific datasets, allowing customization and adaptation to different domains.



ADVERTISEMENT

Try Semrush
for free

⬡ SEMRUSH

On the other hand, AI involves broader technologies, including machine learning, deep learning, and neural networks. AI systems can be trained on vast amounts of data to learn patterns and make predictions, enabling businesses to automate repetitive tasks and gain insights into customer behavior. AI-powered chatbots and virtual assistants can handle customer inquiries and provide personalized recommendations, freeing human resources for more complex tasks.

ADVERTISING

**Applications of GPT and AI in Business**

NEWSLETTER
The Bulletin   Your daily briefing of everything you need to know   [Email address]   SIGN UP

vs

Hypocritical Right Wing Cancel
Culture Warriors Claim Their Next
Victim
By Jason Nichols

ADVERTISEMENT

ExoIris™
A new age
of answers.
DISCOVER

⟩⟨ EXO

OPINION

... of answers.
DISCOVER

Memo...
Chang...
Hands
By Adam...

Hypoc...
Cultur...
Victim
By Jaso...

Pro-Al...
Lives
By Lila R...

The integration of GPT and AI technologies has ushered in a new era of business possibilities. From enhancing customer service to revolutionizing data analysis, enabling personalized experiences, and streamlining business processes, GPT and AI are reshaping the future of business operations.

Below are some of the applications in detail:

ADVERTISEMENT



SCROLL TO CONTINUE READING

### • Customer Service and UX

GPT and AI technologies have revolutionized customer service, enabling businesses to provide efficient and personalized customer support. Chatbots, virtual assistants, and automated response systems provide personalized and interactive experiences with 24/7 support as well as provide effective customized marketing campaigns driven by AI algorithms. This allows for more cross-selling and upselling by analyzing behaviors, preferences, and demographic information.

### • Data Analysis and Insights



Sign up for Newsweek's daily headlines

GPT and AI technologies are revolutionizing data analysis and insights, empowering businesses to extract valuable information from vast data. AI algorithms, trained on extensive datasets, excel in data processing, pattern recognition, and predictive analytics. This gives businesses using this technology a competitive edge. Data-driven insights and predictive analytics help in decision-making and strategic planning. It allows companies to better exploit competitors' weaknesses in marketing and stay on top of trends.

### • Automation and Process Optimization

Efficiently managing business processes is essential for productivity and cost-effectiveness. GPT and AI



Why Normalizing Venezuela's Maduro
Is Dangerous
By Kristina Foltz

What's the End Game for Gaza?
Netanyahu Must Spell It Out
By Taylor Katz

How Taylor Swift Became the Loudest
Woman We've Ever Seen
By Veronica Ruecktt

Hamas Tortured Me for Dissent.
Here's What They Truly Think of
Palestinians
By Hamz

Higher
Effecti
By Rache

College
By Angel

What I
Larger
By Peter

Efficiently managing business processes is essential for productivity and cost-effectiveness. GPT and AI technologies can streamline operations and improve efficiency through automation and intelligent decision-making. Automated workflows powered by GPT and AI can eliminate manual interventions and automate repetitive tasks, potentially reducing errors and improving accuracy. The result is enhanced productivity and cost savings.

ADVERTISEMENT



SCROLL TO CONTINUE READING



Intelligent decision-making systems can optimize resource allocation, leading to more effective use of budgets and minimizing unnecessary expenses. Businesses can allocate their financial resources strategically and achieve better cost management.

**The Future of GPT and AI in Business**

The long-term future of this technology and how it will affect business is hard to imagine because of its infinite possibilities, both good and bad. What we should expect over the next few years is for GPT to unleash a new wave of creativity both in innovation and in marketing that innovation. It will likely create a competition divide between businesses that use it and those that don't. It could also create higher expectations for consumers as they begin to get improved customer experiences. That would force many who are reluctant to use this technology to jump on board to stay in the game.

As AI becomes more humanized, it will likely move into more personalized services such as the legal and medical fields. These are fields that are somewhat skeptical of AI because of the personal responsibility involved in dealing with clients this way, but some are testing it now. AI could feasibly speed up some legal cases, create new winnable courtroom arguments, and make the legal field much more competitive while eliminating some positions such as paralegals or administrative assistants. That could, in theory, cut some costs for clients and make legal advice more accessible to the public.

ADVERTISEMENT













The medical field is more intriguing because it could do online consultations and evaluations that typically are required before you see a doctor. There are currently things that a registered nurse would handle. As it advances, in theory, an AI or GPT program could do an entire physical remotely. That would change home health care and rural medicine dramatically.

*The Newsweek Expert Forum is an invitation-only network of influential leaders, experts, executives, and entrepreneurs who share their insights with our audience.* What's this?

Request Reprint & Licensing   |   Submit Correction   |   View Editorial Guidelines

**About the writer**

Baruch Labunski

To read how Newsweek uses AI as a newsroom tool, click here.

SPONSORED CONTENT                                                        mgid



Game Unveils Uncharted Territory: A World Without The US Military

Search For Your Old High School Yearbook, It's Free

How Legal In Arlington, Cheech & Chong "You Gotta Try Cruise Chews"

Common Signs Your Body Is Fighting Melanoma

Python Owner Slept With Snake Every Night Until This Happened

Arlington: These Unsold Storage Units May Now Be Almost Given Away!

ADVERTISING





Many

Is







## An Essential Business Tool

In the business world, GPT has proven useful in developing conversational chatbots, which can engage with customers and provide personalized support. GPT can also analyze consumer feedback to generate insights into consumer behavior, which businesses can use to improve their products and services. Additionally, GPT can aid in financial decision-making, such as predicting market trends and identifying potential investment opportunities.

## Driving Healthcare Engagement and Outcomes

GPT has significant potential in healthcare, as it can assist in diagnosing and treating illnesses, analyze medical images, and even predict the likelihood of certain conditions based on a patient's medical history. GPT can also help identify patient trends and patterns in medical data, leading to more effective personalized treatments. Moreover, GPT can aid in drug development by analyzing massive amounts of data and generating insights into potential treatments.

NOSTALAB

Home    About NostaLab    How we can help
Technology Quotient    GPT    Blockchain and Cryptocurrency
Innovation Cluster    Psychology Today    Medium
Connect With Us

**ER312**

© 2023 NOSTALAB. All Rights Reserved.



## BTC Definity Pro bot – powered by **GPT** Ai technologies

Disclaimer: BTC Definity bot is a crypto trading tool that provides day traders with AI-based trade predictions. It is important to recognize that all investments come with inherent risks, and we strongly advise against risking any funds that you cannot afford to lose. Conduct thorough research, gain a comprehensive understanding of the associated risks, and carefully plan your investment budget to ensure responsible trading practices.



### Speed and Efficiency

AI-based trading bots such as Bitcoin **GPT** Definity Bot 2.0 can analyze vast amounts of data in real-time to make fast and efficient trading decisions.



### Accuracy

The AI-based trading algorithms can be programmed to make trading decisions better than humans ever could, by eliminating human error and emotions from the trading process.



### Customization

The **GPT** Definity AI-based trading platform can be customized to suit the requirements and preferences of crypto traders including trading strategies and risk parameters.



### 24/7 Trading

**GPT** Definity Bot 2.0 can operate 24/7 for traders to take advantage of opportunities in the market at any time and any place, so you never have to miss another trading opportunity.



## What is **GPT** Definity Ai?



**GPT** Definity Pro is a state-of-the-art generative AI based crypto auto-trading platform that uses the power of the latest AI technologies to help you make faster, more accurate, and more profitable trading decisions. Using AI technology in trading removes the possibilities of human error which in Crypto often occure due to heightened emotions. The BTC **GPT** Definity 2.0 platform works 24-7 and is powered by advanced algorithms that can analyze vast amounts of market data in real-time and identify patterns and trends that would be close to impossible for a human trader to spot.

The **GPT** Definity platform offers an edge in the market by staying ahead of the curve. Set custom trading strategies, risk parameters, and other preferences to suit your trading goals and preferences in order to tailor your trading approach to your specific needs and optimize your performance in the market. So whether you're a seasoned trader or just getting started, the BTC **GPT** Definity 2.0 AI-powered auto-trading platform is the perfect tool to take your trading to the next level.

AI tools incorporate the power of algorithmic trading and **GPT** technology based live data analysis tools enabling artificial intelligence to enter and exit trade the way that you generate the profit with minimum risk.



The BTC **GPT** Definity 2.0 platform also provides a variety of data analytics tools to help you make informed decisions about your trades. It provides real-time market analysis and insights, allowing you to quickly identify opportunities in the markets and take advantage of them. Additionally, you can backtest strategies and refine them based on the data provided, optimizing your strategies over time. Finally, the platform also offers a range of risk-management tools to help you manage your exposure to the markets.

Learn More

## Unveiling a New Dimension in Day Trading
## with <u>Immediate Intal Ai</u>

<u>Immediate Intal Ai</u> unveils a new dimension in day trading, featuring high-tech capabilities, live market updates, and AI-informed forecasts. Its user-centric design is a highlight, fitting for traders of all levels. Immediate Intal and Immediate Intal Ai cater to both crypto trading beginners and experts, setting the stage for an enthralling trading experience.

## <u>Immediate Avapro 360:</u> A Trailblazer
## in Crypto Trading Innovation

<u>Immediate Avapro 360</u> stands out as a trailblazer in crypto trading, offering advanced features, real-time market insights, and AI-led predictions. Its ease of use is a standout feature, accommodating traders from novice to professional. Both Immediate Avapro and Immediate Avapro Ai versions are tailored for varied trading experiences. Embark on a groundbreaking crypto trading journey.

##  Definity Ai & its latest BTC Definity Pro 2.0 versions

BTC Definity Ai is an innovative Crypto auto-trading bot powered by advanced GPT AI technologies. It identifies market opportunities by analyzing optimal buy and sell times for popular Cryptocurrencies like Bitcoin, Ethereum, Solana, Dogecoin, and many more. With state-of-the-art Ai-based technologies, BTC Definity Ai delivers optimal trading signals.

As a leading Crypto pro app, BTC GPT Definity 2.0 caters to both novice and experienced traders. Whether you're new to Crypto or seeking a tool which will help you trade cryptocurrencies GPT Definity Bot is the ideal platform. Designed with user-friendliness and simplicity in mind, BTC GPT Ai provides all the necessary tools for successful trades. Even if you're a trading beginner, the Bitcoin Definity Bot handles the heavy lifting. Experience the unmatched accuracy and innovation of this industry-leading trading bot.

**OPEN GPT BOT**

### Ready to take your cryptocurrency trading to the next level?

Register now with the BTC Definity Ai Bot 2.0 crypto auto-trading platform that utilizes AI technology to optimize your trading strategy and stay ahead of the curve at all times.

**Register**



**01** Sign up for an account
Fill out the registration form and sign up for a BTC Definity AI Bot 2.0 account.

**02** Deposit funds
Once your account is verified, you can fund your account by depositing the minimum requirement.

**03** Start trading
After you've funded your account your ready to start trading with the AI auto-trading bot

Register

## Bitcoin GPT Definity – crypto trading 2.0



Cryptocurrencies have been a popular topic of discussion in recent years, and their future certainly looks bright. While there are always risks and uncertainties associated with any investment, there are several factors that suggest that the value of cryptocurrencies is likely to continue to rise. Major companies like Tesla and PayPal have already begun accepting Bitcoin as a form of payment, and other businesses are likely to follow suit. This increased demand for cryptocurrencies as a means of payment and investment is likely to lead to a surge in their value.

Additionally, cryptocurrency transactions are becoming increasingly secure and efficient, due to the use of blockchain technology. This technology allows for more secure and efficient transactions, leading to more confidence in the cryptocurrency market. Furthermore, the decentralization of cryptocurrencies makes them more resilient to market manipulation, which can be a major benefit for investors. As more people become comfortable with the idea of investing in cryptocurrencies, the market will likely continue to grow, making cryptocurrencies an increasingly attractive investment.

The use of AI and machine learning has also made the GPT Definity Pro the most efficient trading bot. By using a 175 billion parameter, fine-tuned AI system and a generative pre-trained transformer, trading algorithms are able to make more informed decisions, leading to more successful trades. This has helped to further increase the confidence that investors have in the cryptocurrency market, and has encouraged more people to invest in cryptocurrencies. As more people become comfortable with the idea of investing in cryptocurrencies, the market will likely continue to grow, making cryptocurrencies an increasingly attractive investment.



## GPT Definity Bot - BTC Ai Trading Technologies

AI technology has the ability to analyze vast amounts of market data and make real-time trading decisions. This has enabled traders to make more informed and profitable trades, while reducing the potential for human error.

One of the key advantages of AI technology in trading is its ability to process and analyze large amounts of data quickly and accurately. This allows AI auto trading apps like GPT definity to identify patterns and trends in the market that could easily be missed by most human traders. AI technology can also learn from past market behavior and adjust their trading strategies accordingly.

## Frequently asked questions

What is BTC GPT Definity?                                                        ···

BTC GPT Definity is an AI-based crypto trading tool that allows traders to take wised decision on when to buy or sell cryptocurrencies. GPT Definity AI uses sophisticated algorithms to analyze market trends and suggest on optimal trade opportunities without human intervention.






| How does GPT Definity Pro work? | + |
| Can I use GPT Definity Bot on my mobile device? | + |
| What cryptocurrencies does BTC Definity Ai covers? | + |
| Can I customize my trading strategy with GPT Definity Pro? | + |

## GPT Definity Ai & BTC Definity Bot 2.0 highlights

| 🏆 Trading Platform | Crypto Auto-Trading App |
| 💻 Platform Fee | No Fee |
| 🥇 Withdrawal Fee | Free |
| 💳 Deposit Option | Visa, Mastercard, Comodo, Gpay, Apple Pay, PayPal, Skrill, Neteller, UnionPay, Webmoney, Yandex |
| 📱 Minimum Deposit | $250 |
| 🌍 Countries | All countries are available except for USA |



First name





What is Cloud Computing?  / Cloud Computing Concepts Hub  / Generative AI  / Machine Learning & AI

# What is GPT?

Create an AWS Account



**Explore Free Machine Learning Offers**
Build, deploy, and run machine learning applications in the cloud for free



**Check out Machine Learning Services**
Innovate faster with the most comprehensive set of AI and ML services



**Browse Machine Learning Trainings**
Get started on machine learning training with content built by AWS experts



**Read Machine Learning Blogs**
Read about the latest AWS Machine Learning product news and best practices

What is GPT?

Why is GPT important?

What are the use cases of GPT?

How does GPT work?

How was GPT-3 trained?

What are examples of some applications that use GPT?

How can AWS help you run large language models like How was GPT-3 trained?

What are examples of some applications that use GPT?

How can AWS help you run

## What is GPT?

Generative Pre-trained Transformers, commonly known as GPT, are a family of neural network models that uses the transformer architecture and is a key advancement in artificial intelligence (AI) powering generative AI applications such as ChatGPT. GPT models give applications the ability to create human-like text and content (images, music, and more), and answer questions in a conversational manner. Organizations across industries are using GPT models and generative AI for Q&A bots, text summarization, content generation, and search.

## Why is GPT important?

The GPT models, and in particular, the transformer architecture that they use, represent a significant AI research breakthrough. The rise of GPT models is an inflection point in the widespread adoption of ML because the technology can be used now to automate and improve a wide set of tasks ranging from language translation and document summarization to writing blog posts, building websites, designing visuals, making animations, writing code, 1researching complex topics, and even composing poems. The value of these models lies in their speed and the scale at which they can operate. For example, where you might need several hours to research, write, and edit an article on nuclear physics, a GPT model can produce one in seconds. GPT models have sparked the

large language models like
GPT-3?

research in AI towards achieving artificial general intelligence, which means machines can help organizations reach new levels of productivity and reinvent their applications and customer experiences.

## What are the use cases of GPT?

The GPT models are general-purpose language models that can perform a broad range of tasks from creating original content to write code, summarizing text, and extracting data from documents.

Here are some ways you can use the GPT models:

### Create social media content

Digital marketers, assisted by artificial intelligence (AI), can create content for their social media campaigns. For example, marketers can prompt a GPT model to produce an explainer video script. GPT-powered image processing software can create memes, videos, marketing copy, and other content from text instructions.

### Convert text to different styles

GPT models generate text in casual, humorous, professional, and other styles. The models allow business professionals to rewrite a particular text in a different form. For example, lawyers can use a GPT model to turn legal copies into simple explanatory notes.

### Write and learn code

As language models, the GPT models can understand and write computer code in different programming languages. The models can help learners by explaining computer programs to them in everyday language. Also, experienced developers can use GPT tools to autosuggest relevant code snippets.

### Analyze data

What are the use cases of
GPT?

How does GPT work?

How was GPT-3 trained?

What are examples of some
applications that use GPT?

How can AWS help you run
large language models like
GPT-3?

The GPT model can help business analysts efficiently compile large volumes of data. The language models search for the required data and calculate and display the results in a data table or spreadsheet. Some applications can plot the results on a chart or create comprehensive reports.

### Produce learning materials

Educators can use GPT-based software to generate learning materials such as quizzes and tutorials. Similarly, they can use GPT models to evaluate the answers.

### Build interactive voice assistants

The GPT models allow you to build intelligent interactive voice assistants. While many chatbots only respond to basic verbal prompts, the GPT models can produce chatbots with conversational AI capabilities. In addition, these chatbots can converse verbally like humans when paired with other AI technologies.

## How does GPT work?

Though it's accurate to describe the GPT models as artificial intelligence (AI), this is a broad description. More specifically, the GPT models are neural network-based language prediction models built on the Transformer architecture. They analyze natural language queries, known as prompts, and predict the best possible response based on their understanding of language.

To do that, the GPT models rely on the knowledge they gain after they're trained with hundreds of billions of parameters on massive language datasets. They can take input context into account and dynamically attend to different parts of the input, making

them capable of generating long responses, not just the next word in a sequence. For example, when asked to generate a piece of Shakespeare-inspired content, a GPT model does so by remembering and reconstructing new phrases and entire sentences with a similar literary style.

There are different types of neural networks, like recurrent and convolutional. The GPT models are transformer neural networks. The transformer neural network architecture uses self-attention mechanisms to focus on different parts of the input text during each processing step. A transformer model captures more context and improves performance on natural language processing (NLP) tasks. It has two modules, which we explain next.

Read about neural networks »

Read about natural language processing (NLP) »

### Encoder

What are the use cases of GPT?

**How does GPT work?**

How was GPT-3 trained?

What are examples of some applications that use GPT?

How can AWS help you run large language models like GPT-3?

Transformers pre-process text inputs as embeddings, which are mathematical representations of a word. When encoded in vector space, words that are closer together are expected to be closer in meaning. These embeddings are processed through an encoder component that captures contextual information  from an input sequence. When it receives input, the transformer network's encoder block separates words into embeddings and assigns weight to each. Weights are parameters to indicate the relevance of words in a sentence.

Additionally, position encoders allow GPT models to prevent ambiguous meanings when a word is used in other parts of a sentence. For example, position encoding allows the transformer model to differentiate the semantic differences between these sentences:

- A dog chases a cat
- A cat chases a dog

So, the encoder processes the input sentence and generates a fixed-length vector representation, known as an embedding. This representation is used by the decoder module.

### Decoder

The decoder uses the vector representation to predict the requested output. It has built-in self-attention mechanisms to focus on different parts of the input and guess the matching output. Complex mathematical techniques help the decoder to estimate several different outputs and predict the most accurate one.

Compared to its predecessors, like recurrent neural nets, transformers are more parallelizable because they do not process words sequentially one at a time, but instead, process the entire input all at once during the learning cycle. Due to this and the thousands of hours engineers spent fine-tuning and training the GPT models, they're able to give fluent answers to almost any input you provide.

## How was GPT-3 trained?

In a published research paper, researchers described generative pretraining as the ability to train language models with unlabeled data and achieve accurate prediction. The first GPT model, GPT-1, was developed in 2018. GPT-4 was introduced in March 2023 as a successor to GPT-3.

GPT-3 was trained with over 175 billion parameters or weights. Engineers trained it on over 45 terabytes of data from sources like web texts, Common Crawl, books, and Wikipedia. Prior to training, the average quality of the datasets was improved as the model matured from version 1 to version 3.

What are the use cases of GPT?

How does GPT work?

GPT-3 trained in a semi-supervised mode. First, machine learning engineers fed the deep learning model with the unlabeled training data. GPT-3 would understand the sentences, break them down, and reconstruct them into new sentences. In unsupervised training, GPT-3 attempted to produce accurate and realistic results by itself. Then, machine learning engineers would fine-tune the results in

GPT-3 attempted to produce accurate and realistic results by itself. Then, machine learning engineers would fine-tune the results in supervised training, a process known as reinforcement learning with human feedback (RLHF).

You can use the GPT models without any further training, or you can customize them with a few examples for a particular task.

## What are examples of some applications that use GPT?

Since its launch, the GPT models have brought artificial intelligence (AI) to numerous applications in various industries. Here are some examples:

- GPT models can be used to analyze customer feedback and summarize it in easily understandable text. First, you can collect customer sentiment data from sources like surveys, reviews, and live chats, then you can ask a GPT model to summarize the data.

- GPT models can be used to enable virtual characters to converse naturally with human players in virtual reality.

- GPT models can be used to provide a better search experience for help desk personnel. They can query the product knowledge base with conversational language to retrieve relevant product information.

## How can AWS help you run large language models like GPT-3?

Amazon Bedrock is the easiest way to build and scale generative AI applications with large language models, also known as foundation models (FMs), similar to GPT-3. Amazon Bedrock gives you access via an API to foundation models from leading AI startups, including AI21 Labs, Anthropic, and Stability AI—along with Amazon's newest foundation model family, Amazon Titan FMs. With Bedrock's serverless experience, you can get started quickly, privately customize FMs with your own data, and easily integrate and deploy them into your applications using the AWS tools and capabilities you are familiar with (including integrations with Amazon SageMaker ML features like Experiments to test different models and Pipelines to manage your FMs at scale) without having to manage any infrastructure. Learn more about building with Foundation models on Amazon Bedrock.

## Machine learning next steps

**Get Started with AWS**
Learn how to start using AWS in minutes



**AWS Free Tier**
Gain free, hands-on experience with AWS for 12 months



**re:Invent recap: Best of generative AI | January 31, 2024**
Explore how generative AI can drive value for your organization. Register now »



Learn About AWS | Resources for AWS | Developers on AWS | Help

Create an AWS Account

**ER325**

What Is AWS?
What Is Cloud Computing?
AWS Inclusion, Diversity & Equity
What Is DevOps?
What Is a Container?
What Is a Data Lake?
What Is Generative AI?
AWS Cloud Security
What's New
Blogs
Press Releases

Getting Started
Training and Certification
AWS Solutions Library
Architecture Center
Product and Technical FAQs
Analyst Reports
AWS Partners

Developer Center
SDKs & Tools
.NET on AWS
Python on AWS
Java on AWS
PHP on AWS
JavaScript on AWS

Contact Us
Get Expert Help
File a Support Ticket
AWS re:Post
Knowledge Center
AWS Support Overview
Legal
AWS Careers

Amazon is an Equal Opportunity
Employer: Minority / Women /
Disability / Veteran / Gender
Identity / Sexual Orientation /
Age.

Language | عربي | Bahasa Indonesia | Deutsch | English | Español | Français | Italiano | Português | Tiếng Việt | Türkçe | Русский | ไทย | 日本語 | 한국어 | 中文 (简体) | 中文 (繁體)

Privacy | Site Terms | Cookie Preferences | © 2023, Amazon Web Services, Inc. or its affiliates. All rights reserved.

https://www.computerweekly.com/news/366548152/Nutanix-GPT-in-a-Box-aims-hyper-converged-at-AI-ML-use-cases

at 10:49:21, 01/18/2024



NEWS

# Nutanix GPT-in-a-Box aims hyper-converged at AI/ML use cases

**Nutanix targets a pre-configured bundle of AI/ML and GPT software with hyper-converged infrastructure and GPT to help organisations safely take advantage of learning networks**

By **Antony Adshead**, Storage Editor

Published: **15 Aug 2023 14:00**

Nutanix has launched GPT-in-a-Box, a bundled service that adds artificial intelligence (AI) software stack elements – such as foundation models and AI frameworks – to scale-out hyper-converged infrastructure (HCI).

GPT-in-a-Box also offers consulting so that customers can specify the right infrastructure configuration, in terms of hardware – for example, GPU spec – and software, such as AI components.

Nutanix will aim the initial launch squarely at customer on-premise use cases, but including edge workloads, with expansion to the cloud coming later.

Essentially, Nutanix believes customers need help to specify an infrastructure for AI because it can involve a complex mix of software elements plus hardware add-ons, and that concerns are commonplace over privacy and governance in AI applications.

"It's activity that consumes, creates and generates a lot of data," said Nutanix senior vice-president for product management Thomas Cornely. "And discussion about what you can do on-premise often resolves around privacy and governance."

Nutanix will offer what it calls a "full-stack AI-ready platform", in which it expects customers to deploy hardware and software to train and retrain models and be able to expose results to application developers.

GPT-in-a-Box bundles will comprise Nutanix HCI, Nvidia GPU hardware or recommendations, the Nutanix AHV hypervisor, a Kubernetes container layer, AI foundation models, open-source AI frameworks that could include KubeFlow, Jupiter and PyTorch, and a curated set of large language models including Llama2, Falcon GPT and MosaicML, all of which will provide outputs exposed for application development.

**Read more on storage for AI**

- Podcast: Sizing data storage for AI/ML workloads. Artificial intelligence and machine learning workloads come with I/O profiles of different shapes and sizes. We talk to Curtis Anderson of Panasas about how best to procure and size storage for them.

- Storage requirements for AI, ML and analytics. We look at what is needed for artificial intelligence and machine learning, and the pros and cons of block, file and object storage to store and access very large amounts of often unstructured data.

Nutanix's offering is the latest effort from storage array makers to target AI/ML use cases, and clearly aims to hook on the surge in interest in chat-format AI. All of the big storage makers have addressed the rise in prominence of unstructured data as a source of analytics processing, but not all have been so explicit in targeting product bundles. An exception is Vast Data, which wants to build its recently launched Vast Data Platform as a global brain-like network of AI learning



free Data
Storage

The easiest to setup, run,
and upgrade.

Simplify Enterprise Storage

**Latest News**

Gartner: The big IT outsourcing contract returns

Anger sparked by TV drama forces Fujitsu to put
public sector contract bidding on hold

PSTN switch-off threatens access to adult social
care services

View All News

**Download Computer Weekly**

IN THE CURRENT ISSUE:
- Hundreds of subpostmasters to have their
  convictions quashed in blanket exoneration
- How Fujitsu became a central part of the
  decades-long Post Office scandal

Download Current Issue

**Latest Blog Posts**

The Last Word in Analysing SASE Offerings:
Evaluation Advice
– Networks Generation

Tape is back on the main menu
– Write side up - by Freeform Dynamics

View All Blogs

**Related Content**

Nutanix Kubernetes 'ecosystem' aims to underpin
...
– ComputerWeekly.com

Nutanix aims for SMB growth with channel Cloud
Bundles
– MicroScope

Out of this world? Nutanix delivers 'universal'
cloud...
– ComputerWeekly.com

nodes.

Meanwhile, Nutanix GPT-in-a-Box is not just a self-service deploy-and-run offer. "It's a bundled offer and it can scale down and out," said Cornely. "But there's a consulting phase, on GPUs, for example, and the software elements needed to support customer requirements."

It's an offer primarily launched at greenfield deployments in core datacentre or edge locations. Existing Nutanix customers can, in theory, build AI-ready infrastructures but would still need to consult over, for example, GPU sizing. "They do need different components," said Cornely.

"They could upgrade their own infrastructure, but many customers lack the time to get started," he said. "And there are different components for different parts of the [machine learning] process. There's quite a lot of consulting up-front, but Nutanix has people that are chairs and vice-chairs of organisations that are putting this stuff out so they can say, 'This is what's needed for this deployment'."

According to Cornely, many customers lack policies for the data that's going into models and where it goes after it comes out, so for the time being, this offer is aimed at deployments on-premise to simplify matters of privacy, copyright and governance.

"It's clearly targeted at on-premise and edge, and allowing customers to be fully in control of what they're paying for and what data is going into it," he said. "The cloud element is limited to getting foundation models, registering for LLMs, etc."

## ↘ Next Steps

Why IT leaders should deploy generative AI infrastructure now

## ↘ Read more on Converged infrastructure



LLM series - Nutanix:
Boxed for builders, how
to forge & create
developer AI tools

By: Adrian Bridgwater



Why IT leaders should
deploy generative AI
infrastructure now

By: Scott Sinclair



Out of this world?
Nutanix delivers
'universal' cloud
operating model

By: Adrian Bridgwater



ADS BY GOOGLE

CustomerAI

CustomerAI allows you to generate tailored customer experiences at scale.

Twilio

Learn More

Latest TechTarget
resources

CIO

SECURITY

NETWORKING

DATA CENTER

## CIO

**Top 7 CIO challenges in 2024 and how to handle them**

CIOs face multiple tests this year as they scrutinize innovation investment amid budget tightening, chart a course...

**Top 8 Web 3.0 trends and predictions for 2024 and beyond**

Despite blockchain hacks and cryptocurrency's legal troubles, development and adoption of the next...

**16 top ERM software vendors to consider in 2024**

Various software tools can help automate risk management and GRC processes. Here's a look at 16...

DATA MANAGEMENT

amid budget tightening. Chart a course
for AI and ...

Development and adoption of the next
major iteration of the World ...

processes. Here's a look at: 10
enterprise risk management ...

**TechTarget**

| About Us | Corporate Site | Opinions |
| Editorial Ethics Policy | Contributors | Quizzes |
| Meet The Editors | Reprints | Photo Stories |
| Contact Us | Answers | Tips |
| Our Use of Cookies | E-Products | Tutorials |
| Advertisers | Events | Videos |
| Business Partners | In Depth | Computer Weekly Topics |
| Media Kit | Guides | |

All Rights Reserved, Copyright
2000 - 2024, TechTarget

Privacy Policy
Do Not Sell or Share My Personal
Information



FEATURES ⌄   PRICING   PROMOTIONS ⌄                                        LOGIN

# Have Human Conversations With A.I

This software can answer questions and assist you with tasks, such as composing emails, essays, and code.

Hoon GPT software is an A.I chatbot with extra automotive specific training, just like the one used in the Skoda Superb build featured on our social profiles.

You have your own personal A.I chatbot to interact with in a conversational way. The software can respond to questions you ask it. It can compose written content based on your prompt.

Save time in your work, speed up content creation and create customised plans for the projects that interest you.



Login        Privacy Policy        Development Roadmap

Copyright © 2024 Coscorp Pty Ltd trading as Hoon GPT

https://www.newsfilecorp.com/release/156849/Nexalogy-Launches-Analytics-GPT-Beta-Program-for-SMEs

at 10:50:04, 01/18/2024



f   X   in   ✉     👤 Login   🔍 Search

**newsfile**

About ▾   Services ▾   Newsroom ▾   Blog   Contact

f   X   in   🖶

## Nexalogy Launches Analytics GPT Beta Program for SMEs

March 02, 2023 8:00 AM EST | Source: **Datametrex AI Limited**

Toronto, Ontario--(Newsfile Corp. - March 2, 2023) - **Datametrex AI Limited (TSXV: DM) (FSE: D4G) (OTCQB: DTMXF) (the "Company" or "Datametrex")** is pleased to announce that the Company's wholly-owned Artificial Intelligence ("AI") subsidiary, Nexalogy Envirionics Inc. ("**Nexalogy**"), is launching a beta program for its new Analytics GPT software. The program offers small to medium enterprises (SMEs) the opportunity to sign up for exclusive access to Nexalogy's revolutionary Analytics GPT software. The beta program will begin on March 6, 2023.

By participating in the beta program, users will be able to gain early access to the Analytics GPT software, allowing users to test the product and acquire valuable insights into its capabilities before its official launch. Participants will also have the opportunity to learn more about how the A.I. behind the software works, and receive an in-depth white paper that outlines key elements and use case examples that demonstrate how the tool can gather and analyze large sets of data and provide actionable insights.

The Analytics GPT beta program is an excellent opportunity for individuals and businesses seeking to leverage the power of artificial intelligence and data analytics to enhance their business and achieve a competitive advantage in their respective markets.

Don't miss the opportunity to be at the forefront of the next generation of data analytics and artificial intelligence technology.

To sign up for the Analytics GPT beta program and receive additional information, such as the white paper, sample reports, and more, visit https://www.datametrex.com/analyticsgpt.

"We're excited to give users a first-hand look at the software and have users experience the tool in real-time to see how it can provide insights and value for businesses of all sizes. We encourage business owners to sign up for our beta program and take advantage of this exclusive opportunity," said Marshall Gunter, CEO of the Company.

**About Nexalogy**

Nexalogy's technology, AnalyticsGPT reduces the time needed to interpret and integrate large sets of data by offering powerful automated analyses. He/she sets the parameters of the data collection via keywords and other media information (e.g., usernames and links). AnalyticsGPT extracts the relevant data and produces automated reports, thus allowing clients to work with a more manageable information set. AnalyticsGPT allows almost anyone to deal with hundreds of thousands of data points, producing actionable insights in minutes (possible in most, but not all cases). By harnessing the power of GPT technology and fusing it with our state-of-the-art A.I. algorithms, Analytics GPT has removed the barrier to entry to predictive analytics. Now, almost anyone can use Nexalogy's A.I. without the assistance of a trained data analyst to produce critical insights and get results.

Data can be easily filtered to get automatic reports on subsets of the data focusing on specific times, entities, social media users, or topics. With a click of a button, Analytics GPT allows you to receive full reports, complete with written summaries, recommendations, visualizers, and a compilation of media hits at your fingertips in seconds to simplify business operations and maximize potential. Analytics GPT provides critical insights, faster than ever before, provides predictive analysis, is a proven success, and gives you the power of A.I right at your fingertips! The resulting reports are delivered either as PDFs, DOCs, or via API for further processing.

Lastly, AnalyticsGPT helps the user to easily access the required information and helps to detect patterns that currently go unrecognized. This is needed in both the context of the 'short game' of crisis reporting and the 'long game' of identifying narratives and the overall "ZEIT GEIST" that forces us to notice Natural forces yet

### datametrex
Datametrex AI Limited

#### Sign up for Alerts

Sign up to receive news releases by email for Datametrex AI Limited or all companies belonging to the Banking/Financial Services, Technology industries.

SIGN UP

#### Recent News

Datametrex Generates over $1 Million Revenue in December for IT Services
2024-01-11 7:30 AM EST

Datametrex Expands IT Services Footprint to Energy Sector
2024-01-05 7:30 AM EST

Datametrex Secures Approximately $730K Purchase Order from Lotte
2024-01-04 7:30 AM EST

COMPANY PROFILE

#### Articles from Newsfile



NOV 14, 2023

ER333

narratives, as discussed within the BEAD (Build Engage Redistribute District2) framework.

For more information please visit https://www.datametrex.com/analyticsrgpt.

**About Datametrex**

Datametrex AI Limited is a technology-focused company with exposure to artificial intelligence, machine learning, and telehealth and has recently entered the electric vehicle (EV) market. Datametrex's mission is to provide tools and solutions that support companies in fulfilling their operational goals, including health and safety, with predictive and preventive technologies. By working with companies to set a new standard of protocols through artificial intelligence and health diagnostics, the Company provides progressive solutions to support the supply chain.

For additional information on Datametrex and other corporate information, please visit the Company's website at www.datametrex.com.

To learn more about how our AI is used in Cyber Security, Telehealth, and EV, visit https://www.youtube.com/watch?v=ApFk3oWAItg.

**For further information:**

**Investor Relations & Communications**
Priya Monique Atwal, Director of Communications
Email: investors@datametrex.com
Tel: 416-901-5611 x 204

Marshall Gunter, CEO
Email: mgunter@datametrex.com
Tel: 514-295-2300

**Neither TSX Venture Exchange nor its Regulation Services Provider (as that term is defined in the policies of the TSX Venture Exchange) accept responsibility for the adequacy or accuracy of this release.**

**Forward-Looking Statements**

All statements included in this press release that address activities, events, or developments that the Company expects, believes, or anticipates will or may occur in the future are forward-looking statements. These forward-looking statements involve numerous assumptions made by the Company based on its experience, perception of historical trends, current conditions, expected future developments, and other factors it believes are appropriate in the circumstances. In addition, these statements involve substantial known and unknown risks and uncertainties that contribute to the possibility that the predictions, forecasts, projections, and other forward-looking statements will prove inaccurate, certain of which are beyond the Company's control. Except as required by law, the Company does not undertake to revise or update these forward-looking statements after the date hereof or revise them to reflect the occurrence of future unanticipated events.

###

SOURCE: Datametrex AI Limited

**PR Pros' Holiday Toolkit: 5 Press Release Examples from Amazon to Starbucks (+ more)**

Dive into the world of holiday PR with our essential toolkit, showcasing top press release examples from Amazon to Starbucks. In addition, explore how our Top 5 Holiday Press Release....

**Hashtags**

Banking   FinancialServices

Technology   OTC   OTCMarkets

OTCStocks   SmallCaps   TSXV

Investing

**Subjects**

Economy, Business and Finance
Financial and Business Service
Science and Technology

**Similar Stories**

Banking/Financial Services

Technology

Tell Us Your Story     LEARN MORE

**About Us**
Newsfile is a customer-first newswire focused on the distribution of press releases and regulatory disclosures to audiences worldwide.

Copyright 2024 Newsfile Corp. All rights reserved.

**Legal**
Terms of Use
Anti-Spam Policy
Privacy Policy
Bill C-18



# Personalize GPT With Your Data

## Using GPT for Retrieval Augmented Generation

**Recording available until 21. February 2024**

**Watch Recording**     powered by ML Con

<div style="background: linear-gradient(to right, purple, orange); text-align:center;">
This Fullstack Live Event Has Ended
</div>

### Chat Using Your Own Data

The advent of GPT models has revolutionized the concept of "chat using your own data", making it a popular use case. The premise is simple: link this potent language model to your data, thereby crafting a unique, personalized version of GPT.



While the initial setup is easy, real-world applications require careful consideration. In this Fullstack Live Event, we will explore the mechanisms utilized by Kern AI's software, providing a comprehensive understanding of the steps necessary to excel in this domain. We will dive into important aspects such as

- maintaining high data quality
- managing multilingualism
- handling sensitive private information within your data

While having intermediate knowledge and a basic understanding of machine learning is advantageous, newcomers to these concepts are equally welcome to join and learn with us!

**Watch Recording**



## Get To Know Our Expert

**Leonard Püttman - Kern AI**

Leonard Püttmann is a data scientist and developer advocate at Kern AI.

He studied economics at the Hochschule Düsseldorf but quickly found his way into the world of machine learning . His domain of expertise is natural language processing (NLP), but he's also interested in classical machine learning topics, as well as cloud computing.

At the moment, Leonard is most interested in getting language models efficiently into production. He's also an avid tea drinker and always happy to talk about all things data and ML over a hot cup of tea.

## Register Now and Join Our Fullstack Live Event

### Already have Fullstack?

You're all set! Grab a pen and paper and simply check back in at the time of the event to participate. Want to see more Fullstack Live Events? Browse through the complete list of events here.

### No Fullstack yet?

Fullstack Experience members have free access to all Live Events – past, present and future. In addition, Fullstack members also have access to the recording of all live events for three months.

Register your Fullstack Experience now and benefit from this and

Register your Fullstack Experience now and benefit from this and future groundbreaking Fullstack Live Events.

**Watch Recording**

**Get Your Fullstack Experience**



### Fullstack Experience

Individual Membership

$120 p/a

**Start Now**

### Fullstack Team

For Teams between 3 – 15

From $267 p/a

**Start Now**

### Fullstack Company

For Teams above 16

On Request

**Book a Meeting**

## Is Your Team Larger Than 16 Employees?

We can help you master digitalization by giving your team unlimited and groundbreaking software know-how including interactive online workshops, thousands of articles, infographics, topic deep dives and much more!

Get In Touch and we can guide you through the best fit for your team!



**Inquire Now**

## Fullstack at a Glance

| | Basic | Fullstack | Fullstack Teams |
|---|:---:|:---:|:---:|
| Fullstack Read | ✔ | ✔ | ✔ |
| Fullstack Live-Events | ✘ | ✔ | ✔ |
| Fullstack Tutorials | ✘ | ✔ | ✔ |
| Add-Ons: up to 25 % Sale on Conferences & Training Events* | ✘ | ✔ | ✔ |
| Add-Ons: up to 25 % Sale on Akademy & FLEX Camps* | ✘ | ✔ | ✔ |

## Features

| | Basic | Fullstack | Fullstack Teams |
|---|:---:|:---:|:---:|
| Notes | ✔ | ✔ | ✔ |
| Collections | ✔ | ✔ | ✔ |
| AI-Search AskFrank | ✔ | ✔ | ✔ |
| Curated Theme Highlights | ✔ | ✔ | ✔ |
| Live Chat | ✘ | ✔ | ✔ |
| Direct Chat | ✘ | ✔ | ✔ |
| Discounts on Conferences, Training & Akademy Events* | ✘ | ✔ | ✔ |
| 6 Month Access to Video Recordings of Your Conferences | ✘ | ✔ | ✔ |
| Certificates of Participation in Conferences, Training & Academy Events* | ✔ | ✔ | ✔ |
| Access to Slides & Presentations of Conferences Attended | ✔ | ✔ | ✔ |



| Conferences Attended | · | · | · |
| No Administrative Overhead | ✗ | ✗ | ✔ |
| Account Manager | ✗ | ✗ | ✔ |

*Training events & Academy will be available soon

**Start Now**        **Start Now**

### Social

Follow us on social media for more news, content, and background stories from our authors, editors, and events. Share your personal experience with us.



**Learn more**

### App

Access your digital knowledge base everywhere with our mobile apps.

[Download on the App Store]

[GET IT ON Google Play]

### Expand your knowledge

As a subscriber to our newsletter, you will be the first to know about new content.

Email*    SUBMIT

### Start your trial month now

Not convinced yet? Check out our training portfolio for free!

**Test now**

Privacy    Terms and Conditions    Contact    FAQ    Imprint                iOS    Android

https://www.connectionmodel.com/blog/what-chatbot-marketing-is-and-how-to-use-it-in-digital-marketing

at 08.53.44, 02/09/2024



Contact | Support | Demo Leadbot

About    Search Marketing    Design    Blog    Website Audit

Subscribe

## What Chatbot Marketing Is and How to Use It In Digital Marketing

With so much in the world leaning toward automation, it's no surprise that bots and **chatbot technology** are everywhere, especially in the world of **digital marketing strategies**. While it's still necessary to be hands-on with any marketing strategy, bots and automation certainly don't hurt when it comes to aiding in customer satisfaction, managing processes, and generating leads and customers.



One great **automation strategy** is chatbot marketing. Chatbot marketing is used with many platforms like Google and Bing AI chatbot.

What is chatgbt? Chat ai gpt is a digital marketing strategy that helps to automate customer communication and will answer customer questions, up to a certain point, before the customer or user is directed to a real person for assistance. Digital marketing professionals are utilizing aichat more and more to develop digital marketing strategies for their clients.

But there's more to it than that.

### What Are Chatbots?

A **chatbot** is a computer program or software that **automates conversation** with a user. It is much like using virtual agents to assist your users. They can be programmed with different responses based on what a user chooses or requests. Chat GBT is the most commonly used chatbot program to provide **seamless customer support**. For example, a chatbot can ask a user which of a business's services they want to learn more about and provide a response or lead the user to better information based on the user's choice.

Advanced bots are powered by AI (artificial intelligence), but most chatbots are programmed with specific responses and built-out conversation trees to **encourage customer engagement**. There are many third-party services, like an ai bot writer, that make it easy for marketers and business owners to build out their own **chatbot conversation trees** with large language models without needing special coding or development skills. One such third-party service to help with creating your language model is bard a chat GBT. A bard ai chatbot is



Interested in a free website audit?

GET YOUR FREE WEBSITE REPORT

Company Name *

Website URL *

Primary Target Keyword *

Email *

Get Your Free Instant Website Report.

Subscribe Here!

Email*

Subscribe

Get our latest ebook

another **conversational based chatbot** that is designed to determine customer expectations and provide useful information about your website.

A conversation tree covers every possible customer response and tells the chatbot what to say based on that response. This can be personalized to great lengths by the details you provide within your conversation tree and can be used for many fast digital marketing seo strategies. Some examples of ways you can use a conversation tree are with romantic chatbot platforms, **digital advertising**, and for automation paid search advertising as well depending on your **businesses needs**. Here's an example of a basic conversation tree:





*(Source)*

Yours would, of course, pertain to your specific business and the questions you want your bot to ask your customers just like as if they were speaking directly to your customer support team.

### What Is Chatbot Marketing?

Even if you are not looking for a digital marketing career understanding some basic principles is an asset for any company and you don't even have to go through a digital marketing boot camp to grasp the concepts! We've highlighted the main key points for you below.

Chatbot marketing is a strategy that utilizes a chatbot to market the business. This **strategy** really came into popularity when Facebook opened up the ability to integrate bots with its Messenger feature. Previously, many **Facebook Page Messengers** were going completely unused. Occasionally, customers would submit questions or concerns, and even less often would a business actually respond.

A **chatbot marketing strategy** makes sure that your customer service requests aren't going unanswered, and many can even help with lead generation and sales.



### How Can You Use Chatbots in Marketing?

There are many different ways to take advantage of a **chatbot marketing strategy** in your digital marketing. Bots can be incredibly useful for automating basic processes, answering common customer questions, and even making sales.



Let's learn a bit more.

## Chatbots for Customer Service

If your business receives a lot of customer service requests through Messenger (or if you want to start utilizing Facebook Messenger as a customer service channel), a bot can be a huge help. You can create a **chatbot that helps** customers narrow down their customer service issues to a specific category before directing them to the right person to talk to for the correct answer.

## Chatbots for Sales

A chatbot can help to **lead people into your sales pipeline**. Whether you set it set appointments for consultations or to collect emails for your newsletter, it can be a great start to a customer journey. Many customers don't want to pick up the phone and call, so adding an easy way for them to **start communication online** can be helpful.

## Chatbots for FAQ

Let customers or potential customers ask **common questions** of your chatbot. Programming a bot with a list of potential question options and their corresponding answers is a great **way to offer up information** to your audience in a more interactive setting. It can be fun for customers to engage with your chatbots, making them more likely to choose your company over a competitor.

## Chatbots for Shopping

Facebook Messenger chatbots will even allow your business to provide an in-app shopping experience. You can customize it to allow customers to browse through products and even make purchases directly within the chatbot.



## Chatbots for Marketing

Of course, there are so many **different marketing tactics** using a chatbot. You can use it as a lead nurturing device. Once someone willingly messages your chatbot, you're able to continue sending them helpful and informational messages in an effort to nurture them into making a purchase or signing up for services. This can be a powerful tool in your digital marketing arsenal (even more powerful than email marketing) because it's an even more direct form of **one-on-one communication**.

## What Not to Do in Chatbot Marketing

It's important to remember that there are still several don'ts when it comes to chatbot marketing. While it's a powerful and effective strategy, it still requires some work from your marketing team or agency.

First of all, don't let your bots take over your marketing completely. For a strategy to be successful, there has to be some kind of human touch. So while automation can be extremely helpful, it cannot be the only way to communicate. Whether you have your chatbots **start the conversation** that leads to a human or your team uses

communicate. Whether you have your chatbots **start the conversation** that leads to a human or you have your team regularly checking in to ensure the bots are doing their job properly, it's important to remember that chatbot marketing is a "set it and forget it" kind of strategy.

Second, you don't want to overdo it when you're using your chatbot as a marketing or **nurturing tool**. Remember that it is a truly amazing tool to have, and it's useful to be able to directly message customers. So you don't want to abuse that power. If you send too many messages out to your audience, everyone is going to opt out. They're not going to want to see your business's spam in their Facebook Messenger inbox.

Chatbot marketing is a popular and **high-converting digital marketing strategy**. It definitely takes a bit of setup, especially when creating conversation trees and using a third-party software to program your chatbot, but the initial time and cost investment will be well worth it if you use this strategy correctly. You can now even invest in Chat GBT through their chat gbt stock options! This new phenomenon came about not only by the chatbot popularity but also from Chatbot Plus; a subscription-based service where you will have a unique chat gbt login and account to personalize your chatbot marketing strategies. You can also try chatgbt free to give it a try!

At **Connection Model**, we have worked with many clients to launch their chatbot efforts and have developed a Conversational Marketing **e-book** to highlight the benefits of AI and chatbots. Consider if your complimentary advertising bootcamp!

To learn more about how you can use chatbot marketing in your specific business, **contact us** today.

Written By: David Carpenter

Published on November 13, 2020

Last modified on August 7, 2023

Topics: Marketing, Conversational Marketing, Chatbot, artificial intelligence





Web App Development

AI Software Development

Mobile App Development

Software Production

### 3. Personalized User Experiences

GPT development opens up opportunities for delivering highly personalized user experiences. We build AI-powered apps and services that leverage GPT to understand user preferences, recommend relevant products or content, and tailor the user experience based on individual needs.

Our personalized user experience solutions leverage GPT's natural language understanding capabilities to analyze user interactions, interpret user preferences, and provide personalized recommendations. By understanding user intent and historical data, our systems can anticipate user needs, present relevant options, and guide users through their customer journey.

By delivering personalized user experiences, businesses can increase customer engagement, improve customer satisfaction, and drive conversions. Personalization also enables businesses to gather valuable user insights and behavior data, which can be used for targeted marketing campaigns and product/service optimization.

5. Data Analytics and Insights

6. Integration with Existing Systems

### 4. Voice-Enabled AI Assistants

Integrating GPT into voice-enabled AI assistants can transform how businesses engage with their customers. We develop voice-enabled AI assistants that can understand and respond to voice commands, answer questions, perform tasks, and provide personalized recommendations.

Our voice-enabled AI assistants leverage GPT's capabilities to process natural language voice inputs, extract user intent, and generate spoken responses. These assistants can be integrated into smart speakers, mobile apps, and other voice-enabled devices, enabling customers to interact with businesses using voice commands.

By providing voice-enabled AI assistants, businesses can offer hands-free and convenient experiences to their customers, enhancing accessibility and improving customer satisfaction. Voice assistants also enable businesses to provide personalized recommendations and offers, enhancing customer engagement and driving sales.

### 5. Data Analytics and Insights

GPT-powered apps and services can provide valuable data analytics and insights to businesses. We develop AI systems that analyze chat logs, customer interactions, and user behavior to extract meaningful insights, identify patterns, and inform business decisions.

By analyzing chat data, businesses can gain a deep understanding of customer preferences, pain points, and common queries. This information can be used to optimize products and services, improve customer support processes, and develop targeted marketing strategies.

Our data analytics and insights solutions leverage machine learning algorithms and statistical techniques to identify trends, perform sentiment analysis, and uncover hidden patterns in the chat data. By providing actionable insights, we empower businesses to make data-driven decisions and continuously improve their customer experiences.

### 6. Integration with Existing Systems

5. Data Analytics and Insights

6. Integration with Existing Systems



We understand the importance of seamless integration with existing business systems and processes. Our GPT development services include expertise in integrating GPT-powered apps and services with our clients' existing software platforms, CRMs, and databases.

We collaborate closely with your team to understand your existing systems and infrastructure. Our experts develop robust APIs and integration modules that allow for seamless data exchange and communication between the GPT-powered apps and your existing systems. This ensures that customer data is synchronized, and relevant information is readily available to deliver personalized and context-aware experiences.

By integrating GPT-powered apps and services with your existing systems, businesses can leverage the power of conversational AI while maintaining data integrity, security, and compatibility with your established infrastructure.

Partner with Goldeneye Industrial Intelligence for comprehensive GPT development services that help you harness the power of conversational AI to transform customer interactions, automate processes, and drive business growth.

Previous
« Software Development

Next
Web App Development »

**About**

Company

Our Products

**Services**

Consulting

Software Development

**Media**

Research

Twitter

Instagram

**Contact**

Email

Book A Consultation ⬏

**Legal & Compliance**

Terms Of Service

Privacy Policy ⬏

© 2024 Goldeneye Industrial Intelligence Inc.

**ER347**

**United States Patent and Trademark Office (USPTO)**

# USPTO OFFICIAL NOTICE

Office Action (Official Letter) has issued
on February 9, 2024 for
**U.S. Trademark Application Serial No. 97733261**

A USPTO examining attorney has reviewed your trademark application and issued an Office action.  You must respond to this Office action to avoid your application abandoning.  Follow the steps below.

**(1)  Read the Office action**.  This email is NOT the Office action.

**(2)  Respond to the Office action by the deadline** using the Trademark Electronic Application System (TEAS) or the Electronic System for Trademark Trials and Appeals (ESTTA), as appropriate.  Your response and/or appeal must be received by the USPTO on or before 11:59 p.m. **Eastern Time** of the last day of the response deadline.  Otherwise, your application will be abandoned.  See the Office action itself regarding how to respond.

**(3)  Direct general questions** about using USPTO electronic forms, the USPTO website, the application process, the status of your application, and whether there are outstanding deadlines to the Trademark Assistance Center (TAC).

After reading the Office action, address any question(s) regarding the specific content to the USPTO examining attorney identified in the Office action.

# GENERAL GUIDANCE

- **Check the status of your application periodically** in the Trademark Status & Document Retrieval (TSDR) database to avoid missing critical deadlines.

- **Update your correspondence email address** to ensure you receive important USPTO notices about your application.

- **Beware of trademark-related scams**.  Protect yourself from people and companies that may try to take financial advantage of you.  Private companies may call you and pretend to be the USPTO or may send you communications that resemble official USPTO documents to trick you.  We will never request your credit card number or social security number over the phone.  Verify the correspondence originated from us by using your serial number in our database, TSDR, to confirm that it appears under the "Documents" tab, or contact the Trademark Assistance Center.

- **<u>Hiring a U.S.-licensed attorney</u>.**  If you do not have an attorney and are not required to have one under the trademark rules, we encourage you to hire a U.S.-licensed attorney specializing in trademark law to help guide you through the registration process.  The USPTO examining attorney is not your attorney and cannot give you legal advice, but rather works for and represents the USPTO in trademark matters.

1

2

3

4

5

6

7

8

9

10

11

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| OPENAI, INC., a Delaware corporation, | Case No. 3:23-cv-3918-YGR |
| Plaintiff, | **[PROPOSED] ORDER GRANTING DEFENDANTS' REQUEST FOR JUDICIAL NOTICE** |
| v. | |
| OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual, | |
| Defendants. | Hearing Date: May 7, 2024<br>Time: 2:00 p.m.<br>Location: Courtroom 1 |

Case No. 3:23-cv-3918-YGR

## [PROPOSED] ORDER

Defendants Guy Ravine and Open Artificial Intelligence, Inc.'s ("Defendants") Request for Judicial Notice ("RJN") in support of its Motion to Alter or Amend the Judgment Pursuant to Fed. R. Civ. P. 59(e), or in the Alternative, For Relief From a Judgment or Order Pursuant to Fed. R. Civ. P. 60(b) ("Motion"), came on for hearing before this Court. After the Court's full consideration of the written submissions of the parties and the parties' oral arguments, and finding good cause thereby,

IT IS HEREBY ORDERED THAT: Defendants' Request for Judicial Notice is granted.

The Court takes judicial notice of:

1.      The February 9, 2024 "Final Office Action" issued by the United States Patent and Trademark Office ("USPTO"), and ruling on OpenAI L.P.'s CHATGPT trademark application, Serial Number: 97733261, Filing Date: December 27, 2022 (the "CHATGPT Application") attached as Exhibit A to the RJN, and Exhibit A to the Declaration of Jose R. Nuño.


IT IS SO ORDERED.



Dated:

HON. YVONNE GON ALE ROGERS
United States District Judge

Case No. 3:23-cv-3918-YGR

```
 1                                     Pages 1 - 12

 2                         UNITED STATES DISTRICT COURT

 3                        NORTHERN DISTRICT OF CALIFORNIA

 4       Before The Honorable Yvonne Gonzalez Rogers, Judge

 5       OPENAI, INC.,                  )
                                        )
 6                   Plaintiff,         )
                                        )
 7         VS.                          )     NO. 23-CV-03918
                                        )
 8       OPEN ARTIFICIAL INTELLIGENCE,  )
         INC. and GUY RAVINE,           )
 9                                      )
                     Defendants.        )
10       _____)

11                                   Oakland, California
                                     Monday, March 25, 2024
12
                    TRANSCRIPT OF ZOOM VIDEOCONFERENCE PROCEEDINGS
13
         APPEARANCES:
14
         For Plaintiff:
15                              QUINN, EMANUEL, URQUHART & SULLIVAN LLP
                                865 South Figueroa Street, 10th Floor
16                              Los Angeles, California  90017
                           BY:  AARON H. PERAHIA, ATTORNEY AT LAW
17
                                QUINN, EMANUEL, URQUHART & SULLIVAN LLP
18                              555 Twin Dolphin Drive, 5th Floor
                                Redwood Shores, California 94065
19                         BY:  ROBERT P. FELDMAN, ATTORNEY AT LAW
                                MARGRET M. CARUSO, ATTORNEY AT LAW
20
         For Defendants:
21                              WAYMAKER LLP
                                515 South Flower Street, Suite 3500
22                              Los Angeles, California 90071
                           BY:  RYAN G. BAKER, ATTORNEY AT LAW
23                              PATRICIA ROJAS-CASTRO, ATTORNEY AT LAW
                                SCOTT M. MALZAHN, ATTORNEY AT LAW
24

25       REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                                Official Reporter
```

1   <u>**Monday - March 25, 2024**</u>                                    <u>**2:22 p.m.**</u>

2                      <u>**P R O C E E D I N G S**</u>

3                            ---oOo---

4        **THE CLERK:**  Good afternoon, everyone.

5        These proceedings are being court reported by this court.

6   Any other recording of this proceeding, either by video, audio,

7   including screenshots or other copying of the hearing, is

8   strictly prohibited.

9        Your Honor, now calling the civil matter 23-CV-03918-YGR,

10  Open AI, Inc. v. Open Artificial Intelligence, Inc., et al.

11       Parties, please state your appearances for the record,

12  starting with the plaintiff.

13       **MR. FELDMAN:**  Good afternoon, Your Honor.  Robert

14  Feldman, Margret Caruso, and Aaron Perahia for plaintiff.

15       **MR. BAKER:**  Good afternoon, Your Honor.  Ryan Baker.

16  And with me are Scott Malzahn and Patricia Rojas-Castro on

17  behalf of the defendants.

18       **THE COURT:**  Okay.  All right.  So you need a schedule.

19  And it looks like you generally are agreeing to the schedule

20  that's being proposed.

21       **MR. FELDMAN:**  That's correct, Your Honor.

22       **MR. BAKER:**  Your Honor, this is Ryan Baker.  If I may

23  address one issue that I think we don't agree on that is

24  relevant to the schedule.

25       **THE COURT:**  Okay.

1    **MR. BAKER:**  The deadline for the defendants -- there's

2   been, I think, mention before -- before the Court -- of a -- of

3   counterclaims.  That is the one date that I think we don't have

4   agreement on.

5        And, Your Honor, earlier this morning, in light of the

6   fact that we don't have agreement on that, while we have

7   agreement on the other dates, I emailed counsel for the

8   plaintiff and proposed a compromise.  And counsel for the

9   plaintiff emailed me back indicating that their client is

10  traveling, and they didn't know -- they didn't expect to be

11  able to get back to me today and would expect to have -- be

12  able to do so -- within a week.  So that's the one area of

13  disagreement that we've tried to reach agreement on, Your

14  Honor.

15       **THE COURT:**  Okay.  So what -- it's not -- it's not in

16  the chart.  So where -- I'm looking for it in your statement.

17  Or you can tell me what you're proposing and --

18       **MR. BAKER:**  It's on page 6 of the statement.  I think

19  the issue, Your Honor, is, in the prior case management

20  statement, the prior conference, my prior counsel had stated

21  that a counterclaim would be filed within 30 days of the order

22  on the preliminary injunction motion.

23       And the wrinkle here is obviously my firm was retained and

24  appeared the day after the order was entered.  And, since that

25  time, we've been, as the Court may imagine, trying to catch up

1  and learn the case and figure out what to do and how to comply

2  with the preliminary injunction.  And so, therefore, I'd ask

3  for some additional time.

4      In our brief -- or in the case management statement -- we

5  had asked until Friday, May 10th.  The plaintiff's initial

6  proposal was that we get -- we're stuck with the March 29 date,

7  which is 30 days after the Court's ruling.  In the email I sent

8  this morning, I had proposed a compromise.  The date I had

9  proposed was April 30th.  And so that's the date that I hope we

10  can agree on.  Otherwise, we ask for a couple weeks extra in

11  the case management conference statement.  And, again, Your

12  Honor, this is because we're trying to catch up on the case,

13  and we could -- we need a couple extra weeks of time, other

14  than the 30 days, at least.

15      **THE COURT:**  All right.

16      A response?

17      **MS. CARUSO:**  Yes, Your Honor.

18      **THE COURT:**  I mean, look, it's -- this is a very long

19  schedule, as far as I can tell.  I don't -- I don't think you

20  need this much time.  But if you all want that much time,

21  that's fine.  So I don't have any problem giving them

22  April 30th.

23      **MS. CARUSO:**  Your Honor, we just heard about

24  April 30th.  We received the email this afternoon and haven't

25  had a chance to discuss it with the client.  Our primary

 1  concern with that date is just that we not have any depositions

 2  prior to the pleadings being settled in the case.  I mean,

 3  originally, the counterclaims were due in September.  So it has

 4  been a while that we've been waiting here.  And while we agree

 5  the schedule is long, it's the one that defendants wanted.  And

 6  so, in the interest of being accommodating, we agree to that,

 7  given that we have the preliminary injunction in place.  So --

 8              **THE COURT:**  All right.

 9       A response?  No depos until you file; agreed?

10              **MR. BAKER:**  Yes.  Agreed, Your Honor.

11              **THE COURT:**  All right.  That's -- that's what it will

12  be then.  April 30th to file any counterclaims, but no depos

13  before that.  Nonexpert discovery cutoff -- December 12th is

14  fine.  Opening reports -- January 30th is fine.  Rebuttals

15  February 20 -- that's fine.  Expert discovery cutoff --

16  March 13th -- that's fine.  Deadline to file dispositive

17  motions -- April 2nd is fine.

18       Remember, you're required to have a conference with me

19  before anybody can file a dispositive motion.  The process is

20  set forth in my standing order.  Make sure to read it and make

21  sure you get on my calendar before your deadline is due -- or

22  passes.  So you need to work that into your schedule.

23              **MS. CARUSO:**  Thank you.

24              **THE COURT:**  I have, and will again, deny you the

25  opportunity to file that.  And, by the way, you only get one.

```
 1    You do not get multiple shots at the apple.
 2         With respect to the filing deadlines, you know, I'll
 3    put -- we can have your schedule, but, frankly -- well,
 4    actually, I won't.  That's what we do at the conference.  We
 5    figure out what makes sense.  And I'll be able to look at my
 6    calendar, at that time, and figure out when I can hear it.
 7         So you -- what's interesting, though, about your trial
 8    choice, is that you have your pretrial conference August 15th,
 9    which means that you have to be exchanging your exhibits by
10    approximately July 15th, and all your trial filings, which
11    means that you would like me to give you an answer of a
12    fully -- full order -- on your summary judgment.  Either you're
13    going to parallel process or you want me to give you your
14    answer within a week, two.  I appreciate the vote of
15    confidence, but I'm not sure that I can do that.
16         So September 22nd seems a little bit early.  My preference
17    would be to advance everything, because I think, again, this is
18    much more time than you probably need.  But I think, if I'm not
19    hearing your dispositive motions until June, I probably,
20    depending on my docket, will need a little bit more time.  If I
21    can get it done, I will.  But I don't know that I can get it to
22    you in two weeks -- or three weeks.
23         So do you want a potentially parallel process, or do you
24    want a slightly later date?
25         **MR. BAKER:**  Your Honor, this is Ryan Baker for the
```

1    defendants.

2         We would ask that the pretrial conference and trial date

3    be moved back by the time the Court thinks it will need to

4    process those motions; so potentially 30 days.

5              MR. FELDMAN:  I agree -- this is Bob Feldman.  I agree

6    with that.

7              THE COURT:  And what are you anticipating -- so let me

8    ask a couple more questions.  Is this a bench trial or a jury

9    trial?

10             MR. FELDMAN:  Currently, it's a jury trial.

11             THE COURT:  Okay.  What do you anticipate in terms of

12   time?

13             MR. FELDMAN:  To be honest, I think we could put -- I

14   think the trademark case that's currently on file could be

15   tried in three to five days.  I don't know what the

16   counterclaims will bring or how that might change, if there are

17   counterclaims.  We've been hearing about these counterclaims

18   since September.

19             MR. BAKER:  Your Honor, I appreciate Mr. Feldman's

20   statement in that regard.  I obviously haven't been in the case

21   for more than a month.

22        So I can say that our estimate in the case management

23   conference statement is ten days.  And I think that would -- I

24   think that contemplates the counterclaims, Your Honor.  So --

25             THE COURT:  What would they be?  I mean, look, I've

 1  already done the injunction.  I'm having a hard time

 2  understanding what else there is.

 3          **MR. BAKER:**  Well, there is a mirror-image claim for

 4  trademark infringement.  And, obviously, I understand the

 5  Court's ruling, that we don't agree with, and the counterclaims

 6  will reflect that.  But, also, the draft of the document -- the

 7  counterclaims that have been talked about for a while -- isn't

 8  complete, although it's been discussed for some time.

 9      So it may be that it's less than ten days.  And since

10  there's no counterclaim on file -- again, I take Mr. Feldman's

11  comment that -- if there are counterclaims -- that's a

12  reasonable thing to say right now.  So I'm not suggesting the

13  Court needs to plan around claims that have yet to be filed.

14  They're not finalized, so, you know, I think if five days is

15  what the Court wants to set now, then I have no objection.

16          **THE COURT:**  No.  I don't -- I don't make any

17  guarantees until I see it.  So you can ask for ten days; that

18  usually means you get five.

19          **MR. BAKER:**  Understood, Your Honor.

20          **THE COURT:**  So --

21          **MR. FELDMAN:**  I think --

22          **THE COURT:**  October 13th.

23          **MR. FELDMAN:**  I think everybody asks for ten days at

24  this stage; right?  Isn't 10 days --

25          **THE COURT:**  I don't know.

```
1          MR. FELDMAN:  I think it's the average ask.  Nobody --
2          THE COURT:  I don't know, Mr. Feldman.
3          MR. FELDMAN:  I don't think anybody can ask for more.
4          THE COURT:  It's a one-week case, or a two-week case,
5    or a three-month case.  It's kind of like that's -- those are
6    the -- those are the pockets.
7          MR. FELDMAN:  There are no more --
8          THE COURT:  Okay.
9          MR. FELDMAN:  There are no more three-month civil
10   cases, Your Honor.
11         THE COURT:  No, but that's my summer on the criminal
12   side.
13         MR. FELDMAN:  That's true.  That's true.  The criminal
14   cases take too long, but not the civil cases any longer.
15         THE COURT:  It's only because we can't put time
16   limits.
17         MR. FELDMAN:  You could put time limits on the
18   Government, and no one has taken me up on that.
19         THE COURT:  Hm, that's interesting.
20         MR. FELDMAN:  You could.  And you -- you could.  I
21   believe you could.  No one agrees with me.  But I believe you
22   could.
23         THE COURT:  That's great.  This is not what I want to
24   redo, Mr. Feldman.  I don't want to redo it.
25         Okay.  October 13th --
```

1              **MR. FELDMAN:**  That's fine.

2              **THE COURT:**  -- is the trial date.  And that means that

3   your pretrial conference would be September 26th.

4          You'll be placed on a pretrial compliance calendar for

5   September 19th.  I do not expect to see you that day.  What I

6   expect is, five business days prior, on September 12th, you'll

7   file a joint statement that says you've read my standing order

8   on civil trials, you don't have any questions, everybody's

9   doing what they're supposed to be doing.

10         And if you do have questions, that's when I want to know;

11  not later.  I don't want you to come in and say, "Oh, but we

12  thought -- oh, but we disagreed."  Oh, but no.  That's when I

13  want to know.  That's the point of that compliance calendar.

14  Okay?

15         Make sure you've also read my standing order with respect

16  to experts -- how those reports have to be constructed in terms

17  of summary of opinions up front.  Everything has to be

18  numbered.  You are limited on number of motions in limine.  You

19  are limited in number of Dauberts.

20         Any questions?

21             **MR. FELDMAN:**  Not at this point, Your Honor.

22             **THE COURT:**  Okay.

23             **MR. BAKER:**  None from the defense, Your Honor.  Thank

24  you.

25             **THE COURT:**  You have to go to ADR, at some point.  I

 1 | require everybody to do that.  So at what point in the arch --
 2 | arch of the case -- do you want to do that?  Before expert
 3 | reports?
 4 |        **MR. FELDMAN:**  No, no.  I think we've -- well, I think
 5 | we've addressed that, to some extent, in the statement.  And I
 6 | think we had suggested end of May, perhaps, and the other side
 7 | has suggested sometime in July.  You had also suggested, as
 8 | you'll recall, that we engage in that process after the
 9 | argument on the PI.  So at any date between at our date or to
10 | the plaintiff's --
11 |        **THE COURT:**  Well, I'm not going to force -- it's a
12 | mediation.  So if the defendants think they need until
13 | July 19th, they can have until July 19th.
14 |        **MR. FELDMAN:**  That's fine.
15 |        **THE COURT:**  Okay.  And you're going to go to private
16 | mediation.  So you're ordered to private mediation to be
17 | completed by July 19th.
18 |        **MR. FELDMAN:**  Great, thank you.
19 |        **THE COURT:**  And then I will have another conference
20 | with you to see if I'm going to trial or not.  Or, actually,
21 | let's -- your filing deadline's April 2nd.  So let's say
22 | March -- March 17th, 2025 -- another CMC.
23 |     Remember to file an updated case management statement.  If
24 | I don't feel like I need to talk to you, I'll take it off.  But
25 | that will just give me a sense of what's going on in your case

```
 1   while you're litigating.  Okay?
 2            MR. FELDMAN:  Thank you.
 3            MR. BAKER:  Thank you, Your Honor.
 4            THE COURT:  Anything else?  No?
 5        Have a great day.  Thank you.
 6            MR. BAKER:  Thank you, Your Honor.
 7            MR. FELDMAN:  Thank you.
 8            MS. CARUSO:  Thank you.
 9            MR. MALZAHN:  Thank you.
10            THE CLERK:  Court is adjourned in this matter.
11              (Proceedings adjourned at 2:37 p.m.)
12
13                      ---oOo---
14
15              CERTIFICATE OF REPORTER
16        I certify that the foregoing is a correct transcript
17   from the record of proceedings in the above-entitled matter.
18
19   DATE:  Wednesday, March 27, 2024
20
21
22   _____
23            Kendra A. Steppler, RPR, CRR
24        Official Reporter, U.S. District Court
25
```

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Robert P. Feldman (Bar No. 69602)
 bobfeldman@quinnemanuel.com
Margret M. Caruso (Bar No. 243473)
 margretcaruso@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:    (650) 801-5000

Robert M. Schwartz (Bar No. 117166)
 robertschwartz@quinnemanuel.com
Aaron H. Perahia (Bar No. 304554)
 aaronperahia@quinnemanuel.com
865 S. Figueroa St., 10th Fl.
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000

Sam S. Stake (Bar No. 257916)
 samstake@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4624
Telephone:    (415) 875-6600

Dylan I. Scher (*pro hac vice*)
 dylanscher@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000

*Attorneys for Plaintiff OpenAI, Inc.*

WAYMAKER LLP
Ryan G. Baker (Bar No. 214036)
 rbaker@waymakerlaw.com
Scott M. Malzahn (Bar No. 229204)
 smalzahn@waymakerlaw.com
Patricia Rojas Castro (Bar No. 339087)
 projas-castro@waymakerlaw.com
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Telephone:    (424) 652-7800

*Attorneys for Defendants Open Artificial
Intelligence, Inc., and Guy Ravine*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPENAI, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>OPEN ARTIFICIAL INTELLIGENCE, INC.,<br>a Delaware corporation; and GUY RAVINE,<br>an individual,<br><br>Defendants. | Case No. 4:23-cv-03918-YGR<br><br>**JOINT CASE MANAGEMENT STATEMENT AND [PROPOSED] ORDER**<br><br>Date:       March 25, 2024<br>Time:      2:00 p.m.<br>Place:     Zoom Videoconference<br><br>Action Filed:     August 4, 2023 |

ER364

## JOINT CASE MANAGEMENT STATEMENT

Counsel for Plaintiff OpenAI, Inc. ("OpenAI" or "Plaintiff") and counsel for Defendants Open Artificial Intelligence, Inc. ("OAI"), and Guy Ravine (together, with OAI, "Open Artificial Intelligence" or "Defendants") hereby jointly submit this Case Management Statement pursuant to Rule 26(f) of the Federal Rules of Civil Procedure, Civil Local Rule 16-9 and the Standing Order for All Judges in the Northern District of California.

## I.      JURISDICTION AND SERVICE

The Court has subject matter jurisdiction over OpenAI's federal claims pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1338.  This Court has supplemental jurisdiction over OpenAI's remaining claims under 28 U.S.C. § 1367(a).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391.  Defendants do not dispute subject matter jurisdiction, personal jurisdiction, or venue.  All Defendants have been served.

## II.     FACTS

### A.      Plaintiff's Statement

OpenAI brings this lawsuit to stop Defendants from continuing their confusing use of "Open AI" and open.ai, which leads consumers, the public, and business associates into mistakenly believing that Defendants have any connection to, association with, or sponsorship by OpenAI. They do not.

OpenAI was founded as an artificial intelligence research company in 2015. Over the years, OpenAI has introduced several artificial intelligence products and services that have become immensely popular, including ChatGPT and Dall-E.  OpenAI uses the OpenAI Mark in association with its goods and services, including on its website, social media, and marketing.  These uses have enormous reach.   OpenAI's website, which displays the OpenAI mark prominently, ranked in September 2023 as one of the most visited websites in the world.  Statements in the media reflect the widespread association of the OpenAI Mark with OpenAI—Forbes stated, for example, that "[i]n 2023, everyone knows OpenAI's name" while the Washington Post reported that the company was "rocketing into the mainstream."

1   Defendants have had nothing to do with OpenAI or its products and services, but they are

2   using a virtually identical name, "Open AI," to falsely associate themselves and the products and

3   services they make available through their website with OpenAI.  In doing so, they improperly seek

4   to misappropriate OpenAI's goodwill and sow confusion among consumers and the marketplace.

5   Following the release of OpenAI's popular ChatGPT and DALL·E 2 products in 2022,

6   Defendants engaged in newly confusing activities.  Among other things, they redesigned their

7   website in late 2022 to feature a plugin for a third-party product that, like OpenAI's DALL·E 2,

8   allows users to generate images from text prompts—the first time Defendants appear to have ever

9   made available any service that uses artificial intelligence, including chatbot or text to image

10  generator.  Unsurprisingly, Defendants' actions have caused actual confusion.  For example, a

11  review of Defendants' website shows visitors to that site have attempted to use it to search for

12  OpenAI's products and services, such as "chatgpt," plainly evidencing their confusion.  Social

13  media users and sophisticated online publishers have similarly been confused.  Further, a consumer

14  perception study confirmed that Defendants' use of the "Open AI" mark causes confusion with

15  OpenAI and its product and services.

16  Inevitably, Defendants' actions are harming OpenAI's brand and goodwill.  For example,

17  while OpenAI has significant controls to ensure its products, including DALL·E, are not used to

18  generate harmful content, the third-party plugin on Defendants' website lacks such controls.  As a

19  result, Defendants' website displays inappropriate images generated with that third-party plugin,

20  while creating the false impression that OpenAI is the source of those images and Defendants'

21  website.  The confusion Defendants are causing harms not just OpenAI, but also its customers,

22  business associates, and those seeking to contact OpenAI employees but mistakenly reach

23  Defendants instead, having no reason to realize their emails or calendar invitations reached their

24  intended recipients.

25  Defendants' excuses for their conduct do not withstand scrutiny.  Their Supplemental

26  Registration was obtained through Ravine's submission of fabricated specimen, reflecting not

27  genuine use of the website by consumers, but content that had been copied from a third party's

28

1   website.  Defendants' attempt to reframe that evidence as anything else is contrary to all evidence

2   in this case, including their own document production and discovery responses.

3           Even after Ravine obtained supplemental registration of the "Open AI" name in 2017 based

4   on his fraudulent representations to PTO, he did not make *bona fide* use of the mark in commerce.

5   Indeed, from 2017 to 2022, the domain associated with Defendants' trademark application

6   redirected visitors to *OpenAI's* website.  Defendants' assertion that they "invested nine years

7   developing" their website does not comport with the evidence, or any reasonable understanding of

8   what it means to "develop" a website.  Ravine submitted paperwork to the PTO last year "assigning"

9   the "Open AI" mark to Defendant Open Artificial Intelligence Inc., of which he claims to be the

10  President, and soon after Defendants redesigned their website to look more like OpenAI's, leaving

11  no doubt as to Defendants' intent to profit in the wake of OpenAI's success and renown.

12          Before Defendants began making available products that compete with Plaintiffs' products,

13  Plaintiff twice inquired (more than five years apart) whether Ravine would consider selling the

14  open.ai domain, but no terms were ever discussed, or conceptual agreement reached.  It was not

15  until Defendants began offering a competing text-to-image generation service on their website that

16  the domain name went from a "nice to have" to an inevitable source of confusion that compelled

17  Plaintiff to take legal action.

18      **B.      <u>Defendants' Statement</u>**

19          Through this lawsuit, Plaintiff seeks to accomplish what it has been attempting since 2015:

20  the forced acquisition of a significant and valuable trademark from a smaller competitor who used

21  the name "Open AI" before Plaintiff. Defendant Guy Ravine, an inventor and entrepreneur with

22  experience in artificial intelligence, started using the Open AI mark and the open.ai domain in March

23  2015, months before Plaintiff's company was even conceived. In December 2015, Plaintiff chose

24  the nearly identical name "OpenAI" and the domain openai.com, *even though they were well aware*

25  *of Ravine's use of a nearly identical mark and URL* in the same field. To the extent there is a conflict

26  between the parties, it is one entirely of Plaintiff's creation.

27          Since the day Plaintiff's company was formed in 2015, it has repeatedly tried (and failed)

28  to purchase the mark and domain from Open Artificial Intelligence. Plaintiff also repeatedly tried

1    (and failed) to obtain superior trademark rights at the USPTO. Now, after eight years of failure,

2    Plaintiff seeks this Court's assistance in taking through onerous litigation that which it could not

3    obtain fairly: the mark and domain that Open Artificial Intelligence has invested nine years

4    developing. Although Plaintiff has initially convinced this Court it is likely to succeed in this case,

5    Open Artificial Intelligence will show that Plaintiff's arguments have been misleading. Open

6    Artificial Intelligence plans to challenge the preliminary injunction, file counterclaims, and

7    vigorously protect its rights in the registered Open AI trademark and the open.ai domain it owns.

8    That mark was not procured through misrepresentation. Plaintiff's "evidence" to the contrary is

9    misleading.

10          Plaintiff does not deny that its founders, Sam Altman and Greg Brockman, knew of OAI

11   from the outset, and created the present conflict by choosing the same name. Indeed, within days

12   of Plaintiff's founding, Brockman asked Ravine to sell the open.ai domain and told Ravine to stop

13   using the Open AI name because Plaintiff wanted it for its own use. Plaintiff does not deny that

14   Altman spontaneously emailed Ravine in 2022 and asked to buy the open.ai domain "and related

15   IP rights" (i.e., the Open AI trademark), but he never made an actual offer. Plaintiff also does not

16   deny that as early as 2017 they abandoned applications to register Open AI after the USPTO

17   rejected them, citing OAI's earlier priority date.

18          Tired of losing at the PTO, and unwilling to negotiate with Open Artificial Intelligence in

19   good faith, Plaintiff brought this suit in August of 2023. Plaintiff now asserts that Open Artificial

20   Intelligence has no rights in the IP that Plaintiff had been so eager to purchase for the past decade.

21   Plaintiff boldly tells this Court that Ravine is infringing by using the name that Ravine himself

22   invented and first used. Plaintiff says this to the Court with a straight face even though any "harm"

23   Plaintiff might possibly have suffered was completely of its own choice and making.

24          Plaintiff has tried to bludgeon Ravine with the costs of litigation, employing arguments

25   based on incomplete and out-of-context "facts" intended to portray Ravine as a fraud and a troll.

26   While this trope may have an initial appeal, it crumbles with a modicum of consideration: Ravine

27   adapted the Open AI mark and bought the open.ai domain before Plaintiff even existed. If Ravine

28   were simply seeking a payday, he would not have rebuffed Brockman in 2015 and Altman in

1   2022. Instead, he continued to develop AI projects under the mark and domain that he had used

2   and owned first.

3        Plaintiff has confused with its false claims that Ravine acted unethically, demanding that

4   Open Artificial Intelligence prove the existence of websites almost a decade old. Further, by

5   emphasizing Plaintiff's recent commercial success, its counsel asks the Court to reduce trademark

6   rights to a mere popularity contest; a junior user's commercial success does not erase a senior

7   user's trademark rights, nor does it mean that the junior user pulls the rug from the senior user to

8   then acquire substantially exclusive use. In its heavy-handed effort to push Open Artificial

9   Intelligence aside, Plaintiff has also propounded onerous and personally intrusive discovery. To

10  date, the story has been one-sided. A complete set of facts will expose the many spurious

11  assertions on which much of Plaintiff's case rests.

12       With a preliminary injunction now forbidding Open Artificial Intelligence from using a

13  name and domain developed over nine years – and with the de facto designation of Plaintiffs as

14  the owners of a mark they stole – Open Artificial Intelligence has work to do. It is now incumbent

15  on Open Artificial Intelligence to present a complete factual record to the Court to show that these

16  initial setbacks provide no indication of the ultimate outcome; and that Plaintiff's factual

17  presentation, largely taken out of context, tells only a small part of the relevant story. With the aid

18  of its new counsel, Open Artificial Intelligence will do so.

19  **III.   LEGAL ISSUES**

20       OpenAI identifies the following disputed points of law based on the existing pleadings: (1)

21  whether Defendants' acts constitute trademark infringement under 15 U.S.C. § 1125(a); (2) whether

22  Defendants' acts constitute trademark infringement under California Common Law; (3) whether

23  Defendants are subject to civil liability for fraudulently procuring their "Open AI" mark under 15

24  U.S.C. § 1120; (4) whether Defendants' "Open AI" registration on the Supplemental Register is

25  subject to cancellation under 15 U.S.C. § 1119; and (5) whether OpenAI is entitled to permanent

26  injunctive relief to prevent irreparable harm from Defendants' acts.

27       Open Artificial Intelligence identifies the following disputed points of law: (1) whether Open

28  Artificial Intelligence's analogous and/or commercial use of the mark "Open AI," dating back to

2015, can be disregarded based on Plaintiff's subsequent use of "OpenAI"; (2) whether OpenAI is entitled to any relief in this case, and in particular injunctive relief; (3) whether OpenAI has been damaged in any way as a result of any of the conduct alleged in its complaint; (4) whether Open Artificial Intelligence is, in fact, the senior user of the Open AI mark; (5) whether OpenAI's failed attempts to register the OpenAI mark illustrate Open Artificial Intelligence's senior use; (6) whether OpenAI's failed attempts to acquire the "Open AI" mark and "open.ai" domain prior to OpenAI's launch illustrate Open Artificial Intelligence's senior use of the Open AI mark; (7) whether free speech or other rights protect Open Artificial Intelligence's use of open.ai.

Open Artificial Intelligence reserves the right to identify additional disputed points of law following the filing of Open Artificial Intelligence's counterclaims.

## IV.   <u>MOTIONS</u>

On February 28, 2024, the Court granted OpenAI's Motion for a Preliminary Injunction. Dkt. 63.  OpenAI intends to move for summary judgment after the close of discovery.

Open Artificial Intelligence intends to seek relief from the preliminary injunction. Open Artificial Intelligence intends to seek leave of court to amend its answer [Dkt. 42] to counterclaim against Plaintiff and possibly other parties. Open Artificial Intelligence may also seek summary judgment at the appropriate time. Open Artificial Intelligence reserves the right to bring additional motions, as the case proceeds towards trial.

## V.   <u>AMENDMENT OF PLEADINGS</u>

At this time, OpenAI does not anticipate amending its Complaint to add additional parties or claims.  However, OpenAI reserves the right to seek leave to submit further amended pleadings for good cause.  OpenAI proposes that the deadline for amending the pleadings should be set for Monday, April 15, 2024.  However, because Defendants previously agreed that they would file any counterclaims they choose to file within 30 days after the Court rules on OpenAI's preliminary injunction motion (Dkt. 39 at 4), OpenAI objects to Defendants seeking to amend their answer to assert counterclaims after March 29, 2024.  Defendants have not identified any reason they would need longer than five months after their initial answer to do so.

1    Open Artificial Intelligence intends to amend its October 23, 2023 answer [Dkt. 42] to assert
2    counterclaims against OpenAI and other parties for, inter alia, trademark infringement and unfair
3    competition.  Due to Open Artificial Intelligence's recent substitution of counsel, Open Artificial
4    Intelligence proposes that the deadline for amendment of pleadings be set for Friday, May 10, 2024.

5    **VI.   EVIDENCE PRESERVATION**

6    The parties have reviewed the Court's Guidelines Relating to the Discovery of Electronically
7    Stored Information ("ESI Guidelines").  Counsel for the parties met and conferred pursuant to
8    Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence
9    relevant to the issues reasonably evident in this action.  Counsel for the parties have given their
10   respective clients document retention instructions for all categories of all potentially relevant
11   documents, including electronically-stored information.

12   **VII.   DISCLOSURES**

13   The parties exchanged initial disclosures on October 20, 2023.

14   **VIII.   DISCOVERY**

15   **A.   Prior and Future Discovery**

16   The parties are engaged in ongoing written discovery.  Although OpenAI is meeting and
17   conferring with Defendants over certain deficiencies in their discovery responses, OpenAI's efforts
18   to meet and confer have been interrupted and delayed as a result of Defendants' delay and repeated
19   substitution of counsel.   OpenAI also intends to engage in other fact discovery, including
20   depositions, possible third-party discovery, and expert discovery.

21   OpenAI's discovery efforts have focused, and will continue to focus, on relevant matters
22   such as: (i) Defendants' selection and uses of the "Open AI" mark, (ii) Defendants' submissions and
23   correspondence to the PTO concerning the OpenAI Mark or Defendants' "Open AI" mark, including
24   any specimens, letters of protest, or other evidence, (iii) Defendants' domain name and website
25   history, including website traffic and target and actual visitors, (iv) any advertisement, marketing,
26   and promotion of Defendants' website using the "Open AI" mark, (v) communications with
27   consumers, website visitors, and other third parties regarding Defendants' website using the
28   "Open AI" mark, (vi) evidence of actual confusion between the OpenAI Mark and Defendants'

1   "Open AI" mark, (vii) goods and services that Defendant offers or plans to offer with the "Open AI"

2   name and/or through the open.ai website; (viii) Defendants' knowledge of OpenAI and its products

3   and services; (ix) the ownership and structure of Defendant Open Artificial Intelligence, Inc.,

4   including alter ego evidence, (x) evidence concerning the individuals who are acting in concert with

5   Defendants in furthering their infringing activities, and (xi) the basis for each of Defendants'

6   affirmative defenses. Thus far, Plaintiff has served on Defendants collectively 20 interrogatories,

7   65 requests for production, and 9 requests for admission, and has not yet taken any depositions or

8   served third party discovery.

9          Open Artificial Intelligence has responded to Plaintiff's discovery requests. Open Artificial

10  Intelligence's new counsel has met and conferred with Plaintiff's counsel. The parties have resolved

11  several disputes and are working to resolve others. Open Artificial Intelligence will be propounding

12  additional written discovery and will be seeking the depositions of Plaintiff and its principals. Open

13  Artificial Intelligence also intends to issue subpoenas to certain third parties.

14         Open Artificial Intelligence's discovery requests will seek evidence regarding, inter alia, the

15  following: (i) Plaintiff's attempt to register the Open AI mark; (ii) Plaintiff's attempt to purchase

16  the "Open AI" mark; (iii) Plaintiff's use of the OpenAI mark; (iv) Plaintiff's misleading statements

17  to the public that Plaintiff operates for the public good, when in fact Plaintiff operates solely for

18  profit; (v) Plaintiff's false representations to public officials and government entitles that Plaintiff

19  operates for the benefit of the public; (vi) the ownership and structure of OpenAI; (vii) OpenAI's

20  fundraising efforts and the representations made pursuant to those efforts; (viii) the basis for

21  Plaintiff's claims and for any defenses asserted by Plaintiff in this case; (ix) Plaintiff's use of the

22  OpenAI mark and any other marks associated with its artificial intelligence goods and services; (x)

23  the development of Plaintiff's business and product offerings; (xi) Plaintiff's marketing efforts; and

24  (xii) Plaintiff's purported damages.

25         **B.    <u>Proposed Discovery Limits and Stipulations</u>**

26         Plaintiff proposes that the discovery limits set under the Federal Rules of Civil Procedure be

27  modified as follows: (i) the parties will not require logging of privileged documents after Ravine's

28  letter of protest was filed on December 6, 2022; (ii) the parties will limit fact depositions to no more

than 25 hours for witnesses per side, and (iii) the parties will limit requests for admission to 25 per side, except as to authenticity of documents. As the case progresses, the parties may also stipulate to other discovery limits.

Open Artificial Intelligence does not agree to these limitations at this time. Open Artificial Intelligence's new counsel needs additional time to assess the issues and the record in this case before reaching any agreement to limit the rights of Open Artificial Intelligence in discovery. Any such limitations are also premature in light of Open Artificial Intelligence's intention to file counterclaims.

The parties anticipate entering into a stipulated protective order and ESI order. However, although OpenAI proposed drafts of a protective order and ESI agreement in October 2023, and the parties spent months negotiating terms that Defendants requested, Defendants have not yet agreed to sign the protective order or ESI stipulation.

Open Artificial Intelligence adds that new counsel for Open Artificial Intelligence has met and conferred with Plaintiff's counsel related to both the ESI stipulation and the protective order. The parties have exchanged comments the week of March 11, 2024. Open Artificial Intelligence expects the parties will resolve all outstanding issues prior to this case management conference.

### C. **Proposed Discovery Schedule**

The parties propose the schedules set forth in Section 16. Although Plaintiff proposed a shortened schedule to Defendants, it is willing to defer to their request for a longer schedule given the preliminary injunction.

## IX. **CLASS ACTIONS**

Not applicable.

## X. **RELATED CASES**

Not applicable.

## XI. **RELIEF**

In addition to the preliminary injunctive relief that the Court has granted (Dkt. 63), OpenAI seeks a permanent injunction enjoining Defendants from using the "OpenAI" mark or any confusingly-similar mark, including without limitation the "Open AI" mark, in connection with the

display, advertising, development, marketing, production, promotion, sale, and/or distribution of any artificial intelligence products or services, including the results generated by such products or services.   OpenAI also seeks an order cancelling Defendants' "Open AI" registration on the Supplemental Register and transferring Defendants' https://open.ai domain name to OpenAI.   In addition, OpenAI may seek monetary damages arising from Defendants' conduct, including trademark infringement, as well as an accounting and disgorgement of any profits Defendants wrongfully obtained.  At this stage of the proceeding, OpenAI is unable to calculate the amount of damages—as well as interest, attorneys' fees, costs, and punitive damages—it seeks without further discovery from Defendants.

Open Artificial Intelligence acknowledges the Court's February 28, 2024 Order Granting Plaintiff's Motion for a Preliminary Injunction. Open Artificial Intelligence contend that order was incorrectly issued, and Open Artificial Intelligence intends to seek relief from that order, as well as damages that have resulted from the imposition of that injunction. Open Artificial Intelligence contends OpenAI is entitled to no relief. Open Artificial Intelligence intends to file counterclaims, which will seek monetary and injunctive relief. At this stage of the proceeding, Open Artificial Intelligence is unable to calculate damages.

## XII.   SETTLEMENT AND ADR

In October 2023, the parties and counsel filed ADR Certifications indicating that the parties prefer to discuss ADR selections with the Court at the case management conference.  Dkts. 32, 33, 34.  During the parties' meet and confer in March 2024, the parties agreed to a private mediation. OpenAI proposes conducting a private mediation by Friday, May 31, 2024.

Defendants are willing to mediate. Due to the anticipated filing of Defendants' counterclaims, Defendants propose that a mediation completion deadline be set for July 19, 2024.

## XIII.   OTHER REFERENCES

This case is not suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

## XIV. NARROWING OF ISSUES

The parties are not aware of any issues that can be narrowed at this time and do not currently have any suggestions to expedite the evidence at trial. The parties do not wish to bifurcate issues, claims, or defenses in this action.

## XV. EXPEDITED SCHEDULE

The parties do not believe this is the type of case that can be handled under the Expedited Trial Procedure of General Order No. 64 Attachment A.

## XVI. SCHEDULING

Defendants propose, and OpenAI does not object based on the existing pleadings, to the following schedule:

| Event | Proposed Date |
|---|---|
| **Non-expert discovery cutoff** | Thursday, December 12, 2024 |
| **Opening expert reports** | Thursday, January 30, 2025 |
| **Rebuttal expert reports** | Thursday, February 20, 2025 |
| **Expert discovery cutoff** | Thursday, March 13, 2025 |
| **Deadline to file dispositive motions** | Thursday, April 2, 2025 |
| **Deadline for responses to dispositive motions** | Thursday, April 24, 2025 |
| **Deadline for replies in support of dispositive motions** | Thursday, May 8, 2025 |
| **Deadline to hear dispositive motions** | Tuesday, June 10, 2025 |
| **Pretrial conference** | Friday, August 15, 2025 |
| **Trial** | Monday, September 22, 2025 |

## XVII. TRIAL

OpenAI has requested a jury trial on all claims so triable as a matter of right. OpenAI currently anticipates that the trial will require five days based on the existing claims. Defendants estimate a trial of ten days.

**XVIII.** **DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS**

All parties have filed disclosures pursuant to Civil Local Rule 3-15.  Dkts. 3, 10.  OpenAI certifies that there is no financial or non-financial interest in the subject matter in controversy for OpenAI to report.

Open Artificial Intelligence certifies that there are no financial or non-financial interest in the subject matter in controversy for Open Artificial Intelligence to report.

**XIX.** **PROFESSIONAL CONDUCT**

Counsel for the parties have reviewed the Guidelines for Professional Conduct for the Northern District of California.

**XX.** **OTHER**

The parties are unaware of other matters that may facilitate the just, speedy and inexpensive disposition of this matter.


DATED: March 18, 2024                    QUINN EMANUEL URQUHART
                                         & SULLIVAN, LLP

                                            */s/ Robert P. Feldman*
                                         Robert P. Feldman
                                         Counsel for Plaintiff OpenAI, Inc.


DATED: March 18, 2024                    WAYMAKER LLP


                                            */s/ Ryan G. Baker*
                                         Ryan G. Baker
                                         Counsel for Defendants Open Artificial
                                         Intelligence, Inc. and Guy Ravine

## CIVIL LOCAL RULE 5-1 ATTESTATION

I, Robert P. Feldman, am the ECF user whose credentials were utilized in the electronic filing of this document.   In accordance with Civil Local Rule 5-1(i)(3), I hereby attest that Ryan G. Baker concurred in the filing of this document.

DATED: March 18, 2024

_/s/ Robert P. Feldman_
Robert P. Feldman

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CASE MANAGEMENT ORDER</u>**

The above JOINT CASE MANAGEMENT STATEMENT AND [PROPOSED] ORDER is approved as the Case Management Order for this case and all parties shall comply with its provisions.

IT IS SO ORDERED.

Dated: _____

_____
HON. YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE

-14-

CASE NO. 4:23-cv-03918-YGR

JOINT CASE MANAGEMENT STATEMENT

1  Ekwan E. Rhow - State Bar No. 174604
      erhow@birdmarella.com
2  Paul S. Chan - State Bar No. 183406
      pchan@birdmarella.com
3  Kate S. Shin - State Bar No. 279867
      kshin@birdmarella.com
4  Cameron R. Partovi - State Bar No. 319589
      cpartovi@birdmarella.com
5  BIRD, MARELLA, RHOW,
   LINCENBERG, DROOKS & NESSIM, LLP
6  1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
7  Telephone: (310) 201-2100
   Facsimile: (310) 201-2110
8
9  Attorneys for Defendants Open Artificial
   Intelligence, Inc. and Guy Ravine

10            **UNITED STATES DISTRICT COURT**

11     **NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

12

| | |
|---|---|
| 13 OPENAI, INC., a Delaware corporation, | CASE NO. 4:23-cv-03918-YGR |
| 14        Plaintiff, | **DEFENDANTS' STATEMENT OF RECENT DECISION** |
| 15     vs. | |
| 16 OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY | Filed concurrently with Declaration of Cameron R. Partovi |
| 17 RAVINE, an individual, | Assigned to Hon. Yvonne Gonzalez Rogers |
| 18       Defendants. | Date Complaint Filed: August 4, 2023 |

19

20

21

22

23

24

25

26

27

28

Case No. 4:23-cv-03918-YGR

DEFENDANTS' STATEMENT OF RECENT DECISION
**ER379**

## **STATEMENT OF RECENT DECISION**

Pursuant to Civil Local Rule 7-3(d)(2), Defendants Open Artificial Intelligence, Inc. and Guy Ravine (collectively, "Defendants"), respectfully submit this Statement of Recent Decision to bring to the Court's attention the following decisions that Defendants believe are relevant to disposition of Plaintiff OpenAI, Inc.'s ("Plaintiff") Motion for Preliminary Injunction (Dkt. 21) ("Motion"), which was heard before the Court on November 20, 2023:

- The Trademark Trial and Appeal Board's ("TTAB") September 26, 2022, ruling in *Andrusiek v. Cosmic Crusaders LLC*, Cancellation No. 92/064,830, 2022 WL 4103636 (T.T.A.B. Sept. 6, 2022) ("Decision"); and

- The TTAB's January 3, 2024, decision by TTAB redesignating the Decision as precedential, *Andrusiek v. Cosmic Crusaders LLC*, Cancellation No. 92/064,830 (T.T.A.B. Jan. 3, 2024) ("Redesignation Decision").

True and correct copies of the Decision and the Redesignation Decision are attached to the accompanying Declaration of Cameron R. Partovi as Exhibits B and C, respectively.

The Redesignation Decision was issued on January 3, 2024, after the reply brief was filed and after the Court's November 20, 2023, hearing regarding Plaintiff's preliminary injunction motion. The Decision is now binding on subsequent TTAB proceedings and discusses facts and law pertinent to issues raised in the parties' briefs regarding the Motion and at oral argument on November 20, 2023.

Defendants respectfully request that the Court permit the parties to submit briefing regarding the impact of the Redesignation and Decision on the disposition of Plaintiff's Preliminary Injunction Motion.

//
//
//
//
//
//

1  Respectfully submitted,

2

3  DATED:  February 2, 2024

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ekwan E. Rhow
Paul S. Chan
Kate S. Shin
Cameron R. Partovi
Bird, Marella, Rhow,
Lincenberg, Drooks & Nessim, LLP

By:  _____

Cameron R. Partovi
Attorneys for Defendants Open Artificial
Intelligence, Inc. and Guy Ravine

1   Ekwan E. Rhow - State Bar No. 174604
    erhow@birdmarella.com
2   Paul S. Chan - State Bar No. 183406
    pchan@birdmarella.com
3   Kate S. Shin - State Bar No. 279867
    kshin@birdmarella.com
4   Cameron R. Partovi - State Bar No. 319589
    cpartovi@birdmarella.com
5   BIRD, MARELLA, RHOW,
    LINCENBERG, DROOKS & NESSIM, LLP
6   1875 Century Park East, 23rd Floor
    Los Angeles, California 90067-2561
7   Telephone: (310) 201-2100
    Facsimile: (310) 201-2110

8
9   Attorneys for Defendants Open Artificial
    Intelligence, Inc. and Guy Ravine

10   **UNITED STATES DISTRICT COURT**

11   **NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

12

13   OPENAI, INC., a Delaware corporation,   |   CASE NO. 4:23-cv-03918-YGR

14           Plaintiff,   |   **DECLARATION OF CAMERON PARTOVI IN SUPPORT OF DEFENDANTS' STATEMENT OF RECENT DECISION**

15       vs.

16   OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual,

17

18           Defendants.

Assigned to Hon. Yvonne Gonzalez Rogers

Date Complaint Filed: August 4, 2023

19
20
21
22
23
24
25
26
27
28

Case No. 4:23-cv-03918-YGR
DECLARATION OF CAMERON PARTOVI
**ER382**

## DECLARATION OF CAMERON R. PARTOVI

I, Cameron R. Partovi, declare as follows:

1.      I am an active member of the Bar of the State of California and an Associate with Bird, Marella, Rhow, Lincenberg, Drooks & Nessim, LLP, attorneys of record for Defendants Open Artificial Intelligence, Inc. and Guy Ravine ("Defendants") in this action. I make this declaration in support of Defendants' Statement Of Recent Decision. Except for those matters stated on information and belief, I make this declaration based upon personal knowledge and, if called upon to do so, I could and would so testify.

2.      On January 24, 2024, Defendants' counsel asked the Court via email copying all counsel of record, in relevant part, whether Defendants were permitted to file a Statement of Recent Decision "containing (1) a citation to a decision issued by the Trademark Trial And Appeal Board ("TTAB") on September 6, 2022; (2) an October 19, 2023, decision by the Federal Circuit affirming the TTAB's September 6, 2022, decision; and (3) a January 3, 2024, decision by TTAB redesignating its September 6, 2022, decision as precedential." On January 30, 2024, Mr. Edwin Angelo A. Cuenco, the Courtroom Deputy Clerk, informed Defendants' counsel that they "may file a Statement of Recent Decision in accordance with local rules." A true and correct copy of this email exchange is attached as **Exhibit A**.

3.      A true and correct copy of the decision *Andrusiek v. Cosmic Crusaders LLC*, Cancellation No. 92/064,830, 2022 WL 4103636 (T.T.A.B. Sept. 6, 2022) is attached hereto as **Exhibit B**.

4.      A true and correct copy of the decision *Andrusiek v. Cosmic Crusaders LLC*, Cancellation No. 92/064,830 (T.T.A.B. Jan. 3, 2024) is attached hereto as **Exhibit C**.

//
//
//
//
//

1    I declare under penalty of perjury under the laws of the United States of America

2 that the foregoing is true and correct, and that I executed this declaration on February 2,

3 2024, at Los Angeles, California.

4

5

6                                              Cameron R. Partovi

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

## Cameron R. Partovi

| | |
|---|---|
| **From:** | Edwin Cuenco <Edwin_Cuenco@cand.uscourts.gov> |
| **Sent:** | Tuesday, January 30, 2024 10:49 AM |
| **To:** | Cameron R. Partovi |
| **Cc:** | aaronperahia@quinnemanuel.com; bobfeldman@quinnemanuel.com; margretcaruso@quinnemanuel.com; robertschwartz@quinnemanuel.com; Sam Stake; Dylan Scher; Ekwan E. Rhow; Paul S. Chan |
| **Subject:** | RE: OpenAI, Inc. v. Open Artificial Intelligence, Inc. et al., Case No. 4:23-cv-03918-YGR |

Dear Counsel,

You may file a Statement of Recent Decision in accordance with local rules.

Thank you,



Edwin Angelo A. Cuenco
Courtroom Deputy Clerk
United States District Court
1301 Clay Street
Oakland, CA 94612
Edwin_Cuenco@cand.uscourts.gov
(510)637-3540

---

**From:** Cameron R. Partovi <CPartovi@birdmarella.com>
**Sent:** Wednesday, January 24, 2024 4:24 PM
**To:** YGR CRD <YGRCRD@cand.uscourts.gov>
**Cc:** aaronperahia@quinnemanuel.com; bobfeldman@quinnemanuel.com; margretcaruso@quinnemanuel.com; robertschwartz@quinnemanuel.com; Sam Stake <samstake@quinnemanuel.com>; Dylan Scher <dylanscher@quinnemanuel.com>; Ekwan E. Rhow <erhow@birdmarella.com>; Paul S. Chan <pchan@birdmarella.com>
**Subject:** OpenAI, Inc. v. Open Artificial Intelligence, Inc. et al., Case No. 4:23-cv-03918-YGR

**CAUTION - EXTERNAL:**

To the Courtroom Deputy:

Defendants request the Court's permission to file a Statement of Recent Decision, containing (1) a citation to a decision issued by the Trademark Trial And Appeal Board ("TTAB") on September 6, 2022; (2) an October 19, 2023, decision by the Federal Circuit affirming the TTAB's September 6, 2022, decision; and (3) a January 3, 2024, decision by TTAB redesignating its September 6, 2022, decision as precedential. Defendants believe this decision, which became precedential after the November 20, 2023, hearing on Plaintiff's pending Motion for Preliminary Injunction (Dkt. 21), is relevant to disposition of the Motion. Defendants' Statement of Recent Decision would be limited to citations to these three decisions, copies of the three decisions, and a request that the parties be permitted to submit supplemental briefing regarding these decisions. The Statement of Recent Decision will not contain any argument. Please inform us whether Defendants may file this Statement.

1

**ER386**

Thank you,

Cameron Partovi

_____

Cameron R. Partovi
**Attorney**

**Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor, Los Angeles, California 90067-2561

www.birdmarella.com | 310.201.2100| LinkedIn | cpartovi@birdmarella.com

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

2

**ER387**

Exhibit B

> THIS OPINION IS NOT A
> PRECEDENT OF THE TTAB

Hearing: July 22, 2021                    Mailed: September 6, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———

Trademark Trial and Appeal Board

———

*Laverne John Andrusiek*

*v.*

*Cosmic Crusaders LLC and Lewis J. Davidson*

———

Cancellation No. 92064830

———

Michael P. Matesky, II of Matesky Law PLLC, for Laverne John Andrusiek.

Joseph J. Weissman of Johnson Pope Boker Ruppel & Burns LLP,
   for Cosmic Crusaders LLC and Lewis Davidson.

———

Before Wolfson, Lynch, and Larkin,
   Administrative Trademark Judges.

Opinion by Wolfson, Administrative Trademark Judge:

On October 25, 2021, the Board acknowledged the assignment from Cosmic

Crusaders LLC (Cosmic Crusaders or Respondent) to Louis J. Davidson (Davidson)

of Registration No. 4782920 for the mark CAPTAIN CANNABIS (standard

characters) for "comic books" in International Class 16 that is at issue in this case.[1]

---

[1] The assignment was recorded in the United States Patent and Trademark Office ("USPTO")
on August 6, 2021 under Reel/Frame 7387/0773. The assignment identified Cosmic
Crusaders as the assignor and as 'an administratively dissolved Florida limited liability
company;' Cosmic Crusaders was dissolved by the state of Florida on September 25, 2015,

Cancellation No. 92064830

The Board sua sponte joined Davidson as a party defendant, noted that despite the prior assignment of the registration to Davidson, Cosmic Crusaders had filed a Declaration of Use in its own name under Trademark Act Section 8, 15 U.S.C. § 1058, and suspended proceedings pending the USPTO's review and acceptance of the Declaration. 64 TTABVUE 1-2. The USPTO accepted the Declaration on May 26, 2022. Accordingly, proceedings herein are resumed and the case is ready for decision.

## I. Background

Laverne John Andrusiek (Petitioner) petitioned to cancel the involved registration for the mark CAPTAIN CANNABIS under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Davidson's use of the mark was likely to cause confusion with Petitioner's alleged prior use on comic books of the identical mark CAPTAIN CANNABIS.[2]

---

about 2 months after Registration No. 4782920 issued on July 28, 2015. Section 8 declaration filed July 28, 2021. As noted below, Davidson has been substituted into the case in place of Cosmic Crusaders as the party in the position of defendant, but we will refer in this opinion to Cosmic Crusaders as the "Respondent" because Cosmic Crusaders answered the petition for cancellation, filed the brief of the party in the position of defendant, and appeared through counsel at the oral hearing, even though, as discussed below, Davidson claimed to have created and used the registered mark personally.

[2] Petitioner also claimed that Cosmic Crusaders committed fraud in the execution of its April 2, 2014 application that matured into the involved registration; that Cosmic Crusaders did not make use of its mark prior to the application filing date; that any use Cosmic Crusaders may have made was unlawful; and that the specimen ultimately accepted by the USPTO prior to issuance of the involved registration was not in use prior to the filing date of Cosmic Crusaders' use-based application. 9 TTABVUE 47-55. Petitioner pursued these claims at trial.

Additionally, Petitioner argued in his trial brief that Respondent' mark fails to function as a mark because it is merely 'the title of a single comic book issue." 43 TTABVUE 6. Petitioner did not plead as a basis for cancellation that the mark fails to function as a mark because it is merely the title of a single work, nor did the parties try the issue by consent; accordingly, we do not consider the claim. In addition, while Petitioner argues in his trial brief that Respondent has abandoned the mark, there is no pleading of abandonment and therefore we

2

**ER390**

Cancellation No. 92064830

In its Answer, Cosmic Crusaders denied the salient allegations of the Petition to Cancel, and asserted that Petitioner abandoned any rights he may have had prior to Respondent's priority date. However, because Respondent failed to pursue the affirmative defense of abandonment at trial, it is deemed waived and has been given no consideration.[3] *See Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.,* 107 USPQ2d 1750, 1753 n.6 (TTAB 2013), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014). Moreover, the parties agree that the marks are confusingly similar, and as discussed more fully below, Petitioner only has to prove priority of use at common law to prevail on its claim under Section 2(d).

---

will not entertain that claim. *Syngenta Crop Prot. Inc. v. Bio-Chek LLC*, 90 USPQ2d 1112, 1115 n.3 (TTAB 2009); TBMP § 314 ("A party may not rely on an unpleaded claim.").

[3] Respondent's statement, in a footnote to its brief at 47 TTABVUE 22, that Petitioner "admitted" it did not use its mark for 20 years, and that this "raises a presumption of abandonment, which Petitioner cannot possibly rebut" is both a mischaracterization of any statement Petitioner may have made, and inadequate as proof that Petitioner's common law mark has been abandoned. Even if Respondent's statement is true, the 20-year period of time as characterized by Respondent comes "between the late 1970s an [sic] 1999." If Respondent had provided evidence of Petitioner's alleged abandonment prior to 1999, which it did not, such evidence would have no bearing on any subsequent use that Petitioner could prove it made prior to Respondent's date of first use. "[I]f a challenger's date of first use is later than the resumed use of the party alleged to have abandoned the trademark, then the issue of possible abandonment is irrelevant to the question of priority." 3 McCarthy on Trademarks and Unfair Competition § 17:3 (5th ed.); *see also Income Tax Serv. Co. v. Fountain*, 475 F.2d 655, 177 USPQ 388, 389 (CCPA 1973) (abandonment by registrant is irrelevant where its first use after alleged abandonment is prior to petitioner's first use); *W. Fla Seafood Inc. v. Jet Rests. Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1666 (Fed. Cir. 1994) (a party asserting abandonment as a defense to a prior use assertion "bears at a minimum a burden of coming forth with some evidence of abandonment"), *quoted in Exec. Coach Builders, Inc. v. SPV Coach Co.*, 123 USPQ2d 1175, 1181 (TTAB 2017).

3

**ER391**

Cancellation No. 92064830

## II.    Evidentiary Objection

During his rebuttal period, Petitioner filed a rebuttal declaration of Laverne Andrusiek (39 TTABVUE at 3-142);[4] a rebuttal declaration of Michael P. Matesky, II (39 TTABVUE at 143-149); and a rebuttal Notice of Reliance (37 TTABVUE at 2-18).

Respondent objected to Petitioner's rebuttal evidence as improper on the ground that "Petitioner utilized his 'rebuttal' testimonial period simply as a second bite at presenting his evidence in chief." 47 TTABVUE 12. Petitioner responded that the material was introduced to rebut Respondent's claim that it is the senior user of the mark: "Davidson did not solely testify regarding his own claimed first use dates. Rather, by claiming to be the 'senior user,' he necessarily claimed to have begun use of the CAPTAIN CANNABIS mark before Petitioner. . . . Petitioner is therefore entitled to submit evidence rebutting that claim." 51 TTABVUE 10. In other words, Petitioner contends that the evidence he presented during his main testimony period was meant to demonstrate his priority vis-à-vis Davidson, and that it was not until Davidson asserted his right to rely on the prior use by Cosmic Crusaders did it become necessary for Petitioner to present evidence of first use prior to that of Cosmic Crusaders.

"It is axiomatic that rebuttal testimony may be used only to rebut evidence offered by the defendant." *Life Zone Inc. v. Middleman Grp. Inc.*, 87 USPQ2d 1953, 1958 (TTAB 2008) (citing *Wet Seal Inc. v. FD Mgmt. Inc.*, 82 USPQ2d 1629 (TTAB 2007); *Rowell Labs., Inc. v. Can. Packers Inc.*, 215 USPQ 523, 525 n.2 (TTAB 1982)

---

[4] 39 TTABVUE is a corrected resubmission of 36 TTABVUE.

4

**ER392**

Cancellation No. 92064830

("material intended to buttress petitioner's case-in-chief ... constituted improper rebuttal"). With the aforementioned principle in mind, we find that the bulk of Andrusiek's rebuttal testimony and exhibits, the Matesky declaration and exhibits, and the evidence submitted under the rebuttal Notice of Reliance should have been introduced as part of Petitioner's case-in-chief. Inasmuch as the petition was filed against Cosmic Crusaders initially, it is reasonable to impose upon Petitioner a duty to present whatever evidence he had demonstrating his use prior to any use by that entity as part of his main trial evidence.

The only proper rebuttal evidence consists of the averments in Petitioner's rebuttal declaration that directly rebut certain statements made by Davidson in his testimony declaration, namely, that "No character named Captain Cannabis appears in the comic book. In fact, the name or term 'Captain Cannabis' appears nowhere in the comic book story." 17 TTABVUE 4. Accordingly, we admit and have considered the following testimony from the Andrusiek rebuttal declaration and related Exhibit 5:

> 18. In 2006, I published a new issue of the Captain Cannabis comic series, titled "420" (the "420/CAPTAIN CANNABIS" comic book). True and correct copies of the front cover, editorial page, and back cover of the 420/CAPTAIN CANNABIS comic book are attached hereto as Exhibit 5.

> 19. Like all other issues in the CAPTAIN CANNABIS series, the 420/CAPTAIN CANNABIS comic book tells the story of Halburt Lighter, the alter ego of superhero Captain Cannabis.

> 20. The 420/CAPTAIN CANNABIS comic book displays the Captain Cannabis Leaf Design Mark in the upper left hand corner of the front cover.

5

**ER393**

Cancellation No. 92064830

> 21. The editorial page of the 420/CAPTAIN CANNABIS
> comic book features the Captain Cannabis character
> artwork, and both the editorial page and back cover use the
> CAPTAIN CANNABIS trademark to inform readers that
> the 420/CAPTAIN CANNABIS comic book is part of the
> same "CAPTAIN CANNABIS" series and story that I
> began publishing decades earlier.

39 TTABVUE 5-6; Exhibit 5, 39 TTABVUE 26-29.

In all other respects, Respondent's objection to Petitioner's rebuttal evidence is sustained and the evidence has been given no consideration. *See, e.g., Osage Oil & Transp., Inc. v. Standard Oil Co.*, 226 USPQ 905, 907 n.10 (TTAB 1985), *rev'd on other grounds*, 10 USPQ2d 1554 (N.D. Okla. 1988) ("In view of the absence of a period for rebuttal by respondent, and since priority of rights was a crucial issue joined by the pleadings, it was incumbent on petitioner to anticipate that respondent would support its claimed prior rights both by evidence relating to petitioner's date of first use as well as its own."); *Am. Meat Inst. v. Horace W. Longacre, Inc.*, 211 USPQ 712, 719 (TTAB 1981) ("[i]t is the general rule that a party plaintiff may in his case on rebuttal introduce facts and witnesses appropriate to deny, explain, or otherwise discredit the facts and witnesses adduced by the opponent, but not any facts or witnesses which might appropriately have been introduced during its case- in-chief to sustain its pleading); *Gen. Elec. Co. v. Graham Magnetics Inc.*, 197 USPQ 690, 692 n.5 (TTAB 1977) (rebuttal testimony and evidence is intended to be limited to denials, refutations or explanations of defendant's testimony and evidence).

## III.  The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the challenged registration and its application file history. In

Cancellation No. 92064830

addition, and in light of our above evidentiary rulings, the record includes the following:

### A.    Petitioner's Evidence

- Affidavit of Laverne John Andrusiek, including exhibits, 11 TTABVUE 6-95;
- Affidavit of Tom Edgar, site administrator of Francis Ford Coppola's American Zoetrope story development website, including an exhibit, 11 TTABVUE 2-4;
- Affidavit of Jim McPherson, self-identified as Publisher of Phantacea Publications, 11 TTABVUE 79;
- Portions of the Andrusiek rebuttal declaration, 39 TTABVUE 5-6 and Exhibit 5, 39 TTABVUE 26-29;
- Notice of Reliance on Internet materials, discovery requests propounded on Respondent, and an email thread among the USPTO and the parties. 12 TTABVUE.

### B.    Respondent's Evidence

- Testimony declaration of Respondent Lewis Davidson, 17 TTABVUE;
- Testimony declaration of Alex Wadsworth, self-identified as a radio personality, 18 TTABVUE.[5]

## IV.   Entitlement to a Statutory Cause of Action

Entitlement to a statutory cause of action "is an element of the plaintiff's case in every inter partes proceeding." *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671, 210 L. Ed. 2d 833 (2021); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 82, 211 L. Ed. 2d 16 (2021) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 S. Ct. 1377, 188 L. Ed. 2d 392, 109 USPQ2d 2061, 2067 n.4 (2014)).

---

[5] The testimony declaration of Joseph Weissman, filed at 16 TTABVUE, was stricken by the Board on September 18, 2018. 26 TTABVUE.

Cancellation No. 92064830

To establish entitlement to a statutory cause of action, a plaintiff must demonstrate: (i) an interest falling within the zone of interests protected by the statute and (ii) a reasonable belief in damage proximately caused by the registration or continued registration of the mark. *Spanishtown Enters.*, 2020 USPQ2d 11388 at *1 (citing *Corcamore*, 2020 USPQ2d 11277 at *4). *See also Empresa Cubana*, 111 USPQ2d at 1062; *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (TTAB 1982).

As a direct competitor of Respondent, 11 TTABVUE 10-11, who asserts a Section 2(d) claim on which likelihood of confusion is conceded and only priority is at issue, Petitioner has an interest in canceling Respondent's registration. *See, e.g., Books on Tape, Inc. v. Booktape Corp.*, 836 F.2d 519, 5 USPQ2d 1301, 1302 (Fed. Cir. 1987) (finding competitor has standing because it has an interest in the outcome beyond that of the general public); *Peterson v. Awshucks SC, LLC*, 2020 USPQ2d 11526, *6 (TTAB 2020) (entitlement to a statutory cause of action found where petitioner and respondent are competitors).

Petitioner's interest is squarely within the zone of interests protected by the statute and he holds a reasonable belief that damage is proximately caused by the continued registration of Respondent's mark. Petitioner has established his entitlement to a statutory cause of action under the Trademark Act, 15 U.S.C. § 1051 et. seq.

8

**ER396**

Cancellation No. 92064830

## V.    Likelihood of Confusion

Both Petitioner and Respondent are selling comic books under the mark CAPTAIN CANNABIS, which also serves as the name of a fictitious character. Character names are registrable as trademarks where the character name is perceived by the purchasing public as a mark which identifies and distinguishes the source of goods or services. *See, e.g., In re Paramount Pictures Corp.*, 213 USPQ 1111 (TTAB 1982) (television character names determined to serve as trademarks for decalcomanias); *In re Fla. Cypress Gardens, Inc.*, 208 USPQ 288 (TTAB 1980) (designation consisting of name of clown is registrable for entertainment services despite fact that name also identifies a fictitious character played by performers in applicant's shows); *cf. In re DC Comics, Inc.*, 689 F.2d 1042, 215 USPQ 394 (CCPA 1982) (drawings of fictional comic characters held to function as trademarks for toy doll figurines of such characters).

The parties do not dispute that the term CAPTAIN CANNABIS is a distinctive trademark as well as the name of a character. Nor do they dispute that contemporaneous use of their respective marks would likely cause confusion. Petitioner states that "neither party truly disputes likelihood of confusion," 43 TTABVUE 6, and Respondent agrees that "Petitioner cannot possibly prove any likelihood of confusion [only because Petitioner] has not and cannot carry its burden to establish priority of use." 47 TTABVUE 25. Accordingly, the only issue in dispute under Trademark Act Section 2(d) is priority.

To establish priority on a likelihood of confusion claim brought under Trademark Act Section 2(d), 15 U.S.C. § 1052, Petitioner must prove that, vis-à-vis Respondent,

9

Cancellation No. 92064830

he owns "a mark or trade name previously used in the United States . . . and not abandoned. . . ." Trademark Act Section 2(d). Petitioner must establish his priority by a preponderance of the evidence. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1848 (Fed. Cir. 2000); *Giersch v. Scripps Networks Inc.*, 90 USPQ2d 1020, 1023 (TTAB 2009) ("In a case involving common-law rights, 'the decision as to priority is made in accordance with the preponderance of the evidence.'") (citing *Hydro-Dynamics*, 1 USPQ2d at 1773).

Because Petitioner does not own an existing registration upon which he may rely for purposes of a Section 2(d) likelihood of confusion analysis, Petitioner must establish his proprietary rights in the CAPTAIN CANNABIS mark before any date upon which Respondent may rely. Petitioner may establish such rights through prior actual trademark use or through prior use analogous to trademark use, such as use in advertising brochures, trade publications, catalogues, newspaper advertisements and Internet websites that created a public awareness of the designation as a trademark identifying Petitioner as the source of the relevant goods. *See* Trademark Act Sections 2(d) and 45, 15 U.S.C. §§ 1052(d) and 1127; *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002) (proprietary rights in the asserted mark may arise from "prior use analogous to trademark or service mark use, or any other use sufficient to establish proprietary rights"); *Cent. Garden & Pet Co. v. Doskocil Mfg. Co.*, 108 USPQ2d 1134, 1145 (TTAB 2013) ("The analogous use doctrine allows a party to claim priority as of when it is established that the mark is associated in the mind of the consumer with a source for the goods.").

10

**ER398**

Cancellation No. 92064830

### A.    Has priority through analogous use been properly pleaded?

Although the parties make no mention of the issue, we have long held that reliance

on priority through analogous use must be pleaded, *see Cent. Garden & Pet Co.*, 108

USPQ2d at 1142 (citing *Fair Indigo LLC v. Style Conscience*, 85 USPQ2d 1536, 1537-

38 (TTAB 2007) (discussing sufficiency of analogous use pleading). In his amended

petition to cancel, Petitioner claimed priority based on his alleged

> common law usage of the CAPTAIN CANNABIS
> trademark in U.S. interstate trade since at least
> January 25, 1999 when [Petitioner] engaged in sales
> activities at the NATPE trade fair in New Orleans,
> Louisiana and *bona fide* commercial trade in Comic Books
> starting September 25, 2006 by way of direct sale of a
> 420/Captain Cannabis comic book to a customer in the
> state of Florida.

9 TTABVUE 9 (Amend. Pet. for Canc. ¶ 41). Petitioner also claimed priority based on

his alleged "sales and marketing activities through his CAPTAINCANNABIS.COM

web portal since April 22, 1999." *Id.* (Amend. Pet. for Canc. ¶ 42).

We find these statements sufficient to allege Petitioner's analogous use priority

claim. As stated, Petitioner claims 1999 as the date he was engaged in "sales

activities," which is use analogous to trademark use; he also pleads "bona fide

commercial trade" in 2006 and clarifies that this was "by way of direct sale," which

would be, if proven, actual trademark use. Petitioner also relies on marketing

activities, and "even before proper trademark use commences, advertising or similar

pre-sale activities may establish priority if they create the necessary association in

the mind of the consumer." *Central Garden & Pet Co.*, 108 USPQ2d at 1142.

Petitioner has thus sufficiently put Respondent on notice that he intends to rely on

11

**ER399**

Cancellation No. 92064830

both use analogous to trademark use as well as actual trademark use. *See* Fed. R.

Civ. P. 8(e)(1); *see also Scotch Whisky Assoc. v. U.S. Distilled Prods. Co.,* 952 F.2d

1317, 21 USPQ2d 1145 (Fed. Cir. 1991) (under the simplified notice pleading of the

Federal Rules of Civil Procedure, the allegations of a complaint should be construed

liberally so as to do substantial justice); *Fair Indigo*, 85 USPQ2d at 1538 ("The

elements of each claim should be stated concisely and directly, and include enough

detail to give the defendant fair notice."); *Harsco Corp. v. Elec. Scis. Inc.,* 9 USPQ2d

1570, 1571 (TTAB 1988) (since function of pleadings is to give fair notice of claim, a

party is allowed reasonable latitude in its statement of its claims).[6]

### B. Respondent's Priority Date

Because a presumption of validity attaches to Respondent's involved registration,

Davidson is entitled to rely on the April 2, 2014 filing date as his date of constructive

first use. *Cent. Garden & Pet Co.*, 108 USPQ2d at 1140 ("when an application or

registration is of record, the party may rely on the filing date of the application for

registration, *i.e.*, its constructive use date"); *Syngenta Crop Prot.*, 90 USPQ2d at 1119

---

[6] Even if we found Petitioner's allegations insufficient, we believe the issue has been tried by implied consent. Fed. R. Civ. P. 15(b)(2). For example, Respondent acknowledges that Petitioner alleges CAPTAIN CANNABIS artwork appeared on his website in 1999 but argues that "the existence of such artwork standing alone does not establish use of the artwork as a trademark at the website." 47 TTABVUE 23. Also, Petitioner testified that he sold a copy of his "420" comic book in September 2006, 11 TTABVUE 7; Respondent argues that even if true, it did not bear the CAPTAIN CANNABIS mark. 47 TTABVUE 24. "While the question [would be] a very close one we find that the issue was tried by implied consent, and we therefore consider [Petitioner's] analogous use theory." *Cent. Garden & Pet Co.*, 108 USPQ2d at 1142.

**ER400**

Cancellation No. 92064830

("applicant may rely without further proof upon the filing date of its application as a 'constructive use' date for purposes of priority").

However, Davidson asserts an earlier date for priority. Davidson seeks to establish "2013" as Respondent's date of first use in commerce. To this end, Davidson testified that:

> I initially indicated a first-use in commerce date of October 2, 2014 for my "Captain Cannabis" trademark based on a misunderstanding on my part regarding the requirements for use in interstate commerce. In reality, the first sales of my "Captain Cannabis" comic books under the "Captain Cannabis" mark were in 2013.

17 TTABVUE 4 (Davidson Decl. ¶ 17).

When a registrant seeks "to prove a date of first use earlier than the date alleged in its application for registration ..., its proof of that earlier date must be 'clear and convincing.'" *Hydro-Dynamics Inc. v. George Putnam & Co. Inc.,* 811 F.2d 1470, 1 USPQ2d 1772, 1773 (Fed. Cir. 1987) (dates of first use earlier than that alleged in the application is a change of position from one "considered to have been made against interest at the time of filing the application," and therefore requires enhanced proof); *see also Stanspec Co. v. Am. Chain & Cable Co.*, 531 F.2d 563, 189 USPQ 420, 424 n.10 (CCPA 1976) ("An amendment to a registration to claim earlier dates of first use amounts to an enlargement of a registrant's rights. Such a registrant has a heavy burden of proof in attempting to establish a date of first use prior to that stated in its registration.") (internal citations omitted); *NT-MDT LLC v. Kozodaeva*, 2021 USPQ2d 433 (TTAB 2021) (motion to amend dates of first use denied where registrant's proof was not clear and convincing).

13

**ER401**

Cancellation No. 92064830

To support the claimed 2013 date, Davidson testified that he "sold some copies of my 'Captain Cannabis' comic books personally in 2013." 17 TTABVUE 3 (Davidson Decl. ¶ 13). Alex Wadsworth testified that he purchased a CAPTAIN CANNABIS comic book from Davidson in 2013. 18 TTABVUE 2 (Wadsworth Decl. ¶ 2). A copy of the cover of the comic book Wadsworth attested to purchasing was attached to his Declaration as Exhibit 1 (18 TTABVUE 3):



Neither Respondent nor Davidson supplied an invoice or receipt demonstrating this alleged sale to Wadsworth or of any direct sales allegedly made in 2013.

14

**ER402**

Cancellation No. 92064830

Respondent's only receipts come from 2014, in the form of two receipts that fail to identify the items allegedly sold except by unintelligible "deposit ID" numbers. Whether these reflect sales of comic books bearing the artwork shown above, or that displayed below is unclear:[7]



---

[7] This artwork accompanied Respondent's statement of use, and was properly rejected as failing to show use of CAPTAIN CANNABIS in a trademark manner. Trademark Act Sections 1, 2 and 45, 15 U.S.C. §§1051-1052, 1127. After this specimen was rejected, Respondent filed as a substitute specimen, a copy of the cover depicted in Exhibit 1 to the Wadsworth declaration.

15

**ER403**

Cancellation No. 92064830

The only other submission allegedly supporting Respondent's earlier 2013 claimed date of first use is an invoice from a printer for printing "The Cosmic Crusaders-Reboot-Comic." 17 TTABVUE 8. The invoice does not mention CAPTAIN CANNABIS, and it is unclear if and how the term was used in the referenced "Reboot-Comic." The invoice thus has minimal probative value.

When the smoke clears, the above evidence is not clear and convincing proof that Respondent's first use of its mark on a comic book was in 2013 rather than 2014. Respondent has not established that it is entitled to a date of first use earlier than April 2, 2014.[8]

## C. Petitioner's Priority Date

As noted above, "even before proper trademark use commences, advertising or similar pre-sale activities may establish priority if they create the necessary association in the mind of the consumer." *Cent. Garden*, 108 USPQ2d at 1142.

> It is well settled that one may ground one's opposition to an application on the prior use of a term in a manner analogous to service mark or trademark use. Such an "analogous use" opposition can succeed, however, only where the analogous use is of such a nature and extent as to create public identification of the target term with the opposer's product or service.

*T.A.B. Sys. v. PacTel Teletrac,* 77 F.3d 1272, 37 USPQ2d 1879, 1882 (Fed. Cir. 1996). The theory under which use analogous to trademark use can provide a party with priority over another user of the same mark further requires that actual trademark

---

[8] Even had we found "2013" to be Respondent's date of first use, such a finding would not change the results in this case.

16

**ER404**

Cancellation No. 92064830

use must follow the analogous use within a commercially reasonable period of time. *Dyneer Corp. v. Auto. Prods., plc*, 37 USPQ2d 1251, 1255 (TTAB 1995) ("With use analogous to trademark use, the proper inquiry generally is whether any delay between such use and actual, technical trademark use is commercially reasonable.").

To prove prior analogous use, Petitioner need not submit survey evidence or other direct evidence of the consuming public's identification of the CAPTAIN CANNABIS mark with Petitioner as the source of comic books or related goods such as DVDs and animated videos. "Instead, the fact finder may infer the fact of identification on the basis of indirect evidence regarding the [Petitioner's] use of the word or phrase in advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications." *T.A.B. Sys.*, 37 USPQ2d at 1881. While the "activities claimed to constitute analogous use must have substantial impact on the purchasing public," *id.* at 1882, that does not mean proof is required of "a fixed percentage, like 20%, much less 51%, of the potential customers must have formed the required 'prior public identification.'" *Id.* at 1883.

Thus, Petitioner may establish his priority by showing that he has used the CAPTAIN CANNABIS mark in the United States in a manner analogous to trademark use sufficient to create an association in the mind of the relevant consumers between the mark and the goods, followed by actual trademark use of the mark within a "commercially reasonable time." *Dyneer Corp.*, 37 USPQ2d at 1255.

### 1.   Petitioner's Pre-sales Activities

Petitioner testified that he "created a costumed superhero character and comic book titled CAPTAIN CANNABIS" during the 1970s and obtained a Canadian

17

**ER405**

Cancellation No. 92064830

copyright in 1977 for the "unpublished Literary and Artistic (comic book) titled CAPTAIN CANNABIS." Andrusiek Aff. ¶ 2; Annex. 15 (11 TTABVUE 6). The cover of the work appeared as follows:



11 TTABVUE 16.

Following registration of the copyright in Canada, Petitioner attended a trade show of the National Association of Television Program Executives (NATPE) in New Orleans in 1999. There, he promoted CAPTAIN CANNABIS by means of a promotional flyer distributed at the trade show. Andrusiek Aff. ¶ 3; Annex. 17 (11 TTABVUE 6). According to the flyer distributed at the event, CAPTAIN CANNABIS was the main character in an adult animated series that was "in development." Annex. 17 (11 TTABVUE 20):

**Captain Cannabis**

Cross your local super-hero with an aging rock and roll roadie and you get Captain Cannabis. This adult animated series following the exploits of Halburt Lighter as he stumbles from one disaster to the next.

Audience: Adult          Packaging: Animated series - 26 x 1/2 hour

18

**ER406**

Cancellation No. 92064830

Also in 1999, Petitioner registered the domain name <captaincannabis.com>. He testified that he has "always been the registered owner." Andrusiek Aff. ¶ 4 (11 TTABVUE 7). Petitioner operates a website at this address that displays the mark "to promote and sell [Petitioner's] CAPTAIN CANNABIS products." *Id.*

Petitioner testified that "on October 12, 2006, I printed 5000 copies of the first CAPTAIN CANNABIS comic book in the series titled "420-001" with oKee.comX (okee.com) publisher." Andrusiek Aff. ¶ 4 (11 TTABVUE 7). On rebuttal, Petitioner testified that "[i]n 2006, I published a new issue of the Captain Cannabis comic series, titled "420" (the "420/CAPTAIN CANNABIS" comic book)." Corrected Andrusiek Rebuttal Decl. ¶ 18; Ex. 5 (39 TTABVUE 5).

The front cover of the comic book was included within Exhibit 5 to Petitioner's rebuttal testimony declaration. The words CAPTAIN CANNABIS do not appear on the front cover of the comic book, 39 TTABVUE 27, which is depicted below:

19

**ER407**

Cancellation No. 92064830



In addition, within Exhibit 5 to Petitioner's rebuttal declaration and included as part of Annexure 22 to Petitioner's main testimony affidavit, are copies of a page from within the comic book and the back cover of the comic book. On the back cover appears

Cancellation No. 92064830

a reference to "Captain Cannabis" as the main character of the story, and on the inside page before the back cover, "Captain Cannabis" is referred to as the title of the "precursor to '420'" (i.e., the comic book copyrighted in 1977). The back cover at 11 TTABVUE 31 and the inside page before the back cover at 11 TTABVUE 30 follow.

- **Back cover**:

**ER409**

Cancellation No. 92064830



"420" creator Verne Andru found his calling when he met the crew from Captain Canuck Comics at a high school "career day." He quickly became the studio pet, dropping by weekly to show off his latest creations, including "420's" star attraction, Captain Cannabis.

His career got a boost with his first paid job - cel painting on "Blowhard," a National Film Board animated short. This was followed by animation assignments for Hanna Barbera's Saturday morning lineup. At the same time, he continued working in comics, doing covers for Charlton, ink and colour on Captain Canuck and illustrating stories for the independently published Phantacea.

During a feature assignment on Nelvana's "Rock and Rule," he worked with a leading special effects team and became intrigued with the opportunities computers held for fantasy creators. Upon completing that project he attended college, graduating on the honour role a few years later as a computer systems specialist.

Verne was early to apply the technology as it came available. Desktop publishing replaced traditional typesetters. He pioneered digital paint for location and character colour styling on television series work. This was followed by a state-of-the-art desktop animation system he used to produce a range of animations for web and broadcast, including the highly successful Kid's Club commercial spots for Swedish furniture retailer, IKEA.

Verne can be found on the web at www.VerneAndru.com.





# PREPARE TO BE AMAZED!

When an aging rock-n-roll roadie happens across a neurotic ET with a stash of cosmic pot, he finds himself transformed into Captain Cannabis – a reluctant "hero" who must learn how to use his new superhuman powers to stop a crazed global elite and their "machine of death" from turning Earth into the ultimate PRISON PLANET.

## "420" IS A FRESH TAKE ON SCI-FI

Join veteran animator and comic book artist Verne Andru, as he spins a tale that will make even the most jaded conspiracy theorist blush. 30 years in the making, "420" mixes hightbrow comedy and adventure with the rough and tumble sensibilities of the wrong side of the tracks. Down-and-out roadie Halburt "Hal" Lighter finds himself tossed into the middle of an extraterrestrial turf war over the planet Earth, where the entire future of the human species is at stake. Hal and his secret desire Marion befriend the messianic alien oKee, much to the dismay of the Vice President of the United States who is working in collusion with The Supreme One – evil lord of another alien race.

## "420" HAS A UNIQUE VOICE, ONE THAT IS FRESH AND EXUBERANT

While principally a science fiction story, "420" successfully mixes up its genres. It is a hybrid of science fiction and dark comedy/drama. The story is fun and the characters are great answers to the clichés of the genre, adventuring in an inspired universe. More importantly, Verne Andru has a truly original voice and the story is a unique mix of science fiction, dark comedy and gritty realism.

## "420" IS A MULTI-MEDIA EXTRAVAGANZA

"420" was designed from the outset as a multi-media experience. Verne uses his vast well of experience in film, print and the web to craft an entertainment extravaganza that is second-to-none.

Written as a feature-length film, "420" unfolds over 13 chapters. Storyboards and book pages are prepared simultaneously, ensuring continuity between media. From these, Verne draws detailed animation layouts that appear first as black and white "webisodes" [www.oKee.com and www.CaptainCannabis.com]. Once all a chapter's layouts are polished, they are given a colour treatment then published in an illustrated book series. When all 13 are finalized, so will the artwork to produce the "420" feature-length animated film. This is the first time web, print and film are seamlessly integrated into one of the most unique multi-media experiences ever created.

### WEBISODE VIEWING

**www.oKee.com :: www.CaptainCannabis.com**



ISBN 0-9738837-0-7

Verne and 420 logos are trademarks of Verne Andru. ©Copyright 1976-2006, Verne Andru. All rights reserved. No part of this work may be reproduced or used in any form or by any means - including but not limited to graphic, electronic, or mechanical including photocopying, recording, taping, or information storage and retrieval systems - without written permission of the publisher, oKee comX.

First printing - October 2006.

Published and printed in the Dominion of Canada - MMVI

VERIIE
SIGNATURE SERIES™

Cancellation-92064830-Petitioner Testimony - 000084

Affidavit of Petitioner Laverne John Andrusiek - Cancellation No. 92064830 / 26

- **Inside page:**

**ER410**

Cancellation No. 92064830

# 420 :: THE STORY BEHIND THE STORY



The book you're reading is part of a larger story that's been many years in the making. Raised during the 1960's and weaned on such works as Fritz the Cat, The Fabulous Furry Freak Brothers, Harold Hedd and Cheech and Chong, I naturally gravitated to the "fringier" side of life when it came time to develop my own material. My first original work, and precursor to "420," was a short, black and white comic titled "Captain Cannabis." Truth be told, I created Captain Cannabis as a dark counterbalance to the goody-two-shoes Captain Canuck character my "mentors" George Freeman and Jean-Claude St. Aubin were working on.

Sensing I had stumbled onto something good, I filled out the requisite forms, and filed for a copyright. A few months later I received a certificate from the copyright office for a literary work titled – yes folks – "Captain Cannabis." Unnoticed by me at the time – actually it held no significance in popular culture of the 60's and 70's I was aware of – was the fact that the certificate is dated April 20, 1977.

Today, of course, popular culture holds April 20 in particularly high esteem. April is the 4th month of the year making April 20, numerically speaking, 420. April 20 at 4:20 PM is known as the "pot-smokers' holiday," the "hippie New Year," "national smoke time," "national pot-smoking day," "the holiday," "pot appreciation day," "the ultimate session," or "a day of tribute to the scene." While making no claim to originating the 420 term, my Captain Cannabis copyright certificate is one of the oldest documented connections between April 20 and cannabis that I am aware of. That reason alone made it a title befitting the Captain Cannabis "origin" story.

It took another 20 years before I set about to realize a story worthy of the character I had created. A well know axiom in writers circles holds that there are no new stories, just the retelling of old. I was determined to scour the earth to disprove this maxim. At the very least I wanted to find a story that hadn't been told in a long enough time to at least be interesting. I spent the better part of 5 years researching everything from history to law to linguistics to music to politics to religion. The bibliography exceeded 275 books before I stopped keeping track.

I'm pleased to say I believe I've accomplished my objective. "420"

is the first part of a story being told through a series of feature films. It follows the trials and tribulations of the evolution of man – not the evolution of the physical shell we equate with self, but the evolution of our consciousness that inhabits and animates it during its cosmic journey.

Prior to 500 BCE, our forefathers viewed life and their place in it far differently from current Western culture. There was an understanding that material life was transitory and the "holy grail" of "immortality" was attainable given the proper training and requisite preparation. Training was given through a complex system of "mystery schools." They maintained a tradition of esoteric knowledge that was passed from generation to generation. This important light was all but extinguished when early "Christian" zealots destroyed the schools, killed the practitioners and burned, destroyed or spirited away the written teachings and records. Some of the traditions have been maintained in the Eastern schools of thought, particularly Pantheism, Sufism and esoteric Buddhism to which the Falon Gong claims its ancestry.

The Ancients maintained there was only ONE – a singular consciousness from which all else is both a part of and separate from. While time and space are maya [illusion], they provide a mechanism for isolation and individuation from the ONE. Some schools call this ONE "god," while I prefer the less religiously tainted, and more descriptively accurate, handle of "The Universal Consciousness" [TUC].

Similar to the way light dissipates the further it is from its source, instances of individuated consciousness become increasingly fragmented the further they "fall" from their "Edenistic" bliss of communion with TUC. The levels of fragmentation are similar to strata that are sometimes referred to in terms of "bodies." We are all familiar with the physical body we inhabit on a daily basis and the etheric body we inhabit in our dream state but are unaware of our "mental" body where our consciousness is currently resident. These bodies are similar to the Id, Ego and Super-Ego coined in modern psychology – Carl Jung being particularly "esoteric" in his leanings.

You can visualize these strata by studying the following: "a higher dimension sees all lower simultaneously and equally." In other words, if you are outside a fishbowl you can see and describe it in its totality. Conversely, if you are inside a fishbowl [dimension] it is impossible for you to see and describe what the fishbowl [dimension] looks like from the outside. Software programmers, in order to create the illusion of 3 dimensional worlds found in today's motion pictures and video games, use a software "engine" that is a

21

According to Petitioner, "[b]y 2006, internet retailer Amazon.com had become established; Amazon.com listed my CAPTAIN CANNABIS 420 comic book (420-001)

23

Cancellation No. 92064830

placing their first of many orders on September 18, 2006." Andrusiek Aff. ¶ 7 (11 TTABVUE 7). Petitioner submitted copies of two shipping orders, showing shipments of four comic books to Amazon.com.kydc, Inc. in Lexington Kentucky; one is dated September 18, 2006 and the other February 27, 2007. Andrusiek Aff. ¶ 7; Annex. 24 (11 TTABVUE 35-36). Petitioner testified that sales through Amazon.com continued until 2017. Andrusiek Aff. ¶ 7 (11 TTABVUE 7).

Petitioner also submitted additional evidence of sales of the comic book. Petitioner submitted shipping records for a sale of one comic book in the United States on September 25, 2006, to a customer in Florida. Andrusiek Aff. ¶ 8; Annexs. 25-6 at 37-40 (11 TTABVUE 7). Petitioner submitted a copy of a statement from Jim McPherson of Phantacea Publications, asserting that he has a copy of the comic book "dated October 2006" that Petitioner "was selling at the time." Annex. 39 (11 TTABVUE 79). In March 2009, a "420-001 Book/DVD Bundle" was sold to a customer in Brooklyn, New York. Andrusiek Aff. ¶ 9; Annex. 26 (11 TTABVUE 42). That customer referred to the goods as "Captain Cannabis (420) + DVD" in his handwritten order. Andrusiek Aff. ¶ 9; Annex. 26 (11 TTABVUE 44).

Petitioner also attests to having utilized social media platforms since 2010:

> In 2010 I started moving CAPTAIN CANNABIS into social media in a bigger way first on MySpace then Facebook and others. Attached hereto and marked Annexure 42 is a November 17, 2016 screen shot I took from my CAPTAIN CANNABIS Facebook page found open to the public at HYPERLINK http://www.facebook.com/pages/Captain-Cannabis/ 131856846871529 www.facebook.com/pages/Captain-Cannabis/131856846871529.

Andrusiek Aff. ¶ 17; Annex. 42 (11 TTABVUE 85), which is displayed below:

24

**ER412**

Cancellation No. 92064830



Petitioner testified that on "October 12 and 13, 2013 I attended the APE (Alternate Press Expo) comic convention in San Francisco where I sold copies of my CAPTAIN CANNABIS 420 comic books." Andrusiek Aff. ¶ 15 (11 TTABVUE 9). Jim McPherson confirms that Petitioner and he "shared the Phantacea table at the APE (Alternative Press Expo) convention" and that Petitioner sold copies of the comic books at the convention. 11 TTABVUE 79. "I also told potential customers looking for creator signatures or to discuss the Captain Cannabis character with him when he would be back." *Id.*, Exhibit 39. Information as to the number of attendees and number of copies of the comic books that may have been sold at the convention was not provided.

### 2. Have Petitioner's Pre-sales Activities Created the Necessary Association in the Mind of the Relevant Consumer?

As noted, a petitioner's claim of priority based on "analogous use" can succeed only where the analogous use is of "such a nature and extent as to create public

Cancellation No. 92064830

identification of the target term with the [petitioner's] product or service." *T.A.B. Sys.*, 37 USPQ2d at 1882. Petitioner contends that he is well-known within the college and university market, as well as with general comic book enthusiasts. "Over the years, magazines, radio stations and podcasts have repeatedly featured me in articles and interviews as the creator of CAPTAIN CANNABIS and my 420 comic book as a CAPTAIN CANNABIS comic book." Andrusiek Aff. ¶ 9 (11 TTABVUE 7). In support, Petitioner testified about the following media attention garnered by Petitioner before 2014:

- February, 2007: Florida podcaster known as "Q's House" interviewed Petitioner; the resulting interview was broadcast into Florida over the Internet. An announcement of the interview appeared at http://qshouse.slackertown.com/?m=20070227&cat=4, wherein Petitioner was described as "the George Lucas of the comic world":[9]

---

[9] Andrusiek Aff. ¶ 9; Annex. 28 (11 TTABVUE 50).

Cancellation No. 92064830



- February 2007: High Times Magazine published a short article about Petitioner, depicted below.[10] Petitioner states that he "understand[s] their monthly circulation is around 236,000."

---

[10] Andrusiek Aff. ¶ 10; Annex. 26 (11 TTABVUE 8, 52).

27

Cancellation No. 92064830



- May 21, 2007: Radio Station CJSF's "The Interview Show" broadcast an interview with Petitioner; copy of the promotion "they distributed for that show citing me 'creator of CAPTAIN CANNABIS' [that] I saved from http://www.cjsf.ca/index.php" is depicted below:[11]

---

[11] Andrusiek Aff. ¶ 11; Annex. 30 (11 TTABVUE 8, 54).

Cancellation No. 92064830



- June 2011: Culture Magazine interviewed Petitioner, which "resulted in a cover-story article and interview of [Petitioner] discussing CAPTAIN CANNABIS."[12] The article credits Petitioner for being the creator and

---

[12] Andrusiek Aff. ¶ 12; Annex. 33 (11 TTABVUE 8,  58-60).

writer of CAPTAIN CANNABIS. Petitioner states, "I understand they have 500,000 monthly circulation."

BUZZ

A REAL HERO

Holy smoke! It's **Captain Cannabis** to the rescue!

**BY JASEN T. DAVIS**

**Comic Relief**

Captain Cannabis isn't the only THC-powered hero. Back when *Chasing Amy* hit the screens in 1997, comic fiends were introduced to *Bluntman and Chronic*, a series based upon Jay and Silent Bob. In the film, *Jay and Silent Bob Strike Back*, the movie rights to *Bluntman and Chronic* were sold to Miramax and the titular characters attempt to stop the movie. Throughout it all, we're not sure exactly what their super powers are . . .

The *Captain Cannabis* online comic is a series of 13 webisodes presenting the adventures of Halburt Lighter, a.k.a. Captain Cannabis. Equal parts cynical comedy, life-affirming realism and superheroic fantasy, this mind-altering animated comic delivers an enlightening jolt of THC-infused social commentary.

Verne Andru is the creator and writer of *Captain Cannabis*. His previous experience includes working on the legendary cult classic *Rock & Rule*, one of the many heavy metal-infused animated films that were so prevalent during the '70s and early '80s. Since then, he's worked with heavyweights such as Hannah-Barbara, Disney and Industrial Light & Magic.

Andru was able to step away from his magnum opus long enough to share a few words with *CULTURE* about life, the universe and *Captain Cannabis*.

**How would you describe *Captain Cannabis* to some of our readers who might not have heard of your art?**

This is the story of a down-and-out roadie named Halburt Lighter. Through a series of misadventures, he and his girlfriend end up in Vancouver, where a spacecraft shows up to help Earth. Okee, the alien on the spacecraft, has a magical plant he calls "herb." When Hal smokes it, he is able to manifest what he thinks about in real life. I'm eventually going to combine all of the webisodes into a feature film I'm going to call *420*.

**He reminds me of DC's Green Lantern, with an emphasis on the green, only he can control reality. Isn't the alien also a main character?**

I wanted *Captain Cannabis* to look very professional, so I had to split the project into pieces to keep down costs. The next part of the series will deal with Okee's backstory.

***Captain Cannabis* has some deep, occult roots. I've noticed a lot of references to Buddhism, Hinduism, Gnostic philosophy and Tibetan mysticism.**

Yes, the point is that we are a spiritual consciousness stuck in a physical body. Right now, many people just want things for themselves and don't care about anyone else. When you get into the higher realms of spiritualism there is a point where you have to ask, "What is the real truth?" Okee and Hal ask this question.

Okee is meant to illustrate the struggle our consciousness [faces] to rise above the material world. He represents the inherit weakness of man and keeps falling into matter. That's our struggle.

Halburt Lighter, a.k.a. Captain Cannabis, is going through the illumination phase of becoming enlightened. In the first comic, he's just a basic guy who doesn't think beyond his next joint or beer. He goes through a spiritual awakening by smoking pot.

**How does *Captain Cannabis* reflect your personal beliefs about the subject of medical marijuana and the legalization movement? Why is something so useful still illegal?**

One thing people don't understand is that hemp, the parent plant of marijuana, is the reason that Western culture exits in North America. The first industry in the colonies was building ships, which needed hemp for rope. Because it expanded and became financially viable, this allowed Europeans to come over and invest in America. Back then, hemp and marijuana grew everywhere. It actually required a lot of work to eradicate.

Why is it illegal? Money. You can grow cannabis anywhere. Because of that, you have a product that is uncontrollable. Well, why do we have laws? To control us. The question is; what jurisdiction does the DEA have? It's under the control of the IRS, not the FDA. It has nothing to do with food . . . it's about money.

captaincannabis.com.

36 CULTURE • JUNE 2011

Although there is no record evidence of the size of the comic book market or number of marijuana consumers in the United States at the time, both parties seem to be directing their marks to these same niche communities.[13] The evidence attached

[13] Although marijuana remains a controlled substance at the federal level, *see, e.g., In re Stanley Bros. Soc. Enter., LLC,* 2020 USPQ2d 10658 (TTAB 2020), its possession and recreational use has been legalized recently by a number of states. However, at the time that Petitioner engaged in his pre-sales activities, the possession and recreational use of marijuana was not only federally prohibited, but illegal under most state laws. A study by an expert panel of the Department of Commerce's National Highway Safety Administration (https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/expert_dwi_panel.pdf, last accessed

Cancellation No. 92064830

to Petitioner's affidavit suggests that Petitioner's CAPTAIN CANNABIS mark is reasonably well-known within these communities, even if the numbers are not large in absolute terms, and was reasonably well-known prior to Respondent's priority date. By that date, Petitioner's mark had received regional and national attention in niche publications and media, and Petitioner had promoted its mark on a national level, including through trade shows, social media, and the Internet. We find that the evidence considered in its entirety establishes that Petitioner garnered sufficient notoriety from his pre-sales activities to support a finding that his analogous use "is of such a nature and extent as to create public identification of the target term with the [petitioner's] product." *T.A.B. Sys.*, 37 USPQ2d at 1882.

### D. Did Petitioner use the mark CAPTAIN CANNABIS on comic books in the United States within a reasonable time?

The second prong of the test for finding analogous use sufficient to support priority requires that the analogous use be followed up within a reasonable time frame by actual trademark use. To show that he used the CAPTAIN CANNABIS mark within a commercially reasonable period of time following his use analogous to trademark use, Petitioner filed evidence of such technical trademark use from 2016 and 2017. Petitioner took a screenshot of his YouTube channel, and attests:

> On February 25 2007 I started posting the instalments [sic] of my "CAPTAIN CANNABIS in 420" story on my Youtube channel, HYPERLINK "http://www.Youtube.com/

---

on August 31, 2022) stated that in 2016 four states and the District of Columbia had legalized marijuana for recreational use. From this we can reasonably infer that marijuana was not widely consumed legally at the time that Petitioner was promoting "Captain Cannabis" and that the "market" for marijuana-related goods and services was probably relatively small, and surely smaller than it is today.

31

Cancellation No. 92064830

> verneandru" www.Youtube.com/verneandru, and have posted updates as they are available. Attached hereto and marked Annexure 41 is a screen-shot I saved November 6, 2016 of my Youtube channel displaying the completed "CAPTAIN CANNABIS in 420" story.

Andrusiek Aff. ¶ 16; Annex. 41 (11 TTABVUE 9, 83). That screenshot appears below:



Cancellation No. 92064830

The text under the caption titled "Published on Sep 22, 2014" (pointing arrow added to show placement) reads: "Complete animatic of the first [and a bit] storyboard build from the original Captain Cannabis 420 script. This is a rough sketch of the film used to make the story and editing decisions that went into the script rewrite." 11 TTABVUE 83.

On May 1, 2017, Petitioner took a screenshot of his website that he testified displays a copy of the cover of Petitioner's movie script. Andrusiek Aff. ¶4; Annex. 19 (11 TTABVUE 7, 24):



Under Notice of Reliance, Petitioner submitted the following:

33

Cancellation No. 92064830

**1.    Amazon "Author Page" listing for Petitioner dated 12/16/2017 (www.amazon.com/author/verne).** 12 TTABVUE 10-11:





**ER422**

Cancellation No. 92064830

      **2.     IMDb's (Internet Movie Database) "Verne Andru" page December 16, 2017 (www.imdb.com/name/nm3252989).** 12 TTABVUE 14:



Cancellation No. 92064830

3. **"Captain Cannabis Celebrates its 40th Anniversary" August 15, 2017 Culture Magazine (U.S.) article by David Edmundson (http://ireadculture.com/captain-cannabis-celebrates-its-40th-anniversary/).** 12 TTABVUE 8:

http://ireadculture.com/captain-cannabis-celebrates-its-40th-anniversary/



You are here: Home / News / Captain Cannabis Celebrates its 40th Anniversary

# Captain Cannabis Celebrates its 40th Anniversary

by David Edmundson | August 15, 2017



Cannabis in mainstream entertainment may be relatively standard today, but not long ago it was relegated to back rooms as part of the counter culture.

From that bygone era sprung the comic book Captain Cannabis, which is currently celebrating the 40th anniversary of its first issue, titled "Roll Me Another One." The book follows the whacky adventures of Hal Lighter, a hero tasked with protecting Earth amidst an extradimensional war, while trying to protect the love of his life, Marion Jones.

Lighter uses intergalactic weed to transform into the titular Captain Cannabis. Sure it sounds weird, but a lot of comic book powers come from strange places. Shazam, who is an adult aged superhero, got his powers because as a young boy he took a magical subway to a throne room, where a wizened wizard bestowed onto him, not only extraordinary powers, but the ability to go back-and-forth from adult to child when he transforms.

The comic is billed as being "about as far from politically correct as you can get." And it definitely lives up to that moniker. Comic Cook Code be damned, you won't find adventures like this at Marvel or DC. The first issue of the comic, created by Verne Andru, is being reissued with updated artwork to celebrate the milestone.

The parallels between Captain Cannabis and the Green Lantern are too numerous to be a coincidence. Both heroes derive their powers from a mystical source, both play large roles in intergalactic conflicts they never imagined possible and both are motivated by their sense of right and desire to protect the one they love. Readers can only hope that Lighter is better at protecting his beloved, and that she doesn't share the same fate as Green Lantern's (Kyle Rayner) girlfriend Alexandra DeWitt, who was "fridged." No that's not a typo, and DC Comics would love to pretend it didn't happen. Thankfully though, the internet exists and you can read all about it here.

You can pick up the 40th anniversary collector's edition of Captain Cannabis at CaptainCannabis.com.

36

**ER424**

Cancellation No. 92064830

Petitioner's testimony and documentary evidence demonstrate that he has been selling the "420" comic book that included the CAPTAIN CANNABIS character continuously since 2006 to the present, including during 2013-14, and that by 2017, Petitioner sold comic books under the mark CAPTAIN CANNABIS. We find Petitioner's actual trademark use in 2017 to be within a commercially reasonable period of time following his analogous use in 2013-14 so as to create a "continuing association of the mark" with Petitioner's goods. *Dyneer Corp.,* 37 USPQ2d at 1256.

## VI.  Conclusion

When viewed  as a whole, we find the evidence introduced by Petitioner sufficient to establish that Petitioner used his mark prior to April 2, 2014, first in a manner analogous to actual trademark use, then as an actual trademark.

> [W]hether a particular piece of evidence by itself establishes prior use is not necessarily dispositive as to whether a party has established prior use by a preponderance. Rather, one should look at the evidence as a whole, as if each piece of evidence were part of a puzzle which, when fitted together, establishes prior use.

*W. Fla. Seafood,* 31 USPQ2d at 1663. When all of the testimony and documentary evidence is considered together, it  establishes that Petitioner used the mark CAPTAIN CANNABIS in connection with comic books in a manner analogous to trademark use prior to the April 2, 2014 filing date of Respondent's underlying application, and followed that use by actual trademark use within a commercially reasonable time. Accordingly, Petitioner has shown his priority of use based on his analogous use pre-2014 and his actual trademark use post-2014, and because Respondent has conceded that there is a likelihood of confusion resulting from the

Cancellation No. 92064830

simultaneous use of CAPTAIN CANNABIS in connection with the parties' goods, we find that Petitioner has established its Section 2(d) by a preponderance of the evidence.

**Decision:** The petition to cancel Respondent's registration for the mark CAPTAIN CANNABIS is granted under Trademark Act Section 2(d) and Registration No. 4782920 will be cancelled in due course.[14]

---

[14] In view thereof, we need not and do not reach Petitioner's other pleaded claims. *See TiVo Brands LLC v. Tivoli, LLC*, 129 USPQ2d 1097, 1098 (TTAB 2018) (where judgment entered on dilution claim, merits of section 2(d) claim not reached); *Am. Paging Inc. v. Am. Mobilphone Inc.*, 13 USPQ2d 2036, 2039-2040 (TTAB 1989), *aff'd without opinion*, 17 USPQ2d 1726 (Fed. Cir. 1990) ("Having determined that petitioner is entitled to the relief it seeks based upon its claim pursuant to Section 2(d) of the Lanham Act, we need not address petitioner's claim that registrant has abandoned its rights in the mark AMERICAN MOBILPHONE PAGING and design.").

Exhibit C

Original Decision Mailed:                    Redesignation Mailed:

September 6, 2022                             January 3, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Laverne John Andrusiek*

*v.*

*Cosmic Crusaders LLC and Lewis J. Davidson*

————

Cancellation No. 92064830

————

Michael P. Matesky, II of Matesky Law PLLC, for Laverne John Andrusiek.

Joseph J. Weissman of Johnson Pope Boker Ruppel & Burns LLP, for Cosmic Crusaders LLC and Lewis Davidson.

————

By the Board:

The Board has chosen to redesignate the decision that issued on September 6, 2022 as a precedent. A copy of the decision, bearing such designation, is attached. The decision that issued on September 6, 2022 is also corrected as follows: page 1 "Louis" has been changed to "Lewis."

# # # #

**ER428**

> THIS OPINION IS A
> PRECEDENT OF THE TTAB

Hearing: July 22, 2021                    Mailed: September 6, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Laverne John Andrusiek*

*v.*

*Cosmic Crusaders LLC and Lewis J. Davidson*

————

Cancellation No. 92064830

————

Michael P. Matesky, II of Matesky Law PLLC, for Laverne John Andrusiek.

Joseph J. Weissman of Johnson Pope Boker Ruppel & Burns LLP,
   for Cosmic Crusaders LLC and Lewis Davidson.

————

Before Wolfson, Lynch, and Larkin,
   Administrative Trademark Judges.

Opinion by Wolfson, Administrative Trademark Judge:

On October 25, 2021, the Board acknowledged the assignment from Cosmic

Crusaders LLC (Cosmic Crusaders or Respondent) to Lewis J. Davidson (Davidson)

of Registration No. 4782920 for the mark CAPTAIN CANNABIS (standard

characters) for "comic books" in International Class 16 that is at issue in this case.[1]

_____

[1] The assignment was recorded in the United States Patent and Trademark Office ("USPTO")
on August 6, 2021 under Reel/Frame 7387/0773. The assignment identified Cosmic
Crusaders as the assignor and as 'an administratively dissolved Florida limited liability
company;' Cosmic Crusaders was dissolved by the state of Florida on September 25, 2015,

Cancellation No. 92064830

The Board sua sponte joined Davidson as a party defendant, noted that despite the prior assignment of the registration to Davidson, Cosmic Crusaders had filed a Declaration of Use in its own name under Trademark Act Section 8, 15 U.S.C. § 1058, and suspended proceedings pending the USPTO's review and acceptance of the Declaration. 64 TTABVUE 1-2. The USPTO accepted the Declaration on May 26, 2022. Accordingly, proceedings herein are resumed and the case is ready for decision.

## I.   Background

Laverne John Andrusiek (Petitioner) petitioned to cancel the involved registration for the mark CAPTAIN CANNABIS under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Davidson's use of the mark was likely to cause confusion with Petitioner's alleged prior use on comic books of the identical mark CAPTAIN CANNABIS.[2]

---

about 2 months after Registration No. 4782920 issued on July 28, 2015. Section 8 declaration filed July 28, 2021. As noted below, Davidson has been substituted into the case in place of Cosmic Crusaders as the party in the position of defendant, but we will refer in this opinion to Cosmic Crusaders as the "Respondent" because Cosmic Crusaders answered the petition for cancellation, filed the brief of the party in the position of defendant, and appeared through counsel at the oral hearing, even though, as discussed below, Davidson claimed to have created and used the registered mark personally.

[2] Petitioner also claimed that Cosmic Crusaders committed fraud in the execution of its April 2, 2014 application that matured into the involved registration; that Cosmic Crusaders did not make use of its mark prior to the application filing date; that any use Cosmic Crusaders may have made was unlawful; and that the specimen ultimately accepted by the USPTO prior to issuance of the involved registration was not in use prior to the filing date of Cosmic Crusaders' use-based application. 9 TTABVUE 47-55. Petitioner pursued these claims at trial.

Additionally, Petitioner argued in his trial brief that Respondent' mark fails to function as a mark because it is merely 'the title of a single comic book issue." 43 TTABVUE 6. Petitioner did not plead as a basis for cancellation that the mark fails to function as a mark because it is merely the title of a single work, nor did the parties try the issue by consent; accordingly, we do not consider the claim. In addition, while Petitioner argues in his trial brief that Respondent has abandoned the mark, there is no pleading of abandonment and therefore we

2

**ER430**

Cancellation No. 92064830

In its Answer, Cosmic Crusaders denied the salient allegations of the Petition to Cancel, and asserted that Petitioner abandoned any rights he may have had prior to Respondent's priority date. However, because Respondent failed to pursue the affirmative defense of abandonment at trial, it is deemed waived and has been given no consideration.[3] *See Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.,* 107 USPQ2d 1750, 1753 n.6 (TTAB 2013), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014). Moreover, the parties agree that the marks are confusingly similar, and as discussed more fully below, Petitioner only has to prove priority of use at common law to prevail on its claim under Section 2(d).

---

will not entertain that claim. *Syngenta Crop Prot. Inc. v. Bio-Chek LLC*, 90 USPQ2d 1112, 1115 n.3 (TTAB 2009); TBMP § 314 ("A party may not rely on an unpleaded claim.").

[3] Respondent's statement, in a footnote to its brief at 47 TTABVUE 22, that Petitioner "admitted" it did not use its mark for 20 years, and that this "raises a presumption of abandonment, which Petitioner cannot possibly rebut" is both a mischaracterization of any statement Petitioner may have made, and inadequate as proof that Petitioner's common law mark has been abandoned. Even if Respondent's statement is true, the 20-year period of time as characterized by Respondent comes "between the late 1970s an [sic] 1999." If Respondent had provided evidence of Petitioner's alleged abandonment prior to 1999, which it did not, such evidence would have no bearing on any subsequent use that Petitioner could prove it made prior to Respondent's date of first use. "[I]f a challenger's date of first use is later than the resumed use of the party alleged to have abandoned the trademark, then the issue of possible abandonment is irrelevant to the question of priority." 3 McCarthy on Trademarks and Unfair Competition § 17:3 (5th ed.); *see also Income Tax Serv. Co. v. Fountain*, 475 F.2d 655, 177 USPQ 388, 389 (CCPA 1973) (abandonment by registrant is irrelevant where its first use after alleged abandonment is prior to petitioner's first use); *W. Fla Seafood Inc. v. Jet Rests. Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1666 (Fed. Cir. 1994) (a party asserting abandonment as a defense to a prior use assertion "bears at a minimum a burden of coming forth with some evidence of abandonment"), *quoted in Exec. Coach Builders, Inc. v. SPV Coach Co.*, 123 USPQ2d 1175, 1181 (TTAB 2017).

**ER431**

Cancellation No. 92064830

## II.   Evidentiary Objection

During his rebuttal period, Petitioner filed a rebuttal declaration of Laverne Andrusiek (39 TTABVUE at 3-142);[4] a rebuttal declaration of Michael P. Matesky, II (39 TTABVUE at 143-149); and a rebuttal Notice of Reliance (37 TTABVUE at 2-18).

Respondent objected to Petitioner's rebuttal evidence as improper on the ground that "Petitioner utilized his 'rebuttal' testimonial period simply as a second bite at presenting his evidence in chief." 47 TTABVUE 12. Petitioner responded that the material was introduced to rebut Respondent's claim that it is the senior user of the mark: "Davidson did not solely testify regarding his own claimed first use dates. Rather, by claiming to be the 'senior user,' he necessarily claimed to have begun use of the CAPTAIN CANNABIS mark before Petitioner. . . . Petitioner is therefore entitled to submit evidence rebutting that claim." 51 TTABVUE 10. In other words, Petitioner contends that the evidence he presented during his main testimony period was meant to demonstrate his priority vis-à-vis Davidson, and that it was not until Davidson asserted his right to rely on the prior use by Cosmic Crusaders did it become necessary for Petitioner to present evidence of first use prior to that of Cosmic Crusaders.

"It is axiomatic that rebuttal testimony may be used only to rebut evidence offered by the defendant." *Life Zone Inc. v. Middleman Grp. Inc.*, 87 USPQ2d 1953, 1958 (TTAB 2008) (citing *Wet Seal Inc. v. FD Mgmt. Inc.*, 82 USPQ2d 1629 (TTAB 2007); *Rowell Labs., Inc. v. Can. Packers Inc.*, 215 USPQ 523, 525 n.2 (TTAB 1982)

---

[4] 39 TTABVUE is a corrected resubmission of 36 TTABVUE.

4

**ER432**

Cancellation No. 92064830

("material intended to buttress petitioner's case-in-chief ... constituted improper rebuttal"). With the aforementioned principle in mind, we find that the bulk of Andrusiek's rebuttal testimony and exhibits, the Matesky declaration and exhibits, and the evidence submitted under the rebuttal Notice of Reliance should have been introduced as part of Petitioner's case-in-chief. Inasmuch as the petition was filed against Cosmic Crusaders initially, it is reasonable to impose upon Petitioner a duty to present whatever evidence he had demonstrating his use prior to any use by that entity as part of his main trial evidence.

The only proper rebuttal evidence consists of the averments in Petitioner's rebuttal declaration that directly rebut certain statements made by Davidson in his testimony declaration, namely, that "No character named Captain Cannabis appears in the comic book. In fact, the name or term 'Captain Cannabis' appears nowhere in the comic book story." 17 TTABVUE 4. Accordingly, we admit and have considered the following testimony from the Andrusiek rebuttal declaration and related Exhibit 5:

> 18. In 2006, I published a new issue of the Captain Cannabis comic series, titled "420" (the "420/CAPTAIN CANNABIS" comic book). True and correct copies of the front cover, editorial page, and back cover of the 420/CAPTAIN CANNABIS comic book are attached hereto as Exhibit 5.
>
> 19. Like all other issues in the CAPTAIN CANNABIS series, the 420/CAPTAIN CANNABIS comic book tells the story of Halburt Lighter, the alter ego of superhero Captain Cannabis.
>
> 20. The 420/CAPTAIN CANNABIS comic book displays the Captain Cannabis Leaf Design Mark in the upper left hand corner of the front cover.

5

**ER433**

Cancellation No. 92064830

> 21. The editorial page of the 420/CAPTAIN CANNABIS comic book features the Captain Cannabis character artwork, and both the editorial page and back cover use the CAPTAIN CANNABIS trademark to inform readers that the 420/CAPTAIN CANNABIS comic book is part of the same "CAPTAIN CANNABIS" series and story that I began publishing decades earlier.

39 TTABVUE 5-6; Exhibit 5, 39 TTABVUE 26-29.

In all other respects, Respondent's objection to Petitioner's rebuttal evidence is sustained and the evidence has been given no consideration. *See, e.g., Osage Oil & Transp., Inc. v. Standard Oil Co.*, 226 USPQ 905, 907 n.10 (TTAB 1985), *rev'd on other grounds*, 10 USPQ2d 1554 (N.D. Okla. 1988) ("In view of the absence of a period for rebuttal by respondent, and since priority of rights was a crucial issue joined by the pleadings, it was incumbent on petitioner to anticipate that respondent would support its claimed prior rights both by evidence relating to petitioner's date of first use as well as its own."); *Am. Meat Inst. v. Horace W. Longacre, Inc.*, 211 USPQ 712, 719 (TTAB 1981) ("[i]t is the general rule that a party plaintiff may in his case on rebuttal introduce facts and witnesses appropriate to deny, explain, or otherwise discredit the facts and witnesses adduced by the opponent, but not any facts or witnesses which might appropriately have been introduced during its case- in-chief to sustain its pleading); *Gen. Elec. Co. v. Graham Magnetics Inc.*, 197 USPQ 690, 692 n.5 (TTAB 1977) (rebuttal testimony and evidence is intended to be limited to denials, refutations or explanations of defendant's testimony and evidence).

## III.   The Record

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the challenged registration and its application file history. In

Cancellation No. 92064830

addition, and in light of our above evidentiary rulings, the record includes the following:

### A. Petitioner's Evidence

- Affidavit of Laverne John Andrusiek, including exhibits, 11 TTABVUE 6-95;
- Affidavit of Tom Edgar, site administrator of Francis Ford Coppola's American Zoetrope story development website, including an exhibit, 11 TTABVUE 2-4;
- Affidavit of Jim McPherson, self-identified as Publisher of Phantacea Publications, 11 TTABVUE 79;
- Portions of the Andrusiek rebuttal declaration, 39 TTABVUE 5-6 and Exhibit 5, 39 TTABVUE 26-29;
- Notice of Reliance on Internet materials, discovery requests propounded on Respondent, and an email thread among the USPTO and the parties. 12 TTABVUE.

### B. Respondent's Evidence

- Testimony declaration of Respondent Lewis Davidson, 17 TTABVUE;
- Testimony declaration of Alex Wadsworth, self-identified as a radio personality, 18 TTABVUE.[5]

## IV. Entitlement to a Statutory Cause of Action

Entitlement to a statutory cause of action "is an element of the plaintiff's case in every inter partes proceeding." *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671, 210 L. Ed. 2d 833 (2021); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 82, 211 L. Ed. 2d 16 (2021) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 S. Ct. 1377, 188 L. Ed. 2d 392, 109 USPQ2d 2061, 2067 n.4 (2014)).

---

[5] The testimony declaration of Joseph Weissman, filed at 16 TTABVUE, was stricken by the Board on September 18, 2018. 26 TTABVUE.

Cancellation No. 92064830

To establish entitlement to a statutory cause of action, a plaintiff must demonstrate: (i) an interest falling within the zone of interests protected by the statute and (ii) a reasonable belief in damage proximately caused by the registration or continued registration of the mark. *Spanishtown Enters.*, 2020 USPQ2d 11388 at *1 (citing *Corcamore*, 2020 USPQ2d 11277 at *4). *See also Empresa Cubana*, 111 USPQ2d at 1062; *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (TTAB 1982).

As a direct competitor of Respondent, 11 TTABVUE 10-11, who asserts a Section 2(d) claim on which likelihood of confusion is conceded and only priority is at issue, Petitioner has an interest in canceling Respondent's registration. *See, e.g., Books on Tape, Inc. v. Booktape Corp.*, 836 F.2d 519, 5 USPQ2d 1301, 1302 (Fed. Cir. 1987) (finding competitor has standing because it has an interest in the outcome beyond that of the general public); *Peterson v. Awshucks SC, LLC*, 2020 USPQ2d 11526, *6 (TTAB 2020) (entitlement to a statutory cause of action found where petitioner and respondent are competitors).

Petitioner's interest is squarely within the zone of interests protected by the statute and he holds a reasonable belief that damage is proximately caused by the continued registration of Respondent's mark. Petitioner has established his entitlement to a statutory cause of action under the Trademark Act, 15 U.S.C. § 1051 et. seq.

8

**ER436**

Cancellation No. 92064830

## V.    Likelihood of Confusion

Both Petitioner and Respondent are selling comic books under the mark CAPTAIN CANNABIS, which also serves as the name of a fictitious character. Character names are registrable as trademarks where the character name is perceived by the purchasing public as a mark which identifies and distinguishes the source of goods or services. *See, e.g., In re Paramount Pictures Corp.*, 213 USPQ 1111 (TTAB 1982) (television character names determined to serve as trademarks for decalcomanias); *In re Fla. Cypress Gardens, Inc.*, 208 USPQ 288 (TTAB 1980) (designation consisting of name of clown is registrable for entertainment services despite fact that name also identifies a fictitious character played by performers in applicant's shows); *cf. In re DC Comics, Inc.*, 689 F.2d 1042, 215 USPQ 394 (CCPA 1982) (drawings of fictional comic characters held to function as trademarks for toy doll figurines of such characters).

The parties do not dispute that the term CAPTAIN CANNABIS is a distinctive trademark as well as the name of a character. Nor do they dispute that contemporaneous use of their respective marks would likely cause confusion. Petitioner states that "neither party truly disputes likelihood of confusion," 43 TTABVUE 6, and Respondent agrees that "Petitioner cannot possibly prove any likelihood of confusion [only because Petitioner] has not and cannot carry its burden to establish priority of use." 47 TTABVUE 25. Accordingly, the only issue in dispute under Trademark Act Section 2(d) is priority.

To establish priority on a likelihood of confusion claim brought under Trademark Act Section 2(d), 15 U.S.C. § 1052, Petitioner must prove that, vis-à-vis Respondent,

9

**ER437**

Cancellation No. 92064830

he owns "a mark or trade name previously used in the United States . . . and not abandoned. . . ." Trademark Act Section 2(d). Petitioner must establish his priority by a preponderance of the evidence. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1848 (Fed. Cir. 2000); *Giersch v. Scripps Networks Inc.*, 90 USPQ2d 1020, 1023 (TTAB 2009) ("In a case involving common-law rights, 'the decision as to priority is made in accordance with the preponderance of the evidence.'") (citing *Hydro-Dynamics*, 1 USPQ2d at 1773).

Because Petitioner does not own an existing registration upon which he may rely for purposes of a Section 2(d) likelihood of confusion analysis, Petitioner must establish his proprietary rights in the CAPTAIN CANNABIS mark before any date upon which Respondent may rely. Petitioner may establish such rights through prior actual trademark use or through prior use analogous to trademark use, such as use in advertising brochures, trade publications, catalogues, newspaper advertisements and Internet websites that created a public awareness of the designation as a trademark identifying Petitioner as the source of the relevant goods. *See* Trademark Act Sections 2(d) and 45, 15 U.S.C. §§ 1052(d) and 1127; *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002) (proprietary rights in the asserted mark may arise from "prior use analogous to trademark or service mark use, or any other use sufficient to establish proprietary rights"); *Cent. Garden & Pet Co. v. Doskocil Mfg. Co.*, 108 USPQ2d 1134, 1145 (TTAB 2013) ("The analogous use doctrine allows a party to claim priority as of when it is established that the mark is associated in the mind of the consumer with a source for the goods.").

Cancellation No. 92064830

### A.   Has priority through analogous use been properly pleaded?

Although the parties make no mention of the issue, we have long held that reliance

on priority through analogous use must be pleaded, *see Cent. Garden & Pet Co.*, 108

USPQ2d at 1142 (citing *Fair Indigo LLC v. Style Conscience*, 85 USPQ2d 1536, 1537-

38 (TTAB 2007) (discussing sufficiency of analogous use pleading). In his amended

petition to cancel, Petitioner claimed priority based on his alleged

> common law usage of the CAPTAIN CANNABIS
> trademark in U.S. interstate trade since at least
> January 25, 1999 when [Petitioner] engaged in sales
> activities at the NATPE trade fair in New Orleans,
> Louisiana and *bona fide* commercial trade in Comic Books
> starting September 25, 2006 by way of direct sale of a
> 420/Captain Cannabis comic book to a customer in the
> state of Florida.

9 TTABVUE 9 (Amend. Pet. for Canc. ¶ 41). Petitioner also claimed priority based on

his alleged "sales and marketing activities through his CAPTAINCANNABIS.COM

web portal since April 22, 1999." *Id.* (Amend. Pet. for Canc. ¶ 42).

We find these statements sufficient to allege Petitioner's analogous use priority

claim. As stated, Petitioner claims 1999 as the date he was engaged in "sales

activities," which is use analogous to trademark use; he also pleads "bona fide

commercial trade" in 2006 and clarifies that this was "by way of direct sale," which

would be, if proven, actual trademark use. Petitioner also relies on marketing

activities, and "even before proper trademark use commences, advertising or similar

pre-sale activities may establish priority if they create the necessary association in

the mind of the consumer." *Central Garden & Pet Co.*, 108 USPQ2d at 1142.

Petitioner has thus sufficiently put Respondent on notice that he intends to rely on

11

**ER439**

Cancellation No. 92064830

both use analogous to trademark use as well as actual trademark use. *See* Fed. R.

Civ. P. 8(e)(1); *see also Scotch Whisky Assoc. v. U.S. Distilled Prods. Co.,* 952 F.2d

1317, 21 USPQ2d 1145 (Fed. Cir. 1991) (under the simplified notice pleading of the

Federal Rules of Civil Procedure, the allegations of a complaint should be construed

liberally so as to do substantial justice); *Fair Indigo*, 85 USPQ2d at 1538 ("The

elements of each claim should be stated concisely and directly, and include enough

detail to give the defendant fair notice."); *Harsco Corp. v. Elec. Scis. Inc.,* 9 USPQ2d

1570, 1571 (TTAB 1988) (since function of pleadings is to give fair notice of claim, a

party is allowed reasonable latitude in its statement of its claims).[6]

## B.   Respondent's Priority Date

Because a presumption of validity attaches to Respondent's involved registration,

Davidson is entitled to rely on the April 2, 2014 filing date as his date of constructive

first use. *Cent. Garden & Pet Co.*, 108 USPQ2d at 1140 ("when an application or

registration is of record, the party may rely on the filing date of the application for

registration, *i.e.*, its constructive use date"); *Syngenta Crop Prot.*, 90 USPQ2d at 1119

---

[6] Even if we found Petitioner's allegations insufficient, we believe the issue has been tried by implied consent. Fed. R. Civ. P. 15(b)(2). For example, Respondent acknowledges that Petitioner alleges CAPTAIN CANNABIS artwork appeared on his website in 1999 but argues that "the existence of such artwork standing alone does not establish use of the artwork as a trademark at the website." 47 TTABVUE 23. Also, Petitioner testified that he sold a copy of his "420" comic book in September 2006, 11 TTABVUE 7; Respondent argues that even if true, it did not bear the CAPTAIN CANNABIS mark. 47 TTABVUE 24. "While the question [would be] a very close one we find that the issue was tried by implied consent, and we therefore consider [Petitioner's] analogous use theory." *Cent. Garden & Pet Co.*, 108 USPQ2d at 1142.

12

**ER440**

Cancellation No. 92064830

("applicant may rely without further proof upon the filing date of its application as a 'constructive use' date for purposes of priority").

However, Davidson asserts an earlier date for priority. Davidson seeks to establish "2013" as Respondent's date of first use in commerce. To this end, Davidson testified that:

> I initially indicated a first-use in commerce date of October 2, 2014 for my "Captain Cannabis" trademark based on a misunderstanding on my part regarding the requirements for use in interstate commerce. In reality, the first sales of my "Captain Cannabis" comic books under the "Captain Cannabis" mark were in 2013.

17 TTABVUE 4 (Davidson Decl. ¶ 17).

When a registrant seeks "to prove a date of first use earlier than the date alleged in its application for registration ..., its proof of that earlier date must be 'clear and convincing.'" *Hydro-Dynamics Inc. v. George Putnam & Co. Inc.,* 811 F.2d 1470, 1 USPQ2d 1772, 1773 (Fed. Cir. 1987) (dates of first use earlier than that alleged in the application is a change of position from one "considered to have been made against interest at the time of filing the application," and therefore requires enhanced proof); *see also Stanspec Co. v. Am. Chain & Cable Co.*, 531 F.2d 563, 189 USPQ 420, 424 n.10 (CCPA 1976) ("An amendment to a registration to claim earlier dates of first use amounts to an enlargement of a registrant's rights. Such a registrant has a heavy burden of proof in attempting to establish a date of first use prior to that stated in its registration.") (internal citations omitted); *NT-MDT LLC v. Kozodaeva*, 2021 USPQ2d 433 (TTAB 2021) (motion to amend dates of first use denied where registrant's proof was not clear and convincing).

13

**ER441**

Cancellation No. 92064830

To support the claimed 2013 date, Davidson testified that he "sold some copies of my 'Captain Cannabis' comic books personally in 2013." 17 TTABVUE 3 (Davidson Decl. ¶ 13). Alex Wadsworth testified that he purchased a CAPTAIN CANNABIS comic book from Davidson in 2013. 18 TTABVUE 2 (Wadsworth Decl. ¶ 2). A copy of the cover of the comic book Wadsworth attested to purchasing was attached to his Declaration as Exhibit 1 (18 TTABVUE 3):



Neither Respondent nor Davidson supplied  an invoice or receipt demonstrating this alleged sale to Wadsworth or of any direct sales allegedly made in 2013.

14

**ER442**

Cancellation No. 92064830

Respondent's only receipts come from 2014, in the form of two receipts that fail to identify the items allegedly sold except by unintelligible "deposit ID" numbers. Whether these reflect sales of comic books bearing the artwork shown above, or that displayed below is unclear:[7]



---

[7] This artwork accompanied Respondent's statement of use, and was properly rejected as failing to show use of CAPTAIN CANNABIS in a trademark manner. Trademark Act Sections 1, 2 and 45, 15 U.S.C. §§1051-1052, 1127. After this specimen was rejected, Respondent filed as a substitute specimen, a copy of the cover depicted in Exhibit 1 to the Wadsworth declaration.

**ER443**

Cancellation No. 92064830

The only other submission allegedly supporting Respondent's earlier 2013 claimed date of first use is an invoice from a printer for printing "The Cosmic Crusaders-Reboot-Comic." 17 TTABVUE 8. The invoice does not mention CAPTAIN CANNABIS, and it is unclear if and how the term was used in the referenced "Reboot-Comic." The invoice thus has minimal probative value.

When the smoke clears, the above evidence is not clear and convincing proof that Respondent's first use of its mark on a comic book was in 2013 rather than 2014. Respondent has not established that it is entitled to a date of first use earlier than April 2, 2014.[8]

## C.    Petitioner's Priority Date

As noted above, "even before proper trademark use commences, advertising or similar pre-sale activities may establish priority if they create the necessary association in the mind of the consumer." *Cent. Garden*, 108 USPQ2d at 1142.

> It is well settled that one may ground one's opposition to an application on the prior use of a term in a manner analogous to service mark or trademark use. Such an "analogous use" opposition can succeed, however, only where the analogous use is of such a nature and extent as to create public identification of the target term with the opposer's product or service.

*T.A.B. Sys. v. PacTel Teletrac,* 77 F.3d 1272, 37 USPQ2d 1879, 1882 (Fed. Cir. 1996). The theory under which use analogous to trademark use can provide a party with priority over another user of the same mark further requires that actual trademark

---

[8] Even had we found "2013" to be Respondent's date of first use, such a finding would not change the results in this case.

16

Cancellation No. 92064830

use must follow the analogous use within a commercially reasonable period of time. *Dyneer Corp. v. Auto. Prods., plc*, 37 USPQ2d 1251, 1255 (TTAB 1995) ("With use analogous to trademark use, the proper inquiry generally is whether any delay between such use and actual, technical trademark use is commercially reasonable.").

To prove prior analogous use, Petitioner need not submit survey evidence or other direct evidence of the consuming public's identification of the CAPTAIN CANNABIS mark with Petitioner as the source of comic books or related goods such as DVDs and animated videos. "Instead, the fact finder may infer the fact of identification on the basis of indirect evidence regarding the [Petitioner's] use of the word or phrase in advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications." *T.A.B. Sys.,* 37 USPQ2d at 1881. While the "activities claimed to constitute analogous use must have substantial impact on the purchasing public," *id.* at 1882, that does not mean proof is required of "a fixed percentage, like 20%, much less 51%, of the potential customers must have formed the required 'prior public identification.'" *Id.* at 1883.

Thus, Petitioner may establish his priority by showing that he has used the CAPTAIN CANNABIS mark in the United States in a manner analogous to trademark use sufficient to create an association in the mind of the relevant consumers between the mark and the goods, followed by actual trademark use of the mark within a "commercially reasonable time." *Dyneer Corp.*, 37 USPQ2d at 1255.

### 1.   Petitioner's Pre-sales Activities

Petitioner testified that he "created a costumed superhero character and comic book titled CAPTAIN CANNABIS" during the 1970s and obtained a Canadian

17

**ER445**

Cancellation No. 92064830

copyright in 1977 for the "unpublished Literary and Artistic (comic book) titled CAPTAIN CANNABIS." Andrusiek Aff. ¶ 2; Annex. 15 (11 TTABVUE 6). The cover of the work appeared as follows:



11 TTABVUE 16.

Following registration of the copyright in Canada, Petitioner attended a trade show of the National Association of Television Program Executives (NATPE) in New Orleans in 1999. There, he promoted CAPTAIN CANNABIS by means of a promotional flyer distributed at the trade show. Andrusiek Aff. ¶ 3; Annex. 17 (11 TTABVUE 6). According to the flyer distributed at the event, CAPTAIN CANNABIS was the main character in an adult animated series that was "in development." Annex. 17 (11 TTABVUE 20):

**Captain Cannabis**

Cross your local super-hero with an aging rock and roll roadie and you get Captain Cannabis. This adult animated series following the exploits of Halburt Lighter as he stumbles from one disaster to the next.

Audience: Adult          Packaging: Animated series - 26 x 1/2 hour

18

**ER446**

Cancellation No. 92064830

Also in 1999, Petitioner registered the domain name <captaincannabis.com>. He testified that he has "always been the registered owner." Andrusiek Aff. ¶ 4 (11 TTABVUE 7). Petitioner operates a website at this address that displays the mark "to promote and sell [Petitioner's] CAPTAIN CANNABIS products." *Id.*

Petitioner testified that "on October 12, 2006, I printed 5000 copies of the first CAPTAIN CANNABIS comic book in the series titled "420-001" with oKee.comX (okee.com) publisher." Andrusiek Aff. ¶ 4 (11 TTABVUE 7). On rebuttal, Petitioner testified that "[i]n 2006, I published a new issue of the Captain Cannabis comic series, titled "420" (the "420/CAPTAIN CANNABIS" comic book)." Corrected Andrusiek Rebuttal Decl. ¶ 18; Ex. 5 (39 TTABVUE 5).

The front cover of the comic book was included within Exhibit 5 to Petitioner's rebuttal testimony declaration. The words CAPTAIN CANNABIS do not appear on the front cover of the comic book, 39 TTABVUE 27, which is depicted below:

Cancellation No. 92064830



In addition, within Exhibit 5 to Petitioner's rebuttal declaration and included as part of Annexure 22 to Petitioner's main testimony affidavit, are copies of a page from within the comic book and the back cover of the comic book. On the back cover appears

Cancellation No. 92064830

a reference to "Captain Cannabis" as the main character of the story, and on the inside page before the back cover, "Captain Cannabis" is referred to as the title of the "precursor to '420'" (i.e., the comic book copyrighted in 1977). The back cover at 11 TTABVUE 31 and the inside page before the back cover at 11 TTABVUE 30 follow.

- **Back cover**:

Cancellation No. 92064830



"420" creator Verne Andru found his calling when he met the crew from Captain Canuck Comics at a high school "career day." He quickly became the studio pest, dropping by weekly to show off his latest creations, including "420's" star attraction, Captain Cannabis.

His career got a boost with his first paid job - cel painting on "Blowhard," a National Film Board animated short. This was followed by animation assignments for Hanna Barbera's Saturday morning lineup. At the same time, he continued working in comics, doing covers for Charleton, ink and colour on Captain Canuck and illustrating stories for the independently published Phantacea.

During a feature assignment on Nelvana's "Rock and Rule," he worked with a leading special effects team and became intrigued with the opportunities computers held for fantasy creators. Upon completing that project he attended college, graduating on the honour role a few years later as a computer systems specialist.

Verne was early to apply the technology as it came available. Desktop publishing replaced traditional typesetters. He pioneered digital paint for location and character colour styling on television series work. This was followed by a state-of-the-art desktop animation system he used to produce a range of animations for web and broadcast, including the highly successful Kid's Club commercial spots for Swedish furniture retailer, IKEA.

Verne can be found on the web at www.VerneAndru.com.



VERNE
SIGNATURE SERIES

Cancellation-92064830-Petitioner Testimony - 000084

## PREPARE TO BE AMAZED!



When an aging rock-n-roll roadie happens across a neurotic ET with a stash of cosmic pot, he finds himself transformed into Captain Cannabis – a reluctant "hero" who must learn how to use his new superhuman powers to stop a crazed global elite and their "machine of death" from turning Earth into the ultimate PRISON PLANET.

### "420" IS A FRESH TAKE ON SCI-FI

Join veteran animator and comic book artist Verne Andru, as he spins a tale that will make even the most jaded conspiracy theorist blush. 30 years in the making, "420" mixes hightbrow comedy and adventure with the rough and tumble sensibilities of the wrong side of the tracks. Down-and-out roadie Halburt "Hal" Lighter finds himself tossed into the middle of an extraterrestrial turf war over the planet Earth, where the entire future of the human species is at stake. Hal and his secret desire Marion befriend the messianic alien oKee, much to the dismay of the Vice President of the United States who is working in collusion with The Supreme One – evil lord of another alien race.

### "420" HAS A UNIQUE VOICE, ONE THAT IS FRESH AND EXUBERANT

While principally a science fiction story, "420" successfully mixes up its genres. It is a hybrid of science fiction and dark comedy/drama. The story is fun and the characters are great answers to the clichés of the genre, adventuring in an inspired universe. More importantly, Verne Andru has a truly original voice and the story is a unique mix of science fiction, dark comedy and gritty realism.

### "420" IS A MULTI-MEDIA EXTRAVAGANZA

"420" was designed from the outset as a multi-media experience. Verne uses his vast well of experience in film, print and the web to craft an entertainment extravaganza that is second-to-none.

Written as a feature-length film, "420" unfolds over 13 chapters. Storyboards and book pages are prepared simultaneously, ensuring continuity between media. From these, Verne draws detailed animation layouts that appear first as black and white "webisodes" [www.oKee.com and www.CaptainCannabis.com]. Once all a chapter's layouts are polished, they are given a colour treatment then published in an illustrated book series. When all 13 are finalized, so will the artwork to produce the "420" feature-length animated film. This is the first time web, print and film are seamlessly integrated into one of the most unique multi-media experiences ever created.

### WEBISODE VIEWING

## www.oKee.com :: www.CaptainCannabis.com



ISBN 0-9738837-0-7

Verne and 420 logos are trademarks of Verne Andru. ©Copyright 1976-2006, Verne Andru. All rights reserved. No part of this work may be reproduced or used in any form or by any means - including but not limited to graphic, electronic, or mechanical including photocopying, recording, taping, or information storage and retrieval systems - without written permission of the publisher, oKee comiX.

First printing - October 2006.

Published and printed in the Dominion of Canada - MMVI

Affidavit of Petitioner Laverne John Andrusiek - Cancellation No. 92064830 / 26

- **Inside page:**

**ER450**

Cancellation No. 92064830

# 420 :: THE STORY BEHIND THE STORY

The book you're reading is part of a larger story that's been many years in the making. Raised during the 1960's and weaned on such works as Fritz the Cat, The Fabulous Furry Freak Brothers, Harold Hedd and Cheech and Chong, I naturally gravitated to the "fringier" side of life when it came time to develop my own material. My first original work, and precursor to "420," was a short, black and white comic titled "Captain Cannabis." Truth be told, I created Captain Cannabis as a dark counter-balance to the goody-two-shoes Captain Canuck character my 'mentors' George Freeman and Jean-Claude St. Aubin were working on.

Sensing I had stumbled onto something good, I filled out the requisite forms, and filed for a copyright. A few months later I received a certificate from the copyright office for a literary work titled – yes folks – "Captain Cannabis." Unnoticed by me at the time – actually it held no significance in popular culture of the 60's and 70's I was aware of – was the fact that the certificate is dated April 20, 1977.

Today, of course, popular culture holds April 20 in particularly high esteem. April is the 4th month of the year making April 20, numerically speaking, 420. April 20 at 4:20 PM is known as the "pot-smokers' holiday," the "hippie New Year," "national smoke time," "national pot-smoking day," "the holiday," "pot appreciation day," "the ultimate session," or "a day of tribute to the scene." While making no claim to originating the 420 term, my Captain Cannabis copyright certificate is one of the oldest documented connections between April 20 and cannabis that I am aware of. That reason alone made it a title befitting the Captain Cannabis "origin" story.

It took another 20 years before I set about to realize a story worthy of the character I had created. A well know axiom in writers circles holds that there are no new stories, just the retelling of old. I was determined to scour the earth to disprove this maxim. At the very least I wanted to find a story that hadn't been told in a long enough time to at least be interesting. I spent the better part of 5 years researching everything from history to law to linguistics to music to politics to religion. The bibliography exceeded 275 books before I stopped keeping track.

I'm pleased to say I believe I've accomplished my objective. "420"

is the first part of a story being told through a series of feature films. It follows the trials and tribulations of the evolution of man – not the evolution of the physical shell we equate with self, but the evolution of our consciousness that inhabits and animates it during its cosmic journey.

Prior to 500 BCE, our forefathers viewed life and their place in it far differently from current Western culture. There was an understanding that material life was transitory and the "holy grail" of "immortality" was attainable given the proper training and requisite preparation. Training was given through a complex system of "mystery schools." They maintained a tradition of esoteric knowledge that was passed from generation to generation. This important light was all but extinguished when early "Christian" zealots destroyed the schools, killed the practitioners and burned, destroyed or spirited away the written teachings and records. Some of the traditions have been maintained in the Eastern schools of thought, particularly Pantheism, Sufism and esoteric Buddhism to which the Falon Gong claims its ancestry.

The Ancients maintained there was only ONE – a singular consciousness from which all else is both a part of and separate from. While time and space are maya [illusion], they provide a mechanism for isolation and individuation from the ONE. Some schools call this ONE "god," while I prefer the less religiously tainted, and more descriptively accurate, handle of "The Universal Consciousness" [TUC].

Similar to the way light dissipates the further it is from its source, instances of individuated consciousness become increasingly fragmented the further they "fall" from their "Edenistic" bliss of communion with TUC. The levels of fragmentation are similar to strata that are sometimes referred to in terms of "bodies." We are all familiar with the physical body we inhabit on a daily basis and the etheric body we inhabit in our dream state but are unaware of our "mental" body where our consciousness is currently resident. These bodies are similar to the Id, Ego and Super-Ego coined in modern psychology – Carl Jung being particularly "esoteric" in his leanings.

You can visualize these strata by studying the following: "a higher dimension sees all lower simultaneously and equally." In other words, if you are outside a fishbowl you can see and describe it in its totality. Conversely, if you are inside a fishbowl [dimension] it is impossible for you to see and describe what the fishbowl [dimension] looks like from the outside. Software programmers, in order to create the illusion of 3 dimensional worlds found in today's motion pictures and video games, use a software "engine" that is a

21

Affidavit of Petitioner Laverne John Andrusiek - Cancellation No. 92064830 / 25

According to Petitioner, "[b]y 2006, internet retailer Amazon.com had become established; Amazon.com listed my CAPTAIN CANNABIS 420 comic book (420-001)

23

**ER451**

Cancellation No. 92064830

placing their first of many orders on September 18, 2006." Andrusiek Aff. ¶ 7 (11
TTABVUE 7). Petitioner submitted copies of two shipping orders, showing shipments
of four comic books to Amazon.com.kydc, Inc. in Lexington Kentucky; one is dated
September 18, 2006 and the other February 27, 2007. Andrusiek Aff. ¶ 7; Annex. 24
(11 TTABVUE 35-36). Petitioner testified that sales through Amazon.com continued
until 2017. Andrusiek Aff. ¶ 7 (11 TTABVUE 7).

Petitioner also submitted additional evidence of sales of the comic book. Petitioner
submitted shipping records for a sale of one comic book in the United States on
September 25, 2006, to a customer in Florida. Andrusiek Aff. ¶ 8; Annexs. 25-6 at 37-
40 (11 TTABVUE 7). Petitioner submitted a copy of a statement from Jim McPherson
of Phantacea Publications, asserting that he has a copy of the comic book "dated
October 2006" that Petitioner "was selling at the time." Annex. 39 (11 TTABVUE 79).
In March 2009, a "420-001 Book/DVD Bundle" was sold to a customer in Brooklyn,
New York. Andrusiek Aff. ¶ 9; Annex. 26 (11 TTABVUE 42). That customer referred
to the goods as "Captain Cannabis (420) + DVD" in his handwritten order. Andrusiek
Aff. ¶ 9; Annex. 26 (11 TTABVUE 44).

Petitioner also attests to having utilized social media platforms since 2010:

> In 2010 I started moving CAPTAIN CANNABIS into
> social media in a bigger way first on MySpace then
> Facebook and others. Attached hereto and marked
> Annexure 42 is a November 17, 2016 screen shot I took
> from my CAPTAIN CANNABIS Facebook page found
> open to the public at HYPERLINK
> http://www.facebook.com/pages/Captain-Cannabis/
> 131856846871529    www.facebook.com/pages/Captain-
> Cannabis/131856846871529.

Andrusiek Aff. ¶ 17; Annex. 42 (11 TTABVUE 85), which is displayed below:

24

**ER452**

Cancellation No. 92064830



Petitioner testified that on "October 12 and 13, 2013 I attended the APE (Alternate Press Expo) comic convention in San Francisco where I sold copies of my CAPTAIN CANNABIS 420 comic books." Andrusiek Aff. ¶ 15 (11 TTABVUE 9). Jim McPherson confirms that Petitioner and he "shared the Phantacea table at the APE (Alternative Press Expo) convention" and that Petitioner sold copies of the comic books at the convention. 11 TTABVUE 79. "I also told potential customers looking for creator signatures or to discuss the Captain Cannabis character with him when he would be back." *Id.*, Exhibit 39. Information as to the number of attendees and number of copies of the comic books that may have been sold at the convention was not provided.

### 2. Have Petitioner's Pre-sales Activities Created the Necessary Association in the Mind of the Relevant Consumer?

As noted, a petitioner's claim of priority based on "analogous use" can succeed only where the analogous use is of "such a nature and extent as to create public

25

Cancellation No. 92064830

identification of the target term with the [petitioner's] product or service." *T.A.B. Sys.*, 37 USPQ2d at 1882. Petitioner contends that he is well-known within the college and university market, as well as with general comic book enthusiasts. "Over the years, magazines, radio stations and podcasts have repeatedly featured me in articles and interviews as the creator of CAPTAIN CANNABIS and my 420 comic book as a CAPTAIN CANNABIS comic book." Andrusiek Aff. ¶ 9 (11 TTABVUE 7). In support, Petitioner testified about the following media attention garnered by Petitioner before 2014:

- February, 2007: Florida podcaster known as "Q's House" interviewed Petitioner; the resulting interview was broadcast into Florida over the Internet. An announcement of the interview appeared at http://qshouse.slackertown.com/?m=20070227&cat=4, wherein Petitioner was described as "the George Lucas of the comic world":[9]

---

[9] Andrusiek Aff. ¶ 9; Annex. 28 (11 TTABVUE 50).

Cancellation No. 92064830



- February 2007: High Times Magazine published a short article about Petitioner, depicted below.[10] Petitioner states that he "understand[s] their monthly circulation is around 236,000."

---

[10] Andrusiek Aff. ¶ 10; Annex. 26 (11 TTABVUE 8, 52).

Cancellation No. 92064830



- May 21, 2007: Radio Station CJSF's "The Interview Show" broadcast an interview with Petitioner; copy of the promotion "they distributed for that show citing me 'creator of CAPTAIN CANNABIS' [that] I saved from http://www.cjsf.ca/index.php" is depicted below:[11]

---

[11] Andrusiek Aff. ¶ 11; Annex. 30 (11 TTABVUE 8, 54).

Cancellation No. 92064830



- June 2011: Culture Magazine interviewed Petitioner, which "resulted in a cover-story article and interview of [Petitioner] discussing CAPTAIN CANNABIS."[12] The article credits Petitioner for being the creator and

---

[12] Andrusiek Aff. ¶ 12; Annex. 33 (11 TTABVUE 8, 58-60).

writer of CAPTAIN CANNABIS. Petitioner states, "I understand they have 500,000 monthly circulation."

BUZZ

# A REAL HERO

Holy smoke! It's **Captain Cannabis** to the rescue!

**BY JASEN T. DAVIS**

**Comic Relief**

Captain Cannabis isn't the only THC-powered hero. Back when *Chasing Amy* hit the screens in 1997, comic fiends were introduced to *Bluntman and Chronic*, a series based upon Jay and Silent Bob. In the film, *Jay and Silent Bob Strike Back*, the movie rights to *Bluntman and Chronic* were sold to Miramax and the titular characters attempt to stop the movie. Throughout it all, we're not sure exactly what their super powers are . . .

The *Captain Cannabis* online comic is a series of 13 webisodes presenting the adventures of Halburt Lighter, a.k.a. Captain Cannabis. Equal parts cynical comedy, life-affirming realism and superheroic fantasy, this mind-altering animated comic delivers an enlightening jolt of THC-infused social commentary.

Verne Andru is the creator and writer of *Captain Cannabis*. His previous experience includes working on the legendary cult classic *Rock & Rule*, one of the many heavy metal-infused animated films that were so prevalent during the '70s and early '80s. Since then, he's worked with heavyweights such as Hannah-Barbara, Disney and Industrial Light & Magic.

Andru was able to step away from his magnum opus long enough to share a few words with *CULTURE* about life, the universe and *Captain Cannabis*.

**How would you describe *Captain Cannabis* to some of our readers who might not have heard of your art?**
This is the story of a down-and-out roadie named Halburt Lighter. Through a series of misadventures, he and his girlfriend end up in Vancouver, where a spacecraft shows up to help Earth. Okee, the alien on the spacecraft, has a magical plant he calls "herb." When Hal smokes it, he is able to manifest what he thinks about in real life. I'm eventually going to combine all of the webisodes into a feature film I'm going to call *420*.

**He reminds me of DC's Green Lantern, with an emphasis on the green, only he can control reality. Isn't the alien also a main character?**
I wanted *Captain Cannabis* to look very professional, so I had to split the project into pieces to keep down costs. The next part of the series will deal with Okee's backstory.

***Captain Cannabis* has some deep, occult roots. I've noticed a lot of references to Buddhism, Hinduism, Gnostic philosophy and Tibetan mysticism.**
Yes, the point is that we are a spiritual consciousness stuck in a physical body. Right now, many people just want things for themselves and don't care about anyone else. When you get into the higher realms of spiritualism there is a point where you have to ask, "What is the real truth?" Okee and Hal ask this question.

Okee is meant to illustrate the struggle our consciousness [faces] to rise above the material world. He represents the inherit weakness of man and keeps falling into matter. That's our struggle.

Halburt Lighter, a.k.a. Captain Cannabis, is going through the illumination phase of becoming enlightened. In the first comic, he's just a basic guy who doesn't think beyond his next joint or beer. He goes through a spiritual awakening by smoking pot.

**How does *Captain Cannabis* reflect your personal beliefs about the subject of medical marijuana and the legalization movement? Why is something so useful still illegal?**
One thing people don't understand is that hemp, the parent plant of marijuana, is the reason that Western culture exits in North America. The first industry in the colonies was building ships, which needed hemp for rope. Because it expanded and became financially viable, this allowed Europeans to come over and invest in America. Back then, hemp and marijuana grew everywhere. It actually required a lot of work to eradicate.

Why is it illegal? Money. You can grow cannabis anywhere. Because of that, you have a product that is uncontrollable. Well, why do we have laws? To control us. The question is; what jurisdiction does the DEA have? It's under the control of the IRS, not the FDA. It has nothing to do with food . . . it's about money.

captaincannabis.com.

36 CULTURE • JUNE 2011

Although there is no record evidence of the size of the comic book market or number of marijuana consumers in the United States at the time, both parties seem to be directing their marks to these same niche communities.[13] The evidence attached

[13] Although marijuana remains a controlled substance at the federal level, *see, e.g., In re Stanley Bros. Soc. Enter., LLC,* 2020 USPQ2d 10658 (TTAB 2020), its possession and recreational use has been legalized recently by a number of states. However, at the time that Petitioner engaged in his pre-sales activities, the possession and recreational use of marijuana was not only federally prohibited, but illegal under most state laws. A study by an expert panel of the Department of Commerce's National Highway Safety Administration (https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/expert_dwi_panel.pdf, last accessed

Cancellation No. 92064830

to Petitioner's affidavit suggests that Petitioner's CAPTAIN CANNABIS mark is reasonably well-known within these communities, even if the numbers are not large in absolute terms, and was reasonably well-known prior to Respondent's priority date. By that date, Petitioner's mark had received regional and national attention in niche publications and media, and Petitioner had promoted its mark on a national level, including through trade shows, social media, and the Internet. We find that the evidence considered in its entirety establishes that Petitioner garnered sufficient notoriety from his pre-sales activities to support a finding that his analogous use "is of such a nature and extent as to create public identification of the target term with the [petitioner's] product." *T.A.B. Sys.*, 37 USPQ2d at 1882.

### D.  Did Petitioner use the mark CAPTAIN CANNABIS on comic books in the United States within a reasonable time?

The second prong of the test for finding analogous use sufficient to support priority requires that the analogous use be followed up within a reasonable time frame by actual trademark use. To show that he used the CAPTAIN CANNABIS mark within a commercially reasonable period of time following his use analogous to trademark use, Petitioner filed evidence of such technical trademark use from 2016 and 2017. Petitioner took a screenshot of his YouTube channel, and attests:

> On February 25 2007 I started posting the instalments [sic] of my "CAPTAIN CANNABIS in 420" story on my Youtube channel,        HYPERLINK        "http://www.Youtube.com/

---

on August 31, 2022) stated that in 2016 four states and the District of Columbia had legalized marijuana for recreational use. From this we can reasonably infer that marijuana was not widely consumed legally at the time that Petitioner was promoting "Captain Cannabis" and that the "market" for marijuana-related goods and services was probably relatively small, and surely smaller than it is today.

31

Cancellation No. 92064830

> verneandru" www.Youtube.com/verneandru, and have
> posted updates as they are available. Attached hereto and
> marked Annexure 41 is a screen-shot I saved November 6,
> 2016 of my Youtube channel displaying the completed
> "CAPTAIN CANNABIS in 420" story.

Andrusiek Aff. ¶ 16; Annex. 41 (11 TTABVUE 9, 83). That screenshot
appears below:



**ER460**

Cancellation No. 92064830

The text under the caption titled "Published on Sep 22, 2014" (pointing arrow added to show placement) reads: "Complete animatic of the first [and a bit] storyboard build from the original Captain Cannabis 420 script. This is a rough sketch of the film used to make the story and editing decisions that went into the script rewrite." 11 TTABVUE 83.

On May 1, 2017, Petitioner took a screenshot of his website that he testified displays a copy of the cover of Petitioner's movie script. Andrusiek Aff. ¶4; Annex. 19 (11 TTABVUE 7, 24):



Under Notice of Reliance, Petitioner submitted the following:

Cancellation No. 92064830

1.    Amazon "Author Page" listing for Petitioner dated 12/16/2017 (www.amazon.com/author/verne). 12 TTABVUE 10-11:





34

**2. IMDb's (Internet Movie Database) "Verne Andru" page December 16, 2017 (www.imdb.com/name/nm3252989).** 12 TTABVUE 14:

Find Movies, TV shows, Celebrities and more... All
Movies, TV & Showtimes
Celebs, Events & Photos
News & Community
Watchlist

Verne Andru
SEE RANK
Animation Department | Director | Writer
View Resume | Official Photos »
Verne grew up during the dawn of the television era where the wacky worlds of Beatlemania and Bugs Bunny collided with his all too impressionable psyche. Driven to dabble in music and art, it wasn't until he met the crew from Captain Canuck Comics at a high school career day that he found his calling. Pouncing on the opportunity, he dropped by ...
See full bio »
More at IMDbPro »
Represent Verne Andru? Add contact information

Known For
Captain Cannabis
Director
Rock & Rule
Animation Department
(1983)
Wing Commander Acade...
Art Department
(1996)
Mutant League
Animation Department
(1994)

Cancellation No. 92064830

**3. "Captain Cannabis Celebrates its 40th Anniversary" August 15, 2017 Culture Magazine (U.S.) article by David Edmundson (http://ireadculture.com/captain-cannabis-celebrates-its-40th-anniversary/).** 12 TTABVUE 8:

http://ireadculture.com/captain-cannabis-celebrates-its-40th-anniversary/

LATEST FROM CULTURE | 11, 2017 - Celebrating Snow Sports With Cannabis

ADVERTISE SUBSCRIPTION CAREERS CONTACT CART

culture MAGAZINE

COVER | NEWS | DEPARTMENTS | FEATURES | REVIEWS | VIDEOS | FLIPBOOK | CONTESTS | MERCH

You are here: Home / News / Captain Cannabis Celebrates its 40th Anniversary

# Captain Cannabis Celebrates its 40th Anniversary

by David Edmundson | August 15, 2017

Cannabis in mainstream entertainment may be relatively standard today, but not long ago it was relegated to back rooms as part of the counter culture.

From that bygone era sprung the comic book Captain Cannabis, which is currently celebrating the 40th anniversary of its first issue, titled "Roll Me Another One." The book follows the whacky adventures of Hal Lighter, a hero tasked with protecting Earth amidst an extradimensional war, while trying to protect the love of his life, Marion Jones.

Lighter uses intergalactic weed to transform into the titular Captain Cannabis. Sure it sounds weird, but a lot of comic book powers come from strange places. Shazam, who is an adult aged superhero, got his powers because as a young boy he took a magical subway to a throne room, where a wizened wizard bestowed onto him, not only extraordinary powers, but the ability to go back-and-forth from adult to child when he transforms.

The comic is billed as being "about as far from politically correct as you can get." And it definitely lives up to that moniker. Comic Cook Code be damned, you won't find adventures like this at Marvel or DC. The first issue of the comic, created by Verne Andru, is being reissued with updated artwork to celebrate the milestone.

The parallels between Captain Cannabis and the Green Lantern are too numerous to be a coincidence. Both heroes derive their powers from a mystical source, both play large roles in intergalactic conflicts they never imagined possible and both are motivated by their sense of right and desire to protect the one they love. Readers can only hope that Lighter is better at protecting his beloved, and that she doesn't share the same fate as Green Lantern's (Kyle Rayner) girlfriend Alexandra DeWitt, who was "fridged." No that's not a typo, and DC Comics would love to pretend it didn't happen. Thankfully though, the internet exists and you can read all about it here.

You can pick up the 40th anniversary collector's edition of Captain Cannabis at CaptainCannabis.com.

Cancellation No. 92064830

Petitioner's testimony and documentary evidence demonstrate that he has been selling the "420" comic book that included the CAPTAIN CANNABIS character continuously since 2006 to the present, including during 2013-14, and that by 2017, Petitioner sold comic books under the mark CAPTAIN CANNABIS. We find Petitioner's actual trademark use in 2017 to be within a commercially reasonable period of time following his analogous use in 2013-14 so as to create a "continuing association of the mark" with Petitioner's goods. *Dyneer Corp.,* 37 USPQ2d at 1256.

## VI.    Conclusion

When viewed  as a whole, we find the evidence introduced by Petitioner sufficient to establish that Petitioner used his mark prior to April 2, 2014, first in a manner analogous to actual trademark use, then as an actual trademark.

> [W]hether a particular piece of evidence by itself establishes prior use is not necessarily dispositive as to whether a party has established prior use by a preponderance. Rather, one should look at the evidence as a whole, as if each piece of evidence were part of a puzzle which, when fitted together, establishes prior use.

*W. Fla. Seafood,* 31 USPQ2d at 1663. When all of the testimony and documentary evidence is considered together, it  establishes that Petitioner used the mark CAPTAIN CANNABIS in connection with comic books in a manner analogous to trademark use prior to the April 2, 2014 filing date of Respondent's underlying application, and followed that use by actual trademark use within a commercially reasonable time. Accordingly, Petitioner has shown his priority of use based on his analogous use pre-2014 and his actual trademark use post-2014, and because Respondent has conceded that there is a likelihood of confusion resulting from the

Cancellation No. 92064830

simultaneous use of CAPTAIN CANNABIS in connection with the parties' goods, we find that Petitioner has established its Section 2(d) by a preponderance of the evidence.

**Decision:** The petition to cancel Respondent's registration for the mark CAPTAIN CANNABIS is granted under Trademark Act Section 2(d) and Registration No. 4782920 will be cancelled in due course.[14]

---

[14] In view thereof, we need not and do not reach Petitioner's other pleaded claims. *See TiVo Brands LLC v. Tivoli, LLC* , 129 USPQ2d 1097, 1098 (TTAB 2018) (where judgment entered on dilution claim, merits of section 2(d) claim not reached); *Am. Paging Inc. v. Am. Mobilphone Inc.*, 13 USPQ2d 2036, 2039-2040 (TTAB 1989), *aff'd without opinion*, 17 USPQ2d 1726 (Fed. Cir. 1990) ("Having determined that petitioner is entitled to the relief it seeks based upon its claim pursuant to Section 2(d) of the Lanham Act, we need not address petitioner's claim that registrant has abandoned its rights in the mark AMERICAN MOBILPHONE PAGING and design.").

**ER466**

## Other Documents

4:23-cv-03918-YGR OpenAI, Inc.
v. Open Artificial Intelligence, Inc.
et al

ADRMOP,AO279

### U.S. District Court

### California Northern District

**Notice of Electronic Filing**

The following transaction was entered by Partovi, Cameron on 2/2/2024 at 7:14 PM PST and filed on 2/2/2024

| | |
|---|---|
| **Case Name:** | OpenAI, Inc. v. Open Artificial Intelligence, Inc. et al |
| **Case Number:** | 4:23-cv-03918-YGR |
| **Filer:** | Open Artificial Intelligence, Inc. |
| | Guy Ravine |

**Document Number:** 61

**Docket Text:**
**Statement *of Recent Decision* by Open Artificial Intelligence, Inc., Guy Ravine. (Attachments: # (1) Declaration of Cameron Partovi, # (2) Exhibit A, # (3) Exhibit B, # (4) Exhibit C)(Partovi, Cameron) (Filed on 2/2/2024)**

### 4:23-cv-03918-YGR Notice has been electronically mailed to:

Aaron H Perahia     aaronperahia@quinnemanuel.com

Cameron Ryan Partovi     cpartovi@birdmarella.com, mhicks@birdmarella.com

Dylan I Scher     dylanscher@quinnemanuel.com

Ekwan Eric Rhow     eer@birdmarella.com, brl@birdmarella.com, mlw@birdmarella.com

Margret Mary Caruso     margretcaruso@quinnemanuel.com, calendar@quinnemanuel.com,
jenniferhayes@quinnemanuel.com, margret-caruso-0666@ecf.pacerpro.com

Paul S. Chan     psc@birdmarella.com, dlt@birdmarella.com

Robert Michael Schwartz     robertschwartz@quinnemanuel.com

Robert P. Feldman     bobfeldman@quinnemanuel.com, calendar@quinnemanuel.com,
eliness@quinnemanuel.com, rachelarteaga@quinnemanuel.com

Sam Stephen Stake     samstake@quinnemanuel.com, sam-stake-3025@ecf.pacerpro.com

### 4:23-cv-03918-YGR Please see **Local Rule 5-5**; Notice has NOT been electronically mailed to:

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**C:\fakepath\Defendants' Statement of Recent Decision.pdf
**Electronic document Stamp:**
[STAMP CANDStamp_ID=977336130 [Date=2/2/2024] [FileNumber=20980522-0]
[587f7e55b9692e58130ea99a14ba7c809b524cce574c77aec009d027c9bd82564d201
b713907d5c183dd788bacb409cfb3afc1874ae7a74571fc50c98a3dd0bf]]
**Document description:**Declaration of Cameron Partovi
**Original filename:**C:\fakepath\Partovi Declaration ISO Statement of Recent Decision.pdf
**Electronic document Stamp:**
[STAMP CANDStamp_ID=977336130 [Date=2/2/2024] [FileNumber=20980522-1]
[104aad51e96b2d7b9cd39037d1259df59d9c83cf42023b9d81c2d5acec7c14d295557
129e97bd5a1d5b5c834a4004a96b2d8af475d91e117f86deab8af8f32de]]
**Document description:**Exhibit A
**Original filename:**C:\fakepath\Exhibit A.pdf
**Electronic document Stamp:**
[STAMP CANDStamp_ID=977336130 [Date=2/2/2024] [FileNumber=20980522-2]
[2a8ccfa5cecee3647450450e91087f6fcb1487ba4274a92ba57024bfc1324ffb3df3a
9dcd31fb32a95046a9283b47cc6ea0b9fab6c4c898f64ca2389d0dc0ae3]]
**Document description:**Exhibit B
**Original filename:**C:\fakepath\Exhibit B.pdf
**Electronic document Stamp:**
[STAMP CANDStamp_ID=977336130 [Date=2/2/2024] [FileNumber=20980522-3]
[a5637ae90d43a989080a88f1deaa973703bd81fd4fd408d50f55d2dd0151ea454c93a
8f951208c0a40ff0feca21292eda5bcefc5e08884b14bc560b69bb8b089]]
**Document description:**Exhibit C
**Original filename:**C:\fakepath\Exhibit C.pdf
**Electronic document Stamp:**
[STAMP CANDStamp_ID=977336130 [Date=2/2/2024] [FileNumber=20980522-4]
[031862e8752db958f2060610ec99bbbfac149f94533e9b4535557f1cadb799358d7f1
98a58f39bdff0dd9d511bc146a2ddf2686ea9163d4421a5eb0c3b3994f7]]

**Pages 1 - 78**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
OPENAI, INC.,                  )
                               )
          Plaintiff,           )
                               )
   VS.                         )      NO. CV 23-03918-YGR
                               )
OPEN ARTIFICIAL INTELLIGENCE,  )
INC., ET AL.,                  )
                               )
          Defendants.          )
_____)
```

Oakland, California
Monday, November 20, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

```
            QUINN EMANUEL URQUHART & SULLIVAN, LLP
            555 Twin Dolphin Drive, 5th Floor
            Redwood Shores, CA 94065
       BY:  ROBERT FELDMAN, ESQUIRE
            MARGRET CARUSO, ESQUIRE

            QUINN EMANUEL URQUHART & SULLIVAN, LLP
            865 S. Figueroa Street, 10th Floor
            Los Angeles, CA  90017
       BY:  AARON PERAHIA, ESQUIRE

            QUINN EMANUEL URQUHART & SULLIVAN, LLP
            51 Madison Avenue, 22nd Floor
            New York, NY 10010
       BY:  DYLAN SCHER, ESQUIRE
```

Reported By:        Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                    Official Reporter

**APPEARANCES CONTINUED:**

For Defendants:

BIRD MARELLA BOXER WOLPERT NESSIM
DROOKS LINCENBERG & RHOW
1875 Century Park East, Suite 2300
Los Angeles, CA 90067

BY: **EKWAN RHOW, ESQUIRE**
**CAMERON PARTOVI, ESQUIRE**
**PAUL S. CHAN, ESQUIRE**

| 1 | <u>**Monday - November 20, 2023**</u>                     <u>**12:02 p.m.**</u> |

1    <u>**Monday - November 20, 2023**</u>                          <u>**12:02 p.m.**</u>

2                              **P R O C E E D I N G S**

3                                    ---oOo---

4           **THE CLERK:**  Good afternoon, everyone.

5       Calling the matter of CV 23-3918, OpenAI, Inc., vs. Open

6    Artificial Intelligence, Inc., et al.

7           Parties, please step forward and state your appearances

8    for the record.

9           **MS. CARUSO:**  Good afternoon, Your Honor.  Margaret

10   Caruso for the plaintiff, OpenAI, Inc.  With me are my

11   colleagues, Robert Feldman; next to him, Aaron Perahia, Dylan

12   Scher, as well as our paralegal.

13          **THE COURT:**  Well, I'm sure your paralegal has a name,

14   too.

15          **MS. CARUSO:**  Joseph.

16          **MR. LEROY:**  LeRoy.

17          **MS. CARUSO:**  LeRoy.

18          **THE COURT:**  How do you spell his last name?

19          **MS. CARUSO:**  L-E-R-O-Y.

20          **THE COURT:**  Okay.  Great.  Thank you.  Good morning or

21   afternoon.

22          **MR. RHOW:**  Good afternoon.  Ekwan Rhow on behalf of

23   the defendants, and I'm here with Cameron Partovi,

24   P-A-R-T-O-V-I, and Paul Chan, also from my office.

25          **THE COURT:**  Okay.  Hold on just a minute.  So not

1    Joshua Masur?

2              **MR. RHOW:**  Yeah.  He's not from our firm.  I'm not

3    sure the firm is still in the case, but that --

4              **THE COURT:**  He came up on the list.

5              **MR. RHOW:**  Yes.  I saw that.

6              **THE COURT:**  Just checking.

7         Okay.  Lots to do today.

8         My first question that I always ask when someone asks me

9    for a preliminary injunction or a TRO is when you will be ready

10   to go to trial?

11             **MS. CARUSO:**  Yes, Your Honor.  We believe we will be

12   ready to go to trial next fall.

13             **THE COURT:**  So if I don't give it to you, that's fine

14   with you.  You're ready to go in the fall?

15             **MS. CARUSO:**  That's the -- we would like to have it,

16   but that's the soonest we think we can reasonably get there.

17             **THE COURT:**  Okay.

18        Defendants.

19             **MR. RHOW:**  Your Honor, we do have counterclaims, and

20   we did talk about this, but we'll be prepared to go as soon as

21   necessary.

22             **THE COURT:**  If I decide I need to have an evidentiary

23   hearing, when you will be prepared to go?

24             **MS. CARUSO:**  Your Honor, our company is -- our clients

25   closed for the Thanksgiving week, but I believe after that, we

1   could do it next week or so.  We would need to check with them

2   about availability.

3          **MR. RHOW:**  Likewise, Your Honor.  I do think there are

4   some conflicts coming up, but if it's a one-day evidentiary

5   hearing, I'm sure we could schedule sometime in December or

6   January.

7          **THE COURT:**  Well, are you going to be ready -- what if

8   I set it on Monday, will you be ready to go?

9          **MS. CARUSO:**  Your Honor, I think that would be a

10  challenge given that -- where our company is right now just in

11  terms of the holidays.

12         **THE COURT:**  All right.  Tuesday?

13         **MS. CARUSO:**  I need to check with them, but we will do

14  everything we could for Tuesday.

15         **MR. RHOW:**  If Your Honor sets it for those dates, that

16  would be fine.

17      The one issue I would raise -- and this relates to some

18  very recent news relating to OpenAI, that -- the plaintiff's

19  version of OpenAI --

20         **THE COURT:**  We're going to talk primarily in terms of

21  plaintiff and defendant.

22         **MR. RHOW:**  Understood.

23      In terms of plaintiff, as Your Honor may have heard, two

24  of the primary percipient witnesses are no longer with

25  plaintiff as of Friday, Sam Altman and Greg Brockman.

1        **THE COURT:**  Well, they work for Microsoft now, and

2   Microsoft owns 49 percent.

3        **MR. RHOW:**  Understood.  The only reason I raise that

4   is they would be important percipients as well.

5        **THE COURT:**  Are you sure?

6        **MR. RHOW:**  Yes.  If that -- depending, of course, on

7   what the issue Your Honor is focused on, but if it's focused on

8   the interactions between the parties, those are the only three

9   folks, my client and those two individuals.

10       **THE COURT:**  If I do -- if I need an evidentiary

11  hearing and I do not do it next Monday or Tuesday, it will not

12  happen until January.  That's why I'm asking the question.

13       Okay.  Let's get started.

14       **MS. CARUSO:**  All right, Your Honor.

15       As he referenced in our case management conference,

16  Mr. Feldman is going to begin by addressing some of the

17  defendants' evidence.

18       **THE COURT:**  Mr. Feldman, did you have a role in -- how

19  much of a role did you have in the briefing and how much of a

20  role did you have in the slide deck?

21       **MR. FELDMAN:**  Briefing.  I read both briefs, edited

22  both briefs.

23       Slide deck.  I had a very heavy role in the tabs that I'm

24  going to go through that are the beginning of your book, and

25  not as heavy --

1          **THE COURT:**  Is my -- is my book the same as the slide

2   deck that was emailed to us?

3       No.  It looks like it has more than that.

4          **MR. FELDMAN:**  I'm not sure how to answer your question

5   exactly, but I can tell you that in the book that we handed to

6   the Court this morning and that was circulated, so it must have

7   gone to Your Honor, I'm responsible, principally, actually, for

8   Tabs 1 through 12 and not as responsible for what I think is

9   Tab 13, which is the slide deck about the law.  But as to the

10  statements in the book and the documents in the book from Tabs

11  1 through 12, I'm principally responsible.

12      And as for the briefing, I am responsible -- I'm

13  responsible for all of it.

14         **THE COURT:**  Well, I understand, but there's -- as you

15  and I know, there is heavy involvement and there is reading.

16  The reason I ask is because the primary issues that I have --

17         **MR. FELDMAN:**  Yes.

18         **THE COURT:**  -- are explained in the slide deck but

19  were actually not very well explained in the briefing.

20         **MR. FELDMAN:**  Yes.

21         **THE COURT:**  And so that creates some issues.

22         **MR. FELDMAN:**  Yes.  If you're asking me whether I

23  created the slide deck -- this may be where you're going.  If

24  you're asking me whether I created the slide deck, if you will,

25  in response to what was or wasn't in the brief, I did not.

1          **THE COURT:**  All right.

2          **MR. FELDMAN:**  What I am responsible for directly is

3     all of it, and particularly, as I said to you at the CMC, I

4     am -- I am familiar with the quality and the character of the

5     representations made by the defendants to the PTO and to

6     Your Honor.  That's what I have focused my attention on.

7          **THE COURT:**  All right.

8          **MR. FELDMAN:**  And I want to be very clear about

9     something.  I affirmatively read both briefs, edited both

10    briefs, but as I was going to begin my -- my remarks by

11    saying -- and I don't mean to be flippant -- trademark law sits

12    squarely in the universe of substantive areas of the law about

13    which I know very little.  So while I aggressively, if you

14    will, edited those briefs, I don't really know very much about

15    the law in this area.  So I won't be of any particular

16    assistance in that respect.

17         And I will say that, as I'm sure you tell people, I made

18    sure -- I tried to make sure that there weren't a lot of

19    adverbs and adjectives in the briefs to describe some conduct

20    which I think is shocking, and I'm responsible for that not

21    being in the brief.

22         **THE COURT:**  Well, as you know, I appreciate that.

23         **MR. FELDMAN:**  Yes.  So I hope I'm able to be helpful

24    about the -- what I said I would be at the CMC, the quality and

25    the character of the representations to the PTO and to

1    Your Honor.  I'm not familiar --

2              **THE COURT:**  That's fine.

3              **MR. FELDMAN:**  -- with trademark law.

4              **THE COURT:**  All right.  Who am I going to have on the

5    other side dealing with those issues?  Is that you, Mr. Rhow?

6              **MR. RHOW:**  Your Honor, I'll be dealing with all the

7    issues.

8              **THE COURT:**  All right.  Then you should stay at the

9    mic.

10             **MR. RHOW:**  Understood.

11             **THE COURT:**  All right.

12             **MR. FELDMAN:**  So shall I proceed?

13             **THE COURT:**  You should.

14             **MR. FELDMAN:**  One preliminary observation, before I

15   begin the substance of this, in paragraph 3, the individual

16   defendant says that he is recognized by scholars for his

17   contributions to the field.  The example he gives is at

18   Exhibit 1 of his declaration, page 12, and that is a sentence

19   in which he, among 20 people, is thanked for his contribution

20   to the article or his reading of the article.  That's it.

21        So despite paragraphs 3 and 7 of his declaration, which,

22   on our first reading, would suggest that he is a -- well known

23   in the field and an expert in the field, his entire

24   contribution to scholarship is being thanked as one of 20

25   people who read an article in 2017.

1      Your Honor may wish to consider this, not because it's

2   critical to the motion but because I think it suggests by its

3   lack of detail and corroboration what you're about to hear

4   about.

5      So if I could possibly, Your Honor, direct -- and,

6   Your Honor, you have a book from us, and it's got tabs, and I'm

7   going to refer to tab numbers and exhibit numbers so that the

8   record is complete.

9      **THE COURT:**  And did you give me two books or just one?

10      **MR. FELDMAN:**  I gave you a number of books because I

11   wasn't sure how many staff members you would have here today.

12      **THE COURT:**  Okay.  You have a book?  All right.  Go

13   ahead.

14      **MR. FELDMAN:**  So to make sure we're in the same book

15   and on the same page, I'm going to direct Your Honor's

16   attention, if I might, to Tab 1 in the book, which is Exhibit A

17   to Mr. Perahia's declaration.  Mr. Perahia is an associate at

18   our office.

19      **THE COURT:**  Okay.

20      **MR. FELDMAN:**  This is -- as you can see, this is the

21   application for the trademark.  It's dated 12/11/2015.  And in

22   it, there is a representation on page 4 of 7 of the exhibit

23   that the mark was being used in commerce.  And then Your Honor

24   would join me, please, at page 7 of 7 of this exhibit, and

25   you'll see that what was submitted to establish use in commerce

1    is what I now know to be called a landing page that simply

2    says, quote, announcement will be made soon.  And there's a

3    place for anyone who might have seen this to enter their email.

4         So that is the showing that was made to the patent office,

5    patent and trademark office, when the initial application was

6    made.

7         If I could then, please, direct your attention to Tab 2,

8    which is Exhibit B, as in "boy," to Mr. Perahia's declaration,

9    that is what is known as an "office action" as reflected on

10   page 2 of 20.

11        On page 3 of 20 and the material that is yellow

12   highlighted for the Court's consideration, there is a statement

13   that says, "Registration is refused because the specimen does

14   not show the applied-for mark for use in commerce."

15        And then further down in the further highlighting, Mr.--

16   the individual defendant was told that he could submit a

17   different specimen that was in actual use in commerce, at least

18   as early as the filing date of the application.  And then in

19   language which we did not highlight, it says, "or prior to the

20   filing of an amendment."  That was March-- I believe it was

21   March 29th, 2016.  And the applicant was given six months to

22   respond but wasn't told that he couldn't respond earlier than

23   that.

24        Then if I could invite the Court's attention to Tab --

25   and, by the way, my presentation will take about 10 minutes,

1    not very long, but I hope it's worthwhile walking through this

2    because I think the detail matters here.

3        If I could direct the Court's attention to Tab 3 in the

4    book, which is Exhibit C as in "cat," to Mr. Perahia's

5    declaration, there is something known as a response to office

6    action, and that's on page 2 of 7 of that exhibit.

7        On page 3 of 7, there is a representation which we've

8    highlighted for Your Honor that says, "The substitute specimen

9    was in use in commerce at least as early as the filing date of

10   the application."

11       And then on page 4 of Tab 3, which is Exhibit C,

12   Your Honor will see something with which the Court is familiar.

13   The applicant is told that false statements and the like are

14   punishable by fine or imprisonment or both under 1001.

15       I would then invite your attention to pages 6 and 7, which

16   are the specimens, and the specimens were submitted to the

17   patent and trademark office on September 27th, I believe, in

18   2016.  And there's no reason for the Court to -- nor would

19   you -- memorize the yellow highlighted material on pages 6 and

20   7, but I would ask you to just briefly take a look at them and

21   bear them in mind as we go through the next few exhibits.

22       Tab 4 is the -- so what we have, if I may, is these

23   specimens were submitted to the patent and trademark office in

24   September of 2016, and the patent and trademark office was told

25   in a statement under penalty of 1001 that they were in

1    commerce, used in commerce, prior to the date of the

2    application, which was December 2015.

3         Now I would ask Your Honor to look at Tab 4, which is the

4    declaration of Mr.-- of the individual defendant, and that

5    declaration at page -- at page 3 of 9 of the exhibit, which is

6    paragraph 8 -- excuse me -- yes, paragraph 8 in which the

7    defendant says that the discussion board that supposedly

8    existed in 2015 he stopped supporting in or around early 2016.

9    Then in paragraph 9 -- with no explanation for why.  Then in

10   paragraph 9, he says that he developed technology for an

11   improved discussion board in 2016.  Subsequently in

12   September 2016, not '15, '16, "I launched an evolved version of

13   the discussion board which bore the Open AI mark."

14        And then at the end of that paragraph in the last

15   sentence, he says, "Attached as Exhibit 4 to this declaration

16   is a true and correct copy of a screenshot of Hub reflecting

17   the use of Hub in September 2016."

18        If you would please look at Exhibit 4, which is part of

19   this tab, it's at the back of this tab, still on Tab 4 in the

20   page prior to Tab 5, you'll note the highlighted text.

21            **THE COURT:**  Keep going.

22        **MR. FELDMAN:**  You'll note the highlighted text, which

23   is the same text, and it's actually the same post that I

24   brought to Your Honor's attention in the submission to the

25   patent and trademark office in which it was represented that

**ER481**

1    this thing was in existence prior to the application, that is

2    to say, prior to 2015, December 2015.

3        So here you have a declaration in Your Honor's court

4    saying that it reflects that this thing here -- and I call it

5    "thing" because I actually don't know what it is -- which is

6    Exhibit 4 to the individual defendant's declaration was -- is a

7    true and correct copy of something in September of 2016.

8        The next tab, which is Tab 5, is a demonstrative for which

9    I am responsible a hundred percent, in which we show for

10   Your Honor's convenience what I just said, the relationship

11   between what was submitted to the PTO on the left-hand side and

12   what was submitted to Your Honor under oath in this court in

13   connection with these proceedings, and you can see that they're

14   identical.

15       But -- and, Your Honor, as I said, I told the people to

16   keep adjectives and adverbs out of the brief, and I'm going to

17   try to do that here, but I'm now here to tell you that as Tab 6

18   will show you, both the submission to the PTO and the

19   declaration are wrong.  Let me say that again.  There was a

20   submission to the PTO.  There was a submission in a

21   declaration, and they were both wrong.

22       Tab 6, which is Exhibit E to Mr. Perahia's declaration, at

23   page 2 of 4 of Tab 6 -- are you there, Your Honor? -- you'll

24   see that this is the same text.  That's why I asked you to look

25   at just the first little bit of it.  This is the same -- but

1    we've got the whole thing here.  This is the same text as the

2    two that we just looked at, but Mr. Perahia, who's younger than

3    I am and knows about phones and desktops, looked for this on

4    his mobile browser, which means on his phone.  This is in his

5    declaration.  And this version of this post, which was the

6    subject of two conflicting statements, one to the PTO and one

7    to Your Honor -- this post shows when downloaded, if you will,

8    from Mr. Perahia's phone, its creation date, which is

9    September 26th, 2016.

10        Your Honor will remember that I pointed out the date of

11   the response to the PTO's rejection, and the date of the

12   response was September 27th, six months after the office action

13   by the PTO.  So this post retrieved from Mr. Perahia's phone,

14   which bears a created date of September 26th, was created at

15   6:06 a.m. 2016 by somebody, a day before the submission of the

16   response.

17        If I could now direct Your Honor's attention to Tab 7,

18   which is another demonstrative for which I am a hundred percent

19   responsible, this is to make vivid for the Court what I just

20   said, namely, that the specimen, which was undated, submitted

21   to the PTO and the mobile version downloaded from Mr. Perahia

22   shows that it was -- that the undated thing that was submitted

23   to the PTO on September 27th was created on September 26th,

24   even though the PTO was told that it was in existence prior to

25   December 2015.

1    And, Your Honor, this thing from September 26th wasn't

2    simply created on September 26th.  If I could please ask

3    Your Honor to turn to Tab 8, which is Exhibit F as in "Frank"

4    to the Perahia declaration, on page 2 of 12, you will see the

5    same language that I brought to Your Honor's attention in the

6    box and yellow highlighted, and it's language you've seen

7    before already.  And then if you look above that, you'll see

8    that it's dated August 26th, 2016, so the text that was

9    submitted to the PTO on September 26th is identical to this

10   text which Mr. Perahia found on a different website known as

11   GitHub.  That's Mr. Perahia declaration, paragraph 9.

12       And to make that vivid for the Court, at Tab 9, there's a

13   demonstrative for which I am again responsible, and it shows

14   exactly what I just said, that the GitHub post and the PTO

15   specimen submitted on September 26th are identical.

16       So not only was this post that the PTO was told was in

17   commerce in December created on September 26th, but it was, in

18   fact, copied from something called GitHub that had been

19   published in August of 2016.

20       In case Your Honor has any doubt about this, there are two

21   additional factors with respect to the quality and character of

22   these representations to bear in mind.  The showing that I've

23   just walked through was in our opening papers entirely very

24   clearly.  No adjectives, no adverbs, but it was there.

25            THE COURT:  I agree.

1          **MR. FELDMAN:**  And there was no response --

2          **THE COURT:**  I agree.

3          **MR. FELDMAN:**  -- to this, other than to say the PTO

4    has not found there to have been a fraud, and of course the PTO

5    didn't know that there was a fraud.  They weren't told any of

6    these things.  That's number one.

7          Number two, the good Mr. Perahia did not just cherrypick.

8    He looked at this website thing and found two other examples of

9    the exact same pattern, that is to say, creation on

10   September 26th, copied from GitHub earlier posts.  I'm not

11   going to walk Your Honor through them, but with your

12   permission, I will state those cites for the record in case

13   they're of any assistance to the Court at a later point.

14         May I do that?

15         **THE COURT:**  Go ahead.

16         **MR. FELDMAN:**  That would be at Mr. Perahia's

17   declaration at Exhibit C at page -- at 6 at Perahia

18   declaration, paragraph 7, and in paragraph 7, Mr. Perahia said

19   that he found these three posts.  He then said that each of

20   the -- of the posts that he found were dated September 26th

21   between 4:00 and 6:00 a.m.  That's Perahia declaration

22   Exhibit E at 2 through 4.

23         One of those posts is the one you've seen that was in

24   the -- in the individual defendant's submission at Perahia

25   declaration 7.

1    Madame Reporter, am I going too fast?

2        The other two posts were not submitted to the patent and

3    trademark office.  That's at Perahia declaration paragraph 7,

4    Exhibit D as in "David," 4 through 7.

5        The two posts that were not submitted to the patent and

6    trademark office follow the same pattern.  That's at Perahia

7    declaration D, Exhibit D, pages 4 through 5, and Perahia

8    declaration Exhibit 5 at pages 6 through 7, Perahia Exhibit D,

9    6 through 7, with Perahia Exhibit 5 at pages 9 through 12.

10       And I would say one more thing about this.  Mr. Perahia's

11   declaration says that he found three posts.  It does not say

12   that those are the only posts he -- excuse me.  It does not say

13   that those are the only posts that exist.  Those are the only

14   posts that he noted.  None others have been produced by the

15   other side, and they've taken down the website so we can't

16   affirmatively represent to you that those are the only ones,

17   but that's my best belief or prediction or guess or hypothesis.

18       We found three.  Didn't see more.  Can't swear as an

19   officer of the court that there are no more, but I can swear as

20   an officer of the court that none has been submitted to

21   Your Honor, and they took down the website.

22       I think I have one more thing to say.  This relates to

23   Exhibit 2 -- excuse me -- or Tab 10 of the individual

24   defendant's -- sorry.  We're at Tab 10, which is Exhibit 2 to

25   the individual defendant's declaration and paragraph 5 of the

1    same declaration.

2          One of the many things he says he had was something that

3    he called, I think for purposes of the case, quote, an initial

4    collaboration tool.  We've seen no reference in any

5    contemporaneous document to such a tool.  The only reference

6    we've seen to that is in the individual defendant's

7    declaration.  There is nothing in the record from any source

8    that has that title, other than in his declaration.

9          He says that this thing existed from March 2015 until

10   January 2016, and that's at paragraph 5 of his declaration.

11   There is no explanation for why it stopped being available.

12   And if I may say to Your Honor, consistent with his entire

13   declaration, there's no statement that anyone ever saw this or

14   used it.

15         If you look carefully at his declaration, as I know

16   Your Honor will, with respect to all these things that he says

17   existed, there's no statement anywhere that anyone ever saw it

18   or used it.  All he says was either that he developed it or

19   that it was accessible.  But in the papers that have been

20   submitted to you, confusing as they are, the one thing you can

21   be sure of is that there's no evidence that anyone ever saw or

22   used any of the things that the defendant says he had.

23         There's no explanation why this thing wasn't submitted to

24   the patent and trademark office in December of 2015, and

25   there's no explanation why it wasn't submitted to the patent

1    and trademark office after the rejection rather than the phony

2    posts that were submitted.

3         There's no explanation for why there's nothing

4    corroborating the existence of this so-called tool like code or

5    real screenshots or declarations from users or partners or

6    friends or anybody.  And no explanation from even the defendant

7    about what it was used for.  All we have is what he describes

8    in his declaration as a reconstruction.  And, Your Honor,

9    that's at page -- oh, it's in Exhibit 2 of his declaration.

10        And when Your Honor reviews that, you'll see that it

11   actually is nothing.  I mean, it's a page, and it has a lot of

12   technical typing on it, but in terms of actual creation by

13   somebody who purports to have created this thing, there's

14   virtually nothing.

15        And as we've established, the technical material on this

16   page largely comes from an Australian textbook, copied

17   verbatim, which I believe is set forth at Tab 12.  Your Honor

18   can see that there is a textbook that is entitled *Mathematics

19   of Autonomy*, and the text in Exhibit 2 is taken from or

20   identical to, in large part, that textbook.  We have the

21   textbook in court.  We made it available to counsel last week

22   to inspect.  There was no inspection.  If Your Honor has any

23   interest in looking at this book, it's here for your

24   inspection.  There's nothing about that book that suggests that

25   the individual defendant had anything to do with it, and

Case: 24-1963, 05/08/2024, DktEntry: 15.4, Page 234 of 300
Case 4:23-cv-03918-YGR  Document 56  Filed 11/30/23  Page 21 of 79

(234 of 300)
21

1    there's certainly nothing on Exhibit 2 to his declaration that

2    suggests that he copied it, other than the fact that we now

3    found the book from which it was copied.

4        So what you have before you, no adjectives and adverbs,

5    is an extraordinary record, and it's one that was made,

6    notwithstanding 1001, to the patent and trademark office and

7    notwithstanding the laws and rules that apply to declarations

8    before Your Honor.

9        I will turn the rest of this over to Ms. Caruso.

10           **THE COURT:**  Not yet.

11           **MR. FELDMAN:**  I thought it was important that I

12   present this to Your Honor personally.

13           **THE COURT:**  I need a response.

14           **MR. RHOW:**  Yes, Your Honor.

15           **THE COURT:**  And I need it as to the specifics.

16           **MR. RHOW:**  Understood.

17           **THE COURT:**  Because it is shocking to me that there

18   was no response in the opposition.

19           **MR. RHOW:**  Understood, Your Honor.  Let me start, if I

20   may, with some background, and then I'll go into sort of a

21   point-by-point response.

22           **THE COURT:**  Well, first point, why didn't you explain

23   this in the opposition?

24           **MR. RHOW:**  Explain --

25           **THE COURT:**  A response.

1      **MR. RHOW:**  Part of -- the last part -- and I'll start

2  with the last part comes in the reply, the textbook argument

3  comes in the reply.  And I'll explain what that textbook

4  article from 2018 is, is actually a copy of a 2015 Wikipedia

5  article.  So the textbook that is being submitted to the Court

6  itself copied from something in 2015, and that is -- that is

7  from our slide show, and we did not get a chance to respond to

8  that.

9      On the first point, candidly, Your Honor, in terms of

10  going through the history of why Mr. Ravine submitted that

11  specimen, which he did incorrectly, he is not -- there are -- a

12  few people in the room are not trademark law experts, and

13  Mr. Ravine clearly is not, and he did not understand what it

14  meant to submit a specimen.  But for our purposes and what we

15  believe are the germane issues, going into that issue, we're

16  not trying to enforce a USPTO trademark registration.  We are

17  simply enforcing common law rights --

18      **THE COURT:**  So you then concede at this point that you

19  have no rights based upon your application or the supplemental

20  registration dating back to either 2015 or 2016?  Is that the

21  concession?

22      **MR. RHOW:**  The concession is this:  We have common law

23  rights.  That's what --

24      **THE COURT:**  I'm asking specifically about the other,

25  because you haven't responded.

1    **MR. RHOW:**  On the supplemental registration, we are

2  not seeking any rights independent of our common law rights.

3  And we are not basing our common law rights on the supplemental

4  registration.

5       The supplemental registration is a data point that is

6  consistent with our timeline narrative, but we are not bringing

7  claim to enforce a trademark ownership based on that

8  supplemental registration.

9       So --

10       **THE COURT:**  Okay.  So I need my record to be clear,

11  and I am not a trademark specialist.

12       So I'd like you to get up, Ms. Caruso, and tell me what

13  admission I need on the record so that I can avoid all of this.

14       **MS. CARUSO:**  I think you're correct to get the

15  admission that they're not seeking to enforce any rights on the

16  registration; however, what this raises a question of on the

17  response is what we're now hearing is they're asserting common

18  law rights.  What are those common law rights based on?

19       **THE COURT:**  Okay.  That's a separate question.

20       **MS. CARUSO:**  Okay.

21       **THE COURT:**  So tell me what the admission would be so

22  I can get an admission from counsel, and we can move on to the

23  common law issues, to the extent that there any.

24       **MS. CARUSO:**  Thank you.

25       First, that the specimen of use was submitted in error.

1    It does not reflect actual use in commerce of what was

2    submitted as a specimen.

3         **THE COURT:**  Are you admitting that?

4         **MR. RHOW:**  Well, it was meant -- if I may -- I feel

5    like I'm being -- it was meant to depict what he believed was

6    2015 use, but he didn't have those records because it was now

7    2016.

8         If the admission is was that actual use as of the first

9    date, that actual document, we admit it wasn't.

10        **THE COURT:**  So as of December 11th, 2015, the

11   submission that I find at Docket 25-1, page 7 of 7, which is

12   the landing page for the website, you admit is not evidence of

13   commerce?

14        **MR. RHOW:**  The landing page that existed in 2015 is

15   evidence of commerce.  The particular document you're referring

16   to we agree as of 2016 when we submitted it, we don't have --

17        **THE COURT:**  Wait.  You submitted this on December 11th

18   of 2015.  He submitted this on December 11th of 2015.

19        **MR. RHOW:**  So I will take no position as to whether

20   that's use or not.  The -- because it's not been litigated.

21   The USPTO came back and said you need more evidence, so we took

22   that at face value, and because we did not have evidence from

23   2015, submitted what a lay person, in this case, Mr. Ravine,

24   thought could suffice.  But we are not submitting to the Court

25   that that was something that existed in December 2015.  He knew

1    the best he could do was a reconstruction because he did not

2    have evidence at that point, which was a year later.

3         THE COURT:  Are you suggest -- are you admitting that

4    your registration should be canceled?

5         MR. RHOW:  No, Your Honor.  It is -- we have a

6    supplemental registration and that means while not as strong as

7    a normal registration, over time, that can mature into a

8    supplemental registration.

9         And, Your Honor, the broader point is none of these points

10   have been litigated because the plaintiff never raised these

11   points until today.  If they need to be litigated, we will do

12   that.

13        THE COURT:  Well, wait.  No, no, no.  I don't know

14   what you mean by that because none of this was new to me, so it

15   was in the briefs, it was in the filings.  I don't know what

16   you mean.

17        MR. RHOW:  What I meant is back in 2017 when plaintiff

18   had notice that their application had been rejected, that the

19   supplemental registration had occurred as to defendants'

20   trademark, that's seven years ago -- that's six years ago.

21   None of this had actually been litigated until now, and so when

22   you ask me am I admitting all these things, I'm not.  I'm not

23   until we litigate them.

24        But in terms of the evidentiary record, I want to make

25   clear that we agree that what is attached to the supplemental

1    use submission, that as to that particular document, yes, that

2    was not something that we can show existed as of December 2015.

3    And that was a mistake by Mr. Ravine that we do not believe is

4    germane to the issues on this injunction motion.  Maybe

5    relevant to the ultimate litigation, but on this injunction

6    motion, which they've brought for relief, we don't think it's

7    relevant.

8         What we believe remains relevant is that they knew of all

9    these things in 2017.  Their application was expressly rejected

10   by the USPTO based on all these documents, which at that time

11   they could have litigated, analyzed --

12        **THE COURT:**  So the injunction motion is in part based

13   on claims of false registration.  So how are these issues not

14   relevant?

15        **MR. RHOW:**  Because we are not -- we -- is there any

16   evidence --

17        **THE COURT:**  You're not conceding -- you're not

18   conceding that the registration was false.

19        **MR. RHOW:**  Correct.

20        **THE COURT:**  So if I find that they are likely to

21   succeed on the merits as to the false registration, how is that

22   not germane to the proceedings?

23        **MR. RHOW:**  Then you would prevent us from enforcing a

24   USPTO registration, but our common law rights would still

25   exist.  You'd still have to -- for them to get the injunction

1    they're seeking, they would need to get over a lot of hurdles,

2    in our view, but also prove we have no common law rights.  Even

3    assuming that the supplemental registration is relevant --

4          **THE COURT:**  So let's assume, for purposes of argument,

5    that you have common law rights.  How does Title 15 of the U.S.

6    code at Section 1120 -- what element of that claim relates to

7    common law rights?  It's a statutory right.

8          **MR. RHOW:**  Correct.

9          **THE COURT:**  With statutory requirements.

10         **MR. RHOW:**  Correct.

11         **THE COURT:**  So the common law doesn't get you there

12   with respect to that claim.

13         **MR. RHOW:**  Well, not as to that claim and --

14         **THE COURT:**  Right.  And that's the point.  I have to

15   look at each of these individually.

16         **MR. RHOW:**  Right.

17         **THE COURT:**  So if what you're saying is you have a

18   common law right, that's different than a statutory right.

19         **MR. RHOW:**  Correct.  I'm focused on what -- when you

20   say you will grant an injunction, what would the injunction say

21   then?  If we have common law rights but do not have rights

22   under the statute, what's the injunction?  It's you cannot tell

23   people you have a statutory registration?  That's fine.  We

24   don't.  We're not claiming that.

25         **THE COURT:**  No, but you are.  That's why I'm asking.

1          **MR. RHOW:**  Well, no.  You're asking for an admission,

2    Your Honor, that needs to be litigated for purposes of today's

3    injunction, okay, where they are seeking injunction telling us

4    to stop doing something.  If you tell me what they want us to

5    stop doing, then I can back into it, but it's a broader

6    statement to me you're making, which is if you lose on the

7    statute, they get the injunction.  I don't agree with that at

8    all.  We would still have --

9          **THE COURT:**  It is a multifactor test.  That's what it

10    is.

11          **MR. RHOW:**  Agreed.

12          **THE COURT:**  And you could win on some and lose on

13    others, and then I have to figure out what happens if you lose

14    on some and win on others.

15          **MR. RHOW:**  Fair.

16          **THE COURT:**  But you don't want to engage with your

17    weak evidence or your lack of evidence.

18          **MR. RHOW:**  We are not --

19          **THE COURT:**  And I have to -- I am required to analyze

20    each one of these things, not just the one that you want me to.

21          **MR. RHOW:**  Understood.  And I'm not implying that --

22    that -- I know that on the supplemental registration, just from

23    trademark law, that's a weaker trademark.  I'm not disputing

24    that.

25        And, by the way, this came up in reply brief.  The

1     argument that they cited -- and I have a counter-cite for

2     Your Honor -- is by virtue of us being on the supplemental

3     registration, we've conceded it's a descriptive mark and we

4     lose.

5          The case law, if I may --

6               **THE COURT:**  We are not there yet.

7               **MR. RHOW:**  Okay.

8          -- indicates otherwise.  I'll just say that.

9               **THE COURT:**  What I'm trying to figure out is why it is

10    that you didn't respond to these -- as a first step, why you

11    didn't respond to these -- to the evidentiary points that were

12    made.

13              **MR. RHOW:**  Well, to some of them I can respond now,

14    but in terms of if you're saying in the briefing, some came up

15    in the reply brief --

16              **THE COURT:**  I understand --

17              **MR. RHOW:**  A textbook example and a lot --

18              **THE COURT:**  I understand.  But I would like you to go

19    from the top you, and said that you would.  So can we go back

20    to the top?  Tab 1 --

21              **MR. RHOW:**  Yes.

22              **THE COURT:**  -- he submitted a landing page as evidence

23    of commerce.

24              **MR. RHOW:**  Correct.

25              **THE COURT:**  And you concede that that's -- that

1    doesn't actually show that there's a product.  It's -- it is

2    what it is.

3              MR. RHOW:  It is what it is.

4              THE COURT:  It's a landing page that says "coming

5    soon."

6              MR. RHOW:  Understood, and I concede that.

7              THE COURT:  Okay.  That's fine.  That's all I need.

8              MR. RHOW:  Understood, Your Honor.

9              THE COURT:  But you did not put that in your

10   opposition.

11             MR. RHOW:  Understood.

12             THE COURT:  So I'm giving you an opportunity to

13   respond, and I need to know what your position is.

14             MR. RHOW:  Understood.

15             THE COURT:  Okay.  Then Tab 3 -- well, I guess it's

16   Tab 4 relating to Tab 3.

17             MR. RHOW:  Or Tab 5.  Tab 4 is the declaration.  Tab

18   5, I think, and Tab 6.

19             THE COURT:  Well, Tab 5 is the --

20             MR. RHOW:  Tab 4 I have as his declaration.  5, 6, 7 I

21   think is their progression on this document, which I can

22   explain.

23             THE COURT:  So explain the point relative to his

24   declaration, Exhibit 4, Tab 4.

25             MS. CARUSO:  It's the last page of Tab 4.

1        **THE COURT:**  I'm using the binder that was given to me.

2        **MR. RHOW:**  Understood.

3     So, Your Honor, if I could provide a little context --

4        **THE COURT:**  You can provide context later.  I want a

5  response on this for my notes.

6        **MR. RHOW:**  Okay.  Understood.  And the -- sorry.  The

7  specific question is why is he using GitHub information or --

8  and from that date?

9        **THE COURT:**  He told the office -- correct.

10        **MR. RHOW:**  Correct.  So it is GitHub information which

11  is the nature of the products and tools he has where people put

12  in Wikipedia articles, textbook articles, GitHub articles.

13  They put them onto a forum for the public to review, to think

14  about, to analyze.

15     So the fact that he used GitHub is not of any moment, at

16  least based on the purpose of the product.  This is not

17  ChatGPT.  This is a tool for AI researchers to collaborate on

18  and to think about common issues on, just like Reddit, which

19  copies from thousands of different sources, just like

20  Wikipedia, which cuts and pastes from thousands of different

21  sources.  It is exactly like that.

22     So the reason you're seeing GitHub information or

23  Wikipedia information or textbook information is because that's

24  precisely how the product was designed.

25     As to the date, we are not disputing it's from

1    September 2016, and that was a mistake that Mr. Ravine made.

2    When he was asked to present use from 2015, he didn't have that

3    evidence.  The product has iterated.  These are open forums

4    where things are deleted all the time.  And so what he thought

5    he could do was essentially show the 2015 platform and then

6    show content within the platform.  That content was from 2016,

7    but in his mind he was showing how the 2015 platform worked.

8            THE COURT:  And why didn't he put that in his

9    opposition?

10           MR. RHOW:  I -- Your Honor, I didn't think it was

11   relevant for what we believe is relevant on the injunction

12   motion.  We're happy to do that if it's -- if it changes

13   anything because we, again -- and that's partly why in the last

14   case management conference we haven't brought counterclaims.

15   We're not asserting claims on these various registrations, and

16   all we're trying to do, frankly, is rebut this PI motion at

17   this time.

18           THE COURT:  All right.  Next.

19           MR. RHOW:  So then the next one is from the reply --

20   the next -- on the reconstruction, which Guy Ravine's

21   declaration makes very clear that in 2023, he still had an

22   issue with getting 2015 evidence, and so he presented to

23   Your Honor a reconstruction of what existed.  And we admitted

24   that in the declaration.

25           It is true that the reconstruction, because that is how

1    the product was designed to work, includes materials that are

2    copied and pasted from somewhere else.  Plaintiff presented --

3    I guess they had their forensic -- an analyst go through

4    everything out on the internet, and they found this textbook,

5    2018 textbook.

6         Guess what?  If you look at our slide -- sorry.  We

7    presented this as well, Your Honor -- Slide 8, you will see

8    that what is in that textbook actually comes from a March 2015

9    Wikipedia article, which is, again, how this product was meant

10   to work.  You take existing content, discussion analysis, you

11   put it on a common forum so that this community, which is very

12   small at the time -- this community of AI researchers, thought

13   leaders, could talk about it, think about it, and think about

14   the best way to deploy AI to the world.

15        Now, the example that plaintiff just talked about and

16   mentioned in their reply brief really is not relevant, frankly.

17   It was just meant to attack his credibility.  But we never had

18   a chance to respond so I'm responding now.  Because a lot of

19   what the plaintiff is doing is starting with 15 minutes on his

20   credibility when you have, Your Honor, a contemporaneous

21   document, Exhibit 11 to Mr. Ravine's declaration, where he is

22   talking without lawyers, without lawsuits, directly to

23   Mr. Altman and Mr. Brockman and laying out exactly what he is

24   doing at the time and who he is talking to, including Niklas

25   Boström.  Not as a footnote in some article.  Including Peter

1     Norvig, a professor at Stanford.  And if you look at that

2     Exhibit 11, Your Honor -- I don't mean to get into Margaret's

3     time on this, but --

4          **THE COURT:**  There is no time.  I haven't given anybody

5     a specific amount of time.

6          **MR. RHOW:**  Understood.

7          If you could then, Your Honor -- if you look at Exhibit 11

8     to Mr. Ravine's declaration, forget about reconstructions,

9     about textbooks that -- that Aaron found on the internet.

10    Let's go --

11         **THE COURT:**  That who found?

12         **MR. RHOW:**  Aaron, sorry.  That is -- I forget Aaron's

13    last name.  The associate at Quinn Emanuel.

14         **THE COURT:**  We do not use first names.

15         **MR. RHOW:**  I'm sorry.  I just forgot -- I consider

16    Mr. P a friend and I forgot his last name.

17         Your Honor, if you go to Exhibit 11 of Mr. Ravine's

18    declaration -- and we agree this wasn't submitted to the USPTO.

19    We agree that not everything he is saying in here can be

20    documented with evidence because it's 2015.  And this is a

21    startup founder who does everything by himself, who never hired

22    lawyers to do anything, and thought he could keep all the files

23    organized while keeping security on his websites, and he just

24    couldn't do it.

25         But in 2015, he writes -- Guy Ravine directly to Sam

1    Altman.   Sam Altman knows exactly who Guy Ravine is in

2    December 2015.  And he writes -- this is first sentence.  "We

3    have been working on an initiative called Open AI to build a

4    collective engineering platform to enable researchers from

5    around the world to collectively engineer deep learning

6    algorithms."

7        This was not ChatGPT.  This was Wikipedia.  That's what he

8    was doing so that people could talk about common issues.

9        He writes -- and he, in fact, says -- "to collectively

10   engineer deep learning algorithms together through a fast

11   collective iterative process using a number of new tools."

12           THE COURT:  Okay.  But it doesn't say that anything

13   has actually been done --

14       MR. RHOW:  Well, he says, "We have been working" --

15   if I could keep going, there is other points.

16           THE COURT:  Okay.

17       MR. RHOW:  He says, "We have been working on this

18   initiative."  And, again --

19           THE COURT:  So to me when I read that -- and I read

20   this -- what it said to me, at least -- you know, we'll see

21   where else you want to point, but it just means nothing is

22   quite there yet.  They're working on it.

23           MR. RHOW:  And, look, for purposes of trademark law,

24   you don't have to have the final product.  You have analogous

25   trademark use.  You are taking steps to come up with the final

1   product.  You have a website that says "coming soon."  Those

2   are all steps, that under the case law, you are allowed to take

3   into consideration in determining continuous use.

4        But, if I may, Your Honor, there are other statements --

5        **THE COURT:**  Do you agree with that general

6   proposition?  With the general proposition, yes or no?

7        **MS. CARUSO:**  I disagree with it as framed.

8        I agree that there are steps that can be looked at, steps

9   like press releases that receive widespread attention,

10  solicitation of thousands of people that result in some calls.

11  You don't have to have a million users on day one, that's true,

12  but there's no case law -- I don't agree with this at all --

13  that would support that saying "we're working on it" or "coming

14  soon" --

15       **THE COURT:**  I was not asking you to apply.  I was

16  asking you about the general proposition.

17       **MS. CARUSO:**  The general proposition that there can be

18  trademark rights --

19       **THE COURT:**  He says that you don't have to have the

20  final product.  Do you agree or not?

21       **MS. CARUSO:**  I agree.

22       **THE COURT:**  Okay.  All right.

23       Keep going.

24       **MR. RHOW:**  Your Honor, the second paragraph -- and I

25  know not all of these -- I'm trying to give some context, and,

1    to be honest, this is a credibility issue, too, and this email,

2    again, is realtime, and everything he says in it I think

3    Your Honor should consider when assessing sort of these

4    after-the-fact attacks.

5        Second paragraph says, "The initiative has the same goals

6    as yours, which are the accelerate, the arrival of general AI

7    through open effort."

8        The reason this is important, Your Honor, is because

9    ChatGPT, which is a 2022 product, that's something totally

10   different.  What I'm trying to tell Your Honor is from 2015 to

11   2022, they argue progressive encroachment.  There wasn't

12   encroachment.  There was direct competition on this somewhat

13   discrete goal of creating for this small AI community -- and

14   it's not millions of people.  Back then, maybe it's thousands,

15   maybe it's a handful of these folks who are thinking about

16   this, but that was the goal back then.  That's paragraph 2.

17       Paragraph 3 talks again about the platform.  I won't -- I

18   won't repeat that, but it says, "The goal is a platform for

19   collective engineering designed for AI like the one we have

20   been developing."  So "have been developing" means they've

21   started developing it, and I won't get into a semantics battle.

22   Does it mean it's completely finished?  Probably not.

23       But here's the key.  If you go to the fifth paragraph

24   down, he writes, "I've spent several years thinking about the

25   problem."  Third sentence, "My team has built," has already

1   built, "a collective engineer platform called Wikineering."

2   Why is it called "Wikineering," Your Honor?  It's like

3   Wikipedia.  It takes existing textbooks, content, articles.

4   You think about them.  How should we deploy AI to better

5   humanity?  How do we make this thing work?  That's -- that's

6   what its goal was.  It wasn't ChatGPT, and we acknowledge that,

7   but it was already built.

8        And he says what he did -- and this is what Mr. Ravine

9   says quite clearly in his declaration -- is that "we then

10  shifted the focus of Wikineering," which no one disputes

11  existed, "so that it was AI focused."

12       As of December 2015, whether or not every single one of

13  these things is true, Mr. Sam Altman, the founder of OpenAI,

14  should have known there was an existing product, a developing

15  product, whatever you want to call it, there was an existing

16  initiative that was using the Open AI name because that's in

17  the first sentence of this entire email.

18       Going to the bottom -- and I know plaintiffs think very

19  little of Mr. Ravine, but, again, contemporaneous email.

20  December 2015, last paragraph on that first page, he writes, "I

21  have been working with Peter Norvig, Richard Socher and others

22  to push a proposal."

23       Peter Norvig is a professor at Stanford University who

24  specializes in AI thought.  Alphabet, of course, is Google.  He

25  was talking with folks within Google about an AI initiative.

1   And then if you go to the second page, Your Honor, the last

2   sentence says, "Nick Boström has been advising."

3       We're not angling for advantage in a litigation,

4   Your Honor.  We are -- and we're not hiding in the weeds like a

5   trademark troll.  We are going directly to Sam Altman who takes

6   the email and actually meets with Guy -- meets with Guy in

7   December 2015, with Peter Brockman, and we disclose perhaps

8   a -- a startup who has no legal counsel, only -- only someone

9   like that would do it, who goes to the competition and

10  discloses all of their plans.  That's what Guy Ravine does in

11  December 2015.

12      And so rather than focus on reconstructions or alleged

13  copies, focus on this email because this email tells you, for

14  purposes of use, for purposes of delay, Your Honor, for

15  purposes of laches -- this email, which no one disputes is

16  accurate -- Mr. Brockman concedes it's accurate, concedes he

17  met with him, concedes he offered to purchase the domain name

18  in December 2015 -- that this evidence is credible, and it's

19  undisputed.

20      The back end, Your Honor, to what I just mentioned on the

21  front end is Exhibit 15, which is after eight years, nine years

22  of inaction, Mr. Altman and Mr. Brockman, they go back to

23  Mr. Ravine, on their own, by the way -- instead of filing a

24  lawsuit in 2017 when their patent application is abandoned,

25  instead of taking any action to protect their alleged

1    trademark, whether under the USPTO or common law, they go back

2    to him.

3         And this is key, Your Honor.  If you look at the second

4    page, February 19th, 2022, they reach out to him on their own,

5    and they write, "I'm following up on past conversations."  Now,

6    to be clear, Your Honor, we did not put in our declaration

7    anything about conversations other than 2015, but maybe

8    Mr. Brockman or Mr. Altman -- and at this point in 2022, let's

9    be clear, Sam Altman is at the top of the AI game.  Okay?

10   Everyone knows who he is.  But even this email, Your Honor, is

11   eight months before ChatGPT is released.

12        Sam Altman, who is part of this AI community, reaches out

13   to Guy Ravine on his own, and he writes, "I'm following up on

14   past conversations between you and me, regarding your Open AI

15   academic collaboration initiative," because that's what it was,

16   an active --

17             **THE COURT:**  Where are you?

18             **MR. RHOW:**  I'm sorry.  On page 2 of Exhibit 15 to

19   Mr. Ravine's declaration.  It's Document 38-17.  If you look at

20   the emails going bottom to top, February 19th, 2022 -- and

21   let's situate ourselves in time.  At this point in time,

22   plaintiff still has no trademark applications submitted to the

23   USPTO, had their prior application rejected and then abandoned

24   in 2017, has not done anything at all vis-à-vis Mr. Ravine to

25   contest or object to his use of his trademark.

1          And what they do is they reach out to him, and they say,

2     "I'm following up on past conversations between you, me, and

3     Greg Brockman regarding your" -- Mr. Ravine -- "your Open AI

4     academic collaboration initiative."

5          **THE COURT:**  So, wait.  I thought he was asking about

6     the domain name.

7          **MR. RHOW:**  Well, not -- if you read the rest of this,

8     he writes, "Would you be open to us acquiring the open.AI

9     domain name and related IP rights?"

10          What he's trying to buy, Your Honor, in February 2022 --

11     and I'm assuming at this point, because it's a

12     billion-dollar-funded company, their lawyers have looked at

13     this.  Their lawyers are monitoring all of this.  Their lawyers

14     know what we've been doing because that's what billion-dollar

15     companies do.  And Sam writes, with the benefit of those

16     billion-dollar lawyers, Look, you have IP rights, and I'd like

17     to buy them.

18          Mr. Ravine writes back that same day, and he says -- and

19     what's interesting, Your Honor -- talk about credibility

20     because this has been a non-stop focus for them -- in their

21     Complaint they only quote to the public the first line about

22     the $11 million.  They don't quote the whole email.  They don't

23     quote the second sentence of the second paragraph, first line,

24     where he says, "The issue is that if you offered me a sum, I

25     have no use for the money."  He didn't want the money.  He was

1   focused on his academic collaboration initiative.  He was

2   hoping that Sam Altman and Greg Brockman would work with him so

3   that Open AI --

4            THE COURT:  That they would fund it.

5            MR. RHOW:  I'm sorry?

6            THE COURT:  That they would fund it.

7            MR. RHOW:  Or just work with him.  Honestly --

8            THE COURT:  That's not what he says.  He says, "Offer

9   me money and put it into the" -- "into my research."

10           MR. RHOW:  Well, he says, You need to -- okay.

11  Understood, you're right.

12           THE COURT:  Let's -- because one day I might have both

13  of them up here.

14           MR. RHOW:  Understood.

15           THE COURT:  Let's not -- let's not stretch.

16  Neither -- none of them are angels.

17           MR. RHOW:  Understood.  And the reason I didn't say

18  "funded," it says, "you donate the money to an academic

19  collaboration."  That's the sixth paragraph.  If that --

20           THE COURT:  He says --

21           MR. RHOW:  "Suppose that instead of giving a rich guy

22  more money that he doesn't need, you donate the money to an

23  academic collaboration."

24           THE COURT:  "That I am gearing to launch."

25           MR. RHOW:  Understood.

1    **THE COURT:**  His academic collaboration.

2    **MR. RHOW:**  Right.  It's a far cry, though, from the

3    Complaint where they imply that Mr. Ravine was looking for

4    money, and this is a holdup, when, in fact, it was Sam Altman

5    who reached out to Guy Ravine.  Mr. Ravine's response is, I

6    don't need the money.  Let's make this thing work for the

7    world, which, by the way, is the hubbub over this weekend.

8    That's what's causing all of this.

9    **THE COURT:**  Excuse me?

10   **MR. RHOW:**  That's what's causing a lot of the current

11   turmoil at Open AI, is what is the direction?  Is it profit?

12   Remember, it started as a non-profit 2015.  2019 it suddenly

13   become for profit.  When everyone talks about secondary meaning

14   for Open AI, there is no secondary meaning.  No one even knows

15   what Open AI is doing --

16   **THE COURT:**  Are you now conceding there is no

17   secondary meaning?

18   **MR. RHOW:**  On the plaintiff OpenAI concept.

19   **THE COURT:**  And how is there any secondary meaning

20   if -- if there isn't secondary meaning for plaintiffs, there is

21   no secondary meaning for you --

22   **MR. RHOW:**  Your Honor, that's why I waited on the

23   counterclaim.  We may be willing to concede that.

24   The point is we should be able to use "Open AI" as we've

25   been using it.  If they want to, too, that's fine.  I'm not

1    trying to enjoin them.

2         Your Honor, the point, though, of Exhibit 15, just to be

3    clear, is we are now in February 2022.  They asked to buy our

4    IP rights, which they acknowledge exist, at least based on

5    their wording, and they do nothing after that.  We say no, and

6    they do nothing.

7         That's a year and a half ago, which if irreparable harm

8    existed, you should have seen a lawsuit the next day.  You

9    should have seen a lawsuit, frankly, in 2015, in 2017, and any

10   point between 2017 and 2022, but you certainly one hundred

11   percent should have seen a lawsuit at this time.

12        And because all we're here is to litigate a preliminary

13   injunction motion, not the ultimate merits, this --

14             THE COURT:  So you do understand that as part of a

15   preliminary injunction, I have to look at the merits.

16             MR. RHOW:  Understood, Your Honor.

17             THE COURT:  And whether there is a likelihood of

18   success.  That is one of the core components.

19             MR. RHOW:  Understood, Your Honor.  And then a

20   separate component, which this delay issue goes to, is the

21   irreparable harm issue.

22             THE COURT:  I understand that, but it's not as if I

23   can't look at --

24             MR. RHOW:  I understand.

25             THE COURT:  I mean, I have to look at the merits.

1    **MR. RHOW:**  Understood.  And maybe in terms of our

2  focus, you know -- understandably we're focused more on

3  irreparable harm, but I'm not disputing that.

4    **THE COURT:**  These facts are bad for your client.

5  Address them.

6    **MS. CARUSO:**  Yes, Your Honor.  I'm happy to.

7    Looking back at Exhibit 11, which is the December 2015

8  email exchange, as Your Honor noted, the gist of what this

9  email is saying is that nothing is built yet.  The literal

10  quote in the first paragraph of Mr. Ravine's email is it's in

11  development.

12    **THE COURT:**  So if you each have reasonable and

13  differing interpretations of this core evidence, doesn't that

14  mean I have to have an evidentiary hearing and hear from the

15  people who actually wrote them and chatted and resolve factual

16  disputes?

17    **MS. CARUSO:**  Your Honor, I don't believe that I've

18  actually heard factual disputes.  What I've heard are

19  differences about how the law --

20    **THE COURT:**  Do you not believe that they didn't have a

21  product in December of 2015?

22    **MS. CARUSO:**  They don't represent -- the only product

23  they --

24    **THE COURT:**  Answer my question.  My question is do you

25  believe that they had a product in December of 2015?

1          **MS. CARUSO:**  Not under the name "Open AI."

2          **THE COURT:**  And they dispute that, and they've given

3    me some evidence, so doesn't that create a material dispute?

4          **MS. CARUSO:**  Your Honor --

5          **THE COURT:**  Wouldn't that be a material dispute?

6          **MS. CARUSO:**  If Your Honor finds credible their

7    evidence and finds that, in fact, what they say, if you credit

8    it, isn't sufficient on its own under the law to fail, then

9    that would be a material dispute.

10          **THE COURT:**  So why is it that I don't have

11   declarations from this Stanford professor and others who you

12   say knew that all this was happening in 2015?

13          **MR. RHOW:**  Your Honor, I -- that tips the scales.  We

14   can try to get them.  These are third parties, and they may or

15   may not want to be involved in this case, especially when we're

16   talking about 2015 conversations.

17          But the email says what it says, and if Your Honor

18   believes there's relevance, I have no objection to someone

19   trying to bring them to court.  That's the reality of it.

20          If we can get declarations, I can make a good faith effort

21   to do that, but if the question is why, I truly believe

22   Exhibit 11 is not in dispute, and it doesn't say "development."

23   It says, "We have built.  My team has built."

24          **MS. CARUSO:**  It says "we" --

25          **MR. RHOW:**  Hang on.  Let me just finish.

1    **THE COURT:**  It says, "We've built" --

2    **MR. RHOW:**  "My team has built" --

3    **THE COURT:**  Guess what.  I get to decide when I talk.

4    **MR. RHOW:**  Sorry.

5    **THE COURT:**  It says, "My team has built a collective

6    engineering platform called Wikineering," which is not at issue

7    here, "and then I decided that I would make the most" -- "that

8    it would make the most sense to focus on AI, so we started

9    working on the foundations for Open AI."  That doesn't say Open

10   AI is built.

11   **MR. RHOW:**  Well, it -- what his declaration says, he

12   converts Wikineering to the Open AI platform, and he does that

13   as of 2015.  I don't have -- I'm admitting right now, I don't

14   have -- you know, other than the reconstructions, I don't have

15   anything beyond that.  But that email corroborates his timeline

16   narrative.

17   And, by the way, we're talking about 2015.  We're not

18   talking about two months ago where this would be a close call.

19   **THE COURT:**  All right.  Keep going.

20   **MS. CARUSO:**  Your Honor, if I could address that --

21   that larger picture of it being 2015, the issue of whether

22   OpenAI -- the plaintiff should have taken action in 2015 based

23   on a website landing page that said "coming soon," Your Honor,

24   I couldn't, in good faith, sign that Complaint for trademark

25   infringement.  There was no use in commerce of --

1    **THE COURT:**  Does everybody agree that Wikineering was

2    in use as a product?

3    **MS. CARUSO:**  We have no reason to dispute that, but it

4    doesn't use Open AI.  It's a separate product.

5    **THE COURT:**  Did it -- did it transform?  Is it still

6    there?  If I go and Google it right now, is it still there?

7    **MR. RHOW:**  I don't believe so, but I think on the

8    Wayback Machine --

9    **MS. CARUSO:**  Your Honor, we have -- our forensic

10   expert, Dr. Nielson, looked to try and find any evidence of

11   this in a way that you would expect to have existed if you look

12   at the Wayback Machine --

13   **THE COURT:**  Did you talk Dr. Peter Norvig, Richard

14   Socher?

15   **MS. CARUSO:**  I did not, Your Honor.

16   **THE COURT:**  Did your client?

17   **MS. CARUSO:**  I'm unaware of whether my client did or

18   not.

19   **THE COURT:**  Did they tell you he was lying about

20   having all those conversations and about what he was doing in

21   December of 2015?

22   **MS. CARUSO:**  Your Honor, I didn't discuss that with my

23   client because as a matter of law, these kind of conversations

24   are not the kind of things that give rise to a use in commerce

25   that creates trademark rights.

1       **THE COURT:**  The question is whether there was a

2   product, and the problem is, is that this product that is

3   alleged to have existed is a not-for-profit product, so I don't

4   have invoices.  I don't have other kinds of things.

5       Is it -- if it's nonprofit, does it mean that it has no

6   rights?

7       **MS. CARUSO:**  No.  It doesn't mean that.  But if it, in

8   fact -- so this Wikineering product that -- everything about

9   this email suggests we have this Wikineering platform.  We're

10  now turning to something that's in development, doesn't exist

11  as of right now, and therefore as of December 2015, there's no

12  reason for --

13      **THE COURT:**  There is a lot between December of 2015

14  and November of 2022.

15      **MS. CARUSO:**  There is --

16      **THE COURT:**  That is part of my concern.

17      **MS. CARUSO:**  Let's -- let's talk about what there is

18  during that time frame because I agree there is a lot.  And

19  what there is, is the plaintiff coming out with its

20  announcement, very publicly -- it doesn't say "Coming soon.  We

21  don't have anything to tell you yet but stay tuned."  It says,

22  "We're here.  This is what we're doing.  We're hiring."  And

23  that's picked up by the *Wall Street Journal*, *USA Today*, tech

24  press.  It --

25      **THE COURT:**  So why wait so long?

1          **MS. CARUSO:**  Because, Your Honor, there was nothing to

2     take action against.  There was nothing that signaled that

3     Mr. Ravine was claiming trademark rights or that he was

4     actually doing anything that would create risk to my client.

5     And that continued to be the case for years.

6          It's not until they launch this November 2022 new product

7     that they claim users.  The very first users that Mr. Ravine

8     claims in his declaration are in December of 2022.

9          And when you have that, you have a clear indication that

10    there have been no trademark rights, no protectable trademark

11    rights that have existed before that time.

12         Yes, it is true that in certain circumstances where

13    plaintiffs take very aggressive, bold measures to make -- you

14    take steps towards use in commerce such as announcing a new

15    video game that's going to come out in three months; iPhone,

16    the day it was announced, you know, big announcement about it.

17    They didn't have to wait until they sold the first one to start

18    getting those trademark rights.

19         But here with this, there's -- there's nothing at all, no

20    case law that says you can put up a web page that has a name on

21    it, and that creates trademark rights.  That is the definition

22    of trying to reserve trademark rights, which the statute tells

23    us you can't do, which the trademark examiners manual tells us

24    you can't do, which the case law tells us you can't do.

25         And there's nothing at all that defendants have put in the

1   record that would support under any precedent cited in their

2   briefs or that we've been able to find that they have done

3   anything that remotely reaches the level of doing use in

4   commerce --

5        THE COURT:  What about in September of 2016 when you

6   submitted your application and it was rejected because of

7   others potential rights?

8        MS. CARUSO:  Yes, Your Honor.

9        THE COURT:  So that was years ago.

10        MS. CARUSO:  Yes, that was years ago.

11      So at that time, the plaintiff decided to not pursue the

12   registration route.  It's important to keep in mind that when

13   the USPTO makes a determination of likelihood of confusion,

14   it's not basing it on the actual use in the marketplace.  It's

15   just basing it on the registration.  And you can see that in

16   the documents before Your Honor.  That is also the law.  And

17   that is all that the PTO was saying at that time.

18      Significantly, there also was no registration at that

19   time.  The registration had not yet issued and ultimately

20   issued only on the supplemental register, which does not convey

21   any right -- it doesn't establish any presumption of ownership

22   or any trademark protectability rights.  It's often referred to

23   as not creating any trademark rights at all.

24      So the idea that my client in September of 2017 -- 2016

25   would have said, Oh, if I go onto open.AI and see them

1    redirecting to our website, that is creating irreparable harm

2    to us that we have to take action against.

3        And, Your Honor, we've cited to you a lot of case law on

4    this point of trademark owners don't need to canvas the world,

5    turn over every rock and stone --

6        **THE COURT:**  It's not -- that's not relevant here.  You

7    knew about it.  It's not as if you're -- we're not talking

8    about Disney going after someone on Etsy.

9        **MS. CARUSO:**  Understood.  But it's not even just the

10   actual issue of knowledge.  It's the issue of resource use, and

11   we cited the *AIG* case in which the court so pitifully talked

12   about the horns of a dilemma of waiting to see if there is

13   actually something that is going to significantly impact you

14   and having irreparable harm or going in without irreparable

15   harm and being told there is none.

16       So the fact that my client didn't take any action when

17   there was no competitive product, when there was no significant

18   impact, to use the language of the case law, that shows

19   prudence, not delay.

20       **THE COURT:**  Response.

21       **MR. RHOW:**  Your Honor, if I could respond on several

22   levels.

23       First of all, if I heard opposing counsel correctly, what

24   she said was in December 2022, that is the trigger point.  That

25   is when they knew there was an infringement of their trademark.

1    **MS. CARUSO:** That's not what I said.

2    **MR. RHOW:** I think the record will -- she said at that

3 moment, and so that's still a year ago, Your Honor.  If you are

4 a billion-dollar company or, in this case, a

5 hundred-billion-dollar company, if you're Disney and you do see

6 someone on  Etsy --

7    **THE COURT:** So when did you know?

8    **MR. RHOW:** -- you sue the next day.

9    **THE COURT:** Well, not necessarily.  Disney doesn't sue

10 everybody who's using their trademark on Etsy.

11    **MR. RHOW:** But here they've been using it for eight

12 years, and they know that.  They know that -- they've had

13 communications with him, because you asked the right question.

14 They said how are we supposed to know, and then I was thinking

15 Exhibit 15, they reached out to Guy in February 2015.  Not only

16 did they know, they were concerned about it such that they

17 wanted to buy, and I'm quoting, "your related IP rights."

18   It's not Etsy.  It's the opposite.  They're monitoring.

19 They're figuring out what's going on.  Maybe plaintiff does not

20 realize what is important to them or not.  I don't know if they

21 have a trademark on ChatGPT, frankly.  I don't know if they

22 care about trademarks.

23   My quick review today is they don't even have a trademark

24 on ChatGPT, which is their primary product.  I'm not sure why.

25 I can't speak to that.

1    But your other point, Your Honor, about the registration,

2    let's be clear, when they got rejected in 2017, they would have

3    gotten Guy's supplemental use submission.  And while today

4    they've made a lot of hay about the fact that it's not

5    accurate, the fact of the matter is they had it in 2017.

6    Whether they believed it or not, whether they had folks analyze

7    it or knowledge -- which obviously easily could have been done,

8    easily because someone is able to do it on their phone -- they

9    did nothing.  They did absolutely nothing because it wasn't

10   important to them, because it wasn't causing harm.  I'm not

11   sure of the reason.  But they had full, absolute, unquestioned

12   notice of everything we're talking about here today, and they

13   did nothing.

14       The supplemental registration, Your Honor, is important

15   because whether or not that confers rights -- and I -- if

16   Your Honor wouldn't mind, this shows up in the reply brief.

17   There's one cite I would like you to know.

18       The supplemental registration certainly does not diminish

19   your common law rights.  That's under *California Cooler vs.*

20   *Loretto*, Ninth Circuit case, 774 F.2d, 1451 at 1454.  But the

21   registration, again, is notice that someone out in the world is

22   trying to use your trademark.  If you believe you have a

23   trademark, that supplemental notice plus the direct rejection

24   should tell you for this billion-dollar company you got to sue

25   tomorrow.  You got to take action now to protect it.

1    And then when they reach out to him again, my contention

2    is that when he says "your IP rights," that Altman says, he's

3    talking about all of this that he's known for at least five

4    years, if not longer.

5        So, Your Honor, whether or not we agree on all the points,

6    I think the one thing that's undisputed is the consistent

7    disclosures over eight years made by the USPTO, made by Guy

8    Ravine directly, directly to plaintiff, that tells you it

9    wasn't that important to them.

10       **MS. CARUSO:**  Your Honor, Exhibit 15 to Mr. Ravine's

11   declaration, this email that's being much discussed from

12   February of 2022, in that initial reach-out email, it says, "It

13   looks like open.AI currently redirects to our website."

14       Once again, the idea that acquisition of a domain name

15   that redirects to our website is somehow knowledge that the

16   defendant is doing some competitive product, it -- it defies

17   reason.

18       **THE COURT:**  I don't know that I agree one way or the

19   other.  You're making a lot of assumptions about a very small

20   network of individuals who live in this space, and it is not

21   clear to me what they knew or didn't know.

22       **MS. CARUSO:**  Well --

23       **THE COURT:**  And you've not given me any evidence one

24   way or the other.

25       **MS. CARUSO:**  Well, Your Honor, I think what's most

1   important is if there was evidence of actual use, the kind of

2   use that can create trademark rights, we would have expected

3   defendants to have identified it, and they haven't.

4        What they have identified are a number of things that

5   there's no evidence that anyone actually saw or used.  This is

6   one of the reasons that the PTO specimen is so problematic.

7   We're hearing today well, of course it was copied from GitHub.

8   That's how it's supposed to work.  It was presented to the PTO

9   in support of an application showing that users share documents

10  and information.  Users.  Now we're being told well, of course

11  it wasn't users.  It was just Mr. Ravine, who does everything

12  himself, putting together something to show how it could be

13  used.  That is a mockup of a product.  And the PTO's very

14  clear, a mockup of a product is not a use in commerce, and it

15  does not create trademark rights.  It can't suffice as a

16  specimen, and it constitutes fraud on the trademark office,

17  which is not only relevant to their supplemental registration,

18  it's relevant to the point they're trying to make today.

19  They're trying to use those kinds of random uses on websites

20  without proof of user engagement as priority, and under the

21  law, it's not.

22        **THE COURT:**  Sam Altman offered to buy the IP.  Why

23  isn't money enough?

24        **MS. CARUSO:**  Oh, in terms of irreparable harm?  Is

25  that your question?

**ER524**

1        **THE COURT:**  If damages are enough, you -- you're not

2    entitled to an injunction, a preliminary injunction.

3        **MS. CARUSO:**  Yes, Your Honor.  There is irreparable

4    harm that -- it's beyond just buying it.  If the only issue was

5    it would be more convenient for the plaintiff to own the

6    domain, open.AI, then that would be correct.  But that's not

7    the only harm.  The harm is the actual confusion that's going

8    on right now.

9        **THE COURT:**  Well, if there's no product, why -- why

10   is -- why is an issue of confusion at all creating any harm if

11   there's nothing there?

12       **MS. CARUSO:**  Well, now there is.  Since November, they

13   introduced this text-to-image generator, and we submitted as

14   part of the record some of the images that have been generated

15   using it, images that are watermarked with Open AI, a space

16   between, and that will be confused -- confuse people into

17   thinking that they originate from the plaintiff.

18       We have put in evidence that users who reach the

19   defendants' website think that they are using the website

20   belonging to the plaintiff and the product belonging to the

21   plaintiff.  That --

22       **THE COURT:**  It seems to me that there's no dispute on

23   the general topic of confusion; right?

24       **MR. RHOW:**  On the general topic, I would say yes.  And

25   I -- I have re --

1      **THE COURT:**  You say yes.  That means you agree.

2      **MR. RHOW:**  I would agree on the general topic given

3   that fact one is Open, space, AI and the other is OpenAI.  I

4   agree.  I feel like I don't want to make any implied or

5   inadvertent admissions --

6      **THE COURT:**  That's good because you'll be held to

7   them.

8      **MR. RHOW:**  Yes.

9      **MS. CARUSO:**  And once we have evidence of actual

10  confusion, Your Honor, that is the irreparable harm.  That's

11  why the presumption exists, that's why the trademark law was

12  changed, and that's what we see in the case law over and over.

13  When you have actual confusion, that is irreparable harm

14  because the plaintiff is losing control of its reputation and

15  its ability to control what people think of its goods and

16  services because of this confusion.

17      Once you have this confusion, especially this kind of

18  showing we have here, that is irreparable harm.  And the more

19  people are looking for our OpenAI, the plaintiff's OpenAI and

20  encountering the defendants', that is where you see the harm

21  occurring.  Even journalists are confused and linking to the

22  wrong sites.

23      **THE COURT:**  On page 8 of the slide deck that you

24  provided to me, you had all of these references to OpenAI

25  release products, and yet none of -- virtually, I would say

1    most of it, was not referenced in the brief related to some,

2    you know, 300-page exhibit to which there was no argument, no

3    statements.

4        How is that fair to either the Court or the defendant in

5    terms of your analysis that you now so nice and neatly put in a

6    slide page for which I did not have any of that?

7            **MS. CARUSO:**  Your Honor, we do cite to --

8            **THE COURT:**  Yes.  Exhibit Q, which is a 300-page

9    exhibit, and you expect me to discern from the fact that you

10   add that to your filing the arguments that are being made on

11   this slide sheet.  And how is the plaintiff [sic] supposed to

12   discern that as well?  If I can't, how should they be able to

13   be put on notice of that?

14           **MS. CARUSO:**  Your Honor, we could have been more clear

15   in the brief on that point.  But the important --

16           **THE COURT:**  You could have stated something.  It's not

17   an issue of clarity.  It's an issue of not saying anything

18   whatsoever.

19           **MS. CARUSO:**  Well, Your Honor, it's because the

20   2015 -- the real date that we look to is the 2015 date, which

21   we abundantly talked in the briefing and --

22           **THE COURT:**  So I'll just ignore all the others for

23   purposes of this motion.

24           **MS. CARUSO:**  Well, Your Honor, we think the 2015 date

25   gets us there, but the --

1        **THE COURT:**  Did you hear what I said?

2        **MS. CARUSO:**  Yes.

3        **THE COURT:**  So shall I just ignore all of those other

4    dates for purposes of this motion?

5        **MS. CARUSO:**  I don't believe so, Your Honor,

6    especially with respect --

7        **THE COURT:**  So should I allow them to have a response,

8    given that you didn't say anything about this in your brief?

9        **MS. CARUSO:**  If they would like a response,

10   Your Honor, we don't object to that.  However, it is in --

11       **THE COURT:**  And how isn't the 2015 just an

12   announcement like the announcements that are in some of these

13   emails?  It's just an announcement.

14       **MS. CARUSO:**  Your Honor, here's how it's different

15   for -- in this case.  And the *Brookfield* case is very

16   illuminating on this point, the Ninth Circuit's decision there.

17   It looked to a press release that was picked up widely, widely

18   disseminated as an initial use in commerce, and that's what we

19   have here.

20       The way that this was rolled out, the way that it was

21   absorbed by the public so saturated in the media makes it

22   qualitatively different from what the -- what the defendants

23   did.

24       And so the purpose of these additional products is

25   reinforcing that, in fact, there were products released to

 1   consumers.  And the evidence for the Gym product from

 2   April 2016, that code --

 3        **THE COURT:**  You understand that that word wasn't

 4   mentioned once in the brief.  Do you understand that?

 5        **MS. CARUSO:**  Yes, Your Honor.  That was identified in

 6   the defendants' submission, and so I think they knew about it

 7   because they put it into the record, that specimen and that use

 8   date of April 2016.

 9        So even if, in fact, the defendants had made some prior

10   use -- and I'd like to call up one of our slides.  I think it

11   makes this clear, the timeline of their use.  It shows by

12   Mr. Ravine's own declaration -- this is slide 27 -- whatever

13   they were doing with the Wikineering and the original

14   collaboration tool, by Mr. Ravine's own admission, that stopped

15   in early 2016.  And then there wasn't anything else --

16        **THE COURT:**  Where does it say that?  I don't see that

17   on that slide.

18        Well, I was looking at the wrong one.

19        Where does it say that?

20        **MS. CARUSO:**  It's slide 27.  And we have a quote in

21   the pink bar, is what's showing the time -- the duration of

22   these various things.  And this goes to Mr. Ravine's

23   declaration, Exhibit 10 -- sorry -- paragraph 10.  And I

24   haven't -- and this is actually consistent with defendants'

25   timeline slides as well, that this use was made, they claim,

1    approximately March 2015 through early 2016.  And then there's

2    a gap.  There's nothing else that defendants even claim until

3    September of 2016.

4         And so, Your Honor, whatever preceded September 2016

5    doesn't provide priority because priority for trademark rights

6    has to be continuous use.  This wasn't continuous.

7         And this record yields no -- no ambiguity, no

8    contradiction that plaintiff was using OpenAI before

9    September 2016 with consumers, with actual users.

10             **THE COURT:**  Do you want to respond on *Brookfield*?

11             **MR. RHOW:**  On this point, Your Honor, and some of the

12   prior points as well, if I may.

13             **THE COURT:**  *Brookfield* first.

14             **MR. RHOW:**  *Brookfield*, on the case -- sorry.  I missed

15   that.  On this point right here?

16             **THE COURT:**  She cited *Brookfield* as the core case

17   that -- with respect to the announcement and how it identifies

18   a date for purposes of use in commerce.

19             **MR. RHOW:**  Understood, Your Honor.  I -- I -- the

20   broader point on -- that I have --

21             **THE COURT:**  Do you want to respond --

22             **MR. RHOW:**  I am trying to respond on that.  Sorry,

23   Your Honor.

24        There is no question -- and I'm admitting that it had a

25   lot of widespread publicity, but it wasn't associated with use.

1    It wasn't associated with a product.

2         In December 2015 --

3         **THE COURT:**  But is the legal principle correct as

4    articulated by Ms. Caruso?

5         **MR. RHOW:**  I don't believe so unless it's attached to

6    a use.  The publicity can't just be Elon Musk is investing into

7    plaintiff version of OpenAI, which is what generated a lot of

8    that publicity.  There was a supposed billion-dollar

9    investment.  Didn't materialize.  Elon Musk was associated.  If

10   you put Elon Musk on any press release, I guarantee a ton of

11   people are going to pick it up.

12        Sam Altman himself, by the way, who was the founder of Y

13   Combinator, who was not in the AI community, was associated,

14   so, yes, there was publicity.  I don't believe that is what is

15   contemplated by secondary meaning vis-à-vis an actual

16   commercial use.

17        And, Your Honor, your point on slide 8 is well-taken,

18   which is none of these are what we view as commercial use.

19   These are beta programs.  These are programs presenting literal

20   algorithms.  There is no product until 2022 by their own

21   admission.

22        In terms of some of what she's mentioned about our

23   timeline, we had an iterative startup process, and what that

24   means is Guy Ravine, who is -- doesn't have the resources of a

25   thousand engineers, is iterating, improving, sometimes taking

1   off the market certain products and then replacing them as he

2   develops them, and so there is a clear continuous pathway of

3   use that leads to, frankly, the present.

4       The last small point, Your Honor, I want to make is we

5   focus a lot on the USPTO and what it did.  One thing I forgot

6   to mention -- and this is in our slide show on slide 4 -- is as

7   late as 2023, plaintiff, submitting all the evidence that

8   you've seen, Your Honor, on secondary meaning, on press

9   releases, submitting all of that evidence, was rejected again

10  by the USPTO, both in February and April of 2023.

11      And so here again, we have a third party, in this case the

12  USPTO, looking at this evidence and saying, Wait a minute, for

13  whatever reason -- and I'm not saying I know what's going

14  through their minds -- all the evidence you're hearing today is

15  not enough to get a trademark.

16          **THE COURT:**  So the question -- it's an important

17  question, which is why do either of you -- why do either of you

18  have any claim?  That is, the -- the PTO has said multiple

19  times that this is a descriptive mark, that there hasn't been

20  secondary meaning.  Why -- frankly, I don't know why anybody

21  would pick this kind of mark for this kind of thing.  That's

22  why we're not even using it, given that I don't want to

23  constantly be saying Open AI with a space, OpenAI without the

24  space.

25          So why is any of this protectable, period?

1      **MS. CARUSO:**  Your Honor, the plaintiff believes it

2   certainly has rights in this.  It -- OpenAI is associated with

3   the plaintiff at this point in time without question.  We've

4   cited to the kind of evidence that most dilution plaintiffs

5   dream of having.  You have press saying everyone knows the name

6   OpenAI.  It's a household name.  Yes, it is, and it's not a

7   household name in the -- like crypto as some generic thing.

8   People know what OpenAI is and that it originates from a single

9   source.  That's what it takes to have common law trademark

10   rights.

11      We also --

12      **THE COURT:**  Well, it certainly didn't have that before

13   November of 2022.

14      **MS. CARUSO:**  Your Honor, we believe it did.  It was

15   quite -- there's a lot of press that we cite to from before

16   2022.

17      **THE COURT:**  Then you're living in a bubble.

18      **MS. CARUSO:**  It's not just tech press that's from this

19   area.  It's worldwide press, global press.

20      **THE COURT:**  When did it become a household name?

21      **MS. CARUSO:**  Well --

22      **THE COURT:**  Not in 2015.

23      **MS. CARUSO:**  Not in 2015.

24      **THE COURT:**  Not in 2016.

25      **MS. CARUSO:**  Your Honor, what is --

1       **THE COURT:**  When?  When did it become a household

2    name?

3       **MS. CARUSO:**  We aren't asserting a dilution claim, and

4    we haven't -- household name is not the standard for secondary

5    meaning.  We believe secondary meaning was acquired certainly

6    by the time ChatGPT was released, and that was released before

7    the defendants had a product, any product, for which they claim

8    a single consumer, a single person engaged in using it.

9       **THE COURT:**  So 2020?  2018?  What are you saying?

10       **MS. CARUSO:**  We believe the press in 2015 was

11    sufficient, but if not by then, then in early 2022 for certain.

12       **THE COURT:**  How does that timing play into any of the

13    analysis?

14       **MS. CARUSO:**  The way it plays in because the

15    defendants are claiming that they have a senior trademark

16    right.  In order to have a senior trademark right, they have

17    to --

18       **THE COURT:**  Let me -- let me back up a little bit.

19       What if -- what -- theoretically speaking, what if I

20    thought, based upon what's in front of me -- because there's a

21    lot that's not -- that really there was no -- that neither --

22    because it's descriptive and the PTO said it was descriptive

23    multiple times, there really are no rights that attach until

24    either one had secondary meaning.

25       There doesn't seem to be much evidence that the defendant

**ER534**

1   has -- that its mark has secondary meaning, but perhaps

2   plaintiff acquired secondary meaning in early 2022.

3        So injunction can issue and damages, to the extent any

4   would exist, are pretty limited because you haven't had that

5   secondary meaning for that long.

6        How does it play in that kind of hypothetical

7   circumstance?

8             MS. CARUSO:  It could play that way, Your Honor.  That

9   makes sense logically.

10            THE COURT:  How does that play?

11            MR. RHOW:  First, one of the earlier questions you

12  asked, what happens if neither side has the rights.  I mean, we

13  are not the moving party.  We are not the plaintiff.  We are

14  simply the defendant who has this record before them --

15            THE COURT:  I understand.

16            MR. RHOW:  And so I certainly believe that is a

17  potential outcome and that could explain perhaps why we haven't

18  done counterclaims yet.

19       On the issue that you indicated, I think it depends on use

20  in part.  I mean, if Your Honor believes that as of early 2022

21  it's a protectable trademark, then they should sue in early

22  2022.  They still have a massive delay issue.

23       But second, it depends on -- and I go back to use because

24  it seems like somehow in early 2022, because ChatGPT is coming

25  out, that there is secondary meaning, and my argument would be,

1    Your Honor, that yes, we are not contesting that ChatGPT may

2    ascend to that level of meaning, but what we don't see is any

3    association between OpenAI and that secondary meaning.  We're

4    not here contesting ChatGPT.  We are here talking about OpenAI

5    and OpenAI alone.

6          And so if secondary meaning exists, perhaps it's to the

7    product that we all know and use but not to OpenAI.

8          And so OpenAI, if -- playing out your initial

9    hypothetical -- could just exist in the ether, and certainly as

10   to us -- maybe not to others in the world -- but as to us, it

11   cannot be enforced.

12         **THE COURT:**  But if I found, as the PTO has found, that

13   there was no secondary meaning ever that attached to your

14   rights, whatever rights you think you might have had, then how

15   can it not be enforced as against your client if I find or if

16   there is, you know -- that the secondary meaning attached?  I

17   understand that you dispute that the secondary meaning --

18         **MR. RHOW:**  Understood.

19         **THE COURT:**  -- attaches in 2022.

20         **MR. RHOW:**  Right.

21         **THE COURT:**  But if I found that it attached in 2022 as

22   opposed to anything earlier and that because it was otherwise

23   descriptive, your client has no enforceable rights, then

24   doesn't that mean the injunction should issue?

25         **MR. RHOW:**  I don't think so because -- this is

1  thinking off the top of my head, Your Honor, but the -- the --

2  the tools that exist as of 2022, before secondary meaning

3  attaches, has meaning among the folks who are using it.  And so

4  the injunction should not attach to those folks because we've

5  had these products in play for seven years.

6       Again --

7            THE COURT:  Well --

8            MR. RHOW:  I am contesting the secondary meaning, but

9  if Your Honor were to find secondary meaning as of that moment

10  and if all the other obstacles to an injunction are met,

11  irreparable harm, etc., etc., then I suppose on a go-forward,

12  it could.  I just -- I would have to think that through some

13  more and look at the case law in terms of kind of graduating

14  into secondary meaning at some point while you're fully aware

15  that someone else has been using the trademark all along.

16            THE COURT:  Yeah.  Except that -- it's been using a

17  mark.

18            MR. RHOW:  A mark.

19            THE COURT:  Which had no protection.

20            MR. RHOW:  Correct.  I'm not disagreeing with that.

21  So I -- I suppose that could exist.  I would have to research

22  this.

23            THE COURT:  What damage, if any, exists to your client

24  with this -- if the injunction issues?  I mean, it's -- there

25  is certainly no monetary damage.

1          **MR. RHOW:**  Are you talking about to us, Your Honor.

2          **THE COURT:**  Yeah.

3          **MR. RHOW:**  Well, I mean, they have a lawsuit against

4    us.  And one of the big issues that I should raise is, you

5    know, in terms of evidence-based prejudice, this is a classic

6    case where in 2015, we do have evidence back then.  Mr. Ravine

7    has declared to that.  But in 2023, that evidence doesn't

8    exist.  Not just in terms of documentary evidence.  There could

9    be witness memory issues, there could be other means which we

10   could have proven our case if a timely claim had been brought.

11        This is that classic case where I'm constrained to prove

12   certain things because while I believe them to be true, for

13   Your Honor's purposes, evidence is necessary, and I may not

14   have that.  That's the ultimate prejudice that will exist if

15   you find a reasonable probability of success, if you enforce

16   the injunction.

17        But in terms of the harm to us, we're getting hit with a

18   lawsuit right now.  We are being asked, if you look at the

19   Complaint, for a whole host of things beyond simply an

20   injunction, and then we will lose what Mr. Ravine has built for

21   those nine years.  He's built this Open AI academic

22   collaborative concept where people know him for that, where

23   that's his life goal.  And he's built that systematically,

24   perhaps without the benefit of expert trademark counsel prior

25   to 2017, but he has built that.  So the loss is dramatic to him

1    as well from a prejudice perspective.

2          **THE COURT:**  Are attorneys' fees recoverable in this

3    kind of case?

4          **MS. CARUSO:**  For willful infringement in exceptional

5    cases, they are.

6          **THE COURT:**  All right.

7       What else do you want to say?

8          **MS. CARUSO:**  Your Honor, I would like to make just a

9    few points in response to what we just heard so that the record

10   is clear.

11      There was a suggestion that all the press related to

12   ChatGPT, and there was no evidence that, in fact, there was

13   association with OpenAI.  All of the evidence that we submitted

14   for that time period, voluminous exhibits to be sure, but part

15   of the reason it was voluminous is to show there was, in fact,

16   a lot of recognition of OpenAI, not just ChatGPT.

17      The PTO's finding is not a final determination of --

18         **THE COURT:**  No, but it's evidence.

19         **MS. CARUSO:**  Right.  But it hasn't yet been settled.

20   Those trademarks are on pause right now, essentially pending

21   this resolution and us presenting additional evidence.  And the

22   PTO doesn't have all of the evidence that we have presented

23   here today necessarily.

24      And on the issue of harm, again, the fact that defendants'

25   open.AI website has grown in the wake of plaintiff's

1  development of ChatGPT and DALL-E, that is -- so what has been

2  built is a confusion-based ecosystem.

3        **THE COURT:**  I understand.

4        **MR. RHOW:**  Your Honor, one final --

5        **THE COURT:**  Go ahead.  I'm listening.

6        **MS. CARUSO:**  I was going to turn it over to

7  Mr. Feldman.

8        **THE COURT:**  Hold on, Mr. Feldman.

9     Go ahead.

10        **MR. RHOW:**  Your Honor, one final point, and this is

11  kind of a broader point in terms of prejudice and harm.  Maybe

12  it doesn't fit cleanly into a category.

13      But as you, Your Honor, noted, the AI community is rather

14  discrete, and the plaintiffs, in their Complaint, take many

15  shots at Mr. Ravine, and obviously it is what it is.  But the

16  reputational issues here are dramatic as well, especially as an

17  advocate of AI open to the community for the benefit of

18  humanity.  Guy Ravine views that as quite important, views that

19  as an important part of his initiative.  And by virtue of this

20  lawsuit already, he is facing the obstacle of overcoming those

21  perceptions.

22      So there is a lot of downside to an injunction and to this

23  lawsuit, which is why we're defending it, understanding some of

24  the issues Your Honor has raised.  And we say -- that's really

25  from the client.

1          **THE COURT:**  One of the factors in determining

2   secondary meaning is whether the use of the trademark has been

3   exclusive.  Can you address that, given plaintiff's knowledge

4   of Mr. Ravine's use and vice versa?

5          **MS. CARUSO:**  Yes, Your Honor.

6      Exclusive -- that is one of the factors.  Usually what the

7   courts look at is substantially exclusive use, but here, again,

8   if we break down every bit of use that the defendants are

9   claiming, there's -- the use has to be -- the use that matters

10  is use that consumers engage in.  And so until consumers are

11  engaging in the use, then if they're not, then it's still

12  exclusive use.  If they don't see the defendants' mark

13  anywhere, from the consumer perspective, the plaintiff's use is

14  exclusive.

15         **MR. RHOW:**  I have a harder argument in reverse,

16  obviously, since OpenAI is more well-known, but I don't view

17  this as a popularity contest.

18      The reality is Mr. Altman and Mr. Brockman, on at least

19  two occasions, were well aware of the use and as late as

20  February 2022 asked to purchase, not just the domain, but the

21  related IP rights.  That is an acknowledgment of use.  It's an

22  acknowledgment of the trademark ownership and rights.  And

23  that's in plain English in a direct communication between the

24  parties to this lawsuit.

25         **THE COURT:**  And then what about the fact that the

1    plaintiff never petitioned the PTO to cancel defendants'

2    secondary registration within five years?  Why not?  Why didn't

3    you do that when you knew it was there?

4          **MS. CARUSO:**  Your Honor, again, it didn't seem like

5    anything that was a genuine commercial threat, much like Disney

6    in the *VidAngel* case didn't take action, even when there were

7    hundreds of thousands of beta users.  It wasn't until it became

8    a substantial threat that there was a need to do anything.

9        And, again, here that PTO registration pointed to that

10   tool that had, you know, these posts on it.  Looking at that

11   was not any kind of commercial threat that was significant,

12   plus it was on the supplemental register which, again, it's not

13   an impediment to the plaintiff creating rights.

14         **MR. RHOW:**  Your Honor, if I could briefly respond.

15       Your Honor, if you look at their trademark application,

16   the plaintiffs, it's not just about downloadable software like

17   ChatGPT.  It's about research and development services as well,

18   which I believe is Class 42.

19       So when they say it's not a threat because the use looked

20   different, that doesn't answer the question.  ChatGPT is a

21   different product.  It's a red herring for this discussion.

22       During the time period at issue, we are directly in the

23   class that they are alleging in their trademark application,

24   and I'm quoting:  "Research and development services in the

25   field of AI."  That's not ChatGPT.  That's something totally

1    different.

2         The other thing in the case law, Your Honor -- and this

3    is, I think, in our Footnote 8 to our opposition -- is under

4    this *Internet Specialties West* case, Ninth Circuit case, a

5    plaintiff is, and I'm quoting, "not entitled to wait until a

6    competitor's business grows large enough to constitute a real

7    threat."

8         The whole goal, even in the Etsy example you gave, is to

9    the extent you see it, you got to sue on it.  You got to stop

10   it before it grows bigger, and this is the classic case of the

11   opposite where they knew directly that we're in the field and

12   they waited.  They waited.

13        And, by the way, even when that product launches that they

14   now say they're concerned about, they still waited.  They

15   waited another eight months, which under the case law you see,

16   delays as late as, I think it's three months, six months, etc.,

17   are -- are too long when you know.  A lot of those cases are

18   where you don't really know, but they know for sure --

19              **THE COURT:**  It's not your strongest argument.

20          **MR. RHOW:**  Okay.  Understood.

21              **THE COURT:**  Okay.

22        Mr. Feldman, you wanted to say something?

23          **MR. FELDMAN:**  I will be very brief.  I'm not going to

24   argue.  I just have two things to bring to your attention.

25        First, I'm sorry about that April entry on that slide.  I

1  didn't -- I didn't focus on that.  It's my fault.

2       You were favored with Exhibit 11 to I think it's

3  Mr. Ravine's declaration dated December 15th, and I would

4  invite the Court's attention to the first paragraph which

5  refers to a collective engineering platform that is described

6  by the defendant as "it's in development."  So that's

7  December 15th, right after the application.  So that's one

8  thing.

9       With respect to that topic, I would bring two items to

10  Your Honor's attention.  Number one is Mr. Ravine's

11  declaration, the individual defendant's declaration, and

12  paragraph 6 thereof, and Exhibit 3.  Exhibit 3 is something

13  you're probably tired of seeing.  It's one of these.  It's a

14  landing page.  And at paragraph 6 of his declaration, he says

15  that that's what he had in September of 2015.

16       With respect to the same topic, I would bring to

17  Your Honor's attention Mr.-- Exhibit E to Mr. Nielson's

18  declaration, which is another website associated with the

19  defendant.  That's Exhibit E to Mr. Nielson's declaration.

20  That is a screen capture that Mr. Nielson obtained in

21  November 2015, one month before the exhibit that said the

22  engineering platform was in development.  That capture does not

23  mention AI.  There is no functionality on that capture.  All

24  that it permits is entering email on the -- an email address on

25  the last page, and it actually says Wikineering will be

1   released in 2015.  So this is November 2015.  The last page

2   says Wikineering will be released in 2015.  And there's no

3   reference to AI.  And then a month later, there was an email

4   that said it was in development.

5        So when you're considering what the state of -- I think

6   Your Honor may have asked about a product.  That's what the

7   state was in December 2015.

8            **THE COURT:**  Okay.  Anything else?

9            **MS. CARUSO:**  Just very briefly, I wanted to point out

10  that we have in our submissions some summaries of all of the

11  landing pages that defendants' website looked like, as well

12  as -- as Exhibit C to Mr. Scher's declaration.  It goes -- for

13  everything where the defendant said "you should have known here

14  and taken action," it shows what was available then and why it

15  wouldn't have made sense to take action at that time.

16       And in terms of prejudice, we really haven't heard

17  anything specific about what apparently existed at some time

18  that was lost.  We heard that even in 2016, Mr. Ravine didn't

19  have records from 2015.

20       So with that, Your Honor, unless you have additional

21  questions.

22           **MR. RHOW:**  Your Honor, my brief response to what --

23  some of what Mr. Feldman said is if you look at not just that

24  paragraph from Mr. Ravine's declaration, I think -- as I've

25  tried to give, I think the remainder of it tries to give

1    context.  But beyond that, I have nothing further.

2             THE COURT:  Okay.  Happy Thanksgiving.  I'll take it

3    under submission.

4             MR. RHOW:  Thank you, Your Honor.

5             MR. FELDMAN:  Happy Anniversary.

6             THE COURT:  Mr. Feldman, you're right.  Tomorrow.

7             MR. RHOW:  Anniversary of?

8             THE COURT:  My commission.

9             MR. RHOW:  Congratulations, Your Honor.

10            THE COURT:  So it has been 12 years.

11            MS. CARUSO:  You've learned something about trademark

12   law.

13            THE COURT:  Patent and ERISA and securities and all

14   sorts of things that state court judges --

15            MR. FELDMAN:  Can we go off the record?

16            THE COURT:  Yes.  Let's go off the record.

17                 (Proceedings adjourned at 2:09 p.m.)

18

19

20

21

22

23

24

25

1

2

3                         <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Monday, November 27, 2023

8

9     *Pamela Batalo Hebel*

10    _____
      Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11    U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Robert P. Feldman (Bar No. 69602)
2    bobfeldman@quinnemanuel.com
    Margret M. Caruso (Bar No. 243473)
3    margretcaruso@quinnemanuel.com
    555 Twin Dolphin Drive, 5th Floor
4   Redwood Shores, California 94065-2139
    Telephone:    (650) 801-5000
5
    Robert M. Schwartz (Bar No. 117166)
6    robertschwartz@quinnemanuel.com
    Aaron H. Perahia (Bar No. 304554)
7    aaronperahia@quinnemanuel.com
    865 S. Figueroa St., 10th Fl.
8   Los Angeles, California 90017-2543
    Telephone:    (213) 443-3000
9
    Sam S. Stake (Bar No. 257916)
10   samstake@quinnemanuel.com
    50 California Street, 22nd Floor
11  San Francisco, California 94111-4624
    Telephone:    (415) 875-6600
12
    Dylan I. Scher (*pro hac vice*)
13   dylanscher@quinnemanuel.com
    51 Madison Avenue, 22nd Floor
14  New York, NY 10010
    Telephone:    (212) 849-7000
15
    *Attorneys for OpenAI, Inc.*
16

17                  **UNITED STATES DISTRICT COURT**

18                **NORTHERN DISTRICT OF CALIFORNIA**

19
    OPENAI, INC., a Delaware corporation,          Case No. 4:23-cv-03918-YGR
20
                    Plaintiff,                     **[AMENDED PROPOSED] ORDER**
21                                                 **GRANTING OPENAI, INC.'S MOTION**
             vs.                                   **FOR A PRELIMINARY INJUNCTION**
22
    OPEN ARTIFICIAL INTELLIGENCE, INC.,
23  a Delaware corporation; and GUY RAVINE, an
    individual,
24
                    Defendants.
25

26

27

28

**[AMENDED PROPOSED] ORDER**

Before this Court is Plaintiff OpenAI, Inc.'s ("OpenAI") Motion for Preliminary Injunction. Having considered OpenAI's motion and all supporting papers, the responses of Defendants Open Artificial Intelligence, Inc. and Guy Ravine (together, "Defendants"), and replies thereto, and all other arguments of the parties, and good cause having been shown, the Court finds that OpenAI is entitled to a preliminary injunction.   *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

OpenAI is likely to succeed on its trademark infringement claim.  OpenAI has shown evidence of actual confusion, including through a consumer survey, and Defendants do not dispute that their use is likely to cause confusion.  *See* Declaration of Dr. Scott D. Swain (Dkt. 24) & Exs. E-F (Dkts. 24-5 – 24-6); Declaration of Aaron Perahia, Ex. P (Dkt. 25-16); Declaration of Rebecca McCurry, Ex. A at 7-9, 28, 30, 33 (Dkt. 23-1); *see also* Declaration of James Dyett, ¶¶ 6-16 (Dkt. 22) & Exs. C-R (Dkts. 22-3 – 22-18); Declaration of Aaron Perahia, ¶¶ 2-4, 6-9, 13 (Dkt. 25) & Exs. A-G, J-N, Q-S (Dkts. 25-1 – 25-7, 25-10 – 25-14, 25-17 – 25-19).  OpenAI has also shown that it has the senior interest in a protectable mark, including because it was the first to make a bona fide use in commerce.  *See* Declaration of James Dyett, ¶¶ 3-16 (Dkt. 22) & Exs. A-R (Dkts. 22-1 – 22-18); *cf.* Declaration of Guy Ravine, ¶¶ 5-13 (Dkt. 38-2) & Exs. 2-7 (Dkts. 38-4 – 38-9); Declaration of Dylan I. Scher, Ex. C (Dkt. 48-3); Declaration of Seth James Nielson (Dkt. 47); *Social Techs. LLC v. Apple Inc.*, 4 F.4th 811, 819 (9th Cir. 2021) (affirming trademark cancellation because trademark holder's use of the mark, including spending two years maintaining its website, conducting early-stage business planning, receiving an internal $100,000 investment, and soliciting outside investors, did not constitute a bona fide commercial use of the mark); *Gearsource Holdings, LLC v. Google LLC*, 2020 WL 3833258, at *10 (N.D. Cal. July 8, 2020) ("As a matter of law, the mere appearance of the mark on a page, without evidence it was seen by a sufficient number of members of the consuming public … cannot support priority.").

Laches does not defeat OpenAI's likelihood of prevailing on the merits because Defendants' actions did not pose a risk of "significantly impacting plaintiff's goodwill and business reputation" until December 2022 at the earliest—the first month in which Defendants identified any users of

their open.ai website. *See Nat'l Customer Eng'g Inc. v. Lockheed Martin Corp.*, 1997 WL 363970, at *6 (C.D. Cal. Feb. 14, 1997) ("Laches is not measured from a defendant's first use of the contested mark, but from the date that defendant began significantly impacting plaintiff's goodwill and business reputation."); Declaration of Guy Ravine, ¶ 12 (Dkt. 38-2); Declaration of Greg Brockman (Dkt. 46); Declaration of Dylan I. Scher, Ex. C (Dkt. 48-3); Declaration of Aaron Perahia, ¶¶ 12-14 (Dkt. 25) & Exs. I-K (Dkt. 25-9 – 25-11); Declaration of Rebecca McCurry, Ex. A at 7-9, 28, 30, 33 (Dkt. 23-1). Likewise, OpenAI did not unduly delay in seeking injunctive relief given the relative recency of Defendants' competitive offering, OpenAI's discovery of that offering, and Defendants' progressive encroachment. *See Activision Publ'g, Inc. v. Activision TV, Inc.*, 2013 WL 12145597, at *7 (C.D. Cal. July 18, 2013) (no unreasonable delay, despite Defendants having a "trademark registration since 2005," because system at issue "was not operational until 2012"); Declaration of Greg Brockman (Dkt. 46). OpenAI owns valid common law rights in the OpenAI Mark, which are senior to any rights Defendants may have in the Infringing Mark.

Without an injunction, OpenAI will suffer irreparable harm, including loss of reputation and goodwill. *See* Declaration of James Dyett (Dkt. 22); Declaration of Aaron Perahia, Exs. O & P (Dkt. 25-15 – 25-16); Declaration of Dr. Scott D. Swain (Dkt. 24) & Exs. E-F (Dkts. 24-5 – 24-6). *Futuredontics, Inc. v. Goodman*, 201 F.3d 444 (9th Cir. 1999) ("damage to the reputation or goodwill, because it is difficult to calculate, qualifies as irreparable harm"); *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012) (finding irreparable harm where "Plaintiffs have introduced evidence that customers and others have evidenced actual confusion between the marks and names of the two companies"). In addition, the balance of equities and the public interest both favor an injunction, particularly in light of OpenAI's showing of actual confusion and Defendants' failure to identify harm an injunction would cause them.

The Court hereby orders as follows:

1. Defendants, and each of their officers, directors, employees, agents, servants, representatives, affiliates) are preliminarily enjoined and restrained from:

    a. using Defendants' OPEN AI mark, or any other logo, design, or word mark that is a colorable imitation of, or similar to, it, including without limitation "Open AI" and

"open.ai," (collectively, the "Infringing Marks"), in connection with the display, advertising, development, marketing, production, promotion, sale, and/or distribution of any artificial intelligence products or services, including the results generated by such products or services;

    b.   using any Infringing Mark in connection with any website, app, or social media account, including as a domain name or social media handle; and

    c.   representing in any manner or by any method whatsoever that goods, services, or other products branded with any Infringing Marks are sponsored, approved, or authorized by, or originate from, OpenAI, or otherwise taking any action likely to cause confusion, mistake or deception as to the origin, approval, sponsorship, or certification of such goods, products, or services.

2.   All those acting in active concert or participation at the direction of, or in contractual privity with the above-enjoined parties, including domain name registrars, web hosting services, and social media platforms, are preliminarily enjoined and restrained from facilitating, permitting, or otherwise enabling Defendants to engage in any of the actions retrained by this Order, including allowing anything to be displayed on https://open.ai other than a notice of suspension.

3.   Defendants, within 30 days after service of this Order with notice of entry thereof upon them, be required to file with the Court and serve upon OpenAI's attorneys a written report under oath setting forth in detail the manner in which Defendants have complied with the above-mentioned orders, including contacting the domain name registrar and web hosting service of https://open.ai to request suspension of that website.  Defendants must also provide contact information regarding all those acting in active concert or participation at the direction of, or in contractual privity with the above-enjoined parties, including domain name registrars, web hosting services, and social media platforms through which it makes any use of any Infringing Mark.

IT IS SO ORDERED.

DATED: _____, 2023

_____

HONORABLE YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

# INTENTIONALLY LEFT BLANK

# INTENTIONALLY LEFT BLANK

# INTENTIONALLY LEFT BLANK