No. 24-1963

---

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

---

**OPEN ARTIFICIAL INTELLIGENCE, INC. and GUY RAVINE**

*Defendants and Appellants,*

*v.*

**OPENAI, INC.**

*Plaintiff and Appellee.*

---

Appeal from United States District Court
Northern District of California
Hon. Yvonne Gonzalez Rogers
U.S. District Court Case No. 4:23-cv-03918-YGR

---

**APPELLANTS' EXCERPTS OF RECORD
VOLUME 4 of 10**

---

**WAYMAKER LLP**
Ryan G. Baker
rbaker@waymakerlaw.com
Scott M. Malzahn
smalzahn@waymakerlaw.com
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800

*Attorneys for Defendants and Appellants Open Artificial Intelligence, Inc.
and Guy Ravine*

**Pages 1 - 11**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

| | |
|---|---|
| OPENAI, INC., a Delaware corporation, | ) )  ) |
| Plaintiff, | ) ) |
| VS. | )        NO. 4:23-cv-03918 YGR ) |
| OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual, | ) )  )  ) |
| Defendants. | ) )  ) |

Oakland, California
Monday, October 30, 2023

<u>**TRANSCRIPT OF PROCEEDINGS BY ZOOM WEBINAR**</u>

<u>**APPEARANCES BY ZOOM WEBINAR:**</u>

For Plaintiff:

> QUINN, EMANUEL, URQUHART & SULLIVAN LLP
> 51 Madison Avenue, 22nd Floor
> New York, NY 10010
> **BY:  DYLAN I. SCHER**
> **ATTORNEY AT LAW**
>
> QUINN, EMANUEL, URQUHART & SULLIVAN LLP
> 555 Twin Dolphin Dr. - 5th Floor
> Redwood Shores, California  94065
> **BY:  MARGRET MARY CARUSO**
> **ROBERT P. FELDMAN**
> **ATTORNEYS AT LAW**

Reported By:  Rhonda L. Aquilina, CSR No. 9956, RMR, CRR, CRC
Official Reporter

UNITED STATES COURT REPORTERS

**ER557**

**APPEARANCES cont'd.**


For Defendants:
                              BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
                               DROOKS, LINCENBERG & RHOW
                            1875 Century Park East, Suite 2300
                            Los Angeles, CA 90067-2561
             BY:  **EKWAN ERIC RHOW**
                    **CAMERON RYAN PARTOVI**
                    **PAUL CHAN**
                    **ATTORNEYS AT LAW**

UNITED STATES COURT REPORTERS

| | |
|---|---|
| 1 | **Monday - October 30, 2023** **2:19 p.m.** |

2                    **P R O C E E D I N G S**

3                         ---o0o---

4          **THE CLERK:**  Good afternoon, everyone.  Calling the

5  matter of 23-cv-03918-YGR, OpenAI, Incorporated versus Open

6  Artificial Intelligence, Incorporated, et al.

7          Parties, please state your appearances for the record.

8          **MR. FELDMAN:**  Your Honor, this is Robert Feldman and

9  Margret Caruso for the plaintiff.  Ms. Caruso and I are sharing

10  responsibility for the matter, and with your permission she

11  will conduct today's proceedings.

12          **THE COURT:**  Okay.

13          **MR. RHOW:**  Good afternoon, Your Honor.  This is Ekwan

14  Rhow, Paul Chan, and Cameron Partovi on behalf of the

15  defendants.

16          **THE COURT:**  Okay.  So I am trying to figure out the

17  most efficient way to move you all forward.

18          We've got the preliminary injunction hearing on

19  calendar, I believe.  I don't remember what exactly --

20          **MS. CARUSO:**  Yes, Your Honor, that's next week.

21          **MR. RHOW:**  Next Tuesday.

22          **THE COURT:**  Well, I have a big social media case.  I

23  don't know if you've seen it or heard of it, but I've got 400

24  plus plaintiffs.  I'm working on that case right now.  That is

25  my number-one priority.  So I might have to push your matter

Case: 24-1963, 05/08/2024, DktEntry: 15.5, Page 5 of 235    (5 of 235)
Case 4:23-cv-03918-YGR   Document 57   Filed 12/01/23   Page 4 of 11

4

```
1    back a week or so in order to have enough time to look at it.
2          But in any event, just a question I have for you is,
3    is this something that really can be done on the papers or, as
4    is frequently the case with these kinds of cases, is an
5    evidentiary hearing going to be needed?
6          MS. CARUSO:  Your Honor, this is Margret Caruso on
7    behalf of the plaintiff.  From our perspective, the papers go
8    quite a ways, but it could be that once you have time to review
9    them, you will think a credibility determination by live
10   testimony is appropriate, so we defer to you on that.
11         From our perspective, the papers make plain our
12   entitlement and our need for a preliminary injunction.
13         THE COURT:  Which of the two of you is taking the lead
14   on the defense?
15         MR. RHOW:  It is me.  Sorry, Your Honor.  This is
16   Ekwan Rhow.  I do believe that the issues could be resolved on
17   the papers.  I do think oral argument may be necessary, simply
18   because issues are raised in the reply brief that are somewhat
19   new and can be responded to, and for that reason I do think
20   oral argument is necessary.  But in terms of what has been
21   submitted, I think both sides have submitted comprehensive
22   declarations that --
23         THE COURT:  And so -- and, look, and I haven't looked
24   at it, but I've done enough of these cases now.  I expect that
25   when I look at the declarations there are going to be disputes,
```

5

1  aren't there?  If you all agreed on everything, why would you
2  need me?
3       **MR. RHOW:**  Your Honor, we don't disagree.
4  Respectfully, we think if there are disputes, the motion should
5  be denied.
6       But to your question as to whether you would need to
7  assess credibility, I think in reading the declarations, they're
8  comprehensive, they give context and foundation, and from those
9  declarations perhaps Your Honor could make credibility
10 assessments.  But we certainly defer to Your Honor on this.  If
11 further adventure analysis is necessary, we will so prepare.
12      **MS. CARUSO:**  And, Your Honor, just to clarify.  When I
13 said "on the papers," I was distinguishing that from an
14 evidentiary hearing.  I do think oral argument will be useful
15 in this case.
16      **THE COURT:**  Let me ask this question.  When are you
17 going to be ready for trial?
18      **MS. CARUSO:**  Your Honor, we believe that we can be
19 ready for trial in August of next year.
20      **THE COURT:**  Okay.  Is it Mr. Rhow, is that how I say
21 it, right?
22      **MR. RHOW:**  Yes, Rhow.  Thank you.
23      Respectfully, Your Honor, I think, as indicated in our
24 proposal, we think that July 2025 is sufficient and more
25 realistic, given the issues in this case.

 1          THE COURT:  So if I grant an injunction, you don't
 2     care, you'd still rather go until July of 2025?
 3          MR. RHOW:  That's correct, Your Honor.
 4          THE COURT:  Hm, interesting.  Okay.
 5          MR. RHOW:  And let me raise, in part, that is because
 6     there are going to be, as the parties have stipulated,
 7     counterclaims that will be filed at some point after the
 8     injunction hearing.
 9          THE COURT:  Well, what then?
10          MR. RHOW:  The stipulation we filed, Your Honor, if
11     you recall, what happened was there was a motion to dismiss
12     that we filed.  Your Honor properly noted that it was
13     repetitive.  The parties successfully met and conferred.  The
14     compromise was that an answer was to be filed, which was filed,
15     and that we would then file our counterclaims 30 days after the
16     ruling on the preliminary injunction with the --
17          THE COURT:  What was my ruling on the preliminary
18     injunction matter?
19          MR. RHOW:  It could streamline some of the issues.
20          So, for example, there could be competing trademark
21     infringement claims, or not.  There are other claims that would
22     be in the counterclaim, but we did not want to file those until
23     we saw the ruling, and we believe the ruling could --
24          THE COURT:  But I don't understand that.  You believe
25     you have claims, then serve your claims.

1          **MR. RHOW:**  Understood.  I think on the trademark

2     infringement claim in particular, given the issues that have

3     been raised, Your Honor's ruling could apply, frankly, to us as

4     well, which would potentially cause issues with our trademark

5     infringement claim, because there's competing trademarks at

6     this point.  And so there's a chance that Your Honor's ruling,

7     if it was based on, for example, laches or delay, could cut

8     both ways.

9          **THE COURT:**  Why does the fact of your counterclaim

10    require so much more time to prepare for trial?

11         **MR. RHOW:**  I think it, for example -- one of the

12    contemplated counterclaims is false advertising.  So there's

13    two basic areas:  It could be a trademark infringement

14    potential claim, a false advertising claim.  Both of those

15    claims require discovery over the course of eight years.

16          The PI, and the briefing on the PI, I think both sides

17    admit that the issues in this case arise starting in 2015.

18    There's competing narratives about use; there's competing

19    narratives about development of the products; there's competing

20    narratives all along those eight years, and so we have eight

21    years of potential documents, eight years of potential

22    witnesses.  And then if you layer a false advertising

23    counterclaim on top of that, based on the plaintiff's recent

24    disclosure that it was no longer open AI, in fact it was closed

25    AI, that adds another layer of complexity in terms of both

ER563

Case 4:23-cv-03918-YGR   Document 57   Filed 12/01/23   Page 8 of 11

8

```
 1    discovery and the issues.
 2              THE COURT:  Response.
 3              MS. CARUSO:  Your Honor, this is the first we're
 4    hearing of a false advertising counterclaim, and we
 5    conceptually agree that there's no reason to delay the
 6    counterclaims.  It's simply we had stipulated so that we could
 7    get the answer and get moving with the case.
 8              As to the eight years, in defendants' initial
 9    disclosures the only one -- the only witness they have
10    identified on behalf of any of the supposed eight years of uses
11    that they've made is the defendant Guy Ravine.  And we, in
12    fact, have no evidence that we've seen that the defendants
13    actually have been engaged in genuine uses for commercial use
14    anywhere close to eight years.
15              So for us it seems that the issues here are very
16    straightforward, and we don't see why there should be almost
17    two years before this case goes to trial.
18              THE COURT:  Yeah, Mr. Rhow, you probably won't get
19    that, not from me anyway.
20              MR. RHOW:  Understood, Your Honor.
21              THE COURT:  Okay.  The week of November 13th, do you
22    have conflicts?
23              MS. CARUSO:  This coming week of November 13th?
24              THE COURT:  No, I'm moving your hearing.  I'm not
25    going to get to it by the 7th.
```

9

1           **MS. CARUSO:**  Yes, Your Honor, actually, I do.  I have

2   the International Trademark Association Leadership Conference

3   is next week, and I am chairing several meetings during that in

4   Houston.

5           **THE COURT:**  Next week is the week of November 6th.

6           **MS. CARUSO:**  Oh, excuse me, sorry, it's the week of

7   November 13th.

8           **THE COURT:**  The entire week?

9           **MS. CARUSO:**  From Tuesday till Friday.

10          **THE COURT:**  Okay.  Monday, November 20th?

11          **MR. FELDMAN:**  This is Bob Feldman.  That's good for

12   me.

13          **MR. RHOW:**  Your Honor, that would work for me as well.

14   This is Ekwan Rhow.

15          **THE COURT:**  Okay.  I'll go ahead and set it then at

16   1:00 o'clock --

17          **MR. FELDMAN:**  Great.

18          **THE COURT:**  -- on November 20th.

19          **MR. FELDMAN:**  Thank you.

20          **THE COURT:**  That will give me enough time to get up to

21   speed.

22          And then we're going to talk some more.  By that time

23   I'll have a sense of your dispute and a sense of what I think

24   it's going to take to get this thing to trial and how much time

25   you really need.

**ER565**

```
 1              Okay.  Anything else to be done today?

 2         MR. FELDMAN:  One brief thing, Your Honor.  This is

 3    Robert Feldman.  Would it be acceptable to Your Honor if

 4    Ms. Caruso and I, in a very discrete way, split responsibility

 5    for the hearing?  I would handle the issues that go to the

 6    representations made to the patent and trademark office and to

 7    Your Honor, and Ms. Caruso, who you can tell knows something

 8    about trademark, would handle the rest of the hearing.

 9         THE COURT:  Absolutely.  We do that all the time,

10    Mr. Feldman.

11         MR. FELDMAN:  Thank you, Your Honor.

12         THE COURT:  Mr. Feldman has tried a couple of cases in

13    front of me and said he would never try another one here

14    because the Marriott Hotel is so terrible.

15              So, Mr. Feldman, you should know there's a new hotel

16    about a block away.

17         MR. FELDMAN:  Yes, but, Your Honor, I now live in

18    Lafayette, so I won't need to take advantage of that.

19         THE COURT:  Okay.  Well, then that makes it not so bad

20    from driving up from the peninsula.

21         MR. FELDMAN:  That's why I agreed to do this case.

22         THE COURT:  All right.  Good enough.  I will see you

23    all on November 20th, 1:00 p.m.  Thank you.

24         ALL COUNSEL:  Thank you.

25              (Proceedings adjourned at 3:00 p.m.)
```

CERTIFICATE OF REPORTER


    I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE

UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF

CALIFORNIA, 450 GOLDEN GATE AVENUE, 16TH FLOOR, SAN

FRANCISCO, CA 94102, DO HEREBY CERTIFY:


    THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE,

IS A CORRECT TRANSCRIPT OF MY SHORTHAND NOTES OF THE RECORD

OF THE PROCEEDINGS HEREINBEFORE ENTITLED, AND REDUCED TO

TYPEWRITING BY COMPUTER TO THE BEST OF MY ABILITY.


    November 7, 2023


    _____
    Rhonda L. Aquilina, RMR, CRR, CSR 9956



UNITED STATES COURT REPORTERS

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Robert P. Feldman (Bar No. 69602)
 bobfeldman@quinnemanuel.com
Margret M. Caruso (Bar No. 243473)
 margretcaruso@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:    (650) 801-5000

Robert M. Schwartz (Bar No. 117166)
 robertschwartz@quinnemanuel.com
Aaron H. Perahia (Bar No. 304554)
 aaronperahia@quinnemanuel.com
865 S. Figueroa St., 10th Fl.
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000

Sam S. Stake (Bar No. 257916)
 samstake@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4624
Telephone:    (415) 875-6600

Dylan I. Scher (*pro hac vice*)
 dylanscher@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000

*Attorneys for OpenAI, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPENAI, INC., a Delaware corporation, | Case No. 4:23-cv-03918-YGR |
| Plaintiff, | Assigned to the Hon. Yvonne Gonzalez Rogers |
| vs. | **PLAINTIFF OPENAI, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION** |
| OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual, | Date:       November 7, 2023<br>Time:       1:00 p.m.<br>Place:      Oakland Courthouse<br>            Courtroom 1 (4th Fl.) |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.     OPENAI IS LIKELY TO SUCCEED ON THE MERITS ................................... 2

     A.    Defendants Did Not Rebut OpenAI's *Sleekcraft* Analysis. ........................ 2

     B.    OpenAI Is The Senior User. ........................................................................ 3

          1.    Defendants Cannot Establish Senior Trademark Use In Commerce. ............. 3

          2.    Defendants Cannot Establish A Senior Protectable Interest. ........................ 5

     C.    Laches Is No Bar To OpenAI's Claims Or This Injunction. ...................... 6

II.    OPENAI WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION ......... 10

     A.    Defendants Fail To Rebut That OpenAI Will Suffer Irreparable Harm Without An Injunction ........................................................................................... 10

     B.    OpenAI Did Not Unreasonably Delay. ..................................................... 11

          1.    OpenAI Acted Promptly Upon Receipt of Ravine's Protest Letters. ............. 11

          2.    Delay Alone Does Not Preclude Preliminary Injunctive Relief. ................. 13

III.   THE PUBLIC INTEREST STRONGLY FAVORS AN INJUNCTION ............................ 15

IV.   THE BALANCE OF EQUITIES STRONGLY FAVORS AN INJUNCTION ................... 15

CONCLUSION ............................................................................................................... 15

PLAINTIFF OPENAI'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

# **TABLE OF AUTHORITIES**

## **Cases**

*A.I.G. Agency, Inc. v. American International Group, Inc.*,
   33 F.4th 1031 (8th Cir. 2022) ........................................................................ 7

*Activision Publishing, Inc. v. Activision TV, Inc.*,
   2013 WL 12145597 (C.D. Cal. July 18, 2013) ............................................... 8

*Adidas America, Inc. v. Payless Shoesource, Inc.*,
   540 F. Supp. 2d 1176 (D. Or. 2008) .............................................................. 9

*Alliance For the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ........................................................................ 9

*American Automobile Association of Northern California, Nevada & Utah v.*
   *General Motors LLC*,
   367 F. Supp. 3d 1072 (N.D. Cal. 2019) ......................................................... 5

*American Eagle Outfitters, Inc. v. American Eagle Furniture, Inc.*,
   2013 WL 6839815 (N.D. Ill. Decl. 27, 2013) ................................................ 8

*Arc of California v. Douglas*,
   757 F.3d 975 (9th Cir. 2014) ................................................................... 12, 13

*Athleta, Inc. v. Pitbull Clothing Co.*,
   2013 WL 142877 (C.D. Cal. Jan. 7, 2013) ............................................... 8, 13

*Automated Pet Care Products, LLC v. PurLife Brands, Inc.*,
   2023 WL 3046592 (N.D. Cal. Apr. 21, 2023) ................................................ 6

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
   174 F.3d 1036 (9th Cir. 1999) ........................................................................ 5

*Cisco Systems, Inc. v. Dexon Computer, Inc.*,
   2023 WL 6466384 (N.D. Cal. Oct. 3, 2023) ................................................ 14

*DC Comics v. Towle*,
   802 F.3d 1012 (9th Cir. 2015) ........................................................................ 6

*Dean v. Cortes*,
   2018 WL 3425016 (C.D. Cal. July 12, 2018) ................................................ 6

*Derek & Constance Lee Corp. v. Kim Seng Co.*,
   391 F. App'x 627 (9th Cir. 2010) ................................................................... 8

*Desirous Parties Unlimited, Inc. v. Right Connection, Inc.*,
   2023 WL 4285504 (9th Cir. June 30, 2023) ................................................ 13

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
    224 F. Supp. 3d 957 (C.D. Cal. 2016)...................................................................... 13
    869 F.3d 848 (9th Cir. 2017)....................................................................... 12, 13

*Feldenkrais Guild of North America v. Wildman*,
    2018 WL 2331905 (N.D. Cal. May 23, 2018) ............................................... 14

*Gearsource Holdings, LLC v. Google LLC*,
    2020 WL 3833258 (N.D. Cal. July 8, 2020) ................................................... 5

*Home Comfort Heating & Air Conditioning, Inc. v. Ken Starr, Inc.*,
    2018 WL 3816745 (C.D. Cal. July 24, 2018) ................................................ 14

*Intenze Products, Inc. v. TATLAB Corp.*,
    2023 WL 5209729 (C.D. Cal. Aug. 1, 2023) ................................................ 13

*Internet Specialties West, Inc. v. Milon-DiGiorgio Enterprises, Inc.*,
    559 F.3d 985 (9th Cir. 2009) (Opp. 20) .................................................... 7, 8

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.*,
    287 F.3d 866 (9th Cir. 2002)....................................................................... 6

*Lambda Elecronics Corp. v. Lambda Technology, Inc.*,
    515 F. Supp. 915 (S.D.N.Y. 1981)................................................................ 8

*Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*,
    601 F. App'x 469 (9th Cir. 2015)............................................................... 14

*Metamorfoza D.O.O. v. Big Funny, LLC*,
    2021 WL 4572039 (C.D. Cal. July 27, 2021), *aff'd*, 2022 WL 16756362 (9th
    Cir. Nov. 8, 2022)....................................................................................... 6

*National Customer Engineering Inc. v. Lockheed Martin Corp.*,
    1997 WL 363970 (C.D. Cal. Feb. 14, 1997) ................................................ 7

*NBCUniversal Media, LLC v. Jay Kennette Media Group. LLC*,
    2023 WL 2628682 (C.D. Cal. Jan. 27, 2023).............................................. 9

*PTG, Inc. v. Reptilian Nation Expo*,
    2023 WL 3582131 (E.D. Cal. May 22, 2023)............................................. 15

*Robinson v. Best Price Distributors, LLC*,
    2023 WL 2203584 (C.D. Cal. 2023)........................................................... 15

*RSI Corp. v. International Business Machines Corp.*,
    2012 WL 3277136 (N.D. Cal. Aug. 9, 2012) .............................................. 9

*Social Technologies LLC v. Apple Inc.*,
    4 F.4th 811 (9th Cir. 2021)...................................................................... 3, 5

PLAINTIFF OPENAI'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION
ER571

*Synoptek, LLC v. Synaptek Corp.*,
    2018 WL 3359017 (C.D. Cal. June 4, 2018) ........................................................ 7, 9

*TIBCO Software Inc. v. GatherSmart LLC*,
    2021 WL 4477902 (N.D. Cal. Mar. 5, 2021) ............................................................ 5

*Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*,
    465 F.3d 1102 (9th Cir. 2006) ............................................................................. 7, 8

*U.S. Search, LLC v. U.S. Search.com Inc.*,
    300 F.3d 517 (4th Cir. 2002) .................................................................................. 6

*Vans, Inc. v. Walmart, Inc.*,
    2022 WL 1601530 (C.D. Cal. Mar. 31, 2022) ...................................................... 12

*Westchester Media v. PRL USA Holdings, Inc.*,
    214 F.3d 658 (5th Cir. 2000) .................................................................................. 8

*Y.Y.G.M. SA v. Redbubble, Inc.*,
    75 F.4th 995 (9th Cir. 2023) ................................................................................. 14

*Zest Anchors, LLC v. Geryon Ventures, LLC*,
    615 F. Supp. 3d 1206 (S.D. Cal. 2022), *aff'd in rel. part*, 2023 WL 2783175 (9th
    Cir. Apr. 5, 2023) ................................................................................................. 12

## Statutes

15 U.S.C. § 1116 ...................................................................................... 10, 14

15 U.S.C. § 1058 ................................................................................................ 9

15 U.S.C. § 1091 ................................................................................................ 6

## Additional Authorities

J. Thomas McCarthy, MᴄCᴀʀᴛʜʏ ᴏɴ Tʀᴀᴅᴇᴍᴀʀᴋs & Uɴꜰᴀɪʀ Cᴏᴍᴘᴇᴛɪᴛɪᴏɴ
    § 16:34 ................................................................................................................. 6

Ninth Circuit Model Jury Instructions
    1.14 ...................................................................................................................... 4

# INTRODUCTION

Defendants' use of "Open AI" is causing OpenAI irreparable harm that should be enjoined. They do not dispute the facts that cause the harm: their "Open AI" mark is virtually identical to OpenAI's mark, their image-generation and chatbot services compete directly with OpenAI's services, and they launched their services within the last year—just months following OpenAI's general launch of DALL·E 2 and ChatGPT. Nor do Defendants dispute that, one week before OpenAI filed this motion, they changed their website to copy OpenAI's website even more closely:

 

Defendants offer no rebuttal to the evidence of real-world confusion their actions have caused or to OpenAI's expert study showing that confusion is likely among users of Defendants' open.ai website. In fact, Defendants ignored the *Sleekcraft* factor analysis for assessing infringement.

Defendants attempt to distract from OpenAI's evidence by asserting meritless delay arguments, which ignore that Defendants launched their competing services only in November 2022. Nor can they identify a single user of any of their services before December 2022. They also ignore that OpenAI had no reason to know before March 2023 what Defendants were doing, when OpenAI learned that Defendants had sent protest letters about OpenAI to the PTO. Defendants cite no precedent holding that suing and moving for a preliminary injunction within six months of discovering such facts warrants denial of injunctive relief, much less a laches defense.

Instead, Defendants base their delay arguments on sham assertions about Ravine's supposed past use of "Open AI" in connection with other projects, which did not involve text-to-image or chatbot services, and for which Defendants cannot identify an actual user. Not only have Defendants failed to show any early activity that would significantly impact OpenAI's goodwill or business

reputation—which is what triggers any assessment of delay for purposes of irreparable harm or laches—but their evidence raises significant concerns about Ravine's veracity. Defendants offer no explanation why Ravine's PTO specimen features "posts" consisting of content that verbatim copied posts from a third-party website or why they were added to his website the day before the submission (not the year before, as represented). Seeing nothing wrong with presenting content he copied from other sources as his own, Ravine also submitted to the Court a "reconstructed" website that he claims existed in 2015, which contains language copied verbatim from a college textbook that was not published until two years later. He also submitted screenshots of websites captured in 2023, claiming that they existed earlier. Defendants also admit that they "restricted" access to other webpages that supposedly used "Open AI," preventing OpenAI and the Court from evaluating their bona fides.

Defendants rely on this same inauthentic evidence to establish that they have senior trademark rights. But even if their evidence were credible, it is insufficient to establish actual customer engagement or other commercial use necessary to acquire trademark rights. Without such evidence, Defendants' argument fails because, by registering "Open AI" on the Supplemental Register, Defendants conceded that their use of it is merely descriptive. Accordingly, no trademark interests could have arisen unless and until Defendants establish secondary meaning. Because Defendants present no such evidence, e.g., evidence of any pre-December 2015 (or even pre-December 2022) customers or commercial investment, they fail to rebut OpenAI's seniority.

Given the unchallenged evidence of actual confusion and irreparable harm, the balance of hardships that favors OpenAI, and the public interest in avoiding consumer confusion, OpenAI is entitled to an injunction against Defendants' infringing conduct.

