(4) Applicant's Prior-filed Application was abandoned for failure to respond to the Office Action issued on January 5, 2017. *See* Ex. 8 (Applicant's Prior-filed Application History).

(5) Petitioner respectfully requests consistent treatment between the '896 Application and the '985 Application vis-à-vis the '002 Registration. *See* Ex. 9 (Petitioner's Registration).

Applicant's Webpage Clearly Illustrates Similarity of Goods/Services

The similarity of the goods and services offered by Applicant relative to the services offered by Petitioner are readily apparent when taken in context with Applicant's webpage. *See* Ex. 10 (Applicant's OPENAI Webpage). In comparing Petitioner's OPEN AI Webpage (Ex. 3) with Applicant's OPENAI Webpage, each offers nearly identical services in, namely, generating shareable images in the field of artificial intelligence.

Conclusion

Petitioner will be damaged by the registration of Applicant's Mark in connection with Applicant's goods and Applicant's services because Applicant's Mark so closely resembles Petitioner's Mark as to be likely to cause confusion, mistake, or deception in the minds of consumers as to the origin or source of Applicant's Goods and Applicant's Services or the affiliation between Applicant and Petitioner, in violation of Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d).

In conclusion, Applicant's Mark for OPENAI is confusingly similar to Petitioner's Mark for OPEN AI and should be refused registration under Section 2(d) of the Lanham Act, 15 U.S.C. § 1052(d). Petitioner respectfully requests the USPTO act consistently with its previous determination and issue a refusal for the Applicant's Mark under Section 2(d) of the Lanham Act.

Respectfully Submitted,

Page **6** of **7**

VAN WINKLE, BUCK, WALL, STARNES,
AND DAVIS, P.A.

Date:    January 31, 2023

By: /William G. Heedy/

William G. Heedy
David M. Wilkerson
P.O. Box 7376
Asheville, NC 28804
Telephone:  828-258-2991
Email:  wheedy@vwlawfirm.com
Email: dwilkerson@vwlawfirm.com

Counsel for Petitioner
GUY RAVINE

<u>Enclosures</u>
Index of Evidence
Exhibit 1
Exhibit 2
Exhibit 3
Exhibit 4
Exhibit 5
Exhibit 6
Exhibit 7
Exhibit 8
Exhibit 9
Exhibit 10

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Re:    Serial No:    97/238,896
       Mark:         OPENAI
       Applicant:    OpenAI, Inc.
       Filing Date:  January 31, 2023

_____

### INDEX OF EVIDENCE

Exhibit 1

- Type of evidence: Past USPTO Filings

- Ground Supported: Likelihood of Confusion

Exhibit 2

- Type of Evidence: Petitioner's Office Action

- Ground Supported: Likelihood of Confusion

Exhibit 3

- Type of Evidence: OPEN AI Webpage

- Ground Supported: Likelihood of Confusion

Exhibit 4

- Type of Evidence: OPEN AI customer marketing brochure

- Ground Supported: Likelihood of Confusion

Exhibit 5

- Type of evidence: OPEN AI Marketing business card

- Ground Supported: Likelihood of Confusion

**ER1724**

Exhibit 6

- Type of Evidence: U.S. Application No. 87/178,985

- Ground Supported: Likelihood of Confusion

Exhibit 7

- Type of Evidence: Office Action for Applicant's Prior-filed Application

- Ground Supported: Likelihood of Confusion

Exhibit 8

- Type of Evidence: Applicant's Prior-filed Application History

- Ground Supported: Likelihood of Confusion

Exhibit 9

- Type of evidence: Petitioner's Registration

- Ground Supported: Likelihood of Confusion

Exhibit 10

- Type of evidence: Applicant's OPENAI Webpage

- Ground Supported: Likelihood of Confusion

EXHIBIT 1



1/25/23, 12:34 AM                                                Record List Display

**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Contacts | eBusiness | eBiz alerts | News

**Trademarks > Trademark Electronic Search System (TESS)**

*TESS was last updated on Tue Jan 24 03:32:22 EST 2023*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | PREV LIST | NEXT LIST | IMAGE LIST | BOTTOM | HELP

Logout  *Please logout when you are done to release system resources allocated for you.*

Start  List At:        OR  Jump  to record:     483 Record(s) found (This page: 1 ~ 100)

**Refine Search** (image and share and generate)[gs]        Submit

**Current Search:** S2: **(image and share and generate)[gs]** docs: 483 occ: 8237

Export displayed results (1 ~ 100)  .csv

|  | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead | Class(es) |
|---|---|---|---|---|---|---|
| 1 | 97734998 | | OFFICIAL AUTHENTIC ORIGINAL OAO | TSDR | LIVE | |
| 2 | 97734972 | | BUNGAY: THE FIRST NAME IN BITCOIN AND BLOCKCHAIN SOURCE IDENTIFIER, TRADEMARK BRANDS OF CLASS: 042; GENUS: COMPUTER AND SCIENTIFIC SERVICES; SPECIE: QUALITY MANAGEMENT SYSTEM SERVICES AND CONFORMITY ASSESSMENT SERVICES | TSDR | LIVE | |
| 3 | 97348268 | | UNIMAISON | TSDR | LIVE | |
| 4 | 97348241 | | | TSDR | LIVE | |
| 5 | 97731256 | | FLY LYFE | TSDR | LIVE | |
| 6 | 97345230 | | MODELVERSE | TSDR | LIVE | |
| 7 | 97755973 | | INTERNET PROTOCOL VERSION 6 ENTERPRISES | TSDR | LIVE | |
| 8 | 97729793 | | BUILT ON BLOCKCHAIN | TSDR | LIVE | |
| 9 | 97728815 | | WONDERY KIDS | TSDR | LIVE | |
| 10 | 97726902 | | CHOREO PARTNER ALLIANCE | TSDR | LIVE | |
| 11 | 97340714 | | INSM LLC | TSDR | LIVE | |
| 12 | 97419257 | | VIVE SYNC | TSDR | LIVE | |
| 13 | 97745468 | | MICHARL ENTERPRISES | TSDR | LIVE | |
| 14 | 97218702 | | VIRTUAL TRAVEL | TSDR | LIVE | |
| 15 | 97742459 | | CUSTOMER CARE BUTTON | TSDR | LIVE | |
| 16 | 97316045 | | META HORIZON | TSDR | LIVE | |
| 17 | 97046176 | | BUNGAY INTERNATIONAL TECHNOLOGY CONFORMITY OF ORGANIZATION AND INDIVIDUAL NETWORK: BITCOIN | TSDR | LIVE | |
| 18 | 97709317 | | MOMENTS THAT MATTER | TSDR | LIVE | |

https://tmsearch.uspto.gov/bin/showfield                                                 1/4

1/25/23, 12:34 AM                                    Record List Display

| 19 | 97359794 | | AMAZON FREEVEE | TSDR | LIVE | |
| 20 | 97359765 | | FREEVEE | TSDR | LIVE | |
| 21 | 97359721 | | FV | TSDR | LIVE | |
| 22 | 97371801 | | ULTRAV3RSE | TSDR | LIVE | |
| 23 | 97371771 | | ULTRA | TSDR | LIVE | |
| 24 | 97370383 | | BANG ULTRAVERSE | TSDR | LIVE | |
| 25 | 97370333 | | THE ULTRAVERSE | TSDR | LIVE | |
| 26 | 97305177 | | AIRBO | TSDR | LIVE | |
| 27 | 97316037 | | META HORIZON | TSDR | LIVE | |
| 28 | 97306267 | | EVERYMILE | TSDR | LIVE | |
| 29 | 97547517 | | ARTIFICIAL IGNORANCE | TSDR | LIVE | |
| 30 | 97477480 | | YOU WILL NEVER WALK ALONE | TSDR | LIVE | |
| 31 | 97291906 | | SWORD 360 | TSDR | LIVE | |
| 32 | 97116594 | 6923314 | SEO411 | TSDR | LIVE | |
| 33 | 97287957 | | MOONVERSE | TSDR | LIVE | |
| 34 | 97117607 | | NORTON | TSDR | LIVE | |
| 35 | 97117605 | | LIFELOCK BY NORTON | TSDR | LIVE | |
| 36 | 97300299 | | AMP | TSDR | LIVE | |
| 37 | 97300297 | | AMP | TSDR | LIVE | |
| 38 | 97373309 | | META VIEW | TSDR | LIVE | |
| 39 | 97373300 | | META VIEW | TSDR | LIVE | |
| 40 | 97665410 | | GEN | TSDR | LIVE | |
| 41 | 97405052 | | ULTRACORN | TSDR | LIVE | |
| 42 | 97402858 | | CHERRY BLADE LEMONADE | TSDR | LIVE | |
| 43 | 97402831 | | WYLDIN' WATERMELON | TSDR | LIVE | |
| 44 | 97402812 | | STAR BLAST | TSDR | LIVE | |
| 45 | 97402797 | | DELISH STRAWBERRY KISS | TSDR | LIVE | |
| 46 | 97402756 | | BLUE RAZZ | TSDR | LIVE | |
| 47 | 97402685 | | PURPLE HAZE | TSDR | LIVE | |
| 48 | 97400686 | | VPX | TSDR | LIVE | |
| 49 | 97400680 | | MELTDOWN | TSDR | LIVE | |
| 50 | 97400675 | | QUASH | TSDR | LIVE | |
| 51 | 97400652 | | VOOZ | TSDR | LIVE | |
| 52 | 97400648 | | REDLINE | TSDR | LIVE | |
| 53 | 97400643 | | BANG | TSDR | LIVE | |
| 54 | 97391038 | | MYWEB3 | TSDR | LIVE | |
| 55 | 97391028 | | MYMETA | TSDR | LIVE | |
| 56 | 97391010 | | MY3 | TSDR | LIVE | |
| 57 | 97282620 | | OTL | TSDR | LIVE | |

1/25/23, 12:34 AM                                              Record List Display

| | | | | | | |
|---|---|---|---|---|---|---|
| 58 | 97272819 | | ONTHELINE | TSDR | LIVE | |
| 59 | 97596011 | | NUTREETION | TSDR | LIVE | |
| 60 | 97256345 | | | TSDR | LIVE | |
| 61 | 97411928 | | OFFICIAL SPONSOR OF ESPORTS | TSDR | LIVE | |
| 62 | 97256335 | | G FUEL | TSDR | LIVE | |
| 63 | 97256325 | | G FUEL | TSDR | LIVE | |
| 64 | 97675933 | | KINDLE SCRIBE | TSDR | LIVE | |
| 65 | 97544382 | | PREIPO.COM | TSDR | LIVE | |
| 66 | 97517841 | | PREIPO INTELLI | TSDR | LIVE | |
| 67 | 97514302 | | PREIPO INTELLIGENCE | TSDR | LIVE | |
| 68 | 97646977 | | OTHERDEED | TSDR | LIVE | |
| 69 | 97248245 | | UNICORN | TSDR | LIVE | |
| 70 | 97635465 | | D.VERSE | TSDR | LIVE | |
| 71 | 97632837 | | TREEGOAT | TSDR | LIVE | |
| 72 | 97632830 | | | TSDR | LIVE | |
| 73 | 97632791 | | TREEGOAT | TSDR | LIVE | |
| 74 | 97624106 | | METAVERSE SOLAR | TSDR | LIVE | |
| 75 | 97626362 | | | TSDR | LIVE | |
| 76 | 97423669 | | WINNERFORCE | TSDR | LIVE | |
| 77 | 97611669 | | EXHIBIT C | TSDR | LIVE | |
| 78 | 97196379 | | MASK COIN | TSDR | LIVE | |
| 79 | 97196359 | | MASK TOKEN | TSDR | LIVE | |
| 80 | 97196344 | | MASK NETWORK | TSDR | LIVE | |
| 81 | 97588761 | | YUGA | TSDR | LIVE | |
| 82 | 97588760 | | JIMMY THE MONKEY | TSDR | LIVE | |
| 83 | 97588759 | | APEFEST | TSDR | LIVE | |
| 84 | 97202676 | | META QUEST | TSDR | LIVE | |
| 85 | 97202666 | | META QUEST | TSDR | LIVE | |
| 86 | 97202654 | | META | TSDR | LIVE | |
| 87 | 97202633 | | META | TSDR | LIVE | |
| 88 | 97389974 | | KODAS | TSDR | LIVE | |
| 89 | 97389973 | | OTHERSIDE | TSDR | LIVE | |
| 90 | 97189771 | | TIC TOC | TSDR | LIVE | |
| 91 | 97579180 | | SAFEBEAT | TSDR | LIVE | |
| 92 | 97576924 | | MOTION AUGMENTED | TSDR | LIVE | |
| 93 | 97563662 | | INTUIT | TSDR | LIVE | |
| 94 | 97560794 | | BOOST | TSDR | LIVE | |
| 95 | 97560774 | | BOOST COIN | TSDR | LIVE | |
| 96 | 97155522 | | BENTO BIOLOGICAL DIGITAL TWIN | TSDR | LIVE | |



1/25/23, 12:34 AM

Record List Display

| 97 | 97560690 | | B | | TSDR | LIVE | |
| 98 | 97560663 | | B | | TSDR | LIVE | |
| 99 | 97560640 | | BOOSTCOIN | | TSDR | LIVE | |
| 100 | 97560595 | | BOOST COIN | | TSDR | LIVE | |

Export displayed results (1 ~ 100) .CSV

TESS HOME  NEW USER  STRUCTURED  FREE FORM  BROWSE DICT  SEARCH OG  PREV LIST  NEXT LIST  IMAGE LIST  TOP  HELP

| HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

https://tmsearch.uspto.gov/bin/showfield

4/4

ER1730

EXHIBIT 2

| To: | Guy Ravine (jake@merithewlaw.com) |
| --- | --- |
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 86847151 - OPEN AI - N/A |
| **Sent:** | 3/22/2017 7:52:50 PM |
| **Sent As:** | ECOM104@USPTO.GOV |
| **Attachments:** | Attachment - 1 |
| | Attachment - 2 |
| | Attachment - 3 |

**UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)**
**OFFICE ACTION (OFFICIAL LETTER) ABOUT APPLICANT'S TRADEMARK APPLICATION**

**U.S. APPLICATION SERIAL NO.** 86847151

**MARK:** OPEN AI

# *86847151*

**CORRESPONDENT ADDRESS:**
Jake Farrar
MERITHEW LAW PLLC
177 Flint Street
Asheville, NC 28801

**CLICK HERE TO RESPOND TO THIS LETTER:**
http://www.uspto.gov/trademarks/teas/response_forms.jsp

VIEW YOUR APPLICATION FILE

**APPLICANT:** Guy Ravine

**CORRESPONDENT'S REFERENCE/DOCKET NO :**
N/A
**CORRESPONDENT E-MAIL ADDRESS:**
jake@merithewlaw.com

## OFFICE ACTION

### STRICT DEADLINE TO RESPOND TO THIS LETTER
TO AVOID ABANDONMENT OF APPLICANT'S TRADEMARK APPLICATION, THE USPTO MUST RECEIVE APPLICANT'S
COMPLETE RESPONSE TO THIS LETTER **WITHIN 6 MONTHS** OF THE ISSUE/MAILING DATE BELOW.  A RESPONSE
TRANSMITTED THROUGH THE TRADEMARK ELECTRONIC APPLICATION SYSTEM (TEAS) MUST BE RECEIVED BEFORE
MIDNIGHT **EASTERN TIME** OF THE LAST DAY OF THE RESPONSE PERIOD.

**ISSUE/MAILING DATE: 3/22/2017**

This application was approved for publication on January 25, 2017.  *See* 37 C.F.R. §2.80.  However, approval of the application has been
withdrawn to address the issue(s) below.  *See* TMEP §706.01.  The trademark examining attorney apologizes for any inconvenience this may
cause applicant.

**Refusal to Register – Merely Descriptive**

Registration is refused because the applied-for mark merely describes a feature of applicant's services.  Trademark Act Section 2(e)(1), 15
U.S.C. §1052(e)(1); *see* TMEP §§1209.01(b), 1209.03 *et seq.*

A mark is merely descriptive if it describes an ingredient, quality, characteristic, function, feature, purpose, or use of an applicant's goods and/or
services.  TMEP §1209.01(b); *see, e.g., In re TriVita, Inc.*, 783 F.3d 872, 874, 114 USPQ2d 1574, 1575 (Fed. Cir. 2015) (quoting *In re Oppedahl
& Larson LLP*, 373 F.3d 1171, 1173, 71 USPQ2d 1370, 1371 (Fed. Cir. 2004)); *In re Steelbuilding.com*, 415 F.3d 1293, 1297, 75 USPQ2d 1420,
1421 (Fed. Cir. 2005) (citing *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents* , 252 U.S. 538, 543 (1920)).

The determination of whether a mark is merely descriptive is made in relation to an applicant's goods and/or services, not in the abstract.

*DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*, 695 F.3d 1247, 1254, 103 USPQ2d 1753, 1757 (Fed. Cir. 2012); *In re The Chamber of Commerce of the U.S.*, 675 F.3d 1297, 1300, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012); TMEP §1209.01(b); *see, e.g.*, *In re Polo Int'l Inc.* , 51 USPQ2d 1061, 1062-63 (TTAB 1999) (finding DOC in DOC-CONTROL would refer to the "documents" managed by applicant's software rather than the term "doctor" shown in a dictionary definition); *In re Digital Research Inc.*, 4 USPQ2d 1242, 1243-44 (TTAB 1987) (finding CONCURRENT PC-DOS and CONCURRENT DOS merely descriptive of "computer programs recorded on disk" where the relevant trade used the denomination "concurrent" as a descriptor of a particular type of operating system).

"Whether consumers could guess what the product [or service] is from consideration of the mark alone is not the test." *In re Am. Greetings Corp.*, 226 USPQ 365, 366 (TTAB 1985).

"A mark may be merely descriptive even if it does not describe the 'full scope and extent' of the applicant's goods or services."    *In re Oppedahl & Larson LLP*, 373 F.3d 1171, 1173, 71 USPQ2d 1370, 1371 (Fed. Cir. 2004) (citing *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 1346, 57 USPQ2d 1807, 1812 (Fed. Cir. 2001)); TMEP §1209.01(b).  It is enough if a mark describes only one significant function, attribute, or property. *In re The Chamber of Commerce of the U.S.*, 675 F.3d 1297, 1300, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012); TMEP §1209.01(b); *see In re Oppedahl & Larson LLP*, 373 F.3d at 1173, 71 USPQ2d at 1371.

The proposed mark is OPEN AI for "Providing a web site featuring technology that enables internet users to share documents, images and videos."  While the applicant conceded the descriptive nature of the letters AI through its disclaimer, the entire mark is now deemed descriptive.  The term OPEN in the mark is also merely descriptive of a feature of the services because it indicates that the applicant's website allows "public" or "non-proprietary" information sharing.   The term OPEN in terms of computing is defined in foldoc.org as "non-proprietary" and in the netlingo online dictionary the term is defined as meaning "public."  The definitions are attached.

The combination of OPEN and AI in the mark indicates that the applicant's  website contains AI information that is public and non-proprietary.  As such, the mark merely describes features of the applicant's services and registration must be refused under Trademark Act Section 2(e)(1).  Although applicant's  mark has been refused registration, applicant may respond to the refusal(s) by submitting evidence and arguments in support of registration.

**Advisory:  Supplemental Register Option**

The applied-for mark has been refused registration on the Principal Register.  Applicant may respond to the refusal by submitting evidence and arguments in support of registration and/or by amending the application to seek registration on the Supplemental Register.  *See* 15 U.S.C. §1091; 37 C.F.R. §§2.47, 2.75(a); TMEP §§801.02(b), 816.  Amending to the Supplemental Register does not preclude applicant from submitting evidence and arguments against the refusal(s).  TMEP §816.04.

*Benefits of the Supplemental Register*

Although registration on the Supplemental Register does not afford all the benefits of registration on the Principal Register, it does provide the following advantages:

- The registrant may use the registration symbol ®;
- The registration is protected against registration of a confusingly similar mark under Trademark Act Section 2(d);
- The registrant may bring suit for infringement in federal court; and
- The registration may serve as the basis for a filing in a foreign country under the Paris Convention and other international agreements.

*See* 15 U.S.C. §§1052(d), 1091, 1094; TMEP §815.

**Contact Information**

If applicant has questions regarding this Office action, please telephone or e-mail the assigned trademark examining attorney.  All relevant e-mail communications will be placed in the official application record; however, an e-mail communication will not be accepted as a response to this Office action and will not extend the deadline for filing a proper response.  *See* 37 C.F.R. §§2.62(c), 2.191; TMEP §§304.01-.02, 709.04-.05.  Further, although the trademark examining attorney may provide additional explanation pertaining to the refusal(s) and/or requirement(s) in this Office action, the trademark examining attorney may not provide legal advice or statements about applicant's  rights.  *See* TMEP §§705.02, 709.06.

**TEAS PLUS OR TEAS REDUCED FEE (TEAS RF) APPLICANTS – TO MAINTAIN LOWER FEE, ADDITIONAL REQUIREMENTS MUST BE MET, INCLUDING SUBMITTING DOCUMENTS ONLINE:** Applicants who filed their application online using the lower-fee TEAS Plus or TEAS RF application form must (1) file certain documents online using TEAS, including responses to Office actions (see TMEP §§819.02(b), 820.02(b) for a complete list of these documents); (2) maintain a valid e-mail correspondence address; and (3) agree to receive correspondence from the USPTO by e-mail throughout the prosecution of the application. *See* 37 C.F.R. §§2.22(b), 2.23(b); TMEP §§819, 820. TEAS Plus or TEAS RF applicants who do not meet these requirements must submit an additional processing fee of $125 per class of goods and/or services. 37 C.F.R. §§2.6(a)(1)(v), 2.22(c), 2.23(c); TMEP §§819.04, 820.04. However, in certain situations, TEAS Plus or TEAS RF applicants may respond to an Office action by authorizing an examiner's amendment by telephone or e-mail without incurring this additional fee.

/Katina S. Jackson/
Trademark Examining Attorney
Law Office 104
571-272-8889 (Office)
571-273-8889 (Fax)
katina.jackson@uspto.gov

**TO RESPOND TO THIS LETTER:** Go to http://www.uspto.gov/trademarks/teas/response_forms.jsp. Please wait 48-72 hours from the issue/mailing date before using the Trademark Electronic Application System (TEAS), to allow for necessary system updates of the application. For *technical* assistance with online forms, e-mail TEAS@uspto.gov. For questions about the Office action itself, please contact the assigned trademark examining attorney. **E-mail communications will not be accepted as responses to Office actions; therefore, do not respond to this Office action by e-mail.**

**All informal e-mail communications relevant to this application will be placed in the official application record.**

**WHO MUST SIGN THE RESPONSE:** It must be personally signed by an individual applicant or someone with legal authority to bind an applicant (i.e., a corporate officer, a general partner, all joint applicants). If an applicant is represented by an attorney, the attorney must sign the response.

**PERIODICALLY CHECK THE STATUS OF THE APPLICATION:** To ensure that applicant does not miss crucial deadlines or official notices, check the status of the application every three to four months using the Trademark Status and Document Retrieval (TSDR) system at http://tsdr.uspto.gov/. Please keep a copy of the TSDR status screen. If the status shows no change for more than six months, contact the Trademark Assistance Center by e-mail at TrademarkAssistanceCenter@uspto.gov or call 1-800-786-9199. For more information on checking status, see http://www.uspto.gov/trademarks/process/status/.

**TO UPDATE CORRESPONDENCE/E-MAIL ADDRESS:** Use the TEAS form at http://www.uspto.gov/trademarks/teas/correspondence.jsp.



## open

1. (programming) To prepare to read or write a file. This usually involves checking whether the file already exists and that the user has the necessary authorisation to read or write it. The result of a successful open is usually some kind of capability (e.g. a Unix file descriptor) - a token that the user passes back to the system in order to access the file without further checks and finally to close the file.

2. (character) Abbreviation for "open (or left) parenthesis" - used when necessary to eliminate oral ambiguity. To read aloud the LISP form (DEFUN FOO (X) (PLUS X 1)) one might say: "Open defun foo, open eks close, open, plus eks one, close close."

(software) 3. Non-proprietary. An open standard is one which can be used without payment.

4. (mathematics) open interval.

Loading

SHOP THE NEW COLLECTION
dunhill.com

SHOP THE NEW COLLECTION
dunhill.com





| To: | Guy Ravine (jake@merithewlaw.com) |
|---|---|
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 86847151 - OPEN A1 - N/A |
| **Sent:** | 3/22/2017 7:52:53 PM |
| **Sent As:** | ECOM104@USPTO.GOV |
| **Attachments:** | |

## UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)

## IMPORTANT NOTICE REGARDING YOUR
## U.S. TRADEMARK APPLICATION

### USPTO OFFICE ACTION (OFFICIAL LETTER) HAS ISSUED
ON **3/22/2017** FOR U.S. APPLICATION SERIAL NO. 86847151

Please follow the instructions below:

**(1) TO READ THE LETTER:** Click on this link or go to http://tsdr.uspto.gov, enter the U.S. application serial number, and click on "Documents."

The Office action may not be immediately viewable, to allow for necessary system updates of the application, but will be available within 24 hours of this e-mail notification.

**(2) TIMELY RESPONSE IS REQUIRED:** Please carefully review the Office action to determine (1) how to respond, and (2) the applicable response time period. Your response deadline will be calculated from **3/22/2017** (*or sooner if specified in the Office action*). A response transmitted through the Trademark Electronic Application System (TEAS) must be received before midnight **Eastern Time** of the last day of the response period. For information regarding response time periods, see http://www.uspto.gov/trademarks/process/status/responsetime.jsp.

**Do NOT hit "Reply" to this e-mail notification, or otherwise e-mail your response** because the USPTO does NOT accept e-mails as responses to Office actions. Instead, the USPTO recommends that you respond online using the TEAS response form located at http://www.uspto.gov/trademarks/teas/response_forms.jsp.

**(3) QUESTIONS:** For questions about the contents of the Office action itself, please contact the assigned trademark examining attorney. For *technical* assistance in accessing or viewing the Office action in the Trademark Status and Document Retrieval (TSDR) system, please e-mail TSDR@uspto.gov.

## WARNING

**Failure to file the required response by the applicable response deadline will result in the ABANDONMENT of your application.** For more information regarding abandonment, see http://www.uspto.gov/trademarks/basics/abandon.jsp.