## ARGUMENT

## I. OPENAI IS LIKELY TO SUCCEED ON THE MERITS

### A. Defendants Did Not Rebut OpenAI's *Sleekcraft* Analysis.

OpenAI explained how the *Sleekcraft* factors compel a finding of infringement, detailing the strength of the OpenAI mark, consumers' degree of care, instances of actual confusion, and a consumer survey. Mot. 8-18. Defendants do not dispute the OpenAI Mark has become a "household name," or that consumers have visited Defendants' website looking for OpenAI's products and

1  services, or that the consumer perception survey clearly found a likelihood of confusion.  Having

2  failed even to address OpenAI's *Sleekcraft* analysis, Defendants effectively concede that their

3  challenged use is likely to cause confusion.

**B.     OpenAI Is The Senior User.**

**1.     Defendants Cannot Establish Senior Trademark Use In Commerce.**

6  Defendants cannot show their use in commerce of "Open AI" before OpenAI's use.  *Cf.* Opp.

7  16-19. "[T]rademark rights are not conveyed through mere intent to use a mark commercially."  *Soc.*

8  *Techs. LLC v. Apple Inc.*, 4 F.4th 811, 817 (9th Cir. 2021) (citations omitted).  Mere "token use" or

9  "adoption of a mark without bona fide use in commerce, in an attempt to reserve rights for the future,

10  is insufficient."  *Id.*  Genuine use in commerce requires "actual use" and "display" of the mark in a

11  "sufficiently public" manner "to identify or distinguish the marked goods in an appropriate segment

12  of the public mind."  *Id.*

13  First, as to asserted use before 2016, Defendants' only evidence of use relating to the

14  Wikineering website and "Initial Collaboration Tool" (Opp. 5) is Ravine's questionable say-so.

15  Ravine says he used "Open AI" on a "portion" of that website, which he claims was available at

16  "either wikineering.org or ineed.com/wikineering," from March 2015 to 2016.  Dkt. 38-2 ¶ 5.

17  However, in an email he wrote in December 2015, he referred to his Wikineering website as distinct

18  from his "focus on AI" and his "initiative called Open.AI," which he said was still "in development."

19  Declaration of Greg Brockman ("Brockman Decl.") ¶ 4 & Ex. B.

20  Ravine does not claim any contemporaneous records ever existed that would corroborate his

21  story, much less introduce them—no screenshots, no code, no emails, no user logs, no advertising,

22  no marketing plans, no business plans, no partnerships, no financial records, no press releases, and

23  no news coverage.  Nor does he claim that any users, business partners, website developers, or others

24  support his version of events.  Instead, he purports to attach a "true and correct" "screenshot of a

25  reconstruction" of that website that he created sometime in the prior 2-3 months.  Dkt. 38-4, 38-2 ¶

26  5.  Despite claiming he cannot remember the most basic details about that website, such as its address,

27  his reconstruction contains supposedly vivid details, down to the specific content on the page.

28

The detail Ravine does provide raises even more questions about his credibility. A forensic analyst, Dr. Seth James Nielson, found Ravine's reconstruction implausible. He found that large swaths of Ravine's "reconstruction" perfectly match content from a textbook published by World Scientific in 2017—two years *after* Ravine said the content was on *his* website. Declaration of Seth James Nielson ("Nielson Decl.") ¶¶ 55-56 & Ex. I (excerpts of copied textbook), Ex. J (comparison of copying). Dr. Neilson also searched for, but was unable to find, any historical internet records related to the use of "Open AI" on the Wikineering website. *Id*. ¶¶ 48-52.

Defendants' 2016 evidence of supposed use on hub.open.ai (Opp. 6), which consists of portions of their PTO specimen of use (Mot. 4; Dkt. 25-3) is similarly suspicious. This supposed use reflects "posts" that were added to the website on the day before the screenshot was submitted to the PTO and consist of verbatim copies of posts on a third-party website. Mot. 4. Defendants made no attempt to explain these facts, which, curiously, in their answer, they deny knowledge or information about. Dkt. 42 ¶ 34. Instead, they simply assert that the PTO, unaware of these facts, did not find it fraudulent. Opp. 23.

Defendants also claim to have "debuted a 'Wiki' tool that was a sophisticated evolution of the Initial Collaboration Tool" in 2017 on beta.open.ai (Opp. 6) and launched "another AI collaboration tool" on decentralized.open.ai in October 2017 (*id*. 7). But again they offer no contemporaneous support. Instead, they attach what they claim to be screenshots from those websites that they captured last month—before Defendants "restricted" access to them this month (Opp. 6-7, n.1, 2), thus preventing the current websites' contents from being considered. Defendants do not identify any actual users of any of these websites, and the documents they filed with the PTO suggest that the decentralized.open.ai website, if indeed publicly available, lacked the functionality suggested, given subheadings such as "This is a test" and "testing." Declaration of Dylan I. Scher ("Scher Decl.") Ex. A. On this record, any fact-finder would be justified in not believing any of Ravine's testimony. *See, e.g*., Ninth Cir. Model Jury Instruction 1.14.

Second, even if all of Ravine's evidence of prior use were credible, mere display of "Open AI" on these supposed websites does not suffice. For example, nothing about "Open AI" on the Wikineering website suggests that it was used as brand versus a topic, particularly given that the

1   homepage and other pages were branded "Wikineering."  Nielson Decl. Ex. E.  *See Am. Auto. Ass'n*

2   *v. Gen. Motors LLC,* 367 F. Supp. 3d 1072, 1093 (N.D. Cal. 2019) ("The prominent use of [a

3   different] mark instead of the [asserted mark]" on the website "diminish[es] the public's ability to

4   associate a single mark with the service as it is unclear which mark to attach to the [service].")

5   (quotations omitted).  Likewise, the display of the term "Open AI" above "announcement will be

6   made soon" on a webpage (Dkt. 38-5) does not reflect that it was being used in commerce in

7   connection with the offering of any actual goods or services.  Indeed, the PTO rejected it as an

8   inadequate specimen of use for that exact reason.  Mot. 4; Dkt. 25-2.

9       "As a matter of law, the mere appearance of the mark on a page, without evidence it was seen

10  by a sufficient number of members of the consuming public … cannot support priority."  *Gearsource*

11  *Holdings, LLC v. Google LLC*, 2020 WL 3833258, at *10 (N.D. Cal. July 8, 2020); *accord, e.g.,*

12  *TIBCO Software Inc. v. GatherSmart LLC*, 2021 WL 4477902, at *3 (N.D. Cal. Mar. 5, 2021)

13  ("GatherSmart's website standing alone, without advertising, marketing, or selling trademarked

14  goods or services in connection with its website does not constitute use of the mark in commerce.");

15  *Am. Auto Ass'n.*, 367 F. Supp. 3d at 1092 ("limited mention" of mark on screen of website "does not

16  constitute sufficient use").  Just as with Defendants' rejected 2015 specimen, Defendants' other

17  screenshots are classic examples of uses that the PTO would *not* find adequate.  *Compare* Dkt. 38-

18  5-8 *with* Scher Decl. Ex. B at 28, 46, 52; *see also* Scher Decl. Ex. C (demonstrating insufficiency of

19  Defendants' evidence).[1]

20                    **2.      Defendants Cannot Establish A Senior Protectable Interest.**

21      Even if Defendants had shown a bona fide trademark use of "Open AI" before OpenAI did,

22  they nonetheless have no evidence that the use resulted in a protectable trademark interest.  Seniority

23

24  ───────────────

    [1]  Ravine's other pre-2016 activities do not suffice, either. Ravine's open.ai domain name registration

25  is "not sufficient to constitute commercial use."  *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
    174 F.3d 1036, 1052 (9th Cir. 1999).  Ravine's claim (Dkt. 38-2 ¶ 7) that he spoke with unidentified

26  "executives" and sought "funding" for the "Open AI initiative" also does not constitute actual use.
    *Soc. Techs.*, 4 F.4th at 814 (no actual use despite "investor presentation outlining its business plan"

27  and "unsuccessfully solicit[ing] investors"); *Am. Auto. Ass'n*, 367 F. Supp. 3d at 1100-01
    ("communications with potential partners" shows "mere preparation" to use, not actual use, and that

28  "private discussions with potential partners are not sufficiently public") (quotations omitted).

1   of trademark rights requires seniority of protectable rights, not merely first use of a term.  2 McCarthy

2   on Trademarks and Unfair Competition § 16:34 (5th ed.).  Because no protectable trademark interest

3   exists in a descriptive mark until it has acquired secondary meaning, *Japan Telecom, Inc. v. Japan*

4   *Telecom Am. Inc.*, 287 F.3d 866, 873 (9th Cir. 2002), Defendants have no senior trademark rights.

5   As reflected by Defendants' registration of "Open AI" on the Supplemental Register, the prior use

6   they claim is at most of a mark that is descriptive, not suggestive.  15 U.S.C. § 1091; *Automated Pet*

7   *Care Prod., LLC v. PurLife Brands, Inc.*, 2023 WL 3046592, at *3 (N.D. Cal. Apr. 21, 2023)

8   (registration on the Supplemental Register "constitutes an 'admission against interest' that the

9   registered mark is not yet a protectable trademark."); *Dean v. Cortes*, 2018 WL 3425016, at *6 n.6

10  (C.D. Cal. July 12, 2018) ("an application for registration on the Supplemental Register is an 'implied

11  admission' that a design is not inherently distinctive.").[2]  Thus Defendants cannot not now claim that

12  their Infringing Mark is suggestive.  *Cf.* Opp. 16.  Rather, Defendants can establish a protectable

13  interest in the Infringing Mark only through a showing of secondary meaning ***before*** OpenAI's use.

14  McCarthy § 16:34; *Metamorfoza D.O.O. v. Big Funny, LLC*, 2021 WL 4572039, at *5 n.2 (C.D. Cal.

15  July 27, 2021), *aff'd*, 2022 WL 16756362 (9th Cir. Nov. 8, 2022).  Having failed to point to a single

16  user of any good or service ostensibly using "Open AI" as a brand before December 2022 (Opp. 8),

17  they fall far short of the requisite commercial strength needed to establish secondary meaning.  *See*

18  *id.*  That compels rejection of Defendants' claim of priority over OpenAI's trademark rights.

19          **C.       Laches Is No Bar To OpenAI's Claims Or This Injunction.**

20          First, irrespective of delay, laches "does not apply … when the defendant's actions are

21  willfully calculated to exploit the advantage of an established mark."  *DC Comics v. Towle*, 802 F.3d

22  1012, 1027 (9th Cir. 2015) (defendant "barred from asserting a laches defense to DC's trademark

23

24

---

25  [2]  Because descriptiveness is an individualized determination based on the specific class of goods or
    services used in connection with the mark, Defendants' concession that ***their*** Infringing Mark is
26  descriptive is not determinative of the strength of the OpenAI Mark.  *See, e.g.*, *U.S. Search, LLC v.*
    *U.S. Search.com Inc*., 300 F.3d 517, 524 (4th Cir. 2002) ("That the PTO deemed [defendant's] mark
27  to be suggestive simply has no bearing on whether [plaintiff's] use of [the contested mark] in
    connection with different services (executive recruiting) is suggestive as well.").
28

infringement claim because he willfully infringed DC's trademarks").  OpenAI has pled willful infringement and shown that Defendants have acted in bad faith. Mot. 5-6.

Second, the presumption of laches (Opp. 20) does not apply because the purported "eight-year long delay" Defendants claim (*id.*) is incorrect.  OpenAI was "not required to constantly monitor every nook and cranny of the entire nation and to fire both barrels of its shotgun instantly upon spotting a possible infringer." *Synoptek, LLC v. Synaptek Corp.*, 2018 WL 3359017, at *7 (C.D. Cal. June 4, 2018) (quotations and brackets omitted).  "Laches is not measured from a defendant's first use of the contested mark, but from the date that defendant began significantly impacting plaintiff's goodwill and business reputation." *Nat'l Customer Eng'g Inc. v. Lockheed Martin Corp.*, 1997 WL 363970, at *6 (C.D. Cal. Feb. 14, 1997).  Knowledge of Ravine's unlaunched "initiative" in 2015 and his then-pending application in 2017, associated with an informational website, does not begin the period because that earlier activity "did not significantly impact[] [OpenAI]'s goodwill and business reputation." *Id.*  Only late last year, when Defendants began offering a competing product (Mot. 5), did the parties reach analogous circumstances to those in in *Internet Specialties West, Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 990 (9th Cir. 2009) (Opp. 20), where laches was assessed beginning when both companies offered competing "internet access, e-mail, and web hosting."  Given that OpenAI did not know about Defendants' activity until this March, the four-year statute of limitations does not trigger the presumption of laches.

Third, even if a presumption of laches exists based on Ravine's 2015 Collaboration Tool or announcement page, Defendants' progressive encroachment to compete with core OpenAI products (Mot. 5-6, 17-18) rebuts it.  "Under this doctrine, the trademark owner need not sue in the face of *de minimis* infringement by the junior user.  The owner may wait until 'the junior user of a mark moves into direct competition ... selling the same 'product' through the same channels and causing actual market confusion.'" *Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1110 (9th Cir. 2006) (citations omitted).  Accounting for the changing nature of defendants' harm is necessary to "save[] trademark holders from being hoisted upon the horns of an inequitable dilemma—sue immediately and lose because the alleged infringer is insufficiently competitive to create a likelihood of confusion, or wait and be dismissed for unreasonable delay." *A.I.G. Agency,*

1  *Inc. v. Am. Int'l Grp., Inc.*, 33 F.4th 1031, 1034–35 (8th Cir. 2022) (quotations omitted). "This

2  progressive encroachment doctrine allows a plaintiff some latitude in the timing of its bringing suit,

3  permitting it to wait until the likelihood of confusion looms large." *Activision Publ'g, Inc. v.*

4  *Activision TV, Inc.*, 2013 WL 12145597, at *7 (C.D. Cal. July 18, 2013) (quotations omitted).

5           Because OpenAI timely sued when Defendants "move[d] into direct competition,"

6  *Tillamook*, 465 F.3d at 1110, laches does not bar its claims.  *See, e.g.*, *Activision Publ'g*, 2013 WL

7  12145597, at *7 (no unreasonable delay, despite Defendants having a "trademark registration since

8  2005," because system at issue "was not operational until 2012"); *Athleta, Inc. v. Pitbull Clothing*

9  *Co.*, 2013 WL 142877, at *11 (C.D. Cal. Jan. 7, 2013) (no unreasonable delay where "recent conduct"

10  created likelihood of confusion, not earlier demand letter and "discussions regarding a potential sale"

11  of defendant's domain name).[3]  Defendants' cases (Opp. 21) do not involve analogous changes in

12  the alleged wrongful activity.

13           Fourth, Defendants have not demonstrated "prejudice as a result of the plaintiff's

14  unreasonable delay in filing suit." *Tillamook*, 465 F.3d at 1108. Defendants' claimed "expectation

15  prejudice" (Opp. 21-22) is deficient in the trademark context.  What matters is whether a party makes

16  "an investment in the mark [] as the identity of the business in the minds of the public." *Internet*

17  *Specialties*, 559 F.3d at 991–93 (Opp. 20, 21); *id.* (no prejudice where defendant had not spent time

18  "developing brand recognition of its mark."); *see also Derek & Constance Lee Corp. v. Kim Seng*

19  *Co.*, 391 F. App'x 627, 628 (9th Cir. 2010) ("that [defendant's] business grew … is insufficient to

20  establish prejudice").  Here, Defendants do not point to any alleged investment (such as efforts to

21  advertise), nor do they claim that there was **any** public recognition of "Open AI" as a source for

22

---

23  [3]  *See also Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 668 (5th Cir. 2000) (no

24  delay because new magazine was an "entirely new product and different" from old magazine); *Am. Eagle Outfitters, Inc. v. Am. Eagle Furniture, Inc.*, 2013 WL 6839815, at *11 (N.D. Ill. Dec. 27,

25  2013) ("shift from operating a warehouse under a different name to opening three retail stores under the name American Eagle Furniture in malls where AE Outfitters was already operating … is a prime

26  example of progressive encroachment."); *Lambda Elecs. Corp. v. Lambda Tech., Inc.*, 515 F. Supp.

27  915, 923, 930 (S.D.N.Y. 1981) (no delay where defendant began as a "fledgling corporation that conducted no advertising" and plaintiff did not sue for three and half years, when "instances of

28  confusion … began to occur").

Defendants' artificial intelligence services predating December 2022. Defendants' suggestion that they would not have used the name "Open AI" (Opp. 22), without more, does not suffice. *See, e.g.*, *Synoptek*, 2018 WL 3359017, at *8 ($50,000 spent on advertising not "significant enough to find substantial prejudice"). Defendants' lack of advertising activity here makes *RSI Corp. v. International Business Machines Corp.*, 2012 WL 3277136, at *16 (N.D. Cal. Aug. 9, 2012), distinguishable; in that case, the plaintiff acknowledged that the defendant emphasized the allegedly infringing name "in its marketing materials."

Nor have Defendants proven "evidentiary prejudice." They identify no unavailable witness, no information they would have "preserve[d]" if sued earlier (Opp. 22), and no specifics about what evidence, if any, is missing. They do not suggest any invoices, sales, or customer emails ever existed—much less, before 2022—that would confirm their supposed use of "Open AI" in commerce. Nor could they blame purported delay for any lost evidence concerning their ***competing*** uses, which began only last November. Opp. 8-9. Such "[c]onclusory statements that … there is missing documentary evidence" are "not sufficient to establish evidentiary prejudice." *Adidas Am., Inc. v. Payless Shoesource, Inc.*, 540 F. Supp. 2d 1176, 1183 (D. Or. 2008). Moreover, putative trademark owners know that they should retain evidence of their use to support the required, periodic filings with the PTO to confirm continuous use. *See* 15 U.S.C. § 1058.

All other equitable factors strongly support OpenAI, including the OpenAI Mark's commercial strength, the harm to OpenAI, Defendants' bad faith, and Defendants' recent direct competition. *See* Mot. 2-4, 12, 14-18; Sections I.B, II.A. Defendants are therefore unlikely to prevail on their laches claim, and they tellingly point to no decision denying a preliminary injunction on the grounds that the defendant is likely to prevail on laches—an issue of such fact-specific determination that it is rarely amenable to a finding of applicability except by a jury. *See, e.g.*, *NBCUniversal Media, LLC v. Jay Kennette Media Grp. LLC*, 2023 WL 2628682, at *10 (C.D. Cal. Jan. 27, 2023).

In sum, OpenAI is likely to prevail on the merits, or, at minimum, has raised "'serious questions' on the merits," which combined with "a hardship balance that tips sharply toward the plaintiff," and satisfaction of the irreparable injury and public interest factors, "support issuance of an injunction." *All. For the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

1    **II.       OPENAI WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION**

2          **A.       Defendants Fail To Rebut That OpenAI Will Suffer Irreparable Harm Without**

3                 **An Injunction.**

4          Defendants concede, as they must, that irreparable harm is presumed as a matter of law upon

5    showing of a likelihood of success on the merits.  Opp. 15.  Because OpenAI is likely to succeed, as

6    discussed *supra*, and because Defendants failed to rebut the statutory presumption, OpenAI has

7    established irreparable harm.  15 U.S.C. § 1116(a).

8          Even without the presumption, OpenAI demonstrated irreparable harm.  It is undisputed that:

9    (a) Defendants' website with an image generator causes actual confusion; (b) Dr. Swain's consumer

10   perception survey reflects that further actual confusion is likely; (c) OpenAI will lose exclusive

11   control of its reputation and goodwill due to the inevitable association with the Infringing Mark; (d)

12   OpenAI will lose the ability to grow its business without false association with the Infringing Mark;

13   and (e) OpenAI will be unable to control the quality or marketing of any products or services offered

14   with the Infringing Mark.  Mot. 19-20; Dkts. 25-21, 25-22, 22 ¶ 26.  Defendants do not even

15   acknowledge this evidence, much less dispute it.  Nor do Defendants dispute that such evidence of a

16   "potential loss of goodwill or the loss of ability to control one's reputation" establishes irreparable

17   harm. Mot. 19 (citing cases).  Defendants' silence on this evidence is dispositive of irreparable harm.

18         As to the limited evidence Defendants do address (Opp. 14-16), their arguments fail.

19   Defendants claim that their display of harmful images does not establish irreparable harm because

20   OpenAI does not establish a "single consumer" saw that content.  Opp. 15.  That is false.  OpenAI's

21   undisputed evidence, and Defendants' own admissions, indisputably show that Defendants' harmful

22   images were all shown, at minimum, to the users who entered the text prompts resulting in those

23   images on Defendants' website.  Dkt. 38-2 ¶ 12; Dkt. 25 ¶ 21.

24         Defendants also do not dispute that those harmful images were shown on Defendants' public

25   feed page, available for any of Defendants' "2.3 million" website visitors to see, even if they did not

26   themselves enter the prompt to generate the image.  Dkt. 38-2 ¶ 12; *see* Opp. 15 n.4; Dkt. 25 ¶ 17.

27   Defendants' suggestion that ***none*** of the 2.3 million visitors to their website saw the harmful content

28   (Opp. 15) strains credulity.  Defendants concede they actively promote and facilitate sharing of their

1    images on social media, and Ravine's declaration concedes that anyone can "view, download, and/or

2    share" those images beyond Defendants' website.  Dkt. 38-2 ¶ 12; Dkt. 25 ¶ 17.  Defendants also

3    concede that every image downloaded or shared is watermarked with the Infringing Mark.  Dkt. 25

4    ¶ 17.  As a result, even non-visitors to Defendants who view Defendants' harmful images elsewhere

5    are likely to associate the images with OpenAI.

6            Finally, Defendants' meritless attack on OpenAI's reputation concerning ChatGPT does not

7    defeat OpenAI's showing of reputational harm concerning Defendants' images.  Defendants identify

8    no evidence that OpenAI is "already associated with" (Opp. 16) the type of harmful images generated

9    on Defendants' website.  Nor do they offer evidence that OpenAI is known as being reckless in the

10   type of content ChatGPT provides.  *Cf.* Scher Decl. Ex. D (third party articles regarding OpenAI's

11   commitment to safety).  Defendants' assertion that ChatGPT generates "more problematic content

12   than Defendants' AI Image Generator" (*id.*) is baseless.  Indeed, the three articles Defendants cite

13   each acknowledge ChatGPT's safeguards, attempts to prevent harmful texts, and refusals to provide

14   harmful content without adequate warnings and contextualization.  *See* Dkt. 38-20 at 3; Dkt. 38-21

15   at 3; Dkt. 38-22 at 4.  None of those articles suggests that OpenAI is associated with the type of

16   inappropriate, explicit, and exploitive images displayed on Defendants' website and watermarked

17   with "Open AI."  *Id*; Dkt. 25-15.

18           **B.**    <u>**OpenAI Did Not Unreasonably Delay.**</u>

19                   **1.**    **OpenAI Acted Promptly Upon Receipt of Ravine's Protest Letters.**

20           OpenAI filed its infringement action within six months of learning of Defendants' position,

21   as expressed in Defendant Ravine's letter of protest to the Patent and Trademark Office, that its

22   "Open AI" name in connection with "a web site featuring technology that enables internet users to

23   share documents, images, and videos" should bar Plaintiff's registration of its "OpenAI" trademark

24   (the "OpenAI Mark").  Dkt. 1; Mot. 5; Dkt 23-1 at 7.  This knowledge came a few months after

25   Defendants dramatically altered their website to ***begin*** making available artificial intelligence

26   services that ***compete*** with OpenAI's goods and services—i.e., ChatGPT and DALL·E.  Mot. 5-6.  It

27   is only from Defendants' newly added image generation service that the offensive images

28   watermarked with "Open AI" began to appear.  *See* Mot. 7-8. Moreover, Defendants have recently

1    made **_additional_** changes to their website that increase the threat to OpenAI's trademark rights, such

2    as redesigning their website to more closely reflect OpenAI's website design.  Mot. 6.

3           As reflected in the visual chronology of Defendants' website (Nielson Decl. ¶ 58), at no point

4    before Defendants' November 2022 website revisions could OpenAI have had reason to believe that

5    Defendants' operation of the open.ai website would cause irreparable harm.  Until those changes, the

6    risk of confusion arising from that website did not carry remotely the same level of harm as a webpage

7    offering a competing service; for years the open.ai website simply displayed an "announcement

8    coming soon" message, redirected to OpenAI's own website, or displayed a completely different

9    business branding ("CryptoArt").  _Id._; Mot. 9; Brockman Decl. ¶¶ 7, 10.  Further, OpenAI had no

10   reason to know of any of the other website pages Defendants referenced, which were not reachable

11   through any menu links from the open.ai website.  Brockman Decl. ¶ 5; _see also_ Nielson Decl. ¶ 58.

12          Given these facts, OpenAI has not engaged in the kind of delay that can rebut the presumption

13   of irreparable harm.  As the Ninth Circuit has long recognized, "tardiness is not particularly probative

14   in the context of ongoing, worsening injuries."  _Arc of California v. Douglas_, 757 F.3d 975, 990 (9th

15   Cir. 2014).  This is because, where the irreparable harm only becomes clear over time, "waiting to

16   file for preliminary relief until a credible case for irreparable harm can be made is prudent rather than

17   dilatory."  _Id._ at 991.  Where "the magnitude of the potential harm becomes apparent gradually," it

18   "undermin[es] any inference that the plaintiff was sleeping on its rights."  _Id._ at 990–91 (two-year

19   delay unlikely to be probative given existence of "ongoing, worsening injuries").