**PRIVATE COMPANY SOLICITATIONS REGARDING YOUR APPLICATION:** Private companies **not** associated with the USPTO are using information provided in trademark applications to mail or e-mail trademark-related solicitations. These companies often use names that closely resemble the USPTO and their solicitations may look like an official government document. Many solicitations require that you pay "fees."

Please carefully review all correspondence you receive regarding this application to make sure that you are responding to an official document from the USPTO rather than a private company solicitation. All official USPTO correspondence will be mailed only from the "United States Patent and Trademark Office" in Alexandria, VA; or sent by e-mail from the domain "@uspto.gov." For more information on how to handle private company solicitations, see http://www.uspto.gov/trademarks/solicitation_warnings.jsp.

EXHIBIT 3

Open AI

# Open AI™

**Imagine if the best AI models were open and free.**

**What would you do with them?**

Open AI is working to make the world's best models open.

In the meantime...

## Generate any image imaginable.

Generate



justin trudeau style, highly detailed, digital painting, artstation, concept art, wallpaper, smooth, sharp focus, illustration, art by artgerm and greg rutkowski and alphonse mucha trending on

⬆ Share

→

Open AI

**Let me know when you're done baking!**

Enter you email       **Submit**

© **Open AI™ 2014 - 2022**
Terms of Service

**ER1741**

EXHIBIT 4



EXHIBIT 5



(front)



(back)

EXHIBIT 6

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTO Form 1476 (Rev 09/2006)
OMB No. 0051-0009 (Exp 02/28/2018)

## Trademark/Service Mark Application, Principal Register

### TEAS Plus Application

Serial Number: 87178985
Filing Date: 09/21/2016

*NOTE: Data fields with the * are mandatory under TEAS Plus. The wording "(if applicable)" appears where the field is only mandatory under the facts of the particular application.*

The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **TEAS Plus** | **YES** |
| **MARK INFORMATION** | |
| *MARK | OpenAI |
| *STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | OpenAI |
| *MARK STATEMENT | The mark consists of standard characters, without claim to any particular font, style, size, or color. |
| **REGISTER** | Principal |
| **APPLICANT INFORMATION** | |
| *OWNER OF MARK | OpenAI, Inc. |
| *STREET | 3180 18th St Ste 100 |
| *CITY | San Francisco |
| *STATE (Required for U.S. applicants) | California |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE (Required for U.S. applicants) | 94110 |
| PHONE | 6503876701 |
| EMAIL ADDRESS | XXXX |
| AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |
| WEBSITE ADDRESS | http://openai.com |
| **LEGAL ENTITY INFORMATION** | |
| *TYPE | CORPORATION |
| * STATE/COUNTRY OF INCORPORATION | Delaware |
| **GOODS AND/OR SERVICES AND BASIS INFORMATION** | |
| *INTERNATIONAL CLASS | 009 |

| *IDENTIFICATION | Computer software for **artificial intelligence** |
|---|---|
| *FILING BASIS | SECTION 1(a) |
| FIRST USE ANYWHERE DATE | At least as early as 04/27/2016 |
| FIRST USE IN COMMERCE DATE | At least as early as 04/27/2016 |
| SPECIMEN FILE NAME(S) | |
| ORIGINAL PDF FILE | SPE0-20428126158-2016092015392481023l_._Specimen.pdf |
| CONVERTED PDF FILE(S) (1 page) | \\TICRS\EXPORT17\IMAGEOUT17\871\789\87178985\xml1\FTK0003.JPG |
| SPECIMEN DESCRIPTION | The specimen shows a website for downloading OpenAI computer software. The software is identified by the OpenAI logo and a big green "download" button is displayed on the web page. |

## ADDITIONAL STATEMENTS INFORMATION

| *TRANSLATION (if applicable) | |
|---|---|
| *TRANSLITERATION (if applicable) | |
| *CLAIMED PRIOR REGISTRATION (if applicable) | |
| *CONSENT (NAME/LIKENESS) (if applicable) | |
| *CONCURRENT USE CLAIM (if applicable) | |

## CORRESPONDENCE INFORMATION

| *NAME | OpenAI, Inc. |
|---|---|
| FIRM NAME | OpenAI, Inc. |
| *STREET | 3180 18th St Ste 100 |
| *CITY | San Francisco |
| *STATE (Required for U.S. addresses) | California |
| *COUNTRY | United States |
| *ZIP/POSTAL CODE | 94110 |
| PHONE | 6503876701 |
| *EMAIL ADDRESS | uspto@openai.com |
| *AUTHORIZED TO COMMUNICATE VIA EMAIL | Yes |

## FEE INFORMATION

| APPLICATION FILING OPTION | TEAS Plus |
|---|---|
| NUMBER OF CLASSES | 1 |
| FEE PER CLASS | 225 |
| *TOTAL FEE PAID | 225 |

## SIGNATURE INFORMATION

| * SIGNATURE | /Chris Clark/ |
|---|---|
| * SIGNATORY'S NAME | Chris Clark |
| * SIGNATORY'S POSITION | COO |

| SIGNATORY'S PHONE NUMBER | 6503876701 |
|---|---|
| • DATE SIGNED | 09/21/2016 |

Under the Paperwork Reduction Act of 1995 no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## Trademark/Service Mark Application, Principal Register

### TEAS Plus Application

**Serial Number: 87178985**
**Filing Date: 09/21/2016**

### To the Commissioner for Trademarks:

**MARK:** OpenAI (Standard Characters, see mark)
The literal element of the mark consists of OpenAI.
The mark consists of standard characters, without claim to any particular font, style, size, or color.

The applicant, OpenAI, Inc., a corporation of Delaware, having an address of
    3180 18th St Ste 100
    San Francisco, California 94110
    United States
    6503876701(phone)
    XXXX

requests registration of the trademark/service mark identified above in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.), as amended, for the following:

**For specific filing basis information for each item, you must view the display within the Input Table.**
    International Class 009:  Computer software for artificial intelligence

Use in Commerce: The applicant is using the mark in commerce on or in connection with the identified goods/services. The applicant attaches, or will later submit, one specimen as a JPG/PDF image file showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, regardless of whether the mark itself is in the standard character format or is a stylized or design mark. The specimen image file may be in color, and the image must be in color if color is being claimed as a feature of the mark.

In International Class 009, the mark was first used by the applicant or the applicant's related company or licensee predecessor in interest at least as early as 04/27/2016, and first used in commerce at least as early as 04/27/2016, and is now in use in such commerce. The applicant is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) The specimen shows a website for downloading OpenAI computer software. The software is identified by the OpenAI logo and a big green "download" button is displayed on the web page..

**Original PDF file:**
SPE0-20428126158-2016092015392481023l_._Specimen.pdf
**Converted PDF file(s)** (1 page)
Specimen File1

For informational purposes only, applicant's website address is: http://openai.com
The applicant's current Correspondence Information:
    OpenAI, Inc.
    OpenAI, Inc.
    3180 18th St Ste 100
    San Francisco, California 94110
    6503876701(phone)
    uspto@openai.com (authorized)
**E-mail Authorization:** I authorize the USPTO to send e-mail correspondence concerning the application to the applicant or applicant's attorney at the e-mail address provided above. I understand that a valid e-mail address must be maintained and that the applicant or the applicant's attorney must file the relevant subsequent application-related submissions via the Trademark Electronic Application System (TEAS). Failure to do so will result in an additional processing fee of $50 per international class of goods/services.

A fee payment in the amount of $225 has been submitted with the application, representing payment for 1 class(es).

### Declaration

The signatory believes that: if the applicant is filing the application under 15 U.S.C. § 1051(a), the applicant is the owner of the trademark/service mark sought to be registered; the applicant is using the mark in commerce on or in connection with the goods/services in the application; the specimen(s) shows the mark as used on or in connection with the goods/services in the application; and/or if the applicant filed an application under 15 U.S.C. § 1051(b), § 1126(d), and/or § 1126(e), the applicant has a bona fide intention, and is entitled, to use the mark in commerce on or in connection with the goods/services in the application. The signatory believes that to the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive. The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of the application or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

Signature: /Chris Clark/   Date Signed: 09/21/2016
Signatory's Name: Chris Clark
Signatory's Position: COO

RAM Sale Number: 87178985
RAM Accounting Date: 09/22/2016

Serial Number: 87178985
Internet Transmission Date: Wed Sep 21 18:00:54 EDT 2016
TEAS Stamp: USPTO/FTK-XXX.XX.XXX.XXX-201609211800547
49614-87178985-550bc1a1caa1e58191ac8b3fa
33e286726bf5398de785e984b2c413f351d5dc29
63-CC-5233-2016092015392481o231

**ER1751**

OpenAI



82 commits | 1 branch | 0 releases | 7 contributors

Branch: master ▾ New pull request | Create new file | Upload files | Find file | Clone or download ▾

catherio committed on GitHub Merge pull request #17 from jbarnold/patch-1 … Latest commit 8fb1069 18 hours ago

| | | |
|---|---|---|
| binding-cpp | nice spaces | 5 days ago |
| binding-lua | nice spaces | 5 days ago |
| tests | adding sample and contains from PR#12 on main repo | 28 days ago |
| .gitignore | testing main repo travisci build | 21 days ago |
| .travis.yml | new API key from travis | 21 days ago |
| README.md | Update README.md | 20 hours ago |
| example_agent.py | clean up for submit | 21 days ago |
| gym_http_client.py | clean up for submit | 21 days ago |
| gym_http_server.py | clean up for submit | 21 days ago |
| requirements.txt | clean up for submit | 21 days ago |

README.md

# OpenAI gym-http-api

This project provides a local REST API to the gym open-source library, allowing development in languages other than python.

A python client is included, to demonstrate how to interact with the server.

Additional languages:

- C++ (within this repository, author: Oleg Klimov)
- lua (within this repository, work-in-progress)
- Scala (in progress, author: Flavio Truzzi)
- ... Contributions of clients in other languages are welcomed!

## Installation

EXHIBIT 7

| To: | OpenAI, Inc. (uspto@openai.com) |
|---|---|
| Subject: | U.S. TRADEMARK APPLICATION NO. 87178985 - OPENAI - N/A |
| Sent: | 1/5/2017 10:48:52 AM |
| Sent As: | ECOM104@USPTO.GOV |
| Attachments: | Attachment - 1 |
| | Attachment - 2 |
| | Attachment - 3 |
| | Attachment - 4 |
| | Attachment - 5 |
| | Attachment - 6 |
| | Attachment - 7 |
| | Attachment - 8 |
| | Attachment - 9 |
| | Attachment - 10 |
| | Attachment - 11 |
| | Attachment - 12 |
| | Attachment - 13 |
| | Attachment - 14 |
| | Attachment - 15 |
| | Attachment - 16 |
| | Attachment - 17 |
| | Attachment - 18 |
| | Attachment - 19 |
| | Attachment - 20 |

**UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)**
**OFFICE ACTION (OFFICIAL LETTER) ABOUT APPLICANT'S TRADEMARK APPLICATION**

**U.S. APPLICATION SERIAL NO.** 87178985

**MARK:** OPENAI

**\*87178985\***

**CORRESPONDENT ADDRESS:**
 OPENAI, INC.
 OPENAI, INC.
 3180 18TH ST STE 100
 SAN FRANCISCO, CA 94110

**CLICK HERE TO RESPOND TO THIS LETTER:**
http://www.uspto.gov/trademarks/teas/response_forms.jsp

VIEW YOUR APPLICATION FILE

**APPLICANT:** OpenAI, Inc.

**CORRESPONDENT'S REFERENCE/DOCKET NO :**
 N/A
**CORRESPONDENT E-MAIL ADDRESS:**
 uspto@openai.com

## OFFICE ACTION

### STRICT DEADLINE TO RESPOND TO THIS LETTER

TO AVOID ABANDONMENT OF APPLICANT'S TRADEMARK APPLICATION, THE USPTO MUST RECEIVE APPLICANT'S COMPLETE RESPONSE TO THIS LETTER **WITHIN 6 MONTHS** OF THE ISSUE/MAILING DATE BELOW. A RESPONSE TRANSMITTED THROUGH THE TRADEMARK ELECTRONIC APPLICATION SYSTEM (TEAS) MUST BE RECEIVED BEFORE

MIDNIGHT **EASTERN TIME** OF THE LAST DAY OF THE RESPONSE PERIOD.

**ISSUE/MAILING DATE: 1/5/2017**

The referenced application has been reviewed by the assigned trademark examining attorney. Applicant must respond timely and completely to the issue(s) below. 15 U.S.C. §1062(b); 37 C.F.R. §§2.62(a), 2.65(a); TMEP §§711, 718.03.

SUMMARY OF ISSUES:

- Prior Pending Application Advisory
- Section 2(e)(1) Refusal
- Supplemental Register Advisory
- Identification of Goods

PRIOR PENDING APPLICATION ADVISORY

The trademark examining attorney has searched the USPTO's database of registered and pending marks and has found no similar *registered* marks that would bar registration under Trademark Act Section 2(d). TMEP §704.02; *see* 15 U.S.C. §1052(d).

However, the mark in the following identified prior-filed pending application *may present a bar to registration* of applicant's mark as the filing date of pending U.S. Application Serial No. 86847151 precedes applicant's filing date. See attached referenced application. If the mark in the referenced application registers, applicant's mark may be refused registration under Trademark Act Section 2(d) because of a likelihood of confusion with the registered mark(s). *See* 15 U.S.C. §1052(d); 37 C.F.R. §2.83; TMEP §§1208 *et seq*. Therefore, upon receipt of applicant's response to this Office action, action on this application may be suspended pending final disposition of the earlier-filed referenced application.

In response to this Office action, applicant may present arguments in support of registration by addressing the issue of the potential conflict between applicant's mark and the mark in the referenced application. Applicant's election not to submit arguments at this time in no way limits applicant's right to address this issue later if a refusal under Section 2(d) issues.

SECTION 2(e)(1) REFUSAL – MERELY DESCRIPTIVE

Registration is refused because the applied-for mark merely describes a feature or purpose of applicant's goods. Trademark Act Section 2(e)(1), 15 U.S.C. §1052(e)(1); *see* TMEP §§1209.01(b), 1209.03 *et seq*.

A mark is merely descriptive if it describes an ingredient, quality, characteristic, function, feature, purpose, or use of an applicant's goods. TMEP §1209.01(b); *see, e.g., In re TriVita, Inc.*, 783 F.3d 872, 874, 114 USPQ2d 1574, 1575 (Fed. Cir. 2015) (quoting *In re Oppedahl & Larson LLP*, 373 F.3d 1171, 1173, 71 USPQ2d 1370, 1371 (Fed. Cir. 2004)); *In re Steelbuilding.com*, 415 F.3d 1293, 1297, 75 USPQ2d 1420, 1421 (Fed. Cir. 2005) (citing *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents* , 252 U.S. 538, 543 (1920)).

Here, the applied for mark is "OPENAI" for "Computer software for artificial intelligence."

The term "OPENAI" describes features of the applicant's goods because it combines the descriptive words "OPEN" and "AI". The attached evidence from the Huffington Post and Mashable shows that "OPEN" is a term used interchangeably with "open source" to describe software. As shown in the attached dictionary definition from the *American Heritage Dictionary*, "open source" means "Open to public participation, as in the sharing of information or the development of software." Further, as shown by the applicant's specimen, the applicant describes its goods as "open-source." Therefore "OPEN" is merely descriptive of a feature or characteristic of the applicant's goods, in that they include open source software. Further, the attached evidence from Macmillan Dictionary shows that the term "AI" means "artificial intelligence." Accordingly, the term "AI" is merely descriptive of the purpose of applicant's goods as the applicant specifically identifies software "for *artificial intelligence*."

Generally, if the individual components of a mark retain their descriptive meaning in relation to the goods, the combination results in a composite mark that is itself descriptive and not registrable. *In re Fat Boys Water Sports LLC*, 118 USPQ2d 1511, 1516 (TTAB 2016) (citing *In re Tower Tech, Inc.*, 64 USPQ2d 1314, 1317-18 (TTAB 2002)); TMEP §1209.03(d); *see, e.g., In re Cannon Safe, Inc.*, 116 USPQ2d 1348, 1351 (TTAB 2015) (holding SMART SERIES merely descriptive of metal gun safes, because "each component term retains its merely descriptive significance in relation to the goods, resulting in a mark that is also merely descriptive"); *In re King Koil Licensing Co.*, 79 USPQ2d 1048, 1052 (TTAB 2006) (holding THE BREATHABLE MATTRESS merely descriptive of beds, mattresses, box springs, and pillows where the evidence

showed that the term "BREATHABLE" retained its ordinary dictionary meaning when combined with the term "MATTRESS" and the resulting combination was used in the relevant industry in a descriptive sense).

Only where the combination of descriptive terms creates a unitary mark with a unique, incongruous, or otherwise nondescriptive meaning in relation to the goods and/or services is the combined mark registrable. *See In re Colonial Stores, Inc.*, 394 F.2d 549, 551, 157 USPQ 382, 384 (C.C.P.A. 1968); *In re Positec Grp. Ltd.*, 108 USPQ2d 1161, 1162-63 (TTAB 2013).

In this case, both the individual components and the composite result are descriptive of applicant's goods and do not create a unique, incongruous, or nondescriptive meaning in relation to the goods. Specifically, in light of the applied-for goods, the composite term "OPENAI" is descriptive in that it conveys that applicant's goods include open source software for artificial intelligence.

Although applicant's mark has been refused registration, applicant may respond to the refusal(s) by submitting evidence and arguments in support of registration.

SUPPLEMENTAL REGISTER ADVISORY

The applied-for mark has been refused registration on the Principal Register. Applicant may respond to the refusal by submitting evidence and arguments in support of registration and/or by amending the application to seek registration on the Supplemental Register. *See* 15 U.S.C. §1091; 37 C.F.R. §§2.47, 2.75(a); TMEP §§801.02(b), 816. Amending to the Supplemental Register does not preclude applicant from submitting evidence and arguments against the refusal(s). TMEP §816.04.

IDENTIFICATION OF GOODS

The identification for software in International Class 9 is indefinite; applicant must specify the purpose or function of the software. *See* 37 C.F.R. §2.32(a)(6); TMEP §1402.03(d). If the software is content- or field-specific, applicant must also specify its content or field of use. *See* TMEP §1402.03(d). The USPTO requires such specificity in identifying computer software in order for a trademark examining attorney to examine the application properly and make appropriate decisions concerning possible conflicts between the applicant's mark and other marks. *See In re N.A.D. Inc.*, 57 USPQ2d 1872, 1874 (TTAB 2000); TMEP §1402.03(d).

In this case, applicant identifies the field of the software as "artificial intelligence," but the function of the software is not clear

Applicant may adopt the following identification, if accurate:

> Class 9: Computer software for artificial intelligence, namely, computer software for {specify the function of the software in class 9, e.g., processing natural language queries and responses}

Applicant may amend the identification to clarify or limit the goods, but not to broaden or expand the goods beyond those in the original application or as acceptably amended. See 37 C.F.R. §2.71(a); TMEP §1402.06. Generally, any deleted goods may not later be reinserted. See TMEP §1402.07(e).

For assistance with identifying and classifying goods and services in trademark applications, please see the USPTO's online searchable *U.S. Acceptable Identification of Goods and Services Manual. See* TMEP §1402.04.

RESPONSE GUIDELINES

For this application to proceed further, applicant must explicitly address each refusal and/or requirement raised in this Office action. If the action includes a refusal, applicant may provide arguments and/or evidence as to why the refusal should be withdrawn and the mark should register. Applicant may also have other options specified in this Office action for responding to a refusal, and should consider those options carefully. To respond to requirements and certain refusal response options, applicant should set forth in writing the required changes or statements.

In addition, because applicant filed a TEAS Plus application, applicant must respond online using the Trademark Electronic Application System (TEAS) to avoid incurring an additional fee. *See* 37 C.F.R. §2.22(b)(1), (c). For more information and general tips on responding to USPTO Office actions, response options, and how to file a response online, see "Responding to Office Actions" on the USPTO's website.

If applicant does not respond to this Office action within six months of the issue/mailing date, or responds by expressly abandoning the application, the application process will end and the trademark will fail to register. *See* 15 U.S.C. §1062(b); 37 C.F.R. §§2.65(a), 2.68(a); TMEP §§718.01, 718.02. Additionally, the USPTO will not refund the application filing fee, which is a required processing fee. *See* 37 C.F.R. §§2.6(a)(1)(i)-(iv), 2.209(a); TMEP §405.04.

Where the application has been abandoned for failure to respond to an Office action, applicant's only option would be to file a timely petition to revive the application, which, if granted, would allow the application to return to active status. *See* 37 C.F.R. §2.66; TMEP §1714. There is a $100 fee for such petitions. *See* 37 C.F.R. §§2.6(a)(15), 2.66(b)(1).

CONSIDER LEGAL ASSISTANCE

Because of the legal technicalities and strict deadlines involved in the USPTO application process, applicant may wish to hire a private attorney specializing in trademark matters to represent applicant in this process and provide legal advice. Although the undersigned trademark examining attorney is permitted to help an applicant understand the contents of an Office action as well as the application process in general, no USPTO attorney or staff is permitted to give an applicant legal advice or statements about an applicant's legal rights. TMEP §§705.02, 709.06.

For attorney referral information, applicant may consult the American Bar Association's Consumers' Guide to Legal Help, an attorney referral service of a state or local bar association, or a local telephone directory. The USPTO may not assist an applicant in the selection of a private attorney. 37 C.F.R. §2.11.

ASSISTANCE

If applicant has questions regarding this Office action, please telephone or e-mail the assigned trademark examining attorney. All relevant e-mail communications will be placed in the official application record; however, an e-mail communication will not be accepted as a response to this Office action and will not extend the deadline for filing a proper response. *See* 37 C.F.R. §§2.62(c), 2.191; TMEP §§304.01-.02, 709.04-.05. Further, although the trademark examining attorney may provide additional explanation pertaining to the refusal(s) and/or requirement(s) in this Office action, the trademark examining attorney may not provide legal advice or statements about applicant's rights. *See* TMEP §§705.02, 709.06.

**TEAS PLUS OR TEAS REDUCED FEE (TEAS RF) APPLICANTS – TO MAINTAIN LOWER FEE, ADDITIONAL REQUIREMENTS MUST BE MET, INCLUDING SUBMITTING DOCUMENTS ONLINE:** Applicants who filed their application online using the lower-fee TEAS Plus or TEAS RF application form must (1) file certain documents online using TEAS, including responses to Office actions (see TMEP §§819.02(b), 820.02(b) for a complete list of these documents); (2) maintain a valid e-mail correspondence address; and (3) agree to receive correspondence from the USPTO by e-mail throughout the prosecution of the application. *See* 37 C.F.R. §§2.22(b), 2.23(b); TMEP §§819, 820. TEAS Plus or TEAS RF applicants who do not meet these requirements must submit an additional processing fee of $50 per international class of goods and/or services. 37 C.F.R. §§2.6(a)(1)(v), 2.22(c), 2.23(c); TMEP §§819.04, 820.04. However, in certain situations, TEAS Plus or TEAS RF applicants may respond to an Office action by authorizing an examiner's amendment by telephone or e-mail without incurring this additional fee.

/Jonathan Ryan O'Rourke/
Examining Attorney
Law Office 104
571-270-1561
jonathan.orourke@uspto.gov

**TO RESPOND TO THIS LETTER:** Go to http://www.uspto.gov/trademarks/teas/response_forms.jsp. Please wait 48-72 hours from the issue/mailing date before using the Trademark Electronic Application System (TEAS), to allow for necessary system updates of the application. For *technical* assistance with online forms, e-mail TEAS@uspto.gov. For questions about the Office action itself, please contact the assigned trademark examining attorney. **E-mail communications will not be accepted as responses to Office actions; therefore, do not respond to this Office action by e-mail.**

**All informal e-mail communications relevant to this application will be placed in the official application record.**

**WHO MUST SIGN THE RESPONSE:** It must be personally signed by an individual applicant or someone with legal authority to bind an applicant (i.e., a corporate officer, a general partner, all joint applicants). If an applicant is represented by an attorney, the attorney must sign the response.

**PERIODICALLY CHECK THE STATUS OF THE APPLICATION:** To ensure that applicant does not miss crucial deadlines or official

notices, check the status of the application every three to four months using the Trademark Status and Document Retrieval (TSDR) system at http://tsdr.uspto.gov/. Please keep a copy of the TSDR status screen. If the status shows no change for more than six months, contact the Trademark Assistance Center by e-mail at TrademarkAssistanceCenter@uspto.gov or call 1-800-786-9199. For more information on checking status, see http://www.uspto.gov/trademarks/process/status/.

**TO UPDATE CORRESPONDENCE/E-MAIL ADDRESS:** Use the TEAS form at http://www.uspto.gov/trademarks/teas/correspondence.jsp.

**Print: Jan 5, 2017**                              **86847151**

**DESIGN MARK**

**Serial Number**
86847151

**Status**
NON-FINAL ACTION - MAILED

**Word Mark**
OPEN AI

**Standard Character Mark**
Yes

**Type of Mark**
SERVICE MARK

**Register**
PRINCIPAL

**Mark Drawing Code**
(4) STANDARD CHARACTER MARK

**Owner**
Guy Ravine INDIVIDUAL UNITED STATES 346 1st st San Francisco
CALIFORNIA 94105

**Goods/Services**
Class Status -- ACTIVE.  IC 042.  US  100 101.  G & S: Providing a web
site featuring technology that enables internet users to share
documents, images and videos.  First Use: 2015/03/25.  First Use In
Commerce: 2015/03/25.

**Filing Date**
2015/12/11

**Examining Attorney**
MISTER, KATINA

-1-

ER1760

# Open AI



http://mashable.com/2017/03/04/ff91-unveiled-faraday-future-electric-car/#mGkFbFJtmqZ
03/05/2017 10:24:07 AM



While it's not exactly an apples to apples comparison, it seems fair to argue that Google's current domination of the mobile space closely mirrors last century's desktop software behemoth, Microsoft. Even today, the two companies enjoy strikingly similar adoption rates for their respective platforms: according to IDC, over 84% of smartphones shipped in the third quarter of last year were powered by Android (though Apple has made some inroads since then thanks to the popularity of its iPhone 6 lineup), while StatCounter reports that about 88% of personal computers shipped in the fourth quarter of 2014 ran Windows.