20          Accordingly, courts regularly grant injunctive relief when sought in response to defendants'

21   escalating harm, worsening infringement, or an emergent threat.  _See Disney Enters., Inc. v. Vid_

22   _Angel, Inc._, 869 F.3d 848, 866 (9th Cir. 2017) (affirming irreparable harm where injunction sought

23   when the alleged copyright infringement "expanded ... into a real threat"); _Zest Anchors, LLC v._

24   _Geryon Ventures, LLC_, 615 F. Supp. 3d 1206, 1238 (S.D. Cal. 2022), _aff'd in rel. part,_ 2023 WL

25   2783175 (9th Cir. Apr. 5, 2023) (plaintiffs "not dilatory" by not seeking injunction until defendant's

26   trademark infringement "pose[d] a legitimate threat"  even though they knew of infringement for five

27   years); _Vans, Inc. v. Walmart, Inc._, 2022 WL 1601530, at *13 (C.D. Cal. Mar. 31, 2022) ("delay does

28   not negate the presumption of irreparable harm" given "alleged escalating nature" of trademark

1    infringement); *Athleta*, 2013 WL 142877, at \*11 ("plaintiff did not unreasonably delay" because "it

2    was only defendants' recent conduct that created this likelihood of confusion").

3          The Ninth Circuit's affirmance of a preliminary injunction in *Disney* is dispositive.  *See Zest*

4    *Anchors*, 615 F. Supp. 3d at 1238 (S.D. Cal. 2022) (discussing same in trademark case).  Although

5    Disney and other studios first learned of defendant's infringing product when "it was in 'limited beta'

6    and had fewer than 5,000 users," they waited more than one year to sue, after the defendant "started

7    marketing itself more aggressively, expanded its content offering, and posed a more significant threat

8    of harm."  224 F. Supp. 3d 957, 977 (C.D. Cal. 2016).  The Ninth Circuit agreed with the district

9    court that the studios' "delay in seeking an injunction was reasonable under the circumstances, their

10   alleged harms are ongoing, and will likely only increase absent an injunction."  *Disney Enters.*, 869

11   F.3d at 866.  It confirmed that delay in seeking an injunction is reasonable when the plaintiff waits

12   until the infringer "expand[s] ... into a real threat."  *Id.*

13         OpenAI cannot be said to have unreasonably delayed seeking a preliminary injunction to stop

14   actual confusion resulting from Defendants' website iterations that were not in existence before

15   November 2022—especially when OpenAI had no reason to be aware of any use Defendants made

16   of "Open AI" before that other than its "announcement coming soon" and redirecting actions.  *Supra*

17   12.  Just as Disney was not penalized for not filing suit while the defendant was in beta mode, *Disney*

18   *Enters.*, 869 F.3d 848, OpenAI should not be penalized for "delay" while Defendants were not even

19   making available any artificial intelligence goods or services.  Defendants' cited authority (Opp.

20   12-14) does not hold otherwise, as none of their decisions address escalating or evolving harm.

            **2.**      **Delay Alone Does Not Preclude Preliminary Injunctive Relief.**

22         Even where delay is established, it is "but a single factor to consider in evaluating irreparable

23   injury; courts are loath to withhold relief solely on that ground."  *Arc of California*, 757 F.3d at 990,

24   979 (emphasis added) (remanding for "reconsideration of the propriety of injunctive relief in the

25   changed circumstances, applying the correct irreparable harm analysis"); *see also, e.g.*, *Desirous*

26   *Parties Unlimited, Inc. v. Right Connection*, *Inc.*, 2023 WL 4285504, at \*1 (9th Cir. June 30, 2023)

27   (affirming grant of preliminary injunction with alleged 13-month delay in trademark dispute); *Intenze*

28   *Prod., Inc. v. TATLAB Corp.*, 2023 WL 5209729, at \*8 (C.D. Cal. Aug. 1, 2023) ("It is a stretch to

1   suggest that six months is inherently unreasonable, let alone that it is so unreasonable that the Court

2   should withhold relief solely on this ground.").  Delay alone cannot be dispositive because courts

3   balance the elements of the preliminary injunction test, including irreparable harm, on a "sliding

4   scale."  *See* Mot. 8; *Feldenkrais Guild of N. Am. v. Wildman*, 2018 WL 2331905, at *2 (N.D. Cal.

5   May 23, 2018) (granting preliminary injunction in trademark dispute, recognizing "[s]o long as the

6   plaintiff makes a threshold showing of irreparable harm and likelihood of success on the merits, a

7   stronger showing on one element may offset a weaker showing on another").

8        The decision earlier this month in *Cisco Systems, Inc. v. Dexon Computer, Inc.*, 2023 WL

9   6466384 (N.D. Cal. Oct. 3, 2023), is instructive.  The court rejected the defendant's argument that

10  the preliminary injunction should be denied solely due to the plaintiff's having alleged **15 years** of

11  infringing conduct.  *Id.* at *5-6.  Judge Breyer pointed to defendants' failure to cite any "Ninth Circuit

12  case holding that delay, standing alone, rebuts the presumption of irreparable harm under the Lanham

13  Act—particularly where the movant marshals evidence of loss of reputation and consumer goodwill

14  and the non-movant makes no attempt to rebut that evidence."  *Id.*

15       As in *Cisco,* the record here includes evidence of loss of reputation and consumer goodwill.

16  Further, the undisputed evidence of actual confusion (Mot. 6-8), "substantiate[s] the threat to

17  [plaintiff's] goodwill and reputation, which is sufficient to establish a likelihood of irreparable harm."

18  *Home Comfort Heating & Air Conditioning, Inc. v. Ken Starr, Inc.*, 2018 WL 3816745, at *9 (C.D.

19  Cal. July 24, 2018); *see also Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*, 601 F. App'x

20  469, 474 (9th Cir. 2015) (evidence of actual confusion established irreparable harm).

21       Defendants' cited opinions (Opp. 13-14) do not salvage—nor justify—the position that delay

22  is dispositive.  All but three pre-date the Trademark Modernization Act of 2020 (the "TMA"), which

23  modified the Lanham Act's injunctive relief provision to establish a presumption of irreparable injury

24  for a party seeking a preliminary injunction "upon a finding of likelihood of success on the merits."

25  15. U.S.C. § 1116(a); *see also* Mot. 18.  Of those remaining three, one involved the Ninth Circuit

26  *vacating* the denial of a permanent injunction.  *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1007

27  (9th Cir. 2023).  In another, the analysis of delay was based on a local rule specific to temporary

28  restraining orders, there was no evidence defendants had even been served with the complaint, and

1   plaintiff failed to explain "why it is likely to succeed on the merits." *PTG, Inc. v. Reptilian Nation*

2   *Expo*, 2023 WL 3582131, at *3 (E.D. Cal. May 22, 2023).  The only case of the three that denied an

3   injunction outside the TRO context did so where a jury trial did not involve evidence of irreparable

4   harm or consumer confusion.  *Robinson v. Best Price Distributors, LLC*, 2023 WL 2203584, at *3-5

5   (C.D. Cal. Jan. 1, 2023).

6   **III.      THE PUBLIC INTEREST STRONGLY FAVORS AN INJUNCTION**

7        Defendants do not dispute the arguments OpenAI made in its moving brief—that the purpose

8   of trademark law is to avoid defrauding the public, that Defendants' continued use of the Infringing

9   Mark will mislead the public into thinking Defendants' website and the images generated using it are

10  associated with OpenAI, and that the public interest is best served by protecting OpenAI's goodwill

11  and enabling consumers to distinguish between the services offered by the parties.  *See* Mot. 20-21.

12  Defendants make no independent argument on this factor, claiming only that this factor favors them

13  "because [OpenAI's] case on merits is weak and irreparable harm is not established." Opp. 23-24.

14  As discussed above in Sections I & II, this is incorrect.

15  **IV.      THE BALANCE OF EQUITIES STRONGLY FAVORS AN INJUNCTION**

16       Defendants also do not address OpenAI's arguments concerning balance of the equities (Mot.

17  21) apart from pointing to OpenAI's purportedly "unreasonable delay" (Opp. 24)—debunked above.

18  *See* Sections I.C & II.B.  Notably, Defendants do not claim that an injunction will harm any of their

19  business interests or cost them any money.  They have no physical products to rebrand, no labels to

20  reprint, no placed ads to recall. Balanced against the actual confusion and irreparable harm OpenAI

21  is facing, the equities favor requiring Defendants to change the text of their website's homepage.

22                                **CONCLUSION**

23       For the reasons above, OpenAI respectfully requests that this Court grant the Motion and

24  preliminarily enjoin Defendants from using the Infringing Mark.

25  Dated:  October 24, 2023                 QUINN, EMANUEL, URQUHART &
                                             SULLIVAN, LLP
26
                                             By     */s/ Margret M. Caruso*
27                                               Margret M. Caruso
                                                 *Attorneys for OpenAI, Inc.*
28

DocuSign Envelope ID: C668889A-92F5-43CD-9A3C-AEA02B857B70

1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Robert P. Feldman (Bar No. 69602)
2    bobfeldman@quinnemanuel.com
    Margret M. Caruso (Bar No. 243473)
3    margretcaruso@quinnemanuel.com
    555 Twin Dolphin Drive, 5th Floor
4   Redwood Shores, California 94065-2139
    Telephone:    (650) 801-5000
5
    Robert M. Schwartz (Bar No. 117166)
6    robertschwartz@quinnemanuel.com
    Aaron H. Perahia (Bar No. 304554)
7    aaronperahia@quinnemanuel.com
    865 S. Figueroa St., 10th Fl.
8   Los Angeles, California 90017-2543
    Telephone:    (213) 443-3000
9
    Sam S. Stake (Bar No. 257916)
10   samstake@quinnemanuel.com
    50 California Street, 22nd Floor
11  San Francisco, California 94111-4624
    Telephone:    (415) 875-6600
12

13  *Attorneys for OpenAI, Inc.*

14                  **UNITED STATES DISTRICT COURT**

15               **NORTHERN DISTRICT OF CALIFORNIA**

16

17  OPENAI, INC., a Delaware corporation,      Case No. 4:23-CV-03918-YGR

18              Plaintiff,                      Assigned to the Hon. Yvonne Gonzalez Rogers

19         vs.                                  **DECLARATION OF GREG BROCKMAN
                                                IN SUPPORT OF OPENAI, INC.'S**
20  OPEN ARTIFICIAL INTELLIGENCE, INC.,         **MOTION FOR A PRELIMINARY
    a Delaware corporation; and GUY RAVINE,     INJUNCTION**
21  an individual,
                                                Date:      November 7, 2023
22              Defendants.                     Time:      1:00 p.m.
                                                Place:     Courtroom 1 (4th Fl.)
23                                                         1301 Clay St.
                                                           Oakland, CA 94612
24

25

26

27

28

DECLARATION OF GREG BROCKMAN ISO OPENAI'S MOTION FOR A PRELIMINARY INJUNCTION
**ER588**

DocuSign Envelope ID: C668889A-92E1-4FBC-849C-93D4E8661B10

**<u>DECLARATION OF GREG BROCKMAN</u>**

I, Greg Brockman, declare as follows:

1.     I am the President, Chairman, and Co-Founder of Plaintiff OpenAI, Inc.  I submit this declaration in response to Defendants Open Artificial Intelligence, Inc.'s and Guy Ravine's opposition to OpenAI's motion for a preliminary injunction.  I have personal knowledge of the facts stated in this declaration, except as otherwise noted, and if called as a witness, I could and would competently testify to them.

2.     In 2015, I co-founded OpenAI with Sam Altman and Ilya Sutskever, among others. OpenAI's mission is to ensure that artificial intelligence benefits all of humanity.  We announced OpenAI's founding (https://openai.com/blog/introducing-openai) on December 11, 2015.  Attached as **Exhibit A** is a true and correct copy of this announcement on December 11, 2015 from OpenAI's website.

3.     On the night of OpenAI's founding, December 11, 2015 at 9:12 p.m. Pacific Time, Mr. Ravine sent an e-mail to Mr. Altman and Mr. Sutskever.  The next day Mr. Altman forwarded me the e-mail, which I reviewed.   Attached as **Exhibit B** is a true and correct copy of this December 11-12, 2015 e-mail chain.

4.     Mr. Ravine's December 11, 2015 e-mail did not state that he was using the name "Open AI" at that time to offer any products or services.  The e-mail used future-looking verbs, explaining that he was "working on an initiative called Open.AI to build a collective engineering platform to enable researchers from around the world to collectively engineer deep learning algorithms," he was still "developing" the platform, it was still "in development," and he had only "started working" on it.  Mr. Ravine's e-mail referenced his "idea[s]" and "proposal[s]" for his initiative, such as partnering with a third-party to create a school that could "develop and maintain" his proposed platform.  Mr. Ravine's e-mail references a separate "collective engineering platform called Wikineering" that was "built" before his "focus on AI."   Nothing in Mr. Ravine's e-mail suggested that he had already created and released an artificial intelligence service that was actually in use with the name "Open AI."

5.      When I visited the open.ai domain name after receiving Mr. Ravine's e-mail, I saw the webpage reflected in the Internet Archive's capture of it in December 2015.  Attached as **Exhibit C** is a true and correct copy of the Internet Archive's capture of that webpage as of December 14, 2015, as retrieved on October 20, 2023.  The webpage did not have a menu or links to any other webpages.  It featured a large font "AI" with the word "OPEN" above it, and the words (in all capital letters) "open industry wide & academia," and then "wide deep learning initiative" under "AI."  Beneath that, the website stated that an "ANNOUNCEMENT WILL BE MADE SOON."  The webpage did not provide or reference any platform, and it offered no interactive use beyond a box to enter an e-mail address "to be informed of developments."  The appearance of the webpage when I visited Mr. Ravine's webpage in December 2015 was consistent with Mr. Ravine only having "idea[s]", not a product or service he was actually offering.

6.      Mr. Ravine's December 2015 e-mail did not mention him having applied for a trademark in the name "Open AI."  In the e-mail, Mr. Ravine did not claim any ownership rights in an "Open AI" trademark or claim to be using "Open AI" as a trademark or brand.

7.      I met with Mr. Ravine in person on or about December 16, 2015.  As with his e-mail, during that meeting, Mr. Ravine did not mention that he applied to register the name "Open AI" as a trademark or claim to be using the name "Open AI" as a brand.  Mr. Ravine stated during that meeting that he had not released any actual product, platform, or service relating to his artificial intelligence plans.  Instead, he said he had future plans to develop a platform for academia using his domain name and was looking for help or collaboration to develop it.  I politely declined Mr. Ravine's request.

8.      Because I understood Mr. Ravine not to be making any actual use in commerce of his domain name or offering any artificial intelligence services under any brand, I asked Mr. Ravine to change his potential project name, and said that OpenAI would be willing to purchase his "Open.AI" domain name.

9.      Later that day, Mr. Ravine e-mailed Mr. Altman, and I was copied on the e-mail chain.  Attached as **Exhibit D** is a true and correct copy of that e-mail chain.  As with all his prior communications with OpenAI, Mr. Ravine's December 16, 2015 e-mail did not mention his having applied to register the "Open AI" name or claim that he used that name as a brand, his having

trademark rights in "Open AI," or his using the phrase "Open AI" (only "Open.AI" was mentioned). Mr. Ravine's December 16, 2015 e-mail also did not suggest that he had created or launched any product or service for use on the "Open.AI" domain name. Rather, Mr. Ravine asked Mr. Altman if he would "help [] launch" the collaboration platform, after I had already declined his proposal to do so.

10.    Having met with, and read e-mail communications with, Mr. Ravine, I did not believe at any time in 2015 that Mr. Ravine had used the name "Open AI" to offer any goods or services related to artificial intelligence, claimed trademark rights in "Open AI," or had applied to register "Open AI" as a trademark. I also did not believe he had any product or service for use on the "Open.AI" domain name – to the contrary, we declined his repeated proposals to "help [] launch" a platform.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed this __23__ day of October 2023, in San Francisco, California.

DocuSigned by:

*Greg Brockman*

Greg Brockman

Case: 24-1963, 05/08/2024, DktEntry: 15.5, Page 37 of 235
Case 4:23-cv-03918-YGR   Document 46-1   Filed 10/24/23   Page 1 of 5

(37 of 235)

# Exhibit A

 OpenAI

Menu

# Introducing OpenAI

OpenAI is a non-profit artificial intelligence research company. Our goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return. Since our research is free from financial obligations, we can better focus on a positive human impact.



Illustration: Justin Jay Wang

December 11, 2015

**Authors**
Ilya Sutskever ↓
Ilya Sutskever ↓
OpenAI ↓

Announcements

OpenAI is a non-profit artificial intelligence research company. Our goal is to advance digital intelligence in the way that is most likely to benefit humanity as a whole, unconstrained by a need to generate financial return. Since our research is free from financial obligations, we can better focus on a positive human impact.

We believe AI should be an extension of individual human wills and, in the spirit of liberty, as broadly and evenly distributed as possible. The outcome of this venture is uncertain and the work is difficult, but we believe the goal and the structure are right. We hope this is what matters most to the best in the field.

## Background

Artificial intelligence has always been a surprising field. In the early days, people thought that solving certain tasks (such as chess) would lead us to discover human-level intelligence algorithms. However, the solution to

**ER593**

each task turned out to be much less general than people were hoping (such as doing a search over a huge number of moves).

The past few years have held another flavor of surprise. An AI technique explored for decades, deep learning, started achieving state-of-the-art results in a wide variety of problem domains. In deep learning, rather than hand-code a new algorithm for each problem, you design architectures that can twist themselves into a wide range of algorithms based on the data you feed them.

This approach has yielded outstanding results on pattern recognition problems, such as recognizing objects in images, machine translation, and speech recognition. But we've also started to see what it might be like for computers to be creative, to dream, and to experience the world.

## Looking forward

AI systems today have impressive but narrow capabilities. It seems that we'll keep whittling away at their constraints, and in the extreme case they will reach human performance on virtually every intellectual task. It's hard to fathom how much human-level AI could benefit society, and it's equally hard to imagine how much it could damage society if built or used incorrectly.

## OpenAI

Because of AI's surprising history, it's hard to predict when human-level AI might come within reach. When it does, it'll be important to have a leading research institution which can prioritize a good outcome for all over its own self-interest.

We're hoping to grow OpenAI into such an institution. As a non-profit, our aim is to build value for everyone rather than shareholders. Researchers will be strongly encouraged to publish their work, whether as papers, blog posts, or code, and our patents (if any) will be shared with the world. We'll freely collaborate with others across many institutions and expect to work with companies to research and deploy new technologies.

OpenAI's research director is Ilya Sutskever, one of the world experts in machine learning. Our CTO is Greg Brockman, formerly the CTO of Stripe. The group's other founding members are world-class research engineers and scientists: Trevor Blackwell, Vicki Cheung, Andrej Karpathy, Durk Kingma, John Schulman, Pamela Vagata, and Wojciech Zaremba. Pieter Abbeel, Yoshua Bengio, Alan Kay, Sergey Levine, and Vishal Sikka are advisors to the group. OpenAI's co-chairs are Sam Altman and Elon Musk.

Sam, Greg, Elon, Reid Hoffman, Jessica Livingston, Peter Thiel, Amazon Web Services (AWS), Infosys, and YC Research are donating to support OpenAI. In total, these funders have committed $1 billion, although we expect to only spend a tiny fraction of this in the next few years.

You can follow us on Twitter at @OpenAI.

---

| Authors | **Greg Brockman** |
| | View all articles |
| | **Ilya Sutskever** |
| | View all articles |
| | **OpenAI** |
| | View all articles |

---

# Related research

View all research





**DALL·E 3 system card**

Oct 3, 2023

**GPT-4V(ision) system card**

Sep 25, 2023





**Confidence-Building Measures for Artificial Intelligence: Workshop proceedings**

Aug 1, 2023

**Frontier AI regulation: Managing emerging risks to public safety**

Jul 6, 2023



**Research**
Overview
Index
GPT-4
DALL·E 3

**API**
Overview
Data privacy
Pricing
Docs ↗

**ChatGPT**
Overview
Enterprise
Try ChatGPT ↗

**Company**
About
Blog
Careers
Charter
Security
Customer stories
Safety

**OpenAI © 2015–2023**
Terms & policies
Privacy policy
Brand guidelines

Twitter   YouTube   GitHub   SoundCloud   LinkedIn

Back to top ↑

# Exhibit B

On Dec 12, 2015, at 10:46 AM, Sam Altman <sam@ycombinator.com> wrote:

Hi Guy--

Adding Greg here too.

Best,
Sam

On Fri, Dec 11, 2015 at 9:12 PM, guy@open.ai <guyravine@gmail.com> wrote:
Hi Ilya and Sam,

We've been working on an initiative called Open.AI to build a collective engineering platform to enable researchers from around the world to collectively engineer deep learning algorithms together through a fast collective iterative process using a number of new tools and principles. It's in development and is also a non-profit.

The initiative has the same goals as yours, which are the accelerate the arrival of general AI through an open effort.

We think the way research is done today is grossly inefficient, and a platform for collective engineering designed for AI like the one we have been developing could dramatically accelerate progress in the field through a better application of collective intelligence to the problem

We also believe that by applying collective intelligence to refine and simplify deep learning teaching materials in an iterative process through this platform, a lot more people would get involved in improving AI.

I've spent several years thinking about the problem of how to apply collective intelligence to large scale engineering projects, and in particular to AI, in an effective way. The conclusions were a number of key principles towards this end. My team has built a collective engineering platform called Wikineering (wiki engineering, www.wikineering.org), and then I decided that it would make most sense to focus on AI, so we started working on the foundations for Open.AI.

I've been working with Peter Norvig, Richard Socher and others to push a proposal for an AI School within Alphabet. The AI School would be a physical space that would teach its students as well as people online how to improve deep learning algorithms. In the proposal we are working on, the idea is that the AI School would also develop and maintain the Open.AI platform, and improve its teaching materials in an iterative process on Open.AI.

Before we go the Alphabet route (and we are not clear yet whether Larry will approve it being funded), I think it would make sense for us to meet and see if we could team up because we are working towards the same goals. This is bigger than us and I think it could benefit from working together. By the way, Nick Bostrom has also been advising us on the evolution of open AI.

Guy

Guy Ravine
guy@open.ai
(415) 515-7234

# Exhibit C



Case: 24-1963, 05/08/2024, DktEntry: 15.5, Page 47 of 235
Case 4:23-cv-03918-YGR   Document 46-4   Filed 10/24/23   Page 1 of 2

(47 of 235)

# Exhibit D

**From: Guy Ravine** <guyravine@gmail.com>
Date: Thu, Dec 17, 2015 at 10:56 AM
Subject: Re: Open.AI Follow up
To: Sam Altman <sam@ycombinator.com>
CC: Greg Brockman <gdb@gregbrockman.com>

Sure, can we put a date on the calendar in two months? Perhaps by then we'll have more as well.

> On Dec 17, 2015, at 8:59 AM, Sam Altman <sam@ycombinator.com> wrote:
>
> Hi Guy--
>
> Apologies--I'm super busy the next couple of months :( Trying to get caught up on everything I put off for OpenAI...
>
> Sam
>
> On Wed, Dec 16, 2015 at 8:47 PM, Guy Ravine <guyravine@gmail.com> wrote:
>> Hi Sam,
>>
>> I met with Greg today and we discussed the Open.AI collective engineering platform to allow everyone in academia to collaborate on AI algorithms in a faster iterative environment.
>>
>> Greg thinks our goals are aligned, but said the OpenAI lab is focused on internal research. So he suggested that my group would start Open.AI as a separate effort.
>>
>> Would you care to meet and see if you'd be able to help us launch the Open.AI AI collaboration platform? I believe it could accelerate progress in AI research by a factor of 2x or more by reducing iteration times when improving deep learning algorithms, and involving the open community in AI research.
>>
>> Guy
>>
>> Open.AI
>> guy@open.ai
>> (415) 515-7234

**ER603**

1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Robert P. Feldman (Bar No. 69602)
2    bobfeldman@quinnemanuel.com
    Margret M. Caruso (Bar No. 243473)
3    margretcaruso@quinnemanuel.com
    555 Twin Dolphin Drive, 5th Floor
4   Redwood Shores, California 94065-2139
    Telephone:    (650) 801-5000
5
    Robert M. Schwartz (Bar No. 117166)
6    robertschwartz@quinnemanuel.com
    Aaron H. Perahia (Bar No. 304554)
7    aaronperahia@quinnemanuel.com
    865 S. Figueroa St., 10th Fl.
8   Los Angeles, California 90017-2543
    Telephone:    (213) 443-3000
9
    Sam S. Stake (Bar No. 257916)
10   samstake@quinnemanuel.com
    50 California Street, 22nd Floor
11  San Francisco, California 94111-4624
    Telephone:    (415) 875-6600
12
    Dylan I. Scher (*pro hac vice*)
13   dylanscher@quinnemanuel.com
    51 Madison Avenue, 22nd Floor
14  New York, NY 10010
    Telephone:    (212) 849-7000
15

16  *Attorneys for OpenAI, Inc.*

17                  **UNITED STATES DISTRICT COURT**

18                  **NORTHERN DISTRICT OF CALIFORNIA**

19

| | |
|---|---|
| 20  OPENAI, INC., a Delaware corporation, | Case No. 4:23-CV-03918-YGR |
| 21              Plaintiff, | Assigned to the Hon. Yvonne Gonzalez Rogers |
| 22        vs. | **DECLARATION OF DR. SETH JAMES NIELSON SUPPORT OF OPENAI, INC.'S MOTION FOR A PRELIMINARY INJUNCTION** |
| 23  OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual, | |
| 24 | Date:        November 7, 2023 |
| 25              Defendants. | Time:        1:00 p.m. |
| 26 | Place:       Courtroom 1 (4th Fl.) 1301 Clay St. Oakland, CA 94612 |
| 27 | |
| 28 | |

## DECLARATION OF SETH JAMES NIELSON, PH.D.

I, Seth James Nielson, Ph.D., declare as follows:

1. My name is Seth James Nielson, Ph.D. I have been retained by counsel on behalf of Plaintiff OpenAI, Inc. ("OpenAI") in connection with the above-captioned action. I submit this declaration in response to the evidence that Defendants Open Artificial Intelligence, Inc. and Guy Ravine (together, "Defendants") submitted in opposition to OpenAI's motion for a preliminary injunction. I make this declaration based on my personal knowledge, education, training, and experience, as well as my review of relevant literature and case-specific materials. If called and sworn as a witness, I could and would testify competently to my opinions expressed below and the bases and reasons for them.