Speaking of Apple, another similarity between the two firms is, of course, their rivalry with Cupertino, which competes deftly in both mobile and traditional desktop computing — in fact, its OS X happens to be more popular than Google's Chrome OS, while its iOS makes Windows Phone's market share look like a rounding error.

SEE ALSO: OnePlus One Equals the Best Smartphone You Can Buy for $300

Finally, like Microsoft, Google — whose unofficial slogan is "Don't Be Evil" — has come under fire (along with regulatory scrutiny, especially in Europe) for wielding its near-monopoly power to extract concessions from its partners, most famously its insistence that its licensees include the suite of Google Mobile Services in their commercial offerings.

This software bundle, which includes the Play Store, its associated apps, and the Google Search infrastructure, is key to the corporation's monetization of Android. Although it also contributes its code to the Android Open Source Project, Android builds created through that channel aren't privy to this proprietary suite of applications. This is how Google is able to maintain a good deal of

**This is how Google**



Could 2017 be the year people take universal basic income seriously?

466 SHARES

This ridiculous laptop is the portable Batman command center you've always dreamed of

700 SHARES

How data is making journalism smarter than ever

542 SHARES

http://mashable.com/2017/03/04/ff91-unveiled-faraday-future-electric-car/#Em5bEFbF.ztmo2
01/05/2017 10:24:07 AM

...This is how Google
is able to maintain a
good deal of control
over what is widely
perceived to be an
open platform

is now Google is able to maintain a good deal of
control over what is widely perceived to be an
open platform, in no small part due to the
popularity of its many services (Gmail, YouTube,
Google Maps, etc).

Ironically, one particularly outspoken critic of
Google's management of Android is Cyanogen
Inc., a company that was formed to
commercialize a third-party ROM, Cyanogen Mod,
which is based on Android, including the proprietary Google Mobile
Services. Cyanogen claims that its firmware has been installed 12 million
times, making it by far the most popular homebrewed flavor of Android.

Considering how much Android has benefited the Cyanogen developers,
one might think the company would owe Google a debt of gratitude: without
Android, there is no CM. However, not only has Cyanogen publicly railed
against the platform's licensing terms, its CEO, Kirt McMaster, actually
began a recent speech (at The Information's "Next Phase of Android"
event) by stating that "we're attempting to take Android away from Google."

McMaster went on to say that Cyanogen was working on creating an
ecosystem of software and services that would obviate the need for
Google's GMS bundle, including such lofty components as its own app
store, along with what would presumably be an email client, mapping
software, cloud storage, an online document-editing suite, and substitutions
for numerous other Google offerings that Mountain View has spent nearly
two decades, and billions of dollars, developing.

### A brief history of forking

While other companies have forked Android before, only two have come
close to providing the end user with equivalents for most of Google's many
services: Amazon, with its Fire OS, and the manufacturer-formerly-known-
as-Nokia (with its now-discontinued Nokia X phones), with the help of its
current parent, none other than Microsoft. Both of these players possess
the resources that go hand-in-hand with billion-dollar market capitalizations
and while Cyanogen is reportedly in the midst of a Series C round of
funding that would value it in the hundreds of millions of dollars, it has few
revenue streams, nor has it explicitly articulated a clear vision regarding its



Complete meal in a bottle.
20% daily nutrition.
3 delicious flavors.

soylent

1 laptop, 3 4K screens: the ultimate gaming
experience

331  SHARES

Little boy has adorably weary reaction to
trying out VR

1.1K  SHARES



http://mashable.com/2017/03/04/lf91-unveiled-faraday-future-electric-car/#Em0cFbF..hmoZ
01/05/2017 10:24:07 AM

revenue streams, nor has it explicitly articulated a clear vision regarding its planned road to profitability.

What the public has seen of Cyanogen so far, besides its regularly updated ROM (now in version 12), may have left some observers with a bad taste in their mouths. The company's first commercially available product shipped thanks to a partnership with Chinese manufacturer OnePlus, a startup almost fully backed by established Chinese handset manufacturer Oppo. OnePlus began life with a single, hard-to-buy model known simply as the One, and for several months these devices were sold running a custom-built version of CyanogenMod.



The OnePlus One is one of the few phones to ship preloaded with CyanogenMod, a variant of Android.

IMAGE: NATHALIE DANNENBERG

However, when OnePlus made it known that it was expanding its retail sales beyond its domestic borders, to India, Cyanogen had a nasty surprise for it: McMaster and company had secretly inked a deal with leading Indian manufacturer Micromax, and the agreement included an exclusivity clause which forbade other actors from selling Cyanogen-powered phones in the country. The betrayal forced young OnePlus to go to court in order to fight an injunction on sales of its device (it eventually won), and hurriedly develop its own custom Android build, OxygenOS, to replace CyanogenMod on future products.



http://mashable.com/2017/03/16/if91-unveiled-faraday-future-electric-car/#mUsF5F_zmoZ
03/05/2017 10.24.07 AM

From its very founding, Cyanogen has seen its share of controversy. CyanogenMod has historically been a community-developed project, with literally thousands of contributors to its code. Some of these developers felt left out in the cold when a small cabal of top devs surreptitiously formed the venture-backed commercial entity, but declined to establish a profit-sharing arrangement for many of the major contributors whose work was integral to the platform.

To some, the leaders of the organization were living up to their self-adopted callsign: "Team Douche." And when it leaked out that Cyanogen had turned down a seemingly unlikely buyout offer from none other than Google itself, the billion-dollar valuation attached to that rumor (first reported in The Information) lead some to question who had started it in the first place.

### Android's coming civil war

Now Cyanogen has, by virtue of McMaster's statements, drawn a line in the sand between itself and its original benefactor; indeed, he minced few words by claiming that "we will not be based on some derivative of Google in three to five years. There will be services that are doing the same old bullshit with Android, and then there will be something different."

What's up in the air is how different Cyanogen's Android will actually be from Google's Android. Despite the fact that McMaster claimed that his team was "making a version of Android that is more open," neither of these companies is in the business of performing charity. Cyanogen's investors — rumored to soon include Microsoft itself — want to see a return on their investment, and for that to happen, Cyanogen needs to make money off its software. And as Google discovered, and Apple already knew, open software is hard to make a buck on: as the primary developer, you need to retain some control over your code if you expect other entities to pay for usage.

Cyanogen's investors — rumored to soon include Microsoft itself — want to see a return on their investment

There's little doubt that Cyanogen has the technical chops to pull off its intended goal, but if they build it, will people come? In order to successfully break away from Google, the company needs to court two



A new kind of router turns your Wi-Fi network into a fortress

1.2K SodHfLb

Complete meal in a bottle.
20% daily nutrition.
3 delicious flavors.

soylent







http://mashable.com/2017/01/04/ff91-unveiled-faraday-future-electric-car/#Rm9pFbF.Jzmq7
01/05/2017 10:24:07 AM

groups of people: developers and consumers. Like Apple, Google could easily dictate that users of its SDK publish their apps exclusively to the Play Store. Given the choice between writing for Android or writing for Cyanogen, the profit-minded developer will almost surely choose the larger user base every time.

As for consumers, one variable in the calculus that Cyanogen seems to be ignoring is the fact that its customers are also Google's customers; its fans are Google's fans. To foment a very public schism with a company that controls so much of their data and their mindshare, may end up backfiring — and scaring off potential partners in the process.

An old aphorism goes something like, "Don't bite the hand that feeds you." By maligning Google so vehemently, and seemingly ignoring the larger corporation's work in building up the popularity of Android — not to mention creating the basis for its ecosystem — Cyanogen is playing a dangerous game that seems born in arrogance: its perceived success, and apparent high valuation, may have given its principals the notion that they can do no wrong.

But the same environment that led users to cheer them on and independent developers to do their coding for free no longer exists. If Cyanogen continues down this road less traveled, it may find itself in a lonely place — with no way to return.

TOPICS: ANDROID, APPS AND SOFTWARE, CYANOGENMOD, GOOGLE, MOBILE, OXYGENOS, TECH

**Sponsored Content**

10 Cats Losing The Battle Against Human

Learn How this Before Bed Diet Routine can help you Lose Weight

The amazing VA benefits not enough vets are claiming

CEO Sundar Pichai recalls Google job interview, 'I thought Gmail was a joke'

721 SHARES

This Mannequin Challenge expertly shows the need for a Parkinson's cure

1.3K SHARES

PAID CONTENT BY VUDU

See how camera direction impacts the way you view your favorite movie characters

3.5K SHARES

http://mashable.com/2017/01/04/ff91-unveiled-faraday-future-electric-car/#EmGbFb7_itmnz7
03/05/2017 10:24:07 AM



Faraday Future just unveiled a super fast Tesla competitor — here's what it looks like

The FF 91 could be the fastest electric car ever made, accelerating from 0 to 60 mph in 2.39 seconds.

Faraday Future claim it's a "new species" of car that is smarter, faster and more connected than anything else on the road.

Nikolay Nikolov / 1 day ago



http://www.huffingtonpost.com/vala-afshar/10-reasons-to-use-open-so_b_5765719.html
01/06/2017 10:34:35 AM

EDITION

THE BLOG

## 10 Reasons To Use Open Source Software Defined Networking [Slideshare]

09/04/2014 01:52 pm ET | Updated Nov 04, 2014

Vala Afshar
Chief Digital Evangelist, Salesforce





http://www.huffingtonpost.com/vala-afshar/10-reasons-to-use-open-so...b_5766719.html
01/05/2017 10:24:35 AM

### 10 Reasons To Use Open Source Software-Defined Networking from Vala Afshar

Open source software (OSS) now has a permanent role in the enterprise IT world. Gartner forecasts that open-source technology will be included in 85% of all commercial software packages by 2016 and 95% of mainstream IT organizations will leverage some element of OSS. One of the fastest growing segments within open software is Software Defined Networking (SDN), which simplifies IT network configuration and management by decoupling control from the physical network infrastructure. The SDN market is projected to surge from $360M to $3.52B in 2018.

To understand more about open source SDN and why it is growing so quickly, I spoke with Neela Jacques, executive director of OpenDaylight. Neela works closely with the developer and user communities to advance SDN and Network Functions Virtualization (NFV). The range of software companies participating in OpenDaylight account for 95% of the entire SDN market. Neela and I took a look at the data on OSS and consolidated all the reasons that people use open source software for SDN into a top ten list.



Neela Jacques (Twitter: @NeelaJacques), executive director, OpenDaylight

An important source of data on OSS usage is the Future of Open Source survey by Michael J. Skok, partner at North Bridge Venture Partners. Michael is a strong proponent of OSS and shared his views on the CxOTalk panel at CIO Magazine's CIO Perspectives event in Boston. His annual survey provides

http://www.huffingtonpost.com/vala-afshar/10-reasons-to-use-open-so_b_5766716.html
01/05/2017 10:24:35 AM

[...] survey provides a view into the current state of the open source industry and an analysis of future trends. This year, 1240 people representing vendors and users from a cross-section of industries completed the survey.

According to the survey, the number one reason companies choose open source software is quality. In fact, eight out of ten users of OSS made their decision based on quality. The more eyes on the source, the higher the quality, and today over 10 million people are contributing to OSS. This also has an impact on security: users now view open software as more secure than proprietary software.

Here are the top 10 reasons to use open source SDN.

1. **Better Quality Code.** 80% of open software users chose to do so based on quality. Removing company boundaries and allowing any developer to participate, debate, compromise and inspire each other is why code written in open source communities is of higher quality and doesn't degrade in quality over time. (Note: Debate and challenges are overcome by using code. Leave hedges at the door.) Linus is how the benchmark for code quality; open source software quality outpaced proprietary code for the first time in 2013 - Coverity Report 2013

2. **Rapid Innovation.** Imagine being able to roll out services and products without worrying about the network. Having more control of your network via open SDN means you can innovate independently of hardware and software. Your ability to build new products or services increases dramatically to focus on what matters most. Companies get involved in collaborative software development to advance business objectives and to benefit from industry innovation. 91% of business managers and executives surveyed ruled collaborative software development from somewhat to very important to their business. Nearly 50% of business managers said they got involved in collaborative development because it allows them to innovate or help transform their industry - Linux Foundation Collaborative Trends Report 2014

3. **Security.** Although security may have once been viewed as a weakness for open software, it certainly is not today. In the 2014 Future of Open Source - 8th Annual Survey, 72% said they specifically chose open source because of security. This has to do with the transparency of open source as well as the scrutiny it receives from all its users.

4. **Community.** Open source has the power to build communities of people who believe in the technologies and are passionate about seeing them come [...]

http://www.huffingtonpost.com/vala-afshar/10-reasons-to-use-open-so_b_5765718.html
01/05/2017 10:24:35 AM

who believe in the technologies and are passionate about seeing them come to light. The many are smarter than the few—anyone can participate regardless of affiliation, adding to the collective brain trust to overcome an industry's toughest challenges together. It not only makes individuals smarter, but also companies who benefit from a much larger R&D effort. 60% of corporations contribute to open source, and 56% say that they will increase their contributions this year. Individual developers and businesses both benefit from the trend toward collaboration. 83% of software developers said they benefitted personally from collaborative development through exposure to new tools and development practices. More than 77% of business managers said collaborative development practices have benefited their organizations through a shorter product development cycle/faster time to market. – Linux Foundation Collaborative Trends Report 2014

**5. Freedom.** You are not beholden to any one vendor's roadmap, vision or timeline. If you need to change a feature, migrate or roll out new services, you can do that by participating in the open source community and being part of the change. The ability to access source code, add features, and fix code yourself is the number four reason users choose to use open software. 95% want open source in their SDN and Network Functions Virtualization (NFV) solutions. It represents to them greater choice, more functionality and interoperability, and lower costs. – OpenDaylight Survey 2014

**6. Adaptability.** While 63% of technology startups fail within 4 years, open source is not tied to any one individual vendor. Over 1,000 companies have contributed to Linux. The open source development model allows software to adapt quickly to changing times. Legacy and emerging protocols can be implemented if so desired. Open source SDN can evolve as the industry does.

**7. Choice.** There is no silver bullet in networking. A variety of solutions are used to solve different needs. With open SDN users can pick what works for them versus the one-size-fits-all approach of proprietary software. Today there are over 1 million open source projects with over 100 billion lines of code with 10 million people contributing.

**8. Interoperability.** Most businesses use solutions from more than one vendor to fill their needs. A common, open source platform means solutions can be interoperable and you can choose the right solution versus getting locked-in to a single solution that doesn't meet all of your needs. Choose the right solution versus getting locked-in to a single solution.

**9. De-Facto Standards.** Open source dovetails nicely with standards efforts;

http://www.huffingtonpost.com/vala-afshar/10-reasons-to-use-open-so_b_5765718.html
01/05/2017 10:24:35 AM

of up ? Most commercial open source software heavily uses community efforts. By speeding software development cycles, open source solutions become de facto standards that dovetail nicely with standards efforts. Over 100 additional companies join the Linux effort each year.

**10. Maximize Return on Spend.** It not only costs less up front, but it's easier to scale over time versus a proprietary system that adds more cost and complexity as it grows. Avoid costly vendor lock-in. The 2014 Future of Open Source found this can be a top reason for moving to open source software. According the survey, 66% find that open source helps improve efficiency and lower costs.

My own company, Extreme Networks, firmly believes in the benefits of open source and has committed to OpenDaylight as the platform to enable and drive SDN. To further encourage innovation on the OpenDaylight SDN platform, together with US Ignite we have launched the SDN Innovation Challenge, which will award prizes for SDN applications that make a difference in the areas of education, public safety, healthcare, advanced manufacturing, transportation, e-government, the Internet of Things, and clean energy.

For more on the topic of open source software, see my discussion with Brian Stevens, Red Hat CTO, 5 Business Benefits of Open Source Software, in this interview. Brian describes how CIOs can improve openness, collaboration and innovation with OSS.

**Follow Vala Afshar on Twitter:** www.twitter.com/ValaAfshar

Advertise
RSS
Careers
FAQ
User Agreement
Privacy
Comment Policy
About Us
About Our Ads
Contact Us
Archive

Copyright © 2017 TheHuffingtonPost.com, Inc.   "The Huffington Post" is a registered trademark of TheHuffingtonPost.com, Inc. All rights reserved.
Part of HuffPost Impact









| To: | OpenAI, Inc. (uspto@openai.com) |
|---|---|
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 87178985 - OPENAI - N/A |
| **Sent:** | 1/5/2017 10:48:54 AM |
| **Sent As:** | ECOM104@USPTO.GOV |
| **Attachments:** | |

### UNITED STATES PATENT AND TRADEMARK OFFICE (USPTO)

## IMPORTANT NOTICE REGARDING YOUR
## U.S. TRADEMARK APPLICATION

### USPTO OFFICE ACTION (OFFICIAL LETTER) HAS ISSUED
### ON **1/5/2017** FOR U.S. APPLICATION SERIAL NO. 87178985

Your trademark application has been reviewed. The trademark examining attorney assigned by the USPTO to your application has written an official letter to which you must respond. Please follow these steps:

**(1) READ THE LETTER** by clicking on this link or going to http://tsdr.uspto.gov/, entering your U.S. application serial number, and clicking on "Documents."

The Office action may not be immediately viewable, to allow for necessary system updates of the application, but will be available within 24 hours of this e-mail notification.

**(2) RESPOND WITHIN 6 MONTHS** (*or sooner if specified in the Office action*), calculated from **1/5/2017,** using the Trademark Electronic Application System (TEAS) response form located at http://www.uspto.gov/trademarks/teas/response_forms.jsp. A response transmitted through TEAS must be received before midnight **Eastern Time** of the last day of the response period.

**Do NOT hit "Reply" to this e-mail notification, or otherwise e-mail your response** because the USPTO does NOT accept e-mails as responses to Office actions.

**(3) QUESTIONS** about the contents of the Office action itself should be directed to the trademark examining attorney who reviewed your application, identified below.

/Jonathan Ryan O'Rourke/
Examining Attorney
Law Office 104
571-270-1561
jonathan.orourke@uspto.gov

## WARNING

**Failure to file the required response by the applicable response deadline will result in the ABANDONMENT of your application.** For more information regarding abandonment, see http://www.uspto.gov/trademarks/basics/abandon.jsp.

**PRIVATE COMPANY SOLICITATIONS REGARDING YOUR APPLICATION:** Private companies **not** associated with the USPTO are using information provided in trademark applications to mail or e-mail trademark-related solicitations. These companies often use names that closely resemble the USPTO and their solicitations may look like an official government document. Many solicitations require that you pay "fees."

Please carefully review all correspondence you receive regarding this application to make sure that you are responding to an official document from the USPTO rather than a private company solicitation. All official USPTO correspondence will be mailed only from the "United States

Patent and Trademark Office" in Alexandria, VA; or sent by e-mail from the domain "@uspto.gov."  For more information on how to handle private company solicitations, see http://www.uspto.gov/trademarks/solicitation_warnings.jsp.

EXHIBIT 8

Generated on: This page was generated by TSDR on 2023-01-27 09:44:39 EST

Mark: OPENAI

# OpenAI

| | | | |
|---|---|---|---|
| **US Serial Number:** | 87178985 | **Application Filing Date:** | Sep. 21, 2016 |
| **Filed as TEAS Plus:** | Yes | **Currently TEAS Plus:** | Yes |
| **Register:** | Principal | | |
| **Mark Type:** | Trademark | | |

**TM5 Common Status Descriptor:**



DEAD/APPLICATION/Refused/Dismissed or Invalidated

This trademark application was refused, dismissed, or invalidated by the Office and this application is no longer active.

**Status:** Abandoned because the applicant failed to respond or filed a late response to an Office action. To view all documents in this file, click on the Trademark Document Retrieval link at the top of this page.

**Status Date:** Aug. 03, 2017

**Date Abandoned:** Jul. 06, 2017

## Mark Information

**Mark Literal Elements:** OPENAI

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 4 - STANDARD CHARACTER MARK

## Goods and Services

Note:
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [ ] indicate deleted goods/services;
- Double parenthesis (( )) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks * * identify additional (new) wording in the goods/services.

| | | | |
|---|---|---|---|
| **For:** | Computer software for artificial intelligence | | |
| **International Class(es):** | 009 - Primary Class | **U.S Class(es):** | 021, 023, 026, 036, 038 |
| **Class Status:** | ACTIVE | | |
| **Basis:** | 1(a) | | |
| **First Use:** | Apr. 27, 2016 | **Use in Commerce:** | Apr. 27, 2016 |

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44E:** | No |
| **Filed 44E:** | No | **Currently 66A:** | No |
| **Filed 66A:** | No | **Currently No Basis:** | No |
| **Filed No Basis:** | No | | |

## Current Owner(s) Information

Owner Name: OpenAI, Inc.

Owner Address: 3180 18th St Ste 100
San Francisco, CALIFORNIA UNITED STATES 94110

Legal Entity Type: CORPORATION          State or Country  DELAWARE
                                        Where Organized:

## Attorney/Correspondence Information

**Attorney of Record - None**

**Correspondent**

Correspondent   OPENAI, INC.
Name/Address:   OPENAI, INC.
                3180 18TH ST STE 100
                SAN FRANCISCO, CALIFORNIA UNITED STATES 94110

Phone:  6503876701

Correspondent e-  uspto@openai.com          Correspondent e-  Yes
mail:                                        mail Authorized:

**Domestic Representative - Not Found**

## Prosecution History

| Date | Description | Proceeding Number |
|------|-------------|-------------------|
| Aug. 04, 2017 | ABANDONMENT NOTICE MAILED - FAILURE TO RESPOND | |
| Aug. 03, 2017 | ABANDONMENT - FAILURE TO RESPOND OR LATE RESPONSE | |
| Jan. 05, 2017 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | 6325 |
| Jan. 05, 2017 | NON-FINAL ACTION E-MAILED | 6325 |
| Jan. 05, 2017 | NON-FINAL ACTION WRITTEN | 92458 |
| Dec. 28, 2016 | ASSIGNED TO EXAMINER | 92458 |
| Sep. 28, 2016 | NOTICE OF PSEUDO MARK E-MAILED | |
| Sep. 27, 2016 | NEW APPLICATION OFFICE SUPPLIED DATA ENTERED | |
| Sep. 24, 2016 | NEW APPLICATION ENTERED | |

## TM Staff and Location Information

**TM Staff Information**

TM Attorney:  O'ROURKE, JONATHAN RYA          Law Office  LAW OFFICE 104
                                               Assigned:

**File Location**

Current Location:  TMEG LAW OFFICE 104 - EXAMINING          Date in Location:  Aug. 03, 2017
                   ATTORNEY ASSIGNED

EXHIBIT 9

# United States of America

## United States Patent and Trademark Office

# Open AI

| | |
|---|---|
| **Reg. No. 5,258,002** | Guy Ravine (UNITED STATES INDIVIDUAL)<br>346 1st st |
| **Registered Aug. 01, 2017** | San Francisco, CA 94105 |
| **Int. Cl.: 42** | CLASS 42: Providing a web site featuring technology that enables internet users to share documents, images and videos |
| **Service Mark** | FIRST USE 3-25-2015; IN COMMERCE 3-25-2015 |
| **Supplemental Register** | THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT STYLE, SIZE OR COLOR |
| | No claim is made to the exclusive right to use the following apart from the mark as shown: "AI" |
| | SER. NO. 86-847,151, FILED P.R. 12-11-2015; AM. S.R. 03-30-2017<br>KATINA SHAY JACKSON, EXAMINING ATTORNEY |



Joseph Matol

Performing the Functions and Duties of the
Under Secretary of Commerce for
Intellectual Property and Director of the
United States Patent and Trademark Office

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten  Years\***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic  Application System (TEAS) Correspondence  Address and Change of Owner  Address Forms available at** http://www.uspto.gov.

EXHIBIT 10



1/31/23, 12:15 PM                                                    DALL·E 2

DALL·E 2 can create original, realistic images and art from a
text description. It can combine concepts, attributes, and styles.

TEXT DESCRIPTION                                    DALL·E 2

**An astronaut**  Teddy bears  A bowl of soup

**riding a horse**  lounging in a tropical resort in space  playing
basketball with cats in space

**in a photorealistic style**  in the style of Andy Warhol  as a
pencil drawing

→



ER1790

1/31/23, 12:15 PM                                                                DALL·E 2

DALL·E 2 can expand images beyond what's in the original canvas, creating expansive new compositions.



DALL·E 2 can make realistic edits to existing images from a natural language caption. It can add and remove elements while taking shadows, reflections, and textures into account.

ER1791

1/31/23, 12:15 PM

ORIGINAL IMAGE

DALL·E 2

DALL·E 2 EDITS



→









SELECT LOCATION TO ADD A FLAMINGO

DALL·E 2 can take an image and create different
variations of it inspired by the original.

**ER1792**

1/31/23, 12:15 PM

ORIGINAL IMAGE



→

DALL·E 2

DALL·E 2 VARIATIONS







DALL·E 2 has learned the relationship between images and the text used to describe them. It uses a process called "diffusion," which starts with a pattern of random dots and gradually alters that pattern towards an image when it recognizes specific aspects of that image.

1/31/23, 12:15 PM                                                    DALL·E 2



DALL·E 2 Explained  2:47

In January 2021, OpenAI introduced DALL·E. One year later, our newest
system, DALL·E 2, generates more realistic and accurate images with
4x greater resolution.

DALL·E 1                                    DALL·E 2

1/31/23, 12:15 PM
DALL·E 2



"a painting of a fox sitting
in a field at sunrise in the
style of Claude Monet"

DALL·E 2 is preferred over DALL·E 1 for its caption matching and
photorealism when evaluators were asked to compare 1,000 image
generations from each model.

ER1795

1/31/23, 12:15 PM                                                DALL·E 2



DALL·E 2 began as a research project and is now available in beta. Safety
mitigations we have developed and continue to improve upon include:

**Preventing Harmful Generations**

We've limited the ability for DALL·E 2 to generate violent, hate, or adult images. By removing the most explicit content from the training data,
we minimized DALL·E 2's exposure to these concepts. We also used advanced techniques to prevent photorealistic generations of real
individuals' faces, including those of public figures.

**Curbing Misuse**

Our content policy does not allow users to generate violent, adult, or political content, among other categories. We won't generate images if our
filters identify text prompts and image uploads that may violate our policies. We also have automated and human monitoring systems to guard
against misuse.



**Phased Deployment Based on Learning**

Learning from real-world use is an important part of developing and deploying AI responsibly. We began by previewing DALL·E 2 to a limited number of trusted users. As we learned more about the technology's capabilities and limitations, and gained confidence in our safety systems, we slowly added more users and made DALL·E available in beta in July 2022.