## I.  ASSIGNMENT AND SUMMARY OF OPINIONS

2. I have been asked to perform a cyber-forensics investigation and analysis concerning the events and evidence set forth in Mr. Ravine's declaration in opposition to OpenAI's preliminary injunction motion, including as to the existence, accessibility, and functionality of Defendants' purported Wikineering website and related domain names, the so-called "Initial Collaboration Tool," and Defendants' "Open.AI" website and related subdomain names.

3. It is my opinion, based on my education, training, experience, and investigation and analysis in this matter, that: (i) the Wikineering website was nonfunctioning, under construction, or inaccessible to the public before November 16, 2015, (ii) no "platform" on Wikineering website had been released to the public as of November 16, 2015; (iii) because there was no public Wikineering website or platform before November 16, 2015, there was also no public "Initial Collaboration Tool," (iv) Mr. Ravine's 2023 "reconstruction" of the asserted 2015 "Initial Collaboration Tool" contains text identical to text from a 2017 college textbook, which indicates that the reconstruction is not an accurate representation of a 2015 webpage, (v) the Open.AI domain name either redirected to a landing page, OpenAI's website, or a unrelated website for artworks, between September 2015 and November 2022; and (vi) Mr. Ravine's various "tools" did not appear to have real users.

## II.        **QUALIFICATIONS**

4.        My qualifications are summarized below and are addressed more fully in my CV attached as **Exhibit A** to this declaration.

5.        I am a subject matter expert in cyber security, including the sub-fields of forensics, applied cryptography, and network security. I am the Founder and Chief Scientist of Crimson Vista, a computer security investigations company. I hold appointments at the University of Texas at Austin as an Adjunct Associate Professor in the Department of Computer Science and as a Cybersecurity Fellow in the Robert Strauss Center for International Security and Law.

6.        I have been working professionally in the field of computer security since August 2005 and within the field of computer science generally since June 2000. My experience includes graduate-level teaching, academic research, industry employment, and consulting practice.

7.        I received my B.S. in Computer Science in April of 2000. During my final undergraduate semester, I worked both as a teaching assistant for a Computer Networking course and as a researcher in the Networked Computing Lab. In these capacities, I assisted students in debugging and designing TCP/IP protocol stacks, Address Resolution Protocol implementations, and Remote Procedure Call projects. I have collaborated on investigations of statistical traffic engineering for bandwidth allocation, including a published paper entitled, "Effective Bandwidth for Traffic Engineering."

8.        After graduation (from 2001 through 2003), I worked as a software engineer at Metrowerks (formerly Lineo, Inc.), where I had substantial responsibilities relating to software architecture, computer networking, and technical project management.

9.        As part of my technical training and development at Lineo/Metrowerks, I also gained and employed a wide exposure to computer networking and an introduction to network security. I tested and evaluated a prototype firewall product, built a custom VPN solution, and trained in the use of web server and mail server administration. I ran my own personal MTA with an IMAP and POP3 server based on these tools under development.

10.        Another major networking project involved porting the Embedix SDK from Linux to Windows. For this project I used a virtual-machine/networked solution. The underlying SDK engine

DECLARATION OF DR. SETH JAMES NIELSON ISO OPENAI'S PRELIMINARY INJUNCTION MOTION
**ER606**

1    remained running in a Linux VM while the GUI operated in native Windows. I developed all of the

2    code for this remote communication system.

3          11.    Additionally, the SDK provided extensibility through a scripting system based on

4    Python. A critical task was to make the existing Python scripts, built to run in Linux, work

5    unmodified with the new Windows system. I engineered a framework that automatically intercepted

6    certain Python commands and sent them across the network to the other side, similar to RPC

7    technology.  From the perspective of the scripts, all of the function calls were local when, in fact,

8    certain operations were executed remotely.

9          12.    While working at Lineo/Metrowerks, I also returned to BYU to pursue my Master's

10   degree in Computer Science. In addition to the graduate level course work in wireless computer

11   networks and compilers, I pursued graduate research in software engineering topics, with a special

12   emphasis on how programmers think while creating and modifying code. My research included a

13   study of computer architectural patterns and how those patterns might need to change as

14   programming languages change and evolve. Based on my research, I proposed a concept called

15   "Design Dysphasia," wherein a programmer or software developer becomes trapped in their

16   approach to solving problems based on the paradigms and design approaches of the programming

17   language. My research was published as "Design dysphasia and the pattern maintenance cycle," in

18   the Journal Information and Software Technology August 2006. This work also was a major

19   component of my Master's thesis.

20         13.    After finishing my Master's degree, I moved to Houston, TX in 2004 to begin a Ph.D.

21   program at Rice University. At this point, my interest in computer security took priority over my

22   interests in programming languages and software engineering, and my classes and research were

23   directed to that topic.

24         14.    During the 2004 fall semester of my Ph.D. program at Rice University, I identified a

25   security vulnerability in the Google Desktop Search that could have allowed hackers to compromise

26   users' computers and obtain private information. After contacting Google and assisting them in

27   closing the vulnerability, we published the details of our investigation.

28

DECLARATION OF DR. SETH JAMES NIELSON ISO OPENAI'S PRELIMINARY INJUNCTION MOTION
**ER607**

15.     In 2005, I completed an internship at Google, where I designed and implemented a solution to privacy loss in Google Web Accelerator. The Google Web Accelerator was designed to increase the speed of browsing the Internet. Once installed on a user's computer, the browser would request all content through a Google Proxy. The proxy performed pre-fetching and extensive caching in order to provide fast and responsive service to the user. At the time of my internship, news reports had identified odd problems in which users of the Accelerator were accessing other individual's private pages. During my internship, I designed and implemented a prototype solution for this issue in C++.

16.     In 2005, I published a paper entitled, "A Taxonomy of Rational Attacks." This paper categorized and described the various types of attacks that one might see in a decentralized, peer-to-peer network. When there is no centralized authority, users have to cooperate to obtain service. The term "rational attacks" refers to the economic incentives to not cooperate while still exploiting the system for service.

17.     My Ph.D. Thesis was entitled "Designing Incentives for Peer-to-Peer Systems," and it built on this concept. Given a network where participants cannot be forced to cooperate, the operation of said network must induce cooperation by design of the outcomes. In other words, it must be in each participant's best interest to contribute to the cooperative operation. I conducted experiments including simulated extensions to the BitTorrent peer-to-peer protocol for long- term identities and mechanisms for cooperative anonymity.

18.     From 2005 through 2008, with the approval of my Ph.D. adviser, I worked as a Security Analyst and for Independent Security Evaluators (ISE). Much of my early work was spent developing a software encryption library, including the necessary tests and procedures for FIPS-certification. The encryption library provided advanced operations such as secure data splitting and recovery.

19.     In 2009, I went to work full time for ISE as a Security Analyst and later as a Senior Security Analyst. I built a number of advanced projects including a parallel-program for massive code coverage analysis, GPU hardware-accelerated AES encryption, and encrypted file-system prototypes.

20.     In addition to the software development, I also performed security evaluation services that included port-scanning analyses, security protocol analysis using formal and exploratory methods, and investigated security breaches.

21.     I also designed and managed the implementation of a secure communication technology that splits trust between multiple SSL Certificate Authorities (CA), so that if one CA is compromised, the communication stream can still be safely authenticated. My work on the secure communications technology project led to the issuance of multiple patents. In total, I wrote hundreds of thousands of lines of code in C, C++, and Python, including projects where I had to implement the same functionality in two separate languages.

22.     In 2011, I began work as a Research Scientist at Harbor Labs and continued with that consulting firm until fall 2015. I worked with a wide range of clients, specializing in network security, network communications, software architecture, and programming languages. I analyzed an extensive collection of commercial software, including software related to secure email, cloud-based multimedia delivery, document signing, anti-virus and anti-intrusion, high- performance routing, networking protocol stacks in mobile devices, PBX telecommunications software, VoIP, and peer-to-peer communications. I also analyzed security considerations for potential technology acquisitions.

23.     Also at Harbor Labs, I reviewed technology and source code for multiple clients related to accusations of theft and/or misappropriation of trade secrets.  These engagements included an analysis of C, C++, Java, Python, and other source code languages in high-frequency trading, e-commerce, and other similar systems.

24.     I also assessed the security and privacy technologies and policies provided by a third-party vendor to the Center for Copyright Infringement (CCI). CCI represents content owners, such as the RIAA and the MPAA, in finding and reducing piracy online.

25.     For other clients, I have "resurrected" or re-created legacy software systems. For example, I assisted one client in making code from the mid 90's operational. I helped them identify the most compatible components from an old CVS repository, obtain the necessary legacy hardware and software to rebuild the source code, and diagnose why the separate components weren't

completely compatible with each other. Using tools from the era (*i.e.,* the mid-90's), I identified and fixed these issues in C++ and Java code, and successfully demonstrated the operational system.

26.     In other similar examples, I re-created basic software in x86 Assembly code that mimicked the behavior of 1990's era viruses, wrote a file transfer system similar to FTP in pre-2.0 Java, and demonstrated the use of a command-line antivirus software adapted for router/gateway scanning.

27.     During my final year at Harbor Labs, I was engaged as the principal consultant with a large biomedical device firm in a twelve-month analysis of the security of their products. Notably, medical devices were for some time not considered significant threats in terms of computer security. However, recent demonstrations by security researchers of the various ways in which a malicious individual might harm a person using a medical device has shifted the thinking in the industry. Accordingly, I was engaged to assist this company in the analysis of their products, their process, and their future roadmap in order to ensure that patients are not harmed. My team and I analyzed design documents, hardware, and a broad range of additional resources in order to expose potential problems. The security of these systems depends, in part, on the architecture and deployment of the networks in which they operate.

28.     In May 2016, I founded Crimson Vista, Inc. as a boutique computer security engineering company. Similar to the work that I did at Harbor Labs, I continue to provide technical expertise to a wide range of clients in areas of programming languages, computer networks, and network security. My expertise in the area of "security engineering" provides comprehensive analysis, design, and insight into cybersecurity concerns before, during, and after development.

29.     For example, I have been retained by a start-up in telecommunications security to provide cryptography expertise and evaluations of their protocols and architectures. My team and I have prototyped new protocols, written up analyses, and presented to potential partners and investors.

30.     Another start-up company retained me for guidance in matters relating to Blockchain and Smart Contracts. This technology is very much dealing with a "fad" phase where there is a lot of misinformation and hype. I guided the start-up company through where these kinds of technologies

DECLARATION OF DR. SETH JAMES NIELSON ISO OPENAI'S PRELIMINARY INJUNCTION MOTION
**ER610**

1    would help and where they would not. I have also provided training on Blockchain at the Data

2    Architecture Summit and Enterprise Data World conferences.

3         31.    I have also provided technical guidance to an antitrust team in the United States

4    Department of Justice. Although the technologies and parties are confidential, I can disclose that I

5    provided in-person training on technical topics and analyses of competing security products.

6         32.    More recently, I have been retained by clients, including a Fortune 100 financial

7    institution, to provide them with post-data-breach analyses of what went wrong, the impact of the

8    lost data, and guidance on resolution. In these engagements, I provided reverse engineering of the

9    data to demonstrate how an attacker can or would use the compromised information, analyzed

10   software development to determine when the system became vulnerable, and helped identify

11   impacted customers that had been missed in the investigations.

12        33.    Crimson Vista has also expanded and developed as a forensics investigation company.

13   Our projects include investigations into the provenance of electronics documents and materials, data

14   tracking on Internet websites, and blockchain/cryptocurrency matters. Our team makes use of

15   industry-standard investigation tools as well as our own analysis techniques. I am responsible for

16   developing my team's capabilities and overseeing the investigations.

17        34.    Through Crimson Vista, I also invest in research and development. Recent projects

18   include engaging with a partner to implement prototypes of communications security protocols for

19   next-generation automobiles. I also gave a talk on "Detecting Malicious Sandboxes" at the Workshop

20   on Defensive Deception and Trust in Autonomy, in association with the 2018 Naval Applications of

21   Machine Learning Workshop.

22        35.    I also continue to perform a wide range of code reviews for diverse technologies

23   including CAD software, video game systems, digital mobile radios (DMRs), video streaming, and

24   digital rights management (DRM).

25        36.    I maintain ties to academia. I have held adjunct appointments at Johns Hopkins

26   University from 2014 to 2019. From July 2016 to July 2019 I also held an appointment as the Director

27   of Advanced Research Projects in the Johns Hopkins University Information Security Institute.

28

37.     At Johns Hopkins University I taught Network security and Advanced Network Security. I created a custom curriculum and lab experience wherein students develop their own security protocols as a class and then attempt to break their own creations. Students learn how hard it is to get security right, and how easy it is to find something wrong. I published a paper about the labwork in the Journal of Computer Science Education entitled, "PLAYGROUND: Preparing Students for the Cyber Battleground."

38.     The labwork in the advanced course builds on the same framework, but adds in mobile, autonomous vehicles in a game-like simulation. Students program "bots" with computer program "brains" that are used to gather resources, attack, communicate, and so forth. The students explore various opportunities for compromising the brains of the other students as part of the labs.

39.     One of the components of the students' lab work is to create a protected "sandbox" for running untrusted code. The sandbox must provide access to the system in a manner that cannot be exploited. Conversely, the other half of their assignment is to design exploitative code that attempts to bypass and/or neutralize the protections of the sandbox environment. This experimental framework enables the students to learn about creating, identifying, and neutralizing malware such as viruses.

40.     Beyond course instruction, I also mentored Master's students at Johns Hopkins in their capstone projects. These projects include networking security and privacy concerns across a wide range of technologies including cryptography, drone security, iOS security, BitCoin, SSL vulnerabilities, and Twitter "botnets." My students and I have published multiple papers from these capstone projects.

41.     During my tenure as the Director of Advanced Research Projects, I was tasked with developing collaborative research opportunities. Through my efforts, a wide range of student capstones have been executed with partners from the Johns Hopkins Applied Physics Lab or outside corporate partners.

42.     For example, we coordinated with the company OnBoard Security to develop better security for anti-collision protocols for air traffic.  Students demonstrated the potential issues related

DECLARATION OF DR. SETH JAMES NIELSON ISO OPENAI'S PRELIMINARY INJUNCTION MOTION

1  to leaving the protocol unsecured and built a working prototype of a secured variant. OnBoard and

2  Johns Hopkins published press releases which were picked up by aviation-focused news sources.

3        43.    I am now an adjunct professor at the University of Texas at Austin. I previously taught

4  the undergraduate Network Security and Privacy class in the Computer Science department. I now

5  teach the Introduction to Cybersecurity Technology class in the Law School. I continue to advise

6  students in the Computer Science department in independent research projects such as the

7  applications of AI to computer security problems.

8        44.    I am also the co-founder and current director of the Crypto Done Right Foundation, a

9  non-profit. The foundation grew out of a research project initially hosted at Johns Hopkins University

10  and funded by a grant from Cisco. Crypto Done Right is designed to bridge the gap between

11  cryptography SME's and the IT professionals that use it. It provides authoritative guidance on

12  deployment, lifecycle, and management of cryptography in IT systems, software development, and

13  technical management.

14        45.    The attached **Exhibit B** lists the materials I considered in forming my opinions.  I am

15  being compensated at my standard rate of $650 per hour for my time, plus reasonable out-of-pocket

16  expenses.  I have received no additional compensation for my work in this litigation, and my

17  compensation does not depend upon the contents of this report, any testimony that I may provide, or

18  the ultimate outcome of this litigation.

19        46.    I hold my opinions to a reasonable degree of professional certainty. The information

20  I have relied upon is the type of information that is typically relied upon in my fields of expertise. I

21  reserve the right to revise my opinion if additional information, documents, or testimony provided

22  by the parties becomes available that would cause me to amend or supplement my opinions here.

23  **III.**    **OPINIONS AND ANALYSIS**

24      **A.**    **The Wikineering Website**

25        47.    As part of my investigation, I referred to several main sources to begin my analysis,

26  including the Internet Archive's WayBack Machine and advanced searches on Google.

27        48.    Starting with the Internet Archive, I searched for records from the Internet Archive's

28  captures of the Wikineering website, https://wikineering.org, during 2012 when Mr. Ravine has

claimed he started it.  But the Internet Archive had no such records.  Instead, the first three captures included one capture of a GoDaddy.com parked page in 2011 and two captures of a "502 Bad Gateway" error page in April 2013 and June 2013.  Attached as **Exhibit C** is a true and correct copy of screenshots from those three captures on the Internet Archive's website.  In my experience, the "502 Bad Gateway" error page indicates that the website server is down or otherwise unavailable.  This indicates that the Wikineering website was not operational after the time that Mr. Ravine has said he started it in 2012.  Further bolstering this conclusion, a later Internet Archive capture of the Wikineering website on December 18, 2014 showed a basic "Coming soon" page.  Attached as **Exhibit D** is a true and correct copy of a screenshot of that capture on the Internet Archive's website.

49.    After the Internet Archive's capture of the December 18, 2014 "Coming soon" page, the next recorded capture is recorded November 16, 2015.  The Internet Archive's November 16, 2015 capture of the Wikineering website showed a redesigned website with simple, minimal content and functionality.  Attached as **Exhibit E** is a true and correct copy of a screenshot of that capture on the Internet Archive's website.

50.    As shown in Exhibit E, a Wikineering logo is prominently shown in the top left corner, along with the slogan "building the 21st century together."  Although the website featured large font, it was short on substance, with only 12 sentences on the entire website.  Those sentences provided seemingly generic information about Wikineering.  The website did not mention "Open AI," artificial intelligence, or even the so-called "Initial Collaboration Tool."  Nor did the website provide any actual platform with collaboration functionality or the ability to access one, such as through a website menu, login button, or signup page.  Rather, the website expressly stated:  "Wikineering will be released in 2015."  This tells me that the Wikineering "platform" had not yet been released to the public as of the date of this website capture—November 16, 2015.  Notably, the archived Wikineering webpage is hardly different from the current version of that webpage, despite Mr. Ravine's assertion that the website has changed significantly over time.  Attached as **Exhibit F** is a true and correct copy of a screenshot of website taken on October 24, 2023, available at http://wikineering.org/.

51.     In addition, I also searched for and reviewed the Internet Archive's captures of the other domain name that Mr. Ravine mentioned in his declaration, https://ineed.com.  But the captures of that website generally reflected an almost entirely blank space, as shown in the March 25, 2015 screenshot from the Internet Archive attached as **Exhibit G**.  None of those captures that I reviewed reflected a website for Wikineering, much less made any reference to a Wikineering platform, the so-called "Initial Collaboration Tool," or "Open AI."  Further, there was no record whatsoever of the specific URL that Mr. Ravine noted (https://ineed.com/wikineering).  In my opinion, these facts indicate that the ineed.com domain name was not being used to host any consumer-facing platforms in 2015.  It is also not clear why Mr. Ravine would have hosted his Wikineering website on a different domain name (ineed.com), given that he already owned the wikineering.org domain name.  One likely explanation is that platforms that are still being developed and tested before their release to the public are hosted on other domain names.  Thus, to the extent Mr. Ravine had hosted anything related to Wikineering on the ineed.com domain name, it would be consistent with Mr. Ravine not having released that platform to the public.

52.     In addition, I also performed advanced searches on Google for any reference to either "wikineering.org" or "ineed.com/wikineering" (each with quotes).  In my experience as a cyber professional and investigator, I would expect to see at least several pages worth of search results, if not many more, for an online platform that had done business for at least several years.  For example, a Google search for OpenAI's website "openai.com" yields over 2.5 million search results.  Even for a less well-known company or platform, I would still expect to see more than a *de minimis* number of search results, such as press releases, blog posts, news articles, or user generated content about the platform.  I did not see that after performing either search for "wikineering.org" or "ineed.com/wikineering".  In fact, I received *zero* search results for "indeed.com/wikineering."  As for "wikineering.org", Google returned only five search results on a single page, as shown on the true and correct screenshot attached as **Exhibit H**.  In my opinion, the dearth of search results for each of these terms is inconsistent with Mr. Ravine's claim that the website had operated and was used by the public from at least 2012 to early 2016.

**B.      The "Initial Collaboration Tool"**

53.      Having found no evidence to support the existence of the Wikineering platform that Mr. Ravine describes, I proceeded to consider the "reconstruction" of the so-called "Initial Collaboration Tool" that Mr. Ravine provided as Exhibit 2 to his declaration.

54.      In my experience as a cyber professional, I find it unusual and unlikely that Mr. Ravine has no data sources for this supposed tool.  The supposedly recreated data in Mr. Ravine's Exhibit 2 has the appearance of a Wiki.  Wiki pages are generated from text files, but Mr. Ravine has not provided any and suggests none currently exist.  That is unusual because it is easy and straight forward to store these text files in a repository and maintain them even when there are server and other changes over time.  The lack of any data that can be dated to the relevant time period other than what Mr. Ravine *remembers* is unusual.

55.      I also found it curious that Mr. Ravine does not remember *which* domain name provided access to his Wikineering website (i.e., wikineering.org or ineed.com), yet he could remember the specific content within the specific portion of that Wikineering website that allegedly used the words "Open AI."  Given that peculiarity, I began investigating the reconstruction for signs of copying or plagiarism.

56.      Ultimately, I determined that most of the content (and all of the content with any technical depth) in Mr. Ravine's reconstruction is virtually identical to content in a 2017 college textbook entitled, "Mathematics of Autonomy: Mathematical Methods for Cyber-physical-cognitive Systems," by Darryn J. Reid, Michel J. Pilling, and Vladimir G. Ivancevic (World Scientific, December 2017), *available at* https://www.worldscientific.com/worldscibooks/10.1142/10716 and searchable through Google Books.  According to the World Scientific's website linked above, the authors of that textbook were employed by the Defence Science and Technology Group, a formal body within the Australian Government's Department of Defence.  *See* https://www.dst.defence.gov.au/.  Attached as **Exhibit I** is a true and correct copy of an excerpt from this textbook that reflects the text that Mr. Ravine's Exhibit 2 appears to copy, as retrieved from Google Books where these excerpts are available, https://books.google.com/books?id=bp5QDwAAQBAJ.  For the Court's convenience, attached as **Exhibit J** is a side-by-side

1  summary comparison of each of the passages that are virtually identical in Mr. Ravine's

2  reconstruction and the textbook. It is my opinion that Mr. Ravine's reconstruction copies the content

3  from this textbook—which was not published until two years *after* Mr. Ravine said the content

4  appeared on his "platform."

5         **C.**      **The Open.AI Website**

6         57.     To investigate Mr. Ravine's uses of the website available at https://open.ai, I first

7  reviewed the Internet Archive's captures of that website. Because Mr. Ravine states that he

8  "[i]mmediately" put up a landing page after March 26, 2015, I began my review at that date.

9  However, there is no record whatsoever on the Internet Archive of Mr. Ravine having put up a

10  landing page at that time. The earliest record I have seen, which is a basic landing page that states

11  an "ANNOUNCEMENT WILL BE MADE SOON," is dated September 5, 2015. In the eight years

12  since, the website has had very infrequent updates, except for those within the past year.