SIGN UP    CONTENT POLICY    RISKS AND LIMITATIONS

1/31/23, 12:15 PM                                                      DALL·E 2



Our hope is that DALL·E 2 will empower people to express themselves creatively. DALL·E 2 also helps us understand how advanced AI systems see and understand our world, which is critical to our mission of creating AI that benefits humanity.

**Research Advancements**
Aditya Ramesh, Prafulla Dhariwal, Alex Nichol, Casey Chu, Mark Chen

**Engineering, Design, Product, and Prototyping**
Jeff Belgum, Dave Cummings, Jonathan Gordon, Wade Hickey, Christopher Hesse, Joanne Jang, Fraser Kelton, Vishal Kuo, Joel Lehman, Rachel Lim, Bianca Martin, Evan Morikawa, Rajeev Nayak, Glenn Powell, Krijn Rijshouwer, David Schnurr, Maddie Simens, Kenneth Stanley, Felipe Such, Chelsea Voss, Qiming Yuan

**Comms, Policy, Legal, Ops, Safety, and more**
Steven Adler, Lama Ahmad, Miles Brundage, Kevin Button, Che Chang, Chris Chantzis, Derek Chen, Francois Chol, Steve Dowling, Elie Georgieva, Shino Jomoto, Aris Konstantinidis, Gretchen Krueger, Andrew Mayne, Pamela Mishkin, Bob Rotsted, Natalie Summers, Dave Willner, Hannah Wong

**Acknowledgments**
Thanks to those who helped with and provided feedback on this release: Sandhini Agarwal, Sam Altman, Chester Cho, Peter Hoeschele, Jacob Jackson, Jong Wook Kim, Matt Knight, Jason Kwon, Anna Makanju, Katie Mayer, Bob McGrew, Luke Miller, Mira Murati, Adam Nace, Hyeonwoo Noh, Cullen O'Keefe, Long Ouyang, Michael Petrov, Henrique Ponde de Oliveira Pinto, Alec Radford, Dimitri Sastry, Pranav Shyam, Aravind Srinivas, Ilya Sutskever, Preston Tuggle, Arun Vijayvergiya, Peter Welinder

1/31/23, 12:15 PM                                    DALL·E 2



ER1799

| **To:** | wheedy@vwlawfirm.com |
| **Subject:** | U.S. Trademark Application Serial No. 97238896 - OPENAI - OPAI003US |
| **Sent:** | January 06, 2023 04:37:42 PM EST |
| **Sent As:** | tmng.notices@uspto.gov |

**Attachments**

---

### United States Patent and Trademark Office (USPTO)
#### Official Correspondence About Letter of Protest

**Letter of Protest No.** PLOP-2022-006851

**U.S. Application Serial No.** 97238896

**Mark:** OPENAI

**Correspondence Address:**
William G. Heedy
The Van Winkle Law Firm
11 N. Market St.
Asheville NC 28801 UNITED STATES OF AMERICA

**Correspondence Email Address:** wheedy@vwlawfirm.com

## Letter of Protest (LOP) Notice of Determination

**Issue date:** January 6, 2023

The United States Patent and Trademark Office (USPTO) received your letter of protest submitted on December 6, 2022. 15 U.S.C. §1051(f); 37 C.F.R. §2.149.

We reviewed the letter of protest and determined that it identifies one or more grounds for refusal appropriate in ex parte examination. The examining attorney will decide whether a refusal or requirement should be raised or ultimately made final. *See* 37 C.F.R. §2.149(d)(1).

Some or all of the evidence satisfies the requirements for letters of protest and will be included in the application record for the examining attorney to consider. Any grounds or evidence that do not comply with the requirements will not be included. You may view the ground(s) and evidence included in the application record and monitor the application status on our Trademark Status and Document Retrieval system.

You may not communicate directly with the examining attorney, either orally or in writing, regarding the application. 37 C.F.R. §2.149(k).

**ER1800**

Submitting a letter of protest does not stay or extend the time for filing a notice of opposition with the Trademark Trial and Appeal Board (TTAB) after a trademark has published in the *Official Gazette*. 37 C.F.R. §2.149(e).

The determination whether to include evidence in an application record is final and non-reviewable. 15 U.S.C. §1051(f); 37 C.F.R. §2.149(i).

Please see the Letter of protest practice tip webpage and *Trademark Manual of Examining Procedure (TMEP) Section 1715* for further information about letter of protest procedure and evidence requirements.

/Erica Jeung Dickey/
Liaison & Petitions Office

USPTO

(571) 270-3517

erica.dickey@uspto.gov

**United States Patent and Trademark Office (USPTO)**

# USPTO OFFICIAL NOTICE

**Letter of Protest No. PLOP-2022-006851**

**Letter of Protest (LOP) Notice of Determination has issued
on January 6, 2023 for
U.S. Trademark Serial No. 97238896**

The United States Patent and Trademark Office (USPTO) received your letter of protest submitted on December 6, 2022. 15 U.S.C. §1051(f); 37 C.F.R. §2.149.

We reviewed the letter of protest and determined that it identifies one or more grounds for refusal appropriate in ex parte examination. The examining attorney will decide whether a refusal or requirement should be raised or ultimately made final. *See* 37 C.F.R. §2.149(d)(1).

Some or all of the evidence satisfies the requirements for letters of protest and will be included in the application record for the examining attorney to consider. Any grounds or evidence that do not comply with the requirements will not be included. You may view the ground(s) and evidence included in the application record and monitor the application status on our Trademark Status and Document Retrieval system.

You may not communicate directly with the examining attorney, either orally or in writing, regarding the application. 37 C.F.R. §2.149(k).

Submitting a letter of protest does not stay or extend the time for filing a notice of opposition with the Trademark Trial and Appeal Board (TTAB) after a trademark has published in the *Official Gazette*. 37 C.F.R. §2.149(e).

The determination whether to include evidence in an application record is final and non-reviewable. 15 U.S.C. §1051(f); 37 C.F.R. §2.149(i).

Please see the Letter of protest practice tip webpage and *Trademark Manual of Examining Procedure (TMEP) Section 1715* for further information about letter of protest procedure and evidence requirements.

| **To:** | wheedy@vwlawfirm.com |
| **Subject:** | Proceeding No. PLOP-2023-000297 in U.S. Trademark Registration No. undefined |
| **Sent:** | February 14, 2023 04:51:06 PM EST |
| **Sent As:** | tmng.notices@uspto.gov |

---

**Attachments**

### United States Patent and Trademark Office (USPTO)
**Official Correspondence About Letter of Protest**

**Letter of Protest No.** PLOP-2023-000297

**U.S. Application Serial No.** 97238896

**Mark:** OPENAI

**Correspondence Address:**
William G. Heedy
The Van Winkle Law Firm
11 N. Market St.
Asheville NC 28801 UNITED STATES OF AMERICA

**Correspondence Email Address:** wheedy@vwlawfirm.com

## Letter of Protest (LOP) Notice of Determination

**Issue date:** February 14, 2023

The United States Patent and Trademark Office (USPTO) received your letter of protest submitted on January 31, 2023. 15 U.S.C. §1051(f); 37 C.F.R. §2.149.

We reviewed the letter of protest and determined it will not be considered by the examining attorney because it does not meet the legal requirements. 37 C.F.R. §2.149. Specifically, the issues identified in the letter of protest are moot.

The USPTO record shows that the examining attorney already considered the issues raised in the first LOP that was considered on January 6, 2023. 37 C.F.R. §2.149(g)(2). A review of the prosecution record shows that the examining attorney determined that no further action would be taken on the LOP filed on January 6, 2023.

Therefore, the LOP merely sets forth a disagreement with the examination conducted by the examining attorney, or with the examining attorney's exercise of judgment, and does not present new information

**ER1803**

that was previously unavailable.

You may not communicate directly with the examining attorney, either orally or in writing, regarding the application. 37 C.F.R. §2.149(k).

Submitting a letter of protest does not stay or extend the time for filing a notice of opposition with the Trademark Trial and Appeal Board (TTAB) after a trademark has published in the *Official Gazette*. 37 C.F.R. §2.149(e). You may monitor the application status on our Trademark Status and Document Retrieval system.

The determination whether to include evidence in an application record is final and non-reviewable. 15 U.S.C. §1051(f); 37 C.F.R. §2.149(i). You may file a new letter of protest if it is timely and meets the legal requirements. 37 C.F.R. §2.149(j).

Please see the Letter of protest practice tip webpage and *Trademark Manual of Examining Procedure (TMEP) Section 1715* for further information about letter of protest procedure and evidence requirements.

/Karen Strzyz/
Karen Strzyz
Attorney-Advisor
Liaison & Petitions Office

USPTO

(571) 272-9419

Karen.Strzyz@USPTO.GOV

**United States Patent and Trademark Office (USPTO)**

# USPTO OFFICIAL NOTICE

**Letter of Protest No. PLOP-2023-000297**

**Letter of Protest (LOP) Notice of Determination has issued
on February 14, 2023 for
U.S. Trademark Serial No. 97238896**

The United States Patent and Trademark Office (USPTO) received your letter of protest submitted on January 31, 2023. 15 U.S.C. §1051(f); 37 C.F.R. §2.149.

We reviewed the letter of protest and determined it will not be considered by the examining attorney because it does not meet the legal requirements. 37 C.F.R. §2.149. Specifically, the issues identified in the letter of protest are moot.

The USPTO record shows that the examining attorney already considered the issues raised in the first LOP that was considered on January 6, 2023. 37 C.F.R. §2.149(g)(2). A review of the prosecution record shows that the examining attorney determined that no further action would be taken on the LOP filed on January 6, 2023.

Therefore, the LOP merely sets forth a disagreement with the examination conducted by the examining attorney, or with the examining attorney's exercise of judgment, and does not present new information that was previously unavailable.

You may not communicate directly with the examining attorney, either orally or in writing, regarding the application. 37 C.F.R. §2.149(k).

Submitting a letter of protest does not stay or extend the time for filing a notice of opposition with the Trademark Trial and Appeal Board (TTAB) after a trademark has published in the *Official Gazette*. 37 C.F.R. §2.149(e). You may monitor the application status on our Trademark Status and Document Retrieval system.

The determination whether to include evidence in an application record is final and non-reviewable. 15 U.S.C. §1051(f); 37 C.F.R. §2.149(i). You may file a new letter of protest if it is timely and meets the legal requirements. 37 C.F.R. §2.149(j).

Please see the Letter of protest practice tip webpage and *Trademark Manual of Examining Procedure (TMEP) Section 1715* for further information about letter of protest procedure and evidence requirements.

/Karen Strzyz/

Karen Strzyz

Attorney-Advisor
Liaison & Petitions Office


USPTO


(571) 272-9419


Karen.Strzyz@USPTO.GOV

1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Robert P. Feldman (Bar No. 69602)
2   bobfeldman@quinnemanuel.com
   Margret M. Caruso (Bar No. 243473)
3   margretcaruso@quinnemanuel.com
   555 Twin Dolphin Drive, 5th Floor
4  Redwood Shores, California 94065-2139
   Telephone:    (650) 801-5000
5
   Robert M. Schwartz (Bar No. 117166)
6   robertschwartz@quinnemanuel.com
   Aaron H. Perahia (Bar No. 304554)
7   aaronperahia@quinnemanuel.com
   865 S. Figueroa St., 10th Fl.
8  Los Angeles, California 90017-2543
   Telephone:    (213) 443-3000
9
   Sam S. Stake (Bar No. 257916)
10  samstake@quinnemanuel.com
   50 California Street, 22nd Floor
11 San Francisco, California 94111-4624
   Telephone:    (415) 875-6600
12

13 *Attorneys for OpenAI, Inc.*

14                    **UNITED STATES DISTRICT COURT**

15                   **NORTHERN DISTRICT OF CALIFORNIA**

16

17 | OPENAI, INC., a Delaware corporation, | Case No. 4:23-CV-03918-YGR |

18            Plaintiff,                  | Assigned to Hon. Yvonne Gonzalez Rogers

19       vs.                             | **DECLARATION OF DR. SCOTT D.
                                           SWAIN IN SUPPORT OF OPENAI,**
20 OPEN ARTIFICIAL INTELLIGENCE,          | **INC.'S MOTION FOR A**
   INC., a Delaware corporation; and GUY  | **PRELIMINARY INJUNCTION**
21 RAVINE, an individual,
                                          | Date:    November 7, 2023
22            Defendants.                 | Time:    2:00 p.m.
                                          | Place:   Courtroom 1 (4th Fl.)
23                                                    1301 Clay St.
                                                      Oakland, CA 94612
24

25

26

27

28

# TABLE OF CONTENTS

DECLARATION OF DR. SCOTT D. SWAIN ...................................................................3

I.   QUALIFICATIONS ..........................................................................................3

II.  OVERVIEW OF SURVEY AND SUMMARY OF CONCLUSIONS ...............5

III. SURVEY METHODOLOGY .............................................................................7

     A.   Background ..............................................................................................7

     B.   Survey Format .........................................................................................9

     C.   Sampling of the Relevant Population ....................................................10

     D.   Quality Control ......................................................................................11

     E.   Demographics and Screening of Respondents ......................................11

     F.   Main Questionnaire ...............................................................................15

IV.  MAIN QUESTIONNAIRE RESULTS ............................................................26

     A.   Source Confusion as to Company .........................................................26

     B.   Source Confusion as to Services ...........................................................27

     C.   Connection/Affiliation Confusion .........................................................28

     D.   Overall Confusion .................................................................................30

V.   CONCLUSIONS...............................................................................................32

**DECLARATION OF DR. SCOTT D. SWAIN**

I, Dr. Scott D. Swain, declare that:

1.     I am a Professor of Marketing and an inaugural Powers Distinguished Fellow at Clemson University.  I submit this declaration in support of Plaintiff OpenAI, Inc.'s ("OpenAI") Motion for Preliminary Injunction against Defendants Open Artificial Intelligence, Inc. and Guy Ravine ("Defendants") in the above-captioned action.  I make this declaration based on my personal knowledge, education, training, and experience, as well as my review of relevant literature and case-specific materials.  If called and sworn as a witness, I could and would testify competently to my opinions expressed below and the bases and reasons for them.

2.     OpenAI's counsel retained me to study whether Defendants' use of the name "Open AI" (the "OPEN AI mark") is likely to cause confusion with OpenAI's use of its name ("OPENAI") among relevant consumers.  Below I describe the design, methodology, execution, and results of a survey I conducted, along with my opinions based on the survey and other evidence of actual confusion.

## I.     QUALIFICATIONS

3.     Below is a summary of my education and relevant experience.  A copy of my complete curriculum vitae is attached as **Exhibit A**.

4.     I earned an MBA and Ph.D. in Marketing from the University of South Carolina in 1996 and 2002, respectively. I earned a Bachelor of Science in Electrical Engineering from Clemson University in 1991 and a Bachelor of Science in Physics from Francis Marion University in 1991.  Before joining Clemson University in 2013, I served on the faculties of Boston University (Questrom School of Business, 2002-2008) and Northeastern University (D'Amore-McKim School of Business, 2009-2013). I also served as a visiting Professor of Marketing at the Tuck School of Business at Dartmouth College in 2021 and 2022.

5.     My expertise includes consumer behavior, branding, advertising strategy, retailing, promotions, pricing, research methodology, survey design, experimental design, and marketing management. My peer-reviewed research has been published in leading marketing, management, information systems, and behavioral economics journals, including the *Journal of Marketing*,

*Journal of Marketing Research*, *Journal of Consumer Research*, *Journal of the Academy of Marketing Science*, *Journal of Retailing*, *Decision Support Systems*, *Journal of Behavioral and Experimental Economics*, *Journal of Business Research*, and *Marketing Letters*. I have also published many scholarly book chapters, trade articles, and peer-reviewed articles and abstracts in international conference proceedings. I am a member of editorial teams and review boards for leading journals and serve as a referee for research manuscripts at leading journals in retailing, marketing, consumer psychology, information science, and applied psychology, among other topics. This work requires me to maintain expertise in marketing and consumer behavior theory, as well as methodologies such as experimental design, survey design, multivariate analysis, choice modeling, and structural equation modeling.

6.     For over 25 years, I have taught doctoral courses in marketing management, MBA courses in marketing research, advertising strategy, and entrepreneurial marketing, and undergraduate courses in marketing research, advertising, branding, product management, marketing strategy, and marketing principles. I have also supervised and guided numerous theses and dissertations related to my areas of expertise, and I have been recognized for excellence in teaching at multiple institutions.

7.     I have conducted, supervised, and assessed nearly 1,000 studies with marketing applications. Most use qualitative and quantitative methods to assess the perceptions, attitudes, decision-making, and behaviors of customers and others regarding marketing stimuli, such as promotions, pricing, advertising, technology, public relations, packaging, product design, retail environments, and distribution channels. I have also consulted on research and marketing strategy to provide data and insights related to marketing activities and processes in contexts such as advertising-assessment systems, customer segmentation, product design, service design, retail design, technology experiences, customer journeys, and lifetime value. My work as a consultant has frequently involved designing, conducting, and reporting the results of customer surveys.

8.     Based on my education, experience, and expertise in assessing consumer perceptions and marketing activities, I have been retained and qualified as an expert witness in federal proceedings before. I have also testified as an expert before the National Advertising

Division. Attached as **Exhibit B** is a list of cases in which I testified as an expert in a deposition or at trial in the last four years. I am being compensated for my work at a rate of $600 per hour. My compensation is not contingent on my opinions or the outcome of OpenAI's motion or this action.

9. My assessments in this action are based on scientific literature that contains widely accepted theories, methodologies, and data sources for studying individuals' perceptions, attitudes, and decision-making processes. I also draw upon general principles of marketing and consumer behavior; my experience as a marketing scholar, educator, and consultant; and my review of documents and other information related to the action, including the survey I conducted. The attached **Exhibit C** lists the materials I considered in forming my opinions.

10. I hold my opinions to a reasonable degree of professional certainty. The information I have relied upon is the type of information that is typically relied upon in my fields of expertise. I reserve the right to revise my opinion if additional information, documents, or testimony provided by the parties becomes available that would cause me to amend or supplement my opinions in this matter.

## II.    OVERVIEW OF SURVEY AND SUMMARY OF CONCLUSIONS

11. I surveyed 413 qualified respondents. The respondents used or searched for an online service that allows a user to generate or create images or other content using an artificial intelligence system in the past six months, or who were likely to do so in the next six months.

12. Respondents were first shown an image of an OpenAI webpage displaying its OPENAI mark. They were then randomly assigned to a Test Group and a Control Group. Respondents in the Test Group were shown, in random sequential order, images of three other webpages: (i) one from Defendants, (ii) one from Anthropic, a company that offers artificial intelligence products and services, including an artificial intelligence chatbot, and (iii) one from Midjourney, a company that offers artificial intelligence products and services, including an artificial intelligence text-to-image generator. The webpages for Anthropic and Midjourney served as decoys. Respondents in the Control Group were shown, in random sequential order, the same webpage images as the Test Group, except that the allegedly infringing OPEN AI mark on Defendants' webpage was changed to ULTIMATE AI, a fictional name. This control stimulus is

conservative regarding likelihood of confusion because the only change from Defendants' webpage shown in the test condition is the replacement of "Open AI" with "Ultimate AI," leaving unchanged all other potential contributors to confusion (e.g., font and layout).

13.     The survey then asked respondents in the Test Group and the Control Group questions to measure of consumers' likelihood of confusion (i.e., whether they mistakenly believe Defendants' website displaying the OPEN AI mark references a company or services that come from or are connected or affiliated with OpenAI). The survey results indicate a likelihood of confusion of more than half (54.3% of 208) the respondents in the Test Group. The results further indicate a likelihood of confusion of 31.7% of 205 respondents in the Control Group. Subtracting the control confusion from the test confusion removes any potential "noise" due to factors other than the allegedly infringing OPEN AI mark, such as layout, color, design, font, or instances of respondents' guessing, inattentiveness, or misinterpretation of questions.[1] As reflected in Table 1, I observe a net likelihood of confusion of 22.6% among relevant consumers due to Defendants' use of the OPEN AI mark.[2]

| Table 1: Net Likelihood of Confusion | | | | | | |
|---|---|---|---|---|---|---|
| | Test: Open AI Base: 208 | | Control: Ultimate AI Base: 205 | | | Net Confusion |
| | N | Col % | N | Col % | | Col % |
| Confusion expressed in response to Questions Q8-A, Q8-B, & Q11 (consolidated and de-duplicated) | 113 | 54.3% | 65 | 31.7% | | 22.6% |

---

[1] Diamond, Shari S. (2022), "Control Foundations: Rationales and Approaches," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann; Diamond, Shari Seidman (2011), *Trademark and Deceptive Advertising Surveys, Reference Guide on Survey Research*, eds. by Shari Seidman Diamond and Jerre B. Swann; Simonson, Itamar and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Diamond*, Shari S. and Jerre B. Swann (eds.), American Bar Association.

[2] Unless specified otherwise, for the tables in this declaration, the "N" columns represent the number of responses collected and the "Col %" columns represent the percentage of overall responses collected.

DECLARATION OF DR. SCOTT SWAIN ISO OPENAI'S MOTION FOR A PRELIMINARY INJUNCTION
**ER1812**

## III.  **SURVEY METHODOLOGY**

### A.  **Background**

14.    Based on my review of the Complaint, I understand that OpenAI asserts senior use for its OPENAI mark.  I also understand that OpenAI asserts that Defendants' junior use of its OPEN AI mark causes confusion.[3] My survey is designed to provide a valid and reliable measure of the likelihood of consumer confusion resulting from Defendants' use of OPEN AI on their website in accordance with prevailing standards.[4]

15.    In designing a survey to assess likelihood of confusion, a guiding principle is to ensure a sufficiently realistic simulation of the marketplace so that respondents' mental states in the survey are representative of the relevant universe of consumers' mental states when they encounter the allegedly infringing OPEN AI mark. Here, relevant consumers primarily encounter the parties' marks on the parties' respective webpages, as well as in online articles and social media mentions of them.[5] As such, the potential for competitive proximity at a national scale via the internet exists. Because the parties' marks typically are not shown "side-by-side" on a single webpage, the proximity is generally sequential in nature.[6]

16.    I conducted Google searches to better understand the potential for proximity (see **Exhibit D**). I cleared my browser history before each search. I first searched for "open ai" (without quotes) and noted that Google displayed the following a message at the top of the page:

Showing results for *openai*
Search instead for open ai

---

[3] Complaint. ¶ 2.

[4] McCarthy, J. Thomas (2021), § 32:163 "Survey Methodology-Approximating Market Conditions," *McCarthy on Trademarks and Unfair Competition*, 5th edition; Swann, Jerre B. (2022), "Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann.

[5] Complaint. ¶¶ 15-26.

[6] I note also that the Complaint (¶ 3) alleges that "during four years of its existence, the domain associated with Defendants' trademark application redirected visitors to OpenAI's website." This is an extreme example of sequential internet proximity.

17.     Clicking the open ai (versus *openai*) link[7] revealed proximity within the top two search results: the first search result was OpenAI's webpages displaying the OPENAI mark and the second search result was Defendants' webpage displaying the OPEN AI mark. The results are the same as the results when searching for "open ai" (with quotes).

18.     Clicking the *openai* (versus open ai) link[8] in the initial Google search revealed proximity in the top fifteen results, with OpenAI's webpages displaying the OPENAI mark appearing first and Defendants' webpage displaying the OPEN AI mark appearing fifteenth. The results are the same as the results when searching for "openai" (no quotes).

19.     A search for "open artificial intelligence" (without quotes) revealed proximity within the top five search results, with OpenAI's webpages displaying the OPENAI mark appearing first and Defendants' webpage displaying the OPEN AI mark appearing fifth.

20.     In addition to the above proximity evidence, I considered documents revealing actual confusion among online authors (see **Exhibit E**)[9] and social media users (see **Exhibit F**).[10] Based on my experience as a marketing and survey expert, I understand that evidence of actual confusion can be difficult to obtain, even if substantial actual confusion exists. This difficulty parallels a well-known phenomenon in marketing, which is that the true extent of customer dissatisfaction is typically far greater than the observed rate of customer complaints.[11] Customer

---

[7] *See* Google, https://www.google.com/search?q=open+ai.

[8] *See* Google, https://www.google.com/search?q=openai.

[9]  Forbes, *On CRM:  Is ChatGPT Over Hyped?* (Dec. 13, 2022), https://www.forbes.com/sites/quickerbettertech/2022/12/13/on-crm-is-chatgpt-over-hyped; World Economic Forum, *5 Ways Artificial Intelligence Will Disrupt* Science (Jun. 20, 2016), https://www.weforum.org/agenda/2016/06/5-ways-artificial-intelligence-will-disrupt-science/; The Telegraph, *Meet the AI Robot that Can Tidy Your Room and Sort Out Your Laundry* (Jun. 14, 2023), https://telegraph.co.uk/news/2023/06/14/tidybot-robot-princeton-university-tidy-room-laundry-ai/; GoDaddy, *What Is A .AI Domain?* (Apr. 18, 2023), https://ae.godaddy.com/blog/what-is-a-ai-domain/.

[10] Twitter Post (Feb. 14, 2023), https://twitter.com/itsandrewgao/status/1625597653152301057; Twitter Post (Jun. 27, 2023), https://twitter.com/EricCartmanTV/status/1673699808572219395; Twitter Post (June 27, 2023), https://twitter.com/wsi_biggs/status/1673683929096699906; Twitter Post (Jun. 20, 2023), https://twitter.com/BlueCallom/status/1671100620411994114.

[11] Goodman, John (2004). Basic Facts on Customer Complaint Behavior and the Impact of Service on the Bottom Line, Technical Assistance Research Program (TARP); Singh, Jagdip (1988),

DECLARATION OF DR. SCOTT SWAIN ISO OPENAI'S MOTION FOR A PRELIMINARY INJUNCTION

**ER1814**

1  reluctance is one reason marketers observe low rates of consumer dissatisfaction and actual

2  confusion, even when the true rates are significant.  Consumers are often reluctant to report being

3  underserved or confused because of embarrassment or a sense that it is more trouble than it is

4  worth or that nothing can be done. In addition, consumers often fail to recognize that they should

5  complain, or they mistakenly believe a mark originates with, or is connected or affiliated with, the

6  wrong source of the mark. Thus, owners of affected marks are well-justified in their concerns that

7  examples of actual confusion merely represent the "tip of the iceberg."