13         58.     Below is a summary table that reflects captures from the Internet Archive of

14  Defendants' open.ai website between September 5, 2015 and September 18, 2023. As shown in the

15  table: (i) Defendants' website displayed the same landing page in captures between 2015 and 2017,

16  (ii) Defendants had *no* website, instead redirecting their domain name to OpenAI's website, in

17  captures between 2017 and 2022, (iii) Defendants displayed a website for an apparently different

18  company—CryptoArt—without any mention of "Open AI" for a period of time in 2022, and (iv)

19  Defendants began displaying the redesigned website with a text-to-image generator starting in

20  November 2022. As the images shown below reflect, none of these webpages appeared to have any

21  menus or links to subdomains of the open.ai website.

| Description | Thumbnail |
|---|---|
| Date: September 5, 2015<br><br>Type: Landing Page<br><br>Description: The open.ai domain name displayed a single-page website stating an "announcement will be made soon."<br><br>https://web.archive.org/web/20150905165533/http:/open.ai/ |  |

DECLARATION OF DR. SETH JAMES NIELSON ISO OPENAI'S PRELIMINARY INJUNCTION MOTION

| | |
|---|---|
| <u>Date</u>: December 14, 2015<br><br><u>Type</u>: Landing Page<br><br><u>Description</u>: The open.ai domain name displayed a single-page website stating an "announcement will be made soon."<br><br>https://web.archive.org/web/20151214201146/http:/open.ai:80/ |  |
| <u>Date</u>: July 13, 2016<br><br><u>Type</u>: Landing Page<br><br><u>Description</u>: The open.ai domain name displayed a single-page website stating an "announcement will be made soon."<br><br>https://web.archive.org/web/20160713103448/http:/open.ai:80/ |  |
| <u>Date</u>: December 2, 2016<br><br><u>Type</u>: Landing Page<br><br><u>Description</u>: The open.ai domain name displayed a single-page website stating an "announcement will be made soon."<br><br>https://web.archive.org/web/20161202073335/http:/open.ai/ |  |
| <u>Date</u>: June 1, 2017<br><br><u>Type</u>: Landing Page<br><br><u>Description</u>: The open.ai domain name displayed a single-page website stating an "announcement will be made soon."<br><br>https://web.archive.org/web/20170601220909/https:/open.ai/ |  |
| <u>Date</u>: September 26, 2017<br><br><u>Type</u>: Redirect to Plaintiff's Website<br><br><u>Description</u>: The open.ai domain name redirected to OpenAI's website at openai.com.<br><br>https://web.archive.org/web/20170926220527/http:/open.ai/ |  |

DECLARATION OF DR. SETH JAMES NIELSON ISO OPENAI'S PRELIMINARY INJUNCTION MOTION

ER618

| | |
|---|---|
| **Date**: December 27, 2018<br><br>**Type**: Redirect to Plaintiff's Website<br><br>Description: The open.ai domain name redirected to OpenAI's website at openai.com.<br><br>https://web.archive.org/web/20181227232823/http:/open.ai/ |  |
| **Date**: May 4, 2019<br><br>**Type**: Redirect to Plaintiff's Website<br><br>Description: The open.ai domain name redirected to OpenAI's website at openai.com.<br><br>https://web.archive.org/web/20190504061836/http:/open.ai/ |  |
| **Date**: October 6, 2020<br><br>**Type**: Redirect to Plaintiff's Website<br><br>Description: The open.ai domain name redirected to OpenAI's website at openai.com.<br><br>https://web.archive.org/web/20201006113924/https:/open.ai/ |  |
| **Date**: March 16, 2021<br><br>**Type**: CryptoArt Website<br><br>Description: The open.ai domain name displayed a webpage for "CryptoArt," which did not display the "Open AI" name on the website.<br><br>https://web.archive.org/web/20210316154125/https:/open.ai/ |  |
| **Date**: August 3, 2021<br><br>**Type**: Redirect to Plaintiff's Website<br><br>Description: The open.ai domain name redirected to OpenAI's website at openai.com.<br><br>https://web.archive.org/web/20210803032528/https:/open.ai/ |  |

-16-                     Case No. 4:23-cv-03918-YGR

DECLARATION OF DR. SETH JAMES NIELSON ISO OPENAI'S PRELIMINARY INJUNCTION MOTION

| | |
|---|---|
| **Date**: January 24, 2022<br><br>**Type**:  Redirect to Plaintiff's Website<br><br>**Description**:  The open.ai domain name redirected to OpenAI's website at openai.com.<br><br>https://web.archive.org/web/20220124001544/https:/open.ai/ |  |
| **Date**:  July 1, 2022<br><br>**Type**:  CryptoArt Website<br><br>**Description**:  The open.ai domain name displayed a webpage for "CryptoArt," which did not display the "Open AI" name on the website.<br><br>https://web.archive.org/web/20220701135945/https:/open.ai/ |  |
| **Date**:  November 26, 2022<br><br>**Type**:  Redesigned Website<br><br>**Description**:  The webpage invited users to generate images by "play[ing] with some StableDiffusion [*sic*]" "[i]n the meantime."<br><br>https://web.archive.org/web/20221126092122/https:/open.ai/ |  |
| **Date**: December 5, 2022<br><br>**Type**:  Redesigned Website<br><br>**Description**:  The webpage allowed users to generate images from text prompts.<br><br>https://web.archive.org/web/20221212065045/https:/open.ai/ |  |
| **Date**:  August 3, 2023<br><br>**Type**:  Redesigned Website<br><br>**Description**:  The webpage allowed users to generate images from text prompts.<br><br>https://web.archive.org/web/20230802120247/https:/open.ai/ |  |

DECLARATION OF DR. SETH JAMES NIELSON ISO OPENAI'S PRELIMINARY INJUNCTION MOTION

ER620

| | |
|---|---|
| <u>Date</u>:  September 13, 2023<br><br><u>Type</u>:  Redesigned Website<br><br><u>Description</u>:  The webpage allowed users to generate images from text prompts.<br><br>https://web.archive.org/web/20230913093347/https:/open.ai/ |  |
| <u>Date</u>: September 18, 2023<br><br><u>Type</u>:  Redesigned Website<br><br><u>Description</u>:  The webpage allowed users to generate images from text prompts.<br><br>https://web.archive.org/web/20230918194011/https:/open.ai/ | |

### D.      "Tools" on Defendants' Website

59.      I also investigated Mr. Ravine's claims of "tools" that he made available at the following addresses:      https://wikineering.org, https://ineed.com/wikineering, https://open.ai, https://hub.open.ai, https://beta.open.ai, and https://decentralized.open.ai.   Below is a table of my understanding of those "tools" and their dates "available," as represented by Defendants:

| Defendants' Claimed Uses | | |
|---|---|---|
| **Date** | **Website Address** | **Description** |
| 3/25/2015 to Early 2016 | wikineering.org or ineed.com/wikineering | **Initial Collaboration Tool:**  A portion of the Wikineering website dedicated to AI research.  Ravine Dec. ¶ 5. |
| 3/25/2015 to Early 2016 | wikineering.org or ineed.com/wikineering | **Initial Discussion Board:**  A discussion board allowing users to discuss issues relating to AI development.  Ravine Dec. ¶ 8. |
| 3/26/2015 | open.ai | **Parked Website Landing Page:**  A landing page that said:<br>OPEN<br>AI<br>OPEN INDUSTRY WIDE & ACADEMIA WIDE DEEP LEARNING INITIATIVE …<br>ANNOUNCEMENT WILL BE MADE SOON … |

DECLARATION OF DR. SETH JAMES NIELSON ISO OPENAI'S PRELIMINARY INJUNCTION MOTION

| | | Enter your email to be informed of developments or join the initiative."  Ravine Dec., ¶ 6. |
|---|---|---|
| 09/2016 to Early 2023 | hub.open.ai | **Hub:**  An evolved discussion board where users could post research questions or findings about AI related development.  Ravine Dec., ¶ 9. |
| 1/8/2023 to 10/2023 | beta.open.ai | **Evolved Collaboration Tool:**  An evolution of the Initial Collaboration Tool that allowed users to collaborate on AI-related research articles and projects.  Ravine Dec., ¶ 10. |
| 10/2017 to 10/2023 | decentralized.open.ai | **Decentralized:** An AI collaboration tool allowing users to create discussion threads for AI companies and to contribute to a particular company's research and development.  Ravine Dec. ¶ 11. |

60.      In professional experience and opinion, Mr. Ravine's descriptions of these "tools" raise multiple concerns.  First, I have seen no evidence that Mr. Ravine  created or substantially created the underlying platforms on which any of these "tools" ran.  For example, Mr. Ravine states that he "developed technology for an improved discussion board in 2016" in discussing his Hub website.  Ravine Dec. ¶ 9.  However, no source code or other artifacts have been provided that support this assertion.  Moreover, the Hub website apparently uses an existing technology called Discourse (https://www.discourse.org/), a free, open-source platform to add a discussion board to any website.  Attached hereto as **Exhibit K** is a true and correct copy of a screenshot from Discourse's website reflecting the same platform design as shown in Mr. Ravine's Hub website.  Mr. Ravine also appears to use the same software on another website available at subdomain of open.ai, https://guy.open.ai, as reflected in the true and correct copy of a screenshot from that website attached as **Exhibit L**.  As shown in that exhibit, Mr. Ravine merely has "test" posts up.

61.      Second, I have seen no evidence supporting Mr. Ravine's claims to have released so many different "tools," including some that are "evolved" versions of "initial" tools, such as the "evolved" versions he states were located at different website addresses.  For example, Mr. Ravine states that his "Initial Discussion Board" was available on wikineering.org or ineed.com/wikineering.  He also states that his "Hub" was an evolved version of the "Initial Discussion Board" that was available at a different website address.  There is no evidence that this is an evolved or improved version..  There also appears to be no evidence that there were active users that had to be transitioned

from one of these websites to the other.  When a discussion board or other Internet-based collaboration tool migrates from one web address to another, there is a need to migrate the users as well to not interrupt the community or the social momentum.  There is no evidence of any such migration.  This suggests to me that Mr. Ravine did not have any users of his initial "tools," including his "Initial Collaboration Tool" or his "Initial Discussion Board."

62.     Third, I reviewed the Declaration of Aaron Perahia submitted in connection with OpenAI's motion for a preliminary injunction, including Exhibits C to F thereto.  Based on my review of those materials, it is my opinion that the posts on Mr. Ravine's Hub website were copied from prior posts on Github.com, given the nearly identical portions of text that appear.  This suggests to me that the Hub website did not have true users, but rather that these posts were copied by Mr. Ravine and/or other administrators to create the appearance of real user dialogue.

63.     Last, I performed advanced site searches on Google for the beta.open.ai website, the decentralized.open.ai website, and the hub.open.ai website.  In my experience as a cyber professional and investigator, I would expect to see some relevant results if any of those websites had actual users. I did not find any meaningful results.  Attached as **Exhibit M** is a true and correct compilation of print outs from Google reflecting those searches.  For the beta.open.ai website, the only search result found was for "CryptoArt," which suggests that me that the beta.open.ai was not actually providing the tool described by Mr. Ravine, but rather was displayed a separate cryptocurrency-related website. For the decentralized.open.ai and hub.open.ai website, there were no results at all.  These results suggest to me that these "tools" and websites did not have any real users.

IV.     **CONCLUSIONS**

64.     It is my opinion, based on my education, training, experience, and investigation in this matter, that: (i) the Wikineering website was nonfunctioning, under construction, or inaccessible to the public before November 16, 2015, (ii) no "platform" on Wikineering website had been released to the public as of November 16, 2015; (iii) because there was no public Wikineering website or platform before November 16, 2015, there was also no public "Initial Collaboration Tool," (iv) Mr. Ravine's 2023 "reconstruction" of the asserted 2015 "Initial Collaboration Tool" contains text identical to text from a 2017 college textbook, which indicates that the reconstruction is not an

1   accurate representation, (v) the Open.AI domain name either redirected to a landing page, OpenAI's

2   website, or a unrelated website for artworks, between September 2015 and November 2022; and (vi)

3   Mr. Ravine's various "tools" did not appear to have real users.

4   / / /

5   / / /

6   I declare under penalty of perjury of the laws of the United States of America that the foregoing is

7   true and correct.

8        Executed this 24th day of October 2023, in _____Austin_____, _____Texas_____.

9

10

11                                        _____

12                                              Seth James Nielson, Ph.D.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

CRIMSON VISTA
CYBERSECURITY ENGINEERING

# Seth James Nielson's Vita

(512) 387-4310

seth@crimsonvista.com

January 2022

## Academic Degrees

| 2010 | **Ph.D. Computer Science,** Rice University, Houston, TX |
| 2004 | **M.S. Computer Science,** Brigham Young University, Provo, UT |
| 2000 | **B.S. Computer Science,** Brigham Young University, Provo, UT |

## Certifications

CISSP

## Current Appointments

| Founder and Chief Scientist | Crimson Vista, Inc. |
| Director of Cybersecurity Research | Curuvar LLC |
| Adjunct Assistant Professor | University of Texas at Austin Computer Science |
| Cybersecurity Fellow | Robert Strauss Center for International Security and Law |

## Professional Advising

| Advisory Board | Syccure Inc. |

## Non-profit and Community Engagement

| Founding Director | The Crypto Done Right Foundation |
| Cyberlab Advisory Board | The SEED School of Maryland |

## Grants and Research Awards

Decentralizing Zero-Trust Infrastructure to Combat Advanced Persistent Threats and Malicious Insiders (Senior Personnel), NSF 2020 SBIR solicitation. Award number 2051989, Curuvar LLC.

Mitigation of Ransomware, DoD 2018.B STTR solicitation (Army), Topic: A18B-T010, Crimson Vista, $150,000 (2019)

An Enabling Repository of Cryptographic Knowledge (Co-PI), Cisco Grant, Johns Hopkins University Information Security Institute, $150,000 (2017-2021)

## University Research Funding

Sel4 Security Appliance Capstone, funded by Crimson Vista to Brigham Young University Department of Computer Science. 2021

## Academic Awards

Brown Fellowship

John and Eileen Tietze Fellowship

## Professional Service

International Cryptographic Module Conference, 2022 Program Committee
International Cryptographic Module Conference, 2021 Program Committee
International Cryptographic Module Conference, 2020 Program Committee
International Cryptographic Module Conference, 2019 Program Committee
International Cryptographic Module Conference, 2018 Program Committee

## Subject Matter Expertise and Selected Projects

Applied Cryptography

Analysis of compromised password hashes (Crimson Vista, 2020)

"Crypto Done Right", Cryptographic Knowledge Base with Cisco (Johns Hopkins, 2017-2020)

Simulated implementation of Vehicle-to-Vehicle authentication (Crimson Vista, 2018-2019)

Cryptographic protocol analysis and design for Syccure Inc. (Crimson Vista, 2017-)

Timing attacks on Hardware Security Modules with Diamond Key Security (Johns Hopkins, 2018)

Technical consulting for U.S. Dpt. of Justice (Antitrust Division, Transportation, Energy & Agriculture) (Crimson Vista, 2018)

Aircraft/drone anti-collision protocol security with OnBoard Security (Johns Hopkins, 2017)

Cryptographic communication library for Security First Corp (ISE, 2010-2011)

Encryption library, file system encryption, GPU for Security First Corp (ISE, 2005-2011)

IoT Devices and IoT Security

High-security appliance based on formal methods (Crimson Vista, BYU, 2021)

Hadoop security research (Crimson Vista, 2021-)

IoT data sensors for agricultural operations (Crimson Vista, 2020-)

Contributor, reviewer for the Institute of Assured Autonomy (Johns Hopkins, 2019)

IoT data aggregation security with Armored Things (Johns Hopkins, 2018-2019)

Automated IoT device profiling with the Physics Lab (Johns Hopkins, 2018)

Physical forensics from IoT devices (Johns Hopkins 2017)

Network Security

Secure distributed computing (Curuvar, 2021-)

Hadoop deployment and security considerations (Crimson Vista, 2021-)

SSO technology evaluation and test (UT Austin, Crimson Vista, 2021-)

Information risk assessment with respect to data breach (Crimson Vista, 2020-2021)

Data breach analysis with respect to password authentication (Crimson Vista, 2020-2021)

Network security curriculum design for Law and Policy (University of Texas at Austin, 2020-)

Network security curriculum design for undergraduates (University of Texas at Austin, 2020-)

Network security curriculum design (Johns Hopkins, 2013-2019)

Security analysis of financial services vendor for Fortune-100 client (Crimson Vista, 2018-2019)

Analysis of secure e-mail transmission for confidential client (Crimson Vista, 2018-2019)

Cloud storage system security evaluation for confidential client (Harbor Labs, 2015)

Secure gateway security and compliance evaluation for SecurityFirst Corp (Harbor Labs, 2015)

Gateway caching security/privacy engineering (Google, 2005)

<u>Malware and Viruses</u>

Ransomware recovery research and development (Crimson Vista, 2018-2019)

Advanced malware and malware defenses analysis (Johns Hopkins, 2018)

Malware Analysis for Confidential Client (Crimson Vista, 2016)

<u>Privacy</u>

Development of an auditing tool for cookies and other web tracking (Crimson Vista, 2020)

Audit of a large hospital network for cookies and web tracking (Confidential client, 2020)

Development of a privacy curriculum for data architects (Crimson Vista, 2019)

Anonymization of threat indicators with the Applied Physics Lab (Johns Hopkins, 2017)

Analysis of anti-piracy vendor for Center for Copyright Information (Harbor Labs, 2013-2014)

<u>Miscellaneous Security Technologies</u>

Distributed ledger technology for secure state replication (Curuvar, 2021-)

Blockchain technology for sale and/or licensing of intellectual property (Crimson Vista, 2021-)

Blockchain technology analysis for a start-up (Crimson Vista, 2019-2020)

Analysis of cyber security norms for a confidential Fortune 100 client (Crimson Vista, 2018-2019)

Analysis of vulnerabilities in portable chemical manufacturing system (Johns Hopkins, 2018)

Open-Source Contribution and Sponsorship for The PyPy Project (Crimson Vista, 2018-2019)

Blockchain and smart contract design for confidential start-up (Crimson Vista, 2018)

Medical device system security evaluation for confidential client (Harbor Labs, 2015)

Software Engineering and Software Analysis

Software theft analysis and tool design for various clients (Crimson Vista, 2018-)

Cyber insurance investigations for Clyde & Co (Crimson Vista, 2018-2019)

Distributed code coverage analysis tool for a confidential Fortune 100 client (ISE, 2011)

Software engineering for Metrowerks Inc. (2001-2003, formerly Lineo Inc.)

Forensic Source Code Analysis (i.e., Code/IP Theft)

CLE training related to source code analysis/trade secrets (Source Code Discovery, 2021)

Investigation of IP/code theft related to MTA, spear-phishing, and email tech (Crimson Vista, 2019-)

Investigation of code theft related to housing and rental agreement software (Crimson Vista, 2019-)

Investigation of code theft related to digital mobile radios (Crimson Vista, 2017-2021)

Investigation of code theft related to financial trading software (Crimson Vista, 2016-2017)

Investigation of code theft related to e-commerce (Harbor Labs, 2015)

Investigation of IP theft embedded in source code related to domain anti-abuse (Harbor Labs, 2015)

Investigation of IP theft embedded in source code related to high-frequency trading (Harbor Labs, 2010-2011)

## Publications

Books

Seth James Nielson, *The Technology of Cybersecurity* (Working Title). (Expected Summer 2022)

Seth James Nielson, Christopher K. Monson, *Practical Cryptography in Python, Learning Correct Cryptography by Example.* (October 2019).

Refereed Publications

Joseph Kosturko, Eric Schlieber, Sean Futch, Seth James Nielson, *Cracking a Continuous Flow Reactor: A Vulnerability Assessment for Chemical Additive Manufacturing Devices.* In *Proceedings of the 2018 IEEE International Symposium on Technologies for Homeland Security.* (September 2018)

Chanyang Shin, Prerit Chandok, Ran Liu, Seth James Nielson, Timothy Leschke, *Potential*

*Forensic Analysis of IoT Data: An Overview of Amazon Echo, Z-wave, and Home Router Data Extraction and Analysis.* In *Proceedings of the 2017 IEEE International Conference on Internet of Things (iThings)*, Exeter, UK, pp. 705-710 (June 2017).

Seth James Nielson, *PLAYGROUND: Preparing Students for the Cyber Battleground. Computer Science Education*, volume 26, issue 4, pp. 255-276, (January 2017).

Seth James Nielson and Charles D. Knutson, *Design Dysphasia and the Design Patterns Maintenance Cycle. Information & Software Technology,* volume 48, number 8, pp. 660- 675, (August 2006)

Seth James Nielson, Scott S. Crosby, and Dan S. Wallach, *A Taxonomy of Rational Attacks.* In *Proceedings of the Fourth International Workshop on Peer-to-Peer Systems (IPTPS '05)*, Ithaca, New York, (February 2005)

Seth J. Nielson and Charles D. Knutson. *OO++: Exploring the Multiparadigm Shift. Proceedings of the Workshop on Multiparadigm Programming with Object-Oriented Languages* (MPOOL 2004), Oslo, Norway, (June 2004)

Rob Kunz, Seth Nielson, Mark Clement, Quinn Snell, *Effective Bandwidth for Traffic Engineering*, *Proceedings of the IEEE Workshop on High Performance Switching and Routing (HPSR 2001),* Dallas, TX, (May 2001)

## Testimony Before Government Bodies

Testimony in support of *Maryland SB 151/HB 211 Criminal Law - Crimes Involving Computers – Ransomware.* Testimony given to the Judicial Proceedings Committee of the Maryland Senate and the Judiciary Committee of the Maryland House of Delegates (January/February 2019)

## Invited Talks, Panels, and Technical Training

Seth James Nielson, *Maintaining Data Security and Data Privacy in the 21st Century*, 2022 Enterprise Data World, San Diego, CA (March 2022)

Seth James Nielson, *Securing Your Data Assets Against Hackers*, 2021 Enterprise Data World, Boston, MA. (April 2021)

Seth James Nielson, *The Cybersecurity of IP*, 2020 Essential Cybersecurity Law, Austin, TX (Virtual). (July 2020)

[**CANCELED DUE TO COVID 19**] Seth James Nielson and Ellie Daw, *Correct Cryptography in Python*, a Tutorial for Cryptography Beginners, PyCon 2020, Philadelphia, PA. (April 2020)

[**CANCELED DUE TO COVID 19**] Seth James Nielson, *Protecting Your Data Assets*, 2020 Enterprise Data World, Boston, MA. (March 2020)

Seth James Nielson, *Security and Privacy for Data Architects*, 2019 Data Architecture Summit, Chicago, IL (October 2019)

Seth James Nielson, Crypto Done Right, One Year In. Lessons Learned and Next Steps. Presented in the International Cryptographic Knowledge Base 2019 (ICMC 2019), Vancouver, Canada (May 2019)

Panel Discussion, *Hardening US Unmanned Systems Against Enemy Counter Measures*. Accepted invitation to 7th Annual DoD Unmanned Systems Summit, Alexandria, VA (April 2019).

Seth James Nielson, *A Gentle Introduction to Blockchain.* 2019 Enterprise Data World, Boston, MA (March 2019).

Seth James Nielson, *A Gentle Introduction to Blockchain.* 2018 Data Architecture Summit, Chicago, IL (October 2018).

Seth James Nielson, *Detecting Malicious Sandboxes*. Workshop on Defensive Deception and Trust in Autonomy, San Diego, CA (August 2018).

Seth James Nielson and Debra Baker, *Towards a Crowd-Sourced Cryptographic Knowledge Base*. Presented in the International Cryptographic Knowledge Base 2018 (ICMC18), Ottawa, Canada (May 2018).

Seth James Nielson, *The PyPy Sandbox*. Presented in the National Centers of Academic Excellence Tech Talk, Online (March 2018).

Theses

*PhD Thesis:* Designing Incentives for Peer-to-Peer Systems (defended 10/2009)
*Master's Thesis:* OO++ Design Patterns, GOF Revisited (defended 8/2004)

Technical Reports

Seth James Nielson and Dan S. Wallach, The BitTorrent Anonymity Marketplace, arXiv Technical Report 1108.2718, (August 2011)

Seth James Nielson, Caleb E. Spare, and Dan S. Wallach, Building Better Incentives for Robustness in BitTorrent, arXiv Technical Report 1108.2716, (August 2011)

Seth James Nielson, Seth J. Fogarty, and Dan S. Wallach, *Attacks on Local Searching Tools*, arXiv Technical Report 1108.2704 (Originally produced in December, 2004, available on arXiv as of August 2011)

White Papers and Trade Publications

Seth James Nielson, *Techniques for Discovering Unauthorized Copying in Software*, Crimson Vista White Paper, (January 2022)

Aviel D. Rubin, Seth J. Nielson, Christopher K. Monson, *Evaluation of the MarkMonitor AntiPiracy System*, Produced for the Center for Copyright Information (December 2013)

Aviel D. Rubin, Seth J. Nielson, Sam Small, Christopher K. Monson, *Guidelines for Source Code*

*Review in Hi-Tech Litigation*, Harbor Labs White Paper (September 2013)

# Graduate Advising

Capstones for Masters of Science in Security Informatics (Johns Hopkins)

Weizhou Wang, Runjie Zhang, *Research on defense next-generation malware on the Windows platform* (December 2018)

Yu-Tsern Jou, Ying Liu, Menghan Bai, *Open Source HSM Side Channel Analysis* (December 2018)

Bowen Shi, Hong Ma, Mengqi Qin, *Side Channel Attack on HSM Based on Machine Learning* (December 2018)

Dylan Richmond, Matthew Shonman, Jingcheng Yang, *An Exploration of the Usability of HTTPS* (December 2018)

Steven Cheng, Venkata Aditya Bollapragada, and Antara Sargam, *Using Selective RAM Journaling to Fight Ransomware* (December 2018)

Yongqiang Fan, Haiwen Sun, *Fault Tolerance System for IoT* (December 2018)

Weike Chen, Harry Luo, Prashanth Venkateswaran, *IoT Discovery* (August 2018)

Joseph "Jay" Kosturko, Eric Schlieber, Sean Futch, *Cracking a Continuous Flow Reactor: A Vulnerability Assessment for Chemical Additive Manufacturing Devices* (May 2018)

Chao Lei, Wenjun Li, *Anti-Honeypot Detection in Advanced Botnet Attacks* (December 2017)

Ritvik Sachdev, Purushottam Kulkarni, Praveen Malhan, *Securing ADS-B Based Airborne Collision Avoidance Systems* (December 2017)

Ningyuan Bao, Mengying Hu, *Security-Testing-Orientated Internet of Things(IoT) Simulator* (December 2017)

Zehuan Li, Shanshan Yang, Liangjia Fu, *AIS Data De-anonymization* (December 2017)

Chanyang Shin, Prerit Chandok, Aurin Chakravarty, *Forensic Data Collection from IoT Devices* (December 2017)

Kevin Manzotti, Kashif Memon, Rahul Durgad, *Replication of CryptoDrop* (December 2016)

Harshneel More, Jingmiao Wang, Yuanqi Zhu, *Detecting XSS attacks using BRO IDS* (December 2016)

Asmaa Aljohani, Gyan Namdhari, Yue Zhu, *Feasibility, Security and Privacy Analysis of EMVCo Payment Tokenization Technology for Identity Enabled Transactions* (December 2016)

Richard Eaton, *The Emperor Has No Friends: Identifying Botnet Customers and Mapping Out Botnets on Twitter* (May 2015)

Jingru Chen, Yaning Liu, Yifan Yu, Zhiyue Zu, *Investigating the Heartbleed Vulnerability* (2015)

Kartik Thapar, *Security Techniques for Developing iOS Applications* (February 2015)

Jie Feng, Jianxiang Peng, Likai Zhang, *De-anonymizing BitCoin* (January 2014)

# Teaching

<u>University of Texas at Austin</u>

Cybersecurity Tech/Law Policy (2020-)
Network Security and Privacy (2020-2021)

<u>Johns Hopkins University</u>

Advanced Network Security (2017 - 2019)
Network Security (2014 – 2019)

<u>Rice University</u>

Data Structures and Algorithms (Spring 2008)

# Patents

*Co-inventor:* Nielson, S. 2021. Distributed Authentication Between Network Nodes. U.S. Patent 11,032,252 filed January 2, 2019 and issued June 8, 2021.