8          21.     Examples of actual confusion also show that the marks are proximal along with the

9  clear proximity in basic internet searches involving the marks. As noted by Jerre B. Swann, former

10 director of the International Trademark Association and editor-in-chief of the Trademark Reporter,

11 "[a] likelihood of appreciable trademark confusion cannot arise absent appreciable opportunities

12 for consumers contextually to compare the marks at issue."[12]

13         **B.     <u>Survey Format</u>**

14         22.     My survey measured likelihood of confusion using a "two-room" *Squirt* format.

15 A *Squirt* survey measures likelihood of confusion when consumers encounter products in physical

16 or virtual proximity.[13] In the two-room *Squirt* survey format, respondents are first exposed to

17 senior user's mark (here, OPENAI) in "Room 1" to establish awareness and memory accessibility.

18 The mark is shown as it appears in the marketplace. Respondents are then sequentially exposed to

19 a lineup of marks in "Room 2," including the allegedly infringing mark (here, OPEN AI) and

20 other decoy marks from third-party sources (here, companies that offer artificial intelligence

21

22

23 "Consumer Complaint Intentions and Behavior: Definitional and Taxonomical Issues," *Journal of Marketing*, 52 (January), 93-107.

24

25 [12] Swann, Jerre B. (2022), "Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann.

26

27 [13] McCarthy, J. Thomas (2021), § 32:163 "Survey Methodology-Approximating Market Conditions," *McCarthy on Trademarks and Unfair Competition*, 5th edition; Swann, Jerre and R. Charles Henn Jr. (2019), "Likelihood of Confusion Surveys: The Ever-Constant Eveready Format;

28 The Ever-Evolving Squirt Format," *Trademark Reporter*, 109, 671-683.

1  products and services). The decoy marks not only enhance the realism of replication but also serve

2  to disguise the survey's purpose from respondents.

3    23.    A proper two-room *Squirt* survey also includes a Control Group. In the Control

4  Group, respondents take the same survey as a Test Group, except that the allegedly infringing

5  mark is replaced by a non-infringing mark. The Control Group measures the effects of factors

6  other than the allegedly infringing mark. For example, respondents may assume products or

7  services in the survey are connected and then look for commonalities not likely to cause confusion

8  in the actual marketplace. Because of the potential for such "noise," to test for likelihood of

9  confusion in the marketplace context, a survey needs controls to scientifically distinguish between

10 genuine confusion due to confusing use of marks from artificial confusion that may arise from a

11 tendency to answer that two marks are connected because they appear in the same survey or their

12 context shares elements other than similar names. Once the Control Group measurement is

13 subtracted from the Test Group measurement, survey noise is eliminated to arrive at the purified or

14 "net" measure of the likelihood of confusion.

15    **C.    Sampling of the Relevant Population**

16    24.    OpenAI alleges forward confusion—i.e., that consumers will assume Defendants'

17 OPEN AI mark refers to, or is otherwise connected to or approved by, OpenAI. In surveys to

18 evaluate likelihood of forward confusion, the relevant and appropriate population is the junior

19 user's customers. Here, relevant consumers include individuals who have or would consider

20 visiting or using websites like those offered by Defendants.

21    25.    I retained SimpleOpinions, an established and reliable online survey vendor, to

22 conduct the survey based on my instructions.[14]  Under my supervision, SimpleOpinions

23 programmed my survey script, accessed a representative sample from the target population in the

24 United States, collected the survey responses in September of 2023, and processed end-of-survey

25 responses, messaging, and incentives. Potential respondents were unaware of the purpose or topic

26 of the survey and needed to meet the screening criteria outlined below to qualify for the survey.

27

28 ─────────────────
[14] *See* SimpleOpinions, https://simpleopinions.com/.

26.     I have used SimpleOpinions many times before for this type of marketing research because of its procedures ensuring high-quality data, including double opt-in registration, digital fingerprinting, device verification, mobile verifications, and third-party validation. **Exhibit G** contains my survey script and programming instructions. **Exhibit H** contains screenshots of the programmed survey. **Exhibit I** contains tabulations of selected questions in the survey.

**D.     Quality Control**

27.     I ensured that my survey adhered to generally accepted principles for surveys, including surveys intended to measure likelihood of confusion. This includes, among other things, selecting an appropriate design; defining and representing the relevant consumer population; developing and executing an appropriate sampling plan; conducting appropriate and accurate analyses of the data; and minimizing or eliminating the impact of factors such as the wording of questions, the wording or order of answer choices, and the method of respondent qualification, selection, and validation.

28.     I also used techniques to maximize the validity and reliability of the survey data, including randomization (or rotation, as appropriate) of answer choices and stimulus orders, instructions to not guess, respondent validation, and double-blind procedures (*i.e.*, neither SimpleOpinions nor the respondents knew the survey's true purpose or sponsor). I also employed internal controls such as attention checks (to ensure quality responses) and control stimuli (to account for survey noise).[15]

**E.     Demographics and Screening of Respondents**

29.     To ensure a representative sample of the relevant population, I used a series of screening and demographic questions. The survey opened with a welcome message (Question S0) and gave instructions, including answering honestly, avoiding guessing, and refraining from

---

[15] Diamond, Shari S., (2011). "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence* (3rd Edition), Washington, D.C.: National Academies Press, 397-401; *Manual for Complex Litigation*, 4th Edition, Federal Judicial Center; Marsden, Peter V. and James D. Wright (2010), *Handbook of Survey Research* (2nd edition). Emerald Group Publishing; Tourangeau, Roger, Lance J. Rips, and Kenneth Rasinski (2000), *The Psychology of Survey Response*, Cambridge University Press.

consulting with other persons or sources (Question S1). Only respondents who agreed to follow the instructions were allowed to continue. Respondents then identified what type of device they were using (Question S2) and were presented with a bot-check challenge (Question S3).

30.    Each respondent then indicated their gender (Question S4), age (Question S5), and geographic region (Question S6). The tables below show the results for the qualified respondents.

**Table 2: Results for S4 (Gender)**

|  |  | Test Base: 208 | | Control Base: 205 | | Total | |
|---|---|---|---|---|---|---|---|
|  |  | N | Col % | N | Col % | N | Col % |
| 1 | Male | 106 | 51% | 111 | 54% | 217 | 53% |
| 2 | Female | 101 | 49% | 93 | 45% | 194 | 47% |
| 3 | Non-binary or other | 1 | 0% | 1 | 0% | 2 | 0% |
| 4 | Prefer not to answer | 0 | 0% | 0 | 0% | 0 | 0% |

**Table 3: Results for Question S5 (Age)**

|  |  | Test Base: 208 | | Control Base: 205 | | Total | |
|---|---|---|---|---|---|---|---|
|  |  | N | Col % | N | Col % | N | Col % |
| 1 | Under 13 years old | 0 | 0% | 0 | 0% | 0 | 0% |
| 2 | 13 to 17 years old | 15 | 7% | 17 | 8% | 32 | 8% |
| 3 | 18 to 34 years old | 93 | 45% | 85 | 41% | 178 | 43% |
| 4 | 35 to 54 years old | 71 | 34% | 76 | 37% | 147 | 36% |
| 5 | 55 to 64 years old | 21 | 10% | 18 | 9% | 39 | 9% |
| 6 | 65 years old or older | 8 | 4% | 9 | 4% | 17 | 4% |
| 7 | Prefer not to answer | 0 | 0% | 0 | 0% | 0 | 0% |

**Table 4:  Results for Question S6 (Region)**

|  |  | Test Base: 208 | | Control Base: 205 | | Total | |
|---|---|---|---|---|---|---|---|
|  |  | N | Col % | N | Col % | N | Col % |
| 1 | Northeast | 38 | 18% | 37 | 18% | 75 | 18% |
| 2 | Midwest | 46 | 22% | 39 | 19% | 85 | 21% |
| 3 | South | 74 | 36% | 76 | 37% | 150 | 36% |
| 4 | West | 50 | 24% | 53 | 26% | 103 | 25% |

31.     The next two questions screened respondents as past users (Question S7) or prospective users of or searchers for (Question S8) of artificial intelligence products and services. Both questions also presented respondents with six decoy products and services to disguise the purpose and screening criteria for the survey. All seven product and service categories were presented in random order to better serve this purpose and avoid bias based on placement among the options. To remain qualified for the survey, respondents had to respond "Yes," that they had used or searched for (Question S7), and/or were likely to use or search for (Question S8), an online service to "Generate or create images or other content using an artificial intelligence (AI) system." The tables below show the results, with the "N" and "Col %" columns referring to "Yes" responses.

---

**Table 5: Results for Question S7**

*Question S7: In the past six months, have you used or searched for an online service (e.g., webpage, mobile app, television app) that allows the user to do any of the following activities? (Select one for each row.)*

| | | Test Base: 208 | | | Control Base: 205 | | | Total | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | N | Col % | | N | Col % | | N | Col % |
| 1 | Generate or create images or other content using an artificial intelligence (AI) system | 156 | 75% | | 154 | 75% | | 310 | 75% |
| 2 | Stream or download a TV show or movie | 187 | 90% | | 198 | 97% | | 385 | 93% |
| 3 | Publish a blog post, video, or other original content | 109 | 52% | | 109 | 53% | | 218 | 53% |
| 4 | Use financial services (e.g., banking, investing) | 174 | 84% | | 183 | 89% | | 357 | 86% |
| 5 | Participate in video calls or conferences online | 159 | 76% | | 167 | 81% | | 326 | 79% |
| 6 | Stream or download music, radio shows, or podcasts | 181 | 87% | | 188 | 92% | | 369 | 89% |
| 7 | Make travel reservations (e.g., flights, hotels, ground transportation) | 138 | 66% | | 144 | 70% | | 282 | 68% |

DECLARATION OF DR. SCOTT SWAIN ISO OPENAI'S MOTION FOR A PRELIMINARY INJUNCTION

**ER1819**

**Table 6: Results for Question S8**

*Question S8: In the next six months, are you likely to use or search for an online service (e.g., webpage, mobile app, television app) that allows a user to do any of the following activities? (Select one for each row.)*

| | | Test Base: 208 | | Control Base: 205 | | Total | |
|---|---|---|---|---|---|---|---|
| | | N | Col % | N | Col % | N | Col % |
| 1 | Generate or create images or other content using an artificial intelligence system | 172 | 83% | 176 | 86% | 348 | 84% |
| 2 | Stream or download a TV show or movie | 195 | 94% | 190 | 93% | 385 | 93% |
| 3 | Publish a blog post, video, or other original content | 121 | 58% | 126 | 61% | 247 | 60% |
| 4 | Use financial services (e.g., banking, investing) | 178 | 86% | 180 | 88% | 358 | 87% |
| 5 | Participate in video calls or conferences | 163 | 78% | 172 | 84% | 335 | 81% |
| 6 | Stream or download music, radio shows, or podcasts | 188 | 90% | 189 | 92% | 377 | 91% |
| 7 | Make travel reservations (e.g., flights, hotels, ground transportation) | 143 | 69% | 144 | 70% | 287 | 69% |

32.     Question S9 served as an attention check. The question provided a list of ten colors and instructs respondents to select one particular color. The order of the colors was randomized. Only respondents who selected the prescribed color were allowed to continue with the survey.

33.     Question S10 screened out respondents who had completed a survey in the past month on the topic of "Online artificial intelligence services." This question also included six decoy survey topics to disguise the purpose and screening criteria for the survey. The order of all survey topics was randomized.

34.     The last screening question (Question S11) screened out respondents who worked (or who had household members who work) in industries that may serve to bias their responses (artificial intelligence, market research, advertising, and public relations). This question also included four decoy industries to disguise the purpose and screening criteria for the survey. The order of all industries was randomized.

DECLARATION OF DR. SCOTT SWAIN ISO OPENAI'S MOTION FOR A PRELIMINARY INJUNCTION

ER1820

**F.**     **Main Questionnaire**

35.     Qualified respondents who completed the screening questions were taken to the main questionnaire. Although not disclosed to the respondents, the main questionnaire included five categories of questions and information: (1) stimuli-related displays, (2) source confusion questions as to the company, (3) source confusion questions as to the services, (4) confusion questions as to a connection or affiliation, and (5) closing questions.

**1.**     *Stimuli (Q1 to Q6)*

36.     The first screen in the main questionnaire (Screen Q1) gave instructions to respondents:

| Screen Q1 |
|---|
| *On the next few screens, you will see images of webpages referencing artificial intelligence (AI) services. You may or may not have seen these webpages before. You may need to scroll to see the full webpage image.* |
| *After viewing the webpages, you will be asked some questions.* |
| *You will not be able to go backwards. If you do not know or do not have an opinion about any of the questions, please indicate so. Please do not guess.* |

37.     The next screen (Screen Q2) served as "Room 1" of the two-room *Squirt* format. Screen Q2 displayed an image from an OpenAI webpage, https://openai.com/gpt-4, which depicted the OPENAI mark as it appeared in the marketplace on or about August 28, 2023. *See also* **Exhibit G** Appendix (full size image). This screen also asked respondents if they were able to see the image clearly. Only those who answered "Yes" were permitted to continue the survey.

| Screen Q2 |
|---|
| *Please view **Webpage A** as if you came across it while searching for an artificial intelligence service and are considering using it. Take as much time as you like. Later, you will be asked questions about it.*<br><br> |

38.     The third screen (Screen Q3) explained to respondents that they would see images of three other webpages.

| Screen Q3 |
|---|
| *Now you will be shown three additional webpages referencing artificial intelligence services. You may or may not have seen these webpages before. These will be called **Webpages B, C, and D**.*<br><br>*Please click the button to continue.* |

39.     The next three screens (Screens Q4, Q5, and Q6) served as "Room 2" of the two-room *Squirt* format. Screens Q4, Q5 and Q6 displayed a set of three other webpage images captured on or about August 28, 2023. Each image was displayed sequentially and randomized as "Webpage A," "Webpage B," and "Webpage C."  On each screen, respondents were asked if they were able to see the image clearly. Only those respondents who answered "Yes" to all three questions were permitted to continue with the survey.

| Screen Q4 |
|---|
| *Please view **Webpage B** as if you came across it while searching for an artificial intelligence service and are considering using it. Take as much time as you like. Later, you will be asked questions about it.* |

| **Screen Q5** |
| --- |
| *Please view **Webpage C** as if you came across it while searching for an artificial intelligence service and are considering using it. Take as much time as you like. Later, you will be asked questions about it.* |

| **Screen Q6** |
| --- |
| *Please view **Webpage D** as if you came across it while searching for an artificial intelligence service and are considering using it. Take as much time as you like. Later, you will be asked questions about it.* |

40.     The particular set of three images shown as Webpages B, C, and D in Screens Q4, Q5, and Q6 differed for the Test Group and the Control Group. For the Test Group, respondents were shown webpage images from Defendants (https://open.ai/) and two decoys, Anthropic (https://anthropic.com/) and Midjourney (https://midjourney.com/). The images for Webpages B, C, and D depicted Defendants' mark and the decoy marks as they appeared in the marketplace on or about August 28, 2023. See the Appendix of **Exhibit G** for full-size images from these webpages.

41.     The decoys were selected from among competitors that consumers are likely to encounter in the marketplace when searching the category at issue.[16] For the Control Group, the two decoy images were the same, but Defendants' webpage image was modified to replace Defendants' OPEN AI mark with a fictional ULTIMATE AI mark.[17]

---

[16] *See, e.g.*, Forbes, https://www.forbes.com/sites/kenrickcai/2023/08/08/artificial-intelligence-remaking-the-cloud/; Crunchbase, https://news.crunchbase.com/cloud/bessemer-2023-private-cloud-startup-ranking-openai-anthropic/; Yahoo! Finance, https://finance.yahoo.com/news/meta-goes-ai-compete-google-214043266.html; ZDNet, https://www.zdnet.com/article/best-ai-art-generator/; SimpliLearn, https://www.simplilearn.com/tutorials/artificial-intelligence-tutorial/top-generative-ai-tools.

[17] On September 21, 2023 (1.5 weeks after the completion of my survey data collection), I learned that Defendants had updated their website at (https://open.ai/) by using a different background and layout. These changes do not alter my conclusions. Rather, they illustrate the value of the scientific practice of using a control stimulus. As implemented in my survey, the use of a control stimulus removes any effects of non-mark aspects of the webpage (e.g., layouts, colors, designs, fonts) because respondents in the Test Group and Control Group were exposed to identical

42.     The modified image of Defendants' webpage shown in the Control Group served to control for any undue suggestiveness that may be caused by factors other than the allegedly infringing mark. As a leading trademark authority explains, "The general principle for choosing an appropriate control is easily stated: it should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed. The reason for this approach is that it peels away any confounding influences that threaten the inference that the experimental stimulus caused the differences between the test and control groups on the post-treatment measure."[18] Here, the control stimulus conservatively measures likelihood of confusion because the only change from Defendants' actual webpage in the Test Group is the change from "Open AI" to "Ultimate AI," leaving other potential confusion factors (e.g., layouts, colors, designs, fonts) unaltered.

43.     Below are the two sets of three images shown in screens Q4, Q5, and Q6, with the Test Group images shown on the left and the Control Group images shown on the right.  *See* **Exhibit G** Appendix (full size images). As noted above, the order of the three images in each set was randomized.

webpage images except for word marks (OPEN AI was replaced with ULTIMATE AI). Further, Defendants' website (https://open.ai/) is now more similar to Plaintiff's website.

[18] Diamond, Shari S. (2022), "Control Foundations: Rationales and Approaches," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann. P. 628. see also Diamond, Shari Seidman (2011), *Trademark and Deceptive Advertising Surveys, Reference Guide on Survey Research*, eds. by Shari Seidman Diamond and Jerre B. Swann.



<table>
<tr><th colspan="2">Room 2 Stimuli</th></tr>
<tr><th>Test Group Images</th><th>Control Group Images</th></tr>
<tr><td><br></td><td><br></td></tr>
<tr><td><br></td><td><br></td></tr>
<tr><td><br></td><td><br></td></tr>
</table>

### 2. *Source Confusion as to Company (Q7-A, Q8-A, and Q9-A)*

44. After Screen Q6, respondents were asked a series of questions to measure likelihood of confusion. The first of these questions (Question Q7-A) displayed the same thumbnails of the three Webpage B, C, and D images (in the same randomized order) that each respondent saw in Screens Q4, Q5, and Q6. In Question Q7-A, respondents were asked if they thought any of the three Webpages B, C, and D referenced the same company as Webpage A.



| **Question Q7-A** |
| --- |
| *You will now be asked some questions about the webpages you just saw.* |
| *Below are images of Webpages B, C, and D.* |
| *Do any of these webpages reference the same company referred to on **Webpage A** (the first webpage you saw)? Click, tap, or pinch to enlarge an image.* |
| *If you would like to see **Webpage A** again, click here.* |

1.  *<u>Yes</u>, one or more of these webpages reference the same company referred to on **Webpage A***

2.  *<u>No</u>, none of these webpages reference the same company referred to on **Webpage A***

3.  *Don't know / unsure*

45.    If respondents answered "No" or "Don't know / unsure" to Question Q7-A, they were skipped to the next series of questions (starting with Question Q7-B). If respondents answered "Yes" to Question Q7-A, they were asked Question Q8-A, which asked respondents to check a box next to each webpage they thought referenced the same company as shown in Webpage A.  Respondents also had the option to select "I don't know."

| Question Q8-A |
| --- |
| *You indicated that one or more of these webpages reference the same company referred to on **Webpage A.*** |
| *Please select the webpage or webpages you think reference the same company referred to on **Webpage A.*** |
| *If you would like to see **Webpage A** again, click here.* |
|  |

46.     For each webpage that respondents selected in response to Q8-A, they received Question Q9-A, which was an open-ended probe of the reasons for the selection. Respondents could also check a box stating that they did not know.

| Question Q9-A |
| --- |
| *You indicated that the webpage below references the same company referred to on **Webpage A**.* |
| *What makes you think that? Please be as specific as possible.* |

### 3.    *Source Confusion as to Services (Q7-B, Q8-B, and Q9-B)*

47.     Question Q7-B was similar to Q7-A, except that it asked respondents whether they thought any of the *services* referenced on any of Webpages B, C, or D come from same company that offers the services referred to on Webpage A.

| **Question Q7-B** |
| --- |
| *Here is another question about the webpages you just saw.* |
| *Below are images of **Webpages B, C, and D**.* |
| *Does any artificial intelligence service referenced on any of these webpages come from the same company that offers the artificial intelligence service referred to on Webpage A (the first webpage you saw)? Click, tap, or pinch to enlarge an image.* |
| *If you would like to see **Webpage A** again, click here.* |
|  |
| *1. <u>Yes</u>, one or more of these webpages references an artificial intelligence service that comes from the same company that offers the artificial intelligence service referred to on **Webpage A*** |
| *2. <u>No</u>, none of these webpages references an artificial intelligence service that comes from the same company that offers the artificial intelligence service referred to on **Webpage A*** |
| *3. Don't know / unsure* |

48.     If respondents answered "No" or "Don't know / unsure" to Question Q7-B, they were skipped to the next series of questions (starting with Question Q10). If respondents answered "Yes" to Question Q7-B, they were asked Question Q8-B, which asked respondents to check a box next to each webpage they thought showed services that came from the same company as shown on Webpage A.  Respondents also had the option to select "I don't know."

| Question Q8-B |
|---|
| *You indicated that one or more of these webpages references an artificial intelligence service that comes from the same company that offers the artificial intelligence service referred to on* **Webpage A**. |
| *Please select the webpage or webpages you think refer to an artificial intelligence service from the same company that offers the artificial intelligence service referred to on* **Webpage A**. |
| *If you would like to see* **Webpage A** *again, click here.* |



49.     For each webpage that respondents selected in response to Q8-B (if any), they were asked Question Q9-B, which was an open-ended probe of respondents' the reasons for the selection.  Respondents could also indicate that they did not know.

| Question Q9-B |
|---|
| *You indicated that the webpage below references an artificial intelligence service that comes from the same company that offers the artificial intelligence service referred to on* **Webpage A**. |
| *What makes you think that? Please be as specific as possible.* |

DECLARATION OF DR. SCOTT SWAIN ISO OPENAI'S MOTION FOR A PRELIMINARY INJUNCTION
**ER1829**

4.     *Confusion as to Connection/Affiliation (Q10, Q11, & Q12)*

50.     If respondents answered "Yes" to *either* Question Q7-A or Question Q7-B—thus demonstrating confusion—they were skipped to the closing questions (Q13, Q14, and Q15). If respondents answered "No" or "Don't know / unsure" to *both* Question Q7-A and Question Q7-B, they were asked Question Q10, which asked respondents whether they thought any of Webpages B, C, or D were connected to or affiliated with the company that offered the artificial intelligence service referred to in Webpage A.

| **Question Q10** |
|---|
| *Thank you for your responses so far. We just have one more question about the webpages you just saw.* <br><br> *Below are* **Webpages B, C, D**. *Are any of these webpages connected to or affiliated with the same company that offers the artificial intelligence service referred to on Webpage A (the first webpage you saw)? Click, tap, or pinch to enlarge an image. (Select one)* <br><br> *If you would like to see* **Webpage A** *again, click here.* <br><br>  <br><br> *1. <u>Yes</u>, one or more of these webpages is connected to or affiliated with the same company that offers the artificial intelligence service referred to on* **Webpage A** <br><br> *2. <u>No</u>, none of these webpages are connected to or affiliated with the same company that offers the artificial intelligence service referred to on* **Webpage A** <br><br> *3. Don't know / unsure* |

51.     If respondents answered "No" or "Don't know / unsure" to Question Q10, they were skipped to the next series of questions (starting with Question Q13). If respondents answered "Yes" to Question Q10, they were shown Question Q11, which asked which webpages were connected to or affiliated with the company that offered the artificial intelligence service referred to in Webpage A.  Respondents also had the option to select "I don't know."

| Question Q11 |
| --- |
| *You indicated that one or more of these webpages is connected to or affiliated with the same company that offers the artificial intelligence service referred to on* **Webpage A.** *Please select the webpage or webpages you think are connected to or affiliated with the same company that offers the artificial intelligence service referred to on* **Webpage A.** |
| *If you would like to see* **Webpage A** *again, click here.* |



52.     For each webpage that respondents selected in response to Question Q11 (if any), they were asked Question Q12, which was an open-ended probe of the reasons for the selections. Respondents could also check a box stating that they did not know.

| Question Q12 |
| --- |
| *You indicated that the webpages below is connected to or affiliated with the same company that offers the artificial intelligence service referred to on* **Webpage A.** |
| *What makes you think that? Please be as specific as possible.* |

### 5.     Closing Questions (Q13, Q14, & Q15)

53.     After answering the likelihood of confusion questions, all respondents completed validation checks (Questions Q13 and Q14), which required re-entry of the ZIP code reported at

the start of the survey. In the last survey question (Question Q15), all respondents answered a commitment check to affirm their identity and that they had adhered to the survey instructions.

## IV.   MAIN QUESTIONNAIRE RESULTS

### A.   Source Confusion as to Company

54.   As reflected by the Question Q7-A results in Table 7, more than half (54.8%) of respondents in the Test Group and 32.7% of respondents in the Control Group answered that one or more of the webpages they viewed referenced OpenAI.

| | | Test Base: 208 | | Control Base: 205 | |
|---|---|---|---|---|---|
| **Table 7:  Results for Question Q7-A** | | | | | |
| *Q7-A:  Do any of these webpages reference the same company referred to on* **Webpage A** *(the first webpage you saw)?* | | | | | |
| | | N | Col % | N | Col % |
| 1 | Yes, one or more of these webpages reference the same company referred to on Webpage A | 114 | 54.8% | 67 | 32.7% |
| 2 | No, none of these webpages reference the same company referred to on Webpage A | 67 | 32.2% | 112 | 54.6% |
| 3 | Don't know / unsure | 27 | 13.0% | 26 | 12.7% |

55.   To determine the incidence of source confusion as to company, the results for Question Q8-A are computed based on the total number of respondents in the Test and Control groups. As Table 8 shows, 88 out of 208 total Test Group respondents (42.3%) identified Defendants' webpage displaying the OPEN AI mark as refencing OpenAI, while 43 out of 205 respondents (21.0%) in the Control Group selected the control webpage displaying the ULTIMATE AI mark.