*Co-inventor:* Orsini, R. 2014. Systems and methods for security data in motion. U.S. Patent 8,745,372 filed November 24, 2010 and issued June 3, 2014.

*Co-inventor:* Orsini, R. 2014. Systems and methods for security data in motion. U.S. Patent 8,745,379 filed August 20, 2012 and issued June 3, 2014.

*Co-inventor:* O'Hare, R. 2014. Systems and methods for security data. U.S. Patent 8,677,148 filed January 27, 2012 and issued March 18, 2014.

# In the News

"Johns Hopkins Researchers and OnBoard Security Team Up to Protect Drones," *Robotics Tomorrow*, 3/16/2018

"Rice University Computer Scientists Find a Flaw in Google's New Desktop Search Program." *New York Times*, 12/20/2004

# Employment History

*University of Texas at Austin*
2020-                                   **Adjunct Assistant Professor**

*Source Code Discovery, LLC.*
2019-2021                         **Founder and Partner**

*Crimson Vista, Inc.*
2016-Present                    **Founder and Chief Scientist**

*Johns Hopkins Applied Physics Lab*
2018-2019                         **Senior Professional Staff (Temp/On-Call)**

*Johns Hopkins University*

| | |
|---|---|
| 2016-2019 | **Director of Advanced Research Projects** |
| 2015-2019 | **Adjunct Associate Research Scientist** |
| 2014 | **Lecturer** |

*Harbor Labs, LLC*

| | |
|---|---|
| 2014-2015 | **Principal** |
| 2011-2014 | **Research Scientist** |

*Independent Security Evaluators*

| | |
|---|---|
| 2010-2011 | **Senior Security Analyst** |
| 2005-2009 | **Security Analyst** |

*Google, Inc.*

| | |
|---|---|
| 2005 | **Summer Intern** |

*Metrowerks (Formerly Lineo, Inc.)*

| | |
|---|---|
| 2001-2003 | **Software Engineer II** |

## Expert Testimony

On behalf of Samsung in Samsung v. Proxense (2021-Present)

| | |
|---|---|
| Counsel: | Quinn Emanuel Urquhart & Sullivan, LLP |
| Venue: | Western District of Texas (Waco) |
| Subject Matter: | Authentication, Authorization, Device-to-device |
| Reports: | 1 declaration submitted October 2021 |

On behalf of Bitglass in Netskope, Inc. v. Bitglass Inc. (2021-Present)

| | |
|---|---|
| Counsel: | Irell and Manela, LLP |
| Venue: | PTAB Petition for Inter Partes Review |
| Subject Matter: | Authentication, Single-Sign-On |
| Reports: | 1 declaration submitted September 2021 |

On behalf of The State of Arizona in Arizona v. Google (2021-Present)

| | |
|---|---|
| Counsel: | Ruttenberg IP Law |
| Venue: | Superior Court of the State of Arizona (Maricopa) |
| Subject Matter: | Privacy, Location tracking, Data collection |
| Reports: | 1 declaration submitted August 2021 |

On behalf of TLC in TLC v. Koninklijke Philips N.V., US Philips Corporation (2019-2021)

| | |
|---|---|
| Counsel: | Perkins Coie LLP |
| Venue: | PTAB Petition for Inter Partes Review |
| Subject Matter: | Cryptographic protocols |
| Reports: | 1 declaration submitted February 2021 |

On behalf of Magic Micro in Monsoon v. Magic Micro (2020-2021)

| | |
|---|---|
| Counsel: | Gutnicki, LLP |
| Venue: | International Centre for Dispute Resolution |

| | |
|---|---|
| Subject Matter: | Blockchain, file storage |
| Reports: | 1 declaration submitted October 2020 |
| | 1 declaration submitted November 2020 |
| Testimony: | In arbitration December 2020 |

On behalf of Juniper in Juniper Networks Inc. v. Huawei Digital Technologies Co. (2020-Present)

| | |
|---|---|
| Counsel: | Irell and Manella, LLP |
| Venue | PTAB Petition for Inter Partes Review |
| Subject Matter: | Network perimeter defense against malware |
| Reports: | 1 declaration submitted June 2020 |
| | 1 declaration submitted July 2021 |
| Deposition: | April 2021 |

On behalf of DivX in Netflix v. DivX (2020-Present)

| | |
|---|---|
| Counsel: | Lowenstein & Weatherwax, LLP |
| Venue: | PTAB Petition for Inter Partes Review |
| Subject Matter: | Encryption of streaming media |
| Reports: | 1 declaration submitted May 2020 |
| | 1 declaration submitted December 2020 |
| | 1 declaration submitted April 2021 |
| Deposition | January 2021, February 2021 |

On behalf of Juniper in Juniper Networks Inc. v. Implicit LLC (2019-2020)

| | |
|---|---|
| Counsel: | Irell and Manella, LLP |
| Venue: | PTAB Petition for Inter Partes Review |
| Subject Matter: | Packet classification |
| Reports: | 1 declaration submitted February 2020 |

On behalf of the Dealership class in Dealer Management Systems Antitrust Litigation (2019-Present)

| | |
|---|---|
| Counsel: | Milberg Phillips Grossman LLP |
| Venue: | Case No. 18-cv-00864 (Northern District of Illinois) |
| Subject Matter: | Cybersecurity, risk assessment, third-party access |
| Reports: | 1 report submitted November 2019 |
| Deposition: | January 2020 |

On behalf of Symantec in the Trustees of Columbia University in the City of New York v. Symantec Corporation. (2018-Present)

| | |
|---|---|
| Counsel: | Quinn Emanuel Urquhart & Sullivan, LLP |
| Venue: | Case No. Civil Action No. 3:13-cv-00808-JRS (Eastern District of Virginia) |
| Subject Matter: | Deception technologies, Honeypots |
| Reports: | 1 report submitted October 2019 |
| Deposition: | January 2020 |

On behalf of Proofpoint in Proofpoint Inc. v. Vade Secure (2019-2021)

| | |
|---|---|
| Counsel: | Quinn Emanuel Urquhart & Sullivan, LLP |
| Venue: | Case No. 3:19-cv-04238 (Northern District of California) |
| Subject Matter: | Cloud-based email, malware detection, AI |
| Reports: | 1 report submitted September 2019, 1 report submitted December 2019 |

**ER635**

                    1 report submitted February 2021, 1 report submitted April 2021
        Deposition:        April 2021
        In Court:          Expert testimony August 2021

On behalf of Bitdefender in Finjan Inc. v. BitDefender Inc. (2018-2021)
        Counsel:           Susman Godfrey LLP
        Venue:             Case No. 4:17-cv-4790-HSG (Northern District of California)
        Subject Matter:    Web threat detection, malware, gateways
        Reports:           1 report submitted July 2019, 1 report submitted August 2019
        Depositions:       October 2019

On behalf of HTC in Koninklijke Philips N.V., US Philips Corporation v. HTC Corp., HTC America
Inc. (2019-2020)
        Counsel:           Perkins Coie LLP
        Venue:             Case No. 4:18-cv-01887-HSG (Northern District of California)
        Subject Matter:    Cryptographic protocols
        Reports:           1 report submitted May 2019, 1 report submitted June 2019
        Depositions:       August 2019

On behalf of Juniper in Juniper Networks Inc. v. Finjan Inc. (2018-2019)
        Counsel:           Irell and Manella, LLP
        Venue:             PTAB Petition for Inter Partes Review
        Subject Matter:    Malware, firewall/gateway, network security
        Reports:           4 declarations submitted October 2018
        Depositions:       June 2019

On behalf of Redbox in Disney Enterprises, Inc., LucasFilm Ltd, LLC, and MVL Film Finance LLC v.
Redbox Automated Retail, LLC. (2018)
        Counsel:           Robins Kaplan LLP
        Venue:             Case No. 2:17-cv-08655-DDP (AGRx) (Central District of California,
                           Western Division)
        Subject Matter:    DRM, cloud security, media streaming
        Reports:           1 declaration submitted May 2018

On behalf of Trend Micro in Trend Micro, Inc. v. Security Profiling, LLC (2017-2018)
        Counsel:           The Marbury Law Group, PLLC
        Venue:             Inter Partes Review Case No.  IPR2017-02191 and IPR2017-02192
        Subject Matter:    Automated security patches
        Reports:           2 declarations submitted September 2017
        Depositions:       June 2018

On behalf of TeleSign in Twilio Inc. v. TeleSign Corporation (2016-2021, multiple cases)
        Counsel:           Shook, Hardy & Bacon LLP
        Venue:             Inter Partes Review Case No. IPR2016-01688, IPR2016-00360, IPR2017-
                           01976 IPR2017-01977, IPR2017-01978
                           Case No. 5:16-cv-6925-LHK (Nor. District of California, San Jose Div.)
        Subject Matter:    Telecommunications security
        Reports:           1 declaration submitted August 2016, May 2017, and July 2017
        Depositions:       November 2016, July 2017, August 2017

**ER636**

On behalf of Blue Coat in Finjan Inc. v. Blue Coat Systems LLC (2017-2018)

| | |
|---|---|
| Counsel: | Originally Wilson, Sonsini, Goodrich and Rosati PC; later Morrison & Foerster LLP |
| Venue: | Case No. 15-cv-03295-BLF-SVK (Nor. District of California, San Div.) |
| Subject Matter: | Firewalls, gateway, security devices, malware |
| Reports: | 1 report submitted April 2017 |
| Depositions: | April 2017 |
| In Court: | Tech tutorial February 2017, expert testimony November 2017 |

On behalf of Sedosoft in Sedosoft Inc. v Mark Burchett LTD and NFSx9 LLC (2016)

| | |
|---|---|
| Counsel: | McInnes and McLane LLP |
| Venue: | Case No. Civil Action No. 1:15-cv-10244-RGS (District of Massachusetts) |
| Subject Matter: | Code theft |
| Reports: | 1 report submitted May 2016 and August 2016 |

On behalf of USAA in Asghari-Kamrani, et al. v. United Services Automobile Association, Inc.

| | |
|---|---|
| Counsel | Fish and Richardson PC |
| Venue: | Inter Partes Review Case No. IPR2015-01842, and CBM2016-00063, CBM2016-00064 |
| Subject Matter: | Applied cryptography, authentication |
| Reports: | 1 report submitted September 2015, 1 report submitted April 2016 |
| Depositions: | March 2017 |

On behalf of WTS Paradigm in WTS PARADIGM, LLC v EDGEAQ, LLC (2015-2016)

| | |
|---|---|
| Counsel: | Quarles & Brady LLP |
| Venue: | Case No. 3:15-CV-330 (Western District of Wisconsin) |
| Subject Matter: | Software-assisted product configuration, presentation, and ordering |
| Reports: | 1 report submitted March 2016 |
| Depositions: | April 2016 |

On behalf of Mr Leon Stambler in Mr. Leon Stambler v Mastercard IPR (2015-2016)

| | |
|---|---|
| Counsel: | Flachsbart & Greenspoon, LLC |
| Venue: | CBM2015-00044 |
| Subject Matter: | Authentication, authentication codes |
| Reports: | 1 declaration submitted October 2015 |
| Deposition: | December 2015 |

On behalf of Trusteer/IBM in Trusted Knight Corporation v. International Business Machines Corporation and Trusteer, Inc. (2015)

| | |
|---|---|
| Counsel: | Quinn Emanuel Urquhart & Sullivan LLP |
| Venue: | C.A. No. 14-1063 LPS-CJB (District of Delaware) |
| Subject Matter: | Key logging, protections against |
| Reports: | 1 declaration submitted July 2015 |

On behalf of Sensus in Sensus USA, Inc. v. Certified Measurement, LLC (2015)

| | |
|---|---|
| Counsel: | Feldman Gale PA |
| Venue: | Inter Partes Review Case No. IPR2015-01262, IPR2015-01311, IPR2015-01439, IPR2015-01454 |

Case number 3:14-cv-01069 (District of Connecticut)
Subject Matter:    Applied cryptography, certification of data
Reports:           1 declaration submitted June 2015, 4 declarations submitted July 2015

On behalf of Chad Eichenberger in Chad Eichenberger v. ESPN (2015)
Counsel:           Edelson PC
Venue:             Case No. 2:14-cv-00463 (Western District of Washington)
Subject Matter:    Consumer privacy
Reports:           1 declaration submitted January 2015

On behalf of Optimum Content Protection in Microsoft Corporation v. Optimum Content Protection
LLC. (2014)
Counsel:           Sidley Austin LLP
Venue:             Inter Partes Review No. IPR2015-00048
Subject Matter:    DRM, data streaming, protection
Reports:           1 declaration submitted October 2014

On behalf of Fortinet in Fortinet v. Sophos (2014-2015, multiple cases)
Counsel:           Quinn Emanuel Urquhart & Sullivan LLP
Venue:             Inter Partes Review No. IPR2015-00618
                   Case No. 3:13-cv-05831-EMC (DMR) (Nor. District of California, SF div.)
                   Case No. 1:14-cv-00100-GMS (District of Delware)
Subject Matter:    Antivirus, anti-malware
Reports:           2 declarations submitted September 2014, 1 submitted September 2015
                   1 report submitted October 2015, November 2015
Depositions:       October 2014, October 2015
In Court:          Tech tutorial December 2015

On behalf of Afilias in Afilias PLC v Architelos Inc and Alexa Raad (2015)
Counsel:           Haynes Boone LLP
Venue:             Case No. 1:15-cv-00014-LMB-JFA (Eastern District of Virginia)
Subject Matter:    Domain name system anti-abuse
Reports:           1 report submitted April 2015, May 2015
Depositions:       June 2015
In Court:          Expert testimony August 2015

On behalf of Telit in M2M v. Motorola, Telit (2015-2016)
Counsel:           Pearl Cohen Zedek Latzer Baratz LLP
Venue:             Case No. 12-033-RGA (District of Delaware)
Subject Matter:    Authentication
Reports:           1 declaration submitted May 2014,
                   1 report submitted July 2014, August 2014
Depositions:       June 2015

On behalf of Rmail/Rpost in Rmail Limited, v.  Amazon.com, Inc., and Paypal and Rmail Limited,
Rpost Communications Limited, and Rpost Holdings Inc., v.Docusign, Inc. (2013-2014)
Counsel:           Hudnell Law Group PC
Venue:             Case No. 2:10-CV-258-JRG (Lead Case)
                   Case No. 2:11-CV-299-JRG (Member Case) (E.D. Texas)

Subject Matter:    Email security
Reports:           2 reports April 2013, 1 declaration June 2013
Depositions:       May 2013 (2 days)

On behalf of Via Vadis in Via Vadis v. Skype (2012-2014)
Counsel:           WTP Law
Venue:             Via Vadis v. Skype, Case No. 11-507 (RGA) (District of Delaware)
Subject Matter:    P2P communications
Reports:           1 affidavit December 2012

# Exhibit B

**<u>Materials Considered</u>**

- Complaint filed in this action;

- Declaration of Aaron Perahia in support of OpenAI's motion for a preliminary injunction and exhibits thereto, including Exhibits C-F;

- Declaration of Guy Ravine in opposition to OpenAI's motion for a preliminary injunction and exhibits thereto, including Exhibits 2-7;

- All links, books, websites, materials, exhibits, and sources referenced in my declaration, including Exhibits A-K;

- Google searches and results;

- Internet Archive searches and records;

- Records depicting Defendants' websites and tools.

# Exhibit C





# 502 Bad Gateway

nginx/1.0.10



# 502 Bad Gateway

nginx/1.0.10

# Exhibit D



In the 18th century, the joint stock company. In the 19th century, long range communication. In the 20th century, digital information systems. These meta-innovations enabled larger and larger groups of people to innovate together. This in turn accelerated humanity's progress and allowed Earth to support an ever prospering civilization. We believe the meta innovation of the 21st century will take this principle to its logical extreme.

# Exhibit E















# Exhibit F











We have built the tools to enable ordinary people to **wikineer** the products and services they use to make them better.







# Exhibit G



....

# Exhibit H



# Exhibit I

# MATHEMATICS OF AUTONOMY

## Mathematical Methods for Cyber-Physical-Cognitive Systems

Vladimir G Ivancevic

Darryn J Reid

Michael J Pilling

Defence Science & Technology Group, Australia



**World Scientific**

NEW JERSEY · LONDON · SINGAPORE · BEIJING · SHANGHAI · HONG KONG · TAIPEI · CHENNAI · TOKYO

**ER669**

Copyrighted material

*Published by*

World Scientific Publishing Co. Pte. Ltd.

5 Toh Tuck Link, Singapore 596224

*USA office:* 27 Warren Street, Suite 401-402, Hackensack, NJ 07601

*UK office:* 57 Shelton Street, Covent Garden, London WC2H 9HE


**Library of Congress Cataloging-in-Publication Data**

Names: Ivancevic, Vladimir G., author. | Reid, Darryn J., author. | Pilling, M. J., author.

Title: Mathematics of autonomy : mathematical methods for cyber-physical-cognitive systems /
    by Vladimir G. Ivancevic (Defence Science & Technology Group, Australia),
    Darryn J. Reid (Defence Science & Technology Group, Australia),
    Michael J. Pilling (Defence Science & Technology Group, Australia).

Description: [Hackensack] New Jersey : World Scientific, [2017] |
    Includes bibliographical references and index.

Identifiers: LCCN 2017039522 | ISBN 9789813230385 (hardcover : alk. paper)

Subjects: LCSH: Intelligent control systems--Mathematics. | Self-organizing systems--
    Mathematical models. | Cooperating objects (Computer systems)

Classification: LCC TJ217.5 .I93 2017 | DDC 003/.7--dc23

LC record available at https://lccn.loc.gov/2017039522


**British Library Cataloguing-in-Publication Data**

A catalogue record for this book is available from the British Library.

Copyright © 2018 by World Scientific Publishing Co. Pte. Ltd.

*All rights reserved. This book, or parts thereof, may not be reproduced in any form or by any means, electronic or mechanical, including photocopying, recording or any information storage and retrieval system now known or to be invented, without written permission from the publisher.*

For photocopying of material in this volume, please pay a copying fee through the Copyright Clearance Center, Inc., 222 Rosewood Drive, Danvers, MA 01923, USA. In this case permission to photocopy is not required from the publisher.


Printed in Singapore

**ER670**

Copyrighted material

$W_{hh}$ is the hidden-hidden weight matrix, $b_h$ is the hidden bias vector and $\mathcal{H}$ is the hidden layer function.

### 5.1.4  Convolutional Neural Networks (ConvNets)

Since their introduction in the early 1990's by [LBD89] *convolutional neural networks* (ConvNets)[3] have demonstrated excellent performance at tasks such as hand-written digit classification and face detection.

   A ConvNet is composed of one or more convolutional layers with fully connected layers (matching those in typical artificial neural networks) on top. It also uses tied weights and pooling layers. This architecture allows ConvNets to take advantage of the 2D structure of input data. In comparison with other deep architectures, convolutional neural networks are starting to show superior results in both image and speech applications. They can also be trained with standard backpropagation. ConvNets are easier to train than other regular, deep, feed-forward neural networks and have many fewer parameters to estimate, making them a highly attractive architecture to use.

   ConvNets are usually trained by stochastic gradient descent and usually contain different types of layers, including (see [Wik16p] and the references therein):

1. The *convolutional layer*: Unlike a hand-coded *convolution kernel* (e.g., Sobel), in a convolutional neural net, the parameters of each convolution kernel is trained by the backpropagation algorithm. There are many convolution kernels in each layer, and each kernel is replicated over the entire image with the same parameters. The function of the convolution operators is to extract different features of the input. The capacity of a neural net varies, depending on the number of layers. The first convolution layers will obtain the low-level features, like edges, lines and corners. The more layers the network has, the higher-level features it will get.
2. The *ReLU layer* (of rectified linear units): This is a layer of neurons that use the non-saturating activation function $f(x) = max(0, x)$. It increases the nonlinear properties of the decision function and of the overall network without affecting the receptive fields of the convolution layer. Other functions are used to increase nonlinearity. For example the saturating hyperbolic tangent: $f(x) = tanh(x), f(x) = |tanh(x)|$, and the sigmoid function: $f(x) = (1 + e^{(-x)})^{(-1)}$. Compared to tanh units, the advantage of ReLU is that the neural network trains several times faster.

[3] The design of convolutional neural networks follows the discovery of visual mechanisms in living organisms. In particular the visual cortex in the brain contains large number of neural cells, which are responsible for detecting light in small, overlapping sub-regions of the visual field, called *receptive fields*. These cells act as local filters over the input space. The more complex cells have larger receptive fields. A *convolution operator* is created to perform the same function by all of these cells.

Copyrighted material

112     5  Cyber-Cognitive CPC-Autonomy

3. The *pooling layer*: In order to reduce variance, pooling layers compute the max or average value of a particular feature over a region of the image. This will ensure that the same result will be obtained, even when image features have small translations. This is an important operation for object classification and detection.

4. The *dropout layer*: Since a fully connected layer occupies most of the parameters, it is prone to overfitting. The dropout method is introduced to prevent overfitting. Dropout also significantly improves the speed of training. This makes model combination practical, even for deep neural nets. Dropout is performed randomly. In the input layer, the probability of dropping a neuron is between 0.5 and 1, while in the hidden layers, a probability of 0.5 is used. The neurons that are dropped out, will not contribute to the forward pass and back propagation. This is equivalent to decreasing the number of neurons. This will create neural networks with different architectures, but all of those networks will share the same weights.

5. The *loss layer*: It can use different loss functions for different tasks. Softmax loss is used for predicting a single class of K mutually exclusive classes. Sigmoid cross-entropy loss is used for predicting K independent probability values in [0,1]. Euclidean loss is used for regressing to real-valued labels $[-inf, inf]$.

In particular, *convolutional deep belief networks* (CDBNs) are structurally very similar to normal ConvNets. Therefore, like ConvNets they are also able to exploit the 2D structure of images combined with the advantage gained by pre-training in a DBN. They provide a generic structure which can be used in many image and signal processing tasks and can be trained in a way similar to that for DBNs. Recently, many benchmark results on standard image datasets like CIFAR have been obtained using CDBNs (see [Wik16p] and the references therein).

In the recent years, several papers have shown that ConvNets can also deliver outstanding performance on more challenging visual classification tasks. In particular, [CMS12] have demonstrated state-of-the-art performance on NORB and CIFAR-10 datasets, while [KSH12] have showed record beating performance on the ImageNet 2012 classification benchmark, with their ConvNet model achieving an error rate of 16.4%, compared to the 2nd place result of 26.1%. Several factors are responsible for this renewed interest in ConvNet models:

1. The availability of much larger training sets, with millions of labeled examples;
2. Powerful GPU implementations, making the training of very large models practical; and
3. Better model regularization strategies, such as Dropout (see [HSK12] and the references therein).

**ER672**

Copyrighted material

Case: 24-1963, 05/08/2024, DktEntry: 15.5, Page 118 of 235
Case 4:23-cv-03918-YGR   Document 47-10   Filed 10/24/23   Page 1 of 5

(118 of 235)

# Exhibit J

# Defendants' "Reconstruction"



## Convolutional layer [edit]

Unlike a hand-coded convolution kernel (Sobel, Prewitt, Roberts), in a convolutional neural net, the parameters of each convolution kernel are trained by the backpropagation algorithm. There are many convolution kernels in each layer, and each kernel is replicated over the entire image with the same parameters. The function of the convolution operators is to extract different features of the input. The capacity of a neural net varies, depending on the number of layers. The first convolution layers will obtain the low-level features, like edges, lines and corners. The more layers the network has, the higher-level features it will get.

---

1. The *convolutional layer*: Unlike a hand-coded *convolution kernel* (e.g., Sobel), in a convolutional neural net, the parameters of each convolution kernel is trained by the backpropagation algorithm. There are many convolution kernels in each layer, and each kernel is replicated over the entire image with the same parameters. The function of the convolution operators is to extract different features of the input. The capacity of a neural net varies, depending on the number of layers. The first convolution layers will obtain the low-level features, like edges, lines and corners. The more layers the network has, the higher-level features it will get.



# Mathematics of Autonomy

## Mathematical Methods for Cyber-physical-cognitive Systems
### By Vladimir G. Ivancevic, Darryn J. Reid, M. J. Pilling · 2017

ER674

# Defendants' "Reconstruction"



**ReLU layer** [edit]

ReLU is the abbreviation of Rectified Linear Units. This is a layer of neurons that use the non-saturating activation function f(x)=max(0,x). It increases the nonlinear properties of the decision function and of the overall network without affecting the receptive fields of the convolution layer.

Other functions are used to increase nonlinearity. For example the saturating hyperbolic tangent f(x)=tanh(x), f(x)=|tanh(x)|, and the sigmoid function f(x)=(1+e^{-x} )^{-1}. Compared to tanh units, the advantage of ReLU is that the neural network trains several times faster.