56.   The decoy Anthropic was selected by 35 out of 208 respondents (16.8%) in the Test Group and 36 out of 205 respondents (17.6%) in the Control Group, while the decoy Midjourney was selected by 13 out of 208 respondents (6.3%) in the Test Group and 9 out of 205 respondents (4.4%) in the Control Group.

**Table 8:  Results for Question Q8-A**

*Q8-A:  Please select the webpage or webpages you think reference the same company referred to on **Webpage A**.*

| | | | Test<br>Base: 208 | | Control<br>Base: 205 |
|---|---|---|---|---|---|
| | | N | Col % | N | Col % |
| 1 | Open AI (Test) or Ultimate AI (Control) | 88 | 42.3% | 43 | 21.0% |
| 2 | Anthropic (Decoy) | 35 | 16.8% | 36 | 17.6% |
| 3 | Midjourney (Decoy) | 13 | 6.3% | 9 | 4.4% |
| 4 | Don't know / unsure | 5 | 2.4% | 5 | 2.4% |

<u>Note</u>: Respondents could select none, one, or more than one webpage in Q8-A.

## B.     <u>Source Confusion as to Services</u>

57.     As reflected by the Q7-B results in Table 9, 40.9% of respondents in the Test Group and 30.2% of respondents in the Control Group answered that one or more of the webpages referenced OpenAI's artificial intelligence services.

**Table 9:  Results for Question Q7-B**

*Q7-B:  Does any artificial intelligence service referenced on any of these webpages come from the same company that offers the artificial intelligence service referred to on **Webpage A** (the first webpage you saw)?*

| | | Test<br>Base: 208 | | Control<br>Base: 205 | |
|---|---|---|---|---|---|
| | | N | Col % | N | Col % |
| 1 | Yes, one or more of these webpages references an artificial intelligence service that comes from the same company that offers the artificial intelligence service referred to on Webpage A | 85 | 40.9% | 62 | 30.2% |
| 2 | No, none of these webpages references an artificial intelligence service that comes from the same company that offers the artificial intelligence service referred to on Webpage A | 75 | 36.1% | 105 | 51.2% |
| 3 | Don't know / unsure | 48 | 23.1% | 38 | 18.5% |

58.     To determine the incidence of source confusion as to services, the results for Question Q8-B are computed based on the total number of respondents in the Test and Control groups. As reflected by the Question Q8-B results in Table 10, 59 out of 208 total respondents (28.4%) in the Test Group identified Defendants' webpage displaying the OPEN AI mark as referencing OpenAI's artificial intelligence services, while 36 out of 205 total respondents (17.6%) in the Control Group identified the Control webpage displaying the ULTIMATE AI mark as referencing OpenAI's artificial intelligence services.

59.     For the decoy webpages, Anthropic was selected by 25 out of 208 respondents (12.0%) in the Test Group and 37 out of 205 respondents (18%) in the Control Group, while Midjourney was selected by 10 out of 208 respondents (4.8%) in the Test Group and 11 out of 205 respondents (5.4%) in the Control Group.

### Table 10:  Results for Question Q8-B

*Q8-B:  You indicated that one or more of these webpages references an artificial intelligence service that comes from the same company that offers the artificial intelligence service referred to on **Webpage A**. Please select the webpage or webpages you think refer to an artificial intelligence service from the same company that offers the artificial intelligence service referred to on **Webpage A**.*

|   |   | Test Base: 208 | | Control Base: 205 | |
|---|---|---|---|---|---|
|   |   | N | Col % | N | Col % |
| 1 | Open AI (Test) or Ultimate AI (Control) | 59 | 28.4% | 36 | 17.6% |
| 2 | Anthropic (Decoy) | 25 | 12.0% | 37 | 18.0% |
| 3 | Midjourney (Decoy) | 10 | 4.8% | 11 | 5.4% |
| 4 | Don't know / unsure | 5 | 2.4% | 3 | 1.5% |

Note: Respondents could select none, one, or more than one webpage in Q8-B.

### C.     Connection/Affiliation Confusion

60.     As noted earlier, respondents were only asked the connection/affiliation confusion questions (Q10, Q11) if they had not exhibited source confusion as to company (Question Q7-A, Q8-A) or source confusion as to services (Question Q7-B, Q8-B). Since a considerable percentage of respondents did, in fact, exhibit source confusion, the total number of respondents eligible to answer the connection/affiliation confusion filter question (Question Q10) —specifically 78 in the

Test Group and 120 in the Control Group—is smaller than the number of respondents answering the filter questions for source confusion as to company and source confusion as to services.

61. Among respondents who were shown Question Q10, Table 11 shows that 11 out of 78 (14.1%) in the Test Group answered that one or more of the webpages they viewed were connected to or affiliated with OpenAI. Similarly, 12 out of 120 respondents (10%) in the Control Group answered that one or more of the webpages they viewed were connected to or affiliated with OpenAI.

| **Table 11: Results for Question Q10 (Among Respondents Shown Q10)** | | | | | |
|---|---|---|---|---|---|
| *Q10: Are any of these webpages connected to or affiliated with the same company that offers the artificial intelligence service referred to on **Webpage A** (the first webpage you saw)?* | | | | | |
| | | **Test Base: 78** | | **Control Base: 120** | |
| | | N | Col % | N | Col % |
| 1 | Yes, one or more of these webpages is connected to or affiliated with the same company that offers the artificial intelligence service referred to on Webpage A | 11 | 14.1% | 12 | 10.0% |
| 2 | No, none of these webpages are connected to or affiliated with the same company that offers the artificial intelligence service referred to on Webpage A | 41 | 52.6% | 69 | 57.5% |
| 3 | Don't know / unsure | 26 | 33.3% | 39 | 32.5% |

62.     Question Q11 measures additional confusion due to connection or affiliation. To determine the additional incidence of confusion among the total group of respondents as to connection/affiliation, the results for Question Q11 are computed based on the total number of respondents in the Test and Control groups. As Table 12 shows, 7 out of the 208 total Test Group respondents (3.4%) identifying Defendants' webpage displaying the OPEN AI mark as connected to or affiliated with OpenAI, while 6 out of 205 total Control Group respondents (2.9%) selected the control webpage displaying the ULTIMATE AI mark as connected to or affiliated with OpenAI. Anthropic was selected by 3 of 208 total Test Group respondents (1.4%) and 2 out of 205 total Control Group respondents (1.0%), and Midjourney was selected by 2 out of 208 total Test Group respondents (1.0%) and 5 out of 205 total Control Group respondents (2.4%).

---

**Table 12:  Results for Question Q11**

*Q11:  You indicated that one or more of these webpages is connected to or affiliated with the same company that offers the artificial intelligence service referred to on* **Webpage A.** *Please select the webpage or webpages you think are connected to or affiliated with the same company that offers the artificial intelligence service referred to on* **Webpage A.**

|   |   | Test Base: 208 | | Control Base: 205 | |
|---|---|---|---|---|---|
|   |   | N | Col % | N | Col % |
| 1 | Open AI (Test) or Ultimate AI (Control) | 7 | 3.4% | 6 | 2.9% |
| 2 | Anthropic (Decoy) | 3 | 1.4% | 2 | 1.0% |
| 3 | Midjourney (Decoy) | 2 | 1.0% | 5 | 2.4% |
| 4 | Don't know / unsure | 2 | 1.0% | 1 | 0.5% |

<u>Note</u>: Respondents could select none, one, or more than one webpage in Q11.

---

**D.     Overall Confusion**

63.     My study showed a net likelihood of confusion exceeding 20%. To determine the overall likelihood of confusion, the results for Questions Q8-A, Q8-B, and Q11 must be combined and de-duplicated. As shown in Table 13, more than half (54.3%) of respondents in the Test Group were confused by Defendants' webpage as to the source of the company or service shown or its connection or affiliation with OpenAI.  The control webpage displaying the ULTIMATE AI

mark resulted in confusion among 31.7% of respondents in the Control Group. Deducting the

control confusion from the test confusion yields a net likelihood of confusion of 22.6%.

64.    For the decoy webpages, 25.5% of respondents in the Test Group and 26.3% in the

Control Group confused the Anthropic webpage with OpenAI's webpage, and 11.1% of

respondent in the Test Group and 10.7% of respondents in the Control Group confused the

Midjourney webpage with OpenAI's webpage.

**Table 13: Overall Confusion - Consolidated and De-Duplicated Results for Questions Q8-A, Q8-B, & Q11**

| | | Test Base: 208 | | Control Base: 205 | | Net Confusion |
|---|---|---|---|---|---|---|
| | | N | Col % | N | Col % | Col % |
| 1 | Open AI (Test) or Ultimate AI (Control) | 113 | 54.3% | 65 | 31.7% | **22.6%** |
| 2 | Anthropic (Decoy) | 53 | 25.5% | 54 | 26.3% | |
| 3 | Midjourney (Decoy) | 23 | 11.1% | 22 | 10.7% | |
| 4 | Don't know / unsure | 9 | 4.3% | 9 | 4.4% | |

Note: Respondents could select none, one, or more than one webpage in each of Q8-A, Q8-B, & Q11.

65.    The results for the closed-end measures of likelihood of confusion (Questions

Q8-A, Q8-B, and Q11) are supported by respondents' verbatim responses to the open-ended

probes that followed each (Question Q9-A probing Question Q8-A, Question Q9-B probing

Question Q8-B, and Question Q12 probing Question Q11). To illustrate, the list below provides

ID numbers for Test Group respondents whose verbatim responses were coded as indicating

confusion as to company in the Question Q9-A probe.

| Respondent ID | Verbatims for Q9-A |
|---|---|
| 59860 | Both have Open AI referenced |
| 62098 | Both web pages had the title open AI included |
| 60550 | I see 'open AI' referred to in both |
| 59822 | I think it's the same brand |
| 60410 | it is all OpenAI |
| 61156 | Mentions Open AI |
| 60876 | Open AI is listed. |

| 62020 | Open AI is the company referenced in webpage A, and it's here again on the last slide. |
| 63382 | Open AI is used for image generation as well as chat gpt |
| 62542 | Open AI looks similar |
| 61846 | open Ai refrenced in both. |
| 59348 | OpenAI is the name on both |
| 59156 | Same OpenAi as ChatGPT4 |
| 63050 | The both said open ai |
| 62336 | The company name is both OpenAI. |
| 58738 | The first page I seen said Open ai on it and so does webpage A |
| 62286 | The webpage features OpenAI, with no other company or copyright mentioned. Though the ChatGPT page talks about itself as a service, the copyright at the bottom is attributed to OpenAI. |
| 60622 | The website heading is OpenAI |
| 58832 | They are both called Open AI |
| 60034 | They both reference Open AI. |
| 59610 | They both said openAI |
| 62928 | They both share the name of open ai |
| 62036 | they have the same name |
| 61052 | They have the same name and symbol |
| 59570 | theyre both open Ai |
| 59970 | Those webpage are based of Open AI they are same . |

## V.    CONCLUSIONS

66.    In my opinion, based on my education, training, and experience, these survey results show that the relevant universe of consumers is likely to confuse Defendants' OPEN AI mark with OpenAI's OPENAI mark.

67.    Among the 208 respondents in the Test Group who viewed Defendants' webpage displaying the OPEN AI mark, more than half (54.3%) answered that "Open AI" or the services the webpage featured referred to, came from, or were connected or affiliated with OpenAI. Among the 205 respondents in the Control Group who viewed the fictional ULTIMATE AI mark, 31.7% answered that the control webpage or services it featured referred to, came from, or was connected or affiliated with OpenAI. Because the control stimulus changed only "Open AI" to "Ultimate AI" on the webpage, while leaving all other potential contributors to confusion (e.g., font and layout) unchanged, the survey conservatively measures likelihood of confusion. Even after accounting for

(subtracting) the control stimulus confusion, the net percentage of respondents who were confused by Defendants' OPEN AI mark is 22.6%. My opinion that confusion is likely to result from Defendant's OPEN AI mark is also corroborated by the instances of actual confusion reflected in Exhibits E and F.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 29, 2023 in Clemson, South Carolina.



Scott D. Swain, Ph.D.

DECLARATION OF DR. SCOTT SWAIN ISO OPENAI'S MOTION FOR A PRELIMINARY INJUNCTION

ER1839

Exhibit A

CV

**Curriculum Vitae for Scott D. Swain**

Clemson University
Powers Distinguished Fellow
Department of Marketing
326E Wilbur O. and Ann Powers College of Business
225 Walter T. Cox Blvd.
Clemson, SC 29634-1325

EDUCATION

| | | |
|---|---|---|
| Ph.D. | *University of South Carolina*, Moore School of Business<br>Major Field: Marketing (2002) | |
| MBA | *University of South Carolina*, Moore School of Business<br>Concentration: Finance (1996) | |
| B.S. | *Clemson University*, College of Engineering<br>Major: Electrical Engineering (1991) | |
| B.S. | *Francis Marion University*, College of Liberal Arts<br>Major: Physics (1991) | |

ACADEMIC APPOINTMENTS

*Clemson University*, Powers College of Business
> Professor of Marketing, 2021-present
> Powers Distinguished Fellow, 2021-present
> Associate Professor of Marketing, 2016-2021
> Assistant Professor of Marketing, 2013-2016

*Dartmouth College*, Tuck School of Business
> Visiting Professor of Marketing, 2022
> Visiting Associate Professor of Marketing, 2021

*Northeastern University*, D'Amore-McKim School of Business
> Assistant Professor of Marketing, 2009-2013

*Boston University*, Questrom School of Management
> Assistant Professor of Marketing, 2002-2008

*University of South Carolina*, Moore School of Business
> Graduate Assistant and Instructor, 1998-2002

RESEARCH

Peer reviewed journals and conferences
Mullins, Ryan, Scott D. Swain, and Scott B. Friend (2023), "How and Should Firms Motivate Salesperson Effort Across a Multi-Brand Portfolio?," Journal of Business Research, forthcoming.
Swain, Scott D. and B. Andrew Cudmore (2023), "Higher Levels of Compensation Induce Consumer Guilt When Firms are Close but Future Transactions are Distant," *Proceedings of the American Marketing Association Winter Educators' Conference*, eds. Monika Lisjak and Nita Umashankar, Nashville, TN: American Marketing Association, Forthcoming.

2

Swain, Scott D. and B. Andrew Cudmore (2023), "Service Recovery: When Playing It Safe is a Dangerous Strategy," *29th International Conference on Industry, Engineering, and Management Systems*, Clearwater Beach, FL, Association for Industry, Engineering, and Management Systems, March 6.

Swain, Scott D., Christian Sonnenberg, and B. Andrew Cudmore (2023), "A Scalable Framework for Dynamic Interface Testing of Augmented Reality Marketing Applications," *8th Annual Research Symposium*, Clemson University, May 10.

Swain, Scott D. (2022), An Exploratory Study of The Effect of In-Store Recommendation Technology on Wine Shoppers' Search Behaviors, *International Journal of Business Research*, 22 (2), 124-137.

Nath, Pravin, Scott D. Swain, Danny Weathers, Michael Giebelhausen, Eric Hair, Austin Minkowksi, Matt Gorstein, Graham Gaines (2022), "Addressing Supply Chain Vulnerabilities for South Carolina's Mariculture Industry: An Assessment of Preferences for Direct-to-Consumer Marketing of Shellfish Using Conjoint Analysis," Clemson University Research Symposium, Clemson, SC, May 6.

Swain, Scott D. and Danny Weathers (2022), "The Impact of Automation Technology on Consumers' Animal Welfare Perceptions," *28th International Conference on Industry, Engineering, and Management Systems*, Virtual, Association for Industry, Engineering, and Management Systems, March 13-15.

Swain, Scott D. and B. Andrew Cudmore (2022), "The Risks of Overcompensation in Service Recovery Strategies," *28th International Conference on Industry, Engineering, and Management Systems*, Virtual, Association for Industry, Engineering, and Management Systems, March 13-15.

Swain, Scott D. and Danny Weathers (2021), "Spatial Expressions and Consumer Perceptions of Quantity," *27th Association of Marketing Theory and Practice Proceedings*, Virtual: Association for Marketing Theory and Practice, March 18-20.

Swain, Scott D. and Danny Weathers (2021), "Re-envisioning a Masters of Science in Marketing Degree," *27th Association of Marketing Theory and Practice Proceedings*, Virtual: Association for Marketing Theory and Practice, March 18-20.

Swain, Scott D. (2021), "Consumer Responses to Serendipity Narratives," *27th International Conference on Industry, Engineering, and Management Systems*, Virtual: Association for Industry, Engineering, and Management Systems, March 15-17.

Swain, Scott D. and Danny Weathers (2021), "Reframing Extreme Magnitudes," *27th International Conference on Industry, Engineering, and Management Systems*, Virtual: Association for Industry, Engineering, and Management Systems, March 15-17.

Swain, Scott D., Oswald Harris King, IV, Ally Ault, Lucas Ball, Jack Enright, and Aleksandra K. Shtompil (2020), "Measuring the Perceived Intensity of Rivalries," *26th International Conference on Industry, Engineering, and Management Systems*, Clearwater Beach, FL: Association for Industry, Engineering, and Management Systems, March 15-18.

Korschun, Daniel, Hoori Rafieian, Anubhav Aggarwal, and Scott D. Swain (2019). "Taking a Stand: Consumer Responses When Companies Get (Or Don't Get) Political," *Proceedings of the 41st ISMS Marketing Science Conference* (*INFORMS*), eds. Tülin Erdem, Russ Winer, Alberto Pezzi, and Luca Petruzzellis, University of Roma Tre, Rome, Italy: Institute for Operations Research and the Management Sciences (ISBM), June 20-22.

Swain, Scott D., Oswald Harris King IV, Lucas Ball, Bailey Bottini, Tanner Dieterich, Connor Enright, Olivia Pescatore, James Ruddy, Brad Uscilla, Bailey Whetter, and Cameron Zavaski (2019), "Rivalries as Relational Schemas," *Focus on Creative Inquiry*, Clemson University, April 1-2.

Swain, Scott D. (2019), "Misresponse and its Consequences," *25th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 17-19.

Swain, Scott D. and Matthew Kosniewski (2019), "Consumer Responses to Companies' Political Stances," *25th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 17-19.

Cudmore, B. Andrew and Scott D. Swain (2019), "The Influence of CSR-focus and CSR-innovativeness on Perceived Brand Image of Innovative Firms," *25th International Conference on Industry, Engineering, and Management Systems*, Clearwater Beach, FL: Association for Industry, Engineering, and Management Systems, March 17-19.

Kirk, Colleen, Joann Peck, and Scott D. Swain (2018), "Property Lines in the Mind: Consumers' Perceptions of Infringement and Their Territorial Responses," *Journal of Consumer Research*, 45 (1), 148-168.

Swain, Scott D. and B. Andrew Cudmore (2018), "The Human Hand and Technology Adoption," *Journal of Management and Engineering Integration*, 11 (1), 46-53.

Carlson, Jay P., Danny Weathers, and Scott D. Swain (2016), "Consumer Responses to Bonus Pack and Product Enlargement Claims," *Journal of Marketing Theory and Practice*, 24 (1), 59-71.

3

Swain, Scott D., Richard C. Hanna, and B. Andrew Cudmore (2018), "Managing Digital Promotions to Account for the Dual Effects of Time Limits on Customer Response," *24th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 19-21.

Cudmore, B. Andrew, Scott D. Swain, Alexei Rakowitsch, and Titas Vainauskas (2018), "The Influence of Coach Gender and Athletic Skill on the Athlete Attitude and Motivation," *24th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 19-21.

Cudmore, B. Andrew, Scott D. Swain, and Samantha Porter (2018), "The Role of Length and Ambiguity of Movie Trailers on Customer Attitudes and Intentions to Attend the Movie," *24th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 19-21.

Kirk, Colleen, Scott D. Swain, and Joann Peck (2017), "When and How Consumers Defend Their Psychological Possessions," in *Advances in Consumer Research*, Vol. 45, eds. Ayelet Gneezy, Vlad Griskevicius, and Patti Williams, San Diego, CA: Association for Consumer Research, October 26-29.

Swain, Scott D., Richard C. Hanna, and B. Andrew Cudmore (2017), "Using Clickstream Analysis to Examine In-store Technology Appropriation Among Wine Shoppers," *23nd International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 20-22.

Swain, Scott D. and Richard C. Hanna (2017), "Optimal Time Limits for Online Promotions: Balancing Customer Awareness and Urgency" *Proceedings of the American Marketing Association Winter Educator's Conference*, eds. Chandy, Rajesh, Jeffrey Inman, and Christine Moorman, Orlando, FL: American Marketing Association, February 17-19.

Kirk, Colleen, Joann Peck, and Scott D. Swain (2017), "When is an Incursion an Infringement? Consumers' Contingent Territorial Responses for Psychologically Owned Targets," *Workshop on The Future of Ownership Research*, eds. Bernadette Kamleitner, Monika Koller, Joann Peck, and Stephan Dickert, WU Vienna University of Economics and Business. 98-102, July 7-8.

Cudmore, B. Andrew, Jim Sparks, Scott D. Swain, and Enrique Perez (2017), "The Influence of a Firm's CSR Innovativeness and CSR Focus on Customer Attitudes," *23nd International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 20-22.

Kirk, Colleen, Joann Peck, and Scott D. Swain (2017), "Property Lines in the Mind: Consumers' Perceptions of Infringement and their Territorial Responses," *SCP-JACS Collaborative Conference*, eds. Akira Shimizu, Kaichi Saito, Satoko Suzuki, and Jeffrey Inman, Society for Consumer Psychology and Japan Association for Consumer Studies, Tokyo, Japan. May 18-19,

Cudmore, B. Andrew, Jim Sparks, and Scott D. Swain (2017), "The Moderating Role of CSR Focus on Consumer Responses to the CSR Initiatives of Low and High Ability Firms," *23nd International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 20-22.

Kirk, Colleen, Joann Peck, and Scott D. Swain (2017), "Consumers' Emotional and Territorial Responses to Perceived Infringements of Psychologically Owned Targets," *SCP Boutique Conference on Motivation, Emotion, and How They Interact*, eds. Juliano Laran, Oscar Moreno, Keith Wilcox, New York, NY: Society for Consumer Psychology, June 7-8.

Kirk, Colleen, Scott D. Swain, and Joann Peck (2017), "Hey, That's Mine! The Effect of Others' Psychological Ownership Signals on Consumers' Territorial Responses," in *Proceedings of the Society for Consumer Psychology*, eds. Katherine White and On Amir, San Francisco, CA: Society for Consumer Psychology, Feb 16-18.

Swain, Scott D. and B. Andrew Cudmore (2016), "How Players Respond to Monetary Incentives in Online Poker Promotions," *Journal of Management and Engineering Integration*, 9 (1), 93-100.

Korschun, Daniel, C.B. Bhattacharya, and Scott D. Swain (2016), "CSR and the Frontline Context: How Social Programs Improve Customer Service," *GfK Marketing Intelligence Review*, 8 (1), 24-29.

Hanna, Richard C., Scott D. Swain, and Paul D. Berger (2016), "Optimizing Time-Limited Price Promotions," *Journal of Marketing Analytics*, 4 (2), 77-92.

Swain, Scott D., B. Andrew Cudmore, and Jonathan D. Hibbard (2016), "Impact of Mixed Retail Experiences on Consumer Impressions of Salespersons," *22nd International Conference on Industry, Engineering, and

*Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 14-16.

Kirk, Colleen and Scott D. Swain (2016), "The Value in Lurking: The Effect of a Mere Communication Opportunity on Consumers' Psychological Ownership and Valuation of Digital Content," *Proceedings of the American Marketing Association Winter Educators' Conference*, eds. Charles F. Hofacker and Thorsten Hennig-Thurau, Las Vegas, NV: American Marketing Association, C94-C95, February 26-28. Winner, AMA Best Paper in Consumer Behavior Track

Hibbard, Jonathan D., Scott D. Swain, and Richard C. Hanna (2016), "Impact of Cross-Functional Team Projects on Student Performance in Functional Courses," *Marketing Management Association Fall Educator's Conference Proceedings*, eds. Lisa Lindgren and Brent Smith, Providence, RI: Marketing Management Association, 120-121, September 14-16.

Swain, Scott D. and B. Andrew Cudmore (2016), "The Challenges of Being Different at Making a Difference," *22nd International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 14-16.

Noyes, Jamie, Colleen P. Kirk, Joann Peck, Scott D. Swain, and Yasmine Kalkstein (2016), "Yours, Mine, or Ours? The Effect of Psychological Ownership Signals on Consumers' Territorial Responses," *70th Annual Eastern Colleges Science Conference* (ECSC), Springfield, MA, No. 54, April 2.

Kirk, Colleen, Scott D. Swain, and Joann Peck (2016), "You Stepped on My Toes: When Does Psychological Ownership Lead to Territorial Responses?," in *Advances in Consumer Research*, Vol. 44, eds. Page Moreau and Stefano Puntoni, Berlin, Germany: Association for Consumer Research, 743-743. [abstract, poster presentation] October 27-30.

Cudmore, B. Andrew, Scott D. Swain, and Chris Sonnenberg (2016), "Online Poker: Motivations for Online versus Casino Poker Gambling," *22nd International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems, March 14-16.

Noyes, Jamie, Colleen P. Kirk, Joann Peck, Scott D. Swain, and Yasmine Kalkstein (2016), "Hands Off, It's Mine! Psychological Ownership Signals and Consumers' Retaliatory Behaviors," *Proceedings of the 43rd Annual Northeast Business and Economics Association Conference*, ed. Ramon Vasconcellos, West Point, NY: Northeast Business and Economics Association, November 10-12.

Colleen P. Kirk, Scott D. Swain, and Joann Peck (2016), "When Good Fences Make Good Customers: Consumer Responses to Psychological Ownership Signals," *Proceedings of the 43rd Annual Northeast Business and Economics Association Conference*, ed. Ramon Vasconcellos, West Point, NY: Northeast Business and Economics Association, November 10-12.

Kirk, Colleen, Scott D. Swain, and James E. Gaskin (2015), "I'm Proud of It: Consumer Technology Appropriation and Psychological Ownership," *Journal of Marketing Theory and Practice*, 23 (2), 166-184.

Kirk, Colleen, Bernard McSherry, and Scott D. Swain (2015), "Investing the Self: The Effect of Nonconscious Goals on Investor Psychological Ownership," *Journal of Behavioral and Experimental Economics*, 58 (October), 186-194. Winner, *Bright Idea Award* (best journal article in business in 2015), awarded by Seton Hall and the NJ Policy Research Organization Foundation.