2. The *ReLU layer* (of rectified linear units): This is a layer of neurons that use the non-saturating activation function $f(x) = max(0, x)$. It increases the nonlinear properties of the decision function and of the overall network without affecting the receptive fields of the convolution layer. Other functions are used to increase nonlinearity. For example the saturating hyperbolic tangent: $f(x) = tanh(x)$, $f(x) = |tanh(x)|$, and the sigmoid function: $f(x) = (1 + e^{(-x)})^{(-1)}$. Compared to tanh units, the advantage of ReLU is that the neural network trains several times faster.



# Mathematics of Autonomy

Mathematical Methods for Cyber-physical-cognitive Systems
By Vladimir G. Ivancevic, Darryn J. Reid, M. J. Pilling · 2017

**ER675**

# Defendants'
# Reconstructed Text



## Pooling layer [edit]

In order to reduce variance, pooling layers compute the max or average value of a particular feature over a region of the image. This will ensure that the same result will be obtained, even when image features have small translations. This is an important operation for object classification and detection.

3. The *pooling layer*: In order to reduce variance, pooling layers compute the max or average value of a particular feature over a region of the image. This will ensure that the same result will be obtained, even when image features have small translations. This is an important operation for object classification and detection.



# Mathematics of Autonomy
Mathematical Methods for Cyber-physical-cognitive Systems
By Vladimir G. Ivancevic, Darryn J. Reid, M. J. Pilling · 2017

# Defendants' "Reconstructed" Text



**Dropout method** [edit]

Since a fully connected layer occupies most of the parameters, it is prone to overfitting. The dropout method is introduced to prevent overfitting. At each training stage, individual nodes are either "dropped out" of the net with probability 1-p or kept with probability p, so that a reduced network is left; incoming and outgoing edges to a dropped-out node are also removed. Only the reduced network is trained on the data in that stage. The removed nodes are then reinserted into the network with their original weights.

4. The *dropout layer*: Since a fully connected layer occupies most of the parameters, it is prone to overfitting. The dropout method is introduced to prevent overfitting. Dropout also significantly improves the speed of training. This makes model combination practical, even for deep neural nets. Dropout is performed randomly. In the input layer, the probability of dropping a neuron is between 0.5 and 1, while in the hidden layers, a probability of 0.5 is used. The neurons that are dropped out, will not contribute to the forward pass and back propagation. This is equivalent to decreasing the number of neurons. This will create neural networks with different architectures, but all of those networks will share the same weights.



## Mathematics of Autonomy

Mathematical Methods for Cyber-physical-cognitive Systems
By Vladimir G. Ivancevic, Darryn J. Reid, M. J. Pilling · 2017

**ER677**

# Exhibit K





# The online home for your community

We make it easy to connect and collaborate anytime, anywhere

**Build your community**



# Thriving communities made easy

## Features for every use case

Discourse enables thoughtful discussion and meaningful





discussion and meaningful connections with features for every use case, from tracking product feedback to sharing your latest creations, now with the added support of AI.

## Endless ways to customize

Keep the discussion healthy, on-track, and free from any inappropriate content with our best-in-class moderation tools and AI.

*Learn more about our features →*

## Quick chats and thoughtful discussions

An integrated experience for chat and long form discussions enables members to build relationships while your community builds knowledge.

 

I use Discourse every single day. It's a wonder!

**Seth Godin**
Entrepreneur, Author & Teacher

**Build your community**

# A community you own



**Fully open source**



**Truly portable data**



**Unlimited conversation**

The entire Discourse codebase is open and freely available to the public—forever.

No matter where your forum lives, you retain full ownership of your data.

No lock-in, no hidden fees, no data sent to advertisers.

history

Always have full access to your community's conversation history—no questions asked.

## Trusted by Enterprise customers

You get the infrastructure and support needed to ensure the success of your unique community

**Learn more**





Discourse is the most amazing thing we have ever used. We have never experienced software so reliable. Ever.

**Jonathan Bulava**
Developer Advocacy at Twitch

# World-class hosted customer support

With our responsive and helpful technical advocates by your side,

no problem goes unconquered.

    

 I wanna shout out the team at @discourse. Often we see Twitter used as a resource to commiserate on bad experiences with services but it's wonderful to amplify the extraordinary. Every time I've needed help, the team at Discourse has been super responsive and helpful. Y'all rock.

**Hayley Rosenblum**
@HayleyFiasco

**Build your community**

# You're in good company

Every day 50 new Discourse forums are created

Discourse now powers over 20,000 online communities of all shapes and sizes, including:

   

See more of our customers

**ER682**

Discourse is a world-class, modern, community platform that has been my choice for many of my clients. What's more, they are a great team, and continuously innovate in making Discourse even better year-after-year. Highly recommended!



**Jono Bacon**
Community Strategy Consultant and Author of
People Powered

Read more success stories

## Over 3.4 million posts created and 520 million page views served in May on our hosting!

## Sign up for our newsletter!

Get community tips and product updates delivered to your inbox

Your email      **Sign me up!**

We'll use your email to send communications about the launch and future marketing

materials from us. Don't worry, we won't share your email with anyone else and you can opt-out anytime by clicking "unsubscribe".

Discourse is 100% free, **open-source** forum software. Forever. Meet the **team that builds it**.

**Features & Pricing**

Pricing

Features

Plugins

Migrations

Integrations

API

**Company**

What is Discourse?

Who we are

Customers

Wall of love

Partners

Careers

Blog

**Community & Support**

Demo sandbox

Community

Contact us

Releases

Follow us on Twitter

Discourse on GitHub

Content is by-nc-sa, Discourse logo and "Discourse Forum" ®, Civilized Discourse Construction Kit, Inc.

Built with love, Internet style | Privacy Information | Copyright Policy | Accessibility | Status

# Exhibit L



# Exhibit M



Try Google Search Console
www.google.com/webmasters/
Do you own **beta.open.ai**? Get indexing and ranking data from Google.

open.ai
https://beta.open.ai ⋮

CryptoArt
A decentralized authentication system for high-value digital art that leverages the security of the blockchain and the tradability of cryptocurrency.



Google promotion

**Try Google Search Console**
www.google.com/webmasters/
Do you own **decentralized.open.ai**? Get indexing and ranking data from Google.

Your search - **site:decentralized.open.ai** - did not match any documents.

Suggestions:

- Make sure all words are spelled correctly.
- Try different keywords.
- Try more general keywords.







QUINN EMANUEL URQUHART & SULLIVAN, LLP
Robert P. Feldman (Bar No. 69602)
 bobfeldman@quinnemanuel.com
Margret M. Caruso (Bar No. 243473)
 margretcaruso@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:    (650) 801-5000

Robert M. Schwartz (Bar No. 117166)
 robertschwartz@quinnemanuel.com
Aaron H. Perahia (Bar No. 304554)
 aaronperahia@quinnemanuel.com
865 S. Figueroa St., 10th Fl.
Los Angeles, California 90017-2543
Telephone:    (213) 443-3000

Sam S. Stake (Bar No. 257916)
 samstake@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4624
Telephone:    (415) 875-6600

Dylan I. Scher (*pro hac vice*)
 dylanscher@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:    (212) 849-7000

*Attorneys for OpenAI, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OPENAI, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>vs.<br><br>OPEN ARTIFICIAL INTELLIGENCE, INC., a Delaware corporation; and GUY RAVINE, an individual,<br><br>Defendants. | Case No. 4:23-CV-03918-YGR<br><br>Assigned to Hon. Yvonne Gonzalez Rogers<br><br>**DECLARATION OF DYLAN I. SCHER IN SUPPORT OF OPENAI, INC.'S REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:       November 7, 2023<br>Time:       1:00 p.m.<br>Place:      Courtroom 1 (4th Fl.)<br>               1301 Clay St.<br>               Oakland, CA 94612 |

**<u>DECLARATION OF DYLAN I. SCHER</u>**

I, Dylan I. Scher, declare as follows:

1.     I am a member of the State Bar of New York and am admitted to practice before this court *pro hac vice*. I am an associate at Quinn Emanuel Urquhart & Sullivan LLP, counsel for Plaintiff OpenAI, Inc. ("OpenAI") in the above-captioned action. I submit this declaration in support of OpenAI's Reply in Support of its Motion for Preliminary Injunction (the "Motion") against Defendants Open Artificial Intelligence, Inc. and Guy Ravine (together, "Defendants") in this action. I have personal knowledge of the facts stated herein except as noted, and if called as a witness, I could competently testify to them.

2.     Attached as **Exhibit A** is a true and correct excerpt of a document titled "Petition to Director," filed by Open Artificial Intelligence Inc. in connection with trademark application Ser. No. 98/210,091, published on and made publicly accessible at the URL https://tsdr.uspto.gov/documentviewer?caseId=sn98210091&docId=PDR20231011181023&linkId=1#docIndex=0&page=1. I caused this URL to be visited, and this document downloaded, on October 24, 2023.

3.     Attached as **Exhibit B** is a true and correct copy of a document titled "Trademark specimens overview for experienced filers" from the United States Patent and Trademark Office ("PTO"), published on and made publicly accessible at the URL https://www.uspto.gov/sites/default/files/documents/specimen-webinar-30March2021.pdf. I caused this URL to be visited, and this document downloaded, on October 23, 2023.

4.     I created a chart summarizing evidence relating to Defendants' claimed uses of "Open AI" before November 2022, which is attached as **Exhibit C**.

5.     Attached as **Exhibit D** is a true and correct compilation of printouts of online articles from 2023, obtained from https://www.cnn.com/2023/07/26/tech/ai-industry-group/index.html, https://variety.com/2023/digital/news/white-house-ai-safety-google-meta-openai-amazon-1235676401/, and https://www.vox.com/future-perfect/2023/3/25/23665082/ai-openai-gpt-4-safety-microsoft-facebook-meta. I caused these URLs to be visited, and these documents printed, on October 23, 2023.

1    I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct.  Executed on October 24, 2023, at New York, New York.

3

4

5                                                        _____

6                                                        Dylan I. Scher

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DYLAN I. SCHER ISO OPENAI'S MOTION FOR A PRELIMINARY INJUNCTION
ER693

# EXHIBIT A

Case: 24-1963, 05/08/2024, DktEntry: 15.5, Page 140 of 235
Case 4:23-cv-03918-YGR   Document 48-1   Filed 10/24/23   Page 2 of 4

(140 of 235)



Open AI

## GP

**General Purpose Face ID**

## AS

**Automated Store**

## AS

**AI Super Renderer**

## TM

**Task: Masks**

This is a test

## TN

**The Network**

Defining the Network

## RE

**Rachel est**

Testing

10/4/23, 7:21 AM                                        Open AI



**ER697**

# EXHIBIT B





# Trademark specimens overview for experienced filers

Mark Rademacher,

Legal Policy staff attorney

Renee Servance,

Law Office 112 managing attorney





# Why specimens

- Specimens are evidence of how a mark is used in commerce.

- The United States Patent and Trademark Office (USPTO) evaluates specimens to make sure a registration accurately reflects how a mark is used in the marketplace.



4



# Definition of "use in commerce"

- The bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark.

ER702





# Use in commerce

- Continuing obligation even after a mark is registered

- Limited exception for excusable nonuse

- Special circumstances beyond the owner's control or forced by outside causes

- Impact from COVID-19 may qualify

6





# Use in commerce

- The rules require "one specimen per class showing the mark as actually used in commerce on or in connection with the goods or services identified."

7





# Use in commerce on goods

- A mark shall be deemed to be in use in commerce on goods when:
  - It is placed in any manner on the goods, or their containers, or the displays associated therewith; or on the tags or labels affixed thereto; or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale; and
  - The goods are sold or transported in commerce.

8





# Use in commerce on services

- A mark shall be deemed to be in use in commerce on services when:
  - It is used or displayed in the sale or advertising of services and the services are rendered in commerce; or the services are rendered in more than one state; or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

9

uspto

# Specimens for goods

- Use on the goods or on packaging or containers for the goods

- Use on a point of sale display of the goods

- Use on an electronic point of sale display of the goods



# Specimens for goods – mark is on the goods





**ER708**



# Specimens for goods – mark is on the container





**ER709**



# Labels and tags

- Unattached labels and tags are acceptable so long as there is sufficient information to show use in commerce.

- If the appearance of the label or tag suggests the goods are not in actual use in commerce, the examining attorney will refuse registration.

13



# Labels and tags - acceptable



14



# Labels and tags - unacceptable



ER712

# Specimens for goods – physical displays

- Displays associated with the goods essentially comprise point-of-sale material such as banners, shelf-talkers, window displays, menus, and similar devices.

- A display must show use of the mark directly associated with the goods and at the point of sale.

16



# Specimens for goods – catalogs and electronic displays

- A webpage or catalog that displays a product can constitute a "display associated with the goods" if it:
  - Contains a picture or textual description of the identified goods
  - Shows the mark in association with the goods
  - Provides a means for ordering the identified goods

17



# Electronic display



The mark associated with the goods

The means for purchasing the goods

Picture or description of the goods



**FEATURED PRODUCTS**
**COLE HAAN CH4013**

A classic rectangle in stainless steel, this frame features flexible "Ti-Flex" technology in the bridge.

$229.00

**TAKE A CLOSER LOOK**

18

**ER715**

# Means for purchasing the goods



19

ER716



# Specimens for goods – components or ingredients

- A specimen that shows use of a mark to identify a component or ingredient of finished goods is not acceptable for the finished goods.

- For components or ingredients as goods, "it is particularly important that the specimen contain some visual or verbal identification of the component to create the required direct association between the mark and the identified goods."

20

uspto



# **Advertisements**

- Advertising material is generally not acceptable as a specimen for goods and can only be accepted if it comprises a point of sale display.

- Examples:
  - Advertising circulars
  - Brochures
  - Press releases
  - Business cards
  - Invoices

21



# Poll: Would you refuse?



If there is no means for ordering the mark, the display is advertising for goods.



**ER719**



# Specimens for services

Service mark specimens may show use by showing the mark:

- Used or displayed as a service mark in the **sale of the services,** which includes use in the course of rendering or performing the services

- **Used or displayed in advertising the services,** which encompasses marketing and promotional materials



23



# Service mark specimens

- The mark must be presented sufficiently prominent on the specimen – mark placement, size, or stylization are considered.

- The specimen must show the mark used in a manner that creates in the minds of potential consumers a direct association between the mark and the services.

24





# Service mark specimens

Advertising the services:

- To establish the requisite direct association:

  – The specimen must contain a reference to the services.

  – The mark must be used on the specimen to identify the services and their source.

uspto



# Service mark specimens

Rendering the services:

- Direct association may be:
  - Indicated by the **context or environment** in which the services are rendered
  - Inferred based on the consumer's general knowledge of how certain services are provided or from the consumer's prior experience in receiving the services.

26



# Acceptable specimens for services



27



# Unacceptable specimen for services



**ER725**



# Unacceptable specimen for services

"Our sincere commitment to all our customers is that we will continue delivering innovative system utilities that are as simple to use as they are powerful and reliable. We also promise that we will keep providing the first-class free software and online service, for personal or non-commercial use."

"We pursue the genuine ambition of becoming one of the world's top utility producers and Windows system service providers on the Internet."

29

ER726





# Specimens for services - signage

- Mark appearing on the front door of applicant's offices without reference to the services is unacceptable.
  - The door is advertising, which must create an association between the mark and the services.
  - Display on the door is not using the mark in rendering the services. The door is unconnected to any service without prior knowledge of an existing client.

uspto

30

ER727



# Software specimens

- Software must be specifically identified as recorded or downloadable, which is a good, or as providing online non-downloadable software, which is a service.

- An acceptable specimen for software services may not be acceptable for recorded or downloadable software.

31



# **Software specimens - goods**

- ## Recorded or downloadable software:

  - ### Mark may be on the packaging or the recording itself

  - ### Mark may be in a display screen for the software or screenshot of software running

  - ### Downloadable from an app or webpage

    - Must create an association between the mark and the software

    - Must provide means to purchase or download

32



**ER729**



# Software specimens - goods

- Means to purchase or download:

  - Purchaser must see the mark contemporaneously with the ability to purchase.

  - A "Request a demo" button is not sufficient.

  - Ordinary meaning of demo suggests an opportunity to see how the product works, not purchase.

33

**ER730**



# Software specimens - example



Mark:  PORTAL

Goods: Downloadable software enabling users to create, edit, distribute, shape, exhibit, transmit, annotate, download, store, comment on, license, and monetize digital media content via computer, mobile device, and communications networks



34

**ER731**

# Poll: Why would you refuse this specimen?



Mark:  BOT-NET

Goods:  Downloadable computer game software via a global computer network and wireless devices

Specimen:  Digital images of a website currently used in commerce.

35

**ER732**



# Software specimens – manuals

– Software user manuals may be acceptable.

– May not be acceptable where wording on the specimen called into question whether the specimen was actually a manual for software.

36



# Software specimens – manuals



Mark:  USER FIRST

Goods:  Computer software, namely, software development tools for the creation of mobile internet applications and client interfaces.

Specimen is described as a scanned first page of a PDF instruction manual.

Wording "Certification Training Lab:" made it doubtful that these materials would be recognized as a user manual.

37

ER734



# Online non-downloadable software specimens

- Providing temporary use of non-downloadable software is a service.

- Specimens are analyzed form the view point of the purchaser.

- The mark must be shown "in a manner that would be perceived by potential purchasers as identifying the applicant's services and indicating their source."

38




Case 4:23-cv-03918-YGR   Document 48-2   Filed 10/24/23   Page 39 of 78

# Online non-downloadable software specimens

- Advertising is acceptable if the mark is directly associated with the services.
- Sign-in screens are acceptable specimens if:
  - Display of the mark on the sign-in screen alone sufficient to associate the services with the mark
  - Generally known means of accessing online software
  - Textual description of the software is helpful, but not necessary





# Online non-downloadable software specimens – example



Mark: 

Services: Providing temporary use of online non-downloadable software for the management of records, administration and operations for schools and colleges.

URL: https://portal.onlinesmart.net/Login.aspx?ReturnUrl=%2f
Date Accessed: 9/16/2013

40



# Online non-downloadable software specimens

- Software or services:
  - The primary consideration is whether the specimen indicates that the applicant is actually performing the relevant service activities for others or allows users to perform the activity themselves.

41



# Services accessed via an App

Mark: KURBKARMA

Services: On-line matching services for connecting automobile drivers with other drivers who are, respectively, searching for or departing from parking spaces accessible via a mobile application.



42

**ER739**



# Social media specimens

- Using social media is not the same as providing social media services.

- Social media is usually a means to advertise other goods or services.

- Advertising is not acceptable for goods. Consequently, acceptable social media specimens are usually for services.

43

uspto



# Social media specimens



Mark:  SAMBURGERS

Services:  Fast-food restaurant services

Page displays the mark and associates the mark with the services.

URL:  https://www.facebook.com/SamburgersLeesville/
Date Accessed:  7/24/2018

44



**ER741**



# Social media specimens

- Point of sale displays:
  - A page from social media may be accepted for goods, provided the page satisfies the elements of a display specimen. Page must:
    - Contain a picture or textual description of the goods
    - Show the mark in association with the goods
    - Provide means for ordering the identified goods

45





# **Specimens not in use in commerce**

- Digitally created
- Digitally altered
- Mockup

Such specimens do not show actual use of the mark on or in connection with the goods or services in commerce and registration must be refused under Sections 1 and 45 of the Trademark Act.

uspto

# Definitions

- Digitally created
  - Digital drawing of a product or packaging on which the mark appears
- Digitally altered
  - Alteration of an existing digital image of a product or packaging, a display associated with the goods, or an advertisement or website
- Mockup
  - Created, typically non-digitally, to show the mark in connection with the goods

uspto

# Mockups and digitally altered specimens

- Fake specimens present several issues:
  - Fail to show mark as used in commerce
  - Affect integrity of the register
  - Fraud on the USPTO
  - Impact on validity of registration

48





# Examination procedures

- If the specimen shows articulable signs of being digitally altered, created, or a mockup, or the examining attorney finds the identical image without marks or with different marks, the examining attorney must issue:

  – A refusal under Trademark Act Sections 1 and 45 refusal

  – A request for information (RFI) under 37 C.F.R. § 2.61(b)

- In rare circumstances, an RFI may be issued without a refusal.

uspto

49

# Request for information under Rule 2.61(b)

- Information that will help examining attorney determine whether the specimen was in use under the statutory definition (and whether there is use in commerce at all):
  - Examples of use in a sales environment for goods or advertising for services
  - Documents showing payment or other consideration for the goods or services (personal or private information redacted)

50

uspto



# Applicant's response options

- A properly verified and acceptable substitute specimen with satisfactory answers to the RFI:
  - All questions and requests should be addressed.
  - If no information is available for a particular question or request, then submit a statement to that effect.
  - Redact confidential, personal, or otherwise sensitive information from submitted documents.
- Amendment to assert another basis of Section 1(b) or 44(e)

51

uspto

# Tip-offs: digitally created, digitally altered, or mockup

- No depth or surface features or otherwise missing surface features or inappropriate blank spaces

- Drawing of the goods

- Mark does not follow the contours of product or background

- Unrealistic sharp edges

- Floating appearance

- Different level of resolution or sharpness



52

# Tip-offs: digitally created, digitally altered, or mockup

- Different texture from goods
- Odd location or odd wording on the specimen or misspellings
- Use on another party's known, recognizable product
- Questionable information on websites
- Same image used with other marks or no marks
- Incongruous white or other type of border around the mark

53

uspto

# Examples



# Digitally created label vs. actual packaging

Unacceptable: Label lacks depth, surface features and product information. Effectively only a drawing of the mark

Acceptable: Specimen is a photograph of an actual box with dimension and imperfections associated with an actual box





55



ER752



# Digitally created – unrealistic images of the goods





56



# Digitally Altered – mark applied to an existing third party product



**ER754**





# Mockup – mark applied to the product in an atypical manner





58

ER733



# Poll: Would you refuse?

Mark: Heal Different

Goods: Supplements





59

**ER756**



# Poll: Would you refuse?

Mark:  STEALTH

Goods:  Golf shoes





60

**ER757**



# Poll: Would you refuse?

Mark:  GUIGA

Goods:  Knives, forks and spoons





61

**ER758**

# Poll: Would you refuse?

Mark:  HEAL DIFFERENT

Goods:  Supplements





62

**ER759**

# Poll: Would you refuse?





# **Webpage URL and access date**

- A webpage specimen must include the URL and access or print date.

- The URL and access date may be submitted:
  - Directly on the specimen webpage itself
  - Within the electronic form used to submit specimen
  - In a verified statement in a later-filed response

**ER761**



# Webpage URL and access date

- Although using the dedicated fields in the electronic filing form is recommended, the URL and access date information may be provided anywhere within the form:

  – specimen description

  – miscellaneous statement

  – arguments





# Webpage URL and access date – in the screenshot



66

**ER 763**



# Webpage URL and access date – screen-capture software



**ER764**

Case 4:23-cv-03918-YGR   Document 48-2   Filed 10/24/23   Page 68 of 78



# Webpage URL and access date

**Section 1(a)**, Use in Commerce: The applicant is using the mark in commerce on or in connection with the identified goods/services. The applicant attaches, or will later submit, one specimen as a JPG/PDF image file showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, regardless of whether the mark itself is in the standard character format or is a stylized or design mark. The specimen image file may be in color, and the image must be in color if color is being claimed as a feature of the mark.

NOTE: **The specimen must show the mark as actually used in commerce.** Examples of specimens for goods include tags, labels, instruction manuals, containers, and photographs that show the mark on the actual goods or packaging, or displays associated with the actual goods at their point of sale. Webpages may also be specimens for goods when they include a picture or textual description of the goods associated with the mark and the means to order the goods. Examples of specimens for services include advertising and marketing materials, brochures, photographs of business signage and billboards, and website printouts that show the mark used in the actual sale, rendering, or advertising of the services.

Watch the **TMIN Specimen video** explaining what is an appropriate trademark or service mark specimen for a good or service.

NOTE: For attachment, the JPG/PDF image file(s) or sound/motion file(s) showing the specimen(s) must be on your local drive.

A specimen should NOT be: (1) the same file used in the mark section; or (2) a newly-created file that shows only the mark by itself. (*Reminder*: Within the earlier mark section, if you attached an image file for a stylized/design mark or a sound/motion file, you must ensure that it only shows the mark by itself, and does not display anything that would not truly be considered part of the actual mark, e.g., a scan of a complete business card would not be an acceptable mark image, although it may be an acceptable specimen).

Remove this 1(a)

| | |
|---|---|
| **\* Attach Specimen** | Attach/Remove Specimen<br>☐ Check this box if you are mailing a non-traditional specimen using USPS because it meets the qualifications explained in the hyperlink. Sound and motion specimens are not non-traditional and MUST be submitted using this TEAS Plus form. Failure to submit a required specimen through TEAS may result in processing delays and additional fees. |
| **Description of Specimen** | |
| **Webpage Specimens** | If your specimen consists of a webpage, provide the webpage URL:<br><br>If your specimen consists of a webpage, indicate the date you accessed or printed the webpage:<br>(MM/DD/YYYY) |
| | Add Additional URLs(s) and Dates(s) |
| **\* Date of First Use of Mark Anywhere** | By the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as<br>(MM/DD/YYYY) |
| **\* Date of First Use of the Mark in Commerce** | By the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as<br>(MM/DD/YYYY) |
| | Section 44(d)<br>Foreign application exists for same goods/services | Section 44(e)<br>Foreign registration exists for same goods/services |

NOTE: To assign the selected filing basis, click on "Assign Filing Basis" button, *below*. If you selected the wrong basis, click on the "Remove this [basis]" button, *above*, and start over. To assign multiple basis, click on another basis button and complete the section (and repeat process again, if appropriate) before clicking on the "Assign Filing Basis" button.