Weathers, Danny, Scott D. Swain, and Igor Makienko (2015), "When and How Should Retailers Rationalize the Size and Duration of Price Discounts?," *Journal of Business Research*, 68 (12), 2610-2618.

Weathers, Danny, Scott D. Swain, and Varun Grover (2015), "Can Online Product Reviews Be More Helpful? Examining Characteristics of Information Content by Product Type," *Decision Support Systems*, 79 (November), 12-23.

Swain, Scott D., Daniel Korschun, and C.B. Bhattacharya (2015), "When and How Organizational Identification Mediates the Effect of Corporate Social Responsibility on Customer Orientation," in *Proceedings of the American Marketing Association's Winter Educators' Conference*, eds. Tom Brown and Vanitha Swaminathan, San Antonio, TX: American Marketing Association.

Hanna, Richard C., Gary Ottley, Scott D. Swain, and Daniel Qualls (2015), "There's an App for That! An Exploratory Study of How Consumers Search for Wine with the Assistance of Technology," *Bi-Annual Wine Marketing Conference: Innovations and Best Practices*, Vittoriale Degli Italiani, 2015.

Bennett, Delancy and Scott D. Swain (2015), "Sports Immersion Tour: Scoring Big Outside the Classroom," *American Marketing Association's Winter Educators' Conference*, eds. Tom Brown and Vanitha Swaminathan, San Antonio, TX: American Marketing Association.

Swain, Scott D., B. Andrew Cudmore, and Danny Weathers (2015), "Unhelpful and Unaware of It: A Dyadic

5

Analysis of Online Consumer Reviews," *21st International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems.

Swain, Scott D. and Colleen P. Kirk (2015), "Getting Owned: Systematic and Situational Influences on Consumer Responses to Digital Content," in *Proceedings of the 42nd Annual Northeast Business and Economics Association Conference*, ed. Kang Bok Lee, Jamaica, NY: Northeast Business and Economics Association, 152-155.

Mullins, Ryan and Scott D. Swain (2015), "Brand Identity Multiplicity: How Merging Companies Overlook Competing Brand Identities and Hamper Cross-Selling Success," *5th Biennial Enhancing Sales Force Productivity Conference*, Georgia Tech, Scheller College of Business, eds. Goutam Challagalla, Brian Murtha, and Jeff Boichuk.

Korschun, Daniel, C.B. Bhattacharya, and Scott D. Swain (2014), "Corporate Social Responsibility, Customer Orientation, and the Job Performance of Frontline Employees," *Journal of Marketing*, 78 (3), 20-37. [AMA-EBSCO Annual Award for Responsible Research in Marketing, nominee]

Swain, Scott D., Paul D. Berger, and Bruce D. Weinberg (2014), "The Customer Equity Implications of Using Incentives in Acquisition Channels: A Nonprofit Application," *Journal of Marketing Analytics*, 2 (1), 1-17. [lead article]

Swain, Scott D., Colleen P. Kirk, and James E. Gaskin (2014), "Putting the Fun in Functionality: Appropriation, Ownership, and Pride," in *Advances in Consumer Research*, Vol. 42, eds. June Cotte and Stacy Wood, Baltimore, MD: Association for Consumer Research, 791-791.

Kirk, Colleen P., Bernard McSherry, and Scott D. Swain (2014), "Resistance is Frugal: When Ignoring Nonconscious Goals Affect Psychological Ownership of Investment Decision," in *Advances in Consumer Research*, Vol. 42, eds. June Cotte and Stacy Wood, Baltimore, MD: Association for Consumer Research, 791-791.

Borden, Joseph, Colleen P. Kirk, and Scott D. Swain (2014), "I Just Want to Talk: When Website Interactivity Enhances Donor Psychological Ownership in Not-for-profit Organizations," in *Proceedings of the 41st Annual Northeast Business and Economics Association Conference*, ed. Della Lee Sue, West Long Branch, NJ: Northeast Business and Economics Association, 41-43.

Kirk, Colleen P., Scott D. Swain, James E. Gaskin (2014), "I'm Proud of It: Consumer Technology Appropriation and Psychological Ownership," in *Proceedings of the Academy of Marketing Science Annual Conference*, eds. Michael W. Obal, Nina Krey, and Christian Bushardt, Indianapolis, IN: Academy of Marketing Science, 643-645.

Kirk, Colleen P. and Scott D. Swain (2014), "Not Now, I'm Busy: When Interactivity Undermines Psychological Ownership and Product Valuation," in special session titled "Psychological Ownership: A Concept of Value to the Marketing Field," (Marko Sarstedt and Colleen P. Kirk, co-chairs), *Proceedings of the Academy of Marketing Science Annual Conference*, eds. Brad Carlson and Todd Donavan, Indianapolis, IN: Academy of Marketing Science, 219-224.

Kirk, Colleen P., Scott D. Swain, and Richard C. Hanna (2014), "Owning the Intangible: The Roles of Motivational Orientation and Two-Way Communication on Psychological Ownership and Willingness to Pay in New Media," *Proceedings of the American Marketing Association's Winter Educators' Conference*, eds. Gary Hunter and Tom Steenburgh, Orlando, FL: American Marketing Association, C5-C6.

Korschun, Daniel, Bhattacharya, C.B., and Scott D. Swain (2013), "Corporate Social Responsibility and the Customer Orientation of Frontline Employees," Proceedings of the *International Marketing Conference* (MARCON), eds. Organizing committee, Calcutta, India: Indian Institute of Management, Calcutta, Winner, Best Paper in Conference.

Kirk, Colleen P. and Scott D. Swain (2013), "Interactivity and Psychological Ownership in Consumer Value-Co-Creation," *Proceedings of the Academy of Marketing Science Annual Conference*, eds. Leyland Pitt and Constantine Katsikeas, Monterrey, CA: Academy of Marketing Science.

Hanna, Richard C. and Scott D. Swain (2013), "Social Media Game Design: Unintended Effects on Consumer Choice" *Proceedings of the Academy of Marketing Science Annual Conference*, eds. Leyland Pitt and Constantine Katsikeas, Monterrey, CA: Academy of Marketing Science, 286.

Kirk, Colleen P. and Scott D. Swain (2013), "Touching the Intangible: Perceptions of Interactivity and Ownership in New Media," *Proceedings of the American Marketing Association's Winter Educators' Conference*, eds. James Burroughs and Aric Rindfleisch, Las Vegas, NV: American Marketing Association, 464-465.

Kirk, Colleen P. and Scott D. Swain (2013), "I'm Proud of It: Consumer Technology Appropriation and Psychological Ownership," *Vienna University of Economics and Business Workshop on Ownership and*

6

*Decision Making*, Vienna, Austria.

Swain, Scott D., B. Andrew Cudmore, and Danny Weathers (2012), "Communicating Innovations in Product Safety: When Labels Signal Greater Manufacturer Responsibility," *Journal of Management and Engineering Integration*, 5 (Winter), 58-65.

Weathers, Danny, Scott D. Swain, and Jay P. Carlson (2012), "Why Consumers Respond Differently to Absolute versus Percentage Descriptions of Quantities," *Marketing Letters*, 23 (4), 947-953.

Isaacson, Bruce, Jonathan D. Hibbard, and Scott D. Swain (2012), "Three Critical Questions to Evaluate Intellectual Property Surveys," *Intellectual Property Today*, September 19, 1-5.

Kirk, Colleen P. and Scott D. Swain (2012), "Empowering Digital Information Consumers: The Effects of Self-Efficacy, Optimum Stimulation Level, and Perceived Interactivity on Value in Use," *Proceedings of the Academy of Marketing Science Annual Conference*, eds. Barry J. Babin, Adilson Borges, and Eli Jones, New Orleans, LA: Academy of Marketing Science, 250-253.

Swain, Scott D., B. Andrew Cudmore, J. Daniel Wadden (2012), "When Companies Make Customers Feel Guilty," *18th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems.

Bhattacharya, C.B., Daniel Korschun, and Scott D. Swain (2012), "Corporate Responsibility Through the Stakeholder's Looking Glass," *Stakeholder Theory Conference*, Darden School of Business, University of Virginia, Olsson Center for Applied Ethics, Charlottesville, VA, 2012.

Cudmore, B. Andrew, Scott D. Swain, Jared Maynard, Semy Makonnen, and Michelle Condjella (2012), "Corporate Social Responsibility: A Package Safety Labeling Context," *18th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems.

Weathers, Danny, Scott D. Swain, and Jay P. Carlson (2012), "Comparing Consumer Reactions to Percentage and Absolute Values: An Analogue Magnitude Encoding Perspective," *Proceedings of the Academy of Marketing Science Annual Conference*, eds. Barry J. Babin, Adilson Borges, and Eli Jones, New Orleans, LA: Academy of Marketing Science, 350-353.

Cudmore, B. Andrew, Anthony T. Fischetti, and Scott D. Swain (2012), "Evaluation of a Systematic Manipulation of Cigarette Warning Labels on Consumer Attitudes toward Smoking," *18th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems.

Swain, Scott D. and B. Andrew Cudmore (2011), "Conditional Indirect Effects of Corporate Social Responsibility Cues on Purchase Intentions," *Journal of Management and Engineering Integration*, 4 (Winter), 92-100.

Kim, Stephen K., Jonathan D. Hibbard, and Scott D. Swain (2011), "Commitment in Marketing Channels: Mitigator or Aggravator of the Effects of Destructive Acts?," *Journal of Retailing*, 87 (4), 521-539.

Dean, Christopher, Jasmine Tucker, B. Andrew Cudmore, and Scott D. Swain (2011), "Corporate Image Benefits: The Role of Fair Trade and Charitable Donations in a Coffee Context," *17th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems.

Swain, Scott D. (2011), "Investing in Methodology to Advance Theory," *Academy of Marketing Science Annual Conference*, ed. Mary Conway, Coral Gables, FL: Academy of Marketing Science.

Korschun, Daniel, C.B. Bhattacharya, and Scott D. Swain (2011), "When and How Does Corporate Social Responsibility Encourage Customer Orientation?," European School of Management and Technology, *ESMT Technical Series* #11-05

Fombelle, Paul and Scott D. Swain (2011), "The VIP Phenomenon: The Role of Social Comparison in Status-Oriented Experiences," *Northeastern University Research & Scholarship Expo*, Boston, MA.

Hanna, Richard C., Scott D. Swain, and Jonathan D. Hibbard (2011), "Consumer Responses to Promotional Games in Social Media," *Academy of Marketing Science World Marketing Congress*, eds. Barry J. Babin and Adilson Borges, Reims, France: Academy of Marketing Science, 814.

Williams, Matthew L., Donald P. Wilson, B. Andrew Cudmore, Tinatin Kiguradze, and Scott D. Swain (2011), "Telecommuting: Impacts of Work Environment and Salary on Employee Attitude and Motivation," *17th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering, and Management Systems.

Onyemah, Vincent, Scott D. Swain, and Richard C. Hanna (2010), "A Social Learning Perspective on Sales Technology Adoption and Sales Performance: Preliminary Evidence from an Emerging Economy," *Journal*

7

*of Personal Selling & Sales Management*, 30 (2), 131-142.

Kim, Stephen K., Jonathan D. Hibbard, and Scott D. Swain (2010), "A Study of Dual Effects of Dealer Commitment under Relational Distress," *Academy of World Business Marketing and Management Development Conference*, Oulu, Finland: Academy of World Business Marketing and Management Development.

Swain, Scott D., B. Andrew Cudmore, and Jonathan D. Hibbard (2009), "Order Effects in Retail Service Encounters," *15th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: Association for Industry, Engineering and Management Systems.

Isaacson, Bruce, Scott D. Swain, and Jonathan D. Hibbard (2009), "The Use of Online Surveys in Intellectual Property Litigation," *National Advertising Division Annual Conference*, New York, NY: National Advertising Division.

Swain, Scott D., Jonathan D. Hibbard, Richard C. Hanna (2009), "Trademark Infringement: When is Similarity Confusing to Consumers?" in *Academy of Marketing Science World Marketing Congress*, eds. Victoria L. Crittenden, Linda Ferrell, and Göran Svensson: Academy of Marketing Science, 333.

Isaacson, Bruce, Jonathan D. Hibbard, and Scott D. Swain (2008), "Why Online Surveys Can Be a Smart Choice in Intellectual Property Cases," American Bar Association, *Intellectual Property Law Newsletter*, 26 (Spring), 1-15.

Swain, Scott D., Danny Weathers, and Ronald W. Niedrich (2008), "Assessing Three Sources of Misresponse to Reversed Likert Items," *Journal of Marketing Research*, 45 (February), 116-131.

Niedrich, Ronald W. and Scott D. Swain (2008) "The Effects of Exposure-Order and Market Entry-Information on Brand Preference: A Dual Process Model," *Journal of the Academy of Marketing Science*, 36 (September), 309-321.

Swain, Scott D., Tim Silk, and Laura Smarandescu (2008), "The Effect of Monetary Format on the Assignment of Windfall Income to Mental Accounts," *Proceedings of the INFORMS Marketing Science Conference*, eds. Chuck Weinberg, Darren Dahl, and Dan Putler, Vancouver, British Columbia, Canada: Institute for Operations Research and the Management Sciences, 83.

Papavasileiou, Eleni Zoi, Scott D. Swain, C.B. Bhattacharya (2008), "Consumers' Reactions to Acquisitions of Socially Responsible Companies," in *Marketing and Public Policy Conference Proceedings*, Vol. 18, eds. Ronald P. Hill, John C. Kozup, Charles R. Taylor, Philadelphia, PA: American Marketing Association.

Swain, Scott D., Laura Smarandescu, and Tim Silk (2008), "The Effect of Monetary Format on the Assignment of Windfall Income to Mental Accounts," *72nd Annual Midwest Economics Association Conference*, Chicago, IL: Midwest Economics Association.

Swain, Scott D. and Richard C. Hanna (2008), "Emulating Research Firms in the Classroom: Research Practicum Days," Excellence in Marketing Education and Innovative Teaching Track, special session "Creating Value in Marketing Courses," (Richard C. Hanna, chair) in *Proceedings of the Academy of Marketing Science Annual Conference*, eds. Steven P. Brown and Peter A. Dacin, Vancouver, British Columbia, Canada: Academy of Marketing Science, 341.

Swain, Scott D., Tim Silk, and Laura Smarandescu (2008), "The Effect of Monetary Format on the Assignment of Windfall Income to Mental Accounts," in *Proceedings of the Society for Consumer Psychology*, eds. Maria Cronley and Dhananjay Nayakankuppam, New Orleans, LA: Society for Consumer Psychology, 130-133.

Weathers, Danny, Scott D. Swain, and Jay P. Carlson (2008), "An Examination of Concreteness and Whole Number Dominance Effects on the Evaluation of Percentage Shipping Charges," in *Proceedings of the Society for Consumer Psychology*, eds. Maria Cronley and Dhananjay Nayakankuppam, New Orleans, LA: Society for Consumer Psychology, 367-368.

Swain, Scott D. and B. Andrew Cudmore (2008), "Promotional Response as Swarm Intelligence," *14th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: California State University Press, Stanislaus.

Swain, Scott D., Jonathan D. Hibbard, Richard C. Hanna, and B. Andrew Cudmore (2008), "A Signal Detection Approach for Assessing Response Biases in Consumer Confusion," *14th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: California State University Press, Stanislaus.

Miller, Brandon, Jonas Dewitte, B. Andrew Cudmore, and Scott D. Swain (2008), "Student Athlete Attitude toward Performance Enhancing Drugs," *14th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: California State University Press, Stanislaus.

Arnould Diehl, B. Andrew Cudmore, and Scott D. Swain (2008), "The Perceived Importance of an Internationally Diverse and Engaged Student Population," *14th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: California State University Press, Stanislaus.

Swain, Scott D., Danny Weathers, and Jay P. Carlson (2008), "Whole Number Dominance in Price Evaluations," in special session summary titled "Retail Pricing Strategy: Current Perspectives and Research," (Kathleen Seiders, chair), *Proceedings of the American Marketing Association's Winter Educators' Conference*, eds. Tom J. Brown and Zeynep Gurhan Canli, Austin, TX: American Marketing Association.

Swain, Scott D., Jonathan D. Hibbard, and Richard C. Hanna (2008), "Brand Name Similarity and Consumer Confusion," in *Proceedings of the Society for Consumer Psychology*, *Summer*, Boston, MA.

Bhattacharya, C.B., Daniel Korschun, and Scott D. Swain (2008), "Using Corporate Social Responsibility to Create a Stakeholder Oriented Firm," *Stakeholder Marketing Consortium: Beyond the 4 Ps and the Customer*, *Aspen Institute and the Marketing Science Institute*, Boston, MA.

Swain, Scott D. and Danny Weathers (2008), "Survey Data Equivalence: Assessment and Implications," *Eli Lilly Global Market Research Conference*, Indianapolis, IN.

Isaacson, Bruce, Scott D. Swain, and Jonathan D. Hibbard (2008), "Integrating Research Techniques for Deeper Customer Insights: Blurring Boundaries between Research Methods," *American Marketing Association – Marketing Research Conference*, Boston, MA: American Marketing Association.

Papavasileiou, Eleni Zoi, Scott D. Swain, C.B. Bhattacharya (2008), "Consumers' Reactions to Acquisitions of Socially Responsible Companies," in *Advances in Consumer Research*, Vol. 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research, 1015-1017.

Brunel, Frédéric F. and Scott D. Swain (2008) "A Moderated Perceptual Model of Product Aesthetic Evaluations," in special session titled "Consumer Response to Aesthetic Aspects of Product Design: 1-, 2-, and 3-Dimensional Perspectives" (Xiaoyan Deng and Wes Hutchinson, co-chairs) in *Advances in Consumer Research*, Vol. 35, eds. Angela Y. Lee and Dilip Soman, Duluth, MN: Association for Consumer Research, 142-145.

Brunel, Frédéric F. and Scott D. Swain (2008), "A Moderated Perceptual Model of Product Aesthetic Evaluations," in *European Advances in Consumer Research*, Vol. 8, eds. Stefania Borghini, Mary Ann McGrath, and Cele Otnes, Milan, Italy: Association for Consumer Research, 444-445.

Swain, Scott D., Tim Silk, and Laura Smarandescu (2007), "Playing the Cards: The Impact of Monetary Format on Consumer Spending," *Builders and Leaders*, Spring, 22-28.

Berger, Paul D., Richard C. Hanna, Scott D. Swain, and Bruce D. Weinberg (2007), "The Great Potential Benefits of Vertical Cooperative Advertising," *Advertising Express*, 7 (February), 7-11.

Dong, Weimin, Scott D. Swain, and Paul D. Berger (2007), "The Role of Channel Quality in Optimal Allocation of Acquisition and Retention Spending," *Journal of Business Research*, 60 (December), 1243-1252.

Swain, Scott D. and Weimin Dong (2007), "Maximizing Customer Equity when Acquisition and Retention Rate are Negatively Related," in *Marketing Advances in Pedagogy, Process, and Philosophy*, ed. Tom Baker, San Antonio, TX: Society for Marketing Advances, 77-78.

Niedrich, Ronald W. and Scott D. Swain (2007), "The Effects of Exposure-Order and Market Entry-Information on Brand Preference: A Dual Process Model," *Boston University, SMG Technical Series* #2007-16.

Swain, Scott D., Danny Weathers, and Jay P. Carlson (2007), "Partitioning Prices and Whole Number Dominance," *13th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: California State University Press, Stanislaus.

Swain, Scott D. (2007), "Consumer Responses to Product Mass," *13th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: California State University Press, Stanislaus.

Swain, Scott D., J. Daniel Wadden, and B. Andrew Cudmore (2007), "Compensation and Consumer Guilt," *13th International Conference on Industry, Engineering, and Management Systems*, Cocoa Beach, FL: California State University Press, Stanislaus.

Swain, Scott D. and Weimin Dong (2007), "Incorporating Managerial Judgment in an Extended Model of Customer Equity," Boston University, SMG Technical Series #2007-13.

Berger, Paul D., Richard C. Hanna, and Scott D. Swain (2006), "Collaborative Filtering: The Potential to Increase Advertising Efficiency," *Advertising Express*, 6 (May), 11-14.

Swain, Scott D., Weimin Dong, and Paul D. Berger (2006), "The Role of Channel Quality in Optimal Allocation of Acquisition and Retention Spending," *Boston University, SMG Technical Series* #2006-11.

Brunel, Frédéric F. and Scott D. Swain (2006), "A Two-Route Model of Product Aesthetic Evaluation," *Boston University, SMG Technical Series* #2006-09.

9

Swain, Scott D., Danny Weathers, and Ronald W. Niedrich (2006), "Misresponse to Reversed Likert Items: Acquiescence, Inattention, or Item Difficulty?," *Boston University, SMG Technical Series* #2006-12.

Swain, Scott D., Richard C. Hanna, S. Adam Brasel (2006), "Lost in Translation: Consumers' Difficulty in Estimating Expiration Time with Redemption Caps," in *Advances in Consumer Research*, Vol. 34, eds. Gavan Fitzsimons and Vicki Morwitz, Orlando, FL: Association for Consumer Research, 470-472.

Swain, Scott D., Richard C. Hanna, and Lisa J. Abendroth (2006), "How Time Restrictions Work: The Roles of Urgency, Anticipated Regret, and Deal Evaluations," in *Advances in Consumer Research*, Vol. 33, eds. Cornelia Pechmann and Linda Price, San Antonio, TX: Association for Consumer Research, 523-525.

Brunel, Frédéric F. and Scott D. Swain (2005), "The Role of Product Form in Products' Evoked Sets, Recognition, and Evaluation," in *Proceedings of the American Marketing Association's Summer Educators' Conference*, eds. Beth A. Walker and Mark B. Houston, San Francisco, CA: American Marketing Association.

Abendroth, Lisa J., Richard C. Hanna, and Scott D. Swain (2005), "Does the Past Matter? Emotional and Behavioral Responses to Missing Part of a Promotion," in *Proceedings of the Society for Consumer Psychology*, eds. Anne M. Brumbaugh and Geraldine R. Henderson, St. Pete Beach, FL: Society for Consumer Psychology, 30-31.

Hanna, Richard C., Scott D. Swain, and Lisa J. Abendroth (2004) "The Roles of Anticipated Regret and Urgency in Explaining How Discount Level and Time Restriction Affect Purchase Intentions," in *Proceedings of the American Marketing Association's Summer Educators' Conference*, ed. Kenneth L. Bernhardt, James S. Boles, and Pam Scholder Ellen, Boston, MA: American Marketing Association, 78-79.

Swain, Scott D., Richard C. Hanna, and Lisa J. Abendroth (2004), "Buying Time: The Consumer Psychology of Time Limits," *Builders and Leaders*, Fall, 26-27.

Niedrich, Ronald W. and Scott D. Swain (2003) "The Influence of Pioneer Status and Experience Order on Consumer Brand Preference: A Mediated-Effects Model," *Journal of the Academy of Marketing Science*, 31 (Fall), 468-480.

Swain, Scott D., Danny Weathers, and Ronald W. Niedrich (2003), "Effects of Negatively Worded Items on Scale Reliability and Factor Structure," in special session summary titled "Measure for (Valid) Measure: Critical Issues in Developing and Validating Multi-Item, Multi-Dimensional Consumer Psychology Measures" (Frédéric F. Brunel and Cristel A. Russell, co-chairs), in *Proceedings of the Society for Consumer Psychology*, ed. Steven S. Posavac, New Orleans, LA: Society for Consumer Psychology, 143-144.

Becker-Olsen, Karen, B. Andrew Cudmore, and Scott D. Swain (2003), "When Nice Guys Finish First: The Role of Celebrity Endorser Character and Fit on Brand Evaluations," in special session summary titled "Fitting It All Together: A Look at The Fit Construct Across Brand Extension, Sponsorship and Endorsement," (Karen Becker-Olsen, chair) in *European Advances in Consumer Research*, Vol. 6, eds. Stephen Brown and Darach Turley, Dublin, Ireland: Association for Consumer Research, 347-349.

Swain, Scott D. (2003), "Weighing Your Options: The Effect of Product Weight on Preference", in special session summary titled "Weight and Height and Shape and Size: When Do Peripheral Cues Drive Evaluation and Consumption?," (Brian Wansink and Koert van Ittersum, co-chairs), in *Advances in Consumer Research*, Vol. 30, eds. Punam Anand Keller and Dennis W. Rook, Atlanta, GA: Association for Consumer Research, 363-365. [extended abstract, presentation]

Swain, Scott D., B. Andrew Cudmore, and Karen Becker-Olsen (2003), "The Effect of Celebrities' Personal Lives on the Brands They Endorse," in *Advances in Consumer Research*, Vol. 30, eds. Punam Anand Keller and Dennis W. Rook, Atlanta, GA, Association for Consumer Research, 346-347.

Cudmore, B. Andrew, Scott D. Swain, and Karen Becker-Olsen (2002), "The Effect of Endorser Behavior on Brand Attitudes: The Moderating Role of Knowledge," in *Marketing Advances in Pedagogy, Process, and Philosophy*, ed. Beverly T. Venable, St. Pete Beach, FL: Society for Marketing Advances, 83-84.

Swain, Scott D. and B. Andrew Cudmore (2001), "When Bad is Good: The Resilience of Consumer Brand Evaluations to Negative Information about Their Celebrity Endorsers," in *Proceedings of the Academy of Business Disciplines*, eds. Eldon Little and Dave Strupeck, Ft. Meyers, FL: Academy of Business Disciplines.

Wood, Stacy L., Scott D. Swain, and J. Daniel Wadden (2001), "Consumer Perceptions of Product Parity in E-Commerce Markets," in *Advances in Consumer Research*, Vol. 28, ed. J. Meyers-Levy, Salt Lake City, UT: Association for Consumer Research, 394.

Books and chapters

ER1849

Swain, Scott D. and Colleen Kirk (2018), "Consumer Psychological Ownership of Digital Technologies," in *Psychological Ownership and Consumer Behavior*, eds. Joann Peck and Suzanne Shu, New York: Springer, 69-90.

Hanna, Richard C., Scott D. Swain, and Jason Smith (2016), *Email Marketing in a Digital World: The Basics and Beyond*, Business Expert Press, New York, NY.