Assign Filing Basis     Exit

**ER765**



# **Webpage URL and access date**

**Specimen File**
**Watch** the TMIN video explaining what is meant by the term "specimen". Visit the USPTO's website for information on acceptable file sizes and formats.
**Instructions:** Attach ONLY the specimen here, not the entire response to Office action. Each portion of this form serves a specific purpose for data processing reasons. Failure to follow this instruction will cause significant delays in the processing and review of your filing.

Click here to Attach Specimen(s)    0 file(s) attached

☐ Check this box if you are mailing a non-traditional specimen using USPS because it meets the qualifications explained in the hyperlink. Sound and motion specimens are not non-traditional and MUST be submitted using this form. Failure to submit a required specimen through TEAS may result in processing delays and additional fees.
Describe what the submitted specimen consists of

**ADDITIONAL INFORMATION REQUIRED FOR WEBPAGE SPECIMENS:**
Enter webpage URL(s) and date(s) of access below if it does NOT appear on the attached specimen.

If your specimen consists of a webpage, provide the webpage URL:

If your specimen consists of a webpage, indicate the date you accessed or printed the webpage:

(MM/DD/YYYY)

Add Additional URLs(s) and Dates(s)

69

**ER766**

# Webpage URL and access date

- If the webpage contains a picture of the goods bearing the mark, the URL and access date are not necessary.

- The picture must be otherwise acceptable as properly showing the mark on the goods.





# Webpage URL and access date

Mark:  GNC

Goods:  Vitamins



71

**ER768**

# Avoiding specimen pitfalls

- Review the client-provided specimen and discuss what it is with the client

- Ask if better specimens are available if what is presented is marginal

- Provide the most legible, clearly acceptable specimen you can up-front



# Avoiding specimen pitfalls

- Use entire point of sale display, not a cropped, retouched picture of the goods from a webpage

- Highlight or describe where the mark appears and where the goods or services appear or are referenced



73

# Avoiding specimen pitfalls

- Avoid submitting brochures as specimens for goods.

- Consider providing multiple specimens per class.



74

# Avoiding specimen pitfalls

- Provide a clear and accurate description of each specimen provided, explaining what the specimen shows and its context:

  – Is the specimen a photograph and what does it show?

  – Is the specimen a website excerpt or from printed promotional materials?

uspto

# Questions?

Please direct to TMPolicy@uspto.gov with the subject line "Specimens CLE presentation."



UNITED STATES
PATENT AND TRADEMARK OFFICE

uspto



# **Additional resources and feedback**

- Specimens webpage at www.uspto.gov/trademarks/laws/specimen-refusal-and-how-overcome-refusal

- TMEP at tmep.uspto.gov/RDMS/TMEP/current

- General feedback about Trademarks content: TMFeedback@uspto.gov

- Trademarks contact information available at: www.uspto.gov/trademark/contact-trademarks.

76





# EXHIBIT C

**Summary of Defendants' "Open AI" Evidence Before November 2022**

| | Description | Date Opf Asserted Use | Web Address | Image/source | Bona Fide Use In Commerce? | Image Supported by Contemporaneous Documents? | Competitive With OpenAI Product Or Service? |
|---|---|---|---|---|---|---|---|
| | **Defendants' Alleged "Use"** | | | | | | |
| 1. | **"Announcement will be made soon" page** (Opp. 5; Ravine Decl. ¶ 6, Ex. 3) | After March 26, 2015 (Opp. 5) through approximately September 2017 (Nielson Decl. ¶ 58) | open.ai |  (Ravine Decl. Ex. 3) | **No.** - Mere display of term "Open AI," no evidence of use in connection with services/products - No evidence of visitors - No evidence of users **- Rejected by PTO as unacceptable specimen of use in commerce** *See* Mot. 4; Dkt. 25-2. | **Yes.** "Archive.org screenshot reflecting the Open AI homepage as of September 5, 2015." (Ravine Decl. ¶ 6) | **No.** |
| 2. | **"Collaboration Tool"** | | | | | | |
| | "Initial Collaboration Tool" (Opp. 5; Ravine Decl. ¶ 5, Ex. 2) | "On or about March 25, 2015 … until in or around early 2016" (Opp. 5) | wikineering.org or ineed.com/ wikineering |  (Ravine Decl. Ex. 2) | **No.** - Mere display of term "Open AI," no evidence of use in connection with services/products - No evidence of visitors - No evidence of users | **No.** "Screenshot of a reconstruction that I created … in or around late August or early September 2023." (Ravine Decl. ¶ 5; *see also* Nielsen Decl., ¶¶ 49-50). Contemporaneously said "Open.AI" was "in development" and was different from Wikineering. (Brockman Decl. ¶ 4 & Ex. B) | **No.** |

1

**ER777**

| | | | | Defendants' Alleged "Use" | | | |
|---|---|---|---|---|---|---|---|
| | **Description** | **Date Opf Asserted Use** | **Web Address** | **Image/source** | **Bona Fide Use In Commerce?** | **Image Supported by Contemporaneous Documents?** | **Competitive With OpenAI Product Or Service?** |
| | "Evolved Collaboration Tool" (Opp. 6-7; Ravine Decl. ¶ 10, Ex. 5) | "from January 18, 2017, through October 2023" (Opp. 7) | beta.open.ai |  (Ravine Decl. Ex. 5) | **No.** - No evidence of use in connection with services/products - No evidence of visitors - No evidence of users | **No.** Screenshot purports to be from September 2023. Ravine Decl. ¶ 10. Defendants restricted access to website. Opp. 7 n.1. | **No.** |
| | "another AI collaboration tool" (Opp. 7-8; Ravine Decl. ¶ 11, Ex. 6) | "from October 2017, through October 2023" (Opp. 7) | decentralized. open.ai |  (Ravine Decl. Ex. 6) | **No.** - Mere display of term "Open AI," no evidence of use in connection with services/products - No evidence of visitors - No evidence of users - Unfinished website as of October 2023 (*see* Scher Decl. Ex. A) | **No.** Screenshot purports to be from September 2023 (Ravine Decl. ¶ 11). No evidence of functionality; recently submitted documents to the USPTO show that the website is not finished. *See* Scher Decl. A at 2, 3. Defendants restricted access to website. Opp. 7 n.2 | **No.** |
| 3. | **"Discussion Board"** (Opp. 6; Ravine Decl. ¶ 9, Ex. 4) | "September 2016, until in or around early 2023" (Opp. 6) | hub.open.ai |  (Ravine Decl. Ex. 4) | **No.** - No evidence of use in connection with services/products - No evidence of visitors - No evidence of users other than suspicious posts. *See* Mot. 4 | No proof that the "screenshot of Hub reflecting the use of Hub in September 2016" is not fraudulent. (Ravine Decl. ¶ 9); *cf.* Mot. 4. | **No.** |

# EXHIBIT D

10/23/23, 3:45 PM                    Google, Microsoft, OpenAI and Anthropic announce industry group to promote safe AI development | CNN Business

Case: 24-1963, 05/08/2024, DktEntry: 15.5, Page 225 of 235                    (225 of 235)
Case 4:0007v-11059-JFK-01, Document 10-4, Filed 02/20/20, Page 2 of 12

≡  **CNN**                                                                                          AudioLive TV

| Markets → | | |
|---|---|---|
| DOW | 32,961.57 | 0.50% ▼ |
| S&P 500 | 4,221.16 | 0.07% ▼ |
| NASDAQ | 13,035.30 | 0.40% ▲ |

**Fear & Greed Index →**

27

**Latest Market News →**

UAW union just ordered 6,800 workers to strike a massive Ram truck facility

Javier Milei wants Argentina to swap the peso for the US dollar. Here's what that could mean

Kim Kardashian is making Skims for men

# Google, Microsoft, OpenAI and Anthropic announce industry group to promote safe AI development

By Brian Fung, CNN

🕐 3 minute read · Published 10:47 AM EDT, Wed July 26, 2023



Biden hosts AI executives at the White House

Video Ad Feedback

04:09 · Source: CNN

**(CNN)** — Some of the world's top artificial intelligence companies are launching a new industry body to work together — and with policymakers and researchers — on ways to regulate the development of bleeding-edge AI.

The new organization, known as the Frontier Model Forum, was announced Wednesday by Google, Microsoft, OpenAI and Anthropic. The companies said the forum's mission would be to develop best practices for AI safety, promote research into AI risks, and to publicly share information with governments and civil society.

Wednesday's announcement reflects how AI developers are coalescing around voluntary guardrails for the technology ahead of an expected push this fall by US and European Union lawmakers to craft binding legislation for the industry.

ADVERTISING

Case: 24-1963, 05/08/2024, DktEntry: 15.5, Page 226 of 235                    (226 of 235)
Case 4:23-cv-03918-YGR     Document 4-4     Filed 08/29/23     Page 3 of 12



News of the forum comes after the four AI firms, along with several others including Amazon and Meta, pledged to the Biden administration to subject their AI systems to third-party testing before releasing them to the public and to clearly label AI-generated content.



**RELATED ARTICLE**
'It almost doubled our workload': AI is supposed to make jobs easier. These workers disagree

The industry-led forum, which is open to other companies designing the most advanced AI models, plans to make its technical evaluations and benchmarks available through a publicly accessible library, the companies said in a joint statement.

"Companies creating AI technology have a responsibility to ensure that it is safe, secure, and remains under human control," said Microsoft president Brad Smith. "This initiative is a vital step to bring the tech sector together in advancing AI responsibly and tackling the challenges so that it benefits all of humanity."

The announcement comes a day after AI experts such as Anthropic CEO Dario Amodei and AI pioneer Yoshua Bengio warned lawmakers of potentially serious, even "catastrophic" societal risks stemming from unrestrained AI development.

"In particular, I am concerned that AI systems could be misused on a grand scale in the domains of cybersecurity, nuclear technology, chemistry, and especially biology," Amodei said in his written testimony.

Within two to three years, Amodei said, AI could become powerful enough to help malicious actors build functional biological weapons, where today those actors may lack the specialized knowledge needed to complete the process.

The best way to prevent major harms, Bengio told a Senate panel, is to restrict access to AI systems; develop standard and effective testing regimes to ensure those systems reflect shared societal values; limit how much of the world any single AI system can truly understand; and constrain the impact that AI systems can have on the real world.

The European Union is moving toward legislation that could be finalized as early as this year that would ban the use of AI for predictive policing and limit its use in lower-risk scenarios.

US lawmakers are much further behind. While a number of AI-related bills have already been introduced in Congress, much of the driving force for a comprehensive AI bill rests with Senate Majority Leader Chuck Schumer, who has prioritized getting members up to speed on the basics of the industry through a series of briefings this summer.

Starting in September, Schumer has said, the Senate will hold a series of nine additional panels for members to learn about how AI could affect jobs, national security and intellectual property.

**MORE FROM CNN BUSINESS**


companies are winning
back their grown-up
former customers


Chinese drug firms
backed by global banks
found using leopard and
pangolin parts, group
says

**CNN BUSINESS VIDEOS**


▶ Why this company
says it's a 'failure' to
force people back to the
office


▶ Bad Bunny gets help
from big stars on 'SNL'


▶ Why this farming
buzzword might replace
terms like 'organic'


▶ How Abu Dhabi is
pedaling towards pro
cycling success

**Paid Links**

---

Search CNN...                                                🔍



Log In

Live TV

Audio

US



Jul 21, 2023 6:06am PT

## Google, Meta, OpenAI, Other Tech Companies Promise to Comply With White House's AI Safety Framework to 'Protect Americans From Harm and Discrimination'

By Todd Spangler ∨



Screenshot courtesy HBO

Amid deep concerns about the risks posed by artificial intelligence, the Biden administration has lined up commitments from seven tech companies — including OpenAI, Google and Meta — to abide by safety, security and trust principles in

developing AI.

Reps from seven "leading AI companies" — Amazon, Anthropic, Google, Inflection, Meta, Microsoft and OpenAI — are scheduled to attend an event Friday at the White House to announce that the Biden-Harris administration has secured voluntary commitments from the companies to "help move toward safe, secure, and transparent development of AI technology," according to the White House.

"Companies that are developing these emerging technologies have a responsibility to ensure their products are safe," the Biden administration said in a statement Friday. "To make the most of AI's potential, the Biden-Harris Administration is encouraging this industry to uphold the highest standards to ensure that innovation doesn't come at the expense of Americans' rights and safety."

ADVERTISEMENT



3 AI Market Disrupting Stocks

AI is becoming more powerful and smarter by the day, spurring new opportunities never seen

Note that the voluntary agreements from Meta, Google, OpenAI and the others are just that — they're promises to follow certain principles. To ensure legal protections in the AI space, the Biden administration said, it will "pursue bipartisan legislation to help America lead the way in responsible innovation" in artificial intelligence.

The agreements "are an important first step toward ensuring that companies prioritize safety as they develop generative AI systems," said Paul Barrett, deputy director of the NYU Stern Center for Business and Human Rights. "But the voluntary commitments announced today are not enforceable, which is why it's vital that Congress, together with the White House, promptly crafts legislation requiring transparency, privacy protections and stepped-up research on the wide range of risks posed by generative AI."

ADVERTISEMENT

The principles the seven AI companies have agreed to are as follows:

- Develop "robust technical mechanisms" to ensure that users know when content is AI generated, such as a watermarking system to reduce risks of fraud and deception.

ER784

- Publicly report AI systems' capabilities, limitations, and areas of appropriate and inappropriate use, covering both security risks and societal risks, such as "the effects on fairness and bias."
- Commit to internal and external security testing of AI systems prior to release, to mitigate risks related to biosecurity and cybersecurity, as well as broader societal harms.
- Share information across the industry and with governments, civil society and academia on managing AI risks, including best practices for safety, information on attempts to circumvent safeguards and technical collaboration.
- Invest in cybersecurity and "insider threat" safeguards to protect proprietary and unreleased model weights.
- Facilitate third-party discovery and reporting of vulnerabilities in AI systems.
- Prioritize research on the societal risks that AI systems can pose, including on avoiding harmful bias and discrimination.
- Develop and deploy advanced AI systems "to help address society's greatest challenges," ranging from "cancer prevention to mitigating climate change."

The White House said it has consulted on voluntary AI safety commitments with other countries, including Australia, Brazil, Canada, Chile, France, Germany, India, Israel, Italy, Japan, Kenya, Mexico, the Netherlands, New Zealand, Nigeria, the Philippines, Singapore, South Korea, the UAE and the U.K.

The White House said the Office of Management and Budget will soon release draft policy guidance for federal agencies to ensure the development, procurement and use of AI systems is centered around safeguarding the Americans' rights and safety.

ADVERTISEMENT



AdChoices

Enjoy our low intro APR
for 18 months

Get Started    Citi® Double Cash Card

**Read More About:**

Amazon,   Biden Administration,   Google,   Meta,   Microsoft,   OpenAI

**WHAT DO YOU THINK?**     ⋮

Do you prefer to use computer / laptop keyboards that are more or less audible while being typed on?

○   More audible, the louder the better

○   Less audible, the sound of typing annoys me

○   Average typing noise is fine by me

○   I've honestly never thought about it before

○   Other / No opinion

\* By clicking "NEXT" you agree to the following: We use cookies to collect your survey answers for market research and tailored advertising. If you would like to continue with this survey, please read and agree to the CivicScience Privacy Policy and Terms of Service

NEXT *

ER785

10/23/23, 3:43 PM

Case: 24-1963, 05/08/2024, DktEntry: 15.5, Page 231 of 235
Case 4:23-cv-03918-YGR    Tech Companies Commit to White House AI Safety    Page 8 of 12
(231 of 235)

Want to read more articles like this one?    SUBSCRIBE TODAY →



## Sponsored Stories

**This Killer New Electric SUV Is Close To Perfection (Take A Look)**

BESTSEARCHES                                           Click Here

---

**Introducing The Fully Electric Volvo EX90**

FREQUENTSEARCHES

---

**Most Windows Users Didn't Know They Can Block Ads**

SMART SECURITY TIPS                                    Learn More

---

**Empty Alaska Cruise Cabins For Sale Now (See Prices)**

SEARCHTOPICS

---

**My Husband Thought I Had Cosmetic Surgery (This is my Secret)**

NAKED AND THRIVING

---



FUTURE PERFECT   TECHNOLOGY   ARTIFICIAL INTELLIGENCE

# If your AI model is going to sell, it has to be safe

OpenAI's GPT-4 shows the competitive advantage of putting in safety work.

By Haydn Belfield | Mar 25, 2023, 7:30am EDT



CFOTO/Future Publishing via Getty Images



Finding the best ways to do good.

On March 14, OpenAI released the successor to ChatGPT: GPT-4. It **impressed** observers with its markedly improved performance across reasoning, retention, and coding. It also **fanned fears around AI safety,** around our ability to control these increasingly powerful models. But that

ER787

10/23/23, 3:42 PM
OpenAI vs. Google: Can the competitive advantage of AI safety save us? - Vox
Case: 24-1963    05/08/2024    DktEntry: 15.5    Page 233 of 235    (233 of 235)
Case 4:23-cv-03918-YGR    Document 1-5    Filed 08/04/23    Page 1 of 12

debate obscures the fact that, in many ways, GPT-4's most remarkable gains, compared to similar models in the past, have been around safety.

According to the company's **Technical Report**, during GPT-4's development, OpenAI "spent six months on safety research, risk assessment, and iteration." OpenAI **reported** that this work yielded significant results: "GPT-4 is 82% less likely to respond to requests for disallowed content and 40% more likely to produce factual responses than GPT-3.5 on our internal evaluations." (ChatGPT is a slightly tweaked version of GPT-3.5: if you've been using ChatGPT over the last few months, you've been interacting with GPT-3.5.)

This demonstrates a broader point: For AI companies, there are significant competitive advantages and profit incentives for emphasizing safety. The key success of ChatGPT over other companies' large language models (LLMs) — apart from a nice user interface and remarkable word-of-mouth buzz — is precisely its safety. Even as it **rapidly grew** to over 100 million users, it hasn't had to be taken down or significantly tweaked to make it less harmful (and less useful).

Tech companies should be investing heavily in safety research and testing for all our sakes, but also for their own commercial self-interest. That way, the AI model works as intended, and these companies can keep their tech online. ChatGPT Plus is **making money**, and you can't make money if you've had to take your language model down. OpenAI's reputation has been increased by its tech being safer than its competitors, while other tech companies have had their reputations hit by their tech being unsafe, and even having to take it down. (Disclosure: I am listed in the acknowledgments of the GPT-4 System Card, but I have not shown the draft of this story to anyone at OpenAI, nor have I taken funding from the company.)

## The competitive advantage of AI safety

Just ask Mark Zuckerberg. When Meta released its large language model BlenderBot 3 in August 2022, it immediately **faced problems** of making inappropriate and untrue statements. Meta's Galactica was only up for three days in November 2022 before **it was withdrawn** after it was shown confidently 'hallucinating' (making up) academic papers that didn't exist. Most recently, in February 2023, Meta irresponsibly released the full weights of its latest language model, LLaMA. As many experts predicted would happen, it **proliferated to 4chan**, where it will be used to mass-produce disinformation and hate.

I and my co-authors warned about this five years ago in a 2018 report called "**The Malicious Use of Artificial Intelligence**," while the Partnership on AI (Meta was a founding member and remains an active partner) had a great **report** on responsible publication in 2021. These repeated and failed attempts to "move fast and break things" have probably exacerbated Meta's trust problems. In **surveys** from 2021 of AI researchers and the US public on trust in actors to shape the development and use of AI in the public interest, "Facebook [Meta] is ranked the least trustworthy of American tech companies."

But it's not just Meta. The original misbehaving machine learning chatbot was Microsoft's Tay, which was **withdrawn 16 hours after it was released** in 2016 after making racist and inflammatory statements. Even Bing/Sydney had some very erratic responses, including **declaring** its love for, and then threatening, a journalist. In response, Microsoft limited the number of messages one could exchange, and Bing/Sydney no longer answers questions about itself.

We now know Microsoft based it on OpenAI's GPT-4; Microsoft invested $11 billion into OpenAI in return for OpenAI running all their computing on Microsoft's Azure cloud and **becoming** their "preferred partner for commercializing new AI technologies." But it is unclear why the model responded so strangely. It could have been

ER788

10/23/23, 3:42 PM    OpenAI's GPT-4 is the competitive advantage of AI's edge Vox    (234 of 235)

Case: 24-1963  05/08/2024  DktEntry: 15.5  Page 234 of 235
Case 4:23-cv-03918-YGR  Document 144-9  Filed 05/13/24  Page 234 of 12

an early, not fully safety-trained version, or it could be due to its connection to search and thus its ability to "read" and respond to an article about itself in real time. (By contrast, GPT-4's training data only runs up to **September 2021**, and it does not have access to the web.) It's notable that even as it was heralding its new AI models, Microsoft recently **laid off** its AI ethics and society team.

OpenAI took a different path with GPT-4, but it's not the only AI company that has been putting in the work on safety. Other leading labs have also been making clear their commitments, with **Anthropic** and **DeepMind** publishing their safety and alignment strategies. These two labs have also been safe and cautious with the development and deployment of **Claude** and **Sparrow**, their respective LLMs.

## A playbook for best practices

Tech companies developing LLMs and other forms of cutting-edge, impactful AI should learn from this comparison. They should adopt the best practice as shown by OpenAI: Invest in safety research and testing before releasing.

What does this look like specifically? GPT-4's **System Card** describes four steps OpenAI took that could be a model for other companies.

First, prune your dataset for toxic or inappropriate content. Second, train your system with reinforcement learning from human feedback (RLHF) and rule-based reward models (RBRMs). RLHF involves human labelers creating demonstration data for the model to copy and ranking data ("output A is preferred to output B") for the model to better predict what outputs we want. RLHF produces a model that is sometimes overcautious, refusing to answer or hedging (as some users of ChatGPT will have noticed).

RBRM is an automated classifier that evaluates the model's output on a set of rules in multiple-choice style, then rewards the model for refusing or answering for the right reasons and in the desired style. So the combination of RLHF and RBRM encourages the model to answer questions helpfully, refuse to answer some harmful questions, and distinguish between the two.

Third, provide **structured access** to the model through an API. This allows you to filter responses and monitor for poor behavior from the model (or from users). Fourth, invest in moderation, both by humans and by automated moderation and content classifiers. For example, OpenAI used GPT-4 to create rule-based classifiers that flag model outputs that could be harmful.

This all takes time and effort, but it's worth it. Other approaches can also work, like Anthropic's rule-following **Constitutional AI**, which leverages RL from AI feedback (RLAIF) to complement human labelers. As OpenAI acknowledges, their approach is not perfect: the model still hallucinates and can still sometimes be tricked into providing harmful content. Indeed, there's room to go beyond and **improve upon OpenAI's approach**, for example by providing more compensation and career progression opportunities for the human labelers of outputs.

Has OpenAI become less open? If this means less open source, then no. OpenAI adopted a "**staged release**" strategy for GPT-2 in 2019 and an **API** in 2020. Given Meta's 4chan experience, this seems justified. As Ilya Sutskever, OpenAI chief scientist, noted to **The Verge**: "I fully expect that in a few years it's going to be completely obvious to everyone that open-sourcing AI is just not wise."

GPT-4 did have less information than previous releases on "architecture (including model size), hardware, training compute, dataset construction, training method." This is because OpenAI is concerned about **acceleration risk**:

10/23/23, 3:42 PM

Case: 24-1963  05/08/2024  DktEntry: 15.5  Page 235 of 235     (235 of 235)
Case 4:23-cv-03918-YGR  OpenAI seems to be competing to create advantage of AI usage Vox  of 12

"the risk of racing dynamics leading to a decline in safety standards, the diffusion of bad norms, and accelerated AI timelines, each of which heighten societal risks associated with AI."

Providing those technical details would speed up the overall rate of progress in developing and deploying powerful AI systems. However, AI poses many unsolved governance and technical challenges: For example, the **US** and **EU** won't have detailed safety technical standards for high-risk AI systems ready until early 2025.

That's why **I and others** believe we shouldn't be speeding up progress in AI capabilities, but we should be going full speed ahead on safety progress. Any reduced openness should never be an impediment to safety, which is why it's so useful that the System Card shares details on safety challenges and mitigation techniques. Even though OpenAI seems to be coming around to this view, they're still at the forefront of pushing forward capabilities, and should provide more information on how and when they envisage themselves and the field slowing down.

AI companies should be investing significantly in safety research and testing. It is the right thing to do and will soon be required by regulation and safety standards in the EU and USA. But also, it is in the self-interest of these AI companies. Put in the work, get the reward.

*Haydn Belfield has been **academic project manager** at the University of Cambridge's Centre for the Study of Existential Risk (CSER) for the past six years. He is also an associate fellow at the Leverhulme Centre for the Future of Intelligence.*



*You've read 1 article in the last 30 days.*

## Will you support Vox's explanatory journalism?

Most news outlets make their money through advertising or subscriptions. But when it comes to what we're trying to do at Vox, there are a couple reasons that we can't rely only on ads and subscriptions to keep the lights on.

First, advertising dollars go up and down with the economy. We often only know a few months out what our advertising revenue will be, which makes it hard to plan ahead.

Second, we're not in the subscriptions business. Vox is here to help everyone understand the complex issues shaping the world — not just the people who can afford to pay for a subscription. We believe that's an important part of building a more equal society. We can't do that if we have a paywall.

That's why we also turn to you, our readers, to help us keep Vox free. **If you also believe that everyone deserves access to trusted high-quality information, will you make a gift to Vox today?**

One-Time | **Monthly** | Annual

○ **$5/month**  ○ $10/month
○ $25/month  ○ $50/month
○ Other

**Yes, I'll give $5/month**

We accept credit card, Apple Pay, and Google Pay. You can also contribute via PayPal