Swain, Scott D. (2011), "Prize Indemnification," in *Encyclopedia of Sports Management and Marketing*, Linda E. Swayne, Mark Dodds, and J. Geoffrey Golson, eds. Los Angeles: Sage, 1187-1188.

Swain, Scott D. (2011), "Probability Sales Promotions," in *Encyclopedia of Sports Management and Marketing*, Linda E. Swayne, Mark Dodds, and J. Geoffrey Golson, eds. Los Angeles: Sage, 1190-1191.

Swain, Scott D. (2011), "Promotional Risk Management," in *Encyclopedia of Sports Management and Marketing*, Linda E. Swayne, Mark Dodds, and J. Geoffrey Golson, eds. Los Angeles: Sage, 1220-1221.

Berger, Paul D., Richard C. Hanna, Scott D. Swain, and Bruce D. Weinberg (2010), "Configurators/Choiceboards: Uses, Benefits, and Analysis of Data," in *Encyclopedia of E-Business Development and Management in the Global Economy*, In Lee, ed. IGI Publishing, 428-435.

Berger, Paul D., Richard C. Hanna, and Scott D. Swain (2007), "Collaborative Filtering: Advertising Efficiency," in *Media and Advertising Management - New Trends*, Sabyasachi Chatterjeem, ed. Hyderabad: ICFAI University Press, 105-111.

## SERVICE TO THE DISCIPLINE

Associate Editor
- *Journal of Business Research*, 2021-present
- *European Journal of Marketing*, 2017-present

Editorial Review Boards
- *Journal of International Marketing*, 2020-present
- *Journal of Business Research*, 2016-present
- *Journal of Marketing Analytics*, 2015-present
- *International Journal of Business Research*, 2017-present
- *Journal of Management and Engineering Integration*, 2016-present
- *Journal of International & Interdisciplinary Business Research*, 2016-present
- *Academy of Marketing Studies Journal*, 2017-present

Ad hoc Reviewer: Journals
- *Journal of Marketing*
- *Journal of Marketing Research*
- *Journal of Consumer Research*
- *Journal of the Academy of Marketing Science*
- *Journal of Retailing*
- *Journal of International Marketing*
- *Journal of Service Research*
- *Journal of Business Research*
- *Journal of Public Policy & Marketing*
- *Industrial Marketing Management*
- *Journal of Interactive Marketing*
- *Journal of Marketing Management*
- *Journal of Marketing Analytics*
- *Journal of Marketing Theory and Practice*
- *Strategic Management Journal*
- *Marketing Letters*
- *Journal of Marketing Communications*
- *Psychology & Marketing*
- *Journal of Environmental Psychology*
- *Eurasian Business Review*
- *Ethics & Behavior*
- *SAGE Open*
- *Operations Research*
- *Journal of Health Organization and Management*
- *Journal of Management & Engineering Integration*
- *Asian Journal of Business Ethics*
- *Substance Use and Misuse*
- *Environment, Development, and Sustainability*
- *Total Quality Management & Business Excellence*
- *Social Behavior and Personality*
- *PLoS ONE*
- *Journal of Research in Interactive Marketing*
- *Business Horizons*
- *Psychological Reports*
- *Asian Academy of Management Journal*
- *Journal of Marketing Education*

Ad hoc Reviewer: Conferences
- *American Marketing Association*
- *Association for Consumer Research*
- *Academy of Marketing Science*
- *Marketing Management Association*
- *MIT World Conference on Mass Customization & Personalization*
- *Society for Consumer Psychology*
- *Society for Marketing Advances*
- *Marketing and Public Policy*

Judge for Research Competitions and Awards
- Clemson Student Research Forum, 2022-2023
- Focus on Creative Inquiry (FoCI) Poster Forum, 2015-2023
- Journal of International Marketing, S. Tamer Cavusgil Award, 2022
- Summer CI + UR Showcase Poster Symposium, 2022
- Fulbright U.S. Student Program, 2020-2021
- Rutland Institute for Ethics, Case Competition, 2019-2020
- Innovation Week, Clemson Student Research Forum, 2018-2019
- Graduate Research and Discovery Symposium (GRADS) competition, 2015-2018
- Three Minute Thesis (3MT) Competition, 2014-2018
- Society for Marketing Advances, Doctoral Dissertation Competition, 2017
- D'Amore-McKim College of Business case competition 2010-2013

Conference Chair, Session Chair, Invited Panels
- Track Chair, "Marketing," *International Conference on Industry, Engineering, and Management Systems*, Clearwater, FL, 2019-2023
- Session Chair, "Invoking Ownership," Workshop on The Future of Ownership Research, *WU Vienna University of Economics and Business*, Vienna, Austria, 2017
- Session Chair, "Consumer Responses to Autonomous Vehicles," *BMW PhD Scholars*, 2017
- Judge, Society for Marketing Advances, Doctoral Dissertation Competition, 2017
- Discussant, "The Known and Unknown," Workshop on The Future of Ownership Research, *WU Vienna University of Economics and Business*, Vienna, Austria, 2017
- Discussant, "Closing Forum," Workshop on The Future of Ownership Research, *WU Vienna University of Economics and Business*, Vienna, Austria, 2017
- Panelist, "Teaching and Learning Creatively: Pedagogical Innovations to Stimulate Intellectual Curiosity," *American Marketing Association*, 2015
- Panelist, "Growing Theory as Junior Faculty," *Academy of Marketing Science*, 2011
- Session Chair, "Corporate Social Responsibility and Consumer Reactions," *American Marketing Association Winter Educator's Conference*, 2011
- Chair, *Boston Area Corporate Social Responsibility Colloquium*, Northeastern, 2011
- Panelist, *Corporate Social Responsibility Colloquium*, Simmons College, 2010
- Panelist, "Doctoral Student Development," *Society for Consumer Psychology*, 2008
- Discussant, "Pricing and Price Discounts" *American Marketing Association*, 2004
- Panelist, "Doctoral Roundtable: Trends in Service Research," *American Marketing Association*, 2004
- Speaker, "Ethics in Marketing Research," *Boston University Research Colloquium*, 2002

**UNIVERSITY, COLLEGE, AND DEPARTMENT SERVICE**

<u>Clemson University (2013-present)</u>

*University*
- Clemson Corps, Board of Directors 2018-present
- Academic Technology Council, 2022-present
- Graduate Academic Grievance Committee, 2023
- Council on Graduate Studies, member 2019-2022
- Council on Undergraduate Studies, member 2016-2022
- Financial Aid Advisory Committee, member 2019-2022
- Undergraduate Academic Grievance Board, Grievance Committee member, 2016-2022
- AI Research Institute for Science and Engineering (AIRISE), affiliated faculty 2020-present
- Bookstore Advisory Committee, 2021-2023
- University Grievance Board, 2020-2022
- Faculty Senator
  - Lead Senator, College of Business, 2019-2020
  - Faculty Senate Advisory Committee (steering for Senate), member 2019-2020
  - Sub-committee on Research, 2018-2020
  - Sub-committee on Finance and Infrastructure, 2017-2018
- NSF Engineering Research Center (ERC) Planning Workshop for CAN-RESIST (Computer and Network Resiliency and Security for Transportation), invited panel 2020
- Cross-Disciplinary INNO Curriculum Committee, 2018-2020
- Parking Advisory Committee, elected by Faculty Senate, 2018-2020
- Brooks Sport Science Institute (BSSI) Scholarship Committee, chair 2017-2019
- Summer School Committee, member 2018-2020
- BMW German PhD Scholars event, Faculty host and speaker 2017
- Diversity Benefits for Higher Education online course, pilot participant 2017
- International Center for Academic Integrity, advisor 2015-2016
- Library Advisory Committee, 2013-2016

*College of Business*
- College Promotion and Tenure Advisory Committee, member 2021-2023
- Association to Advance Collegiate Schools of Business (AACSB) consultant, 2023
- Faculty Retention Working Group, 2023
- Search Committee for Associate Dean of Research, 2020
- Search Committee for Garrison Endowed Professorship in Sales Innovation, chair 2020
- Honors and Awards ceremony, speaker 2017-2018
- College of Business new building committee, 2015-2016

*Department of Marketing*
- Tenure, Promotion, and Reappointment Committee, 2019-present
- Faculty Advisory Committee, 2021-present
- M.S. program steering committee, 2020-present
- M.S. Marketing program GS2 Committee, 2022-present
- Research Committee, chair, 2020-2023
- Honors Committee, 2023
- Digital Measures Task Force, lead faculty, 2020
- Department Chair Evaluation Committee, 2019, 2022
- Faculty Recruiting Committee, 2017, co-chair 2018, 2019
- Honors and Awards Committee, co-chair 2013-2019

3

- Honors Program, interim director, 2015-2016
- PhD program exploratory committee, 2015
- Tiger Paw Classic, sponsor, 2014-2015
- Marketing Industry night, host 2014-2016
- Curriculum Assessment Task Force, 2013
- AACSB AQ Criteria Task Force, 2013

Northeastern University (2009-2013)
- Member, Global Corporate Citizenship Collaborative, 2012-2013
- Member, Business Sustainability Institute, 2012-2013
- Panelist, MBA Marketing Career Track Advisory Board, 2011
- Presenter, Northeastern University Research & Scholarship Expo, 2011
- Judge, D'Amore-McKim College of Business case competition 2010-2013
- Faculty host, Freshman Business Living and Learning Community, 2011
- Faculty host, Marketing Research Corporate Roundtable, 2010-2013
- Participant, Department of Education review of Center for Emerging Markets BIE grant, 2010
- Faculty host and presenter, Marketing Group Welcome Day for students and parents, 2010-2011
- Committee member, Journal Task Force, 2010-2011
- Faculty advisor, Northeastern University American Marketing Association, 2009-2013
- Faculty search committee, 2009, 2012
- Faculty Auditor, D'Amore-McKim School of Business webpage, 2009-2013
- Early Action Admitted Student Phone-a-thon 2009-2013
- Faculty marshal, graduation ceremonies, 2009

Boston University (2002-2008)
- Academic Conduct Committee 2007-2008
- Chair, Distinguished Speaker Series, 2004-2007
- Faculty Search Committee, 2002-2008
- Research Computing and Databases Support Committee, 2006-2008
- Doctoral comprehensives, examiner 2002-2008
- Doctoral program curriculum committee 2002-2008
- Advisor, MBA marketing concentration 2004-2008
- Faculty host, School of Management Spring Open House, 2003-2007
- Faculty liaison, undergraduate marketing program, 2003-2007
- Speaker, undergraduate concentration orientation, 2006-2007
- Speaker, MBA concentration orientation, 2004-2005
- Pilot, Sakai (SMGTools) course management, 2006-2007
- Coordinator, School of Management Subject Pool 2004-2007

**ACADEMIC HONORS AND AWARDS**

- College of Business Senior Scholar Research Excellence Award, Clemson University, 2022
- University Senior Scholar Research Excellence Award, finalist, Clemson University, 2022
- Powers Distinguished Fellow (Inaugural), Clemson University, since 2021
- Best Reviewer Award, *Journal of International Marketing*, 2021
- Watt Faculty Fellow, Artificial Intelligence, 2019-2020
- Senior Scholar Research Excellence Award, nominee, College of Business, 2019
- AMA-EBSCO Annual Award for Responsible Research in Marketing, nominee 2019

4

- Outstanding Reviewer Award, *Journal of Business Research*, 2018
- Top Researcher Recognition, Board of Trustees, Clemson University, 2017-2018
- Best Paper Award (CB Track), American Marketing Association Winter Conference, 2016
- Faculty initiate, Delta Sigma Pi (professional business fraternity), 2016
- Bright Idea Award, awarded by Seton Hall and the N.J. Policy Research Organization Foundation, 2015
- Best Overall Paper Award, International Marketing Conference (MARCON), IIM-Calcutta, 2013
- Best Teacher Award, finalist College of Business, Northeastern University, 2013
- Research Grant Award (competitive), College of Business, Northeastern University, 2013
- Favorite Professor designation, Northeastern University seniors, 2012
- New Student Organization Advisor of the Year, finalist, Northeastern University, 2011
- Excellence in Teaching Award, finalist Northeastern University, 2011
- Marquis Who's Who in America, 2008
- Academic Keys Who's Who in Business Education, 2016
- Alumni Legacy Gift Teaching Recognition, Boston University, 2005, 2007
- Academy of Marketing Science Fellow, 2003
- Teaching Excellence Recognition, Honors College, University of South Carolina, 2002
- Beta Gamma Sigma (Business honor society), 2001
- Chi Delta Chi (US Veterans honor society), 2001
- AMA Fellow, Sheth-Foundation Doctoral Consortium, 1999
- Top MBA Award, University of South Carolina, 1996
- Francis M. Hipp Merit Fellowship (MBA), University of South Carolina, 1994-1996
- Outstanding Senior (Electrical Engineering), Clemson University, 1991
- Eta Kappa Nu (Electrical Engineering honor society), 1990
- Phi Kappa Phi (Interdisciplinary honor society), 1989
- Student Marshall (top 5% of juniors), Francis Marion, 1988
- Patriot Scholar (varsity soccer scholarship), 1986-1989
- William Douglas Dargan Merit Scholarship, Francis Marion, 1986-1989

### GRANTS

#### External Competitive Grants

- S.C. Sea Grant Consortium, Rapid Response to Seafood Supply Chain Vulnerabilities by Assessing Direct Marketing Options in South Carolina, 2021, 2022
- S.C. Department of Agriculture, Agribusiness Center for Research and Entrepreneurship (ACRE) Commissioner's Grant, 2019, 2020, 2021, 2022
- Verizon Foundation, teacher technology adoption, 2010, 2011
- Human Resources Policy Institute, Drexel University, corporate responsibility, 2010, 2011
- U.S. Dept. of Education, Bureau of International Education, emerging markets, 2009, 2010
- Glavin Global Program, Babson University, marketing ethics, 2009, 2010

#### Internal Competitive Grants

- Wilbur O. and Ann Powers College of Business Summer Research Grant
- Department of Marketing Summer Research Grant 2022, 2023
- Fee Committee Grant, Industry trip, Clemson University, 2022
- CI (#1469), Rivalry Lab, Clemson University, 2018-2020
- Critical Thinking (CT2) Faculty Institute, Clemson University, 2018
- Center of Excellence, digital creativity in teaching, Clemson University 2018
- CI (#841), Impact of College Athletics on University Performance, Clemson University, 2014-2016

- Clemson University, Watt Center Faculty Fellow in Artificial Intelligence, 2019-2020
- Clemson University, Fee Committee grant, Marketing Research industry trip, 2020
- Northeastern University, Dean's Grant Award, 2012-2013
- Boston University, Dean's Faculty Research Grants, 2003- 2007

## PROFESSIONAL DEVELOPMENT AND CERTIFICATIONS

- Center for Connected Multimodal Mobility (C²M²), *HBCU Partnership Conference*, 2021
- Institute for Perception, *Advertising Claims Support: Case Histories and Principles*, 2021
- National Advertising Division: *Advertising Law for Digital Campaigns*, 2021
- *Sawtooth Software European Conference*, Stockholm, Sweden, 2020
- *Cognitive Economics Conference,* Cognitive Economics Society, 2020
- *Data & Analytics Working Group* (DAWG), Clemson University, 2019-2021
- *Sawtooth Software Choice Modeling Workshop*, Orlando, FL, 2020
- *Artificial Intelligence Research Workshop*, Watt Center, Clemson University, 2019
- *2nd Annual Teaching Excellence Conference*, OTEI, Clemson University, 2019
- *Global Learning Institute,* International Virtual Exchange, Clemson University, 2019
- *6th Global Service-Learning Summit*, Inclusion and Transformation, Clemson University, 2019
- *Global Learning Institute*, Annual Conference, Clemson University, 2019
- *Teaching Symposium: Community, Technology, and Research*, Clemson University, 2019
- *Workshop on Data Science, Analytics, and Decision Making*, Clemson University, 2019
- *Study Abroad: Title IX and Health, Safety & Risk Management Training*, Clemson University, 2019
- *Sawtooth Software Choice Modeling Workshop*, Orlando, FL, 2018
- *Clemson Engineers for Developing Countries*, Student Global Outreach Symposium, 2018
- *Critical Thinking (CT2) Summer Intensive Workshop*, Clemson University, 2018
- *Global Learning Institute*, Symposium for Innovative Strategies, Clemson University, 2018
- *Sparking Creativity* (Adobe), Faculty Program Center of Excellence, Clemson University, 2018
- *Data Security & Privacy* Lawroom, Certification, 2017
- *Diversity Benefits for Higher Education*, Pilot, Clemson University, 2017
- *National Center for Faculty Development and Diversity*, mentor, 2015, 2016
- *Eliminate Campus Sexual Violence*, Lawroom, Certification, 2015
- *Innovative Educators* (Go2Knowledge), Certifications: Interactive Practices; Learning Communities; Diversity; Group Work, Motivation and Retention; Test Construction; Assessment; Metacognition; Latino Student Success, 2014
- *Collaborative Institutional Training Initiative* (CITI), Certifications:
  - Social and Behavioral Science Research, Clemson University, 2013-present
  - Responsible Conduct of Research, Drexel 2012-14; Northeastern 2012-14; Clemson, 2017-present.
- *DATIC Hierarchical Linear Modeling* Workshop, University of Connecticut, 2010
- *National Institute of Health*, OER, Northeastern University, Certification, 2009
- *Sustainability Workshop*, Center for Design & Business, Rhode Island School of Design, 2005
- *Harvard Case Teaching*, Harvard University, Course and Certification, 2003
- *Instructional Development Project*, University of South Carolina, Certification, 1998

## TEACHING

Awards and Recognition
- Best Teacher Award, finalist D'Amore-McKim College of Business, Northeastern, 2013
- Favorite Professor, Northeastern University seniors, 2012

6

- Excellence in Teaching Award, finalist, Northeastern University, 2011
- Alumni Legacy Gift Teaching Recognition, Boston University, 2005, 2007
- Teaching Excellence Award, Honors College, University of South Carolina, 2002

Mentoring and Student Outcomes
- McNair Scholars Mentor, U.S. Department of Education TRIO Program, 2021 – present
- Advised finalists in College of Engineering, Computing and Applied Sciences, Spark Challenge, 2021
- Advised 15 students who won/placed in national innovation crowdsourcing competitions, 2017-2019
- Advisor for winner of *Harvey Levenson* competition (Technical Association of the Graphic Arts), 2017
- Advisor for student teams who won 17 awards in four years at the annual AMA National Collegiate Conference: *Outstanding Collegiate Chapter Performance* (1), *Outstanding Communications* (3), *Recognition for Marketing Week Activities* (3), *Outstanding Professional Development* (3), *Outstanding Chapter Planning* (1), *Best Use of Conference Theme Exhibit* (2), *Recognition for Communication of Chapter Activity* (1), *Best Display of Chapter Activities* (2), *Outstanding Community Service* (1), 2009-2013

Dissertations, Theses, Honors Contracts, and Directed Studies
- Supervisor, B.S. honors contract, 2014 (2), 2015 (2), 2017 (2), 2018 (2), 2020 (2), 2021 (2)
- Supervisor, B.S. directed study, 2011 (2), 2014, 2015, 2017, 2018, 2019, 2020, 2022, 2023
- Chair, B.S. honors thesis, 2002, 2007, 2016
- Chair, M.S. thesis, 2005, 2011, 2013, 2015 (2), 2019 (2)
- Chair, Ph.D. dissertation, 2009
- Committee, Ph.D. dissertation, 2008 (2)

Published Instructional Materials
- Instructor's Manual, McDaniel and Gates, *Marketing Research*, 8th ed., Wiley: Hoboken
- Excel Manual, McDaniel and Gates, *Marketing Research*, 8th ed., Wiley: Hoboken
- Internet Exercises, Shimp, *Advertising, Promotion, and Supplemental Aspects of Integrated Marketing Communications*, 6th ed., The Dryden Press: Fort Worth
- Boston University Guidebooks: *Review of Descriptive Statistics & Probability*, *Inferential Statistics & Hypothesis Testing*, *Using SPSS for Marketing Research*

Courses Taught

*Dartmouth College*, Tuck School of Business (Spring 2021, Spring 2022)
- MBA: Marketing Research

*Clemson University*, Powers College of Business (2013-present)
- MBA: Entrepreneurial Marketing
- MS: Marketing Research
- UG: Marketing Research
- UG: Promotional Strategy
- UG: Advertising Strategy
- Creative Inquiry: Rivalry Lab
- Creative Inquiry: Open Innovation
- Creative Inquiry: Athletics and Academics

*Northeastern University*, D'Amore-McKim School of Business (2009-2013)
- MBA: Brand and Advertising Management
- MBA: Marketing Research
- UG: Marketing Principles

7

- UG: Advertising and Brand Promotion
- UG: Marketing Research

*Boston University*, Questrom School of Management (2002-2008)
- Doctoral: Marketing Management
- Doctoral: Mathematical Modeling
- MBA: Brand and Advertising Management
- MBA: Marketing Research
- UG: Advertising and Brand Promotion
- UG: Marketing Research

*University of South Carolina*, Moore School of Business (1998-2002)
- UG: Integrated Marketing Communications
- UG: Product Management
- UG: Marketing Research
- UG: Marketing Strategy and Planning

**OTHER WORK EXPERIENCE**

- *Strategic Research Consultant*, custom research and consulting, 1996-present
- *Expert Witness*, testimony in federal and self-regulatory venues, 2007-present
- *Officer*, United States Navy (Submarines), 1992-2000
- *Manager*, Downwind Trading, Ice Cream Parlor, Myrtle Beach, SC, 1990
- *Barback*, Ocean Dunes / Sand Dunes Resort, Myrtle Beach, SC, 1989
- *Server*, TCBY, Myrtle Beach, SC, 1988
- *Ocean Lifeguard*, City of Myrtle Beach, Myrtle Beach, SC, 1986, 1987

8

Exhibit B


Testimony in Prior Four Years

**Expert Testimony by Deposition or at Trial in the Prior Four Years**

La Potencia, LLC and YC52, LLC d/b/a Chandler Bats v. David Chandler et al. (trial)

NetEase, Inc., NetEase Information Technology Corporation, and Hong Kong NetEase Interactive Entertainment Limited, Plaintiffs and Cross-Defendants, v. Krafton, Inc. and PUBG Santa Monica, Inc., Defendants and Cross-Complainants (deposition and trial)

Ripple Analytics Inc. v. People Center, Inc. d/b/a Rippling (deposition)

Williams et al. v. Apple, Inc. (deposition)

Sundance Botanicals, LLC v. The Power of Elderberries, LLC (deposition)

Chicago Mercantile Exchange Inc. v. Ice Clear Us, Inc.; Ice Clear Europe Limited; and Intercontinental Exchange, Inc. (deposition)

Green Crush, LLC, v. Paradise Splash 1, Inc. (deposition)

The Tool Shed, Inc., v. Mattoon Rural King Supply, Inc. D/B/A Rural King Supply (deposition)

1

Exhibit C

Materials Reviewed

## Materials Reviewed

**Filings**

Complaint for 1. Federal Trademark Infringement and Unfair Competition (15 U.S.C. § 1125(A)), 2. Common Law Trademark Infringement, 3. Fraudulent Registration (15 U.S.C. § 1120), 4. Cancellation—No Bona Fide Use (15 U.S.C. § 1119), 5. Cancellation—Misrepresenting Source (15 U.S.C. § 1119), (August 4, 2023)

**Documents in the Public Domain**

Diamond, Shari S., (2011), "Reference Guide on Survey Research," *Reference Manual on Scientific* Evidence, 3rd edition, National Academies Press, 397-411.

Diamond, Shari S. (2022), "Control Foundations: Rationales and Approaches," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann.

Goodman, John (2004). Basic Facts on Customer Complaint Behavior and the Impact of Service on the Bottom Line, *Technical Assistance Research Program* (TARP).

Manual for Complex Litigation, 4th Edition, Federal Judicial Center.

Marsden, Peter V. and James D. Wright (2010), *Handbook of Survey Research* (2nd edition). Emerald Group Publishing.

McCarthy, J. Thomas (2021), § 32:163 "Survey Methodology-Approximating Market Conditions," *McCarthy on Trademarks and Unfair Competition*, 5th edition.

Singh, Jagdip (1988), "Consumer Complaint Intentions and Behavior: Definitional and Taxonomical Issues," *Journal of Marketing*, 52 (January), 93-107.

Simonson, Itamar and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Diamond*, Shari S. and Jerre B. Swann (eds.), American Bar Association.

Swann, Jerre and R. Charles Henn Jr. (2019), "Likelihood of Confusion Surveys: the Ever-Constant Eveready Format; The Ever-Evolving Squirt Format," *Trademark Reporter*, 109, 671-683.

Swann, Jerre B. (2022), "Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law Science and Design*, 2nd edition, American Bar Association, eds. Shari Seidman Diamond and Jerre Swann.

Tourangeau, Roger, Lance J. Rips, and Kenneth Rasinski (2000), *The Psychology of Survey Response*, Cambridge University Press.

**Websites and Social Media Sited Visited** (August – September 2023)

https://openai.com/gpt-4

https://open.ai/

https://www.anthropic.com/

https://www.midjourney.com/

https://www.forbes.com/sites/kenrickcai/2023/08/08/artificial-intelligence-remaking-the-cloud/?sh=5419c9fc1d39

https://news.crunchbase.com/cloud/bessemer-2023-private-cloud-startup-ranking-openai-anthropic/

https://finance.yahoo.com/news/meta-goes-ai-compete-google-214043266.html

https://www.zdnet.com/article/best-ai-art-generator/

1

https://www.simplilearn.com/tutorials/artificial-intelligence-tutorial/top-generative-ai-tools
https://www.forbes.com/sites/quickerbettertech/2022/12/13/on-crm-is-chatgpt-over-
    hyped/?sh=5a7d2f464308
https://www.weforum.org/agenda/2016/06/5-ways-artificial-intelligence-will-disrupt-science/
https://www.telegraph.co.uk/news/2023/06/14/tidybot-robot-princeton-university-tidy-room-
    laundry-ai/
https://ae.godaddy.com/blog/what-is-a-ai-domain/
https://twitter.com/itsandrewgao/status/1625597653152301057
https://twitter.com/EricCartmanTV/status/1673699808572219395
https://twitter.com/wsi_biggs/status/1673683929096699906
https://twitter.com/BlueCallom/status/1671100620411994114
https://www.google.com/search?sca_esv=567422110&q=open+ai
https://www.google.com/search?sca_esv=567422110&q=openai

